**FILED BY** *HH* **D.C.**

*Jul 30, 2020*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 30, 2020

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  18-12663-JJ
Case Style: Otto Candies, LLC, et al v. Citigroup, Inc., et al
District Court Docket No: 1:16-cv-20725-DPG

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

## UNITED STATES COURT OF APPEALS
### For the Eleventh Circuit

_____

No. 18-12663

_____

District Court Docket No.
1:16-cv-20725-DPG

OTTO CANDIES, LLC,
CANDIES MEXICAN INVESTMENTS S. DE R.L. DE C.V.,
ASHMORE EMERGING MARKETS CORPORATE HIGH YIELD FUND
LIMITED,
ASHMORE EMERGING MARKETS DEBT AND CURRENCY FUND
LIMITED,
ASHMORE EMERGING MARKETS HIGH YIELD PLUS FUND
LIMITED,
ASHMORE SICAV EMERGING MARKETS CORPORATE DEBT FUND,
GENERAL PARTNER ASHMORE EMERGING MARKETS SPECIAL
SITUATIONS OPPORTUNITIES FUND (GP) LIMTED, et al.,

Plaintiffs - Appellants,

versus

CITIGROUP, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: July 01, 2020
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 18-12663

_____

D.C. Docket No. 1:16-cv-20725-DPG


OTTO CANDIES, LLC, et al.,

                                        Plaintiffs - Appellants,

versus

CITIGROUP, INC.,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 1, 2020)

Before JORDAN and NEWSOM, Circuit Judges, and HALL,[*] District Judge.

JORDAN, Circuit Judge:

_____

[*] Honorable James Randal Hall, Chief United States District Judge for the Southern District of
Georgia, sitting by designation.

Two American plaintiffs.  Thirty-seven foreign plaintiffs.  One American defendant.  A fraudulent scheme allegedly taking place here and in Mexico, with the American defendant allegedly engaging in fraudulent activity in the United States. Assumptions, but no evidence, about where the key documents and witnesses are located.

The district court, faced with this paradigm, granted the American defendant's motion to dismiss for *forum non conveniens*.  After reviewing the record, and with the benefit of oral argument, we reverse and remand for further proceedings.  First, the district court mistakenly gave only "reduced" deference to the American plaintiffs' choice of forum.  Second, the American defendant—which had the burden of persuasion—did not support its claims that most of the relevant documents and witnesses are located in Mexico.

## I

In reviewing a motion to dismiss for *forum non conveniens*, we accept as true the factual allegations in the complaint to the extent they are uncontroverted by affidavits or other evidence, or have not been challenged in the context of an evidentiary hearing.  We also draw all reasonable inferences in favor of the plaintiffs. *See Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988) (reviewing Rule 12(b) motions to dismiss for ineffective service of process, lack of personal jurisdiction, and improper venue).  *See also Shi v. New*

2

*Mighty U.S. Tr.*, 918 F.3d 944, 948 (D.C. Cir. 2019) (accepting the plaintiffs'
allegations of facts as true on a motion to dismiss for *forum non conveniens*); *Aguas
Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 697 (2d Cir. 2009) (explaining
that, on appeal from a *forum non conveniens* dismissal without a factual hearing, the
court accepts the plaintiff's facts as true).  The following facts are taken from the
plaintiffs' amended complaint and have not been contested by affidavits or other
evidence.  We set them out in detail because of their importance.

## A

Oceanografía S.A. de C.V., a now-bankrupt Mexican company, provided oil
drilling services to Petròleos Mexicanos S.A. ("Pemex" for short), Mexico's state-
owned oil and gas company.  Grupo Financiero Banamex S.A. de C.V. (the
"Banamex Group") is a wholly owned subsidiary of Citigroup and has its principal
place of business in Mexico.  Banco Nacional de México, S.A. ("Banamex" for
short), also based in Mexico, is a wholly owned subsidiary of the Banamex Group.
Banamex is therefore an indirect subsidiary of Citigroup.

In 2008, Citigroup established credit facilities within Banamex to provide
cash advances to Oceanografía and fund its operations with Pemex.  A division of
Citigroup based in New York, called the Institutional Clients Group, was responsible
for developing and overseeing the credit facilities, and Citigroup supervised the
entire arrangement.  In exchange for the cash advances, Citigroup charged

Oceanografía a high interest rate and obtained the right to collect repayment directly from Pemex.  Because Pemex is state-owned (and perhaps unlikely to default), Citigroup's credit facility was profitable and low risk.  Citigroup increased its cash advances on several occasions, bloating Oceanografía with debt up to half of its annual net revenues and far exceeding the value of the underlying Pemex contracts.

Citigroup was aware that Oceanografía was overleveraged because Oceanografía sent audited financial statements and documents detailing its operational and financial condition.  For each increase of the credit facility, Citigroup prepared a memorandum based on credit application forms that Oceanografía provided.  The forms included work estimates for the Pemex contracts, as well as Pemex's signed authorizations, and were supposed to be subject to Citigroup's internal review procedures.  Citigroup did not perform the review procedures, however, and granted advances knowing they were based on authorization documents with forged Pemex signatures.

Citigroup saved Oceanografía's credit forms to its internal network.  Because Citigroup and Oceanografía communicated directly through Citigroup's servers in the United States, the falsified Pemex documents and related communications are also located in the United States and are in Citigroup's possession.  Several Citigroup employees who oversaw the program and approved the cash advances are (or were) located in Miami and New York.

Citigroup knew about Oceanografía's unstable financial condition not only through the cash advance program, but also because it became intimately involved in other aspects of Oceanografía's business. Citigroup acted as the trustee and paying agent on Oceanografía's 2008 bond issuance, advised Oceanografía on plans to acquire assets, represented the company in pursuing investors, and supervised the creation of payment trusts for the benefit of its trade creditors.

In 2014, the Mexican government discovered that Oceanografía had failed to provide insurance policies for its Pemex contracts and banned it from executing new contracts with Pemex. The government then learned of the cash advance scheme and investigated further. Mexican banking regulators found that ten Citigroup employees had violated Mexican criminal laws, and Mexican authorities pursued charges against Citigroup employees for causing Banamex to violate banking laws.

The scandal began to unfold in Mexico but reverberated in the United States. It prompted Citigroup to conduct an internal review of its cash advance program, and Samuel Libnic, based in Miami as Citigroup's head of legal matters for Latin America, led the project with support from at least one other Miami-based employee. Citigroup publicly admitted that some its employees had been criminally involved in the fraudulent scheme and announced that it had terminated employees both "inside and outside" of Mexico.

The scandal also led the SEC and the Justice Department to open domestic investigations into Citigroup.  Citigroup disclosed these investigations in its SEC annual report, stating that they had "included requests for documents and witness testimony."  Several plaintiffs have now filed civil actions in the United States related to the fraudulent scheme.

## B

In this case, thirty-nine plaintiffs—two American and thirty-seven foreign—sued Citigroup (and only Citigroup) in federal court.  They claim that the fraudulent cash advances lured them into investing in or contracting with Oceanografía and that "Citigroup and/or Oceanografía" knowingly misrepresented Oceanografía's financial stability.  They assert substantive and conspiracy claims under the RICO Act, 18 U.S.C. §§ 1962(c)–(d), as well as state-law claims for fraud, aiding and abetting fraud, conspiring to commit fraud, and breach of fiduciary duty.  The plaintiffs allege that some of the misrepresentations were made during meetings in the United States, on telephone calls to and from the United States, in emails located on servers in the United States, and in written materials reviewed, revised, or approved by Citigroup personnel in the United States.

Some of the plaintiffs are shipping companies which leased vessels to Oceanografía.  They allege that Citigroup's fraudulent misrepresentations and omissions induced them to transact with Oceanografía while it was financially

6

unstable, causing them to lose substantial amounts of money on their leases.  One of those shipping lessors, Otto Candies, LLC, is a citizen of the United States and alleges that it received fraudulent communications in Louisiana.

Another group of plaintiffs comprises Oceanografía bondholders.  They claim that Citigroup's fraudulent misrepresentations and omissions induced them to purchase Oceanografía bonds issued in the United States on which Oceanografía eventually defaulted.  One of those bondholders, Waypoint Asset Management LLC, is an investment company based in the United States.  It acquired bonds in part based on allegedly fraudulent communications made in New York.

Citigroup moved to dismiss the original complaint for *forum non conveniens* or, in the alternative, under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  In response, the plaintiffs moved for limited discovery concerning factual allegations that Citigroup had made in its motion—namely, that all of the witnesses and evidence germane to the claims are located in Mexico, that the cash advance contracts were negotiated and executed in Mexico, and that none of the alleged misconduct took place in the United States.  The plaintiffs argued that Citigroup's assertions contradicted or misrepresented the allegations in the complaint or were not supported by evidence.  Citigroup opposed discovery, arguing that its grounds for *forum non conveniens* dismissal were based entirely on information in the complaint.  The district court denied the plaintiffs' motion,

concluding that the plaintiffs failed to establish good cause for discovery and that their requests were overbroad.

The plaintiffs then filed an amended complaint, and Citigroup again moved to dismiss on the same grounds. The district court heard argument and granted Citigroup's motion to dismiss for *forum non conveniens.*

## II

*Forum non conveniens*, a common law doctrine, provides that a district court has inherent power to decline to hear a case in which there is proper jurisdiction and venue. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947). It is a flexible tool, used to prevent litigation that would "establish oppressiveness and vexation to a defendant out of all proportion to [the] plaintiff's convenience" or that is unsuitable for the domestic forum because of "the court's own administrative and legal problems." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)) (alterations omitted).

Because the plaintiff's forum choice "should rarely be disturbed," *Gulf Oil*, 330 U.S. at 508, a *forum non conveniens* dismissal is subject to three conditions. First, as a threshold matter, a court should not dismiss an action for *forum non conveniens* unless there is an adequate and available alternative forum. *See Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1310–11 (11th Cir. 2001). Second, the balance of the relative private and public interests must weigh in favor of dismissal to justify

invocation of the doctrine. *See id.* Private interests include the parties' relative ease of access to sources of proof, access to witnesses, ability to compel testimony, the possibility of viewing the premises, and the enforceability of a judgment. *See Gulf Oil*, 330 U.S. at 508. Public interests include a sovereign's interests in deciding the dispute, the administrative burdens posed by trial, and the need to apply foreign law. *See id.* at 508–09. Third, the plaintiffs must be able to reinstate their suit in the alternative forum without undue inconvenience or delay. *See Leon*, 251 F.3d at 1310–11. "A defendant has the burden of persuasion as to all elements of a *forum non conveniens* motion[.]" *Id.* at 1311.[1]

With respect to the private interests, courts begin with the presumption that a domestic plaintiff has chosen a sufficiently convenient forum, and it is therefore incumbent upon the defendant "to prove vexation and oppressiveness that are out of all proportion to the plaintiff's convenience." *Id.* at 1314 (internal quotation marks and citation omitted). A defendant invoking *forum non conveniens* with respect to a domestic plaintiff therefore "bears a heavy burden in opposing the plaintiff's chosen forum." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007). The defendant must offer "positive evidence of unusually extreme

---

[1] The district court concluded that Mexico was an adequate and available alternative forum, and that the plaintiffs would not be subject to undue inconvenience or delay if they had to refile there. The plaintiffs do not challenge these conclusions on appeal, so we do not address them further.

circumstances," and the district court must be "thoroughly convinced that material injustice is manifest before exercising any such discretion as may exist to deny a United States citizen access to the courts of this country." *SME Racks, Inc. v. Sistemas Mecánicos Para Electrónica*, 382 F.3d 1097, 1101 (11th Cir. 2004) (quoting *Burt v. Isthmus Dev. Co.*, 218 F.2d 353, 357 (5th Cir. 1955)).

Foreign plaintiffs are also entitled to a presumption in favor of their forum choice, albeit a presumption that "applies with less force." *Sinochem Int'l*, 549 U.S. at 430 (quoting *Piper Aircraft*, 454 U.S. at 255–56). Reduced deference is "not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for *forum non conveniens* is the exception rather than the rule." *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 45–46 (3d Cir. 1988) (citation omitted). *Accord R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 168 (2d Cir. 1991).[2]

We review a *forum non conveniens* dismissal for abuse of discretion, recognizing that a district court has wide latitude to assess the relevant private and public interest factors. *See Piper Aircraft*, 454 U.S. at 257. We may reverse when the district court makes a clear error of judgment or applies the wrong legal standard,

---

[2] The initial presumption is an important mooring for an otherwise flexible doctrine. *See Simon v. Republic of Hungary*, 911 F.3d 1172, 1182 (D.C. Cir. 2018) ("The *forum non conveniens* doctrine comes with ground rules. The starting point is a strong presumption in favor of the plaintiff's choice of the forum in which to press her suit."); 14D Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, & Richard D. Freer, Federal Practice and Procedure § 3828 (4th ed. 2013) ("Without knowing the level of deference to accord the plaintiff's choice of forum, it is not clear how one would assess whether the *Gulf Oil* factors outweigh the plaintiff's choice.") (italics added).

such as an incorrect presumption regarding the plaintiff's forum choice.  *See SME Racks*, 382 F.3d at 1102 (reversing *forum non conveniens* dismissal because the district court "failed to articulate the relevant standards and failed to apply any presumption in its analysis").

## III

Before assessing the private and public interest factors in this case, the district court acknowledged that the two American plaintiffs ordinarily would be entitled to a strong presumption in favor of their forum choice, whereas the remaining thirty-seven foreign plaintiffs would not be entitled to the same level of deference.  But because all the plaintiffs had decided to invest in Oceanografía, a Mexican company doing business in Mexico, the district court determined that the plaintiffs could not "feign surprise at potentially having to litigate a resulting dispute in Mexico."  It therefore applied only a "reduced" deference to the two domestic plaintiffs' forum choice, just as it did for the foreign plaintiffs.  This, we conclude, was incorrect.

## A

The deference owed to the forum choice of domestic plaintiffs cannot be reduced solely because they chose to invest in a foreign entity and may have expected to litigate abroad on certain matters.  Neither the Supreme Court nor the Eleventh Circuit has adopted a "foreign investment" standard, and such a rule would be in tension with existing precedent.  After all, "the central purpose of any *forum*

*non conveniens* inquiry is to ensure that the trial is convenient[.]" *Piper Aircraft*, 454 U.S. at 256. *See also King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1383 (11th Cir. 2009) ("[T]he appropriate inquiry is indeed convenience.").

A court begins with the reasonable assumption that "[w]hen the plaintiff has chosen the home forum . . . this choice is convenient." *Piper Aircraft*, 454 U.S. at 255–56. That a plaintiff invested in a foreign entity or country does not mean that the chosen domestic forum will be inconvenient, or even that it should be presumed to be inconvenient. It is possible that the most significant events giving rise to the plaintiff's claims took place in the United States or that most of the relevant documents or witnesses would be located here, even though foreign investment is involved. *See* 14D Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, & Richard D. Freer, Federal Practice and Procedure § 3828 (4th ed. 2013) ("In some instances, controversies that at first blush appear to be foreign actually have a meaningful connection with the United States or its domestic policies because there have been relevant transnational contacts."). In short, investment in a foreign entity or country alone is not enough to dilute the threshold presumption that an American citizen has chosen the most convenient forum. And—except where there is a valid forum-selection clause, *see Atl. Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 63 (2013)—the plaintiff's reasonable expectations are beside the point.

We acknowledge that at least one case supports the proposition which the district court applied and which Citigroup now urges us to adopt.  In *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 78 (D.D.C. 2017), the district court discounted the presumption in favor of the forum choice of domestic plaintiffs because their decision to invest abroad "put them on notice that they might be required to litigate disputes in a foreign forum," such that litigation abroad was "reasonably foreseeable."  Nevertheless, the court ultimately denied the defendants' motion to dismiss for *forum non conveniens*.  *See id.* at 83.

In our view, the district court in *EIG* misread prior cases in deducing a broad rule that "plaintiffs involved in disputes arising from international commerce receive less choice-of-forum deference than plaintiffs engaging in domestic transactions." *Id.* at 78 (citing *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 795 (5th Cir. 2007), *Intec USA, LLC v Engle*, 467 F.3d 1038, 1040 (7th Cir. 2006), and *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000)).  Of the cases relied on by the district court in *EIG*, the Fifth Circuit's decision in *DTEX* is the only one arguably on point, and even that case did not reduce the deference given to the domestic plaintiff's forum choice solely because of foreign investment.[3]

---

[3] The two other cases cited in *EIG* are not on point.  The Second Circuit in *Guidi* reversed a *forum non conveniens* dismissal in part because the "failure to grant [the plaintiff's] choice of an American forum significant deference was unsound."  224 F.3d at 146.  The Seventh Circuit in *Intec USA* offered some thoughts about *forum non conveniens* and expressed "doubt" that the threshold deference "has controlling force in litigation among firms all of which trade worldwide,"

In *DTEX*, the operative fact was not that the plaintiff did business with a foreign entity, but that it sued for an "injury occurring in a foreign country" and that the "alleged torts all occurred in Mexico." 508 F.3d at 795, 802. This is an important distinction, and one that appears in other international commerce cases.

For example, in *Sussman v. Bank of Israel*, 801 F. Supp. 1068 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993), the district court explained that "[w]here an American plaintiff chooses to invest in a foreign country *and then complains of fraudulent acts occurring primarily in that country*, the plaintiff's ability to rely upon citizenship as a talisman against *forum non conveniens* dismissal is diminished." *Id.* at 1073 (emphasis added). In that case, the plaintiffs invested in an Israeli financial institution, alleged that they were defrauded "in Jerusalem" by the Israeli defendants, and "[a]ccording to [the] plaintiffs' theory, it was in Israel that the defendants hatched their illegal scheme," notwithstanding some "peripheral" activities in the United States. *See id.* at 1071, 1074. Given these allegations, the plaintiffs' citizenship and residence "d[id] not constitute the powerful, near-decisive factors for which they contend[ed]," although the ultimate burden of persuasion still rested with the defendant. *See id.* at 1074. *See also Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944, 951 (1st Cir. 1991) (because the "relevant events" surrounding

---

but it ultimately vacated the *forum non conveniens* dismissal because the district court lacked subject-matter jurisdiction. *See* 467 F.3d at 1040, 1044.

the plaintiff's claims took place in Canada, it was "not surprising" that most of the documents and witnesses were in Canada as well); *Reid-Walen v. Hansen*, 933 F.2d 1390, 1395 (8th Cir. 1991) ("When an American corporation doing extensive foreign business brings an action for injury occurring in a foreign country, many courts have partially discounted the plaintiff's United States citizenship.").  The rule described in cases like *Sussman* is therefore narrower and more nuanced than the one which Citigroup asks us to adopt.

As Citigroup acknowledges, moreover, neither the Supreme Court nor the Eleventh Circuit has squarely addressed whether it would be appropriate to reduce deference to a domestic plaintiff's forum choice in cases like *Sussman*.  Nor have we considered whether some form of intermediate deference is ever permissible for American plaintiffs.  *Compare Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1228 (9th Cir. 2011) (rejecting intermediate deference), *with Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (establishing "sliding scale" deference).

We need not answer those questions here.  Although Citigroup vigorously argues that the claims here "arise from" foreign business dealings, the plaintiffs do not complain of conduct or injuries occurring primarily in Mexico.  Taking the plaintiffs' allegations as true, Citigroup directed a scheme and engaged in acts in furtherance of that scheme from the United States, where it is based.   The

15

Institutional Clients Group was responsible for administering the allegedly fraudulent cash advance program from New York.  Several employees involved in the alleged fraud were based in New York or Miami.  And several of the allegedly fraudulent communications occurred in meetings on United States soil or in emails or calls directed to or maintained in the United States.  As we read the complaint, this is a dispute focused on Citigroup's conduct in the United States, and so one would presume—at least initially—that a trial here would be more convenient (or would at least not be inconvenient).

Citigroup argues that the fraud against the plaintiffs was really perpetrated by Mexican entities in Mexico.  But Citigroup did not present any evidence to support this contention, and its argument mischaracterizes the complaint, the thrust of which is, again, that Citigroup directed the scheme and caused the plaintiffs' injuries from its offices in the United States.  Accepting that Banamex and Oceanografía were key players in the scheme, the plaintiffs still allege that the Institutional Clients Group "developed and oversaw" the credit facility program, approved fraudulent credit applications with knowledge of the risks, and circumvented internal review procedures—all in the United States.

Citigroup points to obscurities in the complaint regarding who committed certain acts, noting that the plaintiffs frequently allege that Citigroup "and/or" Oceanografía made fraudulent misrepresentations.  Citigroup argues that the more

specific allegations in the complaint confirm that Oceanografía and its controlling shareholder, Amado Yáñez, made "nearly all of the alleged misrepresentations." With respect to the domestic plaintiffs, Citigroup points out that they allege that "Mr. Yáñez and/or other Oceanografía principals traveled on dozens of occasions to Louisiana" to make the fraudulent misrepresentations to Otto Candies. Citigroup also submits that Waypoint's claims are "overwhelmingly directed towards" Oceanografía and Mr. Yáñez.

These points have some force, but the complaint's primary allegations are about Citigroup's involvement in the scheme *qua* administrator and supervisor. And, as Citigroup concedes, there are allegations in the complaint that Citigroup communicated directly with some of the plaintiffs in the United States. For example, the plaintiffs allege that Citigroup and Otto Candies discussed over email the mechanics of the cash advance facility and that Citigroup misrepresented Oceanografía's financial situation in those communications. The plaintiffs also allege that Citigroup misrepresented Oceanografía's financial situation to other plaintiffs and, for example, induced them to renegotiate their loans with Oceanografía. Citigroup's response is that the specific allegations about its conduct are not relevant to the causes of action and therefore immaterial to the *forum non conveniens* analysis. For reasons we explain later, however, we have no basis at this stage to assess which allegations are material and which are superfluous.

Significantly, the plaintiffs chose to sue Citigroup—and no one else—for its alleged role in the fraud.  They did not sue Mexican nationals—Banamex or Oceanografía, or their respective employees or agents—who *according to Citigroup* caused their injuries.  We take no position on Citigroup's alternative grounds for dismissal under Rules 9(b) and 12(b)(6), but we note that when Citigroup argues for *forum non conveniens* dismissal because the complaint "directly implicate[s] an alleged fraud carried out by Mexican nationals in Mexico," it improperly assumes that it did not carry out the fraud.  This is an argument on the merits, and not necessarily on whether the facts *as alleged* should be litigated in the United States.

Admittedly, it can sometimes be difficult to disentangle the merits of a complaint from a *forum non conveniens* inquiry.  Whoever is ultimately responsible for the plaintiffs' alleged injuries may be a strong indicator of where the most convenient forum is.  If Citigroup is correct that in the end only the Mexican entities can be liable, then the plaintiffs should have sued those entities instead, in which case Mexico would have been the presumptively most convenient forum.  But, again, the plaintiffs sued Citigroup, and not the Mexican entities.  *Cf.* 7 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1623 (3d ed. 2019) (explaining that plaintiffs may sue one or more joint tortfeasors without joining others, and need not join every coconspirator if joinder is not feasible).  If, on the other hand, the plaintiffs are correct that Citigroup is

18

independently liable for its alleged role in overseeing, directing, or participating in the scheme, then presumably the United States would be the most convenient forum. Because at this stage we accept the complaint's allegations as true, we determine the applicable presumption from the plaintiffs' perspective, and not Citigroup's. *See Delong Equip.*, 840 F.2d at 845; *Shi*, 918 F.3d at 948.

Even as the parties quarrel over the nature of the complaint and the locus of events, there remains an elephant in the room—Citigroup.  It is the only defendant in this case, and it is based in the United States.  Not only that, it has offices in Miami and conducts substantial activities throughout the United States, including New York—where the Institutional Clients Group is based.  One would therefore think that it would be more convenient for Citigroup to litigate in the Southern District of Florida than in Mexico.

This is yet another reason to leave the presumption for the plaintiffs' chosen forum in place and require that Citigroup demonstrate—with positive evidence— why litigating on its home turf would be so oppressive and vexatious that a federal court should decline jurisdiction.  When an American plaintiff sues an American defendant for conduct allegedly occurring in the United States, it should not be easy for the defendant to obtain a *forum non conveniens* dismissal.  *See, e.g., Galustian v. Peter*, 591 F.3d 724, 732 (4th Cir. 2010) (providing greater deference in favor of a domestic forum where "the defendant is a resident and citizen of the forum he

seeks to have declared inconvenient for litigation"); *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir. 1996) (in weighing the *Gulf Oil* factors, "the court starts with a presumption in favor of the plaintiff's choice of forum, especially if the defendant resides in the chosen forum, as here"); *Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 608 (3d Cir. 1991) ("This case is puzzling in that frequently the *forum non conveniens* issue is raised by a defendant sued away from home who seeks to convince the court that the balance of relevant factors should be tipped against requiring it to defend in a forum far from its home jurisdiction."). *Cf. Piper Aircraft*, 454 at 256 n.24 (citing *Pain v. United Techs. Corp.*, 637 F.2d 775, 797 (D.C. Cir. 1980), for the proposition that "citizenship and residence are proxies for convenience").

**B**

We now turn to Citigroup's argument that "where foreign plaintiffs significantly outnumber domestic plaintiffs, diminished deference should be applied to all of the plaintiffs' forum choice." Appellee's Br. at 17. Though addressed preemptively by the plaintiffs in their initial brief, the district court did not reduce deference to the American plaintiffs based on the presence of foreign plaintiffs. It was only because the American plaintiffs invested in a foreign entity that the district court discounted the initial deference and placed them on par with their foreign counterparts. Because that was error, the district court on remand will need to afford

the requisite deference to the American plaintiffs.  It will then have to deal with a mixed group of foreign and domestic plaintiffs, potentially turning Citigroup's argument into a live issue.  We therefore provide a few observations.

We have not found any cases holding that reduced deference to American plaintiffs is warranted when they sue alongside foreigners, but we have located a couple that state the opposite.  In *Carijano*, 643 F.3d at 1228, the Ninth Circuit rejected the argument that *Piper Aircraft* stands for the proposition that "when both domestic and foreign plaintiffs are present, the strong presumption in favor of the domestic plaintiff's choice of forum is somehow lessened."  And in *Simon*, 911 F.3d at 1183, the D.C. Circuit explained that "the addition of foreign plaintiffs does not render for naught the weighty interest of Americans seeking justice in their own courts."  Citigroup cites two unpublished district court cases in support of its argument, but neither is convincing.[4]

---

[4] In *Takiguchi v. MRI Int'l, Inc.*, No. 2:13-cv-01183, 2015 WL 6661479, at *3 (D. Nev. Oct. 29, 2015), the plaintiffs were entitled to limited deference not because the foreign plaintiffs outnumbered the American plaintiffs, but because the latter conceded that they were actually residents of Japan and Canada, and that one was a resident of Texas (not of Nevada, where the district court was located).  The district court, in any event, denied the motion to dismiss for *forum non conveniens*.

In *Fasano v. Juoqing Li*, No. 16-cv-8759, 2017 WL 6764692, at *6 (S.D.N.Y. Dec. 29, 2017), *vacated and remanded sub nom., Fasano v. Yu Yu*, 921 F.3d 333 (2d Cir. 2019), the district court stated that "[b]ecause the foreign plaintiffs outnumber the domestic plaintiff, and because their financial interest in the action is much greater than the domestic plaintiff's interest, the Court accords diminished deference to Plaintiffs' choice of forum."  But the *Fasano* district court did not cite any cases in support of that proposition, and its decision was vacated and remanded for failure to consider a forum selection clause in the contract at issue.

21

There also does not appear to be any practical or doctrinal basis to reduce deference to domestic plaintiffs who sue alongside foreign plaintiffs, particularly when they all sue a single American defendant for conduct that they allege occurred in the United States.   For one, the presence of foreign plaintiffs does not change the otherwise domestic nature of a complaint—here, that Citigroup committed wrongs in or from the United States, where it is based.   *Cf. In re Air Crash Off Long Island, N.Y., on July 17, 1996*, 65 F. Supp. 2d 207, 217 (S.D.N.Y. 1999) (acknowledging that "the presence of foreign plaintiffs (who chose to sue in the United States) [did] not change the essentially American character of [the] case, which involve[d] a flight originating in the United States, a United States carrier, United States manufacturing defendants, and predominantly United States domiciliaries as passengers").

In addition, the purpose of *forum non conveniens* is to prevent the defendant from facing harassing and vexatious litigation out of all proportion to the plaintiffs' convenience.   From Citigroup's perspective, then, the presence of numerous foreign plaintiffs may not make the case more difficult to litigate in the United States. Citigroup may wish to take numerous depositions because of the sheer number of plaintiffs, but that would be true if there were thirty-nine American plaintiffs.   What is significant for our purposes is that the presence of foreign plaintiffs would not necessarily lead to unwarranted burdens or additional travel for Citigroup to depose those plaintiffs.   The district court has broad discretion over the location of

depositions, *see DeepGulf, Inc. v. Moszkowski*, 330 F.R.D. 600, 609 (N.D. Fla. 2019) (collecting cases), and the general rule is that plaintiffs are required to make themselves available for examination in the district in which they bring suit. *See* 8A Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice and Procedure § 2112 (3d ed. 2010) (collecting cases). At the same time, the foreign plaintiffs will not be able to drag Citigroup to all corners of the globe to take corporate depositions, as there is a presumption that a defendant will be deposed in the district of its residence or principal place of business. *See DeepGulf*, 330 F.R.D. at 607 (collecting cases). All else being equal, the ratio of domestic to foreign plaintiffs does not necessarily have a bearing on Citigroup's convenience.[5]

There may be instances of blatant gamesmanship—for example, where a domestic plaintiff is added at the eleventh hour to strengthen the other plaintiffs' connections to the United States—such that reduced deference may be appropriate for all the plaintiffs. *See Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 694–96 (9th Cir. 2009). But at this juncture, we see no evidence of improper forum shopping. Indeed, it would be ironic to fault the foreign plaintiffs for their willingness to travel to the United States to sue Citigroup in its country of citizenship.

---

[5] We say "necessarily" because at this point Citigroup has not put forward any evidence to the contrary.

23

Rather than reduce or enhance the deference owed to domestic or foreign plaintiffs, some courts have conducted a separate *forum non conveniens* analysis for each group.  A bifurcated analysis may be appropriate, for example, where foreign and domestic plaintiffs filed separate lawsuits that were consolidated for administrative purposes, or where parties can be dropped or claims can be severed under Rule 21.  *See Kolawole v. Sellers*, 863 F.3d 1361, 1372 (11th Cir. 2017); *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1335 (11th Cir. 2011); *King*, 562 F.3d at 1383–84; *Banco Latino v. Gomez Lopez*, 17 F. Supp. 2d 1327, 1333 (S.D. Fla. 1998).

We leave it to the district court to determine whether a bifurcated analysis is permissible or warranted in this case once the domestic and foreign plaintiffs are afforded their appropriate deference on remand.  But we note that—procedural issues aside—a split analysis might be problematic in some respects.  If the domestic plaintiffs are permitted to move forward in the district court, then dismissing the foreign plaintiffs would force Citigroup to defend against two actions (assuming the foreign plaintiffs refile in Mexico).  That could defeat the purpose of *forum non conveniens*, particularly if the parties intend to rely on the same documents and witnesses in both countries.  *See In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 370 (S.D.N.Y. 2002) (declining to dismiss a foreign plaintiff with no *bona fide* connection to the chosen forum because the domestic plaintiffs in the consolidated action were permitted to move forward, and therefore

the bulk of evidence would already be in the United States).   Then again, this potential problem would be moot if the claims of the domestic plaintiffs are dismissed for *forum non conveniens*.   These matters are for the district court to consider on remand.

Finally, we address and reject Citigroup's argument that the two American plaintiffs are only "nominal" litigants entitled to reduced deference.   The district court found that these two plaintiffs were American citizens for purposes of its *forum non conveniens* analysis and said no more about whether their role in the lawsuit was legitimate.   There has not been discovery on this issue and there is no evidence that these entities are not real parties-in-interest or that they otherwise lack standing to assert their claims.

## C

In sum, it was inappropriate for the district court to discount or reduce the deference owed to the chosen forum of the American plaintiffs based on their decision to invest or transact business abroad.   Nor was there any other reason to deviate from the normal rule that an American plaintiff suing in the United States is presumed to have chosen the most convenient forum.   A remand is therefore warranted.   *See SME Racks*, 382 F.3d at 1102 (reversing a *forum non conveniens* dismissal due to the district court's failure to afford the proper deference owed to domestic plaintiffs).

Our decision today does not guarantee that plaintiffs can avoid *forum non conveniens* dismissal by making vague allegations, or by strategically joining foreign plaintiffs together with domestic ones and suing a single domestic defendant. The plaintiff-friendly, facial reading of the complaint leads only to an *initial* presumption. That presumption is not dispositive, and a defendant can always marshal positive evidence to overcome it. *See, e.g., Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1449 (9th Cir. 1990) ("Although a defendant must meet an almost impossible burden in order to deny a citizen access to the courts of this country, the cases demonstrate that defendants frequently rise to the challenge.") (internal quotation marks and citation omitted). Citigroup had the opportunity to engage in limited discovery related to *forum non conveniens* and to present evidence in support of its motion. But, as explained below, Citigroup opposed discovery and failed to carry its burden.

## IV

We now consider the *Gulf Oil* private and public interest factors. Although the district court had wide latitude to weigh the evidence and determine whether those factors pointed clearly toward dismissal, the threshold error on the deference owed to the domestic plaintiffs tainted its analysis. The error in effect switched the burden of persuasion and allowed Citigroup to obtain a *forum non conveniens* dismissal without presenting any evidence on these factors.

26

As noted earlier, Citigroup bore the burden of persuasion on all elements of its *forum non conveniens* motion. *See Leon*, 251 F.3d at 1311. A strong presumption in favor of the American plaintiffs should have forced Citigroup to offer "positive evidence of unusually extreme circumstances" and "material injustice" to oust those plaintiffs from their chosen domestic forum. *See SME Racks*, 382 F.3d at 1101 (quoting *Burt*, 218 F.2d at 357). Yet Citigroup opposed discovery and offered no evidence on the private interest factors.

The district court also erred with respect to the foreign plaintiffs. Even though they were entitled to "somewhat" less deference than their domestic counterparts, that lesser degree of deference should not have removed Citigroup's burden entirely. By failing to proffer *any* positive evidence of private inconvenience, Citigroup failed to carry its burden as to both the domestic and foreign plaintiffs.

## A

We begin with *Piper Aircraft*, which involved only foreign plaintiffs and therefore established the floor of a defendant's *forum non conveniens* burden. That case arose from a plane crash in Scotland. *See* 454 U.S. at 238–39. The plane was subject to Scottish air traffic control and operated through a Scottish air taxi service, and the pilot and passengers were all Scottish subjects and residents. *See id.* at 239. The Supreme Court held that, under these circumstances, the defendant's burden to demonstrate private inconvenience was not particularly heavy; the defendant was

not required to "submit affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum." *Id.* at 258. At the same time, the defendant was required to "provide enough information to enable the [d]istrict [c]ourt to balance the parties' interests." *Id.* The Supreme Court did not explain what would constitute "enough" information, so it is useful to examine the facts and history of the case to better delineate its holding.

Before the case reached the Supreme Court, the Third Circuit had reversed the district court's dismissal for *forum non conveniens*, concluding that the defendant did not "set[ ] forth the requisite specific information" of private inconvenience. *See Reyno v. Piper Aircraft Co.*, 630 F.2d 149, 161 (3d Cir. 1980), *rev'd*, 454 U.S. 235 (1981). But the district court had in fact relied on affidavits, including one that attested to the defendant's witnesses and their testimony on certain topics, albeit in broad strokes. *See Piper Aircraft*, 454 U.S. at 259 & n.27. The relevant affidavit did not identify witnesses by name, but offered general categories of witnesses—for example, by occupation or by role in the incident in question—as well as some expected topics of testimony. *See id. See also* Petition for Writ of Certiorari, *Piper Aircraft Co. v. Reyno,* Nos. 80-848 & 80-883 (filed Nov. 25, 1980), at Ex. F (Affidavit of Charles J. McKelvey). On that record, the Supreme Court held that "sufficient information was provided" to allow the district court to assess the relevant interests. *See Piper Aircraft*, 454 U.S. at 258–59. We therefore do not read

28

*Piper Aircraft* as holding that any less information would have sufficed under the circumstances.[6]

When American plaintiffs sue in federal court, the defendant's burden is heavier. As we have long held, a defendant must come forward with "positive evidence of unusually extreme circumstances" such that the district court is "thoroughly convinced that material injustice is manifest before exercising any such discretion as may exist to deny a United States citizen access to the courts of this country." *SME Racks*, 382 F.3d at 1101 (quoting *Burt*, 218 F.2d at 357).[7]

---

[6] The affidavit provided, for example, that the defendant "would call as witnesses the owners and employees of the Scottish air-taxi company which owned and operated the aircraft and hired the pilot," that their testimony "would concern the cause of and liability for this accident," and that all "such persons are residents and citizens of Scotland." The affidavit also provided that the defendant "would call as witnesses the persons who were responsible for the training and licensing of the pilot of this aircraft," that their testimony "would concern the cause of the accident and the liability thereof," and that those witnesses also were residents and citizens of Scotland. The affidavit continued like this for five categories of witnesses. *See* Petition for Certiorari, *Piper Aircraft Co. v. Reyno*, Nos. 80-848 & 80-883 (filed Nov. 25, 1980), at Ex. F.

[7] For cases reversing *forum non conveniens* dismissals because the defendant failed to proffer sufficient evidence in light of the circumstances of the case, see *Lacey*, 862 F.2d at 44 (holding that the evidence was insufficient because the defendants "submitted no evidence to support their contentions," whereas the plaintiff produced a report that the cause of a crash was a defective product manufactured in the United States, and submitted affidavits "that various witnesses on the product liability issue are located in Pennsylvania and throughout the United States and are available to testify here"), and *Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1550 (5th Cir. 1991) (rejecting bare allegations of private inconvenience and holding that "in order to fulfill the requirements of *Gulf Oil*, a more detailed presentation must be made by the defendants concerning the private interest factors").

For cases holding that there was sufficient evidence of inconvenience, see *Interface Partners Int'l Ltd. v. Hananel*, 575 F.3d 97, 105 (1st Cir. 2009) (affirming *forum non conveniens* dismissal where the defendant "adequately identified the twenty-nine witnesses he intend[ed] to call in the proceedings[,] . . . indicated the relevance of at least ten" of those witnesses, and offered "affidavits from those ten" witnesses that they would testify to "various facts disputing the allegations of misconduct asserted"), *Delta Air Lines, Inc. v. Chimet, S.p.A.*, 619 F.3d 288, 300 (3d

We have not set out strict rules on what constitutes "unusually extreme circumstances," and it probably does not make sense to do so. That is because the quantum and quality of evidence needed will depend on the unique facts and circumstances of the given case. *See, e.g., Lacey*, 862 F.2d at 44 (holding that "on the particular facts of this case, the defendants did not submit sufficient information to allow the district court properly to undertake the *forum non conveniens* analysis"). In complex commercial cases—with elaborate legal claims and allegations involving transnational communications, or with multiple international and domestic parties— the locus of events may be difficult to pinpoint.

## B

Because this is a complex commercial dispute with domestic and foreign plaintiffs, Citigroup should have offered some evidence of inconvenience and certainly no less than what the defendant provided in *Piper Aircraft.* After a thorough review of the record, we find very little if any positive evidence of Citigroup's inconvenience, especially regarding the location of documents and witnesses.

Cir. 2010) (affirming a *forum non conveniens* dismissal because the defendant "identified the witnesses it intended to depose and proffered in oral argument the information that it expected to obtain"), and *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 610 (10th Cir. 1998) (holding that the defendants, who "c[a]me forward with documentary evidence," offered the "bare minimum of evidence necessary," although the court "certainly would have benefitted from additional evidence in the record").

In its *forum non conveniens* motion, Citigroup argued that "key individuals identified in the [amended complaint] that would be critical to Citigroup's defense include former Banamex employees located in Mexico."  But it did not identify any of the former Banamex employees by name or position, attest to their residence in Mexico with affidavits, anticipate the basic topics of their testimony, or explain how these unidentified witnesses would be critical to its case.  Citigroup also asserted that its defense would be based on corporate and banking records and communications in Mexico, including documents belonging to Citigroup's alleged Mexican co-conspirators.  Again, however, it did not identify these documents, generally or specifically.  Citigroup also speculated—again without details or evidence—that "[t]here is no reason to doubt that equally critical witnesses from [Oceanografía] and Pemex . . . are also located in Mexico."

The plaintiffs, on the other hand, allege that Citigroup employees involved in the cash advance program are in the United States and identify some of these employees by name.  The plaintiffs also refer to Citigroup's public statement that it fired individuals involved in the fraud both "inside and outside" of the United States. We not only accept these allegations as true at this stage, we also draw from them appropriate reasonable inferences.  *See Delong Equip.*, 840 F.2d at 845; *Shi*, 918 F.3d at 948.  One reasonable inference is that these domestic witnesses have material information and are available or subject to compulsory process in the United States.

Citigroup made some factual assertions in its motion, but it did so by either misconstruing the complaint or by contradicting the plaintiffs' allegations without discrete evidentiary support.  For example, Citigroup argued that "Mexico is where the cash advance contracts were negotiated and executed," which implies that material evidence will be located there.  The paragraph of the complaint to which Citigroup cited, however, alleges that "Citigroup, through Banamex, and Oceanografía entered into a Cash Advance Contract in September 2012."  Nowhere do the plaintiffs allege that the cash advance program was negotiated and executed exclusively in Mexico.  Indeed, they sought discovery on that very point (and others).  Citigroup may be correct, but it had the burden to rebut the plaintiffs' allegations on these matters with positive evidence.  No evidence, by definition, is an absence of positive evidence.

Even if we were to accept its unsupported factual claim that the cash advance program was negotiated and executed in Mexico, Citigroup did not rebut the plaintiffs' plausible allegations that it would have collected and stored the relevant documents during the SEC and Justice Department investigations.  The plaintiffs, we note, allege that a Citigroup employee in Miami led an internal audit into the cash advance program.  Citigroup did not contest this factual allegation with an affidavit from a corporate representative or otherwise explain why documents from that audit would not be available in the United States.

Citigroup argued below that "Mexico is where [Oceanografía's] alleged falsification of Pemex work estimates and authorizations took place." This may be true, but the plaintiffs allege that the ordinary business practice was for Oceanografía to send those work estimate documents to Citigroup in the United States. Based on this unrebutted allegation, it is not clear why Citigroup does not already have—or could not easily access—the allegedly falsified work estimates and authorization documents, even if they were originally created in Mexico. The plaintiffs also plausibly allege that Citigroup controls all the email servers of its subsidiaries, including Banamex, from the United States. Given the absence of evidence to the contrary, it should be relatively easy for Citigroup to access the relevant documents from those servers. If that is not so, Citigroup should explain why not. *See Simon*, 911 F.3d at 1186 (explaining that "[d]igitization . . . has eased the burden of transcontinental document production and has increasingly become the norm in global litigation"); Maggie Gardner, *Retiring Forum Non Conveniens*, 92 N.Y.U. L. Rev. 390, 414 (2017) (arguing that, because of modern technology and digitization, "transnational evidence collection is far less burdensome today than it was even at the time of *Piper*," such that the defendant's burden of proving hardship should be harder to meet).

Citigroup's contentions about the location of key evidence and witnesses may well be plausible. They may even be correct. But Citigroup failed to support those

contentions with positive evidence on the *Gulf Oil* private interest factors, and therefore failed to carry its burden.[8]

**C**

Citigroup makes a more sweeping argument on appeal.  It contends that the district court viewed the complaint as a whole and reasonably concluded that the relevant evidence would be in Mexico.  Citigroup relies on *Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003), for the proposition that district courts must analyze the elements of the plaintiffs' causes of action, consider what evidence is required to

---

[8] Citigroup did provide some positive evidence at the *forum non conveniens* stage, but its evidence did not speak to the location of documents and witnesses.

First, Citigroup cited to an expert affidavit and a copy of a complaint that a Mexican affiliate of Otto Candies had filed in Mexico against Banamex and Citibank, N.A. (a subsidiary of Citigroup not named in this case).  Those documents tended to show that Mexico was an adequate and available forum.  As noted above, the plaintiffs do not challenge this conclusion on appeal, and so this evidence is not relevant for our purposes.

Second, Citigroup referred to the same expert affidavit to show that it would be difficult to compel Mexican witnesses to testify in the United States and that Mexican banking laws would prevent Banamex from sharing information absent permission from the Mexican banking regulator.  These contentions, however, presuppose (1) that material witnesses are in Mexico, and not in the United States, and (2) that Citigroup does not already have domestic access to the Banamex documents apparently protected by Mexican banking secrecy laws.  Citigroup did not offer any evidence to establish these two implicit and necessary premises.

Third, Citigroup submitted various SEC filings to demonstrate that the Institutional Clients Group was a "business segment," not a legal entity, and that the Group had employees all over the world, including at subsidiaries such as Banamex.  The district court did not rely on these documents, and it is not clear how the Group's status as a business segment rather than a distinct legal entity changes the *forum non conveniens* analysis.  The complaint does not depend on that distinction, and instead focuses on the role that the Group played in developing and overseeing the credit facilities.  The fact that the Group is a business segment with employees at Banamex, moreover, could be a double-edged sword.  It might make it more plausible that New York-based executives of the Group directed the alleged scheme from the United States through their subordinates in Mexico.  That would be consistent with the plaintiffs' claims, and it would also mean that evidence of the fraudulent conduct would be accessible in the United States.

34

prove and disprove each element, and make a reasoned assessment about the location of relevant evidence.

There are two problems with Citigroup's argument.  The first is that the district court did not delineate the elements of each claim in order to sort through the relevant and irrelevant evidence.  The second is that the court did not have positive evidence to sort through in the first place.  This case is therefore similar to *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1306–07, 1310 (11th Cir. 1983), where we reversed a *forum non conveniens* dismissal because the district court "did not attempt to go beyond [the] representations of counsel to ascertain the underlying facts of the case" and "did not attempt to pin counsel down to their theories of the case, and the facts that would support their theories."  Likewise, the district court here stated—without further explanation—that it would be necessary for the plaintiffs to establish the "underlying fraud" in Mexico.  It also accepted the contention of Citigroup that its defense would require documents in Mexico, even though Citigroup did not describe with any particularity the defense or the evidence necessary to establish it.

Citigroup assumes that the district court must have "appreciated" which facts would be relevant to the litigation, and therefore tries to reconstruct what it sees as the court's implicit reasoning.  But that is not enough for us evaluate the factual and legal issues of the case.  *See id.* at 1308 ("Without delineating the elements of the

claims and the defenses thereto, we simply cannot know the factual issues raised by these claims, and are left only to speculate as to what witnesses and documents might be relevant and where they might be located.").

Even if we were to accept Citigroup's reconstructed argument—that the RICO claims would require the plaintiffs to establish an "enterprise" with foreign entities and that the aiding and abetting fraud claims would require the plaintiffs to establish an underlying fraud in Mexico—it is still not clear why it wouldn't be just as easy to develop these theories in the United States. First, based on their allegations, it is plausible that the plaintiffs could establish the RICO enterprise and underlying fraud with documents already in Citigroup's possession. Indeed, the plaintiffs contend that there is no real dispute concerning the events in Mexico, so it seems they believe they can prove their case without resorting to additional documents or witnesses there. Second, the plaintiffs intend to prove that Citigroup controlled and directed the enterprise from the United States, so it is not clear why the bulk of evidence wouldn't be in the United States, even if some documents tending to establish the global enterprise could also be found in Mexico. Third, Citigroup's argument ignores the plaintiffs' direct fraud and fiduciary duty claims, which appear at first glance to require investigation into Citigroup's conduct in the United States. In any event, no matter how we try to dissect the various claims, this is a "fragmentary

record" on which it is "impossible to make a sound determination of relative convenience." That requires us to remand for further development. *See id.*

The district court erred in concluding that the "ease of access to evidence" factor supported dismissal. That conclusion was based on unsupported findings that the material documents and evidence "are all located in Mexico," and that "all of the key players in this dispute . . . will be available in Mexico." The court also erred in concluding that the "availability of witnesses and compulsory process" factor favors dismissal. That conclusion was based on the unsupported contention of Citigroup that it needed to rely on witnesses in Mexico for its defense. On this record, these errors were fatal to the *Gulf Oil* private interest analysis. *See Ford*, 319 F.3d at 1308 ("Perhaps the most important 'private interest' of the litigants is access to evidence."); 17 James Wm. Moore et al., Moore's Federal Practice § 111.74[3][c][iii] (3d ed. 2020) ("Of all the private interest factors . . . the relative ability of the forums to compel the attendance of significant unwilling witnesses at trial often is considered the most important factor, because the presentation of live testimony often is 'essential to a fair trial.'").

## D

The district court also concluded that the public interest factors weighed in favor of litigation in Mexico. Although Citigroup is the only named defendant, the case involved "four primary players, three of which are unquestionably Mexican

entities"—Banamex, Oceanografía, and Pemex.  The court reasoned that Mexico "clearly has a substantial interest in this case being litigated in Mexico as evidenced by numerous parallel proceedings underway and the fact that one of the key players in this dispute is owned by the Mexican government."

The district court did not ultimately find "such meaningful connections between any of the parties and [the Southern District of Florida] that would outweigh the clear interest Mexico has over this litigation."  But that conclusion is questionable because the plaintiffs allege that Citigroup conducts substantial business in the Southern District of Florida and that two of its Miami-based employees audited the cash advance program after the scandal unfolded in Mexico.  There is therefore some local interest in the case.  On the other hand, there does not appear to be any local need to have the case dismissed.  The district court did not cite, for example, any administrative difficulties or docket congestion in the Southern District that warranted a *forum non conveniens* dismissal.

But even if the district court adequately considered the administrative interests of the Southern District, it failed to consider the sovereign interests of the United States.  *See SME Racks*, 382 F.3d at 1104 (explaining that although the district court "recognized that Florida had in interest in [that case], it failed to recognize any federal interest").  The United States has a stake in this litigation, and that should factor into the public interest analysis.  *See Republic of Panama, v. BCCI Holdings*

*(Luxembourg) S.A.*, 119 F.3d 935, 953 (11th Cir.1997) ("Relevant public interest factors include the sovereigns' interests in deciding the dispute[.]").

As explained above, the plaintiffs opted to sue Citigroup for its alleged role in the fraud.  If they succeed in proving the facts and legal claims, as alleged, then Citigroup—a United States corporation—would be liable to two American plaintiffs for causing them injuries from its United States offices.  We have observed that "a sovereign has a very strong interest when its citizens are allegedly victims and the injury occurs on home soil." *SME Racks*, 382 F.3d at 1104.  *See also Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1311 (11th Cir. 2002) ("There is a strong federal interest in making sure that plaintiffs who are United States citizens generally get to choose an American forum for bringing suit, rather than having their case relegated to a foreign jurisdiction.").  As further evidence that the United States has a substantial interest in this case, the Justice Department and SEC conducted domestic investigations into Citigroup for the cash advance program at issue.  *See Carijano*, 643 F.3d at 1232 (explaining that the United States has a "significant interest in providing a forum for those harmed by the actions of its corporate citizens").  On remand, the district court must consider the interests of the United States in analyzing the *Gulf Oil* public interest factors.

**V**

We now turn to the discovery conditions that the district court imposed in its order, as the parties dispute their propriety and efficacy. Because we are reversing on other grounds, we do not directly address whether the conditions, as phrased, were appropriate. But we provide some thoughts for the district court and the parties to consider on remand.

In *Piper Aircraft*, the Supreme Court suggested that, in order to mitigate the practical difficulties of *forum non conveniens* dismissals, "district courts might dismiss subject to the condition that defendant corporations agree to provide the records relevant to the plaintiff's claims." 454 U.S. at 257 n.25. The Supreme Court did not explain, however, how district courts should enforce discovery conditions as litigation proceeded abroad. Nonetheless, following the *Piper Aircraft* decision, it became common practice for courts to include stipulations, not only regarding discovery, but also involving the defendant's consent to foreign jurisdiction and final judgment, and the defendant's waiver of foreign statutes of limitation.

With respect to discovery, district courts have imposed conditions that range from the parties having to make "relevant" documents and witnesses available to the parties consenting to abide by the Federal Rules of Civil Procedure. We have approved of these types of discovery conditions and have even held that the imposition of such conditions supported the finding of an adequate, alternative

forum. *See Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001) (affirming the district court's finding that the foreign court was adequate in part because the defendant "agree[d] to conduct all discovery in accordance with the Federal Rules of Civil Procedure"); *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1430–31 (11th Cir. 1996) (affirming a *forum non conveniens* dismissal in part based on the condition that any domestic discovery "be done in accordance with the Federal Rules of Civil Procedure").[9]

In this case, the district court required Citigroup to "reasonably make available all relevant documents and witnesses within its control," and the plaintiffs would have been able "to move to reinstate the action within ninety (90) days of [Citigroup] failing to comply" with that or any other condition. Given our precedent, we do not fault the district court for imposing such a typical condition in its order. But we urge the parties and the court to re-evaluate the limits and contours of that condition in case the district court again dismisses for *forum non conveniens*.

For starters, what rules would govern the scope of "reasonableness," "relevance," and "control"? Would those concepts be defined by Mexican law or by the Federal Rules of Civil Procedure? The plaintiffs urge the latter, arguing that

---

[9] Cases involving similar discovery conditions are voluminous. *See, e.g., Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1358 (1st Cir. 1992); *Stewart v. Dow Chem. Co.*, 865 F.2d 103, 104–05 (6th Cir. 1989); *Oto v. Airline Training Ctr. Arizona, Inc.*, 247 F. Supp. 3d 1098, 1109 (D. Ariz. 2017).

we have "emphasized" dismissals conditioned on compliance with U.S. discovery rules. Although we have sanctioned that type of condition, we have also approved of a condition that only required disclosure of "relevant" documents without reference to the Federal Rules. *See Tazoe*, 631 F.3d at 1330.

Either type of condition could present problems. As the plaintiffs note, the required disclosure of "relevant" evidence is open-ended. If foreign law governs relevance, the condition subjects the parties to some uncertainty and to the idiosyncrasies of the foreign court, which to some extent undermines the purpose of *forum non conveniens*. *See* Maggie Gardner, *Parochial Procedure*, 69 Stan. L. Rev. 941, 987 (2017) (arguing that "it is hard for judges to forecast whether the alternative foreign forum will resolve the defendants evidentiary concerns" or "whether the foreign court's jurisdiction over evidence will actually translate into party access"). Requiring the parties to follow the Federal Rules, on the other hand, may provide them with more clarity about their ongoing obligations. But we have not given much more thought to what mechanisms, or legal authority, the district court has at its disposal to ensure compliance with the Federal Rules while a dismissed case is being litigated in a foreign court. What permits the district court to adjudicate discovery disputes in a case that it has already dismissed? Does the court need to retain some

sort of jurisdiction?  And what happens if those disputes are also pending before a Mexican court?[10]

As noted, the district court included a "return jurisdiction" clause, which permits the plaintiffs to refile in the Southern District of Florida in the event of a breach of a condition and perhaps would encourage Citigroup's compliance with the discovery conditions.  We have modified dismissal orders to *add* return jurisdiction clauses—at least where there was some indication that the foreign court would not assume jurisdiction.  *See Leon*, 251 F.3d at 1316; *King*, 562 F.3d at 1384.  But with the understanding that a return jurisdiction clause is permissible, we still foresee possible practical difficulties.

As one commentator has explained, the efficacy of a return jurisdiction clause depends on a "herculean conception of [the] plaintiffs' patience, litigiousness, and financial resources."  Gardner, *Parochial Procedure*, 69 Stan. L. Rev. at 990.  Some plaintiffs may not have the resources or appetite to refile and start anew in federal court, especially after protracted litigation abroad.  That presupposes that the

---

[10] Other courts have noted some of these issues in passing.  *See In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984*, 809 F.2d 195, 205 (2d Cir. 1987) (explaining that a discovery stipulation would be "subject to such approval as may be required of the [foreign] court," and otherwise "the parties will be limited by the applicable discovery rules of the [foreign] court in which the claims will be pending"); *Pinder v. Moscetti*, 666 F. Supp. 2d 1313, 1321 (S.D. Fla. 2008) (requiring the defendants to provide all relevant evidence within their custody and control, but recognizing that such a condition "d[id] not extend the discovery allowed under the Federal Rules of Civil Procedure to litigation in the Bahamas," as discovery "shall be governed by the applicable discovery rules of the Bahamas court").

plaintiffs even had the resources to travel to and refile in the foreign court in the first place.  *See* Martin Davies, *Time to Change the Federal Forum Non Conveniens Analysis*, 77 Tul. L. Rev. 309, 319 (2002) (explaining that "few plaintiffs even bother to pursue their claim in the alternative foreign forum following *forum non conveniens* dismissal from a U.S. court.") (italics added).

For plaintiffs who do have resources for further litigation, they may actually seek out or manufacture disputes in the hopes that even a minor discovery disagreement could trigger a return jurisdiction clause and reopen the doors to federal court.  The plaintiffs here, for example, might want to seek extremely broad discovery and then refile in the district court the moment that Citigroup withholds a document on relevance grounds.

Accordingly, on remand, the district court should consider whether a single breach would permit the plaintiffs to reinstitute their case in federal court, and whether a breach must be material.  If so, what would constitute a "material" breach, and under whose law?  Moreover, could Citigroup "cure" a breach if the plaintiffs file a discovery motion and the district court concludes that the withheld documents were relevant?  That is, if the district court resumes jurisdiction and resolves a discovery dispute in the plaintiffs' favor, could Citigroup agree to produce the withheld documents and then simply return to the Mexican court?  Or does Citigroup, like Julius Caesar, cross the Rubicon once it improperly withholds a

relevant document?  Without considering these questions (and perhaps others), the district court may face practical problems down the road which could make litigation *less* convenient for everyone involved.

## VI

The district court did not apply the deference owed to the domestic plaintiffs, and it erred in weighing the *Gulf Oil* private interest factors as to all the plaintiffs because Citigroup did not satisfy its burden.  We therefore reverse and remand for further proceedings, including consideration of the United States' interests under the public interest factors.

The district court may in its discretion permit limited discovery, hold an evidentiary hearing, or accept additional evidence and supplemental briefing from the parties on the private and public interest factors.  Because the plaintiffs have not challenged the district court's findings that Mexico is an adequate and available forum, or that they would not be subject to undue inconvenience or delay if they had to reinstate their case in Mexico, those findings stand.  We also leave in place the district court's unchallenged findings with respect to the enforceability of the foreign judgment, though we take no view on the weight of this fact in the district court's *Gulf Oil* analysis on remand.

We do not address at this time whether the district court erred in its understandable attempt to ensure that Citigroup would provide adequate discovery

in Mexico.  We also do not take any view on Citigroup's alternative arguments for

dismissal, which the district court did not reach.

**REVERSED AND REMANDED.**