**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-20725-CIV-GAYLES-OTAZO-REYES**

OTTO CANDIES, LLC, ADAR MACRO FUND LTD., ASHMORE EMERGING MARKETS DEBT AND CURRENCY FUND LIMITED, ASHMORE EMERGING MARKETS HIGH YIELD PLUS FUND LIMITED, ASHMORE EMERGING MARKETS TRI ASSET FUND LIMITED, ASHMORE SICAV IN RESPECT OF ASHMORE SICAV EMERGING MARKETS CORPORATE DEBT FUND, ASHMORE SICAV IN RESPECT OF ASHMORE SICAV EMERGING MARKETS DEBT FUND, ASHMORE SICAV IN RESPECT OF ASHMORE SICAV EMERGING MARKETS HIGH YIELD CORPORATE DEBT FUND, COASTLINE MARITIME PTE. LTD., COÖPERATIEVE RABOBANK U.A., COPERNICO CAPITAL PARTNERS (BERMUDA) LTD., GULF INVESTMENTS AND SERVICES LTD., HALANI INTERNATIONAL LTD., HBK INVESTMENTS L.P., HBK MASTER FUND L.P., HOOP LOBITH INTERNATIONAL B.V., ICE CANYON LLC, ICE 1 EM CLO LIMITED, MÁQUINAS DIESEL S.A. DE C.V., MARFIELD LTD. INC., MONEDA DEUDA LATINOAMERICANA FONDO DE INVERSION, MONEDA INTERNATIONAL INC., MONEDA LATIN AMERICAN CORPORATE DEBT, MONEDA RENTA CLP FONDO DE INVERSION, MONEDA S.A. ADMINISTRADORA GENERAL DE FONDOS, NORDIC TRUSTEE AS, PADSTOW FINANCIAL CORP., SHANARA MARITIME INTERNATIONAL S.A., SHIPYARD DE HOOP B.V., WAYPOINT ASSET MANAGEMENT LLC,

Plaintiffs,

v.

CITIGROUP INC.,

Defendant.

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. PARTIES ..... 6

A. Plaintiffs ..... 6

1. Shipping Companies and Service Providers ..... 7

a. Candies ..... 7

b. Coastline ..... 7

c. De Hoop ..... 7

d. Gulf ..... 7

e. Halani ..... 8

f. MADISA ..... 8

2. Bondholders ..... 8

a. Overview ..... 8

b. Adar ..... 8

c. Ashmore ..... 9

d. Copernico ..... 9

e. HBK ..... 9

f. ICE ..... 10

g. Moneda ..... 10

h. Nordic Trustee ..... 11

i. Waypoint ..... 12

3. Rabobank ..... 12

B. Defendant ..... 12

1. Citigroup ..... 12

2. Citigroup Subsidiaries Banamex Group and Banamex ..... 13

C. OSA ..... 13

III. JURISDICTION AND VENUE ..... 13

IV. RELATIONSHIP BETWEEN CITIGROUP AND BANAMEX, INCLUDING WITH RESPECT TO OSA ..... 14

A. Background ..... 14

B. Examples of Relationship Between Citigroup and OSA ..... 15

C. Examples of the Relationship Between Citigroup and Banamex as to OSA ..... 17

V. CITIGROUP ESTABLISHED AND MANAGED THE CASH ADVANCE FACILITY UTILIZED IN ITS FRAUDULENT SCHEME WITH OSA....................17

A. Overview....................17

B. The Citigroup ICG Division Operated, Managed, and Supervised the Cash Advance Facility with OSA....................18

C. The Citigroup ICG Is Led by Senior, U.S.-based Citigroup Executives....................19

D. Services Provided by the Citigroup ICG....................20

E. Citigroup Policies and Procedures Governed the OSA Cash Advance Facility....................21

1. Overview....................21

2. Citigroup Policies and Procedures Before Issuance of the Handbook of Cash Advances and Contract Guidelines....................23

3. Issuance of Handbook of Cash Advances in February 2011....................24

4. Contract Guidelines....................24

5. Credit Memoranda....................25

6. The Secret Regulatory Contract....................26

VI. THE FRAUDULENT SCHEME....................27

A. Overview....................27

B. Citigroup Earned Millions in Risk-Free Interest by Providing Fraudulent Cash Advances to OSA and Repeatedly Increasing OSA's Credit Line....................29

C. The Fraud Between 2008 and 2010....................31

1. Overview....................31

2. Citigroup Violated Its Internal Controls to Execute the Fraud....................32

D. Deterioration of OSA's Finances and Citigroup's Freezing of the Cash Advance Facility in 2010....................32

E. The Fraud Continues Between 2011 and 2014....................35

1. Overview....................35

2. Citigroup Advanced Funds That Were Greater than the Value of OSA's Contracts with Pemex....................36

3. Citigroup Violated Its New, Internal Controls to Execute the Fraud....................36

4. Citigroup and OSA Secretly Changed the Control System in 2012 to Further Effectuate the Fraud....................37

F. Citigroup Profited from the Fraudulent Scheme....................38

G. Plaintiffs Suffered from the Fraud....................38

VII. CITIGROUP EMPLOYEES ORCHESTRATED AND FURTHERED THE FRAUD, INCLUDING THROUGH THE USE OF THE CASH ADVANCE FACILITY AND BANAMEX EMPLOYEES ....39

A. Citigroup Employees Knowingly Approved the Fraudulent Cash Advance Requests ....39

B. Citigroup Employees Managed Trusts Established by OSA to Pay Creditors from the Cash Advance Facility ....40

1. Rabobank Trust ....40

2. Mexican Trust Established for 2013 Bondholders....41

VIII. DISCOVERY OF THE FRAUD ....41

A. Unrelated Insurance Probe by SFP ....41

B. Citigroup Commences Investigation in Response to SFP's Ban Against New Contracts Between OSA and Pemex ....42

C. Citigroup Publicly Discloses Fraud on February 28, 2014....43

IX. CITIGROUP ADMITTED TO CRIMINAL MISCONDUCT....43

X. MEXICAN AUTHORITIES CONFIRMED CITIGROUP'S CRIMINAL MISCONDUCT ....44

XI. THE U.S. GOVERNMENT CONDUCTED INVESTIGATIONS RELATING TO CITIGROUP'S MISCONDUCT ....46

XII. CITIGROUP IS NOT A VICTIM ....47

A. The Mexican Bankruptcy Court Determined That Citigroup Is Not a Victim ....47

B. Citigroup's Victim Claims Are Unavailing ....48

C. The Actual Fraud Victims Have Obtained No Redress Through the Mexican Bankruptcy Proceedings ....49

XIII. CITIGROUP'S RELATIONSHIP WITH OSA EXTENDED BEYOND THE CASH ADVANCE FACILITY AND TRUSTS....51

A. Overview....51

B. Citigroup, Through Banamex, Served as OSA's Banker ....52

C. Citigroup Acted as Trustee and Collateral Agent for the 2008 Bond Issuance ....52

D. Citigroup Advised OSA on Acquisition of Goliath....53

E. Citigroup Advised OSA on Acquisition of Cal Dive....53

F. Citigroup Loaned OSA Millions in 2013....53

G. Citigroup Advised OSA on Identifying Equity Investors in 2013....54

H. Citigroup Assisted OSA in Preparing "Management Presentations" Between 2013 and 2014 ....54

1. Background ....54

2. December 2013 Presentation ....56

3. January 2014 Presentation ....59

I. Revolving Door of Senior Executives ....62

XIV. CITIGROUP'S AND OSA'S FRAUDULENT MISREPRESENTATIONS AND MATERIAL OMISSIONS INJURED PLAINTIFF BONDHOLDERS ....62

A. Overview ....62

B. 2008 Bond Issuance ....63

1. Overview ....63

a. Role of Citigroup in 2008 Bond Issuance ....64

b. Marketing of 2008 Bonds ....64

c. 2008 Bonds Were Issued in the United States ....65

2. 2008 Bond Documents Distributed to 2008 Bond Plaintiffs ....65

a. Overview ....65

b. 2008 Offering Memorandum ....68

c. 2008 Bond Indenture ....69

3. Communications Between Citibank and the 2008 Bondholders ....70

C. 2013 Bond Issuance to Purchase the Goliath ....72

1. Overview ....72

a. Role of Citigroup in 2013 Bond Issuance ....73

b. Marketing of 2013 Bonds ....73

2. The Pareto Materials ....73

a. Overview ....73

b. 2013 Preliminary Offering Memorandum ....76

c. September 2013 Pareto Investor Presentation ....77

d. September 2013 Pareto Credit Analysis Presentation ....78

e. Pareto Credit Model ....80

f. Term Sheets ....80

g. Pareto Periodic Reports ....81

h. Pareto Materials Intended for U.S. Investors ....81

3. Documents Governing 2013 Bond Issuance ....82

a. 2013 Bond Agreement ....82

b. Mexican Trust Agreement ....84

D. Investor Site ....85

E. Financial Statements Between 2008 and 2014 ....86

F. Adar....89

1. Overview....89

2. Fraudulent Misrepresentations and Material Omissions Between 2013 and 2014 Relating to the Purchase and Retention of the 2008 Bonds ....92

a. June 2008 Preliminary Offering Memorandum....92

b. Receipt of Pareto Materials in September 2013 ....94

3. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Adar ....95

4. Adar Suffered Injury Due to Citigroup and OSA's Fraudulent Misrepresentations and Material Omissions....97

G. Ashmore....98

1. Overview....98

2. Material Omissions Relating to the Purchase and Retention of 2008 Bonds Between 2009 and 2013....102

a. Communications with OSA in 2009 Regarding Untimely Interest Payment....102

b. Communications with OSA Between 2009 and 2010 Regarding the Lack of Financial Information Provided By OSA....104

c. Receipt of 2009 and 2010 Financial Statements in 2011 and 2012....106

d. Discussions with OSA's External Financial Consultant Between 2010 and 2013....109

e. January 2012 Meeting Between OSA's External Financial Consultant and Ashmore....113

3. Fraudulent Misrepresentations and Material Omissions in Materials Provided By Pareto Between September and November 2013 ....117

a. Receipt of the Pareto Materials in September 2013....117

b. Quarterly Review By Pareto ....119

4. Material Omissions Relating to the Retention of the 2008 Bonds in 2014....121

a. February 21, 2014 Discussion Between Citigroup and Ashmore's Counsel ....121

b. February 24, 2014 Discussion Between OSA and Ashmore's Counsel ....123

c. February 26, 2014 Discussion Between OSA and Ashmore's Counsel ....124

5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Ashmore ....126

6. Ashmore Suffered Injury Due to Citigroup and OSA's Fraudulent Misrepresentations and Material Omissions ....128

H. Copernico ....130

1. Overview ....130

2. Material Omissions Relating to the Initial Purchase of 2008 Bonds in May 2013 ....134

a. March 2013 OSA Presentation at a Conference in New York ....134

b. 2008 Offering Memorandum ....136

3. Fraudulent Misrepresentations and Material Omissions Relating To The Retention of 2008 Bonds Between May 2013 and February 2014....138

4. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Copernico ....141

5. The Copernico Funds Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions....142

I. GPF ....143

1. Overview ....143

2. Material Omissions in 2008 Relating to the Purchase of the 2008 Bonds ....148

3. Material Omissions Between 2008 and 2013 Relating To The Retention of the 2008 Bonds....150

a. Communications with OSA in 2008 and 2009 Regarding Untimely Interest Payments ....150

b. Meetings and Communications with OSA's External Financial Consultant Between 2010 and 2013....153

c. Receipt of 2009 and 2010 Financial Statements in 2012....156

4. Fraudulent Misrepresentations and Material Omissions in Materials Provided By Pareto Between September and October 2013 ....158

a. Receipt of the Pareto Materials in September 2013.....158

b. Quarterly Review by Pareto.....160

5. Fraudulent Misrepresentations and Material Omissions Between 2013 and 2014 Relating To The Retention of the 2008 Bonds.....162

a. Access to Investor's Site in November 2013.....162

b. January 2014 Telephone Conference Between 2008 Bondholders and OSA Regarding Media Allegations.....164

c. February 14, 2014 Discussion Between EIG and OSA.....166

d. February 21, 2014 Discussion Between Citigroup and EIG.....169

e. February 24, 2014 Discussion Between OSA and EIG.....170

f. February 26, 2014 Discussion Between OSA and EIG.....172

6. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against GPF II.....173

7. GPF II Suffered Injury Due to OSA and Citigroup's Fraudulent Misrepresentations and Material Omissions.....175

J. HBK.....178

1. Overview.....178

2. Fraudulent Misrepresentations and Material Omissions Relating to the Purchase of the 2008 Bonds.....182

3. Fraudulent Misrepresentations and Material Omissions Relating to the Purchase of the 2013 Bonds and Retention of the 2008 Bonds between June and October 2013.....185

a. August 2013 GMP Desk Note.....185

b. Meetings with OSA and Pareto in September 2013.....187

c. Receipt of Pareto Materials in September 2013.....190

4. Fraudulent Misrepresentations and Material Omissions Relating to the Retention of the 2008 and 2013 Bonds Between October 2013 and February 2014.....192

a. Quarterly Credit Review.....192

b. December 2013 Presentation.....194

c. February 14, 2014 Telephone Conference with OSA.....196

5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against HBK.....198

6. HBK Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions.....200

K. ICE.....202

1. Overview ....202
2. Material Omissions in 2008 Relating to ICE's Purchase and Retention of 2008 Bonds ....206
3. Fraudulent Misrepresentations and Material Omissions in 2011 Relating to ICE's Retention of 2008 Bonds ....208
a. February 2011 Correspondence Between Citigroup, through Citibank as the Trustee of the 2008 Bond Issuance, and ICE ....208
b. February 2011 Meeting between OSA and ICE ....209
c. August 2011 Correspondence Between Citigroup, through Citibank as the Trustee of the 2008 Bond Issuance, and ICE ....211
4. Material Omissions in 2012 Relating to ICE's Retention of 2008 Bonds ....213
a. January/February 2012 Correspondence Between Citigroup, through Citibank as the Trustee of the 2008 Bond Issuance, and ICE ....213
5. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to ICE's Retention of the 2008 Bonds ....214
a. ICE Email with OSA Regarding Bond Interest ....214
b. Receipt of Pareto Materials in September 2013 ....216
6. Fraudulent Misrepresentations and Material Omissions in 2014 Relating to ICE's Retention of the 2008 Bonds ....218
a. January 2014 Telephone Conference Between OSA and ICE ....218
b. January 2014 OSA Press Release ....220
c. January 2014 Telephone Conference Between 2008 Bondholders and OSA Regarding Media Allegations ....222
d. February 2014 Email Between ICE and OSA's External Financial Consultant ....224
e. February 14, 2014 Discussion Between ICE's Counsel and OSA ....227
f. February 21, 2014 Discussion Between Citigroup and ICE's Counsel ....229
g. February 24, 2014 Discussion Between OSA and ICE's Counsel ....230
h. February 26, 2014 Discussion Between OSA and ICE's Counsel ....231
7. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against ICE ....233

8. ICE Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions ....................235

L. Moneda ....................238

1. Overview ....................238

2. Material Omissions Between 2009 and 2013 Relating To The Purchase and Retention of the 2008 Bonds ....................242

3. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to the (i) Purchase and Retention of the 2013 Bonds; and (ii) Retention of the 2008 Bonds ....................244

a. Discussions Between Moneda and OSA's External Financial Consultant Between June 2013 and Early 2014 Regarding the Cash Advance Facility ....................245

b. July 2013 Email Exchange Between OSA and Moneda ....................247

c. July 2013 Correspondence Between Citigroup, through Citibank as the Trustee of the 2008 Bond Issuance, and Moneda ....................249

d. Discussions Between Moneda and Pareto Between July and September 2013 ....................250

e. Receipt of Pareto Materials in September 2013 ....................253

f. October 2013 Meetings Between OSA's External Financial Consultant and Moneda ....................255

g. December 2013 Meeting Between Moneda and OSA ....................258

4. Material Omissions in 2014 Relating to the (i) Retention of the 2013 Bonds; and (ii) Retention of the 2008 Bonds ....................259

a. January 2014 Correspondence Between Moneda and OSA's External Financial Consultant Regarding, Among Other Things, the Refinancing of the 2008 Bonds ....................259

b. January 2014 Correspondence Between Moneda and OSA's External Financial Consultant Regarding Media Allegations ....................262

c. January 2014 Telephone Conference Between 2008 Bondholders and OSA Regarding Media Allegations ....................264

d. February 14, 2014 Discussion Between Moneda's Counsel and OSA ....................266

e. February 21, 2014 Discussion Between Citigroup and Moneda's Counsel ....................268

f. February 24, 2014 Discussion Between OSA and Moneda's Counsel ....................270

g. February 26, 2014 Discussion Between OSA and Moneda's Counsel ....272

5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against the Moneda Group ....274

6. The Moneda Group Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions....276

M. Nordic Trustee-2013 Bondholders....278

1. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against the 2013 Bondholders ....278

2. Nordic Trustee Delayed Taking Actions on Behalf of the 2013 Bondholders Based on Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA....280

a. Overview....280

b. Summary of Fraudulent Misrepresentations and Material Omissions....280

3. Nordic Trustee Relied on the Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA ....285

4. Negotiations Between OSA, Pareto, Nordic Trustee, and Others Relating to the Mexican Trust Agreement, the Term Sheet and 2013 Bond Agreement in Summer 2013 ....285

5. Receipt of Pareto Materials Between July and December 2013....287

6. Financial Statements and Bondholder Calls Between 2013 and 2014 ....290

7. Receipt of December 2013 Presentation....292

8. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Nordic Trustee and the 2013 Bondholders ....294

9. The 2013 Bondholders Suffered Injury Due to OSA and Citigroup's Fraudulent Misrepresentations and Material Omissions....296

N. Waypoint....298

1. Overview....298

2. Initial Contact Between Waypoint and OSA in January 2008 ....302

3. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to Waypoint's Purchase and Retention of the 2008 Bonds....302

a. OSA Presentation and Meeting in May 2013 ....302

b. Discussions Between Waypoint and Pareto in September 2013.....305

c. Telephone Conference with OSA in September 2013 Regarding Late Coupon Payments.....307

d. OSA Management Presentation Prepared by Citigroup at December 2013 Investor Conference.....309

4. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Waypoint.....311

5. Waypoint Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions.....313

XV. CITIGROUP'S AND OSA'S MISREPRESENTATIONS AND OMISSIONS CAUSED THE SHIPPING PLAINTIFFS' INJURIES.....314

A. Overview.....314

B. Candies.....316

1. Overview.....316

2. Summary of the Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA to Candies Between 2011 and 2014.....318

3. Fraudulent Misrepresentations and Material Omissions in 2011 Relating to OSA's Debt to Candies.....322

a. Overview.....322

b. Discussions With OSA's External Financial Consultant in April 2011.....323

c. Fraudulent Misrepresentations and Material Omissions in Discussions with OSA, its External Financial Consultant, and Citigroup in May 2011.....326

d. May 2011 Stock Agreement.....328

4. Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA in Connection with the 2012 Candies Restructuring Agreement.....330

a. Overview.....330

b. Citigroup Played a Central Role in Candies Restructuring Agreement.....331

c. Fraudulent Misrepresentations and Material Omissions Relating to the Candies Restructuring Agreement.....332

d. Citigroup's September 14, 2012 Proposal Regarding the Trust.....334

e. Citigroup's September 21, 2012 Explanation of the Cash Advance Facility and Proposed Instructions ....337

f. Candies and Citigroup's September 26, 2012 Teleconference ....338

g. The Letter of Instructions ....340

5. Citigroup's Fraudulent Misrepresentations and Material Omissions Relating to Candies' February 2014 Demand Letter ....342

a. Background ....342

b. Citigroup's Fraudulent Misrepresentations and Material Omissions Relating to Withdrawal Letter ....343

6. Candies Lawsuit Against Citigroup and Banamex ....345

7. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Candies ....346

8. Candies Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions ....348

C. Coastline ....349

1. Background ....349

a. Caballo Maya ....349

b. Caballo Marango ....351

c. Summary of Fraudulent Misrepresentations and Material Omissions to Coastline ....353

2. Material Omissions in 2008 Relating to Pemex Service Contract ....356

3. Material Omissions in 2011 and 2012 Relating to the Caballo Maya and Caballo Marango Charters ....358

a. Overview ....358

b. 2011 and 2012 Financial Statements ....359

c. April 2012 Meeting Between OSA and Coastline in Houston, Texas ....361

4. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to the Bond Issuance ....363

5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Coastline ....365

6. Coastline Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions ....366

D. De Hoop ....368

1. Overview ....368

2. Material Omissions In 2011 Relating To The Amendment To The Rabobank Trust ....375

a. May 2010 Meetings In Houston, Texas Between De Hoop and OSA ....375

b. May 18, 2011 Presentation Regarding OSA ....377

3. Fraudulent Misrepresentations and Material Omissions in 2012 and 2013 Relating to OSA's Financials ....380

a. Material Omissions Relating to OSA's 2010 and 2011 Audited Financial Statements ....380

b. Discussions with Jose Ortega-Rivera in October 2012 Regarding The Financing Of Four Additional Vessels ....381

c. Meeting Between De Hoop and OSA's External Financial Consultant In Late 2012 – Early 2013 Regarding OSA's Purchase of Seven New Vessels From De Hoop ....384

d. Receipt of Pareto Materials in September 2013 ....386

4. Material Omissions Between 2012 and 2014 Relating To Periodic Reports Sent By Rabobank ....388

5. Citigroup (1) Directly Committed Fraud; and (2) Conspired with and Aided Abetted OSA in Committing Fraud, Against De Hoop ....390

6. De Hoop Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions ....392

E. Gulf ....394

1. Overview ....394

2. Material Omissions in April 2011 Relating to Gulf's Decision to Enter into the Titan Charter Agreement ....397

3. Fraudulent Misrepresentations and Material Omissions in May 2011 Relating to Gulf Continuing to Lease the Titan 2 to OSA ....399

4. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Gulf ....401

5. Gulf Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions ....402

F. Halani ....403

1. Overview ....403

2. Material Omissions in 2012 Relating to the Lease Negotiations ....407

a. January 2, 2012 OSA Communication Forwarding a Standby Letter of Credit ....407

b. 2012 OSA Presentation ....410

3. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to Late Lease Payments ....411

a. Meeting with OSA in Houston, Texas in May 2013 ....411

b. Meetings with OSA's External Financial Consultant in 2013 ....413

c. Receipt of Pareto Materials in Fall 2013 ....415

4. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Halani ....417

5. Halani Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions ....419

G. MADISA ....420

1. Overview ....420

2. Fraudulent Misrepresentations and Material Omissions in 2011 Relating to MADISA's Past Due Invoices ....424

3. Material Omissions in 2012 Relating to MADISA's Past Due Invoices ....426

4. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to MADISA's Past Due Invoices ....428

5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against MADISA ....430

6. MADISA Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions ....431

XVI. CITIGROUP'S AND OSA'S FRAUDULENT MISREPRESENTATIONS AND MATERIAL OMISSIONS CAUSED RABOBANK INJURY ....432

A. Overview ....432

1. Rabobank Loans to OSA ....432

2. Rabobank Agrees to Banamex as Trustee of Rabobank Trust ....433

3. Amendment to Trust Agreement ....434

4. Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA Between 2010 and 2014 ....434

B. 2010 and 2011: Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA Relating to the Restructuring of the Rabobank Loans ....438

1. February 2, 2010 Meeting Between OSA and Rabobank ....438

2. February 3, 2010 Meeting Between Banamex and Rabobank ....440

3. Discussions Between Rabobank and OSA's External Financial Consultant in 2011 Regarding the July 2011 Trust Agreement ....442

4. May 18, 2011 Report Regarding OSA....444

5. July-August 2011 Meetings and Emails Between Banamex, OSA and Rabobank Regarding the Second Amendment to the March 2010 Trust Agreement ....446

C. Fraudulent Misrepresentations and Material Omissions Between 2012 and 2014 Relating to Daily Reports Sent by Citigroup to Rabobank....449

D. Fraudulent Misrepresentations and Material Omissions Between 2011 and 2013 to Convince Rabobank That OSA Was a Financially Attractive Investment....450

1. Discussions Between Rabobank, Citigroup's ICG, Banamex and OSA in or Around August 2011 Regarding the Implementation of the Waterfall....450

2. Discussion Between Rabobank and Citigroup in or Around May 2012 Regarding the Payment Mechanism ....452

3. July 9, 2013 Correspondence Regarding Payment Instructions to the Rabobank Trust....454

E. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Rabobank....456

F. Rabobank Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions....457

XVII. CAUSES OF ACTION ....459

COUNT ONE VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(C)....459

COUNT TWO CONSPIRACY TO VIOLATE FEDERAL RICO, 18 U.S.C. § 1962(D)....508

COUNT THREE FRAUD ....510

COUNT FOUR AIDING AND ABETTING FRAUD....515

COUNT FIVE CONSPIRACY TO COMMIT FRAUD ....524

COUNT SIX VICARIOUS LIABILITY FOR BANAMEX'S AND CITIBANK'S FRAUDULENT CONDUCT BASED ON ACTUAL AGENCY....533

COUNT SEVEN VICARIOUS LIABILITY FOR BANAMEX'S AND CITIBANK'S FRAUDULENT CONDUCT BASED ON APPARENT AGENCY ....536

JURY TRIAL DEMAND ....538

Plaintiffs hereby allege the following against Citigroup Inc. ("Citigroup").

# I. INTRODUCTION

1. Between 2008 and 2014, Citigroup, a major U.S. bank, conspired with Oceanografía S.A. de C.V. ("OSA"), once the largest oil-services company in Latin America before its collapse in March 2014, to fraudulently increase OSA's income and Citigroup's interest payments and fees, all on the backs of Plaintiffs, OSA's largest vendors, creditors and bondholders, including family-owned businesses in the United States and U.S. investors. As discussed herein, the fraud is undisputed and Citigroup has admitted that it was a participant in the fraud.

2. The fraudulent scheme was planned and executed from within the United States and has been the subject of criminal and civil investigations and fines by U.S. regulators, including the U.S. Securities and Exchange Commission ("SEC") and the U.S. Department of Justice ("DOJ").

3. The fraud centers around a cash advance facility that Citigroup established for OSA in 2008 through a Citigroup division based in the United States, utilizing Citigroup's Mexican subsidiary Banco Nacional de Mexico S.A. ("Banamex"). Specifically, Citigroup, through its Institutional Client's Group ("ICG"), operated, managed, supervised, and controlled OSA's cash advance facility, including but not limited to working with, managing and supervising Banamex employees with responsibilities relating to the facility. Indeed, Banamex employees reported to the ICG regarding the facility. Citigroup, through its ICG, necessarily had knowledge of, and authorized and approved, conduct by ICG and Banamex employees on behalf of the ICG, including but not limited to the OSA cash advance facility.

4. The cash advance facility worked as follows. Citigroup, through ICG employees and managers and utilizing Banamex employees: (1) prepaid OSA what it was purportedly owed by its only customer—Petróleos Mexicanos S.A. ("Pemex"), Mexico's state-owned oil and gas

company; (2) collected the full receivable from Pemex; and (3) charged OSA interest on those pre-payments or cash advances. The more OSA requested in cash advances from the facility, the more money Citigroup, through its ICG and utilizing Banamex, made through interest payments.

5. Accordingly, Citigroup, through its ICG and utilizing Banamex, conspired with OSA to orchestrate a fraudulent scheme whereby (1) OSA submitted false documentation including forged Pemex signatures in support of the cash advances to Citigroup's ICG; (2) Citigroup, through its ICG, knowingly approved the false documentation; (3) OSA received funds to which it was not entitled; and (4) Citigroup, through the ICG and utilizing Banamex, earned interest on the illicit funds.

6. Citigroup, through ICG employees, also entered into a secret agreement with OSA, concealed from Plaintiffs, whereby it purported to absolve itself of responsibility for validating and authenticating documents submitted by OSA to the ICG and instead gave the very entity receiving the funds (OSA) that repsonsibility, which was nothing more than a transparent attempt to protect itself against future liability for the fraud while simultaneously making it easier for the fraud to continue undetected (*infra* at Section V.E.)

7. As evidenced by the findings of both U.S. and Mexican regulators and prosecutors, the fraud occurred. Indeed, Mexican authorities have confirmed that OSA submitted documentation with forged Pemex signatures to Citigroup in support of its cash advance requests. And, Citigroup's role in the fraud is also largely undisputed. Citigroup itself has admitted (including in statements by its CEO) that many of its employees, including in the United States, were involved in the fraudulent scheme. Indeed, Citigroup fired 12 employees, including four Managing Directors (two of whom were business heads), and disciplined several others based on its internal review of the fraud conducted from its Latin American headquarters in Miami (*infra* at

Section VIII.B). The Mexican banking regulator (in Spanish, *Comision Nacional Bancaria y de Valores*, the "CNBV") concluded that ten Citigroup ICG employees had violated Mexican banking laws. In addition, the Mexican Attorney General's Office (in Spanish, *Procuraduría General de la República*, the "PGR") issued arrest warrants against three Citigroup ICG employees for their role in the fraud (*infra* at Section X). Furthermore, the SEC fined Citigroup $4.75 million based on the fraud (*infra* at Section XI).

8. The fraud not only provided OSA with increased illicit income and Citigroup with increased illicit interest, but also resulted in misrepresentations of OSA's financial condition. Specifically, Citigroup and OSA misrepresented to Plaintiffs that OSA was (1) a financially attractive company with sufficient and guaranteed liquidity and cash flow; and (2) entitled to Citigroup's cash advances as reflected in its financial statements. These misrepresentations (and corresponding omissions about the fraud) led Plaintiffs and others to (1) invest and maintain their investments in OSA; (2) restructure their debts with OSA; and (3) enter into financial agreements with OSA.

9. Such misrepresentations and omissions occurred either verbally or in writing, through (1) in-person meetings (including in the United States); (2) telephone conferences (including through telephone calls to and from the United States); (3) emails (including using email servers in the United States); and (4) written materials, such as presentations and financial statements (including that were reviewed, revised or approved by Citigroup personnel in the United States), provided to Plaintiffs either in person, via email or on OSA's website.

10. Citigroup's and OSA's fraudulent misrepresentations and material omissions included (1) representations that (i) the cash advance facility with Citigroup provided OSA with a consistent and reliable source of cash flow sufficient for OSA's liquidity needs, and (ii) Citigroup

had primary responsibility for the control system governing the cash advance facility, thereby mitigating the risk that Pemex would not pay Banamex on the invoices submitted by OSA; and (2) omissions that (i) the cash advance facility actually lacked controls; (ii) Citigroup was not following its own internal policies and procedures; (iii) in September 2012, Citigroup executed a contract with OSA purporting to absolve Citigroup and Banamex of any responsibility for validating and authenticating the documentation OSA submitted to the ICG in support of its cash advance requests; (iv) Citigroup was approving false documentation submitted by OSA in support of its cash advance requests; (v) OSA's financial projections were false; and (vi) Citigroup and OSA were involved in an ongoing fraud relating the cash advance facility.

11. Only by way of example, in a (1) April 5, 2011 meeting between Plaintiff Gulf, OSA and Citigroup, a Citigroup ICG senior executive vouched for OSA, including by informing Gulf that Banamex "support[ed] Oceanografía's finances" and "all Oceanografía payments were coming through them" (*infra* at ¶1491), which was false and misleading because Citigroup was not controlling and monitoring the cash advance facility; (2) September 26, 2012 telephone conference between Candies, OSA, and Citigroup, a Citigroup ICG senior executive stated that OSA's debt to Candies was "quite over collateralized" because the amount of Pemex work assigned to each Candies vessel would prevent OSA from failing to pay its debt (*infra* at ¶1260), which was false and misleading given that OSA's liquidity and cash flow was dependent on a cash advance facility propped up by fraud; (3) December 2013 presentation prepared by Citigroup and OSA, which contained the "Citi" logo on the slides and disclosures at the end and was provided to several Plaintiffs including HBK, Moneda, Nordic Trustee, and Waypoint, Citigroup and OSA represented that "OSA engages in recourse factoring with Mexican banks to minimize days receivable and *ensure sufficient liquidity*" (*infra* at ¶237) and showing OSA's projected revenue

drastically increasing just a month before its collapse (*infra* at ¶249), all of which was false and misleading given the fraud; and (4) February 21, 2014 telephone conference between Citigroup and counsel for OSA bondholders including numerous Plaintiffs, "Banamex/Citi" representatives reassured the bondholders that they wanted to "have a constructive and proactive approach" with OSA to prevent a default, and be in "constant contact" with the bondholders to avoid any "negative reactions" from other groups that may "complicate" the situation (*infra* at ¶488), which was false and misleading because Citigroup had no intentions of working with OSA but planned to permanently shut down the cash advance facility in response to, *inter alia*, media allegations against OSA.[1] In addition, in none of these communications and meetings did Citigroup inform Plaintiffs about the lack of controls relating to the cash advance facility, Citigroup's purported abdication of responsibility for controlling the cash advance facility, and most importantly, the ongoing fraudulent scheme between Citigroup and OSA.

12. Citigroup collected tens of millions of dollars in interest every year by extending cash advances to OSA of over $3 billion—believing that state-owned Pemex would pay the receivables in full and Citigroup bore no risk. Indeed, the very employees who stood to gain in stature and compensation from increasing the cash advances misclassified them as a credit risk to Pemex rather than the much-less financially secure OSA (*infra* at ¶117). Citigroup thus continued to increase OSA's cash advance limit even after it was clear that OSA was collecting cash advances from Citigroup far beyond anything OSA could possibly have earned under its contracts with Pemex.

---

[1] Citigroup's additional fraudulent misrepresentations and material omissions to Plaintiffs are described *infra* in Sections XIV-XVI and Appendix 4 (chart summarizing the fraudulent misrepresentations and material omissions).

13. Citigroup also earned fees through its close partnership with OSA by (1) serving as trustee of various trusts established by the ICG for the benefit of several Plaintiffs to whom OSA owed money; (2) serving as trustee of OSA's 2008 bond offering; (3) preparing investor presentations for OSA; (4) providing financial and investment advice to OSA; and (5) providing additional multimillion dollar lines of credit to OSA.

14. Citigroup's and OSA's fraudulent scheme culminated in an explosion of ***nearly half a billion dollars*** that Citigroup injected into OSA in the months leading up to OSA's shocking collapse in 2014 (*infra* at Section VIII).

15. In late February 2014, in connection with an unrelated investigation of OSA's insurance policies by the Mexican government, the fraud was exposed and the PGR opened a criminal investigation into Citigroup's cash advances to OSA. OSA was subsequently seized and put into restructuring proceedings by Mexican prosecutors in March 2014, thereby triggering OSA's collapse. As a result, Plaintiffs incurred losses in excess of $1 billion. On information and belief, Citigroup, on the other hand, was reimbursed, in full, by Pemex and thus suffered no losses from the fraud.

16. Had Plaintiffs known that the cash advance facility lacked sufficient controls and that Citigroup was intentionally violating such controls and was predicated on a fraud, they would have never done business—or would have ceased doing business—with OSA, and avoided their massive losses in excess of $1 billion.

17. Plaintiffs bring this action to hold Citigroup accountable.

## II. PARTIES

### A. Plaintiffs

18. Plaintiffs are OSA's largest vendors, creditors and bondholders—all of whom relied upon fraudulent misrepresentations and/or material omissions by Citigroup or OSA, with

the knowledge and substantial assistance of Citigroup, when investing in, maintaining their investments in, or giving concessions to OSA between 2008 and 2014.

19. There are three categories of Plaintiffs: (1) shipping companies and a service provider that sold or leased vessels to OSA or that provided services to OSA; (2) holders of bonds issued by OSA or its affiliates in 2008 and 2013; and (3) a bank that loaned funds to OSA.

**1. Shipping Companies and Service Providers**

*a. Candies*

20. Plaintiff Otto Candies, LLC ("Candies") is a Louisiana-based vessel building and leasing company and a provider of maritime transport services. It was established in 1942 and has always been wholly-owned by the Candies family.

*b. Coastline*

21. Plaintiff Coastline Maritime Pte. Ltd. is a family-owned vessel building and leasing company incorporated in Singapore, with Panamanian subsidiaries—Plaintiffs Marfield Ltd. Inc. ("Marfield") and Shanara Maritime International, S.A. ("Shanara") (collectively, "Coastline"). Coastline, through Marfield and Shanara, owned two large vessels for oil services: Caballo Maya and Caballo Marango.

*c. De Hoop*

22. Plaintiff Shipyard De Hoop B.V., a vessel-building and design company, and its subsidiary, Plaintiff Hoop Lobith International B.V. (together, "De Hoop"), are incorporated in the Netherlands.

*d. Gulf*

23. Plaintiff Gulf Investments and Services Ltd. ("Gulf") is a vessel-leasing company incorporated in the United Arab Emirates. Erik Arne Hall, Gulf's ultimate owner and CEO is—and has been for over 20 years—a U.S. resident based in Houston, Texas.

*e. Halani*

24. Plaintiff Halani International Ltd. ("Halani") is registered in St. Vincent and Grenadines. It was established in 2002 and is wholly-owned by Ashok Hariram Bhambhani.

*f. MADISA*

25. Plaintiff Maquinas Diesel S.A. de C.V. ("MADISA") is an engineering and industrial equipment distribution company incorporated in Mexico.

**2. Bondholders**

*a. Overview*

26. In 2008, OSA issued $335 million in bonds (the "2008 Bond Issuance"). Citibank, N.A. ("Citibank"), Citigroup's primary U.S. lending and banking entity, acted as trustee for the 2008 Bond Issuance. The bondholders of the 2008 Bond Issuance are investment funds and vehicles from around the world, including funds and vehicles managed by U.S. entities (the "2008 Bondholders"). The 2008 Bondholders that are Plaintiffs in this action are collectively referred to hereinafter as the "2008 Bond Plaintiffs."

27. In 2013, OSA, through its affiliate OSA Goliath Pte. Ltd. ("Goliath Ltd."), issued $160 million in bonds (the "2013 Bond Issuance") to acquire the Goliath, one of the world's largest multi-purpose offshore construction vessels. Plaintiff Nordic Trustee AS ("Nordic Trustee") serves as trustee of the 2013 Bond Issuance and represents all holders of the 2013 bonds (the "2013 Bondholders"). The 2013 Bondholders cannot bring claims on behalf of themselves.

*b. Adar*

28. Adar Capital Partners Ltd. is an investment management firm based in the Cayman Islands and acts on behalf of Plaintiff Adar Macro Fund Ltd., a Cayman Islands-based fund, as its agent and investment advisor or manager (together, "Adar").

*c. Ashmore*

29. Plaintiffs Ashmore Emerging Markets High Yield Plus Fund Limited, Ashmore Emerging Markets Tri Asset Fund Limited, Ashmore Emerging Markets Debt and Currency Fund Limited, Ashmore SICAV in respect of Ashmore SICAV Emerging Markets Debt Fund, Ashmore SICAV in respect of Ashmore SICAV Emerging Markets Corporate Debt Fund, and Ashmore SICAV in respect of Ashmore SICAV Emerging Markets High Yield Corporate Debt Fund are funds and accounts formed in Guernsey and Luxembourg and managed by Ashmore Investment Advisors Limited and Ashmore Investment Management Limited, investment management firms incorporated in England, which are agents for and act on behalf of the Ashmore funds (collectively, "Ashmore"). Ashmore has offices in London and New York.

*d. Copernico*

30. Plaintiff Copernico Capital Partners (Bermuda) Ltd. ("Copernico") is an asset management firm incorporated in Bermuda. Copernico is an agent for and acts on behalf of Copernico Latin America Strategic Fund and Copernico Latam High Yield Fund (formerly Copernico Special Situations Fund), Cayman Islands-based funds for which it is the investment manager (the "Copernico Funds"). The Copernico Funds include U.S. investors whose funds were ultimately sent to the Copernico Funds' prime brokerage account with J.P. Morgan Clearing Corp., a U.S. brokerage firm, to purchase the 2008 bonds.

*e. HBK*

31. Plaintiff HBK Investments L.P. ("HBK") is an investment manager based in the United States. Specifically, HBK has offices in New York, New York, Dallas, Texas, Charlottesville, Virginia, and London.

32. HBK is an agent for and acts on behalf of Plaintiff HBK Master Fund L.P. (the "HBK Fund"), a Cayman Islands-based fund for which HBK is the investment advisor or manager. More than half of the HBK Fund's investors are U.S. investors.

33. HBK is bringing claims on behalf of itself relating to the 2008 bonds.

34. The HBK Fund also represents the interests and pursues the claims of EIG Global Project Fund II, Ltd. ("GPF II"),[2] a Cayman Islands-based fund that was managed or advised by EIG Management Company, LLC ("EIG"), an investment management company based in the United States, relating to the 2008 bonds. In total, 82.1% of GPF II's investors were U.S. investors.

35. Nordic Trustee represents the HBK Fund relating to the 2013 bonds.

*f. ICE*

36. Plaintiff ICE Canyon LLC ("ICE Canyon") is a former investment management company based in Los Angeles, California. ICE Canyon is an agent for and acts on behalf of Plaintiff ICE 1 EM CLO Limited (the "ICE Fund"), an Ireland-based vehicle for which it is the collateral manager and whose investors include U.S. investors.

*g. Moneda*

37. Plaintiff Moneda S.A. Administradora General de Fondos ("Moneda S.A.") is an investment management company based in Chile. Moneda S.A. is an investment manager for and acts on behalf of Plaintiffs Moneda Deuda Latinoamericana Fondo de Inversión ("Moneda Deuda Latinoamericana") and Moneda Renta CLP Fondo de Inversión, Chile-based public investment funds.

---

[2] The HBK Fund succeeded to all of GPF II's rights with respect to any claims arising out of OSA bonds and was substituted for GPF II as a Plaintiff pursuant to the U.S. Court of Appeals for the Eleventh Circuit's July 27, 2018 Order. *See Otto Candies LLC v. Citigroup Inc.*, No. 18-12663.

38. Plaintiff Moneda International Inc. ("Moneda International") is an investment advisor incorporated in the British Virgin Islands. Moneda International is an agent for and acts on behalf of Plaintiff Moneda Latin American Corporate Debt, a Cayman Islands-based fund, and Plaintiff Padstow Financial Corp., a British Virgin Islands-based account, for which it is the investment advisor or manager.

39. Moneda Asset Management, S.A.[3] ("Moneda Asset Management") is a company incorporated in Chile with offices in Santiago, Chile and New York, New York. At all times relevant here, Moneda Asset Management managed one of the funds that purchased bonds in the 2008 and 2013 Bond Issuances.

40. Moneda S.A., Moneda International, and Moneda Asset Management share the same executives. (This complaint will refer to these entities collectively as "Moneda" and to the funds they manage as the "Moneda Funds.")

41. The Moneda Funds include U.S. investors; the U.S. investors contributed funds to a brokerage account with J.P. Morgan Securities Inc. of 383 Madison Avenue, New York, NY 10179, and cleared through J.P. Morgan Clearing Corp. of 3 Chase Metrotech Center, Brooklyn, NY 11245-0001, to purchase the 2008 and 2013 bonds.

42. Moneda is bringing claims relating to the 2008 bonds. Nordic Trustee represents Moneda relating to the 2013 bonds.

*h. Nordic Trustee*

43. Plaintiff Nordic Trustee is a Norwegian company that acts as trustee for bond issuances.

[3] Moneda Asset Management S.A. changed its name to Moneda Asset Management SpA on May 13, 2019.

44. Under the contracts governing the 2013 Bond Issuance, Nordic Trustee serves as trustee, acts on behalf of, and represents the interests of the 2013 Bondholders, which are investment funds from around the world, including funds and vehicles managed by U.S. entities. Nordic Trustee does not seek damages on behalf of itself, but rather those suffered by the 2013 Bondholders.

45. Some of the largest 2013 Bondholders are U.S.-managed investment funds, including the HBK Fund. The 2013 Bondholders represented by Nordic Trustee also include Moneda and other funds owned in part by U.S. investors.

*i. Waypoint*

46. Plaintiff Waypoint Asset Management LLC ("Waypoint") is an investment management company based in Florida. More than a third of Waypoint's investors are U.S. investors.

**3. Rabobank**

47. Plaintiff Coöperatieve Rabobank U.A. ("Rabobank") is a Dutch financial institution that maintains several branches in the United States.

**B. <u>Defendant</u>**

**1. Citigroup**

48. Defendant Citigroup is a multinational banking and financial services corporation incorporated in Delaware. Citigroup maintains a principal place of business at 399 Park Avenue, New York, New York. Citigroup conducts business across the United States, including substantial business in Florida. The ICG, a division of Citigroup which operated, managed and supervised the cash advance facility utilized in the fraudulent scheme at issue herein, is based in New York, New York.

### 2. Citigroup Subsidiaries Banamex Group and Banamex

49. Grupo Financiero Banamex S.A. de C.V. (the "Banamex Group") is a wholly-owned subsidiary of Citigroup. Its principal place of business is at Isabel la Católica 44, Colonia Centro, Delegación Cuauhtémoc, Mexico City, DF 06000, Mexico. Banamex is indirectly a wholly-owned subsidiary of Citigroup and directly a wholly-owned subsidiary of the Banamex Group. Its principal place of business is at Isabel la Católica 44, Colonia Centro, Delegación Cuauhtémoc, Mexico City, DF 06000, Mexico.

50. Banamex provided cash advances to OSA (1) through the cash advance facility established, operated, managed, controlled and supervised by the ICG; and (2) at the direction of and with authority from the ICG.

### C. OSA

51. OSA is a large Mexican offshore oil services company which provided oil drilling services to Pemex, including through the purchase and leasing of various types of vessels. OSA was established in Ciudad del Carmen, Mexico in 1968 by Amado Yáñez-Correa ("Mr. Yáñez Sr."), a Mexican national, for the purpose of providing services to Pemex. In or around 2002, Mr. Amado Yáñez Jr., Mr. Yáñez Sr.'s son, became OSA's manager and controlling shareholder.

## III. JURISDICTION AND VENUE

52. This Court has subject-matter jurisdiction over the federal Racketeer Influenced and Corrupt Organization Act ("RICO") claims under 28 U.S.C. § 1331.

53. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

54. This Court has personal jurisdiction over Citigroup pursuant to Fla. Stat. § 48.193(1) because Citigroup (1) has offices and agents and transacts its affairs in the Southern District of Florida, including at its Latin American headquarters in Miami, Florida since 2013; and

(2) committed acts in furtherance of the fraudulent scheme at its Latin American headquarters in Miami, Florida.

55. This Court's exercise of personal jurisdiction over Citigroup is also consistent with the U.S. Constitution because of Citigroup's extensive contacts with the Southern District of Florida, including the maintenance of Citigroup's Latin American division headquarters in Miami, Florida, since 2013.

56. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(1) and 18 U.S.C. § 1965 because Citigroup is subject to personal jurisdiction within this District.

57. Venue is also proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965 because, on information and belief, a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred within this District, including at Citigroup's Latin American headquarters in Miami, Florida.

58. Plaintiffs bring these claims under U.S. law, including but not limited to Florida common law and the federal RICO statute (18 U.S.C. §§ 1962(c), 1964(c)).

59. As demonstrated herein, Florida has the most significant relationship with the claims, given that, *inter alia*, Citigroup's Latin American headquarters, many of the principal actors in the fraud, and Citigroup's internal review of the cash advances were based in Florida.

## IV. RELATIONSHIP BETWEEN CITIGROUP AND BANAMEX, INCLUDING WITH RESPECT TO OSA

### A. Background

60. Citigroup purchased the Banamex Group in 2001. At all times relevant here, Banamex was an indirect, wholly-owned subsidiary of Citigroup and a direct, wholly-owned subsidiary of the Banamex Group.

61. As demonstrated below, at all times relevant here, Citigroup, through its ICG: (1) controlled Banamex's activities with respect to OSA and the cash advance facility; (2) had knowledge of Banamex's activities with respect to OSA and the cash advance facility; and (3) directed and participated in such activities with respect to OSA. In addition, Banamex's activities with OSA were in furtherance of Citigroup's overall business and Citigroup authorized, approved and acquiesced to Banamex's direct and indirect representations to Plaintiffs and others that it was acting on behalf of Citigroup.

62. Provided below is a non-exhaustive list of examples of the relationship between Citigroup and Banamex, including as to OSA.

**B. <u>Examples of Relationship Between Citigroup and OSA</u>**

63. No later than February 2011, the Banamex letterhead included the Citigroup logo, as sent to Plaintiff Candies and shown below:

**Figure 1: Banamex Letterhead Logo**

Banamex
citigroup

64. As of September 13, 2010 and April 7, 2011, as respectively shown below, employee email signatures contained the logos of both Citigroup and Banamex:

José A. Ortega Rivera
Director
Supply Chain Finance Head
Banamex - citi
(52 55) 2262-7158
E-mail : joseortega@banamex.com

Banamex | Global Transaction Services

José Antonio ORTEGA RIVERA
Director
GTS Channel Finance Head
Banco Nacional de México, S.A.

Act. Roberto Medellín. 800
Piso 3°. Norte
Col. Santa Fe
C.P. 01210 México, D.F.
Tel. (52 55) 2226-6890
Fax (52 55) 2262-9461
joseortega@banamex.com

citi

65. From at least 2011 to 2013, Citigroup had authority to select Banamex's auditor. At least for the years 2011 and 2012, Christopher Robinson, Citigroup's Chief Financial Officer ("CFO") for Mexico who is based in Miami, Florida, directly engaged KPMG to audit Banamex's financial statements.

66. In 2013, Citigroup lost over $80 million in faulty loans to Mexican homebuilders. Responding to media inquiries regarding whether Banamex had acted with Citigroup's acquiescence, a Citigroup spokesperson stated that ***Citigroup directly supervised and approved*** Banamex's decision to award ***any*** credit, e.g., any decisions relating to the provision of financing, cash advances, and loans.

67. No later than September 2013, the legal department of Banamex was run by Samuel Libnic, Citigroup's head of legal matters for Latin America, who was based in Citigroup's Latin American headquarters in Miami, Florida. According to a former Banamex employee, Banamex's legal department reported to Citigroup and specifically to Mr. Libnic. On information and belief, Citigroup reviewed and approved all legal documents relating to the cash advance facility with OSA, including related trust agreements.

68. In 2016, Citigroup renamed Banamex to "Citibanamex," which uses the following logo:

69. At all times relevant here, Banamex employees held positions within Citigroup, had Citigroup email addresses, and had email signature blocks with the Citigroup logo.

### C. Examples of the Relationship Between Citigroup and Banamex as to OSA

70. At all times relevant here, Citigroup executives met with Banamex clients, including OSA.

71. According to a Banamex employee, Banamex reported to Citigroup "in New York" on matters related to OSA.

72. Indeed, at all times relevant here, Plaintiffs perceived Citigroup and Banamex as one and the same based on their statements and conduct (e.g., ICG and Banamex employees identifying themselves as employees of "Banamex-Citi" or "Banamex-Citigroup," ICG employees serving as legal representatives of Banamex and signing documents on behalf of Banamex). Neither Citigroup nor Banamex dissuaded Plaintiffs of this perception. Rather, Citigroup knowingly allowed Banamex to hold itself out as one and the same with Citigroup.

## V. CITIGROUP ESTABLISHED AND MANAGED THE CASH ADVANCE FACILITY UTILIZED IN ITS FRAUDULENT SCHEME WITH OSA

### A. Overview

73. In February 2008, Citigroup established credit facilities within Banamex to provide cash advances to contractors of Pemex, including OSA.[4] By providing a credit facility for Pemex's vendors, Citigroup sought to deepen its ties with one of the largest state-owned enterprises in the world.

---

[4] *In re Citigroup*, SEC Release 83858, 2018 WL 3913653 (Aug. 16, 2018) ("SEC Order"), at 1 & ¶ 8 (OSA used the Banamex cash advance facility from approximately 2008 to 2014); ¶ 5 (the "Banamex accounts receivable factoring facilities *were provided in two of Citigroup's banking divisions*," including the ICG, and "[a]ll of ICG's global accounts receivable factoring facilities, including those originating within Banamex, *were part of … Citigroup*") (emphasis added); ¶¶ 14, 42 (the facility was subject to Citigroup's "Global Deal Review" and "credit review and approval" processes); *see also* OSA's consolidated 2011 and 2012 financial statements, audited by KPMG, indicating that Banamex and OSA entered into a factoring agreement establishing the cash advance facility on February 27, 2008.

74. Such credit facilities were essential to Pemex contractors, and in particular OSA, because Pemex routinely took three to six months to pay its contractors' invoices, thereby depriving the contractors of much needed liquidity and cash flow in the interim. Accordingly, the Banamex credit facilities provided Pemex contractors, and specifically OSA, with consistent and sufficient funds to operate and perform under their Pemex contracts. On information and belief, OSA could not operate without such a credit facility. Indeed, over the life of the facility, Citigroup advanced over $3.3 billion to OSA.[5]

75. On information and belief, Pemex's contracts with OSA were denominated in either pesos or dollars. For contracts requiring dollar payments, Pemex was to pay OSA the dollar amount to OSA's account with Citibank in the United States or, if OSA had transferred the collection rights to a dollar-denominated contract to the ICG cash advance facility with Banamex, Pemex was to deposit payment with Banamex's account at Citibank in New York. On information and belief, Banamex, under the direction and supervision of the ICG, would use the funds received by Pemex to further the fraud by providing OSA with additional illicit cash advances.

### B. The Citigroup ICG Division Operated, Managed, and Supervised the Cash Advance Facility with OSA[6]

76. The ICG is a global Citigroup division responsible for servicing public and private sector clients with large market capitalizations, including Pemex. It is based in New York, New York.

---

5 SEC Order ¶ 8.

6 Per the SEC Order (¶ 9 & ¶ 12), the Consumer and Commercial Bank ("CCB") within Citigroup initially developed and oversaw the cash advance facility with OSA before it was transferred to ICG as OSA and the cash advance facility grew in size. On information and belief, the CCB was managed and supervised by U.S. based senior executives, including in New York, New York.

77. The ICG was responsible for developing and overseeing the credit facilities with Pemex, including the credit facility used by OSA to carry out the fraudulent scheme described below.

### C. **The Citigroup ICG Is Led by Senior, U.S.-based Citigroup Executives**

78. At all times relevant here, (1) Mr. Corbat, Citigroup's former CEO, who was ultimately responsible for the ICG's global operations, was based in New York, New York; (2) Mr. Corbat's direct subordinate, James A. Forese, was the global head of the ICG and was also based in New York; (3) Francesco Vanni d'Archirafi was global CEO of the ICG-GTS,[7] one of the ICG segments focused on cash banking services including cash advances; and (4) Fernando Quiroz Robles was the CEO of the ICG for Latin America and Mexico.

79. In February 2010, Messrs. d'Archirafi and Robles appointed Francisco Aristeguieta CEO of the ICG-GTS for Latin America.[8] Between 2010 and 2012, Mr. Aristeguieta was based in Mexico. Between 2012 and 2015, Mr. Aristeguieta was based in Miami, Florida. In an April 2010 memo addressed to "all the GTS employees in Latin America," Mr. Aristeguieta appointed Roberto Gonzalez Barrera as the ICG-GTS Head for Mexico.

80. At all relevant times, Mr. Gonzalez-Barrera held himself out as a Citigroup employee by identifying himself as an employee of "Mexico, Citi," and was responsible for

---

[7] The ICG is currently divided into the following groups: (1) Capital Markets Origination ("CMO"); (2) Corporate and Investment Banking ("CIB"); (3) Markets and Securities Services ("MSS"); (4) Treasury and Trade Solutions ("TTS"); and (5) Citi Private Bank ("CPB"). In the past, the ICG has had other divisions including Citi Transaction Services ("CTS"), Securities and Fund Services ("SFS") and Global Transaction Services ("GTS").

[8] Thereafter, in 2012, Mr. Aristeguieta became Citigroup's CEO of Latin America, a position he held until 2015. Prior to becoming CEO of Latin America, Mr. Aristeguieta was simultaneously (1) from at least 2012, CEO of the ICG-GTS segment for Latin America and Mexico, which is one of the segments focused on Citigroup's cash banking services including cash advances; and (2) a member of the Executive Committee overseeing the Banamex Group and Banamex.

overseeing the cash advance facility with OSA, including supervising and managing the ICG and Banamex employees responsible for the cash advance facility and, on information and belief, authorizing and approving their communications about such facility with OSA and its creditors, vendors and bondholders. As more fully described in Appendices 2 and 3, Mr. Gonzalez-Barrera and several of the employees under his supervision participated in the fraudulent scheme.

81. Figure 2 below illustrates Citigroup's chain of command from its top Executives to Mr. Gonzalez-Barrera, as relevant here.

**Figure 2. Citigroup's Executive Structure**




**D. <u>Services Provided by the Citigroup ICG</u>**

82. Among other services, the ICG provides financing to companies by purchasing their receivables (e.g., amounts owed by Pemex to a company for goods or services). By selling receivables to Citigroup, companies obtain cash advances on their receivables before they are due. Part of Citigroup's revenues, through the ICG, come from charging its clients interest on each cash advance that it disburses to them. ICG employees, including primarily employees from the ICG's

TTS, CTS, GTS and CIB segments, are in charge of cash advance facilities. The Latin American ("LATAM") segment of the ICG is responsible for the ICG's business in the region.

83. As relevant here, Alonso Garcia-Tames, Citigroup's Public Sector Head in Mexico since 2011, who is or has been based in New York, New York, was responsible for Citigroup's relationship with Pemex and supervised one of the senior ICG employees responsible for the cash advance facility with OSA, Emilio Granja. Mr. Garcia-Tames used a Citigroup email address (alonso.garcia@citi.com).

## E. Citigroup Policies and Procedures Governed the OSA Cash Advance Facility

### 1. Overview

84. Citigroup's policies and procedures, including policies issued by the ICG division,[9] governed the award of cash advances from Banamex to Pemex contractors, including as to OSA.

85. Between 2008 and 2011, on information and belief, in order to advance funds to OSA through the Banamex cash advance facility, Citigroup's policies and procedures required (1) OSA to submit invoices with a Pemex stamp indicating that Pemex would pay for that invoice; and (2) Citigroup to confirm with Pemex that Pemex had reviewed and authorized the OSA invoice.

86. By no later than 2012, the following governed Citigroup's cash advance facility with OSA: (1) the Handbook of Cash Advances; and (2) the Contract Guidelines. As described further below (*infra* at Section V.E.3-4), these policies and procedures required Citigroup to: (1) contact Pemex to verify the authenticity of documents submitted by Pemex contractors, such as OSA, in support of its cash advance requests; and (2) ensure that such documents accurately

---

[9] Pursuant to the ICG Credit Policies, the executives with the highest approval power in Mexico are the "Citi Risk Officer" and the "ICG Director."

reflected the terms of the contract between Pemex and the contractor (e.g., that OSA's invoices to Pemex did not seek reimbursement for goods or services not covered by Pemex's contracts with OSA or for amounts greater than the contracts provided, each of which would cause Pemex not to pay Banamex on the invoice).

87. In addition to the above policies and procedures, for any increase in a cash advance limit to a Pemex contractor, Citigroup was required to issue a "Credit Memoranda." As further described below, Federico Solorzano-Arrache and Emilio Granja Gout, two ICG executives, approved all increases in OSA's cash advance limit.

88. Specifically, Mr. Solorzano-Arrache was ICG's Director of Credit and Citigroup terminated him in the wake of the public disclosure of the fraud. Mr. Granja was ICG's Pemex-Citigroup Relationship Manager and a Citigroup Manager Director from 2010 to 2014. Mr. Granja's email address included "[ICG-CIB]" or "[ICG-LATAM]" electronic stamps. In addition, a March 19, 2013 Citigroup proposal for OSA advisory work was signed by Mr. Granja and listed him as a "Managing Director" who was a member of "Citi's team for Oceanografía," along with other Citi "experienced professionals in New York, Houston and Mexico City." Furthermore, Mr. Granja's LinkedIn profile states that he was a "Citi Managing Director" from January 2012 to May 2013 based in Mexico City, held other positions within Citigroup since 1998 that included "several credit audits in other countries," and received his MBA from Cornell—with no mention of Banamex. Citigroup also terminated Mr. Granja after public disclosure of the fraud and the Mexican banking regulator found that Mr. Granja, among others, was criminally responsible for the fraud.

89. Through the Handbook of Cash Advances, Contract Guidelines, and Credit Memoranda, Citigroup—not the Pemex contractor (e.g., OSA)—was supposed to be responsible

for ensuring that the cash advance facility (1) functioned properly; (2) was sufficiently controlled (i.e., that Citigroup did not issue cash advances to Pemex contractors based on inaccurate or fraudulent documents); and (3) provided the contractor with sufficient liquidity while also ensuring that Pemex ultimately would pay Citigroup for the advances it made to Pemex contractors.

90. In September 2012, however, Citigroup, through senior ICG employees, entered into a secret, side agreement with OSA that materially changed the control system for OSA's cash advance facility. Specifically, on September 21, 2012, Mr. Yáñez of OSA entered into a "Regulatory Contract" with Banamex (the "Regulatory Contract"). Mr. Granja and Alfonso Ortega-Brehm, two senior ICG executives, signed the Regulatory Contract on behalf of Banamex. Through the Regulatory Contract, Citigroup attempted to absolve Banamex and itself of any responsibility to verify or authenticate the documents OSA submitted in support of its cash advance requests.

91. Pursuant to the Regulatory Contract, OSA, not Citigroup, now held sole responsibility for implementing the control system for its own cash advance facility; thereby allowing Citigroup and OSA to more easily execute the fraud, as described further below.

92. Citigroup and OSA concealed the Regulatory Contract from Plaintiffs in furtherance of the fraud.

### 2. Citigroup Policies and Procedures Before Issuance of the Handbook of Cash Advances and Contract Guidelines

93. As noted above, on information and belief between 2008 and 2011, in order to obtain a cash advance, Citigroup's policies and procedures required OSA to submit invoices containing a Pemex stamp indicating that Pemex would pay for that invoice.

94. In addition, Citigroup's policies and procedures required Citigroup to confirm with Pemex that Pemex had reviewed and authorized the OSA invoice.

95. When the invoice became due, Pemex paid it to Citigroup.

### 3. Issuance of Handbook of Cash Advances in February 2011

96. Since February 2011, Citigroup has issued, and annually updated, an internal policy governing cash advance requests from Pemex's contractors to Citigroup (i.e., the Handbook of Cash Advances).

97. The Handbook of Cash Advances describes in detail the process for a Pemex contractor to request and obtain a cash advance from Citigroup. Specifically, to obtain a cash advance from Citigroup, the contractor had to assign all of its collection rights under a contract with Pemex to Citigroup and then submit a (1) cash advance form; (2) Pemex work estimate; and (3) Pemex work estimate authorization.[10]

98. In addition, Citigroup was required to (1) contact Pemex to verify that it had actually issued the Pemex work estimates and work estimate authorizations; and (2) ensure that the documents submitted by the contractor accurately reflected the terms of Pemex's contracts with the contractor.

99. Only upon successful completion of these two steps would Citigroup be permitted to disburse the cash advance to the contractor (or to trusts established for the benefit of the contractor's vendors or creditors).

### 4. Contract Guidelines

100. The Contract Guidelines outline the policy governing all cash advance requests from a Pemex contractor to Citigroup under a specific contract between the contractor and Pemex. One Contract Guideline may govern a Pemex contractor's cash advance requests to Citigroup

---

[10] A Pemex work estimate and work estimate authorization are documents signed by Pemex officials and the contractor's employees reflecting a payment owed to the contractor by Pemex for a service it provided to Pemex.

pursuant to several contracts between Pemex and the contractor. As of 2014, Citigroup had in place at least 13 Contract Guidelines governing all OSA cash advance requests.

101. The Contract Guidelines identified the manager of Citigroup's relationship with OSA (the "OSA-Citigroup Relationship Manager") and the managers of OSA's cash advance requests who received the requests along with their underlying documentation (the "Cash Advance Product Manager"). The Contract Guidelines also designated the Citigroup employees responsible for the relationship between Citigroup and Pemex (the "Pemex-Citigroup Relationship Manager"). The Contract Guidelines further designated the Citigroup employee responsible for managing trusts in Banamex established to pay OSA's vendors and creditors with revenue from OSA's contracts with Pemex and with cash advances from Citigroup (the "Citigroup Trust Manager").[11]

**5. Credit Memoranda**

102. Furthermore, for each increase in the cash advance limit, Citigroup was required to issue a Credit Memorandum, which is the Citigroup document necessary to increase credit facilities.

103. All the Credit Memoranda were in a standard Citigroup form, signed in English, and saved to Citigroup's internal network.

104. Citigroup authorized at least nine cash advance limit increases for OSA between 2010 and 2013.

---

[11] Attached as Appendix 1 is a table indicating (1) the date of all Contract Guidelines in effect at the time of the fraudulent scheme; (2) the OSA-Pemex contracts governed by each Contract Guideline; (3) whether OSA established a trust to receive the cash advances and, if so, (i) the trust's beneficiary, and (ii) the assigned Citigroup Trust Manager; (4) the Pemex-Citigroup Relationship Managers in connection with the OSA-Pemex contract(s) covered by the Contract Guideline; (5) the Cash Advance Product Managers; and (6) the OSA-Citigroup Relationship Managers in connection with the OSA-Pemex contract(s) covered by the Contract Guideline. This demonstrates the depth of Citigroup's own ties to OSA, through employees of its ICG group and its subsidiary Banamex.

### 6. The Secret Regulatory Contract

105. On September 21, 2012, OSA, through Mr. Yáñez, and Citigroup, through Mr. Granja and Mr. Ortega-Brehm of the ICG, executed the Regulatory Contract.[12] The purported purpose of the Regulatory Contract was to permit OSA to assign to Citigroup its collection rights under contracts with Pemex to then obtain cash advances from Citigroup based on documents reflecting receivables such as Pemex work estimates.

106. The Regulatory Contract, however, stated that: "At no time shall Banamex have the obligation or responsibility to determine or verify that the Documents[13] evidencing the Collection Rights are valid and legally enforceable, nor if their text is correct, nor if the original signatures appearing in such Documents correspond to the signatories, nor if the parties that executed such Documents had, at the time of their execution, sufficient powers to do so." Dkt. 83-6 § 5.8.

107. In other words, Citigroup, through the Regulatory Contract signed by two ICG senior executives, attempted to release Banamex and itself from any obligation, as required under its own policies and procedures (e.g., the Handbook of Cash Advances), to verify the validity, authenticity or accuracy of the documents submitted by OSA to Citigroup in support of its cash

---

12 As noted above and in Appendix 2, Mr. Granja was the ICG Pemex-Citigroup Relationship Manager and Citigroup Managing Director from 2010-2014. Mr. Granja's email address included "[ICG-CIB]" or "[ICG-LATAM]" electronic stamps. The Mexican banking regulator, as discussed *infra* in Section X, concluded that Mr. Granja, among others, was criminally responsible for the fraudulent scheme. Citigroup also terminated Mr. Granja after public disclosure of the fraud. Mr. Ortega-Brehm, as discussed in Appendix 3, was ICG's corporate banking director from approximately 2010 to 2014. His email address included "[ICG-CTS]" or "[ICG-GTS]" electronic stamps. The Mexican banking regulator also found Mr. Ortega-Brehm criminally responsible for the fraud and Citigroup terminated him as a result of his role therein. *See infra* Section X.

13 The Regulatory Contract defines "Documents" as: "those that document Physical Work Progress, Invoices, Work Estimates, Receipts, Counter receipts, Bills of exchange, Promissory notes, as well as any document in which a Collection Right derived from a [Pemex] Contract is evidenced."

advance requests. The Regulatory Contract effectively gutted Citigroup's control system for the cash advance facility, by placing the burden of validating and authenticating documents with the very party who collected and prepared the documentation and had the opportunity and incentive to falsify such documentation.

108. On information and belief, Citigroup, through the ICG, executed the Regulatory Contract (1) to further facilitate the fraud by limiting Citigroup's involvement in the validation process and providing OSA with more opportunities to submit false and fraudulent documentation undetected; and (2) as a defense against any future litigation or investigation relating to the ongoing fraud. Citigroup and OSA concealed the Regulatory Contract from Plaintiffs.

## VI. THE FRAUDULENT SCHEME

### A. Overview

109. Beginning as early as 2008 and continuing through February 2014,[14] Citigroup and OSA engaged in a fraudulent scheme utilizing the cash advance facility provided by Citigroup to OSA, under the management, supervision and authority of the ICG (or CCB). Specifically, Citigroup, through the ICG (or CCB) and utilizing Banamex, knowingly advanced OSA hundreds of millions of dollars (1) in excess of the amounts Pemex actually owed OSA under their contracts; and (2) based upon fraudulent documents that bore forged Pemex signatures. On information and belief, Citigroup, through the ICG and utilizing Banamex, would then submit, on at least a

---

[14] *See, e.g.*, SEC Order, 2018 WL 3913653, at 1 (Aug. 16, 2018) ("Over the period between 2008 and February of 2014, Banamex loaned billions of dollars on the basis of invoices and work estimates – also known as 'accounts receivable factoring' in the banking industry – reflecting work performed for [Pemex] by [OSA] … However, some of the factored documents received from OSA, amounting to about $400 million, were fraudulent and included forged signatures."); *see also* OSA's consolidated 2011 and 2012 financial statements, audited by KPMG, indicating that Banamex and OSA entered into a factoring agreement establishing the cash advance facility on February 27, 2008.

quarterly basis and up to multiple times per week, OSA's fraudulent and forged documentation to Pemex for payment and Pemex would pay Citigroup.

110. Citigroup ICG employees were directly involved in the fraud. For example, Erik Cervantes-Murillo, Citigroup ICG's Cash Advance Product Manager, using his Citigroup email address (erik.cervantesmurillo@citi.com), sent fraudulent cash advance requests to ICG Cash Advance Product Analysts based in Mexico City, who were responsible for processing cash advance requests to obtain payment for OSA. Mr. Cervantes-Murillo's email address included an "[ICG-TTS]" electronic stamp. *See* Appendix 2. The Mexican banking regulator concluded that Mr. Cervantes-Murillo, among others, was criminally responsible for the fraudulent scheme and Citigroup terminated him for his role therein.[15]

111. The Mexican banking regulator also concluded that Citigroup ICG Cash Advance Product Analysts Vanessa Ramirez, Rene T. Lopez-Arevalo, Guillermo Perez-Elizundia, and Guadalupe Angelica Ruiz-Martinez, who were responsible for reviewing cash advance requests from OSA to ensure consistency with the Pemex-OSA contracts, were criminally involved in the fraud. Ms. Ramirez had a Citigroup email address, vanezza.ramirez@citi.com and represented herself as a Citigroup employee of "Banamex-Citigroup." Messrs. Lopez-Arevalo and Perez-Elizundia and Ms. Ruiz-Martinez used emails including a "[ICG-GTS]" electronic stamp.

112. On information and belief, the Citigroup ICG Cash Advance Product Analysts were supervised by Sergio Torres-Lebrija, Manager of the ICG Cash Advance Facilities in Mexico. Mr.

---

[15] One of Mr. Cervantes-Murillo's counterparts and co-conspirators at OSA was Israel Varela, OSA's senior financial manager at the time, who was responsible for obtaining cash advances from the facility for OSA. Prior to joining OSA, Mr. Varela worked at Citigroup. On information and belief, Mr. Varela was a principal participant in the fraud with the ICG employees, including by preparing the false documentation submitted to the ICG. Mr. Varela was not investigated by Citigroup or the Mexican authorities.

Torres-Lebrija's email address included an "[ICG-TTS]" electronic stamp. The Mexican banking regulator also found that Mr. Torres-Lebrija was criminally responsible for the fraud.

113. Citigroup, through its ICG and utilizing Banamex, earned millions of dollars in interest by providing OSA with the fraudulent cash advances and, in fact, assisted OSA in increasing its cash advance limit, in order to further increase Citigroup's interest income from the facility. In other words, Citigroup had a clear financial motive to participate in the fraudulent scheme with OSA.

114. To execute the fraudulent scheme, Citigroup blatantly ignored its own policies and procedures, including the Handbook of Cash Advances, Contract Guidelines, and Credit Memoranda. And, in a transparent attempt to further facilitate the fraud but also distance itself therefrom and avoid liability stemming from its intentional failure to validate and authenticate OSA's cash advance documentation, Citigroup executed the secret Regulatory Contract with OSA in September 2012, which placed all responsibility for validating and authenticating the cash advance documentation with OSA, the very party that Citigroup, as a participant in the fraud, knew was submitting false and fraudulent documentation to the ICG as part of the scheme.

**B. <u>Citigroup Earned Millions in Risk-Free Interest by Providing Fraudulent Cash Advances to OSA and Repeatedly Increasing OSA's Credit Line</u>**

115. Citigroup, through its ICG, charged OSA interest on every cash advance it disbursed to OSA. Specifically, Citigroup charged OSA the "ordinary annual interest rate" plus a "spread" (the "Citigroup Rate"). The "ordinary annual interest rate" is an interest rate benchmark in Mexico resulting from averaging the interest rates banks charge each other for inter-bank loans. Citigroup applied the Citigroup Rate on all its cash advances to OSA, from the date of disbursement until the date Pemex reimbursed Citigroup for the cash advance, usually a period of approximately 90 to 180 days.

116. As a condition for extending this short-term credit to OSA, Citigroup, through its ICG, insisted on the right to collect repayment of cash advances made to OSA directly from Pemex. So, when due, Pemex made payment directly to Citigroup. In doing so, Citigroup eliminated virtually all risk to itself. Consistent with Pemex's status as Mexico's largest government entity, providing cash advances to Pemex vendors was risk-free and extremely profitable for Citigroup.

117. Indeed, Citigroup considered this interest risk-free because the very employees who stood to gain—in stature and compensation—from increasing the cash advances misclassified them as a credit risk to Pemex rather than the much less financially secure OSA.[16]

118. The greater the amount of the cash advances, the more interest Citigroup earned. Entirely insulated from risk, Citigroup had every incentive to permit, and indeed encourage, OSA to increasingly seek payment via cash advances. And that is precisely what happened. From 2009 to 2012, Citigroup's cash advances to OSA increased on nine separate occasions and grew, in total, by more than six times. Over that same period, OSA's revenue increased by only half that rate.

119. As one example, in 2012, OSA received almost six times more in cash advances from Citigroup than it did in 2009, even though OSA's revenue increased by less than half that rate over that same period. According to its audited financial statements, OSA had net revenues of $920 million in 2012. That same year, Citigroup extended OSA $450 million—nearly half of OSA's revenue—in cash advances. This disparity could not have escaped notice by any responsible (or otherwise) banker.

120. Citigroup was well aware of OSA's outsized and increasing use of cash advances, including that, by 2012, nearly half of OSA's revenue was in the form of cash advances. From at least 2010 to 2013, OSA sent to Citigroup its annual audited financial statements and frequently

[16] *See, e.g.*, SEC Order, at ¶¶ 21-23.

sent its interim financial statements, as well as other financial and operational information detailing its financial condition and its outstanding debts with its vendors, creditors and bondholders.[17]

121. Yet Citigroup (through its ICG), from as early as 2008 (and no later than September 2013) to February 2014, certain of its ability to collect any advanced amounts from Pemex and motivated by continued and increasing interest payments, advanced amounts (1) it knew were completely inconsistent with, and unsupportable by, the contracts on which they were based (e.g., OSA sought cash advances for amounts greater than the agreed upon price set forth in the applicable contract with Pemex); and (2) based on fraudulent documentation that Citigroup knew bore forged Pemex signatures.

## C. <u>The Fraud Between 2008 and 2010</u>

### 1. Overview

122. On information and belief, between 2008 and 2010, Citigroup, through its CCB and utilizing Banamex, advanced funds to OSA based on documents Citigroup knew were fraudulent and bore forged Pemex signatures, based on its role in the fraud.[18]

---

[17] OSA sent its annual audited financial statements and interim financial statements as well as other operational and financial information to Citigroup on at least the following dates: August 22 and 23, 2010 (complete list of operational expenses and revenue from all Pemex contracts); January 14, 2011 (list of revenue from all Pemex contracts); January 26, 2011 (list of revenue from all Pemex contracts); February 22, 2011 (list of revenue from all Pemex contracts); March 25, 2011 (list of revenue from all Pemex contracts); April 14, 2011 (list of revenue from all Pemex contracts); December 5, 2011 (financial information as of the close of July 2011); December 6, 2011 (financial information as of the close of August 2011); May 12, 2012 (financial information as of the close of March 2012); May 17, 2012 (financial information as of the close of March 2012); July 2, 2012 (2009 and 2010 annual audited financial statements); October 1, 2012 (financial information as of the close of July 2012); November 27, 2012 (list of revenue from all Pemex contracts and details of each OSA creditor and amounts owed); February 1, 2013 (financial information as of the close of November 2012); April 5, 2013 (financial information as of the close of December 2012); April 23, 2013 (list of revenue from all Pemex contracts); August 8, 2013 (2012 annual audited financial statement); September 10, 2013 (financial information as of the close of June 2013).

[18] *See, e.g.*, SEC Order, at 1.

**2. Citigroup Violated Its Internal Controls to Execute the Fraud**

123. To effectuate the fraud between 2008 and 2010, Citigroup, on information and belief, ignored and violated its own internal controls, policies, procedures and practices relating to cash advances to Pemex contractors.[19] For example, on information and belief and in furtherance of the fraud, Citigroup did not validate the authenticity of the Pemex stamps on the invoices submitted by OSA, nor did Citigroup confirm that Pemex had reviewed and authorized the invoices submitted by OSA in support of its cash advance requests.[20]

**D. <u>Deterioration of OSA's Finances and Citigroup's Freezing of the Cash Advance Facility in 2010</u>**

124. In 2010, OSA was in severe financial distress and struggling to pay its creditors, investors and suppliers, including Plaintiffs Candies and Rabobank. Allegations surfaced that OSA was struggling, in part, because Mr. Yáñez was using the funds advanced by Citigroup, through the cash advance facility, not for critical business operations, but for Mr. Yáñez's pet projects and personal expenses.

125. During OSA's financial crisis in 2010, on information and belief, Citigroup was forced to freeze the cash advance facility because Pemex had refused to pay Banamex on invoices

---

[19] *See, e.g.*, *id*. at ¶ 28 ("[T]hroughout the life of the Banamex-OSA accounts receivable factoring facility, Banamex's internal accounting controls were insufficient to appropriately evaluate numerous red flags . . . including: (a) Pemex's refusal in 2010 to pay Banamex on certain invoices OSA had factored with Banamex; (b) Banamex's limited contact with Pemex with respect to the advances; . . . (d) OSA – not Pemex – telling Banamex in certain instances to which advances any particular payment should be applied[.]"), ¶ 31 ("In December of 2009, Banamex had already lost $1 million under the accounts receivable factoring program when it factored invoices for another company that was a supplier for Pemex without properly validating the documents with Pemex. Claiming that the supplier's work was not timely, Pemex ultimately refused to pay the invoices."); ¶ 16 ("[M]edia reports alleged that OSA had defrauded another Mexican bank of more than $30 million dollars in 2006 under a credit product almost identical to the [OSA-Banamex facility], by submitting fraudulent invoices to obtain financing from that bank, i.e. in the exact manner in which OSA defrauded Banamex.").

[20] *Id*.

that OSA had submitted in support of its cash advance requests and that Banamex had advanced to OSA.[21] In other words, Pemex refused to reimburse Banamex for funds it had already advanced to OSA. On information and belief, Pemex refused to pay Banamex because the documentation submitted by OSA was fraudulent.[22]

126. Without the cash advance facility, OSA lacked sufficient liquidity to operate and bankruptcy appeared imminent. Before OSA could restructure any of its debts, it needed to convince Citigroup to re-open the cash advance facility because, without it, OSA did not have the cash flow to operate or provide services to Pemex. In other words, as long the cash advance facility remained frozen, OSA could not earn income from its Pemex contracts. Re-opening the cash advance facility was vital to resolving OSA's financial crisis and ensuring future financial success.

127. On information and belief, during discussions between OSA, Citigroup and Pemex, Pemex informed the parties that Citigroup and OSA needed to develop a new and improved system of controls in order to ensure that (1) the documentation submitted by OSA in support of its cash advances complied with Pemex requirements; and (2) Pemex would pay the invoices upon which Banamex had advanced funds to OSA.

128. Shortly thereafter, Citigroup and OSA purportedly developed and implemented new policies and procedures approved by Pemex including, on information and belief, (1) the Handbook of Cash Advances, which was first issued in February 2011; and (2) the Contract Guidelines.

129. After the parties agreed to implement a new system of controls and Pemex approved such controls, Citigroup re-opened the cash advance facility. On information and belief, Jose

---

[21] *See, e.g.*, SEC Order, ¶28(a) ("Pemex's refusal in 2010 to pay Banamex on certain invoices OSA had factored with Banamex").

[22] *See, e.g., id*. at 1.

Antonio Ortega-Rivera, the Citigroup Head of Cash Advances for Mexico at the time, played a key role in developing this new system of controls.[23] Importantly, in 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012.[24] Shortly thereafter, OSA hired Mr. Ortega-Rivera as an OSA employee.

130. In or around mid-to-late 2010, Citigroup and OSA, including but not limited to Mr. Yáñez, Mr. Granja and Mr. Ortega-Rivera, falsely represented to at least Plaintiffs Candies and Rabobank that Citigroup and OSA had implemented a new control system for the cash advance facility, with the acknowledgement and approval of Pemex, pursuant to which Citigroup was wholly responsible for validating and authenticating the documentation that OSA submitted in support of its cash advance requests.

131. Because of the (1) importance of the cash advance facility to OSA's liquidity and cash flow; and (2) allegations that, in and before 2010, Mr. Yáñez misused the funds from the cash advances, Plaintiffs Candies and Rabobank, among others, had to be convinced that the previous problems with the cash advance facility had been fixed before they would even consider working with OSA on a restructuring plan, among other things.

132. Citigroup and OSA intended and had reason to expect that their own employees, including Mr. Yáñez, other representatives of OSA including Israel Varela Morales (a former Citigroup employee), Mr. Granja, and Mr. Ortega-Rivera, and their agents and representatives would represent to OSA's creditors, vendors and bondholders that: (1) the prior problems with the cash advance facility had been fixed; (2) the facility was functioning properly; (3) Citigroup was

---

23 SEC Order, at ¶34.

24 *Id*.

in charge of the internal controls; and (4) they had nothing to worry about regarding the stability and reliability of the cash advance facility.

133. Between 2010 and early 2014, Citigroup and OSA purposefully concealed the following from OSA's vendors, creditors and bondholders including Plaintiffs: (1) OSA, with Citigroup's knowledge, was submitting false documents containing forged Pemex signatures to ICG employees in support of its cash advance requests; (2) the cash advance facility lacked sufficient internal controls because (i) Citigroup intentionally violated its own internal policies; and (ii) in 2012, through the secret Regulatory Contract, Citigroup attempted to absolve itself of any responsibility for validating and authenticating documents submitted by OSA; and (3) Citigroup and OSA were involved in a fraudulent scheme.

## E. <u>The Fraud Continues Between 2011 and 2014</u>

### 1. Overview

134. Despite representations by Citigroup and OSA to Pemex and others between 2010 and 2011 that they had implemented new and improved controls for the cash advance facility, the fraud continued between 2011 and early 2014.

135. Specifically, during this time period, Citigroup knowingly advanced funds to OSA that were (1) inconsistent with OSA's contracts with Pemex; and (2) based on fraudulent documentation containing forged Pemex signatures.

136. Figure 3 below illustrates the fraudulent scheme during this time period:

**Figure 3. Fraudulent Scheme**




### 2. Citigroup Advanced Funds That Were Greater than the Value of OSA's Contracts with Pemex

137. Over the course of the fraudulent scheme between approximately 2011 and 2014, Citigroup provided cash advances to OSA in amounts that were, at a minimum, as much as five times more than the value of the underlying Pemex contract. For example, OSA requested cash advances of (1) approximately $126 million on a contract that only paid $39 million annually; (2) approximately $110 million on a contract that only paid $23 million annually; (3) approximately $88 million on a contract that only paid $32 million annually; (4) approximately $44 million on a contract that only paid $16 million; and (5) approximately $75 million on a contract that only paid $51 million.

### 3. Citigroup Violated Its New, Internal Controls to Execute the Fraud

138. Beginning in or around 2011 but no later than 2012, for each cash advance request, OSA was required to submit to Citigroup (1) an original cash advance request form; (2) a copy of a Pemex work estimate; and (3) a copy of a Pemex work estimate authorization.

139. Those requests were, in turn, supposed to be subject to a two-step approval process. ***First***, Citigroup purported to insist that two senior Citigroup employees, in the branch office where the cash advance requests were submitted, contact Pemex to verify that it had actually issued the Pemex work estimates and work estimate authorizations. ***Second***, Citigroup purported to insist

that employees in Citigroup's headquarters in Mexico City who were responsible for processing cash advance requests ensure that the documents submitted by OSA accurately reflected the terms of Pemex's contracts with OSA. Only upon the successful completion of ***both*** steps would Citigroup, by its own account, be permitted to disburse the cash advance to OSA or to trusts (*see infra* at Sections VII.B.1 and XIV.C.3.b for description of the trusts) established for the benefit of OSA's vendors or creditors.

140. In actuality, Citigroup did not satisfy ***either*** step. With regard to the first step, as confirmed by the CNBV, the signatures of Pemex employees on each of the 166 Pemex work estimates and work estimate authorizations submitted by OSA to Citigroup, from September 2013 to February 2014, were false. With respect to the second step, these fraudulent cash advance requests were blatantly inconsistent with the value of OSA's contracts with Pemex. Over the course of six months, OSA requested approximately $750 million in cash advances for work that OSA was obligated to perform under 13 contracts with Pemex. The aggregate total value of those contracts was approximately $542 million, and the work was to be performed over terms ranging from one and five years. Yet, OSA requested cash advances that exceeded the value of the underlying contracts by over ***$200 million*** in a ***small fraction*** of the time contemplated by the agreements.

#### 4. Citigroup and OSA Secretly Changed the Control System in 2012 to Further Effectuate the Fraud

141. As noted above, in September 2012, Citigroup and OSA executed, and concealed from the Plaintiffs, the Regulatory Contract, which purported to absolve Citigroup of any responsibility for validating or authenticating the documentation submitted by OSA in support of its cash advance requests.

142. The Regulatory Contract not only contradicted Citigroup's own policies and procedures regarding OSA's cash advance facility but destroyed the new control system purportedly implemented in 2010 and 2011 and on which OSA's creditors and bondholders, including many Plaintiffs, relied upon when (1) agreeing to OSA's restructuring plan; (2) investing or maintaining investments in OSA; or (3) providing concessions to OSA (*see infra* at Section V.E.6).

143. Citigroup and OSA intentionally concealed the Regulatory Contract and the corresponding changes in the control system for OSA's cash advance facility, which rendered the facility unreliable, unstable, and ripe for abuse, from OSA's vendors, creditors and bondholders, including Plaintiffs.

144. In addition, Citigroup's independent risk department flagged the cash advance facility in September 2013 and questioned "whether there was sufficient support for the credit facility being classified as a buyer centric program and whether the process for validation and payment of factored documents was sufficiently robust", but Citigroup continued to operate and drastically increase the cash advances through OSA's collapse in February 2014.[25]

**F. <u>Citigroup Profited from the Fraudulent Scheme</u>**

145. Citigroup retained the fruits of its misconduct. On information and belief, Pemex made Citigroup whole for Citigroup's cash advances to OSA based on falsified Pemex receipts, and Citigroup never disgorged those payments.

**G. <u>Plaintiffs Suffered from the Fraud</u>**

146. Meanwhile, as a direct result of the fraudulent scheme that Citigroup orchestrated, Plaintiffs—the actual victims here—suffered damages totaling over $1 billion.

---

[25] SEC Order, at ¶44.

147. Specifically, and as described *infra* in Sections XIV-XVI, Citigroup and OSA, with Citigroup's assistance and knowledge, made fraudulent misrepresentations and material omissions to Plaintiffs to lure them into investing in or doing business with OSA, and maintaining their investments in or continuing to do business with OSA, in furtherance of the fraud as more fully described below (*see infra* Counts 3-5).

## VII. CITIGROUP EMPLOYEES ORCHESTRATED AND FURTHERED THE FRAUD, INCLUDING THROUGH THE USE OF THE CASH ADVANCE FACILITY AND BANAMEX EMPLOYEES

### A. Citigroup Employees Knowingly Approved the Fraudulent Cash Advance Requests

148. The employees who (1) authorized OSA's cash advance facility; (2) knowingly approved OSA's fraudulent cash advance requests; (3) signed the secret Regulatory Contract; and (4) participated in the fraudulent scheme were employees of (1) Citigroup's ICG; or (2) Banamex employees supervised and managed by Citigroup's ICG with Citigroup's knowledge and approval of, authority to engage in, and acquiescence to their activities, including discussions and representations to OSA's creditors, vendors and bondholders about the cash advance facility.

149. For example, some of the employees who approved OSA's cash advance requests had email addresses with electronic stamps reading "[ICG]," identifying them as employees of the ICG, others held themselves out as employees of Citigroup or had @citi.com email addresses. Indeed, any Banamex employee involved with OSA's cash advance requests and the fraudulent scheme would have reported directly to and been supervised by ICG employees.

150. On information and belief, the Citigroup employees who carried out the fraudulent scheme (and the Banamex employees operating under the management and supervision of the ICG and with the knowledge, authority, approval and acquiescence of Citigroup to discuss the cash advance facility with OSA and its creditors, bondholders and vendors) sent and received emails

including from email addresses ending in @citi.com, @citigroup.com, and @banamex.com to carry out the fraudulent scheme through Citigroup email servers in the United States.

151. Because the ICG (and CCB) is based in New York and it controlled the cash advance facility with OSA, on information and belief, executives with knowledge of the fraudulent scheme and documents regarding the same are in the United States. Indeed, as noted above, Banamex reported to Citigroup "in New York" on matters related to OSA.

152. Appendix 2 includes a non-exhaustive list of Citigroup and Banamex employees (1) responsible for approving OSA's cash advance facility, authorizing OSA cash advance requests or otherwise participating in the cash advance facility; and (2) involved in the fraudulent scheme.

153. Appendix 3 includes a non-exhaustive list of other Citigroup and Banamex employees involved in the fraudulent scheme.

### B. Citigroup Employees Managed Trusts Established by OSA to Pay Creditors from the Cash Advance Facility

154. Throughout the fraud, OSA established several trusts in Banamex's trust division to pay OSA's creditors with revenue from OSA's contracts with Pemex. The purpose of these trusts was to ensure that OSA's creditors received funds from OSA's work for Pemex before OSA. In other words, the trusts were supposed to guarantee payment to OSA's creditors.

155. The ICG, located in the United States, managed these trusts, as discussed *infra* at Sections VII.B.1 and XIV.C.3.b; *see also* Appendix 2.

#### 1. Rabobank Trust

156. For example, OSA established a trust to pay its debts to Plaintiff Rabobank (the "Rabobank Trust"). As described in detail below (*infra* at Section VII.B.1), Banamex was the trustee of Rabobank Trust, of which Plaintiff Rabobank was the beneficiary.

157. In connection with the trust, Plaintiff Rabobank entered into various agreements with OSA and Banamex, executed by ICG employees. Under these agreements, Banamex, under the supervision of the ICG, was supposed to disburse funds to Rabobank from the cash advance facility, upon receipt of a cash advance request by OSA based on work it had performed under Pemex contracts assigned to the Rabobank Trust (*see infra* at Section VII.B.).

158. As discussed further *infra* at Section XVI, Banamex has failed to disburse funds in the Rabobank Trust to Rabobank.

**2. Mexican Trust Established for 2013 Bondholders**

159. On October 17, 2013, OSA, Goliath Ltd. and Nordic Trustee established a trust (the "Mexican Trust") in Banamex to receive the proceeds of Goliath's services to Pemex.

160. The beneficiary of the Mexican Trust was Nordic Trustee, who would receive these funds as collateral for the 2013 bondholders in the event that OSA and Goliath Ltd. failed to pay the principal or interest of the 2013 Bond Issuance to the bondholders.

161. As discussed in detail *infra* at Section XIV.C.3.b, the purpose of the Mexican Trust was to ensure that the 2013 Bondholders received payment from OSA's Pemex contracts because OSA.

## VIII. <u>DISCOVERY OF THE FRAUD</u>

### A. <u>Unrelated Insurance Probe by SFP</u>

162. In June 2013, the Secretaría de la Función Pública ("SFP"), the Mexican agency responsible for overseeing public contracts and government spending, launched a probe into the insurance policies that OSA was required to provide to Pemex under Mexican law.

163. On February 10, 2014, the SFP concluded that, for nine contracts with Pemex, OSA had failed to provide the required insurance policies; the SFP therefore banned OSA from entering into new contracts with Pemex for one year, nine months and 12 days.

164. The SFP published its decision on February 11, 2014.[26]

**B. Citigroup Commences Investigation in Response to SFP's Ban Against New Contracts Between OSA and Pemex**

165. When the SFP publicly announced the ban against OSA on February 11, 2014, Citigroup was forced to launch an internal investigation relating to OSA, including as to the cash advance facility.[27]

166. Far from trying to determine the full extent of the fraudulent scheme, however, Citigroup focused on minimizing its own exposure. That is why Citigroup limited its internal investigation to 166 cash advance requests (totaling approximately $430 million), even though, according to the documents it provided to the PGR in or around March 2014, Oceanografía submitted approximately 223 cash advance requests (totaling approximately $750 million) over that period. That is also why Citigroup neither reviewed, nor provided to Pemex or the PGR, evidence of cash advances from prior to September 2013—Citigroup was processing fraudulent cash advance requests for OSA, on information and belief, as early as 2008.

167. As part of its investigation, Citigroup supposedly contacted Pemex to verify OSA's receivables and the amount of Pemex's pending payments to OSA as reflected in the Pemex work estimates that OSA had submitted to Citigroup.

---

[26] Over the next eight months, Pemex terminated 20 contracts with OSA and 11 contracts reached the end of their terms. OSA challenged the SFP's ban in a Mexican court. In July 2014, OSA prevailed. The court ruled that the SFP's ban against OSA was improper because the Mexican statute governing bans is reserved for fraud, and OSA's failure to obtain proper insurance coverage did not itself constitute fraud.

[27] Samuel Libnic, Citigroup's head of legal matters for Latin America, based in Miami, Florida, led Citigroup's internal review of its cash advance facility with OSA. In doing so, Mr. Libnic worked with Banamex's legal department, which directly reported to Mr. Libnic. Mr. Libnic was supported by at least one other Miami-based Citigroup lawyer, Esteban Mancuso.

168. On February 20, 2014, Pemex confirmed what Citigroup already knew, that Pemex had not signed many of the Pemex work estimates and work estimate authorizations provided by OSA to Citigroup.

169. On approximately February 22, 2014, the CNBV launched a probe into the fraudulent scheme. On information and belief, Pemex informed the CNBV about the fraudulent work estimates and work estimate authorizations after Citigroup alerted them to it, thereby triggering the CNBV investigation.

### C. Citigroup Publicly Discloses Fraud on February 28, 2014

170. Aware that Mexican authorities intended to launch a criminal investigation into the fraudulent scheme, Citigroup had no choice but to publicly acknowledge and attempt to distance itself from it. And on February 28, 2014, it finally did.[28]

171. What Citigroup did not do, however, is acknowledge the full extent of the fraudulent scheme or its role in it. Instead, based on its self-serving investigation, Citigroup's April 2014 internal investigation report acknowledged only approximately $430 million in fraudulent cash advances—likely only a fraction of the full amount of fraudulent cash advances Citigroup had distributed to OSA between 2008 and 2014.

## IX. CITIGROUP ADMITTED TO CRIMINAL MISCONDUCT

172. In April 2014, Citigroup's CEO, Mr. Corbat, stated that Citigroup had conducted an investigation into the fraudulent scheme and fired one of its employees because he was "criminally involved" in the fraudulent scheme. In May 2014, Mr. Corbat admitted that as a result

[28] In public filings with the SEC and in media reports, Citigroup has reported that it became aware of the fraud on February 20, 2014. On information and belief, Citigroup must have commenced an investigation into Banamex's cash advance facility with OSA before February 20, 2014, in order to conclude that a fraud existed by February 20, 2014.

of Citigroup's investigation into the fraudulent scheme, Citigroup had fired approximately a dozen employees, including senior executives. Specifically, Mr. Corbat issued a memo stating that Citigroup had terminated 11 employees as a result of its investigation into the fraudulent scheme, including "four Managing Directors, two of whom are business heads in Mexico." According to Mr. Corbat, employees both "inside ***and outside***" of Mexico perpetrated the fraudulent scheme (emphasis added), thereby conceding the involvement of Citigroup's U.S.-based managers of its Latin American business. Dkt. 83-4.

173. The two highest-ranking Citigroup Mexican executives, Javier Arrigunaga, Banamex's CEO, and Manuel Medina-Mora, Co-President of Citigroup, resigned as a result of the fraudulent scheme in late 2014 and early 2015, respectively. Mr. Arrigunaga, who led Citigroup's cash advance operations in Mexico, expressly stated that Citigroup's investigation had "revealed [our] failures."

174. In August 2014, Citigroup sent a letter to the SEC admitting that Citigroup had provided cash advances to OSA based on Pemex documents submitted by OSA to Citigroup "with no effective confirmation from Pemex or otherwise that the documents were valid or that Pemex intended to pay the amounts owed."

## X. MEXICAN AUTHORITIES CONFIRMED CITIGROUP'S CRIMINAL MISCONDUCT

175. The CNBV also concluded that Citigroup employees were responsible for the fraudulent scheme.

176. On April 29, 2014, the CNBV informed the Mexican federal government that (1) ten Citigroup employees had violated Mexican criminal law, which provides that a bank officer

may not extend a loan the officer knows the recipient cannot repay;[29] and (2) Mr. Yáñez, the CEO and majority shareholder of OSA, and four other OSA employees had violated Mexican criminal law by submitting forged documents to obtain cash advances from Citigroup.[30]

177. Moreover, the Mexican criminal enforcement authority, i.e., the PGR, concluded that Citigroup employees were responsible for the fraudulent scheme. On February 28, 2014, the PGR opened a criminal investigation into the fraudulent scheme. And, on March 1, 2014, at Banamex's request, the PGR seized OSA and all its assets and placed them under the control of the Mexican government agency responsible for managing seized companies and assets (in Spanish, *Servicio de Administración y Enajenación de Bienes*, the "SAE"). On May 12, 2014, on the request of the PGR, a Mexican criminal court issued an arrest warrant against three Citigroup ICG employees for the crimes detailed in the CNBV report, which involves bank officers extending loans they know recipients cannot repay.[31]

178. On October 28, 2014, the PGR obtained an arrest warrant against Mr. Yáñez for his role in the fraudulent cash advances. Mr. Yáñez was ultimately convicted of embezzling funds to

---

29 The ten employees include: (1) Emilio Granja, ICG's Pemex-Citigroup Relationship Manager and a Citigroup Managing Director (2010-2014); (2) Alfonso Ortega-Brehm, ICG's Corporate Banking Director (from approximately 2010 to 2014); (3) Juan Pablo Añorve Borquez, ICG's OSA-Citigroup Relationship Manager; (4) Erik Cervantes Murillo, ICG's Cash Advance Product Manager; (5) José Ángel Castillo-Guerrero, Manager of the ICG's cash advance facilities in Mexico; (6) Ricardo García Salgado, Manager of ICG's cash advance facilities in Mexico; (7) Vanesa Maricela Ramírez Segura, ICG Cash Advance Product Analyst; (8) Guillermo Pérez-Elizundia, ICG Cash Advance Product Analyst; (9) Guadalupe Angélica Ruíz-Martínez, ICG Cash Advance Product Analyst; and (10) Sergio Torres Lebrija**,** Director of Finance for Banamex and manager of the ICG Cash Advance Facilities in Mexico.

30 The four employees include: (1) Jorge Terán Vanoye, OSA's Director of Projects and Construction Superintendent; (2) Juan Carlos Tapia Cárdenas OSA's Technical Representative; (3) Alberto Duarte Martínez, OSA's Construction Superintendent; and (4) Joaquín García Gómez, OSA's legal representative.

31 The PGR issued arrest warrants against (1) Erik Cervantes Murillo; (2) Emilio Gonzalo Granja; and (3) Alfonso Ortega-Brehm.

purchase yachts and luxury vehicles and otherwise finance a lavish lifestyle and for his role in the fraudulent cash advances. Mr. Yáñez served a two-year sentence for his crimes.

179. On June 20, 2014, Jesus Murillo-Karam, the head of the PGR, testified before the Mexican Senate. Mr. Murillo stated that Banamex employees, including at least one senior Banamex executive, and OSA employees conspired to violate Mexican law in furtherance of the fraud. Mr. Murillo did not identify these employees by name, however.

180. Finally, in September 2014, CNBV imposed over 30 fines totaling approximately $2.3 million on Banamex for failing to maintain internal policies and controls adequate to prevent fraud and violating Mexico's banking statute in connection with the fraudulent scheme.

181. Specifically, the CNBV concluded that Banamex had violated Mexican laws requiring that banks have minimum internal policies and controls to prevent fraud. Relatedly, the CNBV charged several Banamex executives with knowingly engaging in wrongdoing and causing the bank to violate Mexico's banking statute. The CNBV did not identify these employees by name, however.

182. When announcing the fine, the CNBV stated that during its investigation it had uncovered evidence of criminal wrongdoing by Citigroup employees based on their knowing participation in the fraudulent scheme, and that the CNBV had referred this wrongdoing to the PGR.

## XI. <u>THE U.S. GOVERNMENT CONDUCTED INVESTIGATIONS RELATING TO CITIGROUP'S MISCONDUCT</u>

183. In its 2014 SEC annual report, Citigroup disclosed that the DOJ and SEC were conducting an investigation into the fraudulent scheme relating to Banamex's cash advance facility with OSA.

184. The SEC also commenced an investigation into Citigroup's role in the fraudulent scheme and the media has reported that the DOJ also conducted an investigation into the same.

185. The SEC's investigation focused on accounting fraud by Citigroup. In its 2017 SEC annual report, Citigroup additionally disclosed that the SEC investigation "included requests for documents and witness testimony."

186. In August 2018, the SEC fined Citigroup $4.75 million for lacking a sufficient system of internal accounting controls concerning Banamex.

187. The status of the DOJ investigation is unclear based on public filings.

## XII. CITIGROUP IS NOT A VICTIM

### A. The Mexican Bankruptcy Court Determined That Citigroup Is Not a Victim

188. In April 2014, the PGR filed for bankruptcy proceedings on OSA's behalf. Citigroup, through Banamex, submitted claims against OSA in those proceedings. In support, Citigroup did not provide its actual books and records to the bankruptcy court. Instead, Banamex provided an accounting certificate purporting to reflect the amount of cash advances disbursed by Citigroup to OSA and whether Pemex had repaid them to Citigroup. But, according to the CNBV, Banamex's accounting certificate revealed that Citigroup did ***not*** properly account for all the payments that Citigroup was receiving from Pemex. On June 20, 2014, Mr. Murillo, the head of the PGR, testified before the Mexican Senate and stated that the PGR had not been able to determine ***any*** Citigroup losses because Citigroup had not provided the PGR with sufficient information.

189. In October 2014, the Mexican bankruptcy court issued a judgment declaring the amounts OSA owed to its hundreds of vendors, creditors and bondholders. The judgment denied Banamex's claims and ruled that Banamex did not prove that OSA owed any money to Banamex. Banamex appealed that decision, arguing that OSA owed it (1) approximately $440 million in cash

advances that Banamex had provided to OSA, because Pemex had not paid Banamex for the receivables; and (2) $8 million in other loans.

190. The appellate court concluded that Banamex had failed to demonstrate that OSA owed it any cash advances and that the accounting certificate provided by Banamex to the bankruptcy court did not prove Banamex's claims. On information and belief, Pemex paid back to Citigroup all the cash advances that Citigroup disbursed to OSA, making Citigroup whole. The appellate court found for Banamex regarding the other loans and concluded that OSA owed the bank approximately $8 million in unpaid loans.

191. On April 6, 2015, the CNBV imposed three additional fines on Banamex, for a total of approximately $90,000 for inaccurately recording its purported claim against OSA in its books.

**B. Citigroup's Victim Claims Are Unavailing**

192. In an effort to escape liability for the fraudulent scheme, Citigroup claims that it was wholly unaware of the fraud and that as soon as Pemex alerted Citigroup to it, Citigroup blew the whistle and terminated the culpable employees. The sheer magnitude of the fraudulent scheme—for example, the distribution of nearly half a billion dollars in cash advances in six months—belies Citigroup's self-serving *ex post* claims.

193. Likewise, (1) Banamex's centrality to Citigroup's operations; (2) that Citigroup's own ICG established and maintained the OSA cash advance facility used in the fraudulent scheme; and (3) the breadth and intimacy of Citigroup's relationship with OSA (*see infra* at Section XIII), render Citigroup's account implausible, regardless of whether Citigroup incurred any losses.

### C. The Actual Fraud Victims Have Obtained No Redress Through the Mexican Bankruptcy Proceedings

194. In a Mexican bankruptcy proceeding, creditors may file claims against the bankrupt entity. Claims of OSA's creditors total approximately $1.6 billion, including approximately $100 million owed to the Mexican government in unpaid taxes, a debt with priority over all others.

195. The Mexican bankruptcy court valued OSA's liquid assets at an estimated $100 million, which amounts to less than 10% of Plaintiffs' losses. Still, in an effort to at least somewhat mitigate their losses, OSA's vendors, creditors and bondholders, including all Plaintiffs, filed claims against OSA in the bankruptcy proceedings.[32]

196. Those proceedings do not afford Plaintiffs recourse against Citigroup or Banamex. Plaintiffs may not recover lost profits or consequential damages and stand only to recover, if anything, cents on the dollar for their investment losses.

197. In May 2015, the bankruptcy court approved an agreement reached by OSA and over 65% of OSA's vendors, creditors and bondholders (the "May 2015 Agreement"). Under the May 2015 Agreement, OSA planned to repay its vendors, creditors and bondholders, in part, by giving them equity in OSA and the remainder through payments over an eight-year period.

198. In September 2015, a Mexican appellate court revoked the May 2015 Agreement and remanded the case back to the bankruptcy court, ordering the bankruptcy court to grant leave for the non-signatory creditors and investors to oppose the agreement.

199. On January 26, 2016, the bankruptcy court approved a new agreement reached by OSA and over half of OSA's vendors, creditors and bondholders (the "January 2016 Agreement"). The January 2016 Agreement assumed that none of OSA's vendors, creditors and bondholders,

---

[32] In the case of Rabobank, a special purpose vehicle that holds the Rabobank-financed vessels filed the claims. Rabobank controls the special purpose vehicle.

including Plaintiffs, would recover 100% of their claims. As in the May 2015 Agreement, under the January 2016 Agreement, OSA planned to repay its vendors, creditors and bondholders, in part, by giving them equity in OSA and the remainder through payments over an eight-year period. The January 2016 Agreement also required that OSA raise approximately $70 million by May 27, 2016, to restart its operations, which OSA failed to do.

200. On July 8, 2016, a Mexican appellate court revoked the January 2016 Agreement and remanded the case back to the bankruptcy court. Specifically, the Mexican appellate court ruled that (1) the Mexican government agency responsible for managing seized companies such as OSA, should have entered into the January 2016 Agreement on behalf of OSA because the SAE controls OSA; (2) the shareholders of OSA should have approved the January 2016 Agreement; (3) the January 2016 Agreement excluded some vendors, creditors and bondholders; and (4) the funding requirement in the January 2016 Agreement affected the priority of OSA's vendors, creditors and bondholders, because under the January 2016 Agreement, OSA would have to repay its new funder before them.

201. On August 8, 2016, a Mexican bankruptcy court declared OSA bankrupt and ordered the SAE to sell OSA's assets (the "August 2016 Bankruptcy Ruling").

202. On January 12, 2018, the bankruptcy court approved a new agreement reached by OSA and its vendors, creditors and bondholders ("the January 2018 Agreement"). As with the May 2015 and January 2016 Agreements, the January 2018 Agreement also assumed that none of OSA's vendors, creditors and bondholders, including Plaintiffs, would recover their 100% of their claims.

203. On August 8, 2018, a Mexican appellate court revoked the January 2018 Agreement and remanded the case back to the bankruptcy court. This time, the Mexican appellate court ruled

that OSA had not met the percentage of common creditors necessary for the validity of the agreement under the Mexican Bankruptcy Law.

204. On September 24, 2019, the bankruptcy court approved the last agreement OSA has reached with its vendors, creditors and bondholders so far ("the September 2019 Agreement").

205. At present, several *amparos* (i.e., constitutional challenges to government action which must be brought in Mexican federal court) against the bankruptcy court rulings are pending in Mexico's courts, including against the September 2019 Agreement. Accordingly, the bankruptcy proceedings have not concluded.

206. It is highly unlikely that OSA's vendors, creditors and bondholders, including Plaintiffs, will ever receive any recovery from the bankruptcy proceedings. OSA is now officially bankrupt and in the process of liquidating its assets, which are only worth approximately $100 million (roughly the amount of the Mexican government's priority tax claim).

207. Neither the May 2015, January 2016, January 2018 and September 2019 Agreements, nor the August 2016 Bankruptcy Ruling, prevent OSA's vendors, creditors and bondholders, including Plaintiffs, from asserting claims against third parties, including Citigroup, or have any effect thereon.

## XIII. CITIGROUP'S RELATIONSHIP WITH OSA EXTENDED BEYOND THE CASH ADVANCE FACILITY AND TRUSTS

### A. Overview

208. Citigroup provided extensive services to OSA, creating a relationship that extended far beyond the cash advance facility and trusts described *supra* at Sections V and VII.

209. As described further below, Citigroup (1) at all times relevant here, served as OSA's banker, through Banamex, for general banking services and daily operations beyond that of the cash advance facility; (2) served as trustee and collateral agent for the 2008 Bond Issuance

through its banking arm Citibank and Banamex, respectively; (3) advised OSA on the acquisition of the Goliath vessel and Cal Dive International Inc. ("Cal Dive"); (4) loaned millions to OSA; (5) advised OSA on identifying equity investors, including by preparing presentations to such investors; and (6) assisted OSA in preparing "Management Presentations".

210. In addition, (1) there was a revolving door between OSA and Citigroup senior executives; and (2) OSA's workers—from the laborers to the mechanics—wore coveralls emblazoned with Banamex's logo (alongside OSA's logo).

**B. Citigroup, Through Banamex, Served as OSA's Banker**

211. At all times relevant here, Citigroup, through Banamex, provided general and routine banking services to OSA. Indeed, OSA held bank accounts at Banamex and Banamex disbursed OSA's payroll.

**C. Citigroup Acted as Trustee and Collateral Agent for the 2008 Bond Issuance**

212. As described above, in 2008, OSA issued $335 million in bonds. OSA issued those bonds in the United States pursuant to 17 C.F.R. § 230.144A ("Rule 144A").

213. Citigroup acted as trustee and paying agent to the 2008 Bond Issuance through its banking arm Citibank. Citigroup remained as trustee of the 2008 Bond Issuance through in or around June 2015, almost 16 months after the collapse of OSA.

214. In or around June 2015, another trustee replaced Citigroup.

215. In addition, Banamex served as the collateral agent of the 2008 Bonds, i.e., the holder of the collateral securing the bonds for the 2008 Bond Issuance.

216. Citigroup's roles as trustee, paying agent and collateral agent of the 2008 Bond Issuance are discussed further *infra* in Section XIV.B.1.b.

### D. Citigroup Advised OSA on Acquisition of Goliath

217. Citigroup advised OSA on the multi-million dollar acquisition of a vessel. In 2012, Citigroup Global Markets, Inc. ("Citi Markets"), a Citigroup subsidiary, assessed whether to finance OSA's acquisition of "Goliath," the world's largest oil-service vessel. Citi Markets signed a commitment letter to finance OSA's acquisition of "Goliath" subject to its review of OSA's financial information. Citi Markets also signed a fee letter pursuant to which it would have made approximately $8 million in fees, if it had financed OSA's acquisition of Goliath.

218. Ultimately, however, Citi Markets did not provide financing to OSA for the purchase of Goliath.

### E. Citigroup Advised OSA on Acquisition of Cal Dive

219. Between 2012 and 2013, Citi Markets advised OSA on its plans to acquire Cal Dive. Cal Dive is a large, publicly-traded U.S.-based oil services company.

220. Citi Markets prepared presentations regarding OSA's finances and plans, which included an analysis of OSA's cash flows from Pemex contracts.

221. In May 2012, OSA sent a letter to Cal Dive stating its interest in acquiring Cal Dive. The letter indicates that Citi Markets was acting as the exclusive financial advisor in connection with the deal.

222. OSA's May 2012 letter to Cal Dive indicates that Alberto Pandolfi and Octavio Molmenti, two Citi Markets employees based in New York City and Houston, respectively, were Citi Markets' representatives. Mr. Pandolfi and Mr. Molmenti each used Citigroup email addresses on U.S.-based servers.

### F. Citigroup Loaned OSA Millions in 2013

223. In or around 2013, Citigroup loaned OSA approximately $8 million in connection with a stand-by letter of credit that Citigroup issued for OSA.

### G. Citigroup Advised OSA on Identifying Equity Investors in 2013

224. In 2013, Citi Markets also advised OSA on OSA's efforts to find equity investors. In May 2013, Citi Markets signed an engagement agreement with OSA pursuant to which Citi Markets would assist OSA in recruiting investors. Mr. Pandolfi executed the engagement on behalf of Citi Markets.

225. In connection with that engagement, Citi Markets prepared presentations for potential investors including the Blackstone Group, L.P., a New York City-based investment firm ranking among the largest investment firms in the world. Citi Markets' presentations for potential investors described OSA's finances, including its cash flow from contracts with Pemex.

226. For example, in or around July 2013, Citigroup executives in the United States and Mexico, including Alberto Pandolfi, prepared a presentation for Blackstone, that included Citigroup's logo (the "Blackstone Presentation").

227. In another example from in or around September 2013, Citigroup executives in the United States and Mexico, including Mr. Pandolfi, prepared a presentation for a U.S.-based investor, Advent International ("Advent"), one of the largest private equity firms in the world, that also included Citigroup's logo (the "Advent Presentation").[33]

### H. Citigroup Assisted OSA in Preparing "Management Presentations" Between 2013 and 2014

#### 1. Background

228. In late fall 2013, OSA, with Citigroup's assistance, began providing current and potential new investors with "Management Presentations." These "Management Presentations" were originally prepared by Citigroup in connection with OSA's meetings with Blackstone and

---

[33] Additionally, in or around October 2013, Citigroup executives in New York City and Mexico directly sent an OSA presentation to three investors, including ones based in the U.S.

Advent (*see supra* at Section XIII.G). Indeed, the Management Presentations are largely the same as the Blackstone and Advent Presentations.

229. For example, Citigroup's April 5, 2013 work plan for the presentations to equity investors included an item to "Draft roadshow presentation to re-acquaint debt investors [i.e., the bondholder Plaintiffs] with the story."

230. On September 10, 2013, Mark Clark of the "Citi Investment Banking/Latin America Group," sent the Advent Presentation, which was titled "Management Presentation", from his mark.clark@citi.com account, to the following recipients, among others: (1) Mr. Yáñez; (2) a third-party financial consultant engaged by OSA to assist in restructuring OSA's debt to Plaintiffs Candies and Rabobank ("OSA's External Financial Consultant");[34] and (3) Citigroup representatives, including Mr. Pandolfi (at alberto.pandolfi@citi.com), Mr. Molmenti (at octavio.molmenti@citi.com), Nicolas Roca (at nicolas.roca@citi.com); Javier Artola (at javier.artola@citi.com); Rodrigo Riveroll whose email address had an electronic stamp of "[ICG-CIB]" and Emilio Granja, whose email address had an electronic stamp of "[ICG-CIB]". In addition, their LinkedIn profiles state that Mr. Pandolfi has been the "Citi Head of Investment Banking" for Latin America since 2010 and is based in New York, Mr. Molmenti was a "Citi Managing Director" from 1998 to 2018 based primarily in Houston, Mr. Roca has been a "Citi Managing Director" since 2012 and is based in New York, Mr. Artola was a "Citi Vice President" from 2012 to 2016 based in Houston, Mr. Riveroll was a "Citi Managing Director" from 2009 to 2015 based in Mexico City, and Mr. Granja was a "Citi Managing Director" from 2012 to 2013 based in Mexico City.

---

[34] At all times relevant here, OSA's external financial consultant used an email account on the mac.com domain, which is hosted in the United States and sends and receives all messages by U.S. wires.

231. On October 10, 2013, Mr. Riveroll of the ICG division of Citigroup circulated a slightly revised version of the Advent Presentation (the "October 2013 Presentation") to other potential investors as well as to (1) Mr. Yáñez and OSA's external financial consultant; (2) Mr. Molmenti (at octavio.molmenti@citi.com); and (3) Emilio Granja, whose email address had the electronic stamp "[ICG-CIB]".

232. Mr. Betancourt, Head of OSA's Investor Relations Department, then revised the October 2013 Presentation to include additional financial information and, on November 29, 2013, sent it to OSA's external financial consultant by email. In his transmittal email, Mr. Betancourt stated that: "I am sending you the modified presentation for the BCP Securities event. *I took the one from Citi* and removed the slides of projections and projects futures, in its place I put the projections of [another] presentation, as well as a sheet with the figures of the Income Statement as of September 30, 2013."

**2. December 2013 Presentation**

233. On December 3, 2013, at an energy and oil industry conference hosted by BCP Securities in Mexico City, Mr. Betancourt and OSA delivered a presentation entitled "Management Presentation" to Plaintiff Moneda and other attendees (the "December 2013 Presentation"). On December 9, 2013, Mr. Yáñez and OSA's external financial consultant gave a similar, if not the same, presentation to One Equity Partners aboard the Goliath (the "One Equity Partners Presentation"). Mr. Riveroll and Juan Pablo Anorve of Citigroup attended the One Equity Partners Presentation. Mr. Pablo Anorve was ICG's OSA-Citigroup Relationship manager. His email address included "[ICG-CIB]" or "[ICG-LATAM]" electronic stamps. Further, Mr. Añorve represented himself as a Citigroup employee by signing emails as an employee of "Banamex-Citi Corporate & Investment Bank." *See* Appendix 2. As discussed further *supra* in Section X, the

Mexican banking regulator concluded in April 2014 that Mr. Anorve, among others, was criminally responsible for the fraudulent scheme.

234. The purpose of the December 2013 Presentation was to maintain investor confidence in OSA and solicit new investors.

235. Based on (1) Citigroup's role in preparing previous versions of substantially similar presentations, including the Advent Presentation; (2) Citigroup's logo on each page of the December Presentation; and (3) Citigroup's disclosures at the end of the Presentation, Citigroup assisted in preparing the December 2013 Presentation.

236. The inclusion of Citigroup's logo in the December 2013 Presentation and Citigroup's disclosures at the end also suggested to current and potential investors in OSA that a highly regarded international bank had (1) reviewed the information contained in the Presentation; (2) conducted its own due diligence, and (3) validated the accuracy of the information set forth in the Presentation, otherwise Citigroup would not have allowed OSA to include its logo in the Presentation.

237. Figure 4 below includes an excerpt from the December 2013 Presentation, including its reference to the cash advance facility ("OSA engages in recourse factoring with Mexican banks to minimize days receivable and ensure sufficient liquidity") with the "Citi" logo on the lower right.




238. In addition, Citigroup's attendance at the One Equity Partners Presentation, which was identical to the December 2013 Presentation, demonstrates that Citigroup was aware and tacitly approved of the contents of the December 2013 Presentation.

239. The December 2013 Presentation included numerous misleading financial figures for OSA (e.g., major increases in revenue, net income and assets, and major decreases in debt and interest, from 2006 to 2017) and misleading information about OSA's cash flow from Pemex contracts and expected growth.

240. The Presentation also references OSA's relationship with specific Plaintiffs, including Candies ("Long term relationship with Candies, one of the largest marine companies in

the US"), Rabobank, Coastline and De Hoop. With respect to Rabobank, the Presentation mentions that OSA had concluded the restructuring of its loans with Rabobank in 2011.

241. Furthermore, the December 2013 Presentation included representations that: (1) OSA had an "[e]xcellent, long-standing relationship with Pemex"; (2) OSA "engages in recourse factoring with Mexican banks to minimize days receivable and ensure sufficient liquidity"; and (3) the increase in revenues between 2010 and 2012 "coincides with the financial restructuring of OSA, an increase in the contracts issued by Pemex and new vessels coming on line at OSA."

242. In other words, through the December 2013 Presentation, Citigroup and OSA were representing that OSA was financially strong and a good investment, including because of (1) its strong relationship with Pemex; (2) the "recourse factoring" system, i.e., the cash advance facility with Citigroup which provided OSA with consistent and reliable liquidity; and (3) the recent financial restructurings, including with Rabobank, which, as discussed *infra* in Sections XV.B and XVI, were achieved based on representations by Citigroup and OSA to Plaintiffs Candies and Rabobank that the cash advance facility was stable and reliable, including because Citigroup was in charge of the internal controls.

243. Because the cash advance facility was critical to OSA's liquidity and cash flow and ultimately its financial success, implicit in the December 2013 Presentation was a claim that the cash advance facility was stable, reliable and sufficiently controlled.

244. The December 2013 Presentation omits any discussion of the false or weak controls in the cash advance facility (*described infra* at ¶¶ 381-83) or the ongoing fraud, of which Citigroup and OSA were aware.

**3. January 2014 Presentation**

245. In January 2014, OSA prepared another "Management Presentation" (the "January 2014 Presentation").

246. The purpose of the January 2014 Presentation was to maintain investor confidence in OSA and solicit new investors.

247. Citigroup assisted in the preparation of the January 2014 Presentation based on (1) Citigroup's role in preparing previous versions of substantially similar presentations, including the Advent Presentation; (2) Citigroup's logo on each page of the Presentation; and (3) Citigroup's disclosures at the end of the Presentation.

248. In addition, the inclusion of Citigroup's logo in the January 2014 Presentation and Citigroup's disclosures at the end suggested to current and potential new investors in OSA that a highly regarded international bank had (1) reviewed the information contained in the Presentation; (2) conducted its own due diligence; and (3) validated the accuracy of the information set forth in the Presentation, otherwise Citigroup would not have allowed OSA to include its logo in the Presentation.

249. Figure 5 below is an excerpt from the January 2014 Presentation showing OSA's projected revenue drastically increasing just a month before its collapse, with the "Citi" logo on the lower right.




250. In addition, Citigroup's attendance at the One Equity Partners Presentation, which was identical to the December 2013 Presentation and January 2014 Presentation, demonstrates that Citigroup tacitly approved of the contents of the January 2014 Presentation.

251. The January 2014 Presentation included substantially the same misleading information as the December 2013 Presentation (*see supra* at Section XIII.H.2).

252. The January 2014 Presentation also omitted any discussion of the false or weak controls in the cash advance facility (described *infra* at ¶ 381-83) or the ongoing fraud, of which Citigroup and OSA were aware.

### I. Revolving Door of Senior Executives

253. Between 1986 and 1994, Barry Joseph Barnes, a senior OSA executive at all times relevant here, served as VP of International Operations and General Manager of the Banamex LA Agency, Senior Account Officer of the Banamex NY Agency and Manager of the International Markets Division for Banco Nacional de Mexico.

254. Mr. Valera, a former Citigroup executive, joined OSA in or before 2008 as a senior official. As previously noted, Mr. Valera had responsibility for the cash advance facility and served as the primary liason between OSA and Pemex.

255. In addition, in or around 2012, after Citigroup fired Mr. Ortega-Rivera for bribery and kickbacks, OSA hired him.

## XIV. CITIGROUP'S AND OSA'S FRAUDULENT MISREPRESENTATIONS AND MATERIAL OMISSIONS INJURED PLAINTIFF BONDHOLDERS

### A. Overview

256. In connection with and in furtherance of the fraud, Citigroup and OSA worked together to increase OSA's cash flow and liquidity, including through the 2008 and 2013 Bond Issuances, resulting in increased interest and fees for Citigroup.

257. Indeed, Citigroup played an instrumental role in those Issuances, including as (1) trustee and paying agent of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent for the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG in connection with the 2013 Bond Issuance.

258. During the 2008 and 2013 Bond Issuances, Citigroup made fraudulent misrepresentations and material omissions regarding OSA's financial condition and the stability and reliability of the cash advance facility with Banamex to the (1) managers of the Issuances; (2)

OSA's external financial consultant; and/or (3) current and potential investors in OSA, such as the Plaintiff Bondholders.

259. As a principal participant in the fraud, Citigroup knew about and substantially assisted and aided and abetted OSA's similar fraudulent misrepresentations and material omissions during the 2008 and 2013 Bond Issuances to current and potential investors, such as the Plaintiff Bondholders.

260. Provided below is a description of (1) the 2008 and 2013 Bond Issuances; (2) the materials prepared in connection therewith and distributed to potential investors including the Plaintiff Bondholders; (3) OSA's financial statements, which were circulated to current and potential investors in OSA between 2008 and 2014; (4) OSA's "Investor's site", which included information and documents for the 2008 and 2013 Bondholders; and (5) the fraudulent misrepresentations and material omissions to the Plaintiff Bondholders by Citigroup and OSA, with Citigroup's knowledge and substantial assistance, which will be described in more detail below in the individual plaintiff sections (*see infra* at Sections XIV-XVI).

## B. <u>2008 Bond Issuance</u>

### 1. Overview

261. In or around mid-2008, OSA engaged Morgan Stanley & Co. ("Morgan Stanley"), a U.S. investment bank and financial services company headquartered in New York, New York, to serve as manager of the 2008 Bond Issuance.

262. The purpose of the 2008 Bond Issuance was for OSA to repay its $300 million term loan facility with Morgan Stanley Senior Funding, Inc. and for "general corporate purposes", among other things.

263. Through the 2008 Bond Issuance, OSA issued $335 million in bonds, the largest bond issuance in OSA's history. The 2008 Bondholders are investment funds and vehicles from around the world, including funds and vehicles managed by U.S. entities.

264. The 2008 Bond Plaintiffs consist of Adar, Ashmore, Copernico, HBK (on behalf of itself and GPF II), ICE, Moneda and Waypoint.

*a. Role of Citigroup in 2008 Bond Issuance*

265. As described above, Citigroup's primary U.S. lending entity, Citibank, acted as trustee and paying agent to the 2008 Bond Issuance through around June 2015 and Banamex served as the collateral agent. On information and belief, Citigroup was paid millions of dollars in fees for its work as trustee, paying agent and collateral agent.

266. On information and belief, in its capacity as trustee and paying agent for the 2008 Bond Issuance, Citigroup, through its banking arm Citibank, registered the 2008 bonds, accepted bond purchase payments, and made scheduled payments to bondholders.

267. In its role as collateral agent, Banamex could, in the event of a default by OSA, foreclose on the collateral and use the proceeds to pay the 2008 Bondholders any outstanding principal and interest owed.

268. Citigroup, as the actual and apparent principal of Citibank, is responsible for all of Citibank's material omissions in its capacity as trustee and collateral agent of the 2008 Bond Issuance from the bonds' inception up until 2015.

*b. Marketing of 2008 Bonds*

269. As manager of the 2008 Bond Issuance, Morgan Stanley was responsible for marketing the 2008 bonds, including by obtaining information and documents from (1) OSA; and (2) Citigroup, as the trustee and collateral agent of the 2008 Bond Issuance through Citibank and

Banamex and OSA's banker through Banamex, in order to prepare materials and presentations for potential investors.

270. Citigroup and OSA knew that Morgan Stanley would incorporate information and documents provided by them into materials distributed to potential investors, including the 2008 Bond Plaintiffs.

*c. 2008 Bonds Were Issued in the United States*

271. As noted above, OSA issued the 2008 bonds in the United States pursuant to Rule 144A, which allows foreign companies to issue securities in the United States.

272. As a bond issuance in the United States, subject to U.S. laws, with Citigroup as U.S. trustee and paying agent, any injuries that directly or indirectly were caused thereby constitute U.S. injuries damaging U.S. market participants including the 2008 Bond Plaintiffs, which could have undertaken other U.S. investments had they not fallen victim to Citigroup's and OSA's fraudulent scheme.

**2. 2008 Bond Documents Distributed to 2008 Bond Plaintiffs**

*a. Overview*

273. In connection with the 2008 Bond Issuance, Morgan Stanley prepared at least the following materials (the "2008 Bond Documents"), which were based on information and documents received from Citigroup and OSA and with their knowledge that such information and documents would be incorporated into materials disseminated to potential investors, including the 2008 Bondholders: (1) the July 2, 2008 offering memorandum (the "2008 Offering Memorandum"); and (2) the July 10, 2008 bond indenture ("2008 Bond Indenture").

274. Specifically, on information and belief, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance as well as OSA's banker, provided Morgan Stanley with false and misleading information about OSA's finances, including as to the cash advance facility that was

integral to OSA's liquidity and cash flow, which Morgan Stanley incorporated into the 2008 Bond Documents (*see supra* at Section V).

275. Between 2008 and early 2014, Morgan Stanley, OSA and/or others distributed the 2008 Bond Documents to, on information and belief, *all* 2008 Bondholders, including the 2008 Bond Plaintiffs.

276. No updates or revisions were made to the 2008 Bond Documents by Morgan Stanley, OSA, Citigroup or others after 2008, even though OSA and others distributed them to current and potential investors after the 2008 Bond Issuance and through early 2014 to solicit investments in both the 2008 and 2013 bonds.

277. In or around mid-2008, when Morgan Stanley prepared the 2008 Bond Documents and obtained and relied upon information and documents from Citigroup and OSA, Citigroup and OSA, on information and belief, were engaged in a fraud relating to the cash advance facility which threatened the stability and reliability of the cash advance facility and rendered OSA's financial projections false and misleading (*see supra* at Section VI).

278. As a principal participant in the fraud and due to its roles as trustee and collateral agent of the 2008 Bond Issuance and OSA's banker, Citigroup knew, but did not inform Morgan Stanley or potential investors (including the 2008 Bond Plaintiffs), in 2008 or thereafter, about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) Pemex's refusal to pay certain invoices; (5) Citigroup's increasing liabilities as a result of Pemex's refusal to pay; and (6) the ongoing fraud, each of which is described *supra* at Section VI.

279. For the same reasons, Citigroup also knew that OSA similarly did not inform Morgan Stanley and potential investors of the omitted information described above, in 2008 or

thereafter, and substantially assisted and aided and abetted OSA in making such material omissions, including by: (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in the 2008 Bond Documents, including by not correcting or revising the false and inaccurate information included in these documents in 2008 and thereafter.

280. Citigroup (and OSA) had a duty to speak and disclose the omitted information to Morgan Stanley, potential and current investors including the 2008 Bond Plaintiffs, and others because: (1) their failure to do so would render their prior and ongoing representations to Morgan Stanley and current and potential investors including the 2008 Bond Plaintiffs false and misleading; (2) Citigroup served as trustee and collateral agent of the 2008 Bond issuance and OSA's banker; (3) OSA, with Citigroup's assistance, was soliciting investments in the 2008 bonds from which it and Citigroup would receive a financial benefit (e.g., increased liquidity leading to more Pemex contracts for OSA, increased fees for Citigroup from Citibank's role as Trustee and Banamex's role as Collateral Agent, and increased interest for Citigroup from increased cash advance requests from OSA); (4) Citigroup and OSA had full access to and knowledge of the omitted information and intentionally withheld it to receive the financial benefit from the 2008 Bondholders' investment; (5) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that the 2008 Bondholders would rely on the omitted facts when determining whether to invest; and (6) the fraudulent scheme began, on information and belief, in 2008 and continued through early 2014. Citigroup's and OSA's special knowledge of its

fraudulent scheme also denied the 2008 Bond Plaintiffs the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest between 2008 and early 2014. In other words, the 2008 Bond Plaintiffs could not fully evaluate OSA's true financial condition because the fraud, which was concealed from them, masked the truth about OSA's financial projections, liquidity and cash flow.

*b. 2008 Offering Memorandum*

281. In connection with its role as manager of the 2008 Bond Issuance and on OSA's behalf, Morgan Stanley prepared the 2008 Offering Memorandum,[35] which, on information and belief, was distributed to all 2008 Bondholders, including the 2008 Bond Plaintiffs.

282. The 2008 Offering Memorandum provided information about OSA, including its finances, and the terms of the Bond Issuance.

283. The 2008 Offering Memorandum lists (1) Citibank as trustee and paying agent; and (2) Banamex as collateral agent. It also sets forth Citibank's and Banamex's duties and responsibilities in these roles.

284. The 2008 Offering Memorandum includes, among other information, OSA's (1) audited "balance sheets" for 2006 and 2007; (2) "related statements of income, of changes in stockholders' equity and of changes in financial position for each of the three years ended December 31, 2005, 2006 and 2007"; and (3) "unaudited interim condensed financial statements as of March 31, 2008 and for the three months ended March 31, 2007 and 2008."

285. The 2008 Offering Memorandum also includes a list of "Risk Factors", none of which referenced OSA's cash advance facility with Banamex, let alone the fraud.

[35] Morgan Stanley also prepared a preliminary offering memorandum dated June 19, 2008 (the "June 2008 Preliminary Offering Memorandum"), which contains the same material omissions regarding OSA's financial health as the 2008 Offering Memorandum.

286. The 2008 Offering Memorandum was not revised or otherwise updated after the 2008 Bond Issuance to reflect (1) OSA's deteriorating financial condition between 2008 and 2010; (2) Pemex's refusal to pay certain invoices between 2008 and 2010 and Citigroup's liabilities stemming therefrom; (3) Citigroup's freezing of the cash advance facility in or around 2010; (4) the insufficient controls of the cash advance facility, including Citigroup's abdication of any responsibility for validating OSA's cash advance documentation through, among other things, the secret Regulatory Contract in September 2012; and (4) the ongoing fraud between 2008 (on information and belief) and early 2014 (*see supra* at Section VI). Yet, OSA, with Citigroup's knowledge, distributed the 2008 Offering Memorandum in its original form to current and potential investors between 2009 and early 2014 to solicit investments in both the 2008 and 2013 bonds.

*c. 2008 Bond Indenture*

287. The 2008 Bond Indenture between OSA, Citibank and Banamex sets forth, among other things, the terms governing the 2008 bonds.

288. The 2008 Bond Indenture lists Citibank as the trustee and paying agent and Banamex as the collateral agent.

289. The 2008 Bond Indenture required Citigroup, as trustee through its banking arm Citibank, to notify the 2008 Bondholders of an "Event of Default", whether Citigroup "has actual knowledge" of or "has received written notice from [OSA] or any [2008 Bondholder] regarding the Default. Under the 2008 Bond Indenture, an "Event of Default" includes the failure to pay the principal of or interest on the 2008 bonds.

290. The 2008 Bond Indenture also required OSA to pay the principal and interest according to the terms in the Indenture.

291. With respect to the interest payments, OSA had a 30-day grace period in which to make the payments before its failure to pay would become an "Event of Default".

292. The 2008 Bond Indenture also required OSA to (1) provide Citigroup, through its banking arm Citibank, and the 2008 Bondholders with, among other things, annual and quarterly financial statements beginning in 2009; and (2) "post copies of such . . . on a web site maintained by [OSA] or provide substantially comparable public availability of such."

293. On account of its roles as trustee, paying agent and collateral agent of the 2008 Bond Issuance and OSA's banker, Citigroup, on information and belief, received and reviewed annual and quarterly financial statements issued by OSA between 2009 and early 2014.

294. In addition, the 2008 Bond Indenture required OSA to establish an account in the name of Banamex in the United States, for the benefit of the 2008 Bondholders, to hold the net proceeds of any sale of the collateral.

### 3. Communications Between Citibank and the 2008 Bondholders

295. After the issuance of the 2008 Bonds, OSA regularly failed to (1) provide financial statements to the 2008 Bondholders by the deadlines set forth in the 2008 Bond Indenture; (2) communicate with or provide transparent information to the 2008 Bondholders; and (3) make the interest payments on the due date, waiting until the very end of the 30-day grace period to pay the 2008 Bondholders.

296. Accordingly, the 2008 Bondholders regularly communicated with Citigroup, as trustee of the 2008 Bond Issuance through its banking arm Citibank, regarding OSA's (1) lack of transparency, including its failure to provide financial statements; (2) failure to timely pay interest; and (3) intent and ability (or lack thereof) to comply with its obligations under the 2008 Bond Indenture.

297. Between 2008 (on information and belief) and early 2014, Citigroup responded to these inquiries and assuaged the 2008 Bondholders' concerns, but omitted any information about the following: (1) OSA's deteriorating financial condition between 2008 and 2010; (2) Pemex's refusal to pay certain invoices between 2008 and 2010 and Citigroup's liabilities stemming therefrom; (3) Citigroup's freezing of the cash advance facility in or around 2010; (4) the insufficient controls of the cash advance facility, including Citigroup's abdication of any responsibility for validating OSA's cash advance documentation through, among other things, the secret Regulatory Contract in September 2012; and (4) the ongoing fraud between 2008 (on information and belief) and early 2014 (*see supra* at Section VI).

298. As a principal participant in the fraud, trustee and collateral agent of the 2008 Bond Issuance, and OSA's banker, Citigroup had knowledge of the omitted information described immediately above.

299. Citigroup (and OSA) had a duty to speak and disclose the omitted information to the 2008 Bondholders, including the 2008 Bond Plaintiffs, because (1) their failure to do so would render their prior and ongoing representations to the 2008 Bondholders false and misleading; (2) Citigroup served as trustee and collateral agent of the 2008 Bond issuance and OSA's banker; (3) OSA, with Citigroup's assistance, was soliciting investments in the 2008 bonds between 2008 and early 2014 from which it and OSA would receive a financial benefit (e.g., increased liquidity leading to more Pemex contracts for OSA, increased fees for Citigroup from Citibank's role as Trustee and Banamex's role as Collateral Agent, and increased interest for Citigroup from increased cash advance requests from OSA); (4) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from the 2008 Bondholders' investment; (5) Citigroup and OSA had full access to and were aware of

the omitted material facts, and also knew that the 2008 Bondholders would rely on the omitted facts when determining whether to invest; and (6) the fraudulent scheme began, on information and belief, in 2008 and continued through early 2014.

300. Citigroup's special knowledge of its fraudulent scheme with OSA also denied the 2008 Bond Plaintiffs the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest between 2008 and early 2014.

### C. <u>2013 Bond Issuance to Purchase the Goliath</u>

#### 1. Overview

301. In or around early 2013, OSA began seeking funding to acquire the Goliath and Caballo Marango, two large oil service vessels. OSA eventually opted to pursue funding only for the purchase of the Goliath.

302. In approximately May 2013, OSA hired Pareto Securities AS ("Pareto AS") and Pareto Securities Pte. Ltd. ("Pareto Ltd"), Norwegian and Singaporean entities, respectively, to act as the managers of the 2013 Bond Issuance.

303. From approximately May 2013 to October 2013, Pareto AS and Pareto Ltd., together with Pareto Securities, Inc., a U.S. entity (collectively with Pareto AS and Pareto Ltd, "Pareto"), marketed and solicited investors for the 2013 Bond Issuance.[36]

304. Through the 2013 Bond Issuance, which closed on or about October 9, 2013, OSA, through its affiliate Goliath Ltd., issued $160 million in bonds, raising capital to acquire the Goliath. As noted above, Plaintiff Nordic Trustee served as trustee of the 2013 Bond Issuance.

---

[36] Pareto "is an independent full service investment bank with a leading position in the Nordic capital markets and a strong international presence within the energy sectors." It is headquartered in Oslo, Norway, with more than 300 employees located in offices in Norway, Sweden, Denmark, Finland, United Kingdom, the United States, Singapore and Brazil.

305. The 2013 Bondholders are investment funds and vehicles from around the world, including U.S.-managed funds and vehicles. Plaintiffs the HBK Fund and Moneda hold bonds from the 2013 Bond Issuance.

306. The Nordic Trustee represents all holders of the 2013 bonds, including those not named as Plaintiffs in this action and whom Plaintiffs' counsel does not represent.

*a. Role of Citigroup in 2013 Bond Issuance*

307. Citigroup, through the ICG, served as the trustee or fiduciary of the Mexican Trust, described above, which was critical to the success of the 2013 Bond Issuance for the reasons described i*nfra* at XIV.C.2.b.

308. In sum, the Mexican Trust and Banamex's role as the fiduciary of the Trust provided comfort to the 2013 Bondholders that, if OSA defaulted on its payments to the bondholders, the Bondholders would receive payment from the Mexican Trust.

*b. Marketing of 2013 Bonds*

309. In order to prepare materials and presentations for potential investors in the 2013 Bonds, Pareto obtained information and documents from (1) OSA; and (2) Citigroup, as (i) OSA's banker, (ii) trustee and collateral agent of the 2008 Bond Issuance through Citibank and Banamex, and (iii) trustee of the Mexican Trust through the ICG.

310. On information and belief, Pareto also relied upon the 2008 Bond Documents, which had not been updated or revised since the 2008 Bond Issuance, in preparing marketing materials for the 2013 Bond Issuance.

**2. The Pareto Materials**

*a. Overview*

311. To solicit a trustee and investors for the 2013 Bond Issuance, Pareto prepared materials for distribution among potential trustees and investors (collectively, the "Pareto

Materials"). The Pareto Materials include but are not limited to the presentations, credit models, term sheets, and offering memorandums discussed below.

312. As noted above, in order to prepare the Pareto Materials, Citigroup and OSA provided information and documents to Pareto about OSA's finances, including future profitability projections (which necessarily assumed a reliable and stable cash advance facility) and protections for bondholders including the Mexican Trust.

313. Specifically, the Pareto Materials explained that Banamex would establish and administer a trust to receive all payments from Pemex to OSA for services provided by OSA to Pemex in connection with the Goliath, which would secure payment to the holders of the 2013 bonds (i.e., the Mexican Trust).[37] The Pareto Materials also specifically described a "waterfall structure," in which Banamex would pay certain expenses and debts, in a specific order each month, with the revenue received from Pemex in connection with the Goliath vessel and that bondholders would receive priority over OSA in terms of distribution. Such representations were false and misleading given, among other things, the ongoing fraud, which would cause the Mexican Trust and waterfall structure to fail when exposed.

314. The Pareto Materials also omitted information about the following which rendered the representations contained therein false and misleading: (1) OSA's false financial projections; (2) the false documentation submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

315. Citigroup made fraudulent misrepresentations and material omissions to Pareto, which Pareto incorporated into the Pareto Materials.

[37] As discussed *supra* in Section XIV.C.3.b, the ICG managed and supervised the Mexican Trust.

316. In addition, Citigroup, as a principal participant in the fraud and fiduciary of the Mexican Trust through the ICG and Banamex, was aware that OSA made fraudulent misrepresentations and material omissions to Pareto and substantially assisted OSA in doing so, including by: (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility in validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in the 2012 OSA Presentation and Pareto Materials, including by not correcting or revising the false and inaccurate information provided by OSA in these documents.

317. Citigroup and OSA knew that Pareto would circulate the Pareto Materials to current and potential investors in OSA, including investors like the 2008 Bond Plaintiffs and 2013 Bondholders, to solicit investments in the 2013 Bond Issuance. Specifically, between May 2013 and early 2014, OSA and/or Pareto, with Citigroup's knowledge, distributed the Pareto Materials to Nordic Trustee and Plaintiff Bondholders.

318. Citigroup and OSA had a duty to speak and disclose the omitted information described above to Pareto and potential investors in the 2013 Bonds because: (1) their failure to speak would render their prior and ongoing representations to Pareto and potential investors false and misleading; (2) Banamex was serving as the trustee of the Mexican Trust under the direction and supervision of the ICG, one of the most important aspects of the 2013 Bond Issuance; (3) OSA, with Citigroup's assistance, was soliciting investments from which it and Citigroup would receive a financial benefit (e.g., increased liquidity leading to more Pemex contracts for OSA, increased

fees for Citigroup from Banamex's role as fiduciary of the Trust, and increased interest for Citigroup from increased cash advance requests from OSA); (4) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it in order to receive the financial benefit from the 2013 Bondholders' investment; (5) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that the 2013 Bondholders would rely on the omitted facts when determining whether to invest; and (6) the fraudulent scheme between Citigroup and OSA was well underway in 2013.

319. Citigroup's and OSA's special knowledge of their fraudulent scheme also denied (i) Pareto the ability to sufficiently investigate OSA's finances before marketing the 2013 bonds; and (ii) the 2013 Bondholders the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

*b. 2013 Preliminary Offering Memorandum*

320. Based on information provided by Citigroup and OSA, Pareto prepared a Preliminary Offering Memorandum dated September 3, 2013 (the "2013 Preliminary Offering Memorandum").[38]

321. The 2013 Preliminary Offering Memorandum describes a "Mexican Trust Agreement" and how it would ensure the security and service of the 2013 bonds. Specifically, the 2013 Preliminary Offering Memorandum states that the Mexican Trust Agreement would be entered into between the (1) Nordic Trustee; (2) OSA and Goliath Ltd.; and (3) the "Fiduciary Bank," which the Memorandum specifically identified as Banamex.

---

[38] On information and belief, the 2013 Preliminary Offering Memorandum was the only such memorandum issued and there is no "final" version.

322. Regarding the flow of funds relating to the Goliath, the 2013 Preliminary Offering Memorandum states that "[p]ursuant to the Mexican Trust Agreement, all earnings generated by [the Goliath] pursuant to any [qualified contract] shall be deposited by [Pemex] . . . into [Banamex accounts]. [Banamex] shall distribute the funds deposited in the [accounts] . . . on the last banking day of each calendar month . . . strictly in accordance with the following order . . . (1) return to [OSA] all VAT amounts of certified paid invoices . . . (2) pay the Fiduciary Bank's fees; (3) pay to the [bondholders] any [amounts] past due; (4) pay to the bondholders any [amounts currently due]; (5) return to the Parent all other costs, expenses, and taxes paid by the Parent . . . on behalf of the Issuers; and (6) transfer to [OSA] any remaining amount in the [accounts]."

323. This strict payment structure is a called a "waterfall" and it prevents a company, like OSA, from deciding which of its creditors to pay and when on the receipt of revenue. Rather, the waterfall structure ensures that creditors, like the 2013 bondholders, are paid in a timely and consistent manner before the company receives any funds.

324. The 2013 Preliminary Offering Memorandum also noted that, pursuant to the Mexican Trust Agreement, Banamex was required to "always act as a good parent and shall be liable for any damages or losses caused by the breach of its obligations."

*c. September 2013 Pareto Investor Presentation*

325. On September 3, 2013, based on information provided by Citigroup and OSA, Pareto prepared a presentation for investors titled *OSA Goliath Pte. Ltd. and Caballo Marango Pte. Ltd.: USD 300m Senior Secured Bond Issue* (the "September 2013 Pareto Investor Presentation").

326. This Presentation included information about: (1) the 2013 Bond Issuance; (2) OSA's business and financials; (3) the relevant market; and (4) risk factors. In a section titled "Transaction and Security Structure", Pareto describes the "Mexican Trust Agreement."

327. According to the Presentation, the Mexican Trust Agreement was an agreement between Banamex, referred to as the "Fiduciary Bank" in the Presentation, and (1) the Nordic Trustee, as first beneficiary; (2) OSA's subsidiary, Goliath Ltd., as second beneficiary; and (3) OSA, as third beneficiary.

328. Pursuant to the Agreement, (1) OSA transferred all of its collection rights under certain contracts with Pemex to Banamex; and (2) Banamex, under the direction and supervision of the ICG, made payments from the revenue collected from the Pemex contracts pursuant to a "defined cash flow waterfall."

329. The Presentation set forth the steps of the "cash flow waterfall." Specifically, the Presentation stated that the Fiduciary Bank, i.e., Banamex, would distribute revenue earned by OSA from certain Pemex contracts to various recipients in a specific order. Importantly, Banamex would pay any debt owed to the 2013 Bondholders before paying OSA.

*d. September 2013 Pareto Credit Analysis Presentation*[39]

330. In a September 4, 2013 Presentation (the "September 2013 Pareto Credit Analysis Presentation") prepared by Pareto Securities titled "OSA Goliath Pte. Ltd. & Caballo Marango Pte. Ltd: *Credit Analysis & Rating Presentation"* and based on information provided by Citigroup and OSA, Pareto gave the bonds a "B-" rating. This rating was based on, among other things: (1) "the ample asset backing of the contemplated bond as well as the long term bareboat contracts," (2) "cash flow is solid and sufficient . . . to service the bond during its tenor," and (3) "Pemex expects to invest more than 110bn over the coming years."

---

[39] Pareto issued at least one update to the September 2013 Pareto Credit Analysis Presentation on September 23, 2013, which included some revisions to the bond terms, but not the substantive information relating to OSA's finances, the Mexican Trust and the Waterfall Structure.

331. Specifically, Pareto highlighted the following as "credit strengths": (1) "Stable and strong cash flow expected"; (2) "Solid asset backing"; (3) "PEMEX as end client"; and (4) "Positive market outlook."

332. The September 2013 Pareto Credit Analysis Presentation also included the below diagram explaining how the funds received from OSA's contracts with Pemex would be disbursed by Banamex, the "Fiduciary bank."

**Figure 6: The Waterfall Structure**




333. Per the Waterfall Structure set forth above, Banamex, as the fiduciary bank, would receive OSA's earnings from its contracts with Pemex; then distribute those earnings according to the "waterfalls" in Figure 1, ensuring that bondholders received payments before OSA. The Waterfall Structure was designed to provide comfort to potential investors in the 2013 Bond

Issuance that they would timely receive their principal and interest payments and that Banamex, not OSA, would be in control of such distributions.

*e. Pareto Credit Model*

334. In or around September 2013, Pareto prepared a credit model (the "Pareto Credit Model"). In preparing the Pareto Credit Model, Pareto relied upon information and documents provided by Citigroup and OSA.

335. The Pareto Credit Model is a comprehensive spreadsheet which Pareto used to calculate OSA's credit risk for purposes of preparing certain of the Pareto Materials and for discussions with potential investors.

336. The Pareto Credit Model includes voluminous financial information about OSA, including profit, loss and cash flow projections through 2018.

*f. Term Sheets*

337. In or around September 2013, Pareto, on behalf of OSA, prepared a Term Sheet with a proposed settlement date of September 20, 2013 (the "Term Sheet") and then a revised term sheet with a proposed settlement date of October 2, 2013 (the "Revised Term Sheet").

338. In preparing the Term Sheet and Revised Term Sheet, Pareto relied upon information and documents provided by Citigroup and OSA.

339. The Term Sheet and Revised Term Sheet include information about, among other things, the Mexican Trust. Specifically, the Term Sheets explain that (1) the Mexican Trust will receive payments from Pemex from the proceeds of Goliath's services to Pemex as collateral for the 2013 Bondholders in the event that OSA failed to pay the principal or interest on the 2013 bonds; and (2) any distributions from the Trust would be made in accordance with the Waterfall Structure discussed *supra* at ¶¶ 322-23.

*g. Pareto Periodic Reports*

340. On a weekly and quarterly basis after the closing of the 2013 Bond Issuance in October 2013 and early 2014, Pareto sent the 2013 Bondholders reports regarding the 2013 bonds (the "Pareto Periodic Reports").

341. The weekly periodic reports included information about OSA's current financial condition, including summaries of any financial statements recently issued by OSA and OSA's telephone conferences with the 2013 Bondholders.

342. The October 2013 Quarterly Review (the "Quarterly Review") included information about (1) OSA's quarterly earnings; (2) the status of the Pemex contracts assigned to the Goliath; and (3) financial projections for OSA through 2018.

343. The Quarterly Review stated that (1) while "earnings [were] on the weak side in the quarter . . . guidance for Q4 is solid"; (2) "the OSA Goliath bond asset backing looks solid with a loan to value of 65%. We furthermore believe that [OSA] will do what it takes to honour its obligations under the bareboat charter . . . thus, the spread of 1,030 bps (yield of 13%) offered at current price looks attractive"; and (3) "[d]uring the quarter, [OSA] secured four new contracts with a total value of USD 86m. With this, total backlog sums to USD 1.3bn, of which USD 680m is for 2014. The secured backlog for 2014 represent ~68% of our 2014e[stimate] revenues, leaving us with some comfort on earnings for next year".

344. Pareto relied upon information provided by OSA and, on information and belief, Citigroup, when preparing the Pareto Periodic Reports. In addition, OSA and Citigroup knew that Pareto would distribute the Reports to the 2013 Bondholders.

*h. Pareto Materials Intended for U.S. Investors*

345. The Pareto Materials were "only intended for and [could] only be distributed to institutional investors in the United States and U.S. entities."

346. The Pareto Materials provided contact information for Pareto executives in the U.S. to provide more information regarding OSA.

347. OSA and Pareto sent the Pareto Materials to potential investors, including investors located in the United States, using email servers in the United States. Accordingly, files and communications critical to this case are in the United States.

**3. Documents Governing 2013 Bond Issuance**

*a. 2013 Bond Agreement*

i. Overview

348. The 2013 Bond Agreement is between (1) OSA, as parent; (2) OSA's affiliate Goliath Ltd., as issuer; and (3) Nordic Trustee (on behalf of the 2013 Bondholders).

349. Pursuant to the 2013 Bond Agreement, Nordic Trustee (1) serves as trustee of the 2013 Bond Issuance; (2) acts on behalf of and represents the interests of all the 2013 Bondholders, *who are precluded from directly asserting claims pursuant to a "no action" clause in the Bond Agreement*; and (3) is responsible for enforcing the bondholders' rights, including collecting on the bond and pursuing their claims in litigation. Indeed, Nordic Trustee may make decisions binding on all 2013 Bondholders with proper notice.

ii. Information Sharing

350. Pursuant to the 2013 Bond Agreement, OSA and Goliath Ltd. agreed to make available to the Nordic Trustee: (1) financial statements no later than 150 days after the end of the financial year; and (2) quarterly financial reports no later than 60 days after the end of the relevant quarter.

351. OSA also agreed to schedule conference calls with Nordic Trustee and the 2013 Bondholders within five banking days following the publication of every quarterly and annual financial report.

iii. Event of Default

352. The 2013 Bond Agreement provides that Nordic Trustee "may declare the Bonds to be in default" upon occurrence of, among other things: (1) Non-payment; (2) Misrepresentations; (3) Insolvency; and (4) Material Adverse Change.

353. Material Adverse Change is defined as "[a]ny other event or circumstance occurs which, in the reasonable opinion of the Bond Trustee, after consultation with the Issuer, would have a Material Adverse Effect." A Material Adverse Effect is defined as an event having a material adverse effect on the financial condition or operations of the issuer, Goliath Ltd., OSA, or any sub-charterer's ability to perform and comply with its obligations under the applicable agreements.

354. In the event of a default, the 2013 Bond Agreement provides that Nordic Trustee could, "in order to protect the interests of the Bondholders, declare [the Bonds] including accrued interest, costs and expenses to be in default and due for immediate payment" and Nordic Trustee "may at its discretion, take every measure necessary to recover the amounts due under [the Bonds], and all other amounts outstanding."

355. Nordic Trustee also operated as the Security Agent and held first priority interests on behalf of the 2013 Bondholders in all the security for the issuance, including (1) the mortgage on the Goliath vessel; (2) OSA's accounts pledge; (3) the Mexican Trust Agreement, (4) the charter contracts and bareboat assignment; and (5) assignment of insurance.

356. The Bond Agreement further requires OSA and Goliath Ltd. to promptly inform Nordic Trustee of any event or circumstance they understood or ought to understand may lead to an event of default or any other event that could have a material adverse effect.

357. Goliath Ltd. was also required at all times to maintain a cash balance of $7.5 million in a liquidity account.

iv. Representations and Warranties

358. In the representations and warranties section of the 2013 Bond Agreement, OSA and Goliath Ltd. both represented that: (1) their "most recent Financial Statements and Quarterly Reports. . . fairly and accurately represent the assets and liabilities and financial condition as at their respective dates, and have been prepared in accordance with the applicable financial reporting standards, consistently applied"; (2) "Since the date of the Financial Statements, there has been no change in its business, assets or financial condition that is likely to have a Material Adverse Effect"; (3) "Any factual information provided by it to the subscribers or the Bond Trustee for the purposes of this Bond Issue was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated"; (4) they have "observed, and to the best of its knowledge and belief, parties acting on its behalf have observed in the course of acting for it, all applicable laws and regulations relating to bribery or corrupt practices."

359. Notably, under the contracts governing the 2013 Bond Issuances, the 2013 Bondholders were entitled to penalty payments if OSA defaulted on the principal or any interest payment.

*b. Mexican Trust Agreement*

360. On October 17, 2013, OSA, Goliath Ltd. and Nordic Trustee executed an agreement (the "Mexican Trust Agreement") establishing the Mexican Trust in Banamex to receive the proceeds of Goliath's services to Pemex. On behalf of Banamex, ICG employees Susana Belen Heredia-Barajas ("Heredia-Barajas") and Laura Berenice Pereda-Diaz ("Pereda-Diaz") executed the Mexican Trust Agreement.

361. The beneficiary of the Mexican Trust was Nordic Trustee, who would receive these funds as collateral for the 2013 bondholders in the event that OSA, through Goliath Ltd., failed to pay the principal or interest of the 2013 Bond Issuance to the bondholders. Such funds would be

disbursed, if necessary, according to a distribution procedure designed to ensure that the 2013 Bondholders received their principal and interest from the Trust before any funds were disbursed to OSA (i.e., the Waterfall Structure discussed *supra* at ¶¶ 322-23).

362. In October 2013, OSA and Pemex had an ongoing services contract involving Goliath. This OSA-Pemex contract describes in detail the process for Pemex to issue credit notes to OSA.[40] The OSA-Pemex contract is an attachment of the Mexican Trust Agreement. The Mexican Trust Agreement's attachments also include the 2013 Bond Agreement.

363. Heredia-Barajas and Pereda-Diaz both had emails with the stamp "ICG". Further, Pereda-Diaz had an @citi.com email account, indicating that Citigroup clearly knew (1) of the 2013 Bond Issuance; (2) that Banamex served as trustee of the Mexican Trust under the direction and supervision of the ICG; and (3) that OSA, through Goliath Ltd., would pay the principal and interest to the bondholders with Pemex payments to OSA.

364. The Mexican Trust Agreement also required the Mexican Trust to have two bank accounts to receive the funds from Pemex and held for the benefit of the Nordic Trustee: one denominated in Pesos at Banamex in Mexico City, Mexico and one denominated in U.S. Dollars at Citibank.

**D. <u>Investor Site</u>**

365. In connection with the 2013 Bond Issuance, OSA established an "Investors Site" section in its website in October 2013: www.oceanografia.com.mx.

[40] A Pemex credit note is a document issued by Pemex describing a service provided to it by a vendor and indicating how much Pemex owes the vendor for that service.

366. Through its "Investors Site," OSA's investors, including holders of the 2008 and 2013 bonds could access (1) recordings of OSA investor calls; (2) financial reports; and (3) company presentations.

367. On information and belief, the Investor's site included the Pareto Materials, the December 2013 Presentation, the January 2014 Presentation, and/or other similar, if not identical, versions of the December 2013 and January 2014 Presentations.

368. On information and belief, the 2008 and 2013 Bondholders all accessed the Investor's Site at some point between October 2013 and February 2014.

**E. Financial Statements Between 2008 and 2014**

369. Between 2008 and 2014, OSA issued, at a minimum, annual financial statements for 2008-2012 and quarterly financial statements for 2010-2013 ("OSA's Financial Statements"). OSA distributed those financial statements to the 2008 and 2013 Bondholders, including the Plaintiff Bondholders, either directly or through (1) Citibank and Nordic Trustee; (2) Morgan Stanley and Pareto; (3) the Investor's Site; (4) OSA's website; and/or (5) third-party brokers soliciting investments in OSA.

370. OSA's annual and quarterly financial statements included information about (1) OSA's finances, including balance sheets, income statements, and cash flow statements; and (2) in some instances, OSA's cash advance facility with Banamex.

371. For example, OSA's (1) consolidated audited financial statements for 2008 and 2009; (2) consolidated audited financial statements for 2010 and 2011; and (3) consolidated audited financial statements for 2011 and 2012, state that OSA had a "factoring agreement" with Banamex and included information about the amounts advanced to OSA under the cash advance facility and the interest paid to Banamex therefrom. The quarterly financial statements, including but not limited to the "2Q12" and "2Q13" quarterly statements, included consolidated balance

sheets and consolidated statements of operations showing profit and loss through the quarter as well as liquid assets, non-liquid assets, short-term liabilities, long-term liabilities, stockholders' equity, net sales, operating expenses, operating income, financing costs, income before taxes, deferred income tax and net income as of the of the quarters.

372. None of OSA's annual or quarterly financial statements included any information about or suggested problems with the cash advance facility, OSA's primary source of liquidity and cash flow. More specifically, none of the financial statements state or suggest that (1) OSA's financial summaries and profit projections were false or misleading, given that they were based on a cash advance facility propped up by false documentation submitted by OSA to ICG employees; (2) between 2008 and 2010, Pemex refused to pay Banamex on certain OSA invoices for which Banamex had already issued cash advances to OSA; (3) the cash advance facility was failing due to false and weak controls, including Citigroup's abdication of responsibility in 2012 for validating OSA's cash advance documentation through the secret Regulatory Contract; or (4) Citigroup and OSA had been engaged in a fraudulent scheme relating to the cash advance facility between 2008 and 2013.

373. None of OSA's Financial Statements were ever updated, revised or amended to reflect or include the material omitted information described above.

374. Per the 2008 Bond Indenture and 2013 Bond Agreement, OSA knew that the 2008 and 2013 Bondholders would receive copies of OSA's Financial Statements. Citigroup, as (i) trustee and collateral agent of the 2008 Bond Issuance through its banking arm Citibank and Banamex respectively, and (ii) trustee of the Mexican Trust through the ICG, similarly knew that the 2008 and 2013 Bondholders would receive copies of OSA's Financial Statements.

375. As principal participants in the fraud, both Citigroup and OSA knew that OSA's Financial Statements were false and misleading, including because they failed to reference the ongoing fraud. But neither Citigroup nor OSA informed the 2008 and 2013 Bondholders of this information or updated, revised or amended OSA's Financial Statements to include this information.

376. OSA had a duty to speak and disclose the material information omitted from the Financial Statements to the 2008 and 2013 Bondholders because (1) its failure to speak would render its prior and ongoing representations in the Financial Statements and in other communications to and materials shared with the 2008 and 2013 Bondholders false and misleading; and (2) OSA was soliciting investments and seeking continued bondholder support (e.g., not taking adverse action against OSA for failing to timely pay interest payments or distribute the Financial Statements) from which it would receive financial benefit (e.g., increased liquidity leading to more Pemex contracts for OSA); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from the 2008 and 2013 Bondholders' investment and continued support of OSA; (4) OSA had full access to and was aware of the omitted material facts, and also knew that the 2008 and 2013 Bondholders would rely on the omitted facts when determining whether to invest and/or continue supporting OSA; and (5) OSA was involved in a fraudulent scheme with Citigroup between 2008 (on information and belief) and 2014. OSA's special knowledge of the fraudulent scheme denied the 2008 and 2013 Bondholders the ability to sufficiently investigate OSA's finances before investing or continuing to invest.

377. Citigroup also had a duty to speak and disclose the omitted information from OSA's Financial Statements to the 2008 and 2013 Bondholders, particularly when distributing OSA's

Financial Statements to and discussing the same with the Bondholders, because of its roles as (i) trustee and collateral agent of the 2008 Bond Issuance through its banking arm Citibank and Banamex respectively, and (ii) trustee of the Mexican Trust.

**F. <u>Adar</u>**

**1. Overview**

378. Between August and October 2013, Adar acquired bonds from the 2008 Bond Issuance in several trades. Adar retained the bonds from the 2008 Bond Issuance through OSA's collapse in 2014 and continues to hold those bonds today.

379. Adar purchased and retained its 2008 bonds, including through the period of the fraud, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup, in materials prepared by Pareto based on information provided by Citigroup and with Citigroup's knowledge that the materials would be distributed to current and potential investors in OSA such as Adar; and (2) OSA, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false and misleading information circulated by OSA and Pareto to the 2008 Bondholders such as Adar.

380. Specifically, Citigroup represented—or substantially assisted OSA in making representations—that OSA (1) was financially secure, including because of the stability and reliability of the cash advance facility; (2) was supported by Citigroup including because Citigroup served as trustee and collateral agent of the 2008 Bond Issuance and the fiduciary of the Mexican Trust (*see supra* at Section XIV B-C) and (3) had positive profit projections.

381. Such representations were false, however, because, as Citigroup (and OSA) knew: (1) OSA was not financially secure; (2) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; (3) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of

OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA; (4) Citigroup intentionally violated its own policies and procedures and was not validating or authenticating the documentation OSA submitted in support of its cash advance requests, contrary to representations about Citigroup's role as a gatekeeper; (5) there was a revolving door of former Citigroup employees taking key positions in OSA; (6) and in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012 (*see supra* ¶¶ 1-17, 109-47, 208).

382. Adar also purchased and retained its 2008 bonds, including through the period of the fraud, in reliance on ***material omissions*** by (1) Citigroup, in materials prepared by Pareto based on information provided by Citigroup and with Citigroup's knowledge that the materials would be distributed to current and potential investors in OSA such as Adar; and (2) OSA, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false and misleading information circulated by OSA and Pareto to the 2008 Bondholders such as Adar.

383. Specifically, Citigroup omitted—or substantially assisted OSA in omitting—the following information from communications and materials shared with Adar, which rendered them false, misleading and deceptive: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections

were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable and propped up by false documentation.

384. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Pareto (and likewise Adar) because (1) of their representations in various memoranda and presentations; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties; (ii) parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from Adar's investment; (iv) Citigroup's and OSA's awareness of Adar's reliance on the false and misleading information in the materials provided by OSA and Pareto to Adar; and (v) Citigroup's and OSA's participation in the fraud (*see infra* at Section XIV F 3).

385. Citigroup and OSA directly benefited from fraudulently inducing and luring Adar to invest, and maintain its investment in OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

386. Citigroup, through the fraudulent misrepresentations and material omissions contained in the materials Pareto provided to Adar, directly committed fraud against Adar. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to Adar and substantially assisted and aided and abetted OSA as well as participated in committing fraud against Adar, as described *infra* at Section XIV F 3.

387. Had Adar known about (1) OSA's true financial condition; (2) Citigroup's false and weak controls in connection with the cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud

between Citigroup and OSA, it would not have purchased and/or retained the 2008 bonds between 2013 and 2014.

388. Due to the fraud and corresponding collapse of OSA, Adar did not receive payment of its principal or interest on the 2008 bonds, and the bonds are currently worthless.

### 2. Fraudulent Misrepresentations and Material Omissions Between 2013 and 2014 Relating to the Purchase and Retention of the 2008 Bonds

#### *a. June 2008 Preliminary Offering Memorandum*

389. On information and belief, in or around August 2013, Adar received the June 2008 Preliminary Offering Memorandum, which included positive financial projections for OSA (*see supra* at Section XIV B 2).

390. The June 2008 Preliminary Offering Memorandum omitted any information about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) Citigroup's false and weak controls in connection with the cash advance facility; and (4) the fraud which, on information and belief, began in 2008. These omissions rendered misleading and deceptive the positive financial projections about OSA contained in the June 2008 Preliminary Offering Memorandum.

391. In 2013, when Adar began considering purchasing the 2008 bonds, neither Citigroup nor OSA had revised or otherwise updated the June 2008 Preliminary Offering Memorandum to reflect OSA's true financial condition, including that the cash advance facility, OSA's primary source of liquidity and cash flow, was unstable due to the fraud.

392. OSA had a duty to speak and disclose the omitted information to Morgan Stanley, the manager of the 2008 Bond Issuance, and potential investors, both in 2008 and later when distributing the June 2008 Preliminary Offering Memorandum to new investors such as Adar, because (1) OSA's failure to speak would render its representations in the June 2008 Preliminary

Memorandum false and misleading; (2) OSA was soliciting investments from which it would receive a financial benefit (e.g., increased liquidity leading to more Pemex contracts); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from Adar's investment; (4) OSA had full access to and were aware of the omitted material facts, and also knew that Adar would rely on the omitted facts when determining whether to invest; and (5) the fraudulent scheme between Citigroup and OSA was, on information and belief, underway in 2008 and ongoing during 2013. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Adar the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

393. In 2013, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with current and potential investors including Adar, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶ 406, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Adar in 2013.

394. When purchasing and retaining the 2008 bonds between 2013 and 2014, Adar relied on the June 2008 Preliminary Offering Memorandum, which (1) included material omissions by OSA; and (2) OSA and/or Pareto distributed to current and potential investors in OSA, including Adar, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶ 406).

*b. Receipt of Pareto Materials in September 2013*

395. In or around September 2013, Adar received the September 2013 Pareto Investor Presentation and the 2013 Preliminary Offering Memorandum and supplement. On information and belief, Adar received these materials from OSA, Pareto and/or the Investor's Site.

396. As described in detail *supra* at Section XIV C-D, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order for it to prepare the Pareto Materials. Accordingly, the Pareto Materials, including those materials received by Adar, included fraudulent misrepresentations and material omissions by both Citigroup and OSA.

397. Citigroup (and OSA) were aware that Pareto intended to provide the Pareto Materials to current and potential investors in OSA, including Adar.

398. As detailed *supra* in Section XIV C, the Pareto Materials, including those documents received by Adar, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure. Such representations were false, however, because in 2013 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Sections I and VI).

399. In addition, the Pareto Materials, including those received by Adar, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

400. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise investors such as Adar) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity resulting in increased Pemex contracts for OSA, increased fees for Citigroup from Banamex's role as fiduciary of the Mexican Trust, and increased interest for Citigroup from increased cash advance requests from OSA); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise investors such as Adar), or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from Adar's investment; and (4) and at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup and OSA's special knowledge of the fraudulent scheme also denied Pareto (and Adar) the ability to sufficiently investigate OSA's finances.

401. Citigroup also had a duty to speak fully and disclose this information to Pareto and Adar on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; and (2) fiduciary of the Mexican Trust through the ICG and Banamex.

402. When purchasing and retaining the 2008 bonds between 2013 and 2014, Adar relied on the Pareto Materials, which included fraudulent misrepresentations and material omissions by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶ 406).

### 3. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Adar

403. Citigroup committed fraud against Adar through the fraudulent misrepresentations and material omissions contained in the Pareto Materials (*see supra* at ¶¶ 395-402).

404. Citigroup knowingly conspired to make, and was aware that OSA was making fraudulent misrepresentations and material omissions in communications and materials shared with Adar, including the June 2008 Preliminary Offering Memorandum and Pareto Materials (*see supra* at ¶¶ 389-402).

405. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like Adar on account of its (1) participation in the fraud (*supra* Sections I and VI); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*supra* Section XIII).

406. With knowledge of OSA's fraudulent misrepresentations and material omissions to Adar, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against Adar, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in the June 2008 Preliminary Offering Memorandum and the Pareto Materials, including by not correcting or revising the false and inaccurate information provided by OSA in these documents.

407. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 4. Adar Suffered Injury Due to Citigroup and OSA's Fraudulent Misrepresentations and Material Omissions

408. When (1) purchasing bonds from the 2008 Bond Issuance; and (2) deciding not to sell their investment in such bonds, Adar relied on the fraudulent misrepresentations and material omissions by (1) Citigroup in communications made to and materials distributed by Pareto; and by OSA (through Pareto), which Citigroup knowingly conspired with OSA to make, and aided and abetted, on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup committed fraud against, and conspired with and aided and abetted OSA in committing fraud against Adar, through the fraudulent misrepresentations and material omissions contained in the June Preliminary Offering Memorandum (described *supra* at ¶¶ 389-94); and

(b) Citigroup committed fraud against, and conspired with and aided and abetted OSA in committing fraud against Adar, through the fraudulent misrepresentations and material omissions contained in the Pareto Materials (described *supra* at ¶¶ 395-402).

409. Upon OSA's collapse, which was caused by Citigroup's lack of controls and the fraudulent scheme between Citigroup and OSA, Adar's bonds from the 2008 Bond Issuance lost their value and Adar stopped receiving interest payments on the bonds.

410. OSA's failure to make interest payments to Adar amounted to a default under the 2008 Bond Issuance Contracts and entitled Adar to full repayment of the principal and interest on the 2008 Bond Issuance.

411. Adar has not received payment of its principal or interest in connection with the 2008 Bond Issuance.

## G. Ashmore

### 1. Overview

412. Ashmore holds bonds from the 2008 Bond Issuance, which they acquired in several trades between 2008 and 2013. Specifically, Ashmore acquired bonds from the 2008 Bond Issuance on or about the following dates: July 2, 2008, August 3, 2009, August 25, 2009, September 10, 2009, March 1, 2010, March 9, 2010, April 30, 2010, May 13, 2010, June 11, 2010, June 18, 2010, July 21, 2010, July 23, 2010, July 28, 2010, August 4, 2010, September 30, 2010, August 10, 2011, September 6, 2011, December 14, 2011, January 31, 2012, February 14, 2012, February 21, 2012, April 26, 2012, July 11, 2013, and September 24, 2013. Ashmore retained the bonds from the 2008 Bond Issuance through OSA's collapse in 2014.

413. As described further below, between 2008 and 2013, Ashmore purchased and retained the 2008 bonds, including through the period of the fraud, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup in (i) communications between Ashmore and Citigroup, as trustee and collateral agent for the 2008 Bond Issuance, and (ii) materials provided by OSA and Pareto to Ashmore, which (a) necessarily incorporated information provided by Citigroup as fiduciary of the Mexican Trust and OSA's banker; and (b) were distributed to current and potential investors in OSA, such as Ashmore, with Citigroup's knowledge; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to Ashmore.

414. Specifically, Citigroup represented to Ashmore—and substantially assisted OSA (and its external financial consultant) in representing—that OSA (1) was financially secure,

including because of its Pemex contracts and the stability and reliability of the cash advance facility; (2) was supported by Citigroup, including in its roles as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust through the ICG and Banamex; and (3) had positive profit projections.

415. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure; (2) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; (3) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA's principals; (4) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (5) there was a revolving door of former Citigroup employees taking key positions at OSA; and (6) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012 (*see supra* at Sections I, VI, and XIII).

416. Ashmore also purchased and retained the 2008 bonds, including through the period of the fraud, in reliance upon ***material omissions*** by (1) Citigroup in (i) communications with Ashmore and (ii) materials prepared by Pareto and others that incorporated information provided by Citigroup and with Citigroup's knowledge that they would be distributed to potential investors like the Ashmore, and (iii) through its roles as trustee and collateral agent for the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance; and (2) OSA—with Citigroup's knowledge and substantial assistance—including Citigroup's

participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to Ashmore. Specifically, between 2008 and 2013, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with Ashmore: (1) the documentation submitted by OSA to Citigroup's ICG in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false and weak because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false and included false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable and propped up by false documentation. Omission of such information from Citigroup and OSA's communications to and materials shared with Ashmore rendered them false, misleading and deceptive.

417. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Ashmore because (1) of Citigroup and OSA's previous and ongoing representations to Ashmore between 2008 and 2013; and (2) the following factors created a duty to speak: (i) the nature of the relationship between Citigroup, OSA and Ashmore (*see supra* at Section XIII); (ii) parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from Ashmore's investment; (iv) Citigroup and OSA's awareness of Ashmore's reliance on the false and misleading information; and (v) Citigroup and OSA's participation in the fraud (*see supra* at Sections IV, VI, XIII, XIV(G)(2)–(4)).

418. Citigroup also had a duty to speak and disclose this information to Morgan Stanley, the manager of the 2008 Bond Issuance, Pareto, the manager of the 2013 Bond Issuance, and investors such as Ashmore on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG and Banamex.

419. Citigroup and OSA directly benefited from fraudulently inducing and luring Ashmore to invest, and maintain its investment in, OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

420. Citigroup directly committed fraud against Ashmore through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with Ashmore, including those in the Pareto Materials, which were based on information provided by Citigroup and with Citigroup's knowledge that OSA and Pareto would distribute the Materials to potential investors in OSA including Ashmore.

421. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to Ashmore (including those made by OSA's external financial consultant) and substantially assisted and aided and abetted OSA as well as participated in committing fraud against Ashmore, as described *infra* at Section XIV(G)(5)–(6).

422. Had Ashmore known about (1) OSA's true financial condition; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, it would not have purchased and/or retained the 2008 bonds between 2008 and 2014.

423. Due to the fraud and corresponding collapse of OSA, Ashmore did not receive full payment of its principal or interest on the 2008 bonds.

### 2. Material Omissions Relating to the Purchase and Retention of 2008 Bonds Between 2009 and 2013

#### *a. Communications with OSA in 2009 Regarding Untimely Interest Payment*

424. Between 2008 and 2009, OSA routinely (1) waited until the end of the grace period to pay interest to the 2008 Bondholders; (2) failed to provide financial statements to the 2008 Bondholders by the deadlines set forth in the 2008 Bond Indenture; and (3) failed to communicate with or provide transparent information to the 2008 Bondholders. Citigroup knew about each of these problems and events of default as the trustee and collateral agent of the 2008 Bond Issuance through Citibank and Banamex respectively, but took no action to protect the interests of the 2008 Bondholders like Ashmore. In June and July 2009, Ashmore repeatedly contacted OSA about these issues.

425. For example, Ashmore's Corporate Investment Committee Notes from July 10, 2009, include comments that "Pemex appears to be stretching its payments," and that S&P had downgraded, citing poor levels of disclosure, which Ashmore had experienced as well. Days later, in response to a July 16, 2009 email from Andrew Edmondson of Ashmore to Alejandro Gaona of OSA, asking about the status of the "coupon" payment, Mr. Yáñez replied to Mr. Edmondson's email account which, on information and belief, was hosted in the United States, and (1) confirmed that OSA had provided the "trustee", Citibank, with a portion of the coupon and OSA would shortly send the remainder; and (2) asked Ashmore to inform the other 2008 Bondholders. These assurances gave false comfort to Ashmore.

426. In the summer of 2009, on information and belief, (1) OSA's finances were deteriorating; (2) the cash advance facility upon which OSA relied for liquidity and cash flow was

failing; and (3) Citigroup and OSA were involved in a fraudulent scheme relating to the cash advance facility (*see supra* at Section VI).

427. Citigroup, not Ashmore, should have been apprising the 2008 Bondholders of OSA's true financial condition and its performance—or lack thereof—of its obligations pursuant to the 2008 Bond Indenture and the actual reasons for delayed coupon payments to the 2008 Bondholders.

428. During these communications in 2009 with Ashmore about the untimely interest payments, Mr. Yáñez and OSA did not advise Ashmore about: (1) OSA's deteriorating financial condition; (2) the false documents submitted by OSA to ICG employees; (3) Citigroup's lack of controls in connection with the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI).

429. OSA had a duty to speak and disclose this information because (1) failure to speak would render its prior representations, including in the 2008 Offering Memorandum, false and misleading; (2) OSA was seeking support from Ashmore and indirectly requesting that Ashmore continue investing in OSA (i.e., not sell its current position in OSA due to the untimely interest payments or take other adverse action against OSA); (3) OSA knew this information and intentionally withheld it to receive the financial benefit of Ashmore's continued investment in OSA (e.g. increased liquidity leading to more Pemex contracts for OSA); (4) OSA was aware of the omitted material facts and also knew that Ashmore would rely on the omitted facts when determining whether to maintain or increase its investment; and (5) on information and belief, the fraudulent scheme with Citigroup was underway at this time.

430. In the summer of 2009, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role as trustee and collateral agent of the 2008 Bond Issuance; and (3)

participation in the fraud, Citigroup was aware that OSA was making material omissions in communications and materials shared with the 2008 Bondholders, including Ashmore, about: (1) OSA's deteriorating financial condition; (2) the false documents submitted by OSA to ICG employees; (3) the weak or nonexistent controls of the cash advance facility; (4) the ongoing fraud; and (5) its ability to timely make the interest payments on the 2008 Bonds. As described *infra* at ¶¶ 507–11, Citigroup substantially assisted OSA in making these material omissions to Ashmore in the summer of 2009.

431. With knowledge of OSA's material omissions in 2009 to the 2008 Bondholders including Ashmore, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

432. When purchasing and retaining bonds from the 2008 Bond Issuance in 2009, Ashmore relied on (1) Citigroup's omissions to the 2008 Bondholders regarding (i) OSA's true financial condition; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud, which it should have disclosed as trustee and collateral agent of the 2008 Bond Issuance; and (2) OSA's omissions in its communications with Ashmore, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 507–11).

*b. Communications with OSA Between 2009 and 2010 Regarding the Lack of Financial Information Provided By OSA*

433. Between 2009 and 2010, Ashmore continued to express concerns about OSA's lack of transparency with the 2008 Bondholders and, on information and belief, received false assurances from OSA and no disclosures from Citigroup regarding OSA's financial condition.

434. For example, on or about November 5, 2009, Ms. Fatma Kamara's notes indicate that the bonds were in "technical default because of delayed financials and a failure to maintain

assets to standard (azteca needs $20mm of repairs)." On information and belief, Ms. Kamara's concerns were falsely assuaged in communications with OSA.

435. On or about September 30, 2010, Ms. Kamara and Mr. Yáñez held a telephone conference regarding (1) OSA's failure to provide financial or other company information to Ashmore since the third quarter of 2009; and (2) Ashmore's desire to obtain audited financials within three business days. On information and belief, Mr. Yáñez falsely assured Ashmore of OSA's financial health.

436. At this time, (1) OSA's finances were deteriorating; (2) the cash advance facility upon which OSA relied for liquidity and cash flow was failing; and (3) Citigroup and OSA were involved in a fraudulent scheme relating to the cash advance facility (*see supra* at Section VI).

437. At no time during these communications with Ashmore in 2010 did Mr. Yáñez or OSA advise Ashmore about: (1) OSA's deteriorating financial condition; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI).

438. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to Ashmore about its financial health false and misleading; (2) OSA was attempting to reassure Ashmore about its financial condition and requesting that Ashmore maintain or increase its investment in OSA; (3) OSA knew this information and intentionally withheld it to receive the financial benefit from Ashmore's investment (e.g. increased liquidity leading to more Pemex contracts for OSA); (4) OSA was aware of the omitted material facts and also knew that Ashmore would rely on the omitted facts when determining whether to maintain its investment; and (5) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of its fraudulent scheme with Citigroup also

denied Ashmore the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

439. Between 2009 and 2010, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role as trustee and collateral agent of the 2008 Bond Issuance; and (3) participation in the fraud, Citigroup was aware that OSA was making material omissions, in communications made to and materials shared with the 2008 Bondholders, including Ashmore, about: (1) OSA's deteriorating financial condition; (2) the false documents submitted by OSA to ICG employees, (3) the weak or nonexistent controls of the cash advance facility; (4) the ongoing fraud; and (5) its ability to timely make the interest payments on the 2008 Bonds. As described *infra* at ¶¶ 507–11, Citigroup substantially assisted and aided and abetted OSA in making these material omissions to Ashmore between 2009 and 2010.

440. With knowledge of OSA's material omissions in 2009 and 2010 to the 2008 Bondholders including Ashmore, Citigroup—as trustee and collateral agent of the 2008 Bond Issuance—had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but it failed to do so.

441. When purchasing and retaining bonds from the 2008 Bond Issuance in 2009 and 2010, Ashmore relied on (1) Citigroup's omissions to the 2008 Bondholders regarding (i) OSA's true financial condition; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud, which it should have disclosed as trustee and collateral agent of the 2008 Bond Issuance; and (2) OSA's omissions in its communications with Ashmore, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 507–11).

*c. Receipt of 2009 and 2010 Financial Statements in 2011 and 2012*

442. On January 7, 2011, Mr. Betancourt, OSA's Head of Investor Relations, provided Ashmore, via email to Ashmore's U.S.-hosted email accounts, with OSA's 2009 and 2010

financial statements, which contained material omissions regarding the fraud, as described *supra* at ¶¶ 375–78.[41] On or about February 28, 2012, Mr. Betancourt sent OSA's 2009 and 2010 audited financial statements via email to Ashmore and other Plaintiffs, which contained similar omissions.

443. As of January 2011, Citigroup and OSA were involved in a fraudulent scheme, which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section V). Yet OSA did not revise or update its 2009 and 2010 financial statements before circulating them in 2011. In addition, Citigroup, Mr. Betancourt, and OSA did not advise Ashmore between January 2011 and February 2012 of: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the absence of controls over the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). These omissions rendered the representations in OSA's 2009 and 2010 financial statements misleading and deceptive.

444. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior representations in OSA's 2009 and 2010 financial statements false and misleading; (2) on information and belief, OSA was seeking Ashmore's continued support (i.e., not taking adverse action due to untimely interest payments) and encouraging Ashmore to maintain and increase its investment in OSA; (3) OSA was aware of the omitted information and intentionally withheld it to receive the financial benefit from Ashmore's continued support and investment; (4) OSA was aware of the omitted material facts and also knew that Ashmore would rely on the omitted facts when determining whether to invest or maintain its investments; and (5) on information and belief, the fraudulent scheme with Citigroup was well underway at this time.

[41] On information and belief, in February 2011, Mr. Betancourt and Ms. Kamara held a telephone conference to discuss OSA's 2009 and 2010 financial statements and media reports regarding OSA.

445. In 2011, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id*.); and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with current and potential investors including Ashmore, was making (1) fraudulent misrepresentations regarding its financial health, the stability and reliability of the cash advance facility, and its ability to make interest payments to bondholders; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 507–11, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Ashmore in 2011.

446. With knowledge of OSA's fraudulent misrepresentations and material omissions in 2011 to current and potential investors such as Ashmore, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

447. When purchasing and retaining bonds from the 2008 Bond Issuance in 2011 and 2012, Ashmore relied on (1) OSA's material omissions in the 2009 and 2010 financial statements, including OSA's failure to update or correct such financials when transmitting them to Ashmore in January 2011 and February 2012, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 507–11) and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees, (iii) the false and weak controls of the cash advance facility, and (iv) the ongoing fraud.

*d. Discussions with OSA's External Financial Consultant Between 2010 and 2013*

448. As background, OSA hired the external financial consultant in or around 2010 to assist OSA in restructuring its debt to Plaintiffs Candies and Rabobank. In connection with this engagement, between on or about 2010 and on or about early 2014, OSA's external financial consultant communicated and worked directly with Citigroup, Banamex, OSA, and Plaintiffs Candies and Rabobank.

449. Occasionally, between on or about 2010 and on or about early 2014, OSA's external financial consultant also communicated and/or met with certain of OSA's bondholders (e.g. Plaintiff Ashmore) and suppliers (e.g., Plaintiff MADISA) regarding OSA's finances.

450. In connection with his engagement to restructure OSA's debt to Plaintiffs Candies and Rabobank, OSA's external financial consultant received information from Citigroup, Banamex, and OSA and disseminated it to at least Plaintiffs Candies and Rabobank. *See infra* at Section XV(B); Section XVI.

451. Citigroup, Banamex and OSA intended and had reason to expect that OSA's financial consultant would disseminate the information and documents that he received from them to Plaintiff Candies, Plaintiff Rabobank and other OSA creditors and investors with whom the external financial consultant communicated about OSA because: (1) on information and belief, OSA's external financial consultant regularly consulted with Citigroup, Banamex and OSA, including Messrs. Yáñez, Granja, and Ortega-Rivera, about his discussions with Plaintiffs Candies, Rabobank and others; (2) Citigroup, Banamex and OSA participated in meetings and telephone conferences attended by OSA's external financial consultant in which he provided information to Plaintiffs Candies and Rabobank (among others) and were on emails that included OSA's external financial consultant and Plaintiffs Candies and Rabobank (among others); and (3) the specific

purpose of OSA's engagement with the external financial consultant was to restructure OSA's debt with Plaintiffs Candies and Rabobank, which necessarily required providing assurances about OSA's finances and the strength and reliability of the cash advance facility to at least Plaintiffs Candies and Rabobank, all of which OSA and Citigroup plainly understood.

452. Plaintiffs, including Ashmore, understood that OSA's external financial consultant had the authority and approval of OSA to provide them information and documents and communicate and meet with them.

453. Ms. Kamara at Ashmore contacted OSA's external financial consultant for information about OSA between 2010 and 2013. During these discussions, Ms. Kamara would inquire as to (1) OSA's overall financial health; and (2) whether OSA intended to make timely interest payments to Ashmore. In response to her inquiries, OSA's external financial consultant assured Ms. Kamara that (1) OSA was financially healthy, as evidenced by the fact that (i) Citigroup had increased OSA's credit limit for the cash advance facility; and (ii) OSA had successfully restructured its debt with Plaintiffs Candies and Rabobank; and (2) OSA would timely make the interest payments to Ashmore on their 2008 bonds. OSA's external financial consultant received this information from Citigroup and OSA and provided it to Ms. Kamara.

454. For example, in October 2010, Ashmore's Corporate Investment Committee notes indicate Ashmore had spoken with a representative of OSA—on information and belief OSA's external financial consultant—who blamed the delay in financials on the auditors and assured Ashmore that the overdue financials would be published, with an investor meeting, during the second week of October. Additionally, Ashmore was told that OSA anticipated $106MM from Pemex by the end of the year, projected a dramatic increase in EBITDA, and described a new

strategy with an "SPV [that] will collect payments from Pemex and will have a waterfall structure" such that, in the event of a cash shortfall, OSA would not get anything.

455. Ms. Kamara spoke with OSA's external financial consultant on these matters during a telephone conference on June 5, 2011. On information and belief, in this conversation, OSA's external financial consultant recommended that Ms. Kamara contact Citigroup through its banking arm Citibank, as the trustee for the 2008 Bonds, for additional information and to confirm the accuracy of the information he was providing.

456. Pursuant to this recommendation, Ms. Kamara, on information and belief, routinely consulted Citibank about OSA's financial health between 2010 and 2013, including OSA's ability to timely pay interest on Ashmore's 2008 bonds. On information and belief, Citibank falsely assured Ms. Kamara that OSA was financially stable and would timely pay the principal and interest on the 2008 Bonds and confirmed the accuracy of the information OSA's external financial consultant had provided to her.

457. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees, (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

458. As noted above (*supra* at ¶¶ 448–50), OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were

aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including Ashmore.

459. Citigroup and OSA purposefully concealed the following information from Ashmore: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility, or (4) the ongoing fraud. These omissions rendered the representations by OSA's external financial consultant about the financial health of OSA and its ability to timely pay interest on the 2008 Bonds, misleading and deceptive.

460. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant and to Ashmore because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant and Ashmore about OSA's financial health false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to (i) restructure OSA's debt; and (ii) obtain support from OSA's creditors and bondholders for the proposed restructuring plans (including as to the 2008 Bond Issuance); (3) Citigroup and OSA were seeking support and patience from Ashmore on the untimely interest payments and, on information and belief, requesting that Ashmore maintain or increase its investment in OSA; (4) Citigroup and OSA were aware of this information and intentionally withheld it to receive the financial benefit from Ashmore's continued support of and investment in OSA (e.g. increased liquidity leading to more Pemex contracts for OSA and for Citigroup, increased fees as trustee and collateral agent of the 2008 Bond Issuance and increased interest on additional cash advance requests from OSA); (5) Citigroup and OSA were aware of the omitted material facts and also knew that (i) OSA's external financial consultant would rely on the omitted facts when communicating with OSA's creditors, vendors and bondholders, and (ii)

Ashmore would rely on the omitted facts when making investment decisions related to OSA; and (6) the fraudulent scheme between Citigroup and OSA was well underway during this time. Citigroup and OSA's special knowledge of the fraud denied OSA's external financial advisor and Ashmore the ability to sufficiently investigate OSA's finances.

461. Citigroup also had a duty to speak and disclose this information to the 2008 Bondholders including Ashmore on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; and (2) collateral agent of the 2008 Bond Issuance through Banamex. Citigroup, as trustee and collateral agent, should have disclosed the information and spoken fully, but it failed to do so.

462. In purchasing and retaining bonds from the 2008 Bond Issuance between 2010 and 2013, Ashmore relied on (1) the material omissions made by OSA's external financial consultant (i) based upon information provided by Citigroup and OSA; and (ii) with Citigroup's knowledge that OSA's external financial consultant would disseminate such information to creditors, vendors and bondholders of OSA, including Ashmore; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees, (iii) the false and weak controls of the cash advance facility, and (iv) the ongoing fraud.

*e. January 2012 Meeting Between OSA's External Financial Consultant and Ashmore*

463. On or about January 27, 2012, Ms. Kamara met with OSA's external financial consultant. On information and belief, the meeting was held in Mexico City. During the meeting, OSA's external financial consultant informed Ms. Kamara that he (1) "helped [OSA] win a number of Pemex contracts as well as recover[ed] $100 mm in accounts receivable", (2) "has a plan for the company and the liquidity / connections to be successful (a) they've settled a number of

disputes / extensions with the banks and (b) Pemex wants [the Consultant's company] involved"; and (3) "will approach the bondholders with some sort of refi/restrux once they clean up issues w/ local banks & suppliers which will include (a) tender (b) extension and (c) re-set of lower coupons."

464. Based on her conversation with the Consultant, Ms. Kamara concluded that "[g]iven the focus on building a going concern in a constructive manner, rather than going into [bankruptcy], I'd be a buyer of more paper at these levels."

465. OSA's external financial consultant made these representations to Ashmore based on information obtained from Citigroup and OSA (*see supra* at ¶¶ 448–50). As noted above, OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including Ashmore. On information and belief, Citigroup in particular was aware of the external financial consultant's representations because Ms. Kamara at Ashmore would routinely call Citigroup for confirmation of the information.

466. In January of 2012, Citigroup and OSA knew about but OSA's external financial consultant did not inform Ashmore of: (1) OSA's false financial projections; (2) the false documentation being submitted by OSA to ICG employees, (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered the representations by OSA's external financial consultant to Ashmore about the (1) improvements in OSA's financial situation; (2) OSA's plan for increased liquidity (which necessarily required the success of

Citigroup's cash advance facility); (3) resolution of issues with banks and suppliers; and (4) a potential restructuring of the 2008 bonds false and misleading.

467. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise the 2008 Bondholders such as Ashmore) because (1) their failure to speak would render their previous and ongoing representations to OSA's external financial consultant and Ashmore false and misleading; (2) Citigroup, OSA, and OSA's external financial consultant were all working together to (i) restructure OSA's debt; (ii) obtain support from OSA's creditors and bondholders for the proposed restructuring plans (including as to the 2008 Bond Issuance); and (iii) solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA, increased fees for Citigroup as trustee and collateral agent and increased interest on cash advance requests by OSA for Citigroup); (3) Citigroup and OSA knew this information and intentionally withheld it to receive the financial benefit from Ashmore's investment; (4) Citigroup and OSA knew the omitted material facts and that Ashmore would rely on the omitted facts when determining whether to invest or maintain its investment; and (5) the fraudulent scheme between Citigroup and OSA was well underway during this time. Citigroup and OSA's special knowledge of the fraudulent scheme also denied OSA's external financial consultant (and Ashmore) the ability to sufficiently investigate OSA's finances.

468. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* Section XIII); (2) role in restructuring OSA's debt (*see supra* at Section VI); and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with the 2008 Bondholders, including Ashmore, was making (i) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (ii) material

omissions regarding (a) the false documentation submitted by OSA to ICG employees; (b) the false and weak controls of the cash advance facility; and (c) the ongoing fraud. As described *infra* at ¶¶ 507–11, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Ashmore in 2012.

469. With knowledge of OSA's material omissions in 2012 to current and potential investors such as Ashmore, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

470. In purchasing and retaining bonds from the 2008 Bond Issuance in 2012 and 2013, Ashmore relied on (1) the material omissions made by OSA's external financial consultant, based on information provided by Citigroup and OSA and with Citigroup's knowledge that OSA's external financial consultant would share that information with OSA's creditors and bondholders, including Ashmore; and (2) Citigroup's material omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. Indeed, in an internal Ashmore email from Ms. Kamara on October 12, 2012, she explained that, according a "source," OSA was "performing really well" and, in acquiring the Goliath vessel, "it seems that it will [be] financed by Banamex." Thus Ashmore took comfort in Banamex's support of OSA and relied on false information in making decisions regarding its bond investment in OSA.

### 3. Fraudulent Misrepresentations and Material Omissions in Materials Provided By Pareto Between September and November 2013

#### *a. Receipt of the Pareto Materials in September 2013*

471. On or about September 6, 2013, Mr. Yáñez, other OSA principals, and representatives of Pareto met with Ashmore in London regarding the 2013 Bond Issuance (the "September 2013 London Meeting"). On information and belief, during this meeting, OSA and Pareto provided Ashmore with the information contained in the Pareto Materials, as described above (*see supra* at Section XIV(C)(2)). The purpose of the meeting was to convince Ashmore to purchase bonds in the 2013 Bond Issuance. Although Ashmore ultimately did not purchase any 2013 bonds, when purchasing and retaining 2008 bonds in late September 2013 and thereafter, it relied on (1) the information provided by OSA and Pareto in connection with the 2013 Bond Issuance; and (2) omissions by Citigroup as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance.

472. Ashmore received the Pareto Materials before, during, and after the September 2013 London meeting.

473. In particular, after the September 2013 London Meeting, Pareto sent an email to Ms. Kamara's Ashmore email address, which, on information and belief was hosted in the United States, on September 6, 2013, containing Pareto's credit model (the "Pareto Credit Model") and the September 2013 Pareto Credit Analysis Presentation. As described above (*id.*, at ¶¶ 334–36), (1) the Pareto Credit Model included information about OSA's finances, including positive financial projections and cash flow; and (2) the September 2013 Pareto Credit Analysis Presentation included representations regarding the Waterfall Structure, including that Banamex, as the fiduciary bank, would receive OSA's earnings from its contracts with Pemex; then distribute

those earnings according to the "waterfalls" in Figure 6, ensuring that bondholders received payments before OSA.

474. As described in detail *supra* at ¶¶ 471–73, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials. Accordingly, as detailed *infra* at ¶¶ 476–77, the Pareto Materials, including the Credit Model and Presentation, contained fraudulent misrepresentations and material omissions by Citigroup and by OSA.

475. Citigroup was aware, as described *supra* at Section XIV(C)(2), that OSA and Pareto intended to provide the Pareto Materials to creditors, vendors and bondholders of OSA in order to demonstrate OSA's continued financial viability, instill confidence in OSA's ability to repay its debts, and/or to solicit further investment in OSA.

476. As detailed *supra* in Section XIV(C)(2), the Pareto Materials, including those documents received by Ashmore, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure (*see supra* at ¶ 313). Such representations were false because in 2013, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* Section V).

477. In addition, the Pareto Materials, including those received by Ashmore, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial

projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

478. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those whom OSA and Pareto provided the Pareto Materials, including Ashmore) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto and investors like Ashmore, or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from Ashmore's investment; (4) and at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup and OSA's special knowledge of the fraudulent scheme also denied Pareto (and Ashmore) the ability to sufficiently investigate OSA's finances.

479. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise Ashmore) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust, but it failed to do so.

480. When purchasing and retaining bonds from the 2008 Bond Issuance in September 2013, Ashmore relied on the Pareto Materials, which included fraudulent misrepresentations and material omissions by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 507–11).

*b. Quarterly Review By Pareto*

481. On or about October 28, 2013, Pareto sent Ashmore, via email to its email accounts which, on information and belief, were hosted in the United States, the Quarterly Credit Review in order for Ashmore to evaluate its position in OSA bonds.

482. The transmittal email and Quarterly Credit Review note that OSA presented a "new attitude towards investors with a much higher degree of transparency than earlier." The transmittal email and Quarterly Credit Review also stated that, with respect to the 2013 Bond Issuance, Pareto believed that "Oceanografía will do what it takes to honour its obligations under the bareboat charter."

483. OSA and, on information and belief, Citigroup provided information to Pareto in order for it to prepare the Quarterly Credit Review and corresponding transmittal email. Citigroup and OSA were aware that Pareto intended to provide information about OSA's finances, including the information contained in the Quarterly Credit Review and corresponding transmittal email, to current and potential investors in OSA, including Ashmore (*see supra* at Section XIV(C)(2)).

484. Omission in the Quarterly Credit Review and corresponding transmittal email of any reference to or discussion of the following rendered these documents false, misleading, and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

485. Citigroup and OSA had a duty to speak and disclose this information to Pareto and investors like Ashmore because (1) their failure to speak would render OSA's and Pareto's previous and ongoing representations about OSA's financial health false and misleading; (2) Citigroup and OSA were soliciting investments and support from current bondholders, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise investors such as Ashmore), or (ii) persuaded Pareto to participate in the scheme, to

receive a financial benefit from Ashmore's investment; (4) and at this time, the fraudulent scheme between Citigroup and OSA was well underway.

486. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise Ashmore) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust, but it failed to do so.

487. When, in late 2013, Ashmore decided to maintain its investment in OSA bonds from the 2008 Bond Issuance, Ashmore relied on the Quarterly Credit Review and corresponding transmittal email, which included fraudulent misrepresentations and material omissions by (1) Citigroup (on information and belief); and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 507–11).

**4. Material Omissions Relating to the Retention of the 2008 Bonds in 2014**

*a. February 21, 2014 Discussion Between Citigroup and Ashmore's Counsel*

488. During conversations on or around February 21, 2014, between Citigroup and counsel for Ashmore, GPF II, ICE Canyon, and the Moneda Funds (the "February 21, 2014 Telephone Conference Between Citigroup and Counsel"), Citigroup reassured the 2008 bondholders that OSA was above-board with its financials, represented that it wanted to "have a constructive and proactive approach" with OSA to prevent a default, and be in "constant contact" with the 2008 Bondholders to avoid any "negative reactions" from other groups that may "complicate" the situation.

489. However, Citigroup was not collaborating constructively and proactively with OSA. On information and belief, by February 21, 2014, Citigroup (1) had already commenced its internal investigation into the fraud; and (2) intended to permanently terminate the cash advance

facility, OSA's primary and most important source of liquidity and cash flow, thereby threatening OSA's survival.

490. At no point during this Telephone Conference did Citigroup disclose to Ashmore or other 2008 Bondholders the (1) fraud; (2) its internal investigation; or (3) its intent to permanently cancel the cash advance facility. These omissions rendered Citigroup's representations that it sought to continue working with OSA and the 2008 Bondholders misleading and deceptive.

491. Citigroup had a duty to speak and disclose this information because (1) Citigroup's failure to speak would render its representations about working with the 2008 Bondholders false and misleading; (2) it was trying to persuade the 2008 Bondholders to continue supporting OSA and not take any adverse actions, from which Citigroup and OSA would receive a financial benefit; and (3) Citigroup knew the omitted material facts and also knew that Ashmore would rely on the omitted facts when determining whether to maintain its investment in OSA.

492. Citigroup also had a duty to speak fully and disclose this information to Ashmore on account of its roles trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

493. When retaining the bonds from the 2008 Bond Issuance, Ashmore relied on Citigroup's (1) material omissions during the February 21, 2014 Telephone Conference Between Citigroup and Counsel; and (2) omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding its (1) internal investigation; and (2) intent to permanently cancel the cash advance facility.

*b. February 24, 2014 Discussion Between OSA and Ashmore's Counsel*

494. During conversations on February 24, 2014 between OSA and counsel for Ashmore, GPF II, ICE Canyon, and the Moneda Funds (the "February 24, 2014 Telephone Conference Between OSA and Counsel"), OSA represented that it had formed a debt restructuring team with a law firm and financial firm to begin the "collaborative process towards a consensual restructuring". These representations, which suggested that the 2008 Bondholders need not be concerned about the financial stability of OSA and its ability to successfully restructure its debts including as to the 2008 Bondholders, were misleading in light of (1) the fraud; (2) Citigroup's internal investigation; and (3) Citigroup's intent to cancel the cash advance facility.

495. On information and belief, given the (1) close relationship between Citigroup and OSA (*see supra* at Section XIII); and (2) fact that Citigroup had commenced an internal investigation into the fraud no later than February 20, 2014, OSA was aware by February 24, 2014 that Citigroup had commenced an investigation into the fraud and intended to cancel the cash advance facility, but OSA did not disclose either fact during this Telephone Conference, rendering OSA's representations regarding the restructuring of its debt misleading and deceptive.

496. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its representations about debt restructuring false and misleading; (2) it was trying to persuade the 2008 Bondholders to continue supporting OSA and not take any adverse actions, from which OSA would receive a financial benefit; and (3) OSA knew the omitted material facts and also knew that Ashmore would rely on the omitted facts when determining whether to maintain its investment in OSA and/or take action against OSA.

497. On information and belief, given (1) the close relationship between Citigroup and OSA (*see supra* at Section XIII); and (2) Citigroup's representations to Ashmore's counsel in the

February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), Citigroup was aware that OSA was informing its creditors, including the 2008 Bondholders like Ashmore, that OSA had a viable plan to restructure its debt, notwithstanding the fact that Citigroup had already commenced an investigation into the fraud and intended to permanently cancel the cash advance facility. As described *infra* at ¶¶ 507–11, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Ashmore during this Telephone Conference (*see supra* ¶¶ 494–96).

498. Citigroup had a duty to speak and disclose this information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but Citigroup failed to do so.

499. Ashmore relied on the following when retaining the bonds from the 2008 Bond Issuance in 2014: (1) the material omissions by OSA in the February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 507–11) and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) the fraud, (ii) Citigroup's internal investigation, and (iii) Citigroup's intent to permanently cancel the cash advance facility.

*c. February 26, 2014 Discussion Between OSA and Ashmore's Counsel*

500. During conversations on February 26, 2014, between Mr. Yáñez (participating by telephone from Miami, Florida), other OSA principals, and counsel for Ashmore, GPF II, ICE Canyon, and the Moneda Funds (the "February 26, 2014 Telephone Conference Between OSA and Counsel"), OSA represented that the "alleged" Pemex issue was "based on interpretation of a contractual obligation" rather than any fault by OSA, and that OSA would sign a confidentiality agreement with counsel for the 2008 Bond Plaintiffs to give them "full access" to the files of such

contractual procedures and other legal documents and information for verification and analysis of OSA's position. These representations, which suggested that the bondholders need not be concerned about the financial stability of OSA, were misleading because of the fraud and the fact that Citigroup had already commenced an internal investigation and intended to terminate the cash advance facility.

501. On information and belief, given (1) the close relationship between Citigroup and OSA; and (2) the fact that Citigroup had commenced an internal investigation no later than February 20, 2014, OSA was aware by February 26, 2014, that Citigroup had commenced an investigation into the cash advance facility and intended to cancel it.

502. At no point during this Telephone Conference did OSA inform counsel for Ashmore of (1) the fraud; (2) Citigroup's internal investigation; or (3) Citigroup's intent to cancel the cash advance facility.

503. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its representations regarding OSA's financial stability false and misleading; (1) it was seeking the bondholders' support and asking them not to take adverse actions (e.g., demanding coupon payments), from which it would receive a financial benefit; and (3) OSA knew the omitted material facts and also knew that Ashmore would rely on the omitted facts when determining whether to maintain its investment in OSA and/or take action against OSA.

504. On information and belief, given (1) the close relationship between Citigroup and OSA (*see supra* at Section XIII); and (2) Citigroup's representations to Ashmore's counsel in the February 21, 2014 Telephone Conference Between Citigroup and Counsel (*see supra* at ¶ 488), Citigroup was aware that OSA was informing its creditors, including the 2008 Bondholders, that (1) the media allegations against OSA were false; (2) Pemex had made an error; and (3) OSA could

restructure and pay bondholders, notwithstanding that Citigroup had already commenced an investigation into the fraud and intended to cancel the cash advance facility. As described *infra* at ¶¶ 507–11, Citigroup substantially assisted and aided and abetted OSA in making these material omissions to Ashmore during this Telephone Conference (*see supra* ¶¶ 500–02).

505. Citigroup had a duty to speak and disclose this information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but Citigroup failed to do so.

506. Ashmore relied on the following when retaining the bonds from the 2008 Bond Issuance in 2014: (1) the material omissions by OSA in the February 26, 2014 Telephone Conference Between OSA and Counsel, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 507–11) and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) the fraud, (ii) Citigroup's internal investigation, and (iii) Citigroup's intent to permanently cancel the cash advance facility.

**5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Ashmore**

507. Citigroup directly committed fraud against De Hoop through the fraudulent misrepresentations and oomissions in the (1) Communications with OSA in 2009 regarding untimely interest payments; (2) Communications with OSA between 2009 and 2010 regarding the lack of financial information provided by OSA; (3) January 2012 Meeting; (4) February 2014 Discussions and (5) materials shared with, and communications made to, Ashmore between 2008 and 2014, including those made by OSA's external financial consultant and contained in the Pareto Materials.

508. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant and those contained in the Pareto Materials) in communications and materials

shared with Ashmore between 2008 and 2014, including those made in the (1) Communications with OSA in 2009 regarding untimely interest payments; (2) Communications with OSA between 2009 and 2010 regarding the lack of financial information provided by OSA; (3) January 2012 Meeting; and (4) February 2014 Discussions.

509. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like Ashmore on account of its (1) participation in the fraud (*see supra* Section VI); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility.

510. With knowledge of OSA's fraudulent misrepresentations and material omissions to Ashmore, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against Ashmore, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA and Pareto in these communications and materials.

511. Citibank received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

**6. Ashmore Suffered Injury Due to Citigroup and OSA's Fraudulent Misrepresentations and Material Omissions**

512. When Ashmore (1) purchaed bonds from the 2008 Bond Issuance; and (2) decided not to sell such bonds between 2008 and 2014, Ashmore relied on the fraudulent misrepresentations and material omissions by Citigroup, through OSA's external financial consultant; and by OSA (including those made by OSA's external financial consultant), which Citigroup aided and abetted on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup in the Communications with OSA in 2009 regarding untimely interest payments, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to Ashmore (described *supra* at ¶¶ 507–11);

(b) Citigroup in the Communications with OSA between 2009 and 20 regarding the lack of financial information provided by OSA, (1) made material omissions to Ashmore and (2) aided and abetted OSA in making material omissions to Ashmore (described *supra* at ¶¶ 507–11);

(c) Citigroup in OSA's 2009 and 2010 Financial Statements receved by Ashmore in 2011 and 2012, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to Ashmore (described *supra* at ¶¶ 507–11);

(d) Citigroup in the Discussions with OSA's external financial consultant between 2009 and 2013, (1) made material omissions as trustee and collateral agent of the

2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to Ashmore (described *supra* at ¶¶ 507–11);

(e) Citigroup in the January 2012 Meeting, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to Ashmore (described *supra* at ¶¶ 507–11);

(f) Citigroup, through Pareto's communications made to and materials transmitted to Ashmore in September 2013, (1) made fraudulent misrepresentations and material omissions to Ashmore; and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to Ashmore (described *supra* at ¶¶ 507–11);

(g) Citigroup, through Pareto's Quaterly Review, (1) made fraudulent misrepresentations and material omissions to Ashmore; and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to Ashmore (described *supra* at ¶¶ 507–11);

(h) Citigroup made material omissions to Ashmore in the February 21, 2014 Meeting (described *supra* at ¶¶ 507–11);

(i) Citigroup in the February 24 and 26, 2014 Discussions, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to Ashmore.

513. In other words, Ashmore would not have invested or continued to invest in OSA had it known of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5)

Citigroup's internal investigation of the fraud; or (6) Citigroup's intent to cancel the cash advance facility.

514. At the time of OSA's collapse, Ashmore held bonds from the 2008 Bond Issuance.

515. Upon OSA's collapse, which was caused by Citigroup's lack of controls in the cash advance facility and the fraud, (1) Ashmore's bonds from the 2008 Bond Issuance lost their value; and (2) Ashmore stopped receiving interest payments on these bonds.

516. OSA's failure to make interest payments to Ashmore amounted to a default under the 2008 Bond Indenture and entitled Ashmore to full repayment of the principal and interest on the bonds from the 2008 Bond Issuance.

517. Ashmore has not received payment of their principal or interest on the bonds they purchased in connection with both the 2008 Bond Issuances

## H. Copernico

### 1. Overview

518. The Copernico Funds hold bonds from the 2008 Bond Issuance, which they acquired on the following dates: (1) May 7, 2013; and (2) August 7, 2013. The Copernico Funds retained the majority of the bonds from the 2008 Bond Issuance through OSA's collapse in 2014 and continue to hold those bonds today.

519. Additionally, in 2013, OSA, through Pareto, targeted the Copernico Funds to purchase bonds in the 2013 Bond Issuance. The Copernico Funds ultimately did not purchase any 2013 bonds but retained most of their previous investment in the 2008 bonds, in reliance upon information and documents received in connection with the 2013 Bond Issuance, as described *infra* at ¶¶ 548–57.

520. As described further below, the Copernico Funds purchased and retained their 2008 bonds, including through the period of the fraud, in reliance on ***fraudulent misrepresentations*** by

(1) Citigroup in (i) communications between the Copernico Funds and Citigroup, as trustee and collateral agent for the 2008 Bond Issuance, and (ii) materials provided by OSA and Pareto to the Copernico Funds, which (a) necessarily incorporated information provided by Citigroup as fiduciary of the Mexican Trust and OSA's banker; and (b) were distributed to current and potential investors in OSA, such as Moneda, with Citigroup's knowledge; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to investors like the Copernico Funds.

521. Specifically, Citigroup represented to the Copernico funds—and substantially assisted OSA (and its external financial consultant) in representing—that OSA (1) was financially secure, including because of the stability and reliability of the cash advance facility; (2) was supported by Citigroup, including in its roles as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust through the ICG and Banamex in connection with the 2013 Bond Issuance; and (3) had positive profit projections.

522. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure; (2) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; (3) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA's principals; (4) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (5) there

was a revolving door of former Citigroup employees taking key positions in OSA; and (6) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012 (*see supra* at Sections I, VI, and XIII).

523. The Copernico Funds also purchased and retained the majority of its 2008 bonds, including through the period of the fraud, in reliance on ***material omissions*** by (1) Citigroup in (i) communications with the Copernico Funds, (ii) materials prepared by Pareto and others that incorporated information provided by Citigroup and with Citigroup's knowledge that they would be distributed to potential investors like the Copernico Funds, and (iii) through its roles as trustee and collateral agent for the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance; and (2) OSA—with Citigroup's knowledge and substantial assistance—including Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to the Moneda Funds.

524. Specifically, in 2013, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications and materials shared with Copernico, which rendered them false, misleading and deceptive: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality,

unstable, unreliable and propped up by false documentation. Omission of such information from Citigroup and OSA's communications to and materials shared with the Moneda Funds rendered them false, misleading and deceptive.

525. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Morgan Stanley and Pareto (and likewise the Copernico Funds) because (1) of their prior representations in communications and documents; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties; (ii) the parties' relative access (or lack thereof) to the omitted information; (iii) the benefits derived by Citigroup and OSA from the Copernico Funds' investment; (iv) Citigroup and OSA's awareness of reliance on the false and misleading information in the materials provided by OSA to Pareto and Pareto to funds like Copernico; and (v) Citigroup's and OSA's participation in the fraud (*see supra* at Sections IV, VI, XIII, XIV(H)(2)–(3)).

526. Citigroup also had a duty to speak and disclose this information to Morgan Stanley, Pareto, and investors such as the Copernico Funds to whom Pareto distributed the Pareto materials, on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG and Banamex.

527. Citigroup and OSA directly benefitted from fradulently inducing and luring Copernico to invest, and maintain its investment in OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

528. Citigroup directly committed fraud against the Copernico Funds through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with the Copernico Funds, including those in the Pareto Materials, which

were based on information provided by Citigroup and with Citigroup's knowledge that OSA and Pareto would distribute the Materials to potential investors in OSA including the Copernico Funds.

529. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to funds like Copernico and substantially assisted OSA as well as participated in committing fraud against Copernico and the Copernico Funds, as described *infra* at ¶¶ 558–62.

530. Had Copernico known about (1) OSA's true financial situation; (2) the false and weak controls of the cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, the Copernico Funds would not have purchased and/or retained the 2008 bonds between 2013 and 2014.

531. Due to the fraud and corresponding collapse of OSA, the Copernico Funds have not received payment of their principal or interest on the 2008 bonds, and the bonds are currently worthless.

**2. Material Omissions Relating to the Initial Purchase of 2008 Bonds in May 2013**

*a. March 2013 OSA Presentation at a Conference in New York*

532. In or around March 2013 in New York, New York, Carlos Federico Carballo, partner of Copernico and principal of CCP Advisors LLC, a sub-advisor providing investment advisory services to one of the Copernico Funds purchasing the OSA bonds, attended a conference in which Mr. Yáñez gave a presentation about OSA (the "March 2013 Presentation"). During the Presentation, Mr. Yáñez emphasized the financial health of OSA, including future business prospects and positive profit projections, which was false and misleading due to the ongoing fraud

which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

533. At this time, (1) OSA was submitting false documents to ICG employees, the cash advance facility was failing due to false and weak controls, and Citigroup and OSA were involved in a fraudulent scheme involving the facility (*see supra* at Section VI).

534. During his presentation, Mr. Yáñez and OSA omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI).

535. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its representations in the March 2013 Presentation false and misleading; (2) on information and belief, at this time, OSA planned to seek investments for a potential bond issuance from which it would receive a financial benefit; (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from additional investments in the company; (4) OSA had full access to and was aware of the omitted material facts, and also knew that the conference participants (including Copernico) would rely on the omitted facts when determining whether to invest in OSA; and (5) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Copernico the ability to sufficiently investigate OSA's finances when determining whether to invest in OSA.

536. In 2013, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with current and potential investors such

as the Copernico Funds, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 558–62, Citigroup aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Copernico in 2013 on account of its knowledge and substantial assistance.

537. With knowledge of OSA's fraudulent misrepresentations and material omissions in 2013 to current and potential investors such as the Copernico Funds, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

538. When purchasing and retaining the 2008 bonds between 2013 and 2014, Copernico and the Copernico Funds relied on the material omissions in the March 2013 Meeting by OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 558–62.).

*b. 2008 Offering Memorandum*

539. Before purchasing its first tranche of 2008 bonds in May 2013, Copernico reviewed the 2008 Offering Memorandum.

540. As described in detail *supra* at ¶¶ 273–74, on information and belief, Citigroup and OSA provided false and misleading information to Morgan Stanley in order for it to prepare the 2008 Offering Memorandum. Accordingly, the 2008 Offering Memorandum included material omissions by both Citigroup and OSA.

541. Citigroup (and OSA) were aware that the 2008 Offering Memorandum would be distributed to potential investors in 2008 as well as later, including in 2013.

542. The 2008 Offering Memorandum omitted any information about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) Citigroup's false and weak controls in connection with the cash advance facility; and (4) the ongoing fraud which, on information and belief, began in 2008. These omissions rendered misleading and deceptive the financial projections about OSA contained in the 2008 Offering Memorandum.

543. In or around 2013, when Copernico began considering purchasing the 2008 bonds on behalf of the Copernico Funds, neither Citigroup nor OSA had revised or otherwise updated the 2008 Offering Memorandum to reflect OSA's true financial condition, including that the cash advance facility, OSA's primary source of liquidity and cash flow, was unstable due to the ongoing fraud.

544. Citigroup and OSA had a duty to speak and disclose the omitted information to Morgan Stanley, the manager of the 2008 Bond Issuance, and potential investors, both in 2008 and later when distributing the 2008 Offering Memorandum to new investors such as the Copernico Funds, because (1) their failure to speak would render the representations in the 2008 Offering Memorandum false and misleading; (2) Citigroup and OSA were soliciting investments from which they would receive a financial benefit (e.g., increased liquidity leading to more Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from Citigroup's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that investors like Copernico and the Copernico Funds would rely on the omitted facts when determining whether to invest; and (4) the fraudulent scheme between Citigroup and OSA was, on information and belief, underway in 2008 and ongoing during

2013. Citigroup's and OSA's special knowledge of the fraudulent scheme also denied Copernico the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

545. In 2013, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with current and potential investors including the Copernico Funds, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 558–62, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Copernico and the Copernico Funds in 2013. OSA.

546. Citigroup also had a duty to speak fully and disclose this information to Morgan Stanley and potential investors in 2008 and thereafter on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG and Banamex.

547. When purchasing and retaining the 2008 bonds between 2013 and 2014, Copernico and the Copernico Funds relied on the material omissions in the 2008 Offering Memorandum by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted on account of its knowledge and substantial assistance (as described *infra* at ¶¶ 558–62).

**3. Fraudulent Misrepresentations and Material Omissions Relating To The Retention of 2008 Bonds Between May 2013 and February 2014**

548. On September 9, 2013, in New York, New York, Mr. Carballo met with a Pareto banker. Pareto, on behalf of OSA, was soliciting an investment by Copernico and the Copernico

Funds in the 2013 Bond Issuance. During this meeting, Pareto provided information to Copernico about the 2013 Bond Issuance.

549. Shortly thereafter, Copernico received the Pareto Materials, including but not necessarily limited to: (1) the September 2013 Updated Pareto Credit Analysis; (2) the September 2013 Pareto Credit Analysis Presentation; (3) the Term Sheet and Revised Term Sheet; and (4) the September 2013 Pareto Investor Presentation.

550. As described in detail *supra* at ¶¶ 311–15, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order for it to prepare the Pareto Materials. Accordingly, the Pareto Materials, including those materials received by Copernico, included fraudulent misrepresentations and material omissions by both Citigroup and OSA.

551. Citigroup (and OSA) were aware that Pareto intended to provide the Pareto Materials to current and potential investors in OSA, including Copernico and the Copernico Funds.

552. As detailed *supra* in ¶¶ 311–15, the Pareto Materials, including those documents received by Copernico: (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure.

553. Such representations were false because in 2013 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* Section V).

554. In addition, the Pareto Materials, including those received by Copernico, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

555. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise investors such as the Copernico Funds) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity resulting in increased Pemex contracts for OSA, increased fees for Citigroup from Banamex's role as fiduciary of the Mexican Trust, and increased interest for Citigroup from increased cash advance requests from OSA); (3) Citigroup and OSA had full access to this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise investors such as the Copernico Funds), or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from the Copernico Funds' investment; and (4) and at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup's and OSA's special knowledge of the fraudulent scheme also denied Pareto (and Copernico) the ability to sufficiently investigate OSA's finances.

556. Citigroup also had a duty to speak fully and disclose this information to Pareto and Copernico on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG and Banamex.

557. Although Copernico and the Copernico Funds ultimately did not purchase any 2013 bonds, when retaining bonds from the 2008 Bond Issuance, they relied on the fraudulent

misrepresentations and material omissions in the Pareto Materials by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted on account of its knowledge and substantial assistance (*see infra* at ¶¶ 558–62).

**4. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Copernico**

558. Citigroup comitted fraud against Copernico and the Copernico Funds through thefraudulent misrepresentations and material omissions in the (1) 2008 Offering Memorandum, the September 9; (2) 2013 Meeting between Copernico and Pareto; and (3) Pareto Materials (*see supra* at ¶¶ 532–57).

559. Citigroup knowingly conspired to make, and was aware that OSA was making fraudulent misrepresentations and material omissions in communications and materials shared with investors like Copernico and the Copernico Funds, like those in the March 2013 Presentation, 2008 Offering Memorandum, and in the Pareto Materials (*see supra* at ¶¶ 532–57).

560. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like Copernico and the Copernico Funds on account of its (1) participation in the fraud (*see supra* Section VI); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

561. With knowledge of OSA's fraudulent misrepresentations and material omissions to Copernico and the Copernico Funds, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against Copernico and the Copernico Funds,

including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in the 2008 Offering Memorandum and the Pareto Materials, including by not correcting or revising the false and inaccurate information provided by OSA in these documents.

562. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

**5. The Copernico Funds Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions**

563. When (1) purchasing bonds from the 2008 Bond Issuance; and (2) deciding not to sell 2008 bonds between 2013 and 2014, the Copernico Funds relied on the fraudulent misrepresentations and material omissions by Citigroup and OSA, which Citigroup knowingly conspired with OSA to make, and aided and abetted, on account of its knowledge and substantial assistnace. Specifically:

564. (1) Citigroup aided and abetted OSA in making material omissions to Copernico and the Copernico Funds in the March 2013 Presentation (described *supra* at ¶¶ 532–38).

565. (2) Citigroup committed fraud against, and aided and abetted OSA in committing fraud against, Copernico and the Copernico Funds through the material omissions in the 2008 Offering Memorandum (described *supra* at ¶¶ 539–47); and

566. (3) Citigroup committed fraud against, and aided and abetted OSA in committing fraud against, Copernico and the Copernico Funds through the fraudulent misrepresentations and material omissions made by Pareto in the September 9, 2013 meeting and the Pareto Materials (described *supra* at ¶¶ 548–57).

567. In other words, the Copernico Funds would not have invested or continued to invest in OSA had it known of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; or the (4) ongoing fraud.

568. At the time of OSA's collapse, the Copernico Funds held bonds from the 2008 Bond Issuance.

569. Upon OSA's collapse, which was caused by the lack of controls in the cash advance facility and the fraud, the (1) Copernico Funds' bonds from the 2008 Bond Issuance lost their value; and (2) Copernico Funds stopped receiving interest payments on these bonds.

570. OSA's failure to make interest payments to the Copernico Funds amounted to a default under the 2008 Bond Indenture and entitled the Copernico Funds to full repayment of the principal and interest on the bonds from the 2008 Bond Issuance.

571. The Copernico Funds have not received payment of their principal or interest on the bonds they purchased in connection with the 2008 Bond Issuance.

## I. <u>GPF</u>

### 1. Overview

572. GPF II held bonds from the 2008 Bond Issuance, which it acquired on or about July 14, 2008. GPF II paid for the bonds via bank transfer from its account at Bank of New York Mellon's Houston Office. GPF II retained the bonds from the 2008 Bond Issuance through OSA's collapse in 2014. From GPF II's establishment in 2004 until February 2013, TCW Group

("TCW") managed GPF II. In February 2013, EIG became the manager and advisor of GPF II. However, most of the EIG executives managing GPF II, including Brian Gilmore, Kevin Corrigan and Patrick Songsanand, worked at both TCW and EIG and managed the fund at both companies. At all relevant times unless otherwise stated, Mr. Gilmore, Mr. Corrigan and Mr. Songsanand were located in and managed GPF II's investment in the 2008 Bond Issuance from Washington, D.C. Plaintiff HBK Fund subsequently acquired GPF II's interest in those bonds.

573. When GPF II purchased and retained the 2008 bonds, it relied on ***fraudulent misrepresentations*** by (1) Citigroup in (i) direct communications between TCW and Citigroup, as trustee and collateral agent for the 2008 Bond Issuance, and (ii)materials provided by OSA and Pareto to TCW/EIG, which (a) necessarily incorporated information provided by Citigroup as OSA's banker; and (b) were distributed to current and potential investors in OSA, such as GPF II, with Citigroup's knowledge; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to TCW/EIG.

574. Specifically, Citigroup represented to TCW/EIG—and substantially assisted OSA (and its external financial consultant) in representing—that OSA (1) was financially secure, including because of its Pemex contracts; (2) was supported by Citigroup, including in its roles as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust through the ICG and Banamex in connection with the 2013 Bond Issuance; and (3) had positive profit projections.

575. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure; (2) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; (3) Citigroup and OSA used

the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA's principals; (4) Citigroup intentionally violated its own policies and procedures for the cash advance facility and was not validating or authenticating the documentation OSA submitted in support of its cash advance requests; (5) there was a revolving door of former Citigroup employees taking positions at OSA; and (6) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012 (*see supra* at Sections I, VI, and XIII).

576. GPF II also purchased and retained the 2008 bonds, including through the period of the fraud, in reliance upon ***material omissions*** by (1) Citigroup in (i) direct communications with TCW/EIG; (ii) materials prepared by Morgan Stanley, Pareto and others that incorporated information provided by Citigroup and with Citigroup's knowledge that they would be distributed to potential investors such as GPF II; and (iii) in its roles as trustee and collateral agent for the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA, Morgan Stanley and Pareto were providing to TCW/EIG.

577. Specifically, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with TCW/EIG: (1) the documentation submitted by OSA to ICG employees in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false and weak because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation but rather OSA

was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false and included false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable and propped up by false documentation. Omission of such information from Citigroup and OSA's communications to and materials shared with TCW/EIG rendered them false, misleading and deceptive.

578. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to TCW/EIG because (1) of Citigroup and OSA's previous and ongoing representations to TCW/EIG between 2008 and 2014; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties (*see supra* at Section XIII); (ii) the parties' relative access (or lack thereof) to the omitted information; (iii) the benefits derived by Citigroup and OSA from GPF II's investment; (iv) Citigroup and OSA's awareness of TCW/EIG's reliance on the false and misleading information; and (v) Citigroup and OSA's participation in the fraud.

579. Citigroup also had a duty to speak and disclose this information to Morgan Stanley, the manager of the 2008 Bond Issuance, Pareto, the manager of the 2013 Bond Issuance, and investors such as GPF II on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG and Banamex. But, it failed to do so.

580. Citigroup and OSA directly benefited from fraudulently inducing and luring GPF II to invest, and maintain its investment in OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

581. Citigroup directly committed fraud against GPF II through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with TCW/EIG, including those in the Pareto Materials, which were based on information provided by Citigroup and with Citigroup's knowledge that OSA and Pareto would distribute the Materials to potential investors in OSA including GPF II.

582. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to TCW/EIG (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in making those misrepresentations and omissions and committing fraud against GPF II, as described *infra* at ¶683-85.

583. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's, fraudulent misrepresentations and material omissions to TCW/EIG (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in committing fraud against GPF II, as described *infra* at ¶683-85.

584. Had TCW/EIG known about (1) OSA's true financial condition; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, those firms would not have had GPF II purchase and/or retain the 2008 bonds between 2008 and 2014.

585. Due to the fraud and corresponding collapse of OSA, neither GPF II nor the HBK Fund as its successor in interest have received payment of their principal or interest on the bonds they purchased in connection with the 2008 Bond Issuances, and the bonds are currently worthless.

### 2. Material Omissions in 2008 Relating to the Purchase of the 2008 Bonds

586. In the spring and early summer of 2008, OSA was seeking investors for the 2008 Bond Issuance. In connection with that effort, OSA executives including Mr. Yáñez, and representatives of Morgan Stanley met with Mr. Gilmore, Mr. Corrigan and Mr. Songsanand, in Los Angeles, California. At that meeting, OSA and Morgan Stanley made a presentation regarding OSA's financial condition and its appeal as an investment.

587. On information and belief, Citigroup, as the trustee and collateral agent of the 2008 Bond Issuance, and OSA, as the issuer of the 2008 bonds, provided Morgan Stanley with information regarding OSA's financial health, the stability and reliability of the cash advance facility (which was vital to OSA's liquidity and cash flow), and its future profit projections, which Morgan Stanley relied upon when preparing materials for and making presentations to potential investors such as GPF II.

588. On information and belief, by July 2008: (1) Citigroup and OSA were fraudulently using the cash advance facility to bolster OSA's financial statements, increase OSA's cash flow, and increase Citigroup's interest payments; (2) OSA's finances were deteriorating; and (3) the cash advance facility was failing due to false and weak controls (*see supra* at Section VI.C-D). Neither OSA nor Morgan Stanley disclosed this information to Mr. Gilmore, Mr. Corrigan or Mr. Songsanand during the 2008 meeting in Los Angeles.

589. On information and belief, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance and a principal participant in the fraud, was aware of the material omissions by OSA to Morgan Stanley and others in connection with the 2008 Bond Issuance and substantially assisted OSA in making such omissions, as described *infra* at ¶¶ 683-85.

590. On information and belief, Citigroup and OSA purposefully concealed from Morgan Stanley (and likewise potential investors in the 2008 bonds) information about: (1) OSA's

true financial condition; (2) the false and weak controls of the cash advance facility; and (3) the ongoing fraud. Such omissions rendered Citigroup's and OSA's representations to Morgan Stanley (and likewise potential investors in the 2008 bonds) about OSA's financial condition false, misleading and deceptive.

591. Citigroup and OSA had a duty to speak and disclose the omitted information to Morgan Stanley and potential investors in the 2008 bonds, including GPF II, because: (1) their failure to speak would render their prior and ongoing representations to Morgan Stanley (and potential investors) false and misleading; (2) OSA, with Citigroup's assistance, was soliciting investments from which it and Citigroup would receive a financial benefit (e.g., increased liquidity leading to more Pemex contracts for OSA, increased fees for Citigroup from Citibank's role as trustee and Banamex's role as collateral agent, and increased interest for Citigroup from increased cash advance requests from OSA); (3) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from the 2008 Bondholders' investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that the 2008 Bondholders would rely on the omitted facts when determining whether to invest; and (4) on information and belief, the fraudulent scheme between Citigroup and OSA was underway in 2008. Citigroup's and OSA's special knowledge of its fraudulent scheme also denied Morgan Stanley and the 2008 Bondholders the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

592. With knowledge of OSA's fraudulent misrepresentations and material omissions to Morgan Stanley and potential investors in the 2008 bonds, Citigroup also had a duty to speak and disclose this information to Morgan Stanley and potential investors in the 2008 Bonds on account of its roles as trustee and collateral agent of the 2008 Bonds, but it failed to do so.

593. When purchasing the bonds from the 2008 Bond Issuance on or about July 14, 2008, GPF II and TCW relied on (1) Citigroup's omissions to Morgan Stanley and the prospective 2008 Bondholders regarding (i) OSA's true financial condition; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud, which it should have disclosed as trustee and collateral agent of the 2008 Bond Issuance; and (2) OSA's omissions (including those unwittingly made by Morgan Stanley on behalf of OSA) in its communications with TCW, which Citigroup aided and abetted on account of its knowledge and substantial assistance (as described *infra* at ¶¶ 683-85).

### 3. Material Omissions Between 2008 and 2013 Relating To The Retention of the 2008 Bonds

#### *a. Communications with OSA in 2008 and 2009 Regarding Untimely Interest Payments*

594. Between 2008 and 2009, OSA routinely waited until the end of the grace period to pay interest to the 2008 Bondholders. As trustee and collateral agent of the 2008 Bond Issuance through its banking arm Citibank and Banamex, respectively, Citigroup necessarily was aware of this problem, but took no action to protect the interests of the 2008 Bondholders like GPF II.

595. Between August 2008 and October 2009, TCW representatives repeatedly contacted and met with OSA about this issue.

596. Specifically, at a minimum: (1) on or about August 17, 2008, Mr. Corrigan and Mr. Gilmore of TCW met with Mr. Yáñez, Mr. Barry Barnes, and other OSA senior executives at OSA's headquarters in Mexico; (2) on or about September 8, 2009, Mr. Corrigan spoke via telephone with Alejandro Gaona of OSA; (3) on or about September 11, 2009, Mr. Corrigan spoke via telephone with Mr. Gaona; and (4) in approximately October 2009, Mr. Corrigan and Mr. Niranjan Ravindran of TCW met with Mr. Yáñez and other OSA senior executives at OSA's headquarters in Mexico.

597. The purpose of each of these meetings and calls was for TCW to obtain financial information about OSA in order to inform its decisions with respect to the 2008 Bonds that GPF II held.

598. For example, in an email regarding preparations for the October 2009 meeting, Mr. Corrigan wrote to Mr. Gaona, copying Mr. Yáñez and Mr. Barnes, that he sought meetings with OSA principals regarding, among other things, "financial statement analysis, focusing on accounts receivable, accounts payable, inventory, etc. to obtain a clearer picture of the Company's liquidity," "debt profile and payment schedule," and "financial strategy to sustain growth."

599. On information and belief, during these meetings and calls, OSA, through Mr. Yáñez, Mr. Gaona, Mr. Barnes, and others, provided Mr. Corrigan, Mr. Gilmore, Mr. Ravindran and others from TCW with OSA's financial information and projections, including information regarding the stability and security of its expected revenue from its contracts with Pemex.

600. At this time, on information and belief, (1) OSA's finances were deteriorating; (2) Citigroup and OSA were engaged in a fraud relating to the cash advance facility; and (3) the cash advance facility was failing, including because (i) the facility had false and weak controls, (ii) Pemex was refusing to pay Banamex on invoices for which it had advanced OSA funds under the cash advance facility; and (iii) Citigroup was incurring significant liabilities in connection with the cash advance facility (*see supra* at Section VI.C-D). Accordingly, OSA's representations to TCW that it was financially healthy and stable and had positive liquidity and cash flow were false and misleading.

601. In addition, during the 2008 and 2009 meetings, on information and belief, OSA and Mr. Yáñez omitted the following information from its communications to TCW: (1) its deteriorating financial condition; (2) its false financial projections; (3) the false and weak controls

of the cash advance facility; (4) Pemex's refusal to pay Banamex on OSA invoices; (5) Citigroup's increasing liability under the cash advance facility; and (5) the ongoing fraud with Citigroup.

602. OSA had a duty to speak and disclose this information to TCW because (1) its failure to speak would render its previous and ongoing representations to TCW about its financial condition false and misleading; (2) OSA knew this information and intentionally withheld it to receive the financial benefit from GPF II's continued investment; (3) OSA knew the omitted material facts and that TCW would rely on the omitted facts when determining whether to maintain GPF II's holdings from the 2008 Bond Issuance; and (4) the fraudulent scheme between Citigroup and OSA was, on information and belief, underway during this time. OSA's special knowledge of the fraudulent scheme with Citigroup also denied TCW the ability to sufficiently investigate OSA's finances.

603. On information and belief, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII, and (2) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with investors, including GPF II, was making (1) fraudulent misrepresentations regarding its financial health, positive liquidity and cash flow, and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶¶ 683-85, Citigroup substantially assisted and aided and abetted OSA in making these material omissions to TCW in 2008 and 2009.

604. With this knowledge, Citigroup had a duty to speak and disclose the omitted information to the 2008 Bondholders, including GPF II, on account of its role as trustee and collateral agent of the 2008 Bond Issuance.

605. TCW relied on OSA's material omissions in 2008 and 2009, which were made with Citigroup's knowledge and substantial assistance, in deciding to maintain GPF II's holdings from the 2008 Bond Issuance.

*b. Meetings and Communications with OSA's External Financial Consultant Between 2010 and 2013*

606. Mr. Corrigan at TCW contacted OSA's external financial consultant for information about OSA by telephone on or about at least the following dates: March 10, 2011; March 24, 2011; April 6, 2011; July 12, 2012; September 25, 2012; and January 17, 2013.

607. Mr. Corrigan and Mr. Gilmore also met with OSA's external financial consultant on or about February 28, 2011 in Mexico City.

608. During these telephone calls and meeting, Mr. Corrigan and Mr. Gilmore inquired as to (1) OSA's overall financial health; and (2) whether OSA intended to make timely interest payments to GPF II. In response to their inquiries, OSA's external financial consultant assured Mr. Corrigan and Mr. Gilmore that (1) OSA was financially healthy, as evidenced by the fact that (i) Citigroup had increased OSA's credit limit for the cash advance facility; and (ii) OSA was in the process of successfully restructuring (or had successfully restructured) its debt with Plaintiffs Candies and Rabobank; and (2) OSA would timely make the interest payments to GPF II on its 2008 bonds. OSA's external financial consultant received this information from Citigroup and OSA and provided it to Mr. Corrigan and Mr. Gilmore.

609. For example, on or about September 25, 2012, Mr. Corrigan contacted OSA's external financial consultant by telephone regarding OSA's financial condition. During that call, OSA's external financial consultant represented to Mr. Corrigan that (1) OSA had secured a $160 million credit facility from Citigroup to purchase the Goliath; (2) OSA's EBITDA was increasing significantly; and (3) these improvements in OSA's finances would cause the price of GPF II's

2008 Bonds to increase. In reliance on this information, TCW decided to maintain GPF II's investment in the 2008 Bonds.

610. But OSA's external financial consultant's representations were false and misleading because, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees, (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

611. As noted above, OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including GPF II.

612. Citigroup and OSA purposefully concealed from TCW the following information: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility, or (4) the ongoing fraud. These omissions rendered the representations by OSA's external financial consultant about the financial health of OSA and its ability to timely pay interest on the 2008 Bonds, misleading and deceptive.

613. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant and to TCW because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant and TCW about OSA's

financial health false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to (i) restructure OSA's debt; and (ii) obtain support from OSA's creditors and bondholders for the proposed restructuring plans (including as to the 2008 Bond Issuance); (3) OSA and Citigroup were seeking support and patience from TCW on the untimely interest payments and, on information and belief, requesting that GPF II maintain or increase its investment in OSA; (4) Citigroup and OSA were aware of this information and intentionally withheld it to receive the financial benefit from GPF II's continued investment in OSA (e.g. increased liquidity leading to more Pemex contracts for OSA and for Citigroup, increased fees as trustee and collateral agent of the 2008 Bond Issuance and increased interest on additional cash advance requests from OSA); (5) Citigroup and OSA were aware of the omitted material facts and also knew that (i) OSA's external financial consultant would rely on the omitted facts when communicating with OSA's creditors, vendors and bondholders, and (ii) TCW would rely on the omitted facts when making investment decisions for GPF II related to OSA; and (5) the fraudulent scheme between Citigroup and OSA was well underway during this time. Citigroup and OSA's special knowledge of the fraud denied OSA's external financial advisor and TCW the ability to sufficiently investigate OSA's finances.

614. Citigroup also had a duty to speak and disclose this information to the 2008 Bondholders including GPF II on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; and (2) collateral agent of the 2008 Bond Issuance through Banamex. Citigroup, as trustee and collateral agent, should have disclosed the information and spoken fully, but it failed to do so.

615. In retaining GPF II's bonds from the 2008 Bond Issuance between 2010 and 2013, TCW relied on (1) the material omissions made by OSA's external financial consultant (i) based

upon information provided by Citigroup and OSA; and (ii) with Citigroup's knowledge that OSA's external financial consultant would disseminate such information to creditors, vendors and bondholders of OSA, including GPF II, and substantial assistance; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees, (iii) the false and weak controls of the cash advance facility, and (iv) the ongoing fraud.

*c. Receipt of 2009 and 2010 Financial Statements in 2012*

616. On or about February 28, 2012, Mr. Betancourt, OSA's Head of Investor Relations, provided TCW with OSA's 2009 and 2010 audited financial statements, which contained fraudulent misrepresentations and material omissions regarding, among other things, the strength and stability of the cash advance facility as described *supra* at Section XIV.E.

617. As of February 2012, Citigroup and OSA were involved in a fraudulent scheme, which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow. Yet OSA did not revise or update its 2009 and 2010 financial statements before circulating them in 2012. In addition, Citigroup, Mr. Betancourt, and OSA did not advise TCW in February 2012 of: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the absence of controls over the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). These omissions rendered the representations in OSA's 2009 and 2010 financial statements misleading and deceptive.

618. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior representations in OSA's 2009 and 2010 financial statements false and misleading; (2) on information and belief, OSA was seeking GPF II's continued support (i.e., not taking adverse action due to untimely interest payments) and encouraging GPF II to maintain and increase its investment in OSA; (3) OSA was aware of the omitted information and

intentionally withheld it to receive the financial benefit from GPF II's continued support and investment; (4) OSA was aware of the omitted material facts and also knew that TCW would rely on the omitted facts when determining whether to have GPF II invest or maintain its investments; and (5) the fraudulent scheme with Citigroup was well underway at this time.

619. In 2012, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with current and potential investors including GPF II, was making (1) fraudulent misrepresentations regarding its financial health, the stability and reliability of the cash advance facility, and its ability to make interest payments to bondholders; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 683-85, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to TCW in 2012.

620. With knowledge of OSA's fraudulent misrepresentations and material omissions in 2012 to current and potential investors such as GPF II, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

621. When maintaining GPF II's bonds from the 2008 Bond Issuance in 2012, TCW relied on (1) OSA's material omissions in the 2009 and 2010 financial statements, including OSA's failure to update or correct such financials when transmitting them to TCW in February 2012, which were made with Citigroup's knowledge and substantial assistance (*see infra* at ¶¶ 683-85); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding

(i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees, (iii) the false and weak controls of the cash advance facility, and (iv) the ongoing fraud.

### 4. Fraudulent Misrepresentations and Material Omissions in Materials Provided By Pareto Between September and October 2013

#### *a. Receipt of the Pareto Materials in September 2013*

622. On or about September 9, 2013, Pareto provided EIG, via email to Mr. Gilmore and Mr. Songsanand, with the Pareto Materials, as described above (*see supra* at Section XIV.C.2). Pareto provided these Materials to Messrs. Gilmore and Songsanand to persuade EIG/GPF II to purchase bonds in the 2013 Bond Issuance.

623. Although EIG/GPF II ultimately did not purchase any 2013 bonds, when retaining 2008 bonds in late September 2013 and thereafter, it relied on (1) the information provided by Pareto in connection with the 2013 Bond Issuance; and (2) omissions by Citigroup as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance.

624. In addition, on or about September 9, 2013, Pareto sent a separate email to Mr. Gilmore and Mr. Songsanand containing the September 2013 Pareto Credit Analysis Presentation. As described above (*supra* at XIV.C.2.d), the September 2013 Pareto Credit Analysis Presentation included representations regarding the Waterfall Structure, including that Banamex, as the fiduciary bank, would receive OSA's earnings from its contracts with Pemex; then distribute those earnings according to the "waterfalls" in Figure 6, ensuring that bondholders received payments before OSA.

625. As described in detail *supra* at Section XIV.C.2, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials.

Accordingly, the Pareto Materials, including the Presentation, contained fraudulent misrepresentations and material omissions by Citigroup and by OSA.

626. Citigroup was aware, as described *supra* at Section XIV.C.2.h, that OSA and Pareto intended to provide the Pareto Materials to creditors, vendors and bondholders of OSA in order to demonstrate OSA's continued financial viability, instill confidence in OSA's ability to repay its debts, and/or to solicit further investment in OSA.

627. The Pareto Materials, including those documents received by EIG, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure.

628. Such representations were false because in 2013, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Sections VI-VII).

629. In addition, the Pareto Materials, including those received by EIG, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

630. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those whom OSA and Pareto provided the Pareto Materials, including EIG/GPF II) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments in OSA, through Pareto, from

which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto and investors like GPF II, or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from GPF II's investment; (4) and at this time, the fraudulent scheme between OSA and Citigroup was well underway. Citigroup and OSA's special knowledge of the fraudulent scheme also denied Pareto (and GPF II) the ability to sufficiently investigate OSA's finances.

631. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise GPF II) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so.

632. When maintaining GPF II's bonds from the 2008 Bond Issuance in September 2013, EIG relied on the Pareto Materials, which included fraudulent misrepresentations and material omissions by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (as described *infra* at ¶¶ 683-85).

*b. Quarterly Review by Pareto*

633. On or about October 28, 2013, Andres Segu of Megeve Investors forwarded to Mr. Gilmore and Mr. Corrigan an email from Pareto containing the Quarterly Credit Review, as described above (*see supra* at XIV.C.2.g), in order for EIG to evaluate GPF II's position in OSA bonds.

634. The Pareto transmittal email and Quarterly Credit Review note that OSA presented a "new attitude towards investors with a much higher degree of transparency than earlier." The transmittal email and Quarterly Credit Review also stated that, with respect to the 2013 Bond

Issuance, Pareto believed that "Oceanografía will do what it takes to honour its obligations under the bareboat charter."

635. OSA and, on information and belief, Citigroup provided information to Pareto in order for it to prepare the Quarterly Credit Review and corresponding transmittal email. OSA and Citigroup were aware that Pareto intended to provide information about OSA's finances, including the information contained in the Quarterly Credit Review and corresponding transmittal email, to current and potential investors in OSA, including EIG/GPF II.

636. Omission in the Quarterly Credit Review and corresponding transmittal email of any reference to or discussion of the following rendered these documents false, misleading, and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

637. Citigroup and OSA had a duty to speak and disclose this information to Pareto and investors like GPF II because (1) their failure to speak would render OSA's and Pareto's previous and ongoing representations about OSA's financial health false and misleading; (2) OSA was soliciting investments and support from current bondholders, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise investors such as GPF II), or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from GPF II's investment; (4) and at this time, the fraudulent scheme between Citigroup and OSA was well underway.

638. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise GPF II) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance

and as fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so.

639. When, in late 2013, EIG decided to maintain GPF II's investment in OSA bonds from the 2008 Bond Issuance, EIG relied on the Quarterly Credit Review and corresponding transmittal email, which included fraudulent misrepresentations and material omissions by (1) Citigroup (on information and belief); and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (as described *infra* at ¶¶ 683-85).

**5. Fraudulent Misrepresentations and Material Omissions Between 2013 and 2014 Relating To The Retention of the 2008 Bonds**

*a. Access to Investor's Site in November 2013*

640. In October 2013, EIG raised concerns with OSA regarding the untimely payment of the coupon for the bonds GPF II held from the 2008 Bond Issuance. In response, Mr. Betancourt of OSA provided EIG with information to allay its concerns.

641. Specifically, on or about November 13, 2013, Mr. Betancourt sent an email to Mr. Gilmore, Mr. Corrigan and Mr. Songsanand providing instructions to access information for investors on OSA's website, including (1) "reports and presentations of OSA;" (2) OSA's financial statements through September 2013 (as described *supra* at Section XIV.E); and (3) a recording of a conference call between OSA and investors held on October 25, 2013 (referred to *supra* at Section XIV.D as the Investor's Site). On information and belief, the Investor's Site had information and documents containing OSA's financial information and projections, including information regarding the stability and security of its expected revenue from its contracts with Pemex.

642. As of November 2013, Citigroup and OSA were involved in a fraudulent scheme, which threatened the reliability and stability of the cash advance facility, OSA's primary source

of liquidity and cash flow. However, on information and belief, the materials on the Investor's Site omitted any reference to: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the absence of controls over the cash advance facility; and (4) the ongoing fraud. In addition, neither Citigroup nor OSA informed EIG of these material omissions when informing it of the Investor's Site in November 2013. These omissions rendered the representations in the materials on the Investor's Site misleading and deceptive.

643. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior representations to TCW/EIG false and misleading; (2) on information and belief, OSA was seeking GPF II's continued support (i.e., not taking adverse action due to untimely interest payments) and encouraging GPF II to maintain and increase its investment in OSA; (3) OSA was aware of the omitted information and intentionally withheld it to receive the financial benefit from GPF II's continued support and investment; (4) OSA was aware of the omitted material facts and also knew that EIG would rely on the omitted facts when determining whether to have GPF II invest or maintain its investments; and (5) the fraudulent scheme with Citigroup was well underway at this time.

644. In November 2013, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with current and potential investors including GPF II, was making (1) fraudulent misrepresentations regarding its financial health, the stability and reliability of the cash advance facility, and its ability to make interest payments to bondholders; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 683-85, Citigroup

substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to EIG through the Investor Site in the fall of 2013.

645. With knowledge of OSA's fraudulent misrepresentations and material omissions in 2013 to current and potential investors such as GPF II, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

646. When maintaining GPF II's bonds from the 2008 Bond Issuance in 2013, EIG relied on (1) OSA's material omissions in the materials on the Investor's Site, which were made with Citigroup's knowledge and substantial assistance (*see infra* at ¶¶ 683-85); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees, (iii) the false and weak controls of the cash advance facility, and (iv) the ongoing fraud.

*b. January 2014 Telephone Conference Between 2008 Bondholders and OSA Regarding Media Allegations*

647. On or about January 22, 2014, Mr. Gilmore emailed Mr. Betancourt regarding OSA's non-payment of the bond coupon which had been due on January 15, 2014. Mr. Betancourt responded by email on the same day to Mr. Gilmore, Mr. Corrigan and Mr. Songsanand assuring them that OSA would pay the coupon "in the coming days" and later clarified in another email that OSA would make the payment in the first week of February.

648. On January 28, 2014, OSA held a conference call with holders of the 2008 bonds regarding the recent media allegations against OSA. EIG did not participate in that call. On or about January 29, 2014, Mr. Betancourt sent an email to Mr. Gilmore and Mr. Corrigan containing a link to download a recording of the January 28, 2014 conference call. EIG, including Mr. Gilmore and Mr. Corrigan, listened to the recording of the call.

649. During this call, Mr. Yáñez reported that the allegations were false and Pemex had made a mistake. In addition, in an attempt to assuage the 2008 bondholders' concerns regarding OSA's ability to pay the coupon (i.e., the annual interest) on the 2008 bond, Mr. Yáñez stated that: (1) OSA had 41 active contracts; (2) OSA was in the process of paying the coupon on the 2008 bonds; (3) most of the money to pay the coupons was "with the trustee", i.e., Citigroup; and (4) the delay in coupon payments was due to Pemex, which had been late paying OSA since April 2013.

650. Such representations were false and misleading, as Citigroup and OSA knew: (1) OSA was submitting false documents to ICG employees, (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

651. At no point during this telephone conference with the 2008 Bondholders (or in subsequent communications with EIG) did OSA advise of the following: (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the weak controls of the cash advance facility; and (4) the ongoing fraud. Such omissions rendered OSA's representations about its financial health and ability to pay the coupon on the 2008 bonds misleading and deceptive.

652. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its prior and ongoing representations to the 2008 Bondholders false and misleading; (2) it was seeking support and patience from the bondholders relating to the untimely interest payments, from which OSA would receive a financial benefit from EIG's continued investment; (3) OSA had full access to and was aware of the omitted material facts, and also knew

that EIG would rely on the omitted facts when determining whether to maintain GPF II's investments or continue investing in OSA; and (4) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of the fraud also denied EIG the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

653. Citigroup was aware that OSA was misrepresenting its financial health, including its ability to make coupon payments and the restructuring of the 2008 Bond Issuance, to holders of the 2008 bonds because of (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); and (2) its ongoing discussions with OSA and its external financial consultant. As described further below (*infra* at ¶¶ 683-85), Citigroup aided and abetted and substantially assisted OSA in making fraudulent misrepresentations and material omissions to creditors and bondholders, including to EIG, in January 2014.

654. Citigroup also had a duty to speak and disclose the omitted information (e.g., (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud) to the 2008 Bondholders, including GPF II, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

655. EIG relied on the following when retaining GPF II's bonds from the 2008 Bond Issuance in 2014: (1) the material omissions by OSA on January 28, 2014, which were made with Citigroup's knowledge and substantial assistance; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*c. February 14, 2014 Discussion Between EIG and OSA*

656. On or about February 7, 2014, Mr. Gilmore emailed Mr. Betancourt again because OSA had still not paid the bond coupon. On or about February 7, 2014, Mr. Betancourt replied to Mr. Gilmore, copying Mr. Corrigan and Mr. Songsanand, stating that OSA was "committed to pay

the coupon" and stating that the non-payment was because OSA's "collections to (sic) PEMEX have been delayed considerably in recent weeks."

657. Subsequently, as OSA continued to fail to pay the coupon, Mr. Betancourt arranged a February 14, 2014 telephone conference between OSA and counsel for Ashmore, GPF II, ICE Canyon, and the Moneda Funds ("February 14, 2014 Telephone Conference Between OSA and Counsel"). In that call OSA represented, among other things, that it (1) was "operating as usual;" (2) would likely win a court decision allowing OSA to enter new Pemex contracts; and (3) was working with its bankers to provide $150 million of Pemex accounts receivable as collateral to the 2008 bondholders, notwithstanding that: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for verifying OSA's documentation; (3) Citigroup and OSA were engaged in a fraud relating to the cash advance facility; and (4) on information and belief, Citigroup had already been forced to commence an investigation into the fraud and intended to permanently cancel the cash advance facility.

658. At no point during this Telephone Conference did OSA disclose (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5) Citigroup's internal investigation; or (6) Citigroup's intent to permanently cancel the cash advance facility. These omissions rendered OSA's representations that OSA was "operating as usual" and was working with its "bankers" to provide collateral to the 2008 bondholders misleading and deceptive.

659. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to the 2008 Bondholders, including to GPF II, false and misleading; (2) OSA was seeking support from the bondholders for, among

other things, the proposed restructuring of the 2008 bonds and the collateral proposal, from which OSA would receive a financial benefit from GPF II's continued investment; (3) OSA had full access to and was aware of the omitted material facts, and also knew that EIG would rely on the omitted facts when determining whether to continue GPF II's investment and/or support OSA's restructuring plan; and (4) OSA had been engaged in a fraudulent scheme with Citigroup relating to the cash advance facility. OSA's special knowledge of the fraud also denied EIG the ability to sufficiently investigate OSA's finances prior to determining whether to maintain GPF II's investment in the 2008 bonds and/or support the restructuring/collateral plan.

660. In February 2014, Citigroup was aware that OSA was misrepresenting its financial health and relationship with its bankers to the 2008 Bondholders, including GPF II, because of (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); (2) its ongoing discussions with OSA and its external financial consultant; and (3) its ongoing investigation. As described further below, Citigroup substantially assisted OSA in making fraudulent misrepresentations and material omissions to creditors and bondholders, including to EIG, in February 2014.

661. Citigroup also had a duty to speak and disclose the omitted information (e.g., (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the ongoing fraud; (5) Citigroup's internal investigation; and (6) Citigroup's intent to cancel the cash advance facility) to the 2008 Bondholders, including GPF II, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

662. EIG relied on the following when maintaining GPF II's bonds from the 2008 Bond Issuance in February 2014: (1) the material omissions by OSA in the February 14, 2014 Telephone

Conference Between OSA and Counsel, which were made with Citigroup's knowledge and substantial assistance; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*d. February 21, 2014 Discussion Between Citigroup and EIG*

663. During the February 21, 2014 Telephone Conference Between Citigroup and Counsel (as described *supra* at ¶ 488), Citigroup reassured the 2008 Bondholders, including EIG, that OSA was above-board with its financials, represented that it wanted to "have a constructive and proactive approach" with OSA to prevent a default, and be in "constant contact" with the 2008 Bondholders to avoid any "negative reactions" from other groups that may "complicate" the situation.

664. However, Citigroup was not collaborating constructively and proactively with OSA. On information and belief, by February 21, 2014, Citigroup (1) had already commenced its internal investigation into the fraud; and (2) intended to terminate the cash advance facility, OSA's primary and most important source of liquidity and cash flow, thereby threatening OSA's survival.

665. At no point during this Telephone Conference did Citigroup disclose to EIG or other 2008 Bondholders (1) the fraud; (2) its internal investigation; or (3) its intent to cancel the cash advance facility. These omissions rendered Citigroup's representations that it sought to continue working with OSA and the 2008 Bondholders misleading and deceptive.

666. Citigroup had a duty to speak and disclose this information because (1) Citigroup's failure to speak would render its representations about working with the 2008 Bondholders false and misleading; (2) it was trying to persuade the 2008 Bondholders to continue supporting OSA and not take any adverse actions, from which OSA and Citigroup would receive a financial benefit; and (3) Citigroup knew the omitted material facts and also knew that EIG would rely on the omitted facts when determining whether to maintain its investment in OSA.

667. Citigroup also had a duty to speak fully and disclose this information to EIG on account of its roles trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

668. When retaining the bonds from the 2008 Bond Issuance, EIG relied on Citigroup's (1) material omissions during the February 21, 2014 Telephone Conference Between Citigroup and Counsel (*supra* ¶ 488); and (2) omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding its (1) internal investigation; and (2) intent to permanently cancel the cash advance facility.

*e. February 24, 2014 Discussion Between OSA and EIG*

669. During the February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), OSA represented to the 2008 Bondholders, including EIG, that it had formed a debt restructuring team with a law firm and financial firm to begin the "collaborative process towards a consensual restructuring." These representations, which suggested that the 2008 Bondholders need not be concerned about the financial stability of OSA and its ability to successfully restructure its debts including as to the 2008 Bondholders, were misleading in light of (1) the fraud; (2) Citigroup's internal investigation; and (3) Citigroup's intent to cancel the cash advance facility.

670. On information and belief, given the (1) close relationship between OSA and Citigroup (*see supra* at Section XIII); and (2) fact that Citigroup had commenced an internal investigation into the fraud no later than February 20, 2014 (*supra* at Section VIII.B), OSA was aware by February 24, 2014 that Citigroup had commenced an investigation into the fraud and intended to cancel the cash advance facility, but OSA did not disclose either fact during this Telephone Conference, rendering OSA's representations regarding the restructuring of its debt misleading and deceptive.

671. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its representations about debt restructuring false and misleading; (2) it was trying to persuade the 2008 Bondholders to continue supporting OSA and not take any adverse actions, from which OSA would receive a financial benefit; and (3) OSA knew the omitted material facts and also knew that EIG would rely on the omitted facts when determining whether to maintain its investment in OSA and/or take action against OSA.

672. Given (1) the close relationship between OSA and Citigroup; and (2) Citigroup's representations to EIG's counsel in the February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), Citigroup was aware that OSA was informing its creditors, including the 2008 Bondholders like EIG/GPF II, that OSA had a viable plan to restructure its debt, notwithstanding the fact that Citigroup had already commenced an investigation into the fraud and intended to permanently cancel the cash advance facility. As described *infra* at ¶¶ 683-85, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to EIG during this Telephone Conference.

673. Citigroup also had a duty to speak and disclose the omitted information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but Citigroup failed to do so.

674. EIG relied on the following when retaining the bonds from the 2008 Bond Issuance in 2014: (1) the material omissions by OSA in the February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), with Citigroup's knowledge and substantial assistance; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) the fraud, (ii) Citigroup's internal investigation, and (iii) Citigroup's intent to permanently cancel the cash advance facility.

*f. February 26, 2014 Discussion Between OSA and EIG*

675. During the February 26, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at Section XIV.G.4.c), Mr. Yáñez, from Miami, Florida, and OSA represented to the 2008 Bondholders, including EIG/GPF II, that the "alleged" Pemex issue was "based on interpretation of a contractual obligation" rather than any fault by OSA, and that OSA would sign a confidentiality agreement with counsel for the 2008 Bondholders to give them "full access" to the files of such contractual procedures and other legal documents and information for verification and analysis of OSA's position. These representations, which suggested that the bondholders need not be concerned about the financial stability of OSA, were misleading because of the fraud and the fact that Citigroup had already commenced an internal investigation and intended to terminate the cash advance facility.

676. On information and belief, given (1) the close relationship between OSA and Citigroup; and (2) the fact that Citigroup had commenced an internal investigation no later than February 20, 2014, OSA was aware by February 26, 2014, that Citigroup had commenced an investigation into the cash advance facility and intended to cancel it.

677. At no point during this Telephone Conference did OSA inform counsel for EIG of (1) the fraud; (2) Citigroup's internal investigation; or (3) Citigroup's intent to cancel the cash advance facility.

678. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to the 2008 Bondholders regarding OSA's financial stability and the media allegations false and misleading; (2) it was seeking the bondholders' support and asking them not to take adverse actions (e.g., demanding coupon payments), from which it would receive a financial benefit; and (3) OSA knew the omitted material

facts and also knew that EIG would rely on the omitted facts when determining whether to maintain GPF II's investment in OSA and/or take action against OSA.

679. On information and belief, given (1) the close relationship between OSA and Citigroup; and (2) Citigroup's representations to EIG's counsel in the February 21, 2014 Telephone Conference Between Citigroup and Counsel (*supra* ¶ 488), Citigroup was aware that OSA was informing its creditors, including the 2008 Bondholders, that (1) the media allegations against OSA were false; (2) Pemex had made an error; and (3) OSA could restructure and pay bondholders, notwithstanding that Citigroup had already commenced an investigation into the fraud and intended to cancel the cash advance facility. As described *infra* at ¶¶ 683-85, Citigroup aided and abetted and substantially assisted OSA in making these material omissions to EIG during this Telephone Conference.

680. Citigroup had a duty to speak and disclose this information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but Citigroup failed to do so.

681. EIG relied on the following when maintaining GPF II's bonds from the 2008 Bond Issuance in 2014: (1) the material omissions by OSA in the February 26, 2014 Telephone Conference Between OSA and Counsel, with Citigroup's knowledge and substantial assistance; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) the fraud, (ii) Citigroup's internal investigation, and (iii) Citigroup's intent to permanently cancel the cash advance facility.

#### 6. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against GPF II

682. Citigroup committed fraud against GPF II through the fraudulent misrepresentations and material omissions in the (1) February 21, 2014 Telephone Conference Between Citigroup and Counsel (*supra* ¶ 488); and (2) materials shared with, and communications

made to, TCW/EIG between 2008 and 2014 by OSA (including those made by its external financial consultant), Morgan Stanley and Pareto, which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors, and bondholders, including GPF II.

683. Citigroup knowingly conspired to make, and was aware that OSA was making fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant) between 2008 and 2014 to investors like GPF II in communications with and material circulated to such investors, like in the marketing of the 2008 Bond Issuance alongside Morgan Stanley, telephone calls and emails regarding the untimely coupon payments on those bonds, the provision of financial statements and presentations both directly and through the Investor's Site, the Pareto Materials, the Pareto Quarterly Credit Review, and telephone conferences regarding the 2014 media allegations.

684. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like GPF II on account of its (1) participation in the fraud (*see supra* Sections VI-VII); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

685. With knowledge of OSA's fraudulent misrepresentations and material omissions to GPF II, Citigroup participated in and substantially assisted and aided and abetted OSA in making fraudulent misrepresentations and material omissions to GPF II and committing fraud against GPF

II, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA and Pareto in these communications and materials.

686. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

**7. GPF II Suffered Injury Due to OSA and Citigroup's Fraudulent Misrepresentations and Material Omissions**

687. When TCW/EIG decided to have GPF II (1) purchase bonds from the 2008 Bond Issuance; and (2) not sell such bonds between 2008 and 2014, TCW/EIG relied on the fraudulent misrepresentations and material omissions by Citigroup in communications made to and materials distributed by Morgan Stanley and Pareto; and by OSA (including through Morgan Stanley and Pareto), which Citigroup knowingly conspired with OSA to make, and aided and abetted, on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup (1) made material omissions to TCW, and (2) aided and abetted OSA in making material omissions to TCW in the marketing materials provided by OSA and Morgan Stanley and in marketing meetings, including in Los Angeles, for the 2008 Bond Issuance in 2008;

(b) Citigroup (1) made material omissions to TCW/EIG, and (2) aided and abetted OSA in making material omissions to TCW/EIG in telephone calls and email exchanges between OSA and TCW/EIG related to OSA's untimely payment of the coupon for the 2008 bonds between 2008 and 2013;

(c) Citigroup committed fraud against, and conspired with and aided and abetted OSA in committing fraud against GPF II, through the material omissions contained in OSA's 2009 and 2010 financial statements, which OSA provided to TCW/EIG in 2012;

(d) Citigroup (1) made fraudulent misrepresentations and material omissions to EIG, and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to EIG in the Pareto Materials and Quarterly Credit Review;

(e) Citigroup (1) made fraudulent misrepresentations and material omissions to EIG, and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to EIG in OSA's financial statements, reports and presentations on the Investor's Site;

(f) Citigroup (1) made fraudulent misrepresentations and material omissions to EIG, and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to EIG in the January 2014 Telephone Conference Between 2008 Bondholders and OSA and related email exchanges between OSA and EIG;

(g) Citigroup (1) made fraudulent misrepresentations and material omissions to EIG, and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to EIG in the February 14, 2014 Teleconference Between OSA and Counsel and related email exchanges between OSA and EIG;

(h) Citigroup (1) made fraudulent misrepresentations and material omissions to EIG, and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to EIG in the February 21, 2014 Teleconference Between Citigroup and Counsel;

(i) Citigroup (1) made fraudulent misrepresentations and material omissions to EIG, and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to EIG in the February 24, 2014 Teleconference Between OSA and Counsel;

(j) Citigroup (1) made fraudulent misrepresentations and material omissions to EIG, and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to EIG in the February 26, 2014 Teleconference Between OSA and Counsel.

688. In other words, TCW/EIG would not have had GPF II invest or continue to invest in OSA had it known of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5) Citigroup's internal investigation of the fraud; or (6) Citigroup's intent to cancel the cash advance facility.

689. At the time of OSA's collapse, GPF II held bonds from the 2008 Bond Issuance.

690. Upon OSA's collapse, which was caused by Citigroup's intentional failure to implement controls in the cash advance facility and the fraud, (1) GPF II's bonds from the 2008 Bond Issuance lost their value; and (2) GPF II stopped receiving interest payments on these bonds.

691. OSA's failure to make interest payments to GPF II amounted to a default under the 2008 Bond Indenture and entitled GPF II to full repayment of the principal and interest on the bonds from the 2008 Bond Issuance.

692. GPF II has not received payment of principal or interest on the bonds it purchased in connection with both the 2008 Bond Issuance. The HBK Fund, as GPF II's successor, has likewise not received payment of principal or interest on those bonds.

## J. HBK[42]

### 1. Overview

693. HBK holds bonds from the 2008 and 2013 Bond Issuances, which it acquired in June and October of 2013, respectively.

694. As described further below, in 2013, HBK purchased and retained the 2008 and 2013 bonds, including through the period of the fraud, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup in materials provided by OSA and Pareto to HBK, including the Pareto Materials and December 2013 Presentation, which (i) necessarily incorporated information provided by Citigroup as fiduciary of the Mexican Trust and OSA's banker; and (ii) were distributed to current and potential investors in OSA, such as HBK, with Citigroup's knowledge; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to investors like HBK.

---

[42] As noted above, HBK is bringing claims relating to the 2008 bonds. Nordic Trustee represents HBK relating to the 2013 bonds. For efficiency purposes, however, the fraudulent misrepresentations and material omissions to HBK in connection with the 2008 and 2013 Bond Issuances are included together in this section.

695. Specifically, Citigroup represented to HBK—and substantially assisted OSA in representing—that OSA (1) was financially secure, including because of its Pemex contracts and the stability and reliability of the cash advance facility; (2) was supported by Citigroup, including in its roles as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust through the ICG and Banamex in connection with the 2013 Bond Issuance; and (3) had positive profit projections.

696. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure; (2) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; (3) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA's principals; (4) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (5) there was a revolving door of former Citigroup employees taking positions in OSA; and (6) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012 (*see supra* at ¶¶ 1-17, 109-47, 208-55.

697. HBK also purchased and retained the 2008 and 2013 bonds, including through the period of the fraud, in reliance upon ***material omissions*** by (1) Citigroup in materials provided by OSA, Pareto and others to HBK, including the 2008 Offering Memorandum, Pareto Materials and December 2013 Presentation, which incorporated information provided by Citigroup and with Citigroup's knowledge that they would be distributed to potential investors like HBK; and (2)

OSA—with Citigroup's knowledge and substantial assistance—including Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA, Pareto and others were providing to HBK.

698. Specifically, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with HBK: (1) the documentation submitted by OSA to ICG employees in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false and included false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable and propped up by false documentation. Omission of such information from Citigroup and OSA's communications to and materials shared with HBK rendered them false, misleading and deceptive.

699. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to HBK because (1) of Citigroup and OSA's previous and ongoing representations to HBK in 2013 (*see infra* at ¶¶ 706-761); and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties; (ii) parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from HBK's investment; (iv) Citigroup and OSA's awareness of HBK's reliance on the false and misleading information; and (v) Citigroup and OSA's participation in the fraud (*supra* ¶¶ 60-147, 209-55).

700. Citigroup also had a duty to speak and disclose this information to Morgan Stanley, the manager of the 2008 Bond Issuance, Pareto, the manager of the 2013 Bond Issuance, and investors such as HBK on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG in connection with the 2013 Bond Issuance (*supra* ¶¶ 208-55).

701. Citigroup and OSA directly benefited from fraudulently inducing and luring HBK to invest, and maintain its investment in OSA, in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

702. Citigroup committed fraud against HBK through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with HBK, including those in the Pareto Materials, which were based on information provided by Citigroup and with Citigroup's knowledge that OSA and Pareto would distribute the Materials to potential investors in OSA including HBK.

703. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to HBK (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in committing fraud against HBK, as described *infra* at ¶¶ 763-65.

704. Had HBK known about (1) OSA's true financial situation; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, HBK would not have purchased or retained the 2008 and 2013 Bonds.

705. Due to the fraud and corresponding collapse of OSA, HBK has not received full payment of its principal or interest on the 2008 or 2013 Bonds and the bonds are currently worthless.

**2. Fraudulent Misrepresentations and Material Omissions Relating to the Purchase of the 2008 Bonds**

706. On June 26 and 27 of 2013, Alvaro Gonzalez of GMP Securities, LLC ("GMP"), a broker, provided Pijus Virketis of HBK with information about OSA and its 2008 Bond Issuance, including but not limited to: (1) the 2008 Offering Memorandum; (2) a financial summary for OSA dated January 16, 2013 prepared by GMP; (3) a "desk note" dated October 25, 2012 prepared by GMP; (4) OSA's financial statements for 2008 and 2009 prepared by PwC; (5) OSA's 2010 and 2011 financial statements prepared by KPMG; and (6) OSA's balance sheets for Q2 and Q3 of 2012 (collectively, the "Broker Package").

707. In his June 26, 2013 transmittal email to Mr. Virketis, Mr. Gonzalez summarized OSA's financial results for the third quarter of 2012, stating that "[i]n general, numbers were in line with our previous conversations with management . . . [o]n the other hand, cash continues to be tight. *I expect the "'credito Pemex' factoring credit line to compensate any short-term shortfa*ll."[43]

708. On information and belief, OSA (1) provided information and documents to GMP in order for it to prepare the (1) financial summary; (2) "desk note"; and (3) the June 26, 2013

[43] After GMP's solicitation, HBK commenced due diligence on OSA. Before purchasing any OSA bonds, HBK evaluated OSA's source of liquidity and cash flow and understood that, because Pemex routinely paid late, OSA had a factoring facility in which it sold its Pemex receivables for a discount in order to more quickly receive payment on its outstanding invoices.

transmittal email; and (2) knew that GMP would incorporate such information and documents into communications made to and materials shared with potential investors such as HBK.

709. The (1) Broker Package, including the 2008 Offering Memorandum described *supra* ¶¶281-286; and (2) the June 26, 2013 transmittal email, included positive financial forecasts for OSA, portrayed OSA as financially stable, and stated that any cash flow issues would be mitigated by the cash advance facility. At this time, however, Citigroup and OSA were involved in a fraudulent scheme, which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at ¶¶ 108-147). Yet OSA did not revise or update any of the materials in the Broker Package, including its financial statements, before GMP circulated them on OSA's behalf in 2013.

710. In addition, the Broker Package and June 26, 2013 transmittal email omit any reference to or information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at ¶¶ 109-47). Such omissions rendered false and misleading the representations contained in the Broker Package and the corresponding transmittal email.

711. OSA had a duty to speak and disclose this information to GMP (and current and potential investors in the 2008 bonds) because (1) its failure to speak would render its prior and ongoing representations to GMP and potential and current investors false and misleading; (2) it was soliciting investments, through GMP, from which it would receive a financial benefit; (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from HBK's investment; (4) OSA had full access and was aware of the omitted material facts, and also knew that HBK would rely on the omitted facts when determining whether to invest; and (4) the fraudulent scheme with Citigroup was well underway in 2013 when GMP

was soliciting investments on OSA's behalf. OSA's special knowledge of its fraudulent scheme with Citigroup also denied HBK the ability to sufficiently investigate OSA's finances prior to investing.

712. In 2013, given Citigroup's (1) close relationship with OSA; (2) role as trustee and collateral agent of the 2008 Bond Issuance; (3) role in restructuring OSA's debt; and (4) participation in the fraud, Citigroup was aware that OSA (including through brokers and others acting on OSA's behalf), in communications and materials shared with current and potential investors including HBK, was making (1) fraudulent misrepresentations regarding its financial health, including the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 763-765, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to HBK in 2013.

713. With knowledge of OSA's fraudulent misrepresentations and material omissions in 2013 to current and potential investors such as HBK, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

714. When purchasing bonds from the 2008 Bond Issuance in 2013, HBK relied on (1) the fact that an internationally recognized financial institution, i.e., Citigroup, was serving as trustee and collateral agent for the 2008 Bond Issuance and OSA's banker; (2) OSA's (i) fraudulent misrepresentations, through GMP, in the June 2013 transmittal email; and (ii) material omissions, through GMP, in the Broker Package, including OSA's failure to update or correct the information contained therein when GMP circulated the Package to HBK in June 2013, both of which were

made with Citigroup's knowledge and substantial assistance (*see infra* at ¶¶ 763-765); and (3) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees, (iii) the false and weak controls of the cash advance facility, and (iv) the ongoing fraud.

### 3. Fraudulent Misrepresentations and Material Omissions Relating to the Purchase of the 2013 Bonds and Retention of the 2008 Bonds between June and October 2013

#### *a. August 2013 GMP Desk Note*

715. On August 15, 2013, Mr. Virketis of HBK received via email an updated "Desk Note" from Marino Mazzeo of GMP. Mr. Mazzeo's email said "Please find attached our latest note on OCEANO. To be sent to existing bondholders only." The attached note included the following representations by GMP: (1) "OCEANO finally paid its coupon [to 2008 bondholders] and released its audited 2012 financial results"; (2) "Total debt stood at MXN 14.1 billion (USD 1.1 billion) of which 18% was short term. Cash continues to be tight, *but we expect the 'credito Pemex' factoring credit line to compensate any short-term shortfall*"; (3) "working capital cycle continued to improve. That said, it is not clear if such improvements reflect better collections from Pemex or *larger sale of receivables through the factoring facilities*."

716. On information and belief, OSA provided information and documents to GMP to prepare the "desk note" and knew that GMP would incorporate such information and documents into communications made to and materials shared with potential investors such as HBK.

717. At this time, however, Citigroup and OSA were involved in a fraudulent scheme, which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow. Accordingly, the representations contained in the "desk note", particularly those representations that any cash short fall would be mitigated by the "*the 'credito*

*Pemex' factoring credit line*" were false and misleading given that the cash advance facility was propped up by false documentation and was neither stable nor reliable.

718. In addition, the "desk note" omitted the following information rendering it false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

719. OSA had a duty to speak and disclose this information to GMP (and current and potential investors such as HBK) because (1) its failure to speak would render its prior and ongoing representations to GMP and potential and current investors false and misleading; (2) it was soliciting investments and investor support, through GMP, from which it would receive a financial benefit; (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from HBK's investment; (4) OSA had full access and was aware of the omitted material facts, and also knew that HBK would rely on the omitted facts when determining whether to invest or maintain its investment; and (5) the fraudulent scheme with Citigroup was well underway in 2013 when GMP was soliciting investments. OSA's special knowledge of its fraudulent scheme with Citigroup also denied HBK the ability to sufficiently investigate OSA's finances prior to investing or deciding to maintain its investment.

720. In 2013, given Citigroup's (1) close relationship with OSA; (2) role as trustee and collateral agent of the 2008 Bond Issuance; (3) role in restructuring OSA's debt; and (4) participation in the fraud, Citigroup was aware that OSA (including through brokers and others acting on OSA's behalf), in communications and materials shared with current and potential investors including HBK, was making (1) fraudulent misrepresentations regarding its financial health, including the stability and reliability of the cash advance facility; and (2) material omissions

regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* ¶¶ 763-765, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to HBK in 2013.

721. With knowledge of OSA's fraudulent misrepresentations and material omissions in 2013 to current and potential investors such as HBK, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

722. When retaining bonds from the 2008 Bond Issuance and purchasing bonds from the 2013 Bond Issuance in 2013, HBK relied on (1) the fact that an internationally recognized financial institution, i.e., Citigroup, was serving as trustee and collateral agent for the 2008 Bond Issuance and OSA's banker; (2) OSA's fraudulent misrepresentations and material omissions, through GMP, in the "desk note" about the stability and reliability of the cash advance facility, which were made with Citigroup's knowledge and substantial assistance (*see infra* at ¶¶ 763-765); and (3) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees, (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud.

*b. Meetings with OSA and Pareto in September 2013*

723. On or about September 5, 2013, Dmitri Mirovitski of HBK attended Pareto Securities' 20th Annual Oil & Offshore Conference in Oslo, Norway. During this conference, Mr. Mirovitski met with OSA and Pareto representatives about the 2013 Bond Issuance. In preparation for the conference, HBK team members prepared background materials and questions for OSA and Pareto for Mr. Mirovitski, including questions regarding the factoring facility.

724. During the conference, OSA and Pareto informed HBK that it had a factoring relationship with Citigroup/Banamex and did not provide any information suggesting that the factoring facility was unstable or that OSA's liquidity and cash flow projections could in any way be impacted by problems with the facility.

725. On September 6, 2013, Mr. Virketis of HBK met with Mr. Yáñez of OSA and Pareto representatives in HBK's offices in London. During the meeting, HBK asked questions about OSA's financial projections and did not receive any information suggesting that the cash advance facility was unstable or that OSA's liquidity and cash flow could in any way be impacted by problems with the cash advance facility.

726. At no point during any of HBK's meetings or communications with OSA and Pareto between September 4 and 6, 2013, did OSA or Pareto inform HBK about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud, of which Citigroup and OSA were necessarily aware at this time as participants in the fraud. These omissions rendered OSA's and Pareto's representations about OSA's financial projections misleading and deceptive.

727. As described in detail *supra* at ¶¶ 311-347, in the summer and fall of 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order for Pareto to prepare the Pareto Materials and solicit investments on OSA's behalf. Accordingly, OSA's and Pareto's communications to potential investors in the 2013 bonds, including HBK, in September 2013 included fraudulent misrepresentations and material omissions by both Citigroup and OSA.

728. Citigroup (and OSA) were aware, as described *supra* at ¶¶ 311-47, that OSA and Pareto intended to provide information and documents, such as the Pareto Materials, to potential

and current investors as well as creditors and vendors of OSA in order to demonstrate OSA's continued financial viability, instill confidence in OSA's ability to repay its debts, and/or to solicit further investment in OSA. Citigroup and (OSA) were also aware that OSA's and Pareto's communications to and materials shared with potential and current investors as well as creditors and vendors of OSA in connection with the 2013 Bond Issuance would be based, in part, on information and documents provided by Citigroup and OSA to Pareto.

729. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise potential investors like HBK) because (1) their failure to speak would render OSA's and Pareto's representations to current and potential investors such as HBK false and misleading; (2) Citigroup and OSA were soliciting investments, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise investors such as HBK), or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from HBK's investment; and (4) at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup's and OSA's special knowledge of the fraudulent scheme also denied Pareto (and HBK) the ability to sufficiently investigate OSA's finances.

730. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise HBK) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so.

731. When purchasing bonds from the 2013 Bond Issuance and retaining bonds from the 2008 Issuance, HBK relied on (1) the fact that an internationally recognized financial institution,

i.e., Citigroup, was serving as trustee and collateral agent for the 2008 Bond Issuance; (2) the material omissions by OSA and Pareto during their meetings with HBK between on or about September 4 and on or about September 6, 2013, which included material omissions by (i) Citigroup; and (ii) OSA, with Citigroup's knowledge and substantial assistance (as described *infra* at ¶¶ 763-765).

*c. Receipt of Pareto Materials in September 2013*

732. In or around September 2013, but before HBK purchased the 2013 bonds in October 2013, HBK received certain of the Pareto Materials described *supra* at ¶¶ 311-47, including but not limited to the (1) September 2013 Offering Memorandum; (2) September 2013 Pareto Credit Analysis; (3) Pareto Credit Model; (4) September 2013 Investor Presentation; and (5) Term Sheet.[44]

733. In the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials. Accordingly, the Pareto Materials, including those received by HBK, contained fraudulent misrepresentations and material omissions by Citigroup and by OSA.

734. Citigroup was aware that OSA and Pareto intended to provide the Pareto Materials to creditors, vendors and bondholders of OSA in order to demonstrate OSA's continued financial viability, instill confidence in OSA's ability to repay its debts, and/or to solicit further investment in OSA.

---

[44] HBK also received access to the Investor Site on or about October 16, 2013 and, at a minimum, retrieved OSA's financial statement for "3Q13".

735. The Pareto Materials, including those documents received by HBK, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure (*see supra* ¶¶ 311-47).

736. Such representations were false because in 2013, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at ¶¶ 109-47).

737. In addition, the Pareto Materials, including those received by HBK, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

738. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those whom OSA and Pareto provided the Pareto Materials, including HBK) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and (i) intentionally withheld such information from Pareto and investors like HBK, or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from HBK's investment; and (4) at this time, the fraudulent scheme between Citigroup and OSA was well

underway. Citigroup and OSA's special knowledge of the fraudulent scheme also denied Pareto (and HBK) the ability to sufficiently investigate OSA's finances.

739. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise HBK) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust, but it failed to do so.

740. When purchasing and retaining bonds from the 2008 Bond Issuance in September 2013, HBK relied on (1) the fact that an internationally recognized financial institution, i.e., Citigroup, was involved in both the 2008 and 2013 Bond Issuances; (2) the Pareto Materials, which included fraudulent misrepresentations and material omissions by (1) Citigroup; and (2) OSA, with Citigroup's knowledge and substantial assistance (as described *infra* at ¶¶ 763-765). Indeed, on September 12, 2013 after its meetings with OSA and Pareto and again on October 1, 2013, Mr. Pijus Virketis and HBK prepared an analysis of the 2013 Bond Issuance, referred to by HBK as a "one-pager", for use in determining whether HBK should purchase the 2013 bonds. The one-pager highlighted the Mexican Trust Agreement as a "security" for the bondholders. In other words, when considering whether to purchase the 2013 bonds, HBK relied upon, among other things, the protections purportedly provided to bondholders by the Mexican Trust Agreement and the waterfall structure (*supra* ¶¶ 159-61, 311-47).

**4. Fraudulent Misrepresentations and Material Omissions Relating to the Retention of the 2008 and 2013 Bonds Between October 2013 and February 2014**

*a. Quarterly Credit Review*

741. On or about October 28, 2013, Pareto sent HBK, via email, the Quarterly Credit Review in order for HBK to evaluate its position in OSA bonds.

742. The transmittal email and Quarterly Credit Review note that OSA presented a "new attitude towards investors with a much higher degree of transparency than earlier." The transmittal

email and Quarterly Credit Review also stated that, with respect to the 2013 Bond Issuance, Pareto believed that "Oceanografía will do what it takes to honour its obligations under the bareboat charter."

743. OSA and, on information and belief, Citigroup provided information to Pareto in order for it to prepare the Quarterly Credit Review and corresponding transmittal email. Citigroup and OSA were aware that Pareto intended to provide information about OSA's finances, including the information contained in the Quarterly Credit Review and corresponding transmittal email, to current and potential investors in OSA, including HBK.

744. Omission in the Quarterly Credit Review and corresponding transmittal email of any reference to or discussion of the following rendered these documents false, misleading, and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

745. Citigroup and OSA had a duty to speak and disclose this information to Pareto and investors like HBK because (1) their failure to speak would render OSA's and Pareto's previous and ongoing representations about OSA's financial health false and misleading; (2) Citigroup and OSA were soliciting investments and support from current bondholders, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise investors such as HBK), or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from HBK's investment; (4) and at this time, the fraudulent scheme between Citigroup and OSA was well underway.

746. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise HBK) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust, but it failed to do so.

747. When, in late 2013, HBK decided to maintain its investment in OSA bonds from the 2008 and 2013 Bond Issuances, HBK relied on the Quarterly Credit Review and corresponding transmittal email, which included material omissions by (1) Citigroup (on information and belief); and (2) OSA, with Citigroup's knowledge and substantial assistance (as described *infra* at ¶¶ 763-765).

*b. December 2013 Presentation*

748. On December 12, 2013, Mr. Virketis of HBK received a copy of the December 2013 presentation. As discussed above (*see supra* at ¶¶ 233-244), Citigroup assisted OSA in preparing the December 2013 Presentation and was aware that OSA was providing the Presentation, either directly or through third-parties, to current and potential investors such as HBK.

749. In addition, the Citigroup logo on the December 2013 Presentation suggested that a highly regarded international financial institution had (1) reviewed the information contained therein; (2) conducted their own due diligence; and (3) validated the accuracy of the information set forth in the Presentation.

750. The December Presentation represented that OSA was financially strong and a good investment, including because of (1) its strong relationship with Pemex; (2) the "recourse factoring" system, i.e., the cash advance facility with Citigroup which provided OSA with consistent and reliable liquidity; and (3) the recent financial restructurings, including with Rabobank, which, were achieved based on representations by Citigroup and OSA to Candies and Rabobank that the cash advance facility was stable and reliable, including because Citigroup was

in charge of the internal controls. Such representations were false and misleading, however, given that Citigroup and OSA were engaged in a fraudulent scheme in 2013 that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow.

751. In addition, the December 2013 Presentation omitted any discussion about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered false and misleading Citigroup's and OSA's representations in the December 2013 Presentation about the financial strength of OSA, including as to its cash flow and liquidity.

752. Citigroup and OSA had a duty to speak and disclose this information in the December 2013 Presentation because (1) their failure to speak would render their representations in the December 2013 Presentation false and misleading; (2) they prepared the Presentation together in order to, among other things, solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g., increased Pemex contracts to OSA, increased fees to Citigroup from Banamex's role as fiduciary of the Trust, and increased interest to Citigroup from the cash advance facility); (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from HBK's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that HBK would rely on the omitted facts when determining whether to invest or maintain its investments in OSA; and (5) the fraudulent scheme between Citigroup and OSA was well underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied HBK the ability to sufficiently investigate OSA's finances prior to determining whether to invest or maintain its investment in OSA.

753. Citigroup also had a duty to speak and disclose the information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so.

754. When retaining bonds from the 2008 and 2013 Bond Issuances between December 2013 and February 2014, HBK relied on the (1) fraudulent misrepresentations and material omissions by Citigroup and OSA in the December 2013 Presentation; and (2) the material omissions by Citigroup as trustee and collateral agent in the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance.

*c. February 14, 2014 Telephone Conference with OSA*

755. On February 14, 2014, Peter Diepenmaat of HBK participated in the February 14, 2014 Telephone Conference Between OSA and Counsel described above (*see supra* at ¶¶ 656-662), in which OSA represented, among other things, that it (1) was "operating as usual"; (2) would likely win a court decision allowing OSA to enter new Pemex contracts; and (3) was working with its bankers to provide $150 million of Pemex accounts receivable as collateral to the 2008 bondholders.

756. On information and belief, at the time of this telephone conference, Citigroup had already been forced to commence an investigation into the fraud and intended to *permanently* cancel the cash advance facility (*see supra* at ¶¶ 162-71).

757. At no point during this Telephone Conference did OSA disclose (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5) Citigroup's internal investigation; or (6) Citigroup's intent to permanently cancel the cash advance facility. These omissions rendered false and misleading OSA's representations that (1) OSA was "operating as usual"; (2) the cash

advance facility was only frozen (not cancelled); and (3) OSA was working with its "bankers" to provide collateral to the 2008 bondholders.

758. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to the 2008 Bondholders, including HBK, false and misleading; (2) OSA was seeking support from the bondholders for the proposed restructuring of the 2008 bonds and a 60-day extension of the coupon payment, from which OSA would receive a financial benefit from HBK's continued investment; (3) OSA had full access to and was aware of the omitted material facts, and also knew that HBK would rely on the omitted facts when determining whether to continue investing and/or support OSA's restructuring plan; and (4) OSA had been engaged in a fraudulent scheme with Citigroup relating to the cash advance facility. OSA's special knowledge of the fraud also denied HBK the ability to sufficiently investigate OSA's finances prior to determining whether to continue to invest and/or support the restructuring plan.

759. In February 2014, Citigroup was aware that OSA was misrepresenting its financial health and relationship with its bankers to the 2008 Bondholders, including HBK, because of (1) Citigroup's role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); (2) its ongoing discussions with OSA and its external financial consultant; and (3) its role in the fraud. As described further below, Citigroup substantially assisted OSA in making fraudulent misrepresentations and material omissions to the 2008 bondholders, including to HBK, in February 2014.

760. Citigroup also had a duty to speak and disclose the omitted information, e.g., (1) the fraud; (2) Citigroup's internal investigation; and (3) Citigroup's intent to permanently cancel

the cash advance facility, to the 2008 Bondholders, including HBK, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

761. HBK relied on the following when retaining their bonds from the 2008 and 2013 Bond Issuances in February 2014: (1) the material omissions by OSA in the February 14, 2014 Telephone Conference Between OSA and Counsel, which were made with Citigroup's knowledge and substantial assistance; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

### 5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against HBK

762. Citigroup committed fraud against HBK through the fraudulent misrepresentations and material omissions in the (1) June 2013 Broker Package; (2) August 2013 GMP Desk Note (3) December 2013 Presentation; (4) February 2014 Discussion; and (5) materials shared with and communications made to HBK by GMP and Pareto which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors and bondholders, including HKB.

763. Citigroup knowingly conspired to make, and was aware that OSA was making fraudulent misrepresentations and material omissions in communications with and materials shared with HBK in 2013 and 2014, including (1) June 2013 Broker Package; (2) August 2013 GMP Desk Note (3) December 2013 Presentation; (4) February 2014 Discussion; (5) Quaterly Credit Review; and (6) materials shared with and communications made to HBK by GMP and Pareto which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors and bondholders, including HKB.

764. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like HBK on account of its (1) participation in the fraud; (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at ¶¶ 1-17; ¶¶ 109-147; ¶¶ 208-255).

765. With knowledge of OSA's fraudulent misrepresentations and material omissions to HBK, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against HBK, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA and Pareto in these communications and materials.

766. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 6. HBK Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions

767. When (1)purchasing bonds from the 2008 and 2013 Bond Issuances; and (2) deciding not to sell its investment in such bonds between 2013 and 2014, HBK relied on the fraudulent misrepresentations and material omissions by (1) Citigroup, in communications made to and materials distributed by GMP and Pareto; and (2) OSA (including those through GMP and Pareto), which Citigroup knowingly conspired with OSA to make, and aided and abetted, on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup (1) made material omissions to HBK; and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions contained the Broker Package which GMP provided to HBK in June 2013 (described *supra* at ¶ 706-714);

(b) Citigroup (1) made material omissions to HBK; and (2) aided and abetted OSA in making material omissions to HBK in the August 2013 GMP Desk Note (described *supra* at ¶¶ 715-722);

(c) Citigroup, through Pareto's communications made to and materials transmitted to HBK in September 2013, (1) made fraudulent misrepresentations and material omissions to HBK; and (2) aided and abetted OSA's fraudulent misrepresentation and material omissions committed fraud against, and conspired with and aided and abetted OSA in committing fraud against HBK, through the fraudulent misrepresentations and material omissions contained in the Pareto Materials to HBK (described *supra* at ¶¶ 723-740);

(d) Citigroup aided and abetted OSA in making fradulent misrepresentations and material omissions contained in the Quarterly Credit Review (described *supra* at ¶¶ 741-747);

(e) Citigroup, (1) made fraudulent misrepresentations and material omissions to HBK; and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions committed fraud against, and conspired with and aided and abetted OSA in committing fraud against to HBK, through the fraudulent misrepresentations and material omissions contained in the December 2013 Presentation (described *supra* at ¶¶ 748-754); and

(f) Citigroup, (1) made material omissions to HBK; and (2) aided and abetted OSA's material omission to HKB in the February 14, 2014 Telephone Conference between HBK and OSA (described *supra* at ¶¶ 755-761).

768. In purchasing and retaining the 2008 and 2013 bonds, HBK also relied on the fact that (1) OSA had access to liquidity through a factoring facility; (2) OSA was "in business with a reputable bank" and (3) Citigroup served as trustee and collateral agent of the 2008 Bonds and OSA's banker.

769. In other words, HBK would not have invested or continued to invest in OSA had it known about (1) the lack of controls governing Citigroup's relationship with OSA; or the (2) ongoing fraud.

770. Upon OSA's collapse, which was caused by Citigroup's intentional failure to implement controls over the cash advance facility and the fraud, HBK's bonds from the 2008 and 2013 Bond Issuances lost their value and HBK stopped receiving interest payments on these bonds.

771. OSA's failure to make interest payments to HBK amounted to a default under the 2008 Bond Indenture and 2013 Bond Agreement and entitled HBK to full repayment of the principal and interest on the bonds from the 2008 and 2013 Bond Issuances.

772. HBK has not received full payment of its principal and interest on the bonds it purchased in connection with both the 2008 and 2013 Bond Issuances.

## K. ICE

### 1. Overview

773. ICE Canyon and the ICE Fund (together, "ICE") hold bonds from the 2008 Bond Issuance, which ICE Canyon's funds, including the ICE Fund, acquired on the following dates: (1) July 2, 2008; (2) July 24, 2008; (3) November 13, 2008; (4) December 9, 2008; (5) December 11, 2008; (6) December 16, 2008; (7) December 22, 2008; (8) January 7, 2009; (9) January 15, 2009; (10) January 16, 2009; (11) February 6, 2009; (12) February 10, 2009; (13) February 11, 2009; (14) February 13, 2009; (15) February 25, 2009; (16) March 3, 2009; (17) March 10, 2009; (18) March 16, 2009; (19) March 18, 2009; (20) March 24, 2009; (21) April 2, 2009; (22) April 6, 2009; (23) April 7, 2009; (24) June 3, 2009; and (25) June 4, 2009. ICE retained the bonds from the 2008 Bond Issuance through OSA's collapse in 2014 and continues to hold those bonds today.

774. In 2013, OSA targeted ICE to purchase bonds in the 2013 Bond Issuance. ICE ultimately did not purchase any 2013 bonds, but retained its previous investment in 2008 bonds in reliance upon information and documents received in connection with the 2013 Bond Issuance, as described *infra* ¶¶ 894-99.

775. ICE Canyon's funds purchased and retained the 2008 bonds, including through the period of the fraud, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup, in the 2008 Offering Memorandum and the Pareto Materials, both of which (i) included false and misleading information provided by Citigroup to Morgan Stanley and Pareto; and (ii) were distributed to

current and potential investors in OSA including ICE with Citigroup's knowledge; and (2) OSA, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false and misleading information circulated by OSA and Pareto to current and potential investors, including ICE.

776. Specifically, Citigroup represented to ICE—or substantially assisted OSA in making representations—that OSA (1) was financially secure, including because of the stability and reliability of the cash advance facility; (2) was supported by Citigroup including because Citigroup served as trustee and collateral agent of the 2008 Bond Issuance and the fiduciary of the Mexican Trust through the ICG; and (3) had positive profit projections.

777. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure, including because (i) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; and (ii) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA; (2) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (3) there was a revolving door of former Citigroup employees taking key positions in OSA; and (4) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012.

778. ICE Canyon's funds also purchased and retained the 2008 bonds, including through the period of the fraud, in reliance on ***material omissions*** by (1) Citigroup, including in the 2008

Offering Memorandum and the Pareto Materials, both of which (i) included omissions by Citigroup based on false and misleading information Citigroup provided to Morgan Stanley and Pareto; and (ii) were distributed to current and potential investors in OSA including ICE with Citigroup's knowledge; and (2) OSA, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false and misleading information circulated by OSA and Pareto to the 2008 Bondholders such as ICE.

779. Specifically, Citigroup omitted—or substantially assisted OSA in omitting—the following information from communications and materials shared with ICE, which rendered them false, misleading and deceptive: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable and propped up by false documentation.

780. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Morgan Stanley and Pareto (and likewise ICE) because (1) of their prior representations in communications and documents; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties (*infra* ¶ 781); (ii) parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from

ICE's investment; (iv) Citigroup's and OSA's awareness of ICE's reliance on the false and misleading information in the materials provided by OSA, Morgan Stanley and Pareto to ICE; and (v) Citigroup's and OSA's participation in the fraud (*infra* ¶¶ 889-93).

781. Citigroup also had a duty to speak and disclose this information to Morgan Stanley, Pareto and investors such as ICE on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG.

782. Citigroup and OSA directly benefited from fraudulently inducing and luring ICE to invest, and maintain its investment in OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

783. Citigroup, including through the fraudulent misrepresentations and material omissions contained in the 2008 Offering Memorandum and the Pareto Materials, directly committed fraud against ICE.

784. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to ICE and substantially assisted and aided and abetted OSA as well as participated in committing fraud against ICE, as described *infra* ¶¶ 889-93.

785. Had ICE known about (1) OSA's true financial situation; (2) the false and weak controls of the cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, ICE would not have purchased or retained the 2008 bonds between 2008 and 2014.

786. Due to the fraud and corresponding collapse of OSA, ICE has not received full payment of its principal or interest on the 2008 bonds, and the bonds are currently worthless.

### 2. Material Omissions in 2008 Relating to ICE's Purchase and Retention of 2008 Bonds

787. Before purchasing its first tranche of 2008 bonds between July and December 2008, ICE reviewed the 2008 Offering Memorandum.

788. As described in detail *supra* ¶¶ 273-74, on information and belief, Citigroup and OSA provided false and misleading information to Morgan Stanley in order for it to prepare the 2008 Offering Memorandum. Accordingly, the 2008 Offering Memorandum included material omissions by both Citigroup and OSA.

789. Citigroup (and OSA) were aware that the 2008 Offering Memorandum would be distributed to potential investors such as ICE.

790. The 2008 Offering Memorandum omitted any information about (1) OSA's deteriorating financial condition; (2) its false financial projections; (3) the false and weak controls of the cash advance facility; (4) on information and belief, Pemex's refusal to pay Banamex on OSA invoices; (5) on information and belief, Citigroup's increasing liability under the cash advance facility; and (6) on information and belief, the ongoing fraud with Citigroup (*supra* ¶¶ 285-86). These omissions rendered misleading and deceptive the positive financial projections about OSA contained in the 2008 Offering Memorandum.

791. At no point after July 2008, did Citigroup or OSA revise or otherwise update the 2008 Offering Memorandum to reflect OSA's true financial condition, including that the cash advance facility, OSA's primary source of liquidity and cash flow, was unstable due to the ongoing fraud.

792. Citigroup and OSA had a duty to speak and disclose the omitted information to (1) Morgan Stanley, the manager of the 2008 Bond Issuance; and (2) potential investors in 2008 and thereafter, including ICE, because (1) their failure to speak would render the representations in the

2008 Offering Memorandum false and misleading; (2) Citigroup and OSA were soliciting investments from which they would receive a financial benefit (e.g., increased liquidity leading to more Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from Citigroup's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that ICE would rely on the omitted facts when determining whether to invest; and (5) the fraudulent scheme between Citigroup and OSA was, on information and belief, underway in 2008 and ongoing through 2014. Citigroup's and OSA's special knowledge of the fraudulent scheme also denied ICE the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

793. Given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role as trustee and collateral agent of the 2008 Bond Issuance; and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with current and potential investors including ICE, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* ¶ 892, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to ICE in 2008.

794. Citigroup also had a duty to speak fully and disclose this information to Morgan Stanley and potential investors in 2008 and thereafter on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG and Banamex.

795. When purchasing and retaining the 2008 bonds between 2008 and 2014, ICE relied on the material omissions in the 2008 Offering Memorandum by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 894-99).

### 3. Fraudulent Misrepresentations and Material Omissions in 2011 Relating to ICE's Retention of 2008 Bonds

#### *a. February 2011 Correspondence Between Citigroup, through Citibank as the Trustee of the 2008 Bond Issuance, and ICE*

796. On February 23, 2011, Aneesh Partap contacted Citigroup, through its banking arm Citibank as the trustee of the 2008 Bond Issuance, requesting OSA's financial statements for 2009 and 2010. Specifically, Mr. Partap emailed Louis A. Piscitelli, Vice President of Citibank N.A., Agency and Trust in New York with an email address of Louis.A.Piscitelli@Citigroup.com.

797. In response to Mr. Partap's request, on February 23, 2011, Mr. Piscitelli provided OSA's audited financial statements for 2009 and quarterly financial statements for 2010.

798. In February 2011, Citigroup and OSA were aware of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees: (3) the false and weak controls of the cash advance facility; and (4) and the ongoing fraud. At no point during this February 23, 2011 email exchange, however, did Mr. Piscitelli inform Mr. Partap and ICE of this information. These omissions rendered misleading and deceptive Citigroup's provision and tacit endorsement of OSA's financial statements.

799. Citigroup had a duty to speak and disclose this information because (1) it was providing information about OSA in response to bondholder requests; (2) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from ICE's investment in OSA (e.g., increased interest from cash advance requests); (3) Citigroup had full access to and was aware of the omitted material facts, and also knew that ICE would rely

on the omitted facts when determining whether to invest or maintain its investments; and (4) the fraudulent scheme with OSA was well underway at this time. Citigroup's special knowledge of its fraudulent scheme with OSA also denied ICE the ability to sufficiently investigate OSA's finances prior to investing and/or maintaining its investments.

800. Citigroup also had a duty to speak and disclose this information as trustee and collateral agent of the 2008 Bond Issuance, but failed to do so.

801. When retaining bonds from the 2008 Bond Issuance, ICE relied on Citigroup's material omissions in the February 23, 2011 email exchange regarding OSA's finances.

*b. February 2011 Meeting between OSA and ICE*

802. On February 28, 2011, Said Saffari of ICE met with OSA's external financial consultant in Mexico City (the "February 2011 Meeting"), during which OSA gave a presentation highlighting its: (1) strong financial projections; and (2) cash advance facility with Citigroup and Banamex, as evidence of its financial strength. After the presentation, OSA brought ICE to meet Fausto Barajas, a member of Pemex's Board of Directors and Mexico's then-Undersecretary of Communications and Transport, to tout OSA's close relationship with Pemex and the Mexican government.

803. At this time, however, and as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility had false and weak controls; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

804. OSA's external financial consultant made these representations based on information obtained from Citigroup and OSA (*see supra* at ¶¶ 448–50). As noted, OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily

included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including ICE.

805. Citigroup and OSA purposefully concealed from ICE the following information: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility, and (4) the ongoing fraud. These omissions rendered the representations by OSA's external financial consultant to ICE during the February 2011 Meeting false and misleading.

806. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise to ICE) because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant and ICE about OSA's financial health and the cash advance facility false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to (i) restructure OSA's debt; and (ii) solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g. increased liquidity leading to more Pemex contracts for OSA and increased fees as trustee and collateral agent of the 2008 Bond Issuance and increased interest on additional cash advance requests for Citigroup); (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from ICE's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that (i) OSA's external financial consultant would rely on the omitted facts when making presentations to current and potential investors of OSA; and (ii) ICE would rely on the omitted facts when determining whether to invest; and (5) the fraudulent scheme between Citigroup and OSA was well underway

at this time. Citigroup's and OSA's special knowledge of the fraud also denied OSA's external financial consultant and ICE the ability to sufficiently investigate OSA's finances.

807. Citigroup also had a duty to speak and disclose this information to the 2008 Bondholders including ICE on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; and (2) collateral agent of the 2008 Bond Issuance through Banamex. Citigroup, as trustee and collateral agent, should have disclosed the information and spoken fully, but it failed to do so.

808. When retaining its bonds from the 2008 Bond Issuance, ICE relied on the material omissions made by OSA's external financial consultant during the February 2011 Meeting about OSA's financial health and its relationship with Citigroup, based on false and misleading information provided by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 894-99).

*c. August 2011 Correspondence Between Citigroup, through Citibank as the Trustee of the 2008 Bond Issuance, and ICE*

809. On August 5, 2011, Jorge Betancourt of OSA emailed Citigroup, through its banking arm Citibank as the trustee of the 2008 Bond Issuance, stating that OSA had "made the settlement of the coupon bond" and to "confirm receipt of funds in the trust." Specifically, Mr. Betancourt emailed (1) Wafaa M. Orfy, Vice President of Citibank N.A., Agency and Trust in New York with an email address of Wafaa.M.Orfy@Citi.com; (2) Yanet Encarnacion of Citibank N.A., Agency and Trust in New York with an email address of Yanet.Encarnacion@Citi.com; and (3) Louis A. Piscitelli, Vice President of Citibank N.A., Agency and Trust in New York with an email address of Louis.A.Piscitelli@Citi.com. Ms. Encarnaction responded that the full payment had been received and copied Michelle Chotoosingh (michelle.chotoosingh@citi.com) and Steven Payano (steven.payano@citi.com).

810. Mr. Betancourt forwarded the email to Mr. Yanez, who instructed him to send it to Said Saffari of ICE. Upon receipt of the email, Mr. Saffari forwarded it to Mr. Piscitelli and Mr. Orfy asking them to confirm that OSA paid the coupon, to which Mr. Orfy replied and confirmed.

811. In August 2011, Citigroup and OSA were aware of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees: (3) the false and weak controls of the cash advance facility; and (4) and the ongoing fraud. At no point during this August 5, 2011 email exchange, however, did Mr. Orfy or Mr. Piscitelli inform Mr. Saffari and ICE of this information. These omissions rendered misleading and deceptive Citigroup's confirmation of OSA's interest payment and implicit endorsement of OSA's financial stability.

812. Citigroup had a duty to speak and disclose this information because (1) it was providing information about OSA in response to bondholder requests; (2) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from ICE's investment in OSA (e.g., increased interest from cash advance requests); (3) Citigroup had full access to and was aware of the omitted material facts, and also knew that ICE would rely on the omitted facts when determining whether to invest or maintain its investments; and (4) the fraudulent scheme with OSA was well underway at this time. Citigroup's special knowledge of its fraudulent scheme with OSA also denied ICE the ability to sufficiently investigate OSA's finances prior to investing and/or maintaining its investments.

813. Citigroup also had a duty to speak and disclose this information as trustee and collateral agent of the 2008 Bond Issuance, but failed to do so.

814. When retaining bonds from the 2008 Bond Issuance, ICE relied on Citigroup's material omissions in the August 5, 2011 email exchange regarding OSA's interest payments.

#### 4. Material Omissions in 2012 Relating to ICE's Retention of 2008 Bonds

##### *a. January/February 2012 Correspondence Between Citigroup, through Citibank as the Trustee of the 2008 Bond Issuance, and ICE*

815. On January 20, 2012, Said Saffari of ICE emailed Louis Piscitelli of Citigroup, stating that "It's that time of year again and I am wondering if the Oceanografía payment was fully paid." Mr. Piscitelli replied, "No funds at all as of now." Thereafter, on February 10, 2012, Mr. Piscitelli confirmed the funds were received ("January/February 2012 Email Exchange").

816. In January 2012, Citigroup and OSA were aware of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees: (3) the weak controls of the cash advance facility; and (4) and the ongoing fraud. At no point during this January/February 2012 Email Exchange, however, did Mr. Piscitelli inform Mr. Saffari and ICE of this information. These omissions rendered misleading and deceptive Citigroup's confirmation of OSA's interest payment and implicit representation regarding the stability of OSA's finances.

817. Citigroup had a duty to speak and disclose this information because (1) it was providing information about OSA in response to bondholder requests; (2) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from ICE's investment in OSA (e.g., increased interest from cash advance requests); (3) Citigroup had full access to and was aware of the omitted material facts, and also knew that ICE would rely on the omitted facts when determining whether to invest or maintain its investments; and (4) the fraudulent scheme with OSA was well underway at this time. Citigroup's special knowledge of its fraudulent scheme with OSA also denied ICE the ability to sufficiently investigate OSA's finances prior to investing and/or maintaining its investments.

818. Citigroup also had a duty to speak and disclose this information as trustee and collateral agent of the 2008 Bond Issuance, but failed to do so.

819. When retaining bonds from the 2008 Bond Issuance, ICE relied on Citigroup's material omissions in the January/February 2012 Email Exchange regarding OSA's finances.

### 5. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to ICE's Retention of the 2008 Bonds

#### *a. ICE Email with OSA Regarding Bond Interest*

820. On February 13, 2013, Said Saffari of ICE emailed OSA's external financial consultant, "We are all wondering when you will be making the coupon payment? It gets a bit exhausting for all of us to drag this through the last possible day of the grace period every payment. Now that the company is doing so well, we are all hoping that the coupon payment is actually paid when it's due, not the last possible grace day period. Eventually, some new lender not familiar with you will ask for the delayed interest, which amounts a huge sum if you add up all the grace days we've had over the years."

821. OSA's external financial consultant replied, "The final payment comes today, we have been funding since last week, so citi has almost all the money I [sic] will get completed today!"

822. At this time, however, as Citigroup (and OSA) were aware: (1) the cash advance facility, OSA's primary source of liquidity and cash flow, was failing due to its false and weak controls; and (2) Citigroup and OSA were engaged in a fraudulent scheme relating to the facility. Accordingly, the representations and suggestions by OSA's external financial consultant regarding OSA's ability to timely make interest payments and its financial stability were false and misleading.

823. In addition, at no point during this email exchange, did OSA's external financial consultant advise Mr. Saffari and ICE of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash

advance facility; and (4) the ongoing fraud. Such omissions rendered misleading and deceptive the representations by OSA's external financial consultant about OSA's ability to timely make interest payments and its financial stability.

824. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise to ICE) because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant (and likewise to ICE) false and misleading; (2) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from ICE's continued investment and support for OSA; (3) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that ICE would rely on the omitted facts when determining whether to invest; and (4) Citigroup and OSA were engaged in a fraudulent scheme at this time. Citigroup's and OSA's special knowledge of its fraudulent scheme also denied ICE the ability to sufficiently investigate OSA's finances prior to investing or deciding to maintain its investments.

825. In February 2013, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role as trustee and collateral agent of the 2008 Bond Issuance; (3) role in restructuring OSA's debt; and (4) participation in the fraud, Citigroup was aware that OSA (including through its external financial consultant) was making material omissions in communications to and materials shared with current and potential investors, such as the 2008 Bondholders including ICE, about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees, (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. As described *infra* at ¶ 892, Citigroup substantially assisted OSA in making these material omissions to ICE in February 2013.

826. With knowledge of OSA's material omissions in 2013 to the 2008 Bondholders including ICE, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

827. When purchasing and retaining bonds from the 2008 Bond Issuance in 2013, ICE relied on (1) Citigroup's omissions to the 2008 Bondholders regarding (i) OSA's true financial condition; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud, which it should have disclosed as trustee and collateral agent of the 2008 Bond Issuance; and (2) OSA's omissions, through its external financial consultant, in this email exchange, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 894-99).

*b. Receipt of Pareto Materials in September 2013*

828. On September 3, 2013, ICE received the Pareto Materials from Pareto in connection with the 2013 Bond Issuance.

829. As described in detail *supra* at ¶¶ 311–15, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials. Accordingly, the Pareto Materials contained fraudulent misrepresentations and material omissions by Citigroup and by OSA.

830. Citigroup (and OSA) were aware, as described *supra* at ¶¶ 311-47, that OSA and Pareto intended to provide the Pareto Materials to creditors, vendors and bondholders of OSA in order to (1) demonstrate OSA's continued financial viability; (2) instill confidence in OSA's ability to repay its debts; and/or (3) solicit further investment in OSA.

831. The Pareto Materials, including those documents received by ICE, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure.

832. Such representations were false because in 2013, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow.

833. In addition, the Pareto Materials, including those received by ICE, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

834. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those whom OSA and Pareto provided the Pareto Materials, including ICE) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto and investors like ICE, or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from ICE's investment; (4) and at this time, the fraudulent scheme between Citigroup and

OSA was well underway. Citigroup and OSA's special knowledge of the fraudulent scheme also denied Pareto (and ICE) the ability to sufficiently investigate OSA's finances.

835. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise ICE) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so.

836. When retaining bonds from the 2008 Issuance, ICE relied on the Pareto Materials, which included fraudulent misrepresentations and material omissions by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at 889-93).

**6. Fraudulent Misrepresentations and Material Omissions in 2014 Relating to ICE's Retention of the 2008 Bonds**

*a. January 2014 Telephone Conference Between OSA and ICE*

837. On January 21, 2014, Hector Rocha and Patrick Free of ICE spoke with OSA's external financial consultant in response to media reports of irregularities in OSA's contracts with Pemex. OSA's external financial consultant said the allegations were false and told ICE that (1) "any discrepancy is a Pemex bookkeeping error"; (2) "Oceanografía has never defaulted on a Pemex contract"; and (3) "don't sell your bonds because we're going to pay the coupon and everything will be fine." ICE also asked OSA's external financial consultant about the possibility of OSA buying back bonds, and he responded that he "was always looking for ways to manage Oceanografía's liabilities."

838. At this time, however, and as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and

(3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

839. OSA's external financial consultant made these representations based on information obtained from Citigroup and OSA (*see supra* at ¶¶ 448–50). As noted above, OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including ICE.

840. Citigroup and OSA purposefully concealed from ICE the following information: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility, and (4) the ongoing fraud. These omissions rendered the representations by OSA's external financial consultant to ICE during the January 21, 2014 call misleading and deceptive.

841. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise to ICE) because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant and ICE about OSA's financial health and the cash advance facility false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to (i) restructure OSA's debt; (ii) obtain support from OSA's creditors and bondholders for the proposed restructuring plans (including as to the 2008 Bond Issuance); and (iii) solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g. increased liquidity leading to more Pemex contracts for OSA and increased fees as trustee and collateral agent of the 2008 Bond

Issuance and increased interest on additional cash advance requests for Citigroup); (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from ICE's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that (i) OSA's external financial consultant would rely on the omitted facts when communicating with ICE about the coupon payments; and (ii) ICE would rely on the omitted facts when determining whether to invest; and (5) the fraudulent scheme between Citigroup and OSA was well underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied OSA's external financial consultant and ICE the ability to sufficiently investigate OSA's finances.

842. Citigroup also had a duty to speak and disclose this information to the 2008 Bondholders including ICE on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; and (2) collateral agent of the 2008 Bond Issuance through Banamex. Citigroup, as trustee and collateral agent, should have disclosed the information and spoken fully, but it failed to do so.

843. When retaining its bonds from the 2008 Bond Issuance, ICE relied on the material omissions made by OSA's external financial consultant during the January 21, 2014 call about OSA's financial health, based on false and misleading information provided by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at 889-93).

*b. January 2014 OSA Press Release*

844. On January 24, 2014, OSA issued a press release in response to media reports of Mexican authorities investigating OSA contracts, which was forwarded from GMP to Joel Singson of ICE that same day. The press release stated, "we have always acted with legality in each contract under the guidelines and regulations of Petróleos Mexicanos (PEMEX)," notwithstanding

that: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for verifying OSA's documentation; (3) Citigroup and OSA were engaged in a fraud relating to the cash advance facility; and (4) on information and belief, Citigroup had already been forced to commence an investigation into the fraud and intended to permanently cancel the cash advance facility (*see supra* at ¶¶ 109-47).

845. At no point during in this Press Release did OSA disclose (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5) Citigroup's internal investigation; or (6) Citigroup's intent to permanently cancel the cash advance facility. These omissions rendered OSA's representations that OSA has "always acted with legality in each contract under the guidelines and regulations of [Pemex]" false and misleading.

846. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak rendered the Press Release false and misleading; (2) OSA was seeking support from the bondholders for the proposed restructuring of the 2008 bonds and patience regarding untimely coupon payments, from which OSA would receive a financial benefit from ICE's continued investment; (3) OSA had full access to and was aware of the omitted material facts, and also knew that ICE would rely on the omitted facts when determining whether to continue investing and/or support OSA's restructuring plan; and (4) OSA had been engaged in a fraudulent scheme with Citigroup relating to the cash advance facility. OSA's special knowledge of the fraud with Citigroup also denied ICE the ability to sufficiently investigate OSA's finances prior to determining whether to continue to invest and/or support the restructuring plan.

847. In January 2014, Citigroup was aware that OSA was misrepresenting its financial health and lack of misconduct with respect to Pemex contracts to the 2008 Bondholders, including ICE, and in the press, including because of: (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); and (2) its ongoing discussions with OSA and its external financial consultant. As described *infra* at ¶ 892, Citigroup substantially assisted OSA in making fraudulent misrepresentations and material omissions to creditors and bondholders, including to ICE, in the Press Release.

848. Citigroup also had a duty to speak and disclose the omitted information (e.g., (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the ongoing fraud; (5) Citigroup's internal investigation; and (6) Citigroup's intent to cancel the cash advance facility) to the 2008 Bondholders, including ICE, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

849. ICE relied on the following when retaining its bonds from the 2008 Bond Issuance in January 2014: (1) the fraudulent misrepresentations and material omissions by OSA in the January 2014 Press Release, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at 894-99); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*c. January 2014 Telephone Conference Between 2008 Bondholders and OSA Regarding Media Allegations*

850. On January 28, 2014, ICE participated in a telephone call between holders of the 2008 bonds and OSA regarding the recent media allegations against OSA. During this call, Mr. Yáñez reported that the allegations were false and Pemex had made a mistake. In addition, in an attempt to assuage the 2008 bondholders' concerns regarding OSA's ability to pay the coupon

(i.e., the annual interest) on the 2008 bond, Mr. Yáñez stated that: (1) OSA had 41 active contracts; (2) OSA was in the process of paying the coupon on the 2008 bonds; (3) most of the money to pay the coupons was "with the trustee", i.e., Citigroup; and (4) the delay in coupon payments was due to Pemex, which had been late paying OSA since April 2013.

851. Such representations were false and misleading, as Citigroup and OSA knew: (1) OSA was submitting false documents to ICG employees, (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

852. At no point during this telephone conference did OSA advise ICE of (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. Such omissions rendered OSA's representations about its financial health and ability to pay the coupon on the 2008 bonds misleading and deceptive.

853. OSA had a duty to speak and disclose this information because (1) failure to speak would render its prior and ongoing representations to the 2008 Bondholders including ICE false and misleading; (2) it was seeking support and patience from the bondholders regarding the coupon payments, from which OSA would receive a financial benefit from ICE's continued investment; (3) OSA had full access to and was aware of the omitted material facts, and also knew that ICE would rely on the omitted facts when determining whether to invest or continue investing; and (4) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of the fraud also denied ICE the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

854. In January 2014, Citigroup was aware that OSA was misrepresenting its financial health, including its ability to make coupon payments and the restructuring of the 2008 Bond Issuance, to the 2008 Bondholders because of (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); (2) its ongoing discussions with OSA and its external financial consultant; (3) on information and belief, its investigation of the fraud; and (4) on information and belief, it's intent to permanently cancel the cash advance facility. As described further below, Citigroup substantially assisted OSA in making fraudulent misrepresentations and material omissions to creditors and bondholders, including to ICE, in January 2014.

855. Citigroup also had a duty to speak and disclose the omitted information (e.g., (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5) the internal investigation; and (6) Citigroup's intent to permanently cancel the cash advance facility) to the 2008 Bondholders, including ICE, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

856. ICE relied on the following when retaining its bonds from the 2008 Bond Issuance in 2014: (1) the fraudulent misrepresentations and material omissions by OSA on January 28, 2014, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 894-99); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*d. February 2014 Email Between ICE and OSA's External Financial Consultant*

857. On February 6, 2014, Patrick Free of ICE emailed OSA's external financial consultant and asked about the status of the January 15 interest payment for the 2008 Bond

Issuance. OSA's external financial consultant replied that "We already started to deposit money in the trust as Pemex releases the money we had in trust, it's my understanding that we are close to half of the coupon already there I will keep you informed."

858. On February 20, 2014, Hector Rocha of ICE asked if ICE could expect the interest by February 14, the end of the grace period, to which OSA's external financial consultant replied "Yes off [sic] course," although ICE never received this interest, and notwithstanding that: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for verifying OSA's documentation; (3) Citigroup and OSA were engaged in a fraud relating to the cash advance facility; and (4) on information and belief, Citigroup had already been forced to commence an investigation into the fraud and intended to permanently cancel the cash advance facility (*see supra* at ¶¶ 109-47).

859. At no point during this communication did OSA's external financial consultant disclose (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5) Citigroup's internal investigation; or (6) Citigroup's intent to permanently cancel the cash advance facility. These omissions rendered the representations by OSA's external financial consultant that OSA would make the interest payment to the 2008 bondholders misleading and deceptive.

860. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise to the 2008 bondholders including ICE) because (1) their failure to speak would render its prior and ongoing representations to the 2008 Bondholders, including ICE, false and misleading; (2) Citigroup and OSA were seeking support and patience from the bondholders in connection with the late interest payments, from which they would receive

a financial benefit from ICE's continued investment; (3) Citigroup and OSA had full access to and was aware of the omitted material facts, and also knew that ICE would rely on the omitted facts when determining whether to continue investing and/or support OSA's restructuring plan; and (4) Citigroup and OSA had been engaged in a fraudulent scheme relating to the cash advance facility. Citigroup's and OSA's special knowledge of the fraud also denied ICE the ability to sufficiently investigate OSA's finances prior to determining whether to continue to invest and/or support the restructuring plan.

861. In February 2014, Citigroup was aware that OSA (including through its external financial consultant) was misrepresenting its financial health, including its ability to make the coupon payments, to the 2008 Bondholders, including ICE, because of (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); (2) its ongoing discussions with OSA and its external financial consultant; (3) its ongoing investigation and intent to permanently cancel the cash advance facility; and (4) its role in the fraud. As described *infra* at ¶ 892, Citigroup substantially assisted OSA in making fraudulent misrepresentations and material omissions to creditors and bondholders, including to ICE, in February 2014.

862. Citigroup also had a duty to speak and disclose the omitted information (e.g., (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the ongoing fraud; (5) Citigroup's internal investigation; and (6) Citigroup's intent to cancel the cash advance facility) to the 2008 Bondholders, including ICE, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

863. ICE relied on the following when retaining their bonds from the 2008 Bond Issuance in February 2014: (1) the fraudulent misrepresentations and material omissions made by OSA's external financial consultant in this email, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 894-99); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*e. February 14, 2014 Discussion Between ICE's Counsel and OSA*

864. On February 14, 2014, ICE's counsel participated in the February 14, 2014 Telephone Conference Between OSA and Counsel, in which OSA represented, among other things, that it (1) was "operating as usual"; (2) would likely win a court decision allowing OSA to enter new Pemex contracts; and (3) was working with its bankers to provide $150 million of Pemex accounts receivable as collateral to the 2008 bondholders, notwithstanding that: (1) Citigroup and OSA had been engaged in a fraud relating to the cash advance facility; and (2) on information and belief, Citigroup had already been forced to commence an investigation into the fraud and intended to permanently cancel the cash advance facility.

865. At no point during this Telephone Conference did OSA disclose (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5) Citigroup's internal investigation; or (6) Citigroup's intent to permanently cancel the cash advance facility. These omissions rendered OSA's representations that OSA was "operating as usual" and was working with its "bankers" to provide collateral to the 2008 bondholders misleading and deceptive.

866. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to the 2008 Bondholders, including ICE, false and misleading; (2) OSA was seeking support from the bondholders for the proposed restructuring of the 2008 bonds, from which OSA would receive a financial benefit from ICE's

continued investment; (3) OSA had full access to and was aware of the omitted material facts, and also knew that ICE would rely on the omitted facts when determining whether to continue investing and/or support OSA's restructuring plan; and (4) OSA had been engaged in a fraudulent scheme with Citigroup relating to the cash advance facility. OSA's special knowledge of the fraud also denied ICE the ability to sufficiently investigate OSA's finances prior to determining whether to continue to invest and/or support the restructuring plan.

867. In February 2014, Citigroup was aware that OSA was misrepresenting its financial health and relationship with its bankers to the 2008 Bondholders, including ICE, because of (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); (2) its ongoing discussions with OSA and its external financial consultant; (3) its ongoing investigation and intent to permanently cancel the cash advance facility; and (4) its role in the fraud.

868. Citigroup also had a duty to speak and disclose the omitted information (e.g., (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the ongoing fraud; (5) Citigroup's internal investigation; and (6) Citigroup's intent to cancel the cash advance facility) to the 2008 Bondholders, including ICE, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

869. ICE relied on the following when retaining their bonds from the 2008 Bond Issuance in February 2014: (1) the fraudulent misrepresentations and material omissions by OSA in the February 14, 2014 Telephone Conference Between OSA and Counsel, which Citigroup aided and abetted, on account of its knowledge and substantial assistance; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance (*see infra* at ¶¶ 894-99).

*f. February 21, 2014 Discussion Between Citigroup and ICE's Counsel*

870. During the February 21, 2014 Telephone Conference Between Citigroup and Counsel (*supra* ¶ 488), "Banamex/Citi" representatives reassured the 2008 Bondholders, including ICE, that OSA was above-board with its financials, represented that it wanted to "have a constructive and proactive approach" with OSA to prevent a default, and be in "constant contact" with the 2008 Bondholders to avoid any "negative reactions" from other groups that may "complicate" the situation.

871. However, Citigroup was not collaborating constructively and proactively with OSA. On information and belief, by February 21, 2014, Citigroup (1) had already commenced its internal investigation into the fraud; and (2) intended to terminate the cash advance facility, OSA's primary and most important source of liquidity and cash flow, thereby threatening OSA's survival.

872. At no point during this Telephone Conference did Citigroup disclose to ICE or other 2008 Bondholders (1) the fraud; (2) its internal investigation; or (3) its intent to cancel the cash advance facility. These omissions rendered Citigroup's representations that it sought to continue working with OSA and the 2008 Bondholders misleading and deceptive.

873. Citigroup had a duty to speak and disclose this information because (1) Citigroup's failure to speak would render its representations about working with the 2008 Bondholders false and misleading; (2) it was trying to persuade the 2008 Bondholders to continue supporting OSA and not take any adverse actions, from which OSA and Citigroup would receive a financial benefit; and (3) Citigroup knew the omitted material facts and also knew that ICE would rely on the omitted facts when determining whether to maintain its investment in OSA.

874. Citigroup also had a duty to speak fully and disclose this information to ICE on account of its roles trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

875. When retaining the bonds from the 2008 Bond Issuance, ICE relied on Citigroup's (1) fraudulent misrepresentations and material omissions during the February 21, 2014 Telephone Conference Between Citigroup and Counsel (*supra* ¶ 488); and (2) omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding its (1) internal investigation; and (2) intent to permanently cancel the cash advance facility.

*g. February 24, 2014 Discussion Between OSA and ICE's Counsel*

876. During the February 24, 2014 Telephone Conference Between OSA and Counsel (described *supra* at ¶ 494), OSA represented to the 2008 Bondholders, including ICE, that it had formed a debt restructuring team with a law firm and financial firm to begin the "collaborative process towards a consensual restructuring." These representations, which suggested that the 2008 Bondholders need not be concerned about the financial stability of OSA and its ability to successfully restructure its debts including as to the 2008 Bondholders, were misleading in light of (1) the fraud; (2) Citigroup's internal investigation; and (3) Citigroup's intent to cancel the cash advance facility.

877. On information and belief, given the (1) close relationship between OSA and Citigroup; and (2) fact that Citigroup had commenced an internal investigation into the fraud no later than February 20, 2014, OSA was aware by February 24, 2014 that Citigroup had commenced an investigation into the fraud and intended to cancel the cash advance facility, but OSA did not disclose either fact during this Telephone Conference, rendering OSA's representations regarding the restructuring of its debt misleading and deceptive.

878. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its representations about debt restructuring false and misleading; (2) it was trying to persuade the 2008 Bondholders to continue supporting OSA and not take any adverse actions, from which OSA would receive a financial benefit; and (3) OSA knew the omitted material

facts and also knew that ICE would rely on the omitted facts when determining whether to maintain its investment in OSA and/or take action against OSA.

879. Given (1) the close relationship between OSA and Citigroup; and (2) Citigroup's representations to ICE's counsel in the February 21, 2014 Telephone Conference Between OSA and Counsel (*supra* ¶ 488), Citigroup was aware that OSA was informing its creditors, including the 2008 Bondholders like ICE, that OSA had a viable plan to restructure its debt, notwithstanding the fact that Citigroup had already commenced an investigation into the fraud and intended to permanently cancel the cash advance facility. As described *infra* at ¶ 892, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to ICE during this Telephone Conference.

880. Citigroup also had a duty to speak and disclose the omitted information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

881. ICE relied on the following when retaining the bonds from the 2008 Bond Issuance in 2014: (1) the fraudulent misrepresentations and material omissions by OSA in the February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶ 892); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) the fraud, (ii) Citigroup's internal investigation, and (iii) Citigroup's intent to permanently cancel the cash advance facility.

*h. February 26, 2014 Discussion Between OSA and ICE's Counsel*

882. During the February 26, 2014 Telephone Conference Between OSA and Counsel, Mr. Yáñez, from Miami, Florida, and OSA represented to counsel for the 2008 Bondholders, including ICE, that the "alleged" Pemex issue was "based on interpretation of a contractual obligation" rather than any fault by OSA, and that OSA would sign a confidentiality agreement

with counsel for the 2008 Bondholders to give them "full access" to the files of such contractual procedures and other legal documents and information for verification and analysis of OSA's position. These representations, which suggested that the bondholders need not be concerned about the financial stability of and allegations against OSA, were misleading because of the fraud and the fact that Citigroup had already commenced an internal investigation and intended to terminate the cash advance facility.

883. On information and belief, given (1) the close relationship between OSA and Citigroup; and (2) the fact that Citigroup had commenced an internal investigation no later than February 20, 2014, OSA was aware by February 26, 2014, that Citigroup had commenced an investigation into the cash advance facility and intended to cancel it.

884. At no point during this Telephone Conference did OSA inform counsel for ICE of (1) the fraud; (2) Citigroup's internal investigation; or (3) Citigroup's intent to cancel the cash advance facility.

885. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to the 2008 Bondholders regarding OSA's financial stability and the media allegations false and misleading; (2) it was seeking the bondholders' support and asking them not to take adverse actions (e.g., demanding coupon payments), from which it would receive a financial benefit; and (3) OSA knew the omitted material facts and also knew that ICE would rely on the omitted facts when determining whether to maintain ICE's investment in OSA and/or take action against OSA.

886. On information and belief, given (1) the close relationship between OSA and Citigroup; and (2) Citigroup's representations to ICE's counsel in the February 21, 2014 Telephone Conference Between Citigroup and Counsel (*supra* ¶ 488), Citigroup was aware that

OSA was informing its creditors, including the 2008 Bondholders, that (1) the media allegations against OSA were false; (2) Pemex had made an error; and (3) OSA could restructure and pay bondholders, notwithstanding that Citigroup had already commenced an investigation into the fraud and intended to cancel the cash advance facility. As described *infra* ¶ 892, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to ICE during this Telephone Conference.

887. Citigroup had a duty to speak and disclose this information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but Citigroup failed to do so.

888. ICE relied on the following when maintaining its bonds from the 2008 Bond Issuance in 2014: (1) the fraudulent misrepresentations and material omissions by OSA in the February 26, 2014 Telephone Conference Between OSA and Counsel, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*infra* at ¶ 892); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) the fraud, (ii) Citigroup's internal investigation, and (iii) Citigroup's intent to permanently cancel the cash advance facility.

**7. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against ICE**

889. Citigroup committed fraud against ICE through the fraudulent misrepresentations and material omissions in the (1) 2008 Offering Memorandum; (2) February 23, 2011 Email Exchange; (3) February 2011 Meeting; (4) August 5, 2011 Email Exchange; (5) January/February 2012 Email Exchange; (6) February 2013 Email Exchange; (7) January 2014 Telephone Conference; (8) January 24, 2014 Press Release; (9) January 28, 2014 Telephone Conference; (10) February 2014 Email; (11) February 14, 2014 Discussion; (12) February 21, 2014 Telephone Conference; (13) February 24 and 26, 2014 Telephone Conferences; and (15) materials shared

with, and communications made to, ICE between 2011 and 2014 by OSA, including those made by OSA's external financial consultant and contained in the Pareto Materials.

890. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant) in communications and materials shared with ICE between 2008 and 2014, including those made in the (1) 2008 Offering Memorandum; (2) February 2011 Meeting; (3) February 2013 Email Exchange; (4) January 2014 Telephone Conference; (5) January 24, 2014 Press Release; (6) January 28, 2014 Telephone Conference; (7) February 2014 Email; (9) February 14, 2014 Discussion; and (9) February 24 and 26, 2014 Telephone Conferences.

891. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like ICE on account of its (1) participation in the fraud (*supra* Section X); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility.

892. With knowledge of OSA's fraudulent misrepresentations and material omissions to ICE, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against ICE, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded

the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA and Pareto in these communications and materials.

893. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 8. ICE Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions

894. When purchasing bonds from the 2008 Issuance and deciding not to sell their investment in such bonds, ICE relied on the fraudulent misrepresentations and material omissions by Citigroup, through OSA's external financial consultant and Pareto, and by OSA (including those made by OSA's external financial consultant), which Citigroup aided and abetted on account of its knowledge and substantial assistance.

895. Specifically:

(a) Citigroup in the 2008 Offering Memorandum (1) made material omissions to ICE and (2) aided and abetted OSA in making material omissions to ICE (*supra* ¶¶ 787-95);

(b) Citigroup made material omissions to ICE in the February 23, 2011 Email Exchange (*supra* ¶¶ 796-801);

(c) Citigroup in the communications with OSA between 2009 and 2014 regarding the lack of financial information provided by OSA in the February 2011 Meeting, (1) made material omissions to ICE through OSA's external financial consultant and (2) aided and abetted OSA in making material omissions to ICE (*supra* ¶¶ 802-08);

(d) Citigroup made material omissions to ICE in the August 5, 2011 Email Exchange (*supra* ¶¶ 809-14);

(e) Citigroup made material omissions to ICE in the January/February 2012 Email Exchange (*supra* ¶¶ 815-19);

(f) Citigroup in the February 2013 Email Exchange, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to ICE (*supra* ¶¶ 820-27);

(g) Citigroup, through Pareto's communications made to and materials transmitted to ICE in September 2013, (1) made fraudulent misrepresentations and material omissions to ICE; and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to ICE (*supra* ¶¶ 828-36);

(h) Citigroup in the January 2014 Telephone Conference, (1) made material omissions through OSA's external financial consultant, and (2) aided and abetted OSA in making material omissions to ICE (*supra* ¶¶ 837-43);

(i) Citigroup in the January 24, 2014 Press Release, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to ICE (*supra* ¶¶ 844-49);

(j) Citigroup in the January 28, 2014 Telephone Conference, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to ICE (*supra* ¶¶ 850-56);

(k) Citigroup in the February 2014 Email, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to ICE (*supra* ¶¶ 857-63);

(l) Citigroup in the February 14, 2014 Discussion, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to ICE (*supra* ¶¶ 864-69);

(m) Citigroup in the February 21, 2014 Telephone Conference made material omissions to ICE as trustee and collateral agent of the 2008 Bond Issuance (*supra* ¶¶ 870-75);

(n) Citigroup in the February 24 and 26, 2014 Telephone Conferences, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to ICE (*supra* ¶¶ 876-88).

896. In other words, ICE would not have invested or continued to invest in OSA had it known of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

897. Upon OSA's collapse, which was caused by (1) Citigroup's intentional failure to sufficiently control the cash advance facility; and (2) the fraud, ICE's bonds from the 2008 Bond Issuance lost their value and ICE stopped receiving interest payments on these bonds.

898. OSA's failure to make interest payments to ICE amounted to a default under the 2008 Bond Indenture and entitled ICE to full repayment of the principal and interest on the bonds from the 2008 Bond Issuance.

899. ICE has not received payment of their principal or interest on the bonds they purchased in connection with the 2008 Bond Issuance.

## L. **Moneda**[45]

### 1. Overview

900. The Moneda Funds hold bonds from the 2008 Bond Issuance, which they acquired in several trades between 2009 and 2013. Specifically, the Moneda Funds acquired bonds from the 2008 Issuance on: (1) September 12, 2009; (2) January 14, 2010; (3) January 15, 2010; (3) August 5, 2011; (4) October 16, 2012; (5) October 22, 2012; and (6) May 13, 2013. The Moneda Funds retained the bonds from the 2008 Bond Issuance through OSA's collapse in 2014 and continue to hold those bonds today.

901. Additionally, in 2013, OSA targeted the Moneda Funds to purchase bonds in the 2013 Bond Issuance, which Moneda did in late fall 2013. The Moneda Funds retained the bonds from the 2013 Bond Issuance through OSA's collapse in 2014 and continue to hold those bonds today.

902. As described further below, between 2009 and 2014, the Moneda Funds purchased and retained the 2008 bonds and 2013 bonds, including through the period of the fraud, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup in (i) communications between the Moneda Funds and Citigroup, as trustee and collateral agent for the 2008 Bond Issuance, and (ii) materials provided by OSA and Pareto to the Moneda Funds, which necessarily incorporated information provided by Citigroup as fiduciary of the Mexican Trust and OSA's banker and were distributed

---

[45] Moneda, as defined above (*see supra* at ¶¶ 37-42), manages all the Moneda Funds. For purposes of this Third Amended Complaint, Moneda and the Moneda Funds constitute the "Moneda Group." Any fraudulent misrepresentations and material omissions by OSA (including through its external financial consultant) and Citigroup to Moneda, or to one or more of the Moneda Funds, constitute fraudulent misrepresentations and material omissions to the entire Moneda Group. In addition, as noted above, Moneda is bringing claims relating to the 2008 bonds. Nordic Trustee represents Moneda relating to the 2013 bonds. For efficiency purposes, however, the fraudulent misrepresentations and material omissions to Moneda in connection with the 2008 and 2013 Bond Issuances are included together in this section.

to current and potential investors in OSA, such as Moneda, with Citigroup's knowledge; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to investors like the Moneda Funds.

903. Specifically, Citigroup represented to the Moneda Funds—and substantially assisted OSA (and its external financial consultant) in representing—that OSA (1) was financially secure, including because of its Pemex contracts and the stability and reliability of the cash advance facility; (2) was supported by Citigroup, including in its roles as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust through the ICG and Banamex in connection with the 2013 Bond Issuance; and (3) had positive profit projections.

904. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure; (2) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; (3) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA's principals; (4) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (5) there was a revolving door of former Citigroup employees taking key positions in OSA; and (6) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012 (*see supra* at ¶¶ 1-17; ¶¶ 109-147; ¶¶ 208-255).

905. The Moneda Funds also purchased and retained the 2008 bonds and 2013 bonds, including through the period of the fraud, in reliance on ***material omissions*** by (1) Citigroup in (i) communications with the Moneda Funds, (ii) materials prepared by Pareto and others that incorporated information provided by Citigroup and with Citigroup's knowledge that they would be distributed to potential investors like the Moneda Funds, and (iii) through its roles as trustee and collateral agent for the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance; and (2) OSA—with Citigroup's knowledge and substantial assistance—including Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to the Moneda Funds.

906. Specifically, between 2009 and 2014, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with the Moneda Funds: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false and included false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable and propped up by false documentation. Omission of such information from Citigroup and OSA's communications to and materials shared with the Moneda Funds rendered them false, misleading and deceptive.

907. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to the Moneda Funds because (1) of Citigroup and OSA's previous and ongoing representations to the Moneda Funds between 2009 and 2014; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties (*see infra* at ¶¶ 1027-1029); (ii) parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from the Moneda Funds' investment; (iv) Citigroup and OSA's awareness of the Moneda Funds' reliance on the false and misleading information; and (v) Citigroup and OSA's participation in the fraud (*see infra* at ¶¶ 1027-1029).

908. Citigroup also had a duty to speak and disclose this information to Pareto, the manager of the 2013 Bond Issuance, and investors such as the Moneda Funds to whom Pareto distributed the Pareto materials, on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG in connection with the 2013 Bond Issuance.

909. Citigroup and OSA directly benefited from fraudulently inducing and luring Moneda to invest, and maintain its investment in OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

910. Citigroup directly committed fraud against the Moneda Funds through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with the Moneda Funds, including those in the Pareto Materials, which were based on information provided by Citigroup and with Citigroup's knowledge that OSA and Pareto would distribute the Materials to potential investors in OSA including the Moneda Funds.

911. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's, fraudulent misrepresentations and material omissions to the Moneda Funds (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in committing fraud against the Moneda Funds, as described *infra* at ¶¶ 1027-1029.

912. Had the Moneda Funds known about (1) OSA's true financial situation; (2) the false and weak controls of the cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, the Moneda Funds would not have purchased or retained the 2008 and 2013 Bonds.

913. Due to the fraud and corresponding collapse of OSA, the Moneda Funds have not received payment of their principal or interest on the bonds they purchased in connection with both the 2008 and 2013 Bond Issuances and the bonds are currently worthless.

**2. Material Omissions Between 2009 and 2013 Relating To The Purchase and Retention of the 2008 Bonds**

914. In or around December 2009, during a meeting in Mexico City between OSA principals and Fernando Tisné of Moneda, Mr. Yáñez and OSA presented information suggesting that OSA was "financially very strong" and emphasized Citigroup's and Banamex's relationship with and financial support of OSA (the "December 2009 Meeting").

915. At this time, on information and belief, (1) OSA was in financial distress; (2) the cash advance facility, OSA's primary source of liquidity and cash flow, was failing due to its false and weak controls; and (3) Citigroup and OSA were engaged in a fraudulent scheme relating to the facility. Accordingly, OSA's representations to Mr. Tisné during this meeting regarding OSA's financial health and relationship with Citigroup and Banamex were false, misleading and deceptive.

916. In addition, at no point during this December 2009 Meeting, did Mr. Yáñez and OSA advise Mr. Tisné and Moneda of (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. Such omissions rendered misleading and deceptive OSA's representations about the positive financial projections of OSA and the strength of OSA's relationship with Citigroup and Banamex.

917. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its representations during the December 2009 Meeting false and misleading; (2) on information and belief, OSA was soliciting investments from Moneda and other investors, from which it would receive a financial benefit; (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from Moneda's investment; (4) OSA had full access to and was aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest; and (5) on information and belief, the fraudulent scheme with Citigroup was underway at this time. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Moneda the ability to sufficiently investigate OSA's finances prior to investing or deciding to maintain its investments.

918. In December 2009, given Citigroup's (1) close relationship with OSA; (2) role as trustee and collateral agent of the 2008 Bond Issuance; and (3) participation in the fraud, Citigroup was aware that OSA was making material omissions in communications to and materials shared current and potential investors such as the 2008 Bondholders and Moneda, about: (1) Citigroup's and Banamex's strong relationship; (2) OSA's deteriorating financial condition; (3) the false documents submitted by OSA to ICG employees; (4) the weak or nonexistent controls of the cash

advance facility; and (5) the ongoing fraud. As described *infra* at ¶¶ 1027-1029, Citigroup substantially assisted OSA in making these material omissions to Moneda in December 2009.

919. With knowledge of OSA's material omissions in 2009 to the 2008 Bondholders including Moneda, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

920. When purchasing and retaining bonds from the 2008 Bond Issuance in 2009 and 2010, Moneda relied on (1) Citigroup's omissions to the 2008 Bondholders regarding (i) OSA's true financial condition; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud, which it should have disclosed as trustee and collateral agent of the 2008 Bond Issuance; and (2) OSA's omissions in the December 2009 Meeting, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1027-1029).

### 3. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to the (i) Purchase and Retention of the 2013 Bonds; and (ii) Retention of the 2008 Bonds

921. Beginning in or about June 2013, OSA began soliciting investors for the 2013 Bond Issuance. On October 4, 2013, based on material omissions by (1) Citigroup; and (2) OSA, with Citigroup's knowledge and substantial assistance, the Moneda Funds purchased bonds from the 2013 Bond Issuance.

922. The Moneda Funds then continued to hold and not sell its 2008 and 2013 bonds based on the fraudulent misrepresentations and material omissions by (1) Citigroup, and (2) OSA, with Citigroup's knowledge and substantial assistance.

a. *Discussions Between Moneda and OSA's External Financial Consultant Between June 2013 and Early 2014 Regarding the Cash Advance Facility*

923. Between on or about June 2013 and early 2014, George Atuan of Moneda, who was based in the United States between June and September 2013, had several telephone conversations with OSA's external financial consultant about the financial stability of OSA, including the reliability of the cash advance facility.

924. During these conversations with Mr. Atuan between June 2013 and early 2014, OSA's external financial consultant repeatedly assured Mr. Atuan that the cash advance facility was a reliable source of liquidity for the company, notwithstanding the false documents submitted by OSA to ICG employees, the weak controls of the cash advance facility, and the ongoing fraud of which OSA and Citigroup were aware.

925. OSA's external financial consultant made these misrepresentations based on information obtained from Citigroup and OSA. As noted above (*see supra* at ¶¶ 448-52), OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including Moneda.

926. Citigroup and OSA purposefully concealed the following information from Moneda: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive the representations made by OSA's external financial consultant to Mr. Atuan and the Moneda Group between June 2013 and early 2014.

927. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise the Moneda Group) because (1) Citigroup, OSA and OSA's external financial consultant were all working together to (i) restructure OSA's debt; (ii) obtain support from OSA's creditors and bondholders for the proposed restructuring plans (including as to the 2008 Bond Issuance); and (iii) solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g., increased Pemex contracts and cash flow for OSA, increased fees and interest for Citigroup in connection with is role as fiduciary of the Mexican Trust and from increased cash advance requests); (2) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from Moneda's investment; (3) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest; and (4) the fraudulent scheme with Citigroup was well underway at this time. OSA's and Citigroup's special knowledge of the fraud also denied OSA's external financial consultant and Moneda the ability to sufficiently investigate OSA's finances.

928. Citigroup also had a duty to speak and disclose this information on account of its role as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

929. When retaining bonds from the 2008 Bond Issuance and purchasing and retaining bonds from the 2013 Bond Issuance, Moneda relied on the material omissions made by OSA's external financial consultant to Mr. Atuan between June 2013 and early 2014 regarding (1) OSA's true financial condition; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility, and (4) the ongoing fraud, which were based on material omissions by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1027-1029).

*b. July 2013 Email Exchange Between OSA and Moneda*

930. On July 11, 2013, Mr. Atuan of Moneda emailed OSA several questions relating to OSA's finances. Specifically, Mr. Atuan, using an email account hosted in the United States, emailed Jorge Betancourt Méndez, OSA's Head of Investor Relations, and asked him questions regarding why OSA's profit margin improved in 2011 and about discrepancies between contracted amounts for services versus OSA's expected revenues on those contracts. Mr. Betancourt replied and attached a detailed presentation dated June 2013 and titled "Clientes" purporting to show OSA's strong financial projections, among other things (the "June 2013 Presentation").

931. As of July 2013, Citigroup and OSA were involved in a fraudulent scheme which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow. Yet, OSA did not revise or update OSA's purported strong financial projections in the June 2013 Presentation before circulating it in July 2013.

932. In addition, Mr. Betancourt and OSA did not advise Moneda in July 2013 of: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls over the cash advance facility; and (4) the ongoing fraud. These omissions rendered the representations in OSA's June 2013 Presentation misleading and deceptive.

933. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior representations in the June 2013 Presentation false and misleading; (2) it was soliciting investments, from which it would receive a financial benefit; (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from Moneda's investment; (4) OSA had full access to and was aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest; and (5) the fraudulent scheme with Citigroup was well underway at this time.

OSA's special knowledge of its fraudulent scheme with Citigroup also denied Moneda the ability to sufficiently investigate OSA's finances prior to investing.

934. In 2013, given Citigroup's (1) close relationship with OSA; (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with current and potential investors including Moneda, was making (1) fraudulent misrepresentations regarding its financial health, the stability and reliability of the cash advance facility, and its ability to make interest payments to bondholders; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 1027-1029, Citigroup substantially assisted and aided and abetted OSA in making these material omissions to Moneda in 2013.

935. Citigroup had a duty to speak and disclose the omitted information to Moneda given its roles as trustee and collateral agent through its banking arm Citibank for the 2008 Bond Issuance and fiduciary of the Mexican Trust through the ICG and Banamex in the 2013 Bond Issuance, but failed to do so.

936. When retaining bonds from the 2008 Bond Issuance and purchasing bonds from the 2013 Bond Issuance, the Moneda Funds relied on (1) OSA's material omissions relating to the financial strength of the company in the July 11, 2013 email exchange with Mr. Betancourt, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1027-1029; and (2) Citigroup's omissions as trustee, collateral agent, and fiduciary of the Trust regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees; (iii) the weak controls of the cash advance facility; and (iv) the ongoing fraud.

*c. July 2013 Correspondence Between Citigroup, through Citibank as the Trustee of the 2008 Bond Issuance, and Moneda*

937. On July 15, 2013, Mr. Atuan contacted Citigroup, through its banking arm Citibank as the trustee of the 2008 Bond Issuance, requesting OSA's financial statements for 2012 and inquiring whether OSA's failure to report those financial statements for over half a year was an "event of default." Specifically, Mr. Atuan emailed, from his email account hosted in the United States, Louis A. Piscitelli, Vice President of Citibank N.A., Agency and Trust in New York with an email address of Louis.A.Piscitelli@Citigroup.com.

938. In response to Mr. Atuan's request, Mr. Piscitelli provided OSA's preliminary financials for 2012 and for the first quarter of 2013. On that same day, after reviewing the materials provided by Citigroup, Mr. Atuan asked Mr. Piscitelli several questions about the financials including as to whether OSA must issue final financial statements to the market within 150 days, to which Mr. Piscitelli responded that since OSA's financials "are going through the audit process I believe they are fine."

939. Moneda took the representations of Citigroup, a highly regarded international bank, at face value as bondholders routinely rely on information provided (or not provided) by trustees.

940. In July 2013, Citigroup and OSA were aware of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees: (3) the weak controls of the cash advance facility; and (4) and the ongoing fraud. At no point during this July 15, 2013 email exchange, however, did Mr. Piscitelli inform Mr. Atuan and Moneda of this information. These omissions rendered misleading and deceptive Citigroup's representations that OSA's financial statements were "fine."

941. Citigroup had a duty to speak and disclose this information because (1) Citigroup's failure to speak would render its prior representations in the July 15, 2013 Email Exchange false

and misleading; (2) it was providing assurances to bondholders, including to prevent them from taking adverse actions against OSA which would provide a financial benefit to Citigroup and OSA; (3) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from Moneda's investment in OSA (e.g., increased interest from cash advance requests); (4) Citigroup had full access to and was aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest or maintain its investments; and (4) the fraudulent scheme with OSA was well underway at this time. Citigroup's special knowledge of its fraudulent scheme with OSA also denied Moneda the ability to sufficiently investigate OSA's finances prior to investing and/or maintaining its investments.

942. Citigroup also had a duty to speak and disclose this information as trustee and collateral agent of the 2008 Bond Issuance, but failed to do so.

943. When retaining bonds from the 2008 Bond Issuance and purchasing bonds from the 2013 Bond Issuance, the Moneda Funds relied on Citigroup's material omissions in the July 15, 2013 email exchange regarding OSA's finances.

*d. Discussions Between Moneda and Pareto Between July and September 2013*

944. Before the 2013 Bond Issuance, the Moneda Group had concerns about continuing to invest in OSA due, in part, to allegations that Mr. Yáñez had misused funds from the cash advance facility between 2009 and 2012. Accordingly, when OSA solicited the Moneda Group to purchase the new bonds from the 2013 Bond Issuance, it had serious reservations about reinvesting in OSA.

945. In one or more meetings in New York between June and September 2013, Mr. Atuan of Moneda met with a Pareto banker to discuss the 2013 Bond Issuance and whether

Moneda planned to invest in the bonds. Erik Thoen of Pareto set up the meeting between Mr. Atuan and the Pareto banker.

946. The Pareto banker, on behalf of Citigroup and OSA and with their knowledge that he would make such representations (and omissions) on their behalf, informed Mr. Atuan that: (1) Pareto (and therefore Citigroup and OSA) were aware of the previous issues with the cash advance facility; and (2) OSA and Banamex had implemented a new system (i.e., the waterfall structure discussed *supra* at ¶¶ 311-347) preventing OSA from accessing the cash flow from the facility before the bondholders were paid.

947. Specifically, at one dinner between Mr. Atuan and the Pareto banker in New York between July and September 2013, Mr. Atuan expressed concerns about the cash advance facility, to which the Pareto banker responded that the facility was "100% secure" and OSA had "no access to the facility." Mr. Atuan then raised different scenarios with the Pareto banker (e.g., what happens if OSA uses the money before it pays the interest on the bonds), in response to which the Pareto banker explained how the facility would prevent OSA from accessing the funds and protect the bondholders.

948. At no point during any of Mr. Atuan's discussions or communications with Pareto, including with its banker, did Pareto inform Mr. Atuan or the Moneda Group about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the weak controls of the cash advance facility; and (4) the ongoing fraud, of which Citigroup and OSA were aware. These omissions rendered Pareto's, including its bankers, representations about OSA's financial projections and the strength and reliability of the cash advance facility misleading and deceptive.

949. As described in detail *supra* at ¶¶ 311-347, in the summer and fall of 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order for Pareto to prepare the Pareto Materials and solicit investments on OSA's behalf. Accordingly, the Pareto Materials and Pareto's communications with potential investors such as Moneda included fraudulent misrepresentations and material omissions by both Citigroup and OSA.

950. Citigroup (and OSA) were aware that OSA and Pareto intended to provide information based on the information and documents provided from Citigroup and OSA to creditors, vendors, bondholders and potential investors of OSA in order to demonstrate OSA's continued financial viability, instill confidence in OSA's ability to repay its debts, and/or to solicit further investment in OSA.

951. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise potential investors like the Moneda Group) because (1) their failure to speak would render Pareto's representations to current and potential investors such as Moneda false and misleading; (2) Citigroup and OSA were soliciting investments, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise investors such as the Moneda Group), or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from Moneda's investment; and (4) at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup's and OSA's special knowledge of the fraudulent scheme also denied Pareto (and the Moneda Group) the ability to sufficiently investigate OSA's finances.

952. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise Moneda) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so.

953. When purchasing bonds from the 2013 Bond Issuance and retaining bonds from the 2008 Issuance, the Moneda Funds relied on the fraudulent misrepresentations and material omissions by Pareto, which included fraudulent misrepresentations and material omissions by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* ¶¶ 1027-1029).

*e. Receipt of Pareto Materials in September 2013*

954. As described in detail *supra* at ¶¶ 311-347, in September 2013, Moneda received the Pareto Materials from Pareto and/or the Investor's Site in connection with the 2013 Bond Issuance.

955. In the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials. Accordingly, the Pareto Materials contained fraudulent misrepresentations and material omissions by Citigroup and by OSA.

956. Citigroup (and OSA) were aware that OSA and Pareto intended to provide the Pareto Materials to creditors, vendors and bondholders of OSA in order to (1) demonstrate OSA's continued financial viability; (2) instill confidence in OSA's ability to repay its debts; and/or (3) solicit further investment in OSA.

957. The Pareto Materials, including those documents received by Moneda, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be

protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure.

958. Such representations were false because in 2013, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow.

959. In addition, the Pareto Materials, including those received by Moneda, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

960. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those whom OSA and Pareto provided the Pareto Materials, including Moneda) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information and belief, (i) intentionally withheld such information from Pareto and investors like Moneda, or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from Moneda's investment; and (4) at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup and OSA's special knowledge of the fraudulent scheme also denied Pareto (and Moneda) the ability to sufficiently investigate OSA's finances.

961. Citigroup also had a duty to fully and disclose this information to Pareto (and likewise Moneda) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so.

962. When purchasing bonds from the 2013 Issuance and retaining bonds from the 2008 Issuance, the Moneda Funds relied on the Pareto Materials, which included fraudulent misrepresentations and material omissions by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1027-1029).

*f. October 2013 Meetings Between OSA's External Financial Consultant and Moneda*

963. On or about October 3, 2013, Moneda representatives, including Mr. Tisné, and a group of Canadian investors held a meeting with OSA's external financial consultant in Mexico City (the "October 2013 Meeting"), during which the financial consultant: (1) presented strong financial projections for OSA; and (2) highlighted OSA's close relationship with Citigroup and Banamex as evidence of OSA's financial strength.

964. During the October 2013 Meeting, OSA's external financial consultant specifically represented that (1) OSA was supported by the "biggest bank" in Mexico; (2) Citigroup and OSA were working on refinancing the 2008 bonds; (3) Citigroup was OSA's "partner" and "supports" OSA; (4) Citigroup had a "great" factoring line (i.e., cash advance facility) with OSA; (5) therefore they could "see the flow of cash"; (6) the factoring line "monetize[d] [OSA's] invoices"; and (7) Citigroup is "inside" Pemex and OSA and therefore it sees everything. Based on these and other factors, OSA's external financial consultant advised Mr. Atuan and the Moneda Group "not to worry" about OSA's ability to pay the 2008 bondholders on the 2015 maturity date.

965. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

966. OSA's external financial consultant made these representations based on information obtained from Citigroup and OSA (*see supra* at ¶¶ 448-52). As noted above, OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including the Moneda Group.

967. Citigroup and OSA purposefully concealed from Moneda the following information: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered the representations by OSA's external financial consultant about (1) the strength of OSA's finances; (2) the stability and reliability of the cash advance facility; and (3) OSA's relationship with Citigroup and Banamex, misleading and deceptive.

968. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise to the Moneda Group) because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant and the Moneda Group about OSA's financial health false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to (i) restructure OSA's debt; (ii)

obtain support from OSA's creditors and bondholders for the proposed restructuring plans (including as to the 2008 Bond Issuance); and (iii) solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g. increased liquidity leading to more Pemex contracts for OSA and increased fees as trustee and collateral agent of the 2008 Bond Issuance and increased interest on additional cash advance requests for Citigroup); (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from Moneda's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest; and (5) the fraudulent scheme between Citigroup and OSA was well underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied OSA's external financial consultant and Moneda the ability to sufficiently investigate OSA's finances.

969. Citigroup also had a duty to speak and disclose this information to Pareto and the 2008 Bondholders including the Moneda Group on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; and (2) collateral agent of the 2008 Bond Issuance through Banamex. Citigroup, as trustee and collateral agent, should have disclosed the information and spoken fully, but it failed to do so.

970. When retaining its bonds from the 2008 Bond Issuance and purchasing and retaining bonds from the 2013 Bond Issuance, the Moneda Funds relied on the fraudulent misrepresentations and material omissions made by OSA's external financial consultant during the October 2013 Meeting about OSA's financial health and its relationship with Citigroup, based on false and misleading information provided by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1027-1029).

*g. December 2013 Meeting Between Moneda and OSA*

971. On December 3, 2013, Javier Montero of Moneda attended the December 2013 Presentation in Mexico City, which included fraudulent misrepresentations and material omissions by Citigroup and OSA about the financial viability of OSA, including claims regarding the strength of OSA's relationship with Pemex and the role of the cash advance facility in providing OSA with sufficient liquidity. At this time, Citigroup and OSA were aware of the false documents submitted by OSA to ICG employees, the weak controls of the cash advance facility, and the ongoing fraud. Accordingly, the representations in the December 2013 Presentation regarding the strength of OSA's finances and the cash advance facility were false.

972. As discussed above (*see supra* at ¶¶ 233-244), Citigroup assisted OSA in preparing the December 2013 Presentation and was aware that OSA was providing the Presentation to current and potential investors such as the Moneda Group. In addition, the Citigroup logo on the December 2013 Presentation suggested to Moneda that a highly regarded international financial institution had (1) reviewed the information contained therein; (2) conducted their own due diligence; and (3) validated the accuracy of the information set forth in the Presentation.

973. The December 2013 Presentation omitted any discussion about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered Citigroup's and OSA's representations about the financial strength of OSA, including as to its cash flow and liquidity, misleading and deceptive.

974. Citigroup and OSA had a duty to speak and disclose this information in the December 2013 Presentation because (1) their failure to speak would render their representations in the December 2013 Presentation false and misleading; (2) they prepared the Presentation together in order to, among other things, solicit new investments in OSA, from which Citigroup

and OSA would receive a financial benefit (e.g., increased Pemex contracts to OSA, increased fees to Citigroup from Banamex's role as fiduciary of the Trust, and increased interest to Citigroup from the cash advance facility); (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from Moneda's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest; and (5) the fraudulent scheme between Citigroup and OSA was well underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied Moneda the ability to sufficiently investigate OSA's finances prior to investing.

975. Citigroup also had a duty to speak and disclose the information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so

976. When purchasing and retaining bonds from the 2013 Issuance and retaining the bonds from the 2008 Issuance, the Moneda Funds relied on the (1) fraudulent misrepresentations and material omissions by Citigroup and OSA in the December 2013 Presentation; and (2) the omissions by Citigroup as trustee, collateral agent and fiduciary.

**4. Material Omissions in 2014 Relating to the (i) Retention of the 2013 Bonds; and (ii) Retention of the 2008 Bonds**

*a. January 2014 Correspondence Between Moneda and OSA's External Financial Consultant Regarding, Among Other Things, the Refinancing of the 2008 Bonds*

977. On January 4, 2014, Mr. Atuan of Moneda corresponded and spoke with OSA's external financial consultant about, among other things: (1) OSA's contract with Pemex relating to the Goliath; and (2) refinancing the 2008 bonds.

978. Specifically, in his January 4, 2014 communications with Mr. Atuan, OSA's external financial consultant reported that (1) Pemex intended to extend the Goliath contract for another 800 to 900 days; and (2) he and OSA were working on restructuring the 2008 bonds and that they would provide a report in the next two weeks.

979. Such representations were misleading because, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

980. OSA's external financial consultant made these representations based on information obtained from Citigroup and OSA. As noted above, OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including the Moneda Group.

981. Citigroup and OSA purposefully concealed the following information from Moneda: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive the representations by OSA's external financial consultant about (1) increased Pemex contracts; and (2) OSA's intent to restructure the 2008 bonds.

982. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant and to the Moneda Group because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant and the Moneda Group about OSA's financial health false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to (i) restructure OSA's debt; (ii) obtain support from OSA's creditors and bondholders for the proposed restructuring plans (including as to the 2008 Bond Issuance); and (iii) solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g. increased liquidity leading to more Pemex contracts for OSA and for Citigroup, increased fees as trustee and collateral agent of the 2008 Bond Issuance and increased interest on additional cash advance requests from OSA); (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from Moneda's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest or continuing to invest; and (5) the fraudulent scheme between Citigroup and OSA was well underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied OSA's external financial consultant and Moneda the ability to sufficiently investigate OSA's finances.

983. Citigroup also had a duty to speak and disclose this information to the 2008 Bondholders including the Moneda Group on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; and (2) collateral agent of the 2008 Bond Issuance through Banamex. Citigroup, as trustee and collateral agent, should have disclosed the information and spoken fully, but it failed to do so.

984. When retaining its bonds from the 2008 and 2013 Bond Issuance, the Moneda Funds relied on (1) the material omissions made by OSA's external financial consultant in the January 4, 2014 telephone conference with Moneda (i) based upon information provided by Citigroup and OSA; and (ii) with Citigroup's knowledge that OSA's external financial consultant would disseminate such information to creditors, vendors and bondholders of OSA, including the Moneda Group; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*b. January 2014 Correspondence Between Moneda and OSA's External Financial Consultant Regarding Media Allegations*

985. On January 21, 2014, in response to a media article reporting that OSA was under investigation by the SFP after Pemex discovered that OSA had made over $245 million in potentially illegal service contract modifications in 2011 and 2012, Mr. Atuan of Moneda contacted OSA's external financial consultant who informed Moneda that, among other things: (1) OSA was in "compliance with everything"; (2) Pemex made an error; and (3) the investigation of OSA was politically motivated.

986. OSA's external financial consultant then informed Mr. Atuan that (1) he expected Pemex to issue a longer term contract for the Goliath; and (2) he was working with Citigroup and "analyzing the bank's proposals" regarding the restructuring of the 2008 Bond Issuance.

987. Such representations were false and misleading because, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

988. OSA's external financial consultant made these representations based on information obtained from Citigroup and OSA.

989. As noted above, OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including the Moneda Group.

990. Citigroup and OSA purposefully concealed the following information from Moneda: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility, and (4) the ongoing fraud. These omissions rendered misleading and deceptive the representations by OSA's external financial consultant to Moneda about (1) the falsity of the allegations against OSA; (2) the future Goliath contracts; and (3) the restructuring of the 2008 bonds.

991. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant and to Moneda because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant and the Moneda Group about OSA's financial health false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to (i) restructure OSA's debt; (ii) obtain support from OSA's creditors and bondholders for the proposed restructuring plans (including as to the 2008 Bond Issuance); and (iii) solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g. increased liquidity leading to more Pemex contracts for OSA and for Citigroup, increased fees as trustee and collateral agent of the 2008 Bond Issuance

and increased interest on additional cash advance requests from OSA); (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from Moneda's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest or continue investing; and (5) the fraudulent scheme between Citigroup and OSA was well underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied Moneda the ability to sufficiently investigate OSA's finances prior to investing.

992. Citigroup also had a duty to speak and disclose this information to the 2008 Bondholders including the Moneda Group on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; and (2) collateral agent of the 2008 Bond Issuance through Banamex. Citigroup, as trustee and collateral agent, should have disclosed the information and spoken fully, but it failed to do so.

993. When retaining its bonds from the 2008 and 2013 Bond Issuance, the Moneda Funds relied on (1) the material omissions made by OSA's external financial consultant during the January 21, 2014 telephone conference with Moneda (i) based upon information provided by Citigroup and OSA; and (ii) with Citigroup's knowledge that OSA's external financial consultant would disseminate such information to creditors, vendors and bondholders of OSA, including the Moneda Group; and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*c. January 2014 Telephone Conference Between 2008 Bondholders and OSA Regarding Media Allegations*

994. On January 28, 2014, Mr. Atuan of Moneda participated in a telephone call between holders of the 2008 bonds and OSA regarding the recent media allegations against OSA. During this call, Mr. Yáñez reported that the allegations were false and Pemex had made a mistake. In

addition, in an attempt to assuage the 2008 bondholders' concerns regarding OSA's ability to pay the coupon (i.e., the annual interest) on the 2008 bond, Mr. Yáñez stated that: (1) OSA had 41 active contracts; (2) OSA was in the process of paying the coupon on the 2008 bonds; (3) most of the money to pay the coupons was "with the trustee", i.e., Citigroup; and (4) the delay in coupon payments was due to Pemex, which had been late paying OSA since April 2013.

995. Such representations were false and misleading, as Citigroup and OSA knew: (1) OSA was submitting false documents to ICG employees, (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

996. At no point during this telephone conference did OSA advise Moneda of (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the weak controls of the cash advance facility; and (4) the ongoing fraud. Such omissions rendered OSA's representations about its financial health and ability to pay the coupon on the 2008 bonds misleading and deceptive.

997. OSA had a duty to speak and disclose this information because (1) it was seeking support from the bondholders for the proposed restructuring of the 2008 bonds, from which OSA would receive a financial benefit from Moneda's continued investment; (2) OSA had full access to and was aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to invest or continue investing; and (3) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of the fraud also denied Moneda the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

998. Citigroup was aware that OSA was misrepresenting financial health, including its ability to make coupon payments and the restructuring of the 2008 Bond Issuance, to holders of the 2008 bonds because of (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); and (2) its ongoing discussions with OSA and its external financial consultant. As described further below, Citigroup substantially assisted OSA in making fraudulent misrepresentations and material omissions to creditors and bondholders, including to Moneda, in January 2014.

999. Citigroup also had a duty to speak and disclose the omitted information (e.g., (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud) to the 2008 Bondholders, including the Moneda Funds, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

1000. The Moneda Funds relied on the following when retaining its bonds from the 2008 and 2013 Bond Issuance in 2014: (1) the material omissions by OSA on January 28, 2014, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1027-1029); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*d. February 14, 2014 Discussion Between Moneda's Counsel and OSA*

1001. On February 14, 2014, Moneda received an email summary from its counsel regarding the February 14, 2014 Telephone Conference Between OSA and Counsel described above (*see supra* at ¶¶ 656-661), in which OSA represented, among other things, that it (1) was "operating as usual"; (2) would likely win a court decision allowing OSA to enter new Pemex contracts; and (3) was working with its bankers to provide $150 million of Pemex accounts receivable as collateral to the 2008 bondholders, notwithstanding that: (1) OSA was submitting

false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for verifying OSA's documentation; (3) Citigroup and OSA were engaged in a fraud relating to the cash advance facility; and (4) on information and belief, Citigroup had already been forced to commence an investigation into the fraud and intended to permanently cancel the cash advance facility (*see supra* at ¶¶ 109-47).

1002. At no point during this Telephone Conference (as summarized in the email) did OSA disclose (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the fraud; (5) Citigroup's internal investigation; or (6) Citigroup's intent to permanently cancel the cash advance facility. These omissions rendered OSA's representations that OSA was "operating as usual" and was working with its "bankers" to provide collateral to the 2008 bondholders misleading and deceptive.

1003. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to the 2008 Bondholders, including the Moneda Funds, false and misleading; (2) OSA was seeking support from the bondholders for the proposed restructuring of the 2008 bonds, from which OSA would receive a financial benefit from Moneda's continued investment; (3) OSA had full access to and was aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to continue investing and/or support OSA's restructuring plan; and (4) OSA had been engaged in a fraudulent scheme with Citigroup relating to the cash advance facility. OSA's special knowledge of the fraud also denied Moneda the ability to sufficiently investigate OSA's finances prior to determining whether to continue to invest and/or support the restructuring plan.

1004. In February 2014, Citigroup was aware that OSA was misrepresenting its financial health and relationship with its bankers to the 2008 Bondholders, including the Moneda Funds, because of (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); and (2) its ongoing discussions with OSA and its external financial consultant. As described further below, Citigroup substantially assisted OSA in making fraudulent misrepresentations and material omissions to creditors and bondholders, including to Moneda, in February 2014.

1005. Citigroup also had a duty to speak and disclose the omitted information (e.g., (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; (4) the ongoing fraud; (5) Citigroup's internal investigation; and (6) Citigroup's intent to cancel the cash advance facility) to the 2008 Bondholders, including the Moneda Funds, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

1006. The Moneda Funds relied on the following when retaining their bonds from the 2008 and 2013 Bond Issuances in February 2014: (1) the material omissions by OSA in the February 14, 2014 Telephone Conference Between OSA and Counsel, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶1027-1029); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*e. February 21, 2014 Discussion Between Citigroup and Moneda's Counsel*

1007. On February 21, 2014, Moneda received an email summary from its counsel regarding the February 21, 2014 Telephone Conference Between Citigroup and Counsel described above (*supra* at ¶¶ 656-661), in which "Banamex/CITI" representatives stated that they sought a "constructive" and "proactive" approach with OSA and wished to be in "constant contact" with

the holders of the 2008 bonds, notwithstanding that: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for verifying OSA's documentation; (3) Citigroup and OSA were engaged in a fraud relating to the cash advance facility; and (4) Citigroup had already been forced to commence an investigation into the fraud and intended to permanently cancel the cash advance facility. In other words, as of February 21, 2014, Citigroup had no intention of continuing to work with OSA and therefore its representations that it sought a "constructive" and "proactive" approach with OSA and "constant contact" with the 2008 Bondholders were false and misleading.

1008. At no point during this Telephone Conference (as summarized in the email) did Citigroup disclose (1) the fraud; (2) its internal investigation; or (3) its intent to cancel the cash advance facility. These omissions also rendered Citigroup's representations that it sought to continue working with OSA and the 2008 bondholders misleading and deceptive.

1009. Citigroup had a duty to speak and disclose this information because (1) Citigroup's failure to speak would render its prior and ongoing representations to the 2008 Bondholders false and misleading; (2) it was trying to persuade the 2008 bondholders to continue supporting OSA, from which Citigroup and OSA would receive a financial benefit (e.g., increased liquidity for OSA and increased interest on cash advances for Citigroup); (3) Citigroup had full access to and was aware of the omitted material facts, and also knew that Moneda would rely on the omitted facts when determining whether to continuing supporting OSA and declining to take any adverse action against OSA; and (4) Citigroup's internal investigation had commenced and it intended to cancel the cash advance facility. Citigroup's special knowledge of the fraud, its internal investigation, and its intentions regarding the cash advance facility also denied Moneda the ability to sufficiently investigate OSA's finances before deciding whether to continue supporting the company.

1010. Citigroup also had a duty to speak and disclose the omitted information on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

1011. When retaining their bonds from the 2008 and 2013 Bond Issuances in February 2014, the Moneda Funds relied on Citigroup's (1) material omissions during the February 21, 2014 Telephone Conference Between Citigroup and Counsel; and (1) material omissions, as trustee and collateral agent.

*f. February 24, 2014 Discussion Between OSA and Moneda's Counsel*

1012. On February 24, 2014, Moneda received an email summary from its counsel regarding the February 24, 2014 Telephone Conference Between OSA and Counsel described above (as described *supra* at ¶ 494), in which OSA represented that it had formed a debt restructuring team with a law firm and investment bank to come up with ideas for "consensual restructuring." These representations, which suggested that the bondholders need not be concerned about the financial stability of OSA and its ability to successfully restructure, were misleading because of (1) the fraud; and (2) Citigroup's internal investigation and intent to cancel the cash advance facility.

1013. On information and belief, given (1) the close relationship between Citigroup and OSA; and (2) the fact that Citigroup had commenced an internal investigation no later than February 20, 2014, OSA was aware by February 24, 2014 that Citigroup had commenced an investigation into the fraud and intended to cancel the cash advance facility.

1014. But, at no time during this Telephone Conference did OSA inform counsel for Moneda (1) of the fraud; or (2) that Citigroup had commenced an internal investigation into the fraud and intended to permanently cancel the cash advance facility. These omissions rendered OSA's representations regarding the restructuring of its debt misleading and deceptive.

1015. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to the 2008 Bondholders regarding its financial health false and misleading; (2) it was seeking the bondholders' support and asking them not to take adverse actions (e.g., demanding coupon payments), from which OSA would receive a financial benefit; (3) OSA had full access to this information and intentionally withheld it to receive a financial benefit; (4) OSA had been involved in a fraud with Citigroup and was aware that Citigroup had been forced to commence an investigation and intended to cancel the cash advance facility. OSA's special knowledge of the (1) fraud; (2) Citigroup's investigation; and (3) Citigroup's intent to cancel the cash advance facility also denied Moneda the ability to sufficiently investigate OSA's finances prior to deciding whether to continue supporting the company and/or declining to take adverse action against OSA.

1016. On information and belief, given (1) the close relationship between Citigroup and OSA; and (2) Citigroup's representations to Moneda's counsel in the February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), Citigroup was aware that OSA was informing its creditors, including the 2008 bondholders, that OSA had a viable plan to restructure its debt even though Citigroup had already commenced an investigation into the fraud and intended to permanently cancel the cash advance facility. As described *infra* at ¶¶ 1027-29, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to the 2008 Bondholders.

1017. Citigroup also had a duty to speak and disclose the omitted information (e.g., the fraud, its internal investigation, and its intent to cancel the cash advance facility) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

1018. The Moneda Funds relied on the following when retaining their bonds from the 2008 and 2013 Bond Issuances in February 2014: (1) the material omissions by OSA in the February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1027-29); and (2) Citigroup's omissions, as trustee and collateral agent.

*g. February 26, 2014 Discussion Between OSA and Moneda's Counsel*

1019. During the February 26, 2014 Telephone Conference Between OSA and Counsel described above (*supra* at ¶¶ 656-661), OSA claimed that the Pemex issue was "based on interpretation of a contractual obligation" rather than any misconduct by OSA and that OSA would sign a confidentiality agreement with counsel for the 2008 Bondholders to give them "full access" to the files of such contractual procedures and other legal documents and information for verification and analysis of OSA's position. These representations, which suggested that the bondholders need not be concerned about the financial stability of OSA, were misleading because of (1) the fraud; and (2) Citigroup's pending internal investigation and intent to terminate the cash advance facility.

1020. On information and belief, given (1) the close relationship between Citigroup and OSA; and (2) the fact that Citigroup had commenced an internal investigation no later than February 20, 2014, OSA was aware by February 26, 2014 that Citigroup had commenced an investigation into the fraud and intended to cancel the cash advance facility.

1021. But, at no time during this Telephone Conference did OSA inform counsel for Moneda (1) of the fraud; or (2) that Citigroup had commenced an internal investigation into the fraud and intended to permanently cancel the cash advance facility. These omissions rendered OSA's representations that it had not engaged in any misconduct misleading and deceptive.

1022. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to the 2008 Bondholders regarding its financial health and lack of misconduct false and misleading; (2) it was seeking the bondholders' support and asking them not to take adverse actions (e.g., demanding coupon payments), from which OSA would receive a financial benefit; (3) OSA had full access to this information and intentionally withheld it to receive a financial benefit; (4) OSA had been involved in a fraud with Citigroup and was aware that Citigroup had been forced to commence an investigation and intended to cancel the cash advance facility. OSA's special knowledge of the (1) fraud; (2) Citigroup's investigation; and (3) Citigroup's intent to cancel the cash advance facility also denied Moneda the ability to sufficiently investigate OSA's finances prior to deciding whether to continue supporting the company and/or declining to take adverse action against OSA.

1023. On information and belief, given (1) the close relationship between Citigroup and OSA; and (2) Citigroup's representations to Moneda's counsel in the February 24, 2014 Telephone Conference Between OSA and Counsel (as described *supra* at ¶ 494), Citigroup was aware that OSA was informing its creditors, including the 2008 bondholders, that it had a viable plan to restructure its debt and that it had not engaged in any misconduct, even though Citigroup had already commenced an investigation into the fraud and intended to permanently cancel the cash advance facility by February 26, 2014. As described *infra* at ¶¶ 1027-29, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to the 2008 Bondholders.

1024. Citigroup also had a duty to speak and disclose the omitted information (e.g., the fraud, its internal investigation, and its intent to cancel the cash advance facility) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

1025. The Moneda Funds relied on the following when retaining their bonds from the 2008 and 2013 Bond Issuances in February 2014: (1) the material omissions by OSA in the February 26, 2014 Telephone Conference Between OSA and Counsel, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1027-1029), and (2) Citigroup's omissions, as trustee and collateral agent.

**5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against the Moneda Group**

1026. Citigroup committed fraud against the Moneda Group through the fraudulent misrepresentations and material omissions in (1) the December 2009 Meeting; (2) July 15, 2013 Email Exchange; (3) December 2013 Meeting; (4) February 21, 2014 Discussion; and (5) materials shared with and communications made to Moneda by OSA's external financial consultant and Pareto which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors, and bondholders, including Moneda.

1027. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant) in communications and materials shared with the Moneda Group between 2009 and 2014, including (1) the December 2009 Meeting; (2) the discussions between Moneda and OSA's external financial consultant between June 2013 and early 2014 regarding the cash advance facility; (3) the July 2013 Email Exchange between OSA and Moneda; (4) the discussions between Moneda and Pareto between July and September 2013; (5) the receipt of Pareto Materials in September 2013; (6) the October 2013 Meeting; (7) the December 2013 Meeting; the January 2014 Correspondences; (8) the January 2014 Teleconference regarding media allegations; (9) the

February 14, 2014 Discussion; (10) the February 24, 2014 Discussion; and (11) the February 26, 2014 Discussion.

1028. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like the Moneda Group on account of its (1) participation in the fraud (*see supra* Section VI); (2) its role in approving OSA's false documentation (see supra Section VII); (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

1029. With knowledge of OSA's fraudulent misrepresentations and material omissions to the Moneda Group, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against the Moneda Group, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA and Pareto in these communications and materials.

1030. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 6. The Moneda Group Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions

1031. When (1) purchasing bonds from the 2008 and 2013 Bond Issuances; and (2) deciding not to sell their investment in such bonds between 2013 and 2014, Moneda relied on the fraudulent misrepresentations and material omissions by (1) Citigroup, in its communications with Moneda and through OSA's external financial consultant and Pareto; and (2) OSA (including those made by OSA's external financial consultant and Pareto), which Citigroup knowingly conspired with OSA to make, and aided and abetted, on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup (1) made material omissions to Moneda and (2) aided and abetted OSA in making material omissions to Moneda in the December 2009 Meeting in Mexico City (described *supra* at ¶¶ 914-920);

(b) Citigroup (1) through OSA's external financial consultant, made material omissions to Moneda and (2) aided and abetted OSA in making material omissions to Moneda in the Discussions between Moneda and OSA's external financial consultant between June 2013 and early 2014 regarding the cash advance facility (described *supra* at ¶¶ 923-929);

(c) Citigroup aided and abetted OSA in making material omissions to Moneda in the July 2013 Email Exchange (described *supra* at ¶¶ 930-936);

(d) Citigroup made material omissions to Moneda in the July 15, 2013 Email Exchange (described *supra* at ¶¶ 937-943);

(e) Citigroup, through Pareto's communications made to and materials transmitted to Moneda between July and September 2013, (1) made fraudulent misrepresentations and material omissions to Moneda; and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to Moneda (described *supra* at ¶¶ 944-962);

(f) Citigroup, during a meeting in or around October 2013, (1) made material omissions to Moneda through OSA's external financial consultant and (2) aided and abetted OSA in making material omissions to Moneda (described *supra* at ¶¶ 963-970);

(g) Citigroup, during a meeting in or around December 2013, (1) made fraudulent misrepresentations and material omissions to Moneda and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to Moneda (described *supra* at ¶¶ 971-976);

(h) Citigroup, during the January 2014 Correspondences, (1) made material omissions to Moneda through OSA's external financial consultant and (2) aided and abetted OSA in making material omissions to Moneda (described *supra* at ¶¶ 977- 993);

(i) Citigroup aided and abetted OSA in making material omissions to Moneda in the January 2014 Teleconference (described *supra* at ¶¶ 994-1000);

(j) Citigroup aided and abetted OSA in making material omissions to Moneda in the February 14, 2014 Discussion (described *supra* at ¶¶ 1001-1006);

(k) Citigroup made material omissions to Moneda in the February 21, 2014 Discussion (described *supra* at ¶¶ 1007- 1011);

(l) Citigroup aided and abetted OSA in making material omissions to Moneda in the February 24 and 26, 2014 Discussions (described *supra* at ¶¶ 1012-1025);

(m) Citigroup committed fraud against Moneda between 2013 and 2014 by making material omissions and failing to disclose information as trustee, collateral agent, and fiduciary of the Trust (described *supra* at ¶¶ 1026-1030).

1032. In other words, Moneda would not have invested or continued to invest in OSA had it known of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1033. Upon OSA's collapse, which was caused by (1) Citigroup's intentional failure to control the cash advance facility; and (2) the fraud, the Moneda Funds' bonds from the 2008 and 2013 Bond Issuances lost their value and the Funds stopped receiving interest payments on these bonds.

1034. OSA's failure to make interest payments to the Moneda Funds amounted to a default under the 2008 Bond Indenture and 2013 Bond Agreement and entitled the Moneda Funds to full repayment of the principal and interest on the bonds from the 2008 and 2013 Bond Issuances.

1035. The Moneda Funds have not received payment of their principal or interest on the bonds they purchased in connection with both the 2008 and 2013 Bond Issuances.

## M. Nordic Trustee-2013 Bondholders

### 1. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against the 2013 Bondholders

1036. Pursuant to the 2013 Bond Agreement (described *supra* at ¶¶ 348–49), Nordic Trustee (1) serves as trustee of the 2013 Bond Issuance; (2) acts on behalf of and represents the

interests of all the 2013 Bondholders, *who are precluded from directly asserting claims pursuant to a "no action" clause in the Bond Agreement*; and (3) is responsible for enforcing the bondholders' rights, including collecting on the bond and pursuing their claims in litigation.

1037. Accordingly, Nordic Trustee is not pursuing claims or damages on behalf of itself, but rather on behalf of the 2013 bondholders.

1038. Plaintiffs Moneda and HBK are 2013 Bondholders represented by Nordic Trustee.

1039. Nordic Trustee represents other 2013 Bondholders not included as Plaintiffs in this action and whom Plaintiffs' counsel does not represent.

1040. On information and belief, the 2013 Bondholders represented by Nordic Trustee that are not Plaintiffs in this action received similar information and documents as Moneda and HBK and, based on such information and documents, invested or maintained their investment in OSA between 2013 and 2014.

1041. On information and belief, had the 2013 Bondholders learned about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls; and (4) the ongoing fraud, it would have not have invested or continued to invest in the 2013 Bonds and taken action to mitigate their losses.

1042. For the same reasons as Citigroup committed fraud against Moneda and HBK, and conspired with and aided and abetted OSA in committing fraud against Moneda and HBK, in connection with the 2013 Issuance (*see supra* at Section XIV.L; Section XIV.J, Citigroup committed fraud against and aided and abetted OSA in committing fraud against the 2013 Bondholders.

### 2. Nordic Trustee Delayed Taking Actions on Behalf of the 2013 Bondholders Based on Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA

#### *a. Overview*

1043. In approximately June or July 2013, OSA approached Nordic Trustee to request that it act as trustee for the 2013 Bond Issuance. After lengthy discussions with OSA and Pareto, Nordic Trustee agreed.

1044. As described *infra* at ¶¶ 348–49, as trustee of the 2013 Bond Issuance and pursuant to the 2013 Bond Agreement, Nordic Trustee had the right to (1) declare an event of default on account of a fraud (and other events); (2) seek immediate payment of the bonds; and (3) take other enforcement actions to protect the 2013 Bondholders.

1045. In reliance on the fraudulent misrepresentations and material omissions by Citigroup and OSA more fully described below, Nordic Trustee did not execute enforcement actions against OSA until after its collapse in late February 2014.

1046. The earlier Nordic Trustee learned accurate information about OSA's true financial condition and the fraudulent use of the cash advance facility by Citigroup and OSA, the greater the recovery Nordic Trustee would have been able to make on behalf of the 2013 Bondholders.

1047. Because Nordic Trustee did not learn accurate information until OSA had collapsed, its collection efforts were insufficient to mitigate the losses suffered by the 2013 Bondholders or to make the 2013 Bondholders whole.

#### *b. Summary of Fraudulent Misrepresentations and Material Omissions*

1048. In agreeing to serve as trustee for the 2013 Bondholders and in the performance of its duties between 2013 and 2014, Nordic Trustee relied on ***fraudulent misrepresentations*** by (1) Citigroup in materials provided by OSA and Pareto to Nordic Trustee, which (a) necessarily

incorporated information provided by Citigroup as fiduciary of the Mexican Trust and OSA's banker; and (b) were distributed to current and potential creditors and investors in OSA, such as Nordic Trustee and the 2013 Bondholders ; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to creditors and investors like Nordic Trustee and the 2013 Bondholders.

1049. Specifically, Citigroup (through the Pareto Materials and December 2013 Presentation) represented to Nordic Trustee—and substantially assisted OSA in representing—that OSA (1) was financially secure, including because of its Pemex contracts and the stability and reliability of the cash advance facility; (2) was supported by Citigroup, including in its role as fiduciary of the Mexican Trust through the ICG and Banamex in connection with the 2013 Bond Issuance; (3) the 2013 Bonds were secure, including because of the Waterfall Structure (*see supra* at ¶ 313);and (4) OSA had positive profit projections indicating that OSA was a good investment.

1050. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure; (2) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; (3) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA's principals; (4) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (5) there was a revolving door of former Citigroup employees taking key positions in OSA; and (6) in

August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012 (*see supra* at Sections I, VI, and XIII).

1051. In agreeing to serve as trustee for the 2013 Bondholders and in the performance of its duties between 2013 and 2014, Nordic Trustee also relied on ***material omissions*** by (1) Citigroup in (i) communications with Nordic Trustee, (ii) materials prepared by Pareto and others that incorporated information provided by Citigroup and with Citigroup's knowledge that they would be distributed to potential creditors and investors like Nordic Trustee and the 2013 Bondholders, and (iii) through its role as fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance; and (2) OSA—with Citigroup's knowledge and substantial assistance—including Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to Nordic Trustee and the 2013 Bondholders. Specifically, Citigroup omitted (in the Pareto Materials and December 2013 Presentation)—or substantially assisted OSA in omitting—the following information from communications made to and materials shared with Nordic Trustee and the 2013 Bondholders: (1) the documentation submitted by OSA to ICG employees in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false and weak because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false and included false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable and propped up by false documentation. Omission of such information from

communications to and materials shared with Nordic Trustee and the 2013 Bondholders rendered them false, misleading and deceptive.

1052. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Nordic Trustee (and the 2013 Bondholders) and Pareto given (1) Citigroup and OSA's previous and ongoing representations to Nordic Trustee and Pareto between 2013 and 2014; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties (*see infra* at Section V); (ii) parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from the 2013 Bond Issuance and Nordic Trustee's implicit endorsement of the same through its role as trustee; (iv) Citigroup and OSA's awareness of Nordic Trustee's reliance on the false and misleading information in agreeing to serve as trustee and in performing its duties (including not executing enforcement actions and declaring events of default); and (v) Citigroup and OSA's participation in the fraud (*see supra* at Sections IV, VI, XIII, XIV(I)(3)–(7)).

1053. Citigroup also had a duty to speak and disclose this information to Pareto, the manager of the 2013 Bond Issuance, and Nordic Trustee, as trustee of the 2013 Bond Issuance, on account of its significant role as fiduciary of the Mexican Trust through the ICG and Banamex, but it failed to do so.

1054. Citigroup and OSA directly benefited from fraudulently inducing and luring the Nordic Trustee bondholders to invest, and maintain its investment in OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1055. Citigroup committed fraud against Nordic Trustee through the fraudulent misrepresentations and material omissions contained in the Pareto Materials and December 2013 Presentation, which were based on information provided by Citigroup and with Citigroup's

knowledge that OSA and Pareto would distribute the Materials and Presentation to Nordic Trustee and the 2013 Bondholders.

1056. Citigroup (1) was also aware of OSA's fraudulent misrepresentations and material omissions to Nordic Trustee and the 2013 Bondholders in the Pareto Materials, December 2013 Presentation, its financial statements, and its telephone conferences with bondholders; and (2) substantially assisted and aided and abetted OSA in making such misrepresentations and material omissions and committing fraud against Nordic Trustee and the 2013 Bondholders, as described *infra* at ¶¶ 1095–99.

1057. Citigroup and OSA directly benefited from fraudulently inducing and luring Nordic Trustee and the 2013 Bondholders to invest, and maintain their investment in, OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1058. Citigroup committed fraud against Noridc Trustee (and the 2013 Bondholders) through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with Nordic Trustee and the 2013 Bondholders, including those in the Pareto Materials, which were based on information provided by Citigroup and with Citigroup's knowledge that OSA and Pareto would distribute the Materials to potential creditors and investors in OSA including Nordic Trustee and the 2013 Bondholders.

1059. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's, fraudulent misrepresentations and material omissions to Nordic Trustee and the 2013 Bondholders (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in committing fraud against Nordic Trustee and the 2013 Bondholders, as described *infra* at ¶¶ 1095–99.

### 3. Nordic Trustee Relied on the Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA

1060. Had Nordic Trustee known about (1) OSA's true financial condition; (2) the false documentation submitted by OSA to ICG employees; (3) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (4) the ongoing fraud between Citigroup and OSA, Nordic Trustee would have immediately initiated enforcement actions to protect the 2013 Bondholders from incurring losses, as it did in 2014 upon public disclosure of the fraud (*see infra* at ¶ 1062.

1061. Due to the fraud and corresponding collapse of OSA, the 2013 Bondholders did not receive full payment of its principal or interest on the 2013 Bonds.

(a) Nordic Trustee's Post-Fraud Enforcement Actions

1062. Upon disclosure of the fraud at 5 p.m. on a Friday in 2014, Plaintiff Nordic Trustee immediately took drastic enforcement actions to mitigate losses to the 2013 Bondholders, which included (1) seizing the shares of the Goliath entity, installing its own board of directors at that entity, acquiring a crew for the Goliath vessel and removing it from Mexico the following day, a Saturday; (2) collecting the funds in the debt service account; (3) arranging additional bond issuances in 2014 and 2015 to pay for the enforcement actions; and (4) eventually transferring and selling the Goliath vessel at auction in the Bahamas.

1063. Nordic Trustee also serves as trustee of those subsequent bond issuances.

### 4. Negotiations Between OSA, Pareto, Nordic Trustee, and Others Relating to the Mexican Trust Agreement, the Term Sheet and 2013 Bond Agreement in Summer 2013

1064. Between on or about July 26, 2013, and on or about August 1, 2013, Nordic Trustee representatives participated in at least one conference call and a series of emails with OSA

principals, Pareto representatives, and others—approximately 25 different individuals—to discuss the draft term sheet and draft bond agreement for the proposed 2013 Bond Issuance (the "July Negotiations").

1065. The July Negotiations focused on the draft term sheet, including the process by which the Mexican Trust would collect the earnings for OSA charter contracts through the Mexican Trust. During the July Negotiations, the parties agreed to the following revisions to the term sheet: (1) the removal, in certain circumstances, of the client-consent requirement to transfer collection rights to vessel earnings from its corresponding Pemex contracts to the Mexican Trust; and (2) the addition of guarantees that all vessel earnings had to be received by the Mexican Trust before any money was distributed to OSA. In the relevant email chain, Pareto directed its counsel to make corresponding changes to the Mexican Trust Agreement to reflect the changes made to the term sheet.

1066. Between on or about August 7, 2013, and on or about August 26, 2013, Nordic Trustee engaged in additional discussions with OSA, Pareto, and others regarding the draft term sheet and bond agreement for the 2013 Bond Issuance, including during at least one conference call and in a series of emails. During these discussions, Nordic Trustee was an active participant, including by requesting revisions to ensure adequate protections for bondholders through the Mexican Trust.

1067. The resulting Mexican Trust Agreement, 2013 Bond Agreement, and Term Sheet for the 2013 Bond Issuance (described in detail *supra* at ¶¶ 337–39, 348–49, 360–64) reflected Nordic Trustee's comments and revisions.

1068. Accordingly, in agreeing to serve as trustee for the 2013 Bondholders and in performing its duties relating thereto, Nordic Trustee relied upon its understanding, as presented

(1) in these documents and the 2013 Preliminary Offering Memorandum (described *supra* at ¶¶ 320–24); and (2) by OSA and Pareto during the July and August negotiations, that the Mexican Trust, with Banamex as the fiduciary, would protect the 2013 Bondholders' investments in OSA.

1069. On information and belief, Citigroup, through its ICG, was (1) fiduciary of the Mexican Trust; and (2) a signatory to the Mexican Trust Agreement, was aware (1) of the negotiations between OSA, Pareto and Nordic Trustee between July and August 2013 relating to the 2013 Bond Issuance, including as to the Mexican Trust Agreement, 2013 Bond Agreement, and Term Sheet, including that revisions to the Mexican Trust Agreement stemmed from, in part, comments and edits by Nordic Trustee; and (2) that Nordic Trustee agreed to serve as trustee and approved the Agreements and Term Sheet based on its understanding that the Mexican Trust, including Banamex's role as fiduciary of the Trust, would protect the bondholders.

**5. Receipt of Pareto Materials Between July and December 2013**

1070. In or around mid-July 2013, Nordic Trustee was contacted by Pareto regarding a potential bond issuance for OSA.

1071. On or about July 29, 2013, Nordic Trustee received an email with a proposed term sheet and additional information about the proposed issuance. In particular, Pareto advised, "As this is a Mexican Charter and the client is Pemex, we have included a very special mechanism with a Mexican Trust set-up." The same day, Pareto emailed Nordic Trustee the Waterfall Structure and explained that the transaction would allow for a sub-charterer wholly owned by OSA.

1072. According to the Waterfall Structure and governing documents, Pareto advised that "i) a sub-charter contract will be entered into between the Parent and the sub-charterer for the use of any of the Vessels, (ii) the sub-charterer shall become a party to the Mexican Trust Agreement on the same terms as the Parent by way of an adhesion agreement and (iii) all collection rights or

earnings under any sub-charter contract shall be paid by the Fiduciary Bank [Banamex] to the Debt Service Account."

1073. The Nordic Trustee received additional Pareto Materials, described above (*see supra* at Section XIV(C)(2)) on several occasions between July and December 2013.[46] In particular, Nordic Trustee received the September 3, 2013 Preliminary Offering Memorandum, the September 3, 2013 Investor Presentation, as well as the final term sheet dated September 30, 2013.

1074. In the months leading up to September 2013, as described in detail *supra* at ¶¶ 311–15, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials. Accordingly, the Pareto Materials, including those received by Nordic Trustee, contained fraudulent misrepresentations and material omissions by Citigroup and by OSA.

1075. Citigroup knew that OSA and Pareto would provide the Pareto Materials to Nordic Trustee, due to its role as trustee of the 2013 Bond Issuance, and that Nordic Trustee would rely on the information contained therein when communicating with potential and current bondholders and executing its duties as trustee.

1076. As detailed *supra* at at ¶¶ 311–15, the Pareto Materials, including those documents received by Nordic Trustee, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure (*see supra* at at ¶¶ 313).

[46] On information and belief, OSA and Pareto sent materials to Nordic Trustee on August 2, 2013, September 4, 2013, September 9, 2013, September 23, 2013, September 27, 2013, October 21, 2013, October 28, 2013, and December 2, 2013.

Such representations were false because between July and December 2013, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Sections V to VI).

1077. In addition, the Pareto Materials, including those received by Nordic Trustee, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1078. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those whom OSA and Pareto provided the Pareto Materials, including Nordic Trustee) because (1) their failure to speak would render their prior representations to Nordic Trustee, including those between July and August of 2013 (*see supra* at ¶¶ 1064–69), false and misleading; (2) Citigroup and OSA were relying on Nordic Trustee's tacit endorsement of the 2013 Bond Issuance as trustee, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and (i) intentionally withheld such information from Pareto and Nordic Trustee, or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from the 2013 Bond Issuance and Nordic Trustee's unwitting endorsement of the Issuance as trustee; and (4) at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup and OSA's special knowledge of the fraudulent scheme also denied (i) Pareto the ability to sufficiently investigate OSA's finances before soliciting investments; and (ii) Nordic Trustee

the opportunity to take actions to protect the bondholders (e.g., declaring an event of default and seeking immediate payment).

1079. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise Nordic Trustee) on account of its role as fiduciary of the Mexican Trust and signatory to the Mexican Trust Agreement with Nordic, but it failed to do so.

1080. Had Nordic Trustee known about the fraudulent misrepresentations and material omissions by Citigroup and OSA in the Pareto Materials, including the ongoing fraud, it would have immediately taken action to protect the 2013 bondholders, including but not limited to declaring an event of default, seeking immediate payment, and taking steps to secure the Goliath, the Bond collateral. Nordic Trustee took no such action between August and December 2013, however, due to the fraudulent misrepresentations and material omissions by Citigroup and OSA in the Pareto Materials, which Citigroup and OSA knew would be provided to Nordic Trustee.

**6. Financial Statements and Bondholder Calls Between 2013 and 2014**

1081. In October 2013 and February 2014, Nordic Trustee received, either directly from OSA or through OSA's website or the Investor's Site, OSA's financial statements, as was required by the 2013 Bond Agreement (*see supra* at ¶ 350).[47]

---

[47] On information and belief, each of the 2013 Bondholders received and relied upon these financial statements when purchasing and retaining bonds from the 2013 Bond Issuance, which contained fraudulent misrepresentations and material omissions by OSA, with Citigroup's knowledge and substantial assistance as described *supra* at ¶¶ 372–75. For the same reasons as discussed with respect to Moneda and HBK (*see supra* at Sections XIV(J) and XIV(L)), Citigroup aided and abetted OSA in committing fraud against the 2013 Bondholders based on the fraudulent misrepresentations and material omissions in OSA's financial statements.

1082. In October 2013 and February 2014, Nordic Trustee also participated in bondholder calls with OSA. As noted above, OSA was required to hold bondholder calls per the 2013 Bond Agreement.[48]

1083. OSA did not disclose in either the financial statements or the bondholder calls its (1) false financial projections; (2) the false documentation OSA submitted to ICG employees; (3) the false and weak controls over the cash advance facility; and (4) the ongoing fraud with Citigroup.

1084. In 2013, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role as fiduciary of the Mexican Trust through the ICG and Banamex; (3) role in restructuring OSA's debt (*id.*, at ¶¶ 1095–99); and (4) participation in the fraud, Citigroup was aware that OSA, in its financial statements and bondholder calls with Nordic Trustee, was making material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 1095–99, Citigroup aided and abetted and substantially assisted OSA in making these material omissions to Nordic Trustee between October 2013 and February 2014.

1085. With knowledge of OSA's material omissions in the financial statements OSA distributed between October 2013 and February 2014 and bondholder calls OSA held between October 2013 and February 2014 , Citigroup, as fiduciary of the Mexican Trust through the ICG

---

[48] On information and belief, the 2013 Bondholders participated in and relied upon the information provided in the bondholder calls when purchasing and retaining their bonds from the 2013 Bond Issuance, which contained material omissions by OSA, which were made with Citigroup's knowledge and substantial assistance as described *supra* at ¶ 1085.

and Banamex, had a duty to speak and disclose the omitted information to Nordic Trustee and the 2013 Bondholders, but Citigroup failed to do so.

1086. Citigroup, as the fiduciary of the Mexican Trust through the ICG and Banamex, had a duty to speak and disclose the omitted information described above to Nordic Trustee. Citigroup, as the fiduciary of the Mexican Trust, should have disclosed the information and spoken fully, but it failed to do so.

1087. Nordic Trustee relied on the material omissions in OSA's financial statements and bondholder calls between October 2013 and February 2014, which were made with Citigroup's knowledge and substantial assistance, when not declaring an event of default or executing other enforcement actions on OSA, until the 2014 disclosure of the fraud.[49]

**7. Receipt of December 2013 Presentation**

1088. On December 2, 2013, Nordic Trustee received the December 2013 Presentation.[50]

1089. As discussed above (*see supra* Section XIII(H)(2)), Citigroup assisted OSA in preparing the December 2013 Presentation and was aware that OSA was providing the Presentation to current and potential investors such as the 2013 Bondholders as well as Nordic Trustee.

[49] On information and belief, the 2013 Bondholders also attended a meeting in Mexico City in November 2013 organized by OSA and relied upon the information provided therein by OSA regarding its financial health when purchasing and retaining their 2013 bonds.

[50] On information and belief, each of the 2013 Bondholders received and relied upon the December 2013 Presentation, which contained fraudulent misrepresentations and material omissions by Citigroup and OSA, as described *supra* at ¶¶ 239–42. For the same reasons discussed with respect to Moneda and HBK (*see supra* at *see supra* at Sections XIV(J) and XIV(L)), Citigroup committed fraud and aided and abetted OSA in committing fraud against the 2013 Bondholders based on the fraudulent misrepresentations and material omissions in the December 2013 Presentation.

1090. In addition, the Citigroup logo on the December 2013 Presentation suggested that a highly regarded international financial institution had (1) reviewed the information contained therein; (2) conducted their own due diligence; and (3) validated the accuracy of the information set forth in the Presentation.

1091. The December 2013 Presentation omitted any discussion about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). These omissions rendered OSA and Citigroup's representations about the financial strength of OSA, including as to its cash flow and liquidity, misleading and deceptive given that the cash advance facility was critical to the survival of OSA.

1092. Citigroup and OSA had a duty to speak and disclose this information to Nordic Trustee because (1) their failure to speak would render prior representations to Nordic Trustee and the 2013 Bondholders false and misleading; (2) Nordic Trustee was the trustee of the 2013 Bond Issuance; (3) Citigroup and OSA were seeking investments in and continued support of OSA from new and current investors including by relying upon the tacit endorsement of the 2013 Bond Issuance by Nordic Trustee, from which OSA and Citigroup would receive a financial benefit (e.g., increased liquidity and contracts with Pemex for OSA and increased fees and interest for Citigroup through the cash advance facility and Mexican Trust); (4) Citigroup and OSA knew this information and intentionally withheld it to receive the financial benefit from the 2013 Bondholders' investment; (5) Citigroup and OSA knew the omitted material facts, and also knew that Nordic Trustee would rely on the omitted facts when deciding not to notice a default or execute an enforcement action; and (6) the fraudulent scheme between Citigroup and OSA was well underway at this time.

1093. Furthermore, Citigroup, as the fiduciary of the Mexican Trust through the ICG and Banamex and a signatory to the Mexican Trust Agreement, had a duty to speak and disclose the omitted information described above to Nordic Trustee. Citigroup, as fiduciary and signatory, should have disclosed the information and spoken fully, but it failed to do so.

1094. Nordic Trustee relied on the fraudulent misrepresentations and material omissions by Citigroup and OSA in the December 2013 Presentation when not declaring an event of default or executing other enforcement actions on OSA, until the 2014 disclosure of the fraud.

**8. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Nordic Trustee and the 2013 Bondholders**

1095. Citigroup committed fraud against Nordic Trustee and the 2013 Bondholders, through its it's ththe fraudulent misrepresentations and material omissions between 2013 and 2014 in the (1) Pareto Materials; and (2) December 2013 Presentation, which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors, and bondholders, including Nordic Trustee., which included false and misleading information provided by Citigroup with Citigroup's knowledge that they would be provided to current and potential investors in OSA and Nordic Trustee, committed fraud against Nordic Trustee and the 2013 Bondholders.

1096. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant) in communications and materials shared with Nordic Trustee and the 2013 Bondholders between 2013 and 2014, including in the Pareto Materials, December 2013 Presentation, financial statements, and bondholder calls.

1097. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like Nordic Trustee on account of its (1)

participation in the fraud (*see supra* Section VI); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

1098. With knowledge of OSA's fraudulent misrepresentations and material omissions to Nordic Trustee and the 2013 Bondholders, Citigroup directly participated in and aided and abetted and substantially assisted OSA in committing fraud against them, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in the financial statements, Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA and Pareto in these communications and materials.

1099. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 9. The 2013 Bondholders Suffered Injury Due to OSA and Citigroup's Fraudulent Misrepresentations and Material Omissions

1100. On information and belief, when purchasing and retaining their bonds from the 2013 Issuance, the 2013 Bondholders relied on the fraudulent misrepresentations and material omissions. Specifically:

1101. (1a) Citigroup, in the Pareto Materials, (1) made fraudulent misrepresentation and material omissions to Nordic Trustee; and (2) aided and abetted OSA to make fraudulent misrepresentations and omissions to Nordic Trustee (described *supra* at ¶¶ 1095–99); and

1102. (b) Citigroup, in the December 2013 Presentation, which Nordic Trustee received in December 2013 (1) made fraudulent misrepresentation and material omissions to Nordic Trustee; and (2) aided and abetted OSA to make fraudulent misrepresentations and omissions to Nordic Trustee (described *supra* at ¶¶ 1095–99);

1103. (c) Citigroup aided and abetted OSA in making material omissions to Nordic Trustee in financial statements (described *supra* at ¶¶ 1095–99); and

1104. (d) Citigroup aided and abetted OSA in making material omissions to Nordic Trustee in October 2013-February 2014 bondholder calls (described *supra* at ¶¶ 1095–99).

1105. In other words, on information and belief, the 2013 Bondholders would not have invested or continued to invest in OSA had they known about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; or the (4) ongoing fraud.

1106. Upon OSA's collapse, which was caused by (1) Citigroup's intentional failure to implement controls over the cash advance facility; and (2) the fraud, the 2013 bonds lost their value and the 2013 Bondholders stopped receiving interest payments on these bonds.

1107. OSA's failure to make interest payments to the 2013 Bondholders amounted to a default under the 2013 Bond Agreement and entitled the 2013 Bondholders to full repayment of the principal and interest on the bonds from the 2013 Bond Issuances.

1108. The 2013 Bondholders have not received payment of their principal and interest on the bonds it purchased in connection with the 2013 Bond Issuances.

1109. Between October 2013 and February 2014, the Nordic Trustee did not declare an event of default, demand immediate payment of the bonds, or take other enforcement actions to protect the bondholders, in reliance upon fraudulent misrepresentations and material omissions by: (1) Citigroup in the Pareto Materials and the December 2013 Presentation, which included false and misleading information provided by Citigroup with Citigroup's knowledge that they would be provided to current and potential investors in OSA; and (2) OSA in the Pareto Materials, December 2013 Presentation, financial statements, and October 2013-February 2014 bondholder calls, which OSA made with Citigroup's knowledge and substantial assistance.

1110. Had the Nordic Trustee learned the truth about OSA's financial condition or the fraudulent operation of the cash advance facility between October 2013 and February 2014, it would have declared an event of default, demanded immediate payment of the bonds and/or executed other enforcement actions to protect the 2013 Bondholders' interests before OSA's collapse and the seizure of its assets and forced bankruptcy by the Mexican government; thereby reducing the bondholders' loss.[51]

---

[51] Through the Nordic Trustee's efforts to mitigate the 2013 Bondholders' losses described *supra* at ¶¶ 1046–47, many if not all of the 2013 Bondholders now hold 2014 and 2015 bonds related to the purchase of the Goliath—approximately $200 million in bonds. Such efforts have not made the 2013 Bondholders whole. Under the contracts governing the 2014 and 2015 Bond Issuances, Nordic Trustee serves as trustee, acts on behalf and represents the interests of all the 2014 and 2015 bondholders, and is responsible for enforcing the bondholders' rights, including through litigation.

1111. As soon as Nordic Trustee learned the truth of OSA's financial condition and Citigroup and OSA's fraudulent operation of the cash advance facility, it undertook extreme measures to salvage whatever value it could on behalf of the 2013 Bondholders, as described above. Had Nordic Trustee learned earlier, it would have been able to mitigate the 2013 Bondholders' losses and collect on the bonds before the Mexican government seized OSA's assets and made them unreachable.

**N. <u>Waypoint</u>**

**1. Overview**

1112. Waypoint holds bonds from the 2008 Bond Issuance, which it acquired in several trades between 2013 and 2014. Specifically, Waypoint's fund acquired bonds from the 2008 Issuance on: (1) May 13, 2013; (2) May 14, 2013; (3) May 15, 2013; (4) June 13, 2013; (5) June 19, 2013; (6) June 26, 2013; (7) August 21, 2013; (8) January 21, 2014; (9) February 12, 2014; and (10) February 13, 2014. Waypoint retained the majority of its bonds from the 2008 Bond Issuance through OSA's collapse in 2014 and continues to hold those bonds today.

1113. In 2013, OSA targeted Waypoint to purchase bonds in the 2013 Bond Issuance. Waypoint ultimately did not purchase any 2013 bonds, but retained its previous investment in 2008 bonds in reliance upon information and documents received in connection with the 2013 Bond Issuance, as described *infra* ¶¶ 1167-68.

1114. Waypoint purchased and retained the 2008 bonds, including through the period of the fraud, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup, through the Pareto Materials and December 2013 Presentation, both of which (i) included information provided by Citigroup; and (ii) were distributed to current and potential investors in OSA including Waypoint with Citigroup's knowledge; and (2) OSA, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false

and misleading information circulated by OSA and Pareto to current and potential investors, including Waypoint.

1115. Specifically, Citigroup (through the Pareto Materials and December 2013 Presentation) represented—or substantially assisted OSA in making representations—that OSA (1) was financially secure, including because of the stability and reliability of the cash advance facility; (2) was supported by Citigroup including because Citigroup served as trustee and collateral agent of the 2008 Bond Issuance and the fiduciary of the Mexican Trust; and (3) had positive profit projections.

1116. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure, including because (i) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; and (ii) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA; (2) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (3) there was a revolving door of former Citigroup employees taking key positions in OSA; and (4) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012.

1117. Waypoint also purchased and retained the 2008 bonds, including through the period of the fraud, in reliance on ***material omissions*** by (1) Citigroup, through (the Pareto Materials and December 2013 Presentation), both of which included (i) omissions by Citigroup; and (ii) were

distributed to current and potential investors in OSA including Waypoint with Citigroup's knowledge; and (2) OSA, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false and misleading information circulated by OSA and Pareto to current and potential investors, including Waypoint.

1118. Specifically, Citigroup omitted—or substantially assisted OSA in omitting—the following information from communications and materials shared with Waypoint, whether directly or through OSA and Pareto, which rendered them false, misleading and deceptive: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable and propped up by false documentation.

1119. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Pareto, manager of the 2013 Bond Issuance, and Waypoint given (1) their prior representations in communications with and documents provided to Pareto and Waypoint; and (2) (i) the close relationship between Citigroup and OSA; (ii) the parties' relative access (or lack thereof) to the omitted information; (iii) the benefits derived by Citigroup and OSA from Waypoint's investment; (iv) Citigroup's and OSA's awareness of Waypoint's reliance on the

false and misleading information in the materials provided by OSA and Pareto to Waypoint; and (v) Citigroup's and OSA's participation in the fraud (*infra* ¶¶ 1162-66).

1120. Citigroup also had a duty to speak and disclose this information to Pareto and investors such as Waypoint on account of its roles as (1) trustee of the 2008 Bond Issuance through its banking arm Citibank; (2) collateral agent of the 2008 Bond Issuance through Banamex; and (3) fiduciary of the Mexican Trust through the ICG and Banamex.

1121. Citigroup and OSA directly benefited from fraudulently inducing and luring Waypoint to invest, and maintain its investment in OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1122. Citigroup, through the fraudulent misrepresentations and material omissions contained in the Pareto Materials and December 2013 Presentation, committed fraud against Waypoint.

1123. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to Waypoint and aided and abetted OSA as well as participated in committing fraud against Waypoint, on account of its knowledge and substantial assistance as described *infra* ¶ 1165.

1124. Had Waypoint known about (1) OSA's true financial situation; (2) the false and weak controls of the cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, Waypoint would not have purchased or retained the 2008 Bonds between 2013 and 2014.

1125. Due to the fraud and corresponding collapse of OSA, Waypoint has not received payment of its principal or interest on the 2008 bonds, and the bonds are currently worthless.

**2. Initial Contact Between Waypoint and OSA in January 2008**

1126. The week of January 21, 2008, Mr. Yáñez met Gonzalo Romero of Waypoint at the J.P. Morgan Global High Yield & Leveraged Finance Conference in Miami, Florida. Mr. Yáñez stated that he was "looking to sell Oceanografía" and that it was "worth over $1 billion." Mr. Yáñez also emphasized that OSA had numerous vessels and that it was a "good business" with just a "bad cash flow" given the time between OSA's work for Pemex and receiving payment for that work.

**3. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to Waypoint's Purchase and Retention of the 2008 Bonds**

*a. OSA Presentation and Meeting in May 2013*

1127. On May 9, 2013, at a BBVA Bancomer investor conference in New York, Jorge Betancourt, Head of Investor Relations for OSA, delivered a presentation entitled "Corporate presentation" to Jose Pedreira of Waypoint and other attendees (the "May 2013 Presentation"), which included fraudulent misrepresentations and material omissions by OSA about the financial viability of OSA, including as to the strength of OSA's relationship with Pemex and the role of the cash advance facility in providing OSA with sufficient liquidity.

1128. In the Presentation, OSA asserted, among other things, that the amounts advanced by Banamex to OSA under the cash advance facility, and which Pemex had not yet paid Banamex, should not be considered an OSA debt or liability because Pemex ultimately would pay Banamex on those invoices pursuant to its contracts with OSA. Specifically, the May 2013 Presentation included a slide with "OSA's DEBT" that classified a $265 million debt to Banamex as "Off Balance Sheet Debt," stating that "Banamex factoring should not be debt with cost."

1129. The May 2013 Presentation also showed OSA's debt with Banamex significantly decreasing over time, when in reality the exact opposite occurred. Specifically, the Presentation

showed OSA's debt with Banamex decreasing from $265 million in July 2012 to $108 million by the beginning of 2014, when instead it nearly tripled to $750 million by that time (*see supra* x-x).

1130. The following day, on May 10, 2013, Mr. Yáñez met with Mr. Pedreira and represented that Banamex was expediting cash advances to OSA based on Pemex contracts (the "May 2013 Meeting"). Specifically, Mr. Yáñez stated that OSA expected more Pemex contracts and was "getting Banamex to discount and monetize those contracts earlier."

1131. However, as of May 2013, Citigroup and OSA were involved in a fraudulent scheme, which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow (*supra* Sections V to VI). In addition, in the May 2013 Presentation and May 2013 Meeting, OSA omitted any reference to: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*id.*). These omissions rendered OSA's representations in the May 2013 Presentation and May 2013 Meeting false and misleading.

1132. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to Waypoint false and misleading; (2) OSA was encouraging Waypoint and other investors to invest in OSA; (3) OSA was aware of the omitted information and intentionally withheld it to receive the financial benefit from Waypoint's investment (e.g., increased liquidity and contracts with Pemex); (4) OSA was aware of the omitted material facts and also knew that Waypoint would rely on the omitted facts when determining whether to invest in OSA; and (5) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Waypoint the ability to sufficiently investigate OSA's finances before investing.

1133. In May 2013, given Citigroup's (1) close relationship with OSA (*supra* Section XIII); (2) role in restructuring OSA's debt (*supra* Sections V to VI); and (3) participation in the fraud, Citigroup was aware that OSA, in communications to and materials shared with current and potential investors including Waypoint, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* ¶ 1165, Citigroup aided and abetted and substantially assisted OSA in making these fraudulent misrepresentations and material omissions to Waypoint in May 2013.

1134. With knowledge of OSA's fraudulent misrepresentations and material omissions in May 2013 to current and potential investors such as Waypoint, Citigroup, as trustee and collateral agent of the 2008 Bond Issuance, had a duty to speak and disclose the omitted information to the 2008 Bondholders and potential investors, but Citigroup failed to do so.

1135. When purchasing and maintaining its 2008 bonds between May 2013 and September 2013, Waypoint relied on (1) OSA's fraudulent misrepresentations and material omissions in the May 2013 Presentation and May 2013 Meeting, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*infra* ¶ 1165); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance, regarding (i) OSA's false financial projections; (ii) the false documents submitted by OSA to ICG employees, (iii) the false and weak controls of the cash advance facility, and (iv) the ongoing fraud.

*b. Discussions Between Waypoint and Pareto in September 2013*

1136. In September 2013, Mr. Romero of Waypoint attended an investor conference in New York relating to OSA's 2013 Bond Issuance (the "September 2013 Investor's Conference") and listened to a presentation by Pareto and reviewed the Pareto Materials.

1137. During the September 2013 Investor's Conference, Mr. Romero spoke with a Pareto sales representative and expressed his concern about OSA's ability to honor its obligations under the 2008 Bond Issuance in light of its new obligations under the 2013 Bond Issuance. In response to Mr. Romero's concerns, the Pareto sales representative reassured Mr. Romero of the positive aspects of the 2013 Bond Issuance (e.g., the Mexican Trust Agreement, Waterfall Structure, and Banamex's role as the fiduciary of the Mexican Trust) which purportedly would protect both the 2013 Bondholders as well as the 2008 Bondholders.

1138. At this time, however, Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the (1) cash advance facility; (2) the Mexican Trust and (3) the Waterfall Structure emphasized by Pareto as a basis to invest in the 2013 Bonds. But, at no point during Mr. Romero's discussions with Pareto, did Pareto disclose (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1139. As described in detail above, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order for Pareto to solicit investors and prepare the Pareto Materials. Accordingly, as detailed above, the Pareto Materials (and presentations relating thereto) contained fraudulent misrepresentations and material omissions by Citigroup and by OSA.

1140. Citigroup (and OSA) were aware, as described *supra* at ¶¶ 311-47, that OSA and Pareto intended to provide the Pareto Materials (and make presentations based thereon) to

creditors, vendors and bondholders of OSA in order to (1) demonstrate OSA's continued financial viability; (2) instill confidence in OSA's ability to repay its debts; and/or (3) solicit further investment in OSA.

1141. As detailed above, the Pareto Materials (and presentations based thereon), including those documents received by Waypoint, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure.

1142. Such representations were false because in 2013, as Citigroup (and OSA) knew: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*supra* Sections V to VI).

1143. In addition, the Pareto Materials (and presentations based thereon), including those received by Waypoint, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1144. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those whom OSA and Pareto provided the Pareto Materials and made presentations relating thereto, including Waypoint) because (1) their failure to speak would render their representations in the Pareto Materials (and related presentations) false and misleading; (2) Citigroup and OSA were soliciting investments in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup); (3) Citigroup and OSA knew this information and, on information

and belief, (i) intentionally withheld such information from Pareto and investors like Waypoint, or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from Waypoint's investment; (4) and at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup and OSA's special knowledge of the fraudulent scheme also denied Pareto (and Waypoint) the ability to sufficiently investigate OSA's finances.

1145. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise Waypoint) on account of its roles as trustee and collateral agent of the 2008 Bond Issuance and as fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance, but it failed to do so.

1146. When retaining its bonds from the 2008 Issuance in 2013, Waypoint relied on the (1) fraudulent misrepresentations and material omissions by Pareto in its presentation during the September 2013 Investor's Conference and discussions with Mr. Romero that same day, and in the Pareto Materials, all of which were based on false and misleading information provided by Citigroup to Pareto and which Citigroup knew Pareto was going to communicate to Waypoint; and (2) Citigroup's omissions to Waypoint as trustee of the 2008 Bond Issuance and fiduciary of the Mexican Trust.

*c. Telephone Conference with OSA in September 2013 Regarding Late Coupon Payments*

1147. As described above, OSA routinely made interest payments to the 2008 Bondholders at the end of the grace period.

1148. In September 2013, Mr. Betancourt of OSA held a telephone conference with Mr. Romero of Waypoint regarding OSA's untimely interest payments. Mr. Betancourt assured Mr. Romero that OSA was financially secure and would make its coupon payments, telling him "don't

worry, Oceanografia will pay" based on its "short term receivable discount facility with Banamex that it used for regular cash flow."

1149. Such representations were false and misleading, as Citigroup and OSA knew: (1) OSA was submitting false documents to ICG employees; (2) the cash advance facility lacked sufficient controls, including because Citigroup had abdicated responsibility for validating OSA's documentation; and (3) Citigroup and OSA were involved in a fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1150. At no point during this telephone conference with Waypoint (or in subsequent communications with Waypoint) did OSA advise of the following: (1) its false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the weak controls of the cash advance facility; and (4) the ongoing fraud. Such omissions rendered OSA's representations about its financial health and ability to pay interest on the 2008 bonds false and misleading.

1151. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its prior and ongoing representations to the 2008 Bondholders (including Waypoint) false and misleading; (2) it was seeking support and patience from the bondholders relating to the untimely interest payments, from which OSA would receive a financial benefit from Waypoint's continued investment; (3) OSA had full access to and was aware of the omitted material facts, and also knew that Waypoint would rely on the omitted facts when determining whether to maintain its fund's investments or continue investing in OSA; and (4) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of the fraud also denied Waypoint the ability to sufficiently investigate OSA's finances prior to investing or continuing to invest.

1152. Citigroup was aware that OSA was misrepresenting its financial health, including its ability to make coupon payments and the restructuring of the 2008 Bond Issuance, to holders of the 2008 bonds because of (1) its role as trustee and collateral agent of the 2008 Bond Issuance (through Citibank and Banamex respectively); and (2) its ongoing discussions with OSA and its external financial consultant. As described further below, Citigroup substantially assisted OSA in making fraudulent misrepresentations and material omissions to creditors and bondholders, including to Waypoint, in September 2013.

1153. Citigroup also had a duty to speak and disclose the omitted information to the 2008 Bondholders, including Waypoint, on account of its roles as trustee and collateral agent of the 2008 Bond Issuance, but it failed to do so.

1154. Waypoint relied on the following when retaining bonds from the 2008 Bond Issuance in 2013: (1) the fraudulent misrepresentations and material omissions by OSA in the September 2013 telephone conference with Waypoint, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*infra* ¶ 1610); and (2) Citigroup's omissions, as trustee and collateral agent of the 2008 Bond Issuance.

*d. OSA Management Presentation Prepared by Citigroup at December 2013 Investor Conference*

1155. On December 3, 2013, Jose Pedreira of Waypoint attended the December 2013 Presentation in Mexico City which, as described above, included fraudulent misrepresentations and material omissions by Citigroup and OSA about the financial viability of OSA, including information regarding the strength of OSA's relationship with Pemex and the role of the cash advance facility in providing OSA with sufficient liquidity.

1156. At this time, Citigroup and OSA were aware of the false documents submitted by OSA to ICG employees, the weak controls of the cash advance facility, and the ongoing fraud.

Accordingly, the discussion in the December 2013 Presentation regarding the strength of OSA's finances and the cash advance facility were false and misleading.

1157. As discussed above, Citigroup assisted OSA in preparing the December 2013 Presentation and was aware that OSA was providing the Presentation to current and potential investors such as Waypoint. In addition, the Citigroup logo on the December 2013 Presentation suggested that a highly regarded international financial institution had (1) reviewed the information contained therein; (2) conducted their own due diligence; and (3) validated the accuracy of the information set forth in the Presentation.

1158. The December 2013 Presentation omitted any discussion about the false documents submitted by OSA to ICG employees, the weak controls of the cash advance facility, or the ongoing fraud. These omissions rendered Citigroup's and OSA's representations about the financial strength of OSA, including as to its cash flow and liquidity, false and misleading given that the cash advance facility was critical to the survival of OSA.

1159. In addition, Citigroup and OSA had a duty to speak and disclose this information in the December 2013 Presentation because (1) their failure to speak would render their prior and ongoing representations to current and potential investors in OSA, including Waypoint, false and misleading; (2) they prepared the Presentation together in order to, among other things, solicit new investments in OSA, from which Citigroup and OSA would receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA, increased fees to Citigroup from Banamex's role as fiduciary of the Trust, and increased interest to Citigroup from the cash advance facility); (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from Waypoint's investment; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Waypoint would rely on the omitted facts

when determining whether to invest or continue investing; and (4) the fraudulent scheme between Citigroup and OSA was well underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied Waypoint the ability to sufficiently investigate OSA's finances prior to investing.

1160. Furthermore, Citigroup, as trustee of the 2008 Bond Issuance through its banking arm Citibank and fiduciary of the Mexican Trust through the ICG and Banamex, did not inform Waypoint of the omitted information. Citigroup, as trustee, should have disclosed the information and spoken fully and failed to do so.

1161. When purchasing and retaining bonds from the 2008 Issuance after December 2013, Waypoint relied on (1) the fraudulent misrepresentations and material omissions by Citigroup and OSA in the December 2013 Presentation; and (2) Citigroup's omissions as trustee of the 2008 Bond Issuance and fiduciary of the Mexican Trust. Indeed, after selling nearly 40% of its position in OSA's 2008 bonds on August 22, 2013 and January 10, 2014, Waypoint reacquired nearly the same amount of shares on January 21, 2014 and February 12-13, 2014 because it was so convinced that OSA was on the right path, including based on the December 2013 Presentation.

### 4. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Waypoint

1162. Citigroup committed fraud against Waypoint through the fraudulent misrepresentations and material omissions between in the (1) May 2013 Presentation and Meeting; (2) September 2013 Investor's Conference; (3) September 2013 Telephone Conference; (4) December 2013 Presentation; and (5) materials shared with, and communications made to, Waypoint between 2013 and 2014 by OSA, including those unwittingly made by Pareto which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge

that such information would be disseminated to OSA's creditors, vendors, and bondholders, including Waypoint.

1163. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions in communications and materials shared with Waypoint between 2013 and 2014, including those made in the (1) May 2013 Presentation and Meeting and (2) September 2013 Telephone Conference.

1164. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to investors like Waypoint on account of its (1) participation in the fraud (*supra* Sections V to VI); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*supra* Section IV).

1165. With knowledge of OSA's fraudulent misrepresentations and material omissions to Waypoint, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against Waypoint, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in the Pareto Materials, December

2013 Presentation and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA and Pareto in these communications and materials.

1166. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 5. Waypoint Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions

1167. When purchasing bonds from the 2008 Issuance and deciding not to sell their investment in such bonds between 2013 and 2014, Waypoint relied on the fraudulent misrepresentations and material omissions by Citigroup, and by OSA (including those unwittingly made by Pareto), which Citigroup aided and abetted on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup, in the May 2013 Presentation and Meeting, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to Waypoint (*supra* ¶ 1165);

(b) Citigroup, (1) through Pareto's communications made to and materials transmitted to Waypoint in September 2013 made fraudulent misrepresentations and material omissions to Waypoint; and (2) made material omissions to Waypoint in the September 2013 Investor's Conference (;

(c) Citigroup, in the September 2013 Telephone Conference, (1) made material omissions as trustee and collateral agent of the 2008 Bond Issuance and (2) aided and abetted OSA in making material omissions to Waypoint;

(d) Citigroup, in the December 2013 Presentation, (1) as trustee of the 2008 Bond Issuance and fiduciary of the Mexican Trust made material omissions to Waypoint and (2) made material omissions to Waypoint.

1168. In other words, Waypoint would not have invested or continued to invest in OSA had it known of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1169. Upon OSA's collapse, which was caused by (1) Citigroup's intentional failure to sufficiently control the cash advance facility; and (2) the fraud, Waypoint's bonds from the 2008 Bond Issuance lost their value and Waypoint stopped receiving interest payments on these bonds.

1170. OSA's failure to make interest payments to Waypoint amounted to a default under the 2008 Bond Indenture and entitled Waypoint to full repayment of the principal and interest on the bonds from the 2008 Bond Issuance.

1171. Waypoint has not received payment of their principal or interest on the bonds they purchased in connection with the 2008 Bond Issuance.

## XV. CITIGROUP'S AND OSA'S MISREPRESENTATIONS AND OMISSIONS CAUSED THE SHIPPING PLAINTIFFS' INJURIES

### A. Overview

1172. The Shipping Plaintiffs include Candies, De Hoop, Gulf, Halani and MADISA.

1173. As described herein, the Shipping Plaintiffs relied on fraudulent misrepresentations and material omissions by Citigroup and OSA when (1) negotiating with OSA about its late payments; (2) restructuring OSA's debt obligations; (3) entering into new agreements with OSA; (4) delaying the cancellation of their agreements with OSA; and (5) generally continuing to do business with OSA.

1174. Had the Shipping Plaintiffs know about (1) OSA's true financial condition; (2) the false documentation submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud, they would not have continued to do business with OSA and taken action against OSA to collect outstanding debts.

1175. Citigroup (1) committed fraud against the Shipping Plaintiffs in (i) communications with them; (ii) in communications by OSA's external financial consultant based on information provided to him by Citigroup and with Citigroup's knowledge that he would disseminate such information to the Shipping Plaintiffs; and (iii) in materials incorporating information provided by Citgroup and with Citigroup's knowledge that such materials would be distributed to OSA's creditors, like the Shipping Plaintiffs; and (2) conspired with and aided and abetted OSA in committing fraud against Shipping Plaintiffs, because Citigroup knew, as a (i) principal participant in the fraud, (ii) OSA's banker, and (iii) collateral agent and trustee of the Mexican Trust in connection with the 2008 and 2013 Bond Issuances, that OSA was making similar fraudulent misrepresentations and material omissions to its creditors, like the Shipping Plaintiffs, and substantially assisted OSA in doing so (as described *infra* at ¶¶ 1177-1615).

1176. Citigroup profited from the fraud against the Shipping Companies. Additional investments in OSA and the restructuring of its debt with key creditors, such as the Shipping Plaintiffs, brought additional capability and credibility to OSA, thereby enhancing OSA's ability to gain new contracts with Pemex and enabling Citigroup to extend additional cash advances and receive more interest. In addition, as trustee of several trusts for the benefit of OSA's creditors (e.g., Rabobank), Citigroup received additional fees. As noted above, on information and belief, Pemex made Citigroup whole and Citigroup never disgorged the Pemex payments (*supra* at ¶ 145).

Accordingly, Citigroup made hundreds of millions of dollars on the backs of the Shipping Plaintiffs and other Plaintiffs.

## B. Candies[52]

### 1. Overview

1177. Candies is a builder and supplier of ships for major oil and rigging companies internationally. Though historically based within the United States, in 2001, Candies decided to diversify the business by expanding into Mexico. Pursuant to this diversification strategy, Candies developed a relationship with Mr. Yáñez and soon Candies began leasing vessels to OSA for use by OSA in connection with its Pemex contracts.

1178. At the beginning of the parties' relationship, Candies considered entering into a joint venture with OSA, such that Candies and OSA would jointly own OSA. But, after due diligence, Candies elected not to follow through with the joint venture and pursued a more general business relationship with OSA in which Candies leased vessels to OSA for use by OSA in providing services to Pemex.

1179. Between approximately 2001 and 2014, Candies leased a total of 21 vessels to OSA, which OSA utilized to provide services to Pemex. During this period, OSA was Candies' largest client.

1180. Candies also took extraordinary and expensive measures to cultivate this relationship. Because Pemex had a policy of awarding contracts primarily to Mexican-owned and flagged vessels, Candies established a sub-entity in Mexico, Candies Mexican Investments

---

[52] For purposes of this Section XV B, references to Candies also include Candies' U.S. and Mexican legal counsel (respectively, Karl Zimmerman and Jorge Sepulveda), who frequently participated in meetings and telephone conferences on behalf of Candies.

(CMI),[53] to which it transferred ownership of various vessels thereby allowing those vessels to carry Mexican flags. Candies either (1) converted to Mexican flags its U.S.-flagged vessels; (2) purchased Mexican-flagged vessels; or (3) flagged new vessels under construction under Mexico. Candies did so for the benefit of OSA, so that OSA could more easily obtain contracts with Pemex utilizing the Candies vessels. Candies had never converted its vessels to a non-U.S. flag for any other client because doing so bans a vessel from becoming U.S.-flagged again, and thus, limits its use to outside of the United States. As a result, OSA was able to obtain additional Pemex contracts using Candies vessels.

1181. As another example of the lengths to which Candies went to develop and cultivate its relationship with OSA, Candies sought financing from third parties to purchase vessels it would lease to OSA, which was not its common business practice, and purchased vessels responsive to OSA's specific requirements. Additionally, one of the Candies owners spent extended periods of time in residence at OSA's headquarters from approximately 2005 to 2007 in order to monitor the vessels and their maintenance.

1182. Furthermore, after OSA stopped making lease payments in or around 2010 and accruing significant debt with Candies, Candies agreed to work with OSA on restructuring its debt, including by using OSA's cash advance facility to guarantee payments to Candies.

1183. Increasingly since 2008, OSA had continually missed its monthly payments on the leases of vessels from Candies. As a result, in or around 2011, Candies informed OSA that if payments were not made, it was willing to walk away from its business with OSA. As a result, OSA and Candies entered into discussions to restructure OSA's debt and on May 23, 2011 signed

53 CMI had no personnel and its management and funds were at all times controlled by Candies out of its Louisiana office.

a stock agreement that established an agreed-to repayment schedule. Within a few months of signing the stock agreement, OSA reneged on it, and requested a different structure to repay its debt to Candies. After negotiations including with Citigroup ICG employees, upon which Candies relied for their purported neutrality as a third-party, expertise and professionalism, OSA and Candies entered into a new restructuring agreement on August 14, 2012.

1184. Notwithstanding the August 14, 2012 restructuring agreement, OSA missed its payments to Candies in February 2013, August 2013, and January 2014. Relying on Citigroup and Banamex's representatives misrepresentations, Candies declined to take actions against OSA for these missed payments. As discussed further below, when agreeing to restructure OSA's debt and not taking action against OSA, Candies relied on representations by Citigroup and Banamex employees and OSA's external financial consultant that Banamex (through Citigroup's ICG), not OSA, controlled the cash advance facility and the cash flow to OSA.

### 2. Summary of the Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA to Candies Between 2011 and 2014

1185. As described below, Candies (1) continued to lease its vessels to OSA; (2) agreed to restructure OSA's debt; and (3) entered into several agreements with OSA, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup, including in meetings and telephone conferences with Candies and in communications made to and materials shared with Candies by OSA's external financial consultant; and (2) OSA (including those made by its external financial consultant), with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false information circulated by OSA and its external financial consultant to current and potential creditors, vendors and bondholders, including Candies.

1186. Specifically, Citigroup represented to Candies—or substantially assisted OSA (and its external financial consultant) in making representations to Candies—that OSA (1) was financially strong (including because of the stability and reliability of the cash advance facility and Citigroup's representations that it, not OSA, controlled the cash flow); (2) was supported by Citigroup; (3) had positive profitability projections; (4) would lease an increasing number of vessels from Candies; and (5) had sufficient cash flow to pay Candies under the lease agreements.

1187. Such representations were false because, as Citigroup (and OSA) knew: (1) Citigroup and OSA were engaged in a fraud involving the cash advance facility between 2008 (on information and belief) and 2014; (2) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA; (3) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (4) there was a revolving door of former Citigroup employees taking key positions in OSA; and (5) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012.

1188. Candies also (1) continued to lease its vessels to OSA; (2) agreed to restructure OSA's debt; and (3) agreed to enter into agreements with OSA, in reliance on ***material omissions*** by (1) Citigroup in meetings and telephone conferences with Candies and in communications made to and materials shared with Candies by OSA's external financial consultant; and (2) OSA (including those made by its external financial consultant), with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct

or revise the false information circulated by OSA and its external financial consultant to current and potential creditors, vendors and bondholders, including Candies.

1189. Specifically, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with Candies: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable, and propped up by false documentation. Omission of such information from Citigroup's and OSA's communications to and materials shared with Candies rendered them false, misleading and deceptive.

1190. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Candies because (1) their failure to speak would render their previous and ongoing representations to Candies, including in emails, agreements, and meetings, false and misleading; and (2) the following factors created a duty to speak: (i) the nature of the relationship between Citigroup, OSA and Candies; (ii) the parties' relative access (or lack thereof) to the omitted information; (iii) the benefits derived by Citigroup and OSA from the relationship with Candies; (iv) Citigroup's and OSA's awareness of Candies' reliance on the false and misleading

information; and (v) Citigroup's and OSA's participation in the fraud (*see supra* at Sections I and VI).

1191. Citigroup, through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with Candies, including those by OSA's external financial consultant based on the false and misleading information provided by Citigroup and with Citigroup's knowledge, committed fraud against Candies.

1192. Citigroup was also aware of OSA's fraudulent misrepresentations and material omissions to Candies (including those made by OSA's external financial consultant) and substantially assisted and aided and abetted OSA in making such misrepresentations and material omissions and committing fraud against Candies, as described *infra* at ¶ 1299).

1193. Citigroup and OSA directly benefited from fraudulently inducing and luring Candies to agree to enter into additional lease agreements with OSA, continue doing business with OSA, and/or provide concessions to OSA. in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1194. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's, fraudulent misrepresentations and material omissions to Candies (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in committing fraud against Candies, as described *infra* at ¶ 1297.

1195. Had Candies known about (1) OSA's true financial situation; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, it would not have entered into additional lease agreements with OSA, continued doing business with OSA, and/or provided concessions to OSA.

1196. Due to the fraud and corresponding collapse of OSA, Candies has been unable to recover the unpaid debt of approximately $120 million, and the loss of the use of the 21 vessels Candies leased to OSA, worth hundreds of millions of dollars.

### 3. Fraudulent Misrepresentations and Material Omissions in 2011 Relating to OSA's Debt to Candies

#### *a. Overview*

1197. Leading into 2011, Candies had leased 17 vessels to OSA. However, OSA had continually missed its monthly payments on the leases.

1198. Candies had developed concerns about OSA's financial status because of the missed lease payments. Over the course of the relationship, and with increasing frequency since 2008, OSA had paid its lease installments late, or with less than the amount owed. OSA's failure to pay contravened the lease agreements and entitled Candies to cancel the leases. And, in 2011, Candies was considering doing so. Candies informed OSA that if payments were not made, it was willing to walk away from its business with OSA.

1199. On April 25, 2011, Candies met with Mr. Yañez's personal attorney, Omar Olvera, to discuss mechanisms through which OSA could repay its debt, the payments OSA owed Candies, and the Pemex contracts assigned to Candies vessels. Candies expressed that it was significantly concerned that OSA had failed to pay its lease installments. Candies also expressed frustration and concern that it had no direct knowledge of the Pemex contracts assigned to its vessels, and as a corollary, the value of the contracts. Because the factoring structure advanced funds to OSA based on individual contracts, Candies understood that the value of contracts controlled OSA's ability to repay its leases. Candies informed Mr. Olvera that it wanted to see the updated contract log to make sure that Banamex's record of contracts matched what OSA told Candies about the number of contracts currently assigned to Candies vessels. Candies felt it was being kept in the

dark about the value of the contracts, and consequently whether OSA had the ability to pay its debts.

*b. Discussions With OSA's External Financial Consultant in April 2011*

1200. Around April 29, 2011, OSA's external financial consultant contacted Candies about the debt restructuring.

1201. Candies understood that OSA's external financial consultant worked directly with OSA and Banamex (and later understood that he also worked with Citigroup) to (1) help navigate the restructuring of OSA's debt with Candies (and others); and (2) design the terms of whatever final agreement Candies and OSA reached.

1202. Candies also understood that, because OSA's external financial consultant had personal relationships and worked closely with Citigroup and Banamex representatives, he could guarantee the support and cooperation of Banamex, which Candies viewed as being one and the same as Citigroup. The relationship between OSA's external financial consultant and Banamex provided comfort to Candies that the previously productive partnership between OSA and Candies would continue in the future and ultimately OSA's debt to Candies would be resolved.

1203. As part of the restructuring discussions in April 2011, OSA's external financial consultant informed Candies that he could provide them with access to income and cash flow from the cash advance facility to cover OSA's debt.

1204. At this time, as Citigroup and OSA knew, Citigroup and OSA were involved in a fraudulent scheme that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow and the very income source that OSA's external financial consultant and Banamex represented could be used to pay Candies.

1205. OSA's external financial consultant made these representations based on information obtained from Citigroup and OSA (*see supra* at Section ¶¶ 448-52). As noted above (*supra* at ¶ 458), OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including Candies.

1206. However, Citigroup and OSA purposefully concealed the following from Candies: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). Accordingly, OSA's external financial consultant did not inform Candies of this information during his communications with them in April 2011. These omissions rendered the representations made by OSA's external financial consultant to Candies in April 2011 misleading and deceptive.

1207. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant, and likewise Candies, because (1) their failure to speak would render their prior and ongoing representations to Candies about OSA's financial health and the stability and reliability of the cash advance facility false and misleading; (2) Citigroup, OSA. and OSA's external financial consultant were all working together to (i) restructure OSA's debt; and (ii) obtain support from OSA's creditors and bondholders, particularly Candies, for the proposed restructuring plans; (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from the continued lease of the Candies vessels (e.g.,

increased contracts with Pemex using the Candies vessels for OSA and increased interest from increased cash advances relating thereto for Citigroup ); (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Candies would rely on the omitted facts when determining whether to terminate its leases with OSA; and (5) Citigroup's and OSA's fraudulent scheme was underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied Candies the ability to sufficiently investigate OSA's finances prior to deciding whether to terminate its leases with OSA.

1208. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including Candies, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶ 1299, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Candies in April 2011.

1209. When deciding whether to terminate its leases in 2011, Candies relied on the fraudulent misrepresentations and material omissions made by (1) Citigroup, through OSA's external financial consultant in his discussions with Candies in April 2011, which were based on false and misleading information provided by Citigroup and with Citigroup's knowledge that the financial consultant would provide such information to creditors and vendors of OSA, particularly

Candies; and (2) OSA, through OSA's external financial consultant, which Citigroup aided and abetted on account of its knowledge and substantial assistance (as described *infra* at ¶ 1299).

*c. Fraudulent Misrepresentations and Material Omissions in Discussions with OSA, its External Financial Consultant, and Citigroup in May 2011*

1210. By May 10, 2011, Candies had run out of patience with OSA's continued broken promises to send its financial statements, contract log, and payments. Candies requested an immediate meeting with ICG employees, and told them and OSA that if a meeting was not set, Candies would terminate all contracts and sue for the balance owed. Candies also requested that OSA immediately provide the log of contracts assigned to Candies-owned vessels so that Candies could conclusively determine the number of Pemex contracts assigned to each Candies vessel and their value.

1211. On May 13, 2011, at OSA's office in Mexico City, Mexico, Candies met with (1) OSA's external financial consultant; (2) Mr. Ortega-Rivera, Head of Citigroup Cash Advances; (3) Emilio Granja, senior ICG executive; and (4) Messrs. Yáñez, and Olvera of OSA ("May 2011 Meeting"). The purpose of the May 2011 Meeting was to determine how OSA would pay its past-due lease payments and whether OSA would be able to purchase the vessels Candies currently leased to OSA after making the past-due payments.

1212. In the May 2011 Meeting, Citigroup, through the Citigroup/Banamex representatives, represented that it was helping OSA to restructure the debt it owed Candies. In response to Candies' concerns about delay, Citigroup, through the Citigroup/Banamex employees, and/or OSA also represented that restructuring negotiations would "speed up" after a pending meeting with Banamex. Citigroup, through the Citigroup/Banamex employees, and/or OSA further represented that OSA could not operate without Candies, and that OSA had a "moral obligation" to repay the debt.

1213. At this time, (1) OSA was submitting false documents to ICG employees in support of its cash advance requests; (2) the cash advance facility was failing due to false and weak controls; and (3) Citigroup and OSA were engaged in an ongoing fraud which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1214. At no point during the May 2011 Meeting did Mr. Granja, Mr. Ortega, or the OSA representatives advise Candies of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered the representations made by Citigroup and OSA on May 13, 2011 false and misleading.

1215. Citigroup and OSA had a duty to speak and disclose this information because (1) their failure to speak would render their prior and ongoing representations about OSA's financial position and the stability and reliability of the cash advance facility false and misleading; (2) OSA was trying to restructure its debt to and convince Candies not to cancel its leases, from which Citigroup and OSA would receive a financial benefit (e.g., increased contracts with Pemex for OSA and increased interest on cash advances for Citigroup flowing therefrom); (3) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of restructuring OSA's debt to Candies; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Candies would rely on the omitted facts when determining whether to renegotiate OSA's debt; and (5) the fraudulent scheme between Citigroup and OSA was underway by May 2011. Citigroup's and OSA's special knowledge of the fraud also denied Candies the ability to sufficiently investigate OSA's finances when considering whether to agree to restructure OSA's debt.

1216. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id*.); (3) participation in meetings with Candies and OSA; and (4) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including Candies, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶ 1299, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Candies in May 2011.

1217. When deciding whether to agree to restructure OSA's debt or cancel the leases entirely and sue for the balance owed, Candies relied on the fraudulent misrepresentations and material omissions in the May 2011 Meeting by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶ 1299).

*d. May 2011 Stock Agreement*

1218. By May 23, 2011, OSA owed Candies $140,980,676 in past due lease payments for vessels owned by Candies and its affiliates.

1219. On May 23, 2011, Candies and OSA signed a stock agreement that established an agreed-to repayment schedule ("May 2011 Stock Agreement"). The Agreement included information on the Pemex contracts assigned to the Candies' vessels and the payments from Pemex on those contracts. The Agreement also established a trust which would receive payments from Pemex on contracts assigned to Candies' vessels. The trust would then disburse payments to Candies, before paying OSA.

1220. In May 2011, as Citigroup and OSA were aware: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in an fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Sections I and VI).

1221. The May 2011 Stock Agreement omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered false and misleading OSA's representations in the Agreement that it had performant contracts assigned to the Candies vessels which generated money from Pemex and the implicit representation contained therein that OSA had sufficient cash flow to pay Candies.

1222. OSA had a duty to speak and disclose this information to Candies because (1) its failure to speak would render its representations in the May 2011 Stock Agreement false and misleading; (2) it was seeking to restructure OSA's debt and to lease additional vessels from Candies, from which OSA would receive a financial benefit (e.g., increased contracts with Pemex); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of the restructuring its debt with and leasing additional vessels from Candies; (4) OSA had full access to and was aware of the omitted material facts, and also knew that Candies would rely on the omitted facts when determining whether to restructure OSA's debt and enter into additional new lease agreements for additional vessels with OSA; and (5) the fraudulent scheme with Citigroup was well underway in 2011. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Candies the ability to sufficiently investigate OSA's finances prior to restructuring OSA's debt and entering into new contracts with OSA.

1223. Citigroup also had a duty to speak and disclose this information on account of its role as trustee of the trust, through its ICG, established in the May 2011 Stock Agreement, of which Candies was a beneficiary, but it failed to do so.

1224. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); (3) participation in meetings with Candies and OSA; and (4) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, particularly Candies, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶ 1299, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Candies in and relating to the May 2011 Stock Agreement.

1225. When deciding to enter into the May 2011 Stock Agreement, Candies relied on the material omissions by OSA in the May 23, 2011 Stock Agreement, including as to the Pemex contracts and stability and reliability of the cash advance facility, which Citigroup aided and abetted on account of its knowledge and substantial assistance (*see infra* at ¶ 1299).

### 4. Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA in Connection with the 2012 Candies Restructuring Agreement

#### *a. Overview*

1226. Within a few months of signing the May 2011 Stock Agreement, OSA reneged on the Agreement and requested a different structure to repay its debt to Candies.

1227. Ultimately, OSA and Candies entered into an agreement on August 14, 2012 (the "Candies Restructuring Agreement"), which required OSA to make monthly payments to Candies

of (1) $3,000,000 from September 10, 2012 to December 10, 2012; and (2) $4,166,700 from January 10, 2013 to January 10, 2016. After completing these payments, Candies would transfer title of the 21 vessels to OSA.

*b. Citigroup Played a Central Role in Candies Restructuring Agreement*

1228. After OSA reneged on the May 2011 Stock Agreement and sought a new restructuring plan with Candies, Candies informed OSA that, before negotiating a new restructuring agreement, OSA had to provide confirmation and guarantees of contract assignments from Pemex. And due to the continued non-payment, Candies required a trustworthy third party to oversee the remaining negotiations and final agreement, whatever form it would take, because Candies no longer trusted OSA and Mr. Yáñez.

1229. Candies therefore proposed that a respected financial institution participate in the restructuring process. The parties agreed that Citigroup was an ideal match given that Banamex already served as OSA's and Mr. Yáñez's bank; therefore Citigroup was perfectly positioned to assist in the restructuring.

1230. The presence of Citigroup in the restructuring negotiations, and their support for the restructuring of OSA's debt and of OSA itself, was material to Candies' decision to continue doing business with Mr. Yáñez and OSA.

1231. Candies was aware that Citigroup and Banamex had direct, extensive knowledge of OSA's financials.

1232. Had Citigroup and Banamex not (1) backed OSA; and (2) handled the restructuring, Candies would have terminated the lease agreements and sued for the remaining balance. Candies made this clear to OSA.

1233. Candies thus relied on Citigroup's and Banamex's neutrality, expertise and professionalism and trusted them to oversee and execute the restructuring with the same principles.

*c. Fraudulent Misrepresentations and Material Omissions Relating to the Candies Restructuring Agreement*

1234. On August 14, 2012, OSA's external financial consultant met with Candies and Mr. Yáñez at OSA's offices in Ciudad del Carmen to discuss restructuring OSA's debt (the "August 2012 Meeting"). During the August 2012 Meeting, OSA's external financial consultant provided Candies with OSA's 2010 and 2011 audited (by KPMG) financial statements and a financial analysis of OSA's projected financial health based on those audits.

1235. OSA's external financial consultant also told Candies that KPMG had issued a "clean" audit opinion, notwithstanding that in August 2012, Citigroup and OSA were involved in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow, of which Citigroup and OSA (but not its external financial consultant) were aware.

1236. Based on (1) the financial statements and analysis; (2) previous representations by OSA, its external financial consultant, and Citigroup about the company's financial health and security and the stability and reliability of the cash advance facility (*see supra* at Section XV B 3); and (3) Citigroup's support of and participation in the restructuring, Candies agreed to enter into the Candies Restructuring Agreement that same day.

1237. OSA failed to advise Candies of the following information in the August 2012 communications: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). These omissions rendered the representations made by OSA's external financial consultant to Candies in August 2012 (and all other times) false and misleading.

1238. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise Candies) because (1) their failure to speak would render false and misleading their prior and ongoing representations to OSA's external financial consultant and Candies false and misleading; (2) they were all working together to (i) restructure OSA's debt; (ii) obtain support for the proposed restructuring plan from Candies; and (iii) retain use of the Candies vessels so OSA could keep the Pemex contracts to which the vessels were assigned, from which Citigroup and OSA would receive a financial benefit (e.g., increased Pemex contracts for OSA and increased interest from the cash advance facility for Citigroup); (3) Citigroup and OSA had full access to this information and intentionally withheld it from OSA's external financial consultant and Candies to receive the financial benefit that came from retaining use of Candies vessels; (4) Citigroup and OSA had full access to and were aware of the omitted facts, and also knew Candies would rely on the omitted facts when determining whether to enter into the Restructuring Agreement; and (5) the fraudulent scheme was well underway at this time. Citigroup and OSA's special knowledge of the fraud also denied Candies the ability to sufficiently investigate OSA's finances prior to or during the restructuring.

1239. Candies relied on the material omissions made by Citigroup, through OSA's external financial consultant in August 2012, which were based on false and misleading information provided by Citigroup and with Citigroup's knowledge that OSA's external financial consultant would disseminate this information to OSA's creditors, vendors and bondholders, particularly Candies, when it agreed to continue its leases, and determined that it would not withdraw from the business relationship, and that it would enter into a restructuring agreement with OSA.

*d. Citigroup's September 14, 2012 Proposal Regarding the Trust*

1240. As negotiations about restructuring OSA's debt to Candies proceeded, the parties began discussing the concept of a trust structure through which funds derived from OSA's earnings on Pemex contracts assigned to Candies vessels would be kept in trust by a third party to ensure payment to Candies.

1241. In an email on September 14, 2012, Mr. Granja (a senior ICG employee)[54] attached a draft letter of instruction, which formed the basis of a subsequent mechanism through which the ICG would direct Banamex to transfer funds from OSA to Candies in the event OSA failed to pay what it owed. Copied on the email were employees ICG employees, specifically: Alfonso Ortega-Brehm, a senior ICG executive, Rene Lopez-Arevalo, Citigroup Cash Advance Product Analyst[55], and Juan Pablo Anorve Borquez, ICG's OSA-Citigroup Relationship Manager, who represented himself as "Banamex-Citi Corporate & Investment Bank".

1242. Implicit in this email and draft proposal was a representation by Citigroup that OSA's cash advance facility, the primary source of liquidity and cash flow for OSA and from which OSA would pay Candies, was stable, reliable, and controlled by Banamex (under the direction and control of Citigroup's ICG).

1243. At this time, as Citigroup and OSA knew: (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak (including because Citigroup was preparing to abdicate responsibility for validating OSA's cash advance documentation through the secret Regulatory Contract); and (3) Citigroup and OSA were

---

54 OSA's external financial advisor had previously introduced Mr. Granja as "Head of Corporate in Banamex-Citi" in an email on September 12, 2012.

55 Mr. Lopez-Arevalo used an email address including "[ICG-GTS"] electronic stamp.

engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Sections I and VI) and from which Candies would be paid.

1244. In his September 14, 2012 communications to Candies, Mr. Granja (and other Citigroup and Banamex representatives) omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive the September 14, 2012 emails and the implicit representations contained therein that OSA had sufficient cash flow to pay Candies.

1245. In an email on September 14, 2012 from Candies, which responded to Mr. Granja (a senior ICG employee) and copied Mr. Ortega-Brehm (a senior ICG employee), Ms. Lopez-Arevalo (an ICG employee), and Mr. Anorve (who represented himself as "Banamex-Citi Corporate & Investment Bank"), Candies asked about the trust structure Citigroup had proposed because it called for payments from Banamex to Candies only with "excess funds". Candies could not discern from the letter whether there were other creditors to whom OSA owed money, and as a corollary, whether there would be any excess funds from which OSA could make its required payments to Candies.

1246. In response, a Citigroup ICG or Banamex representative informed Candies that there were no additional creditors and promised Candies that the proposed trust structure would guarantee payments because it ensured that Candies would be paid before OSA. On or around this time, Banamex representatives also informed Candies that they, not OSA, controlled the cash advance facility and managed the money and cash flow. Candies considered this a significant representations and the negotiations proceeded.

1247. Citigroup had a duty to speak and disclose the omitted information described *supra* at ¶ 1244 because (1) its failure to speak would render its prior representations to Candies regarding OSA's financial projections and the stability and reliability of the cash advance facility false and misleading; (2) it was providing assurances to Candies to induce it to continue leasing its vessels to OSA, from which Citigroup would also receive a financial benefit (e.g., increased contracts with Pemex for OSA and increased interest on cash advances for Citigroup flowing therefrom); (3) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from OSA's continued relationship with Candies; (4) Citigroup had full access to and was aware of the omitted material facts, and also knew that Candies would rely on the omitted facts when determining whether to enter into agreements or continue doing business with OSA; and (5) the fraudulent scheme with OSA was well underway at this time.

1248. Citigroup knew Candies would rely on the information Citigroup disclosed to it in the meeting by virtue of its reputation, position, and status as a respected bank and neutral third-party, which Candies had demanded as part of its agreement with OSA to continue with the restructuring.

1249. Citigroup's special knowledge of its fraudulent scheme with OSA also denied Candies the ability to sufficiently investigate OSA's finances prior to agreeing to restructure OSA's debt and continue leasing its vessels to OSA.

1250. When deciding whether to continue doing business with OSA in September 2012, including agreeing to continue negotiations regarding the debt restructuring, Candies relied on the September 14, 2012 email, which included material omissions by Citigroup as described *supra* at ¶ 1244.

*e. Citigroup's September 21, 2012 Explanation of the Cash Advance Facility and Proposed Instructions*

1251. On September 21, 2012, Rene Lopez-Arevalo, Citigroup Cash Advance Product Analyst, using the email tag [ICG-GTS], explained in detail in an email to Candies the mechanics of the cash advance facility, with senior ICG executives, Mr. Granja and Alfonso Ortega-Brehm, copied. Citigroup knew that the source of funds for paying Candies was the cash advance facility, as indicated in numerous emails exchanged between the parties. Ms. Lopez-Arevalo (an ICG employee) also explained that OSA "allows Banamex to set off collection funds from PEMEX payments upon contracts assigned to Banamex to cover any payment instruction provided by OSA." In other words, Ms. Lopez-Arevalo (an ICG employee) confirmed that a mechanism was in place that would allow Banamex to transfer funds to Candies before the money ever reached OSA.

1252. At this time, as Citigroup and OSA knew: (1) OSA was submitting false documents to ICG employees in support of its cash advance requests; (2) the cash advance facility was failing due to false and weak controls, including Citigroup's abdication of any responsibility for validating OSA's cash advance documentation through the secret Regulatory Contract; and (3) Citigroup and OSA were engaged in an ongoing fraud that threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow and from which Candies would be repaid.

1253. At no point in the September 21, 2012 Email did Ms. Lopez-Arevalo (or the other Citigroup representatives) advise Candies of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1254. Citigroup had a duty to speak and disclose these omitted facts because (1) its failure to speak would render its prior representations to Candies about the reliability and stability of the cash advance facility false and misleading; (2) it was providing assurances to Candies to induce it to lease its vessels to OSA, from which Citigroup would also receive a financial benefit (e.g., increased interest from cash advance requests by OSA relating to Pemex contracts assigned to Candies vessels); (3) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit OSA's continued relationship with Candies; (4) Citigroup had full access to and was aware of the omitted material facts, and also knew that Candies would rely on the omitted facts when determining whether to continue leasing its vessels to OSA; and (5) the fraudulent scheme with OSA was well underway at this time.

1255. Citigroup knew Candies would rely on the information Citigroup disclosed (or did not disclose) in the September 21, 2012 email by virtue of its reputation, position, and status as a respected, neutral bank, which Candies had demanded as part of its agreement to continue with the restructuring of OSA's debt.

1256. Citigroup's special knowledge of its fraudulent scheme with OSA also denied Citigroup the ability to sufficiently investigate OSA's finances prior to agreeing to restructure OSA's debt.

1257. When deciding whether to continue doing business with OSA in September 2012, including agreeing to continue negotiations regarding the debt restructuring, Candies relied on the September 21, 2012 email, which included material omissions by Citigroup.

*f. Candies and Citigroup's September 26, 2012 Teleconference*

1258. On September 26, 2012, Candies, OSA, and Citigroup held a teleconference to discuss altering the recently executed restructuring agreement. Mr. Granja, a senior ICG executive, and representatives from Banamex were present.

1259. The purpose of the telephone conference was to discuss changes in the restructuring agreement and specifically Candies' concern about the number of contracts tied to each of the Candies vessels, and the possibility of a default.

1260. Mr. Granja and the Banamex representatives conveyed to Candies that they considered Candies to be "quite over collateralized"—meaning that Candies should take comfort in the amount of collateral available to them because the amount of Pemex work assigned to each vessel resulted in a cash flow value that would prevent OSA from defaulting.

1261. In this teleconference, Mr. Granja and the Banamex representatives fraudulently misrepresented (1) on information and belief, the amounts of the Pemex contracts assigned to the Candies vessels; (2) that OSA's finances were stable and secure; and (3) that OSA would be able to timely pay Candies.

1262. At this time, as Citigroup and OSA knew: (1) OSA was submitting false documents to ICG employees in support of its cash advance requests; (2) the cash advance facility was failing due to false and weak controls; and (3) Citigroup and OSA were engaged in an ongoing fraud which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow and from which Candies would be repaid.

1263. At no point in the September 26, 2012 teleconference did Mr. Granja and the Banamex representatives advise Candies of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered false and misleading Citigroup's assurances about OSA's financial stability, including its ability to make future payments and repay its debt to Candies.

1264. Citigroup had a duty to speak and disclose these omitted facts because (1) its failure to speak would render its prior and ongoing representations about OSA's financial condition and the stability and reliability of the cash advance facility false and misleading; (2) it was providing assurances to Candies to induce it to continue leading its vessels to OSA, from which Citigroup would also receive a financial benefit (e.g., increased interest from cash advance requests by OSA on Pemex contracts assigned to Candies vessels); (3) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from OSA's continued relationship with Candies; (4) Citigroup had full access to and was aware of the omitted material facts, and also knew that Candies would rely on the omitted facts when determining whether to continue leasing its vessels to OSA; and (5) the fraudulent scheme with OSA was well underway at this time.

1265. Citigroup knew Candies would rely on the information Citigroup disclosed (or did not disclose) in the September 2012 telephone conference by virtue of its reputation, position, and status as a respected, neutral bank, which Candies had demanded as part of its agreement to continue with the restructuring.

1266. Citigroup's special knowledge of its fraudulent scheme with OSA also denied Candies the ability to sufficiently investigate OSA's finances prior to agreeing to restructure OSA's debt and continuing its leases.

1267. When deciding whether to continue doing business with OSA in September 2012, including agreeing to continue negotiations regarding the debt restructuring, Candies relied on the September 2012 telephone conferences, which included material omissions by Citigroup.

*g. The Letter of Instructions*

1268. Pursuant to the Candies Restructuring Agreement, OSA also submitted a letter of instructions to Citigroup (the "Candies Instructions") on September 28, 2012 instructing Citigroup

to pay Candies, with revenue from services provided by OSA to Pemex using Candies vessels, any monthly installments that OSA failed to pay, or partially paid, to Candies.

1269. In the event of OSA's failure to pay, Candies would inform Citigroup and Banamex, and Citigroup would make the payment directly to Candies. Citigroup would pay Candies with funds ordinarily due to OSA under the cash advance facility.

1270. Thus, payment to Candies under the Candies Instructions was dependent on the stability and reliability of the cash advance facility, including the availability of funds to pay Candies.

1271. At this time, as Citigroup and OSA knew: (1) OSA was submitting false documents to ICG employees in support of its cash advance requests; (2) the cash advance facility was failing due to false and weak controls; and (3) Citigroup and OSA were engaged in an ongoing fraud which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1272. The Candies Instructions did not mention (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered OSA's representations, through the Candies Instruction, that Candies would be paid from the cash advance facility if OSA failed to pay false and misleading.

1273. The Candies Instructions was material to Candies' decision to enter into the Candies Restructuring Agreement and continue leasing its vessels to OSA because it provided a mechanism to obtain payment if OSA defaulted.

1274. For Candies, the fact that Citigroup, one of the largest financial institutions in the world, would agree to participate in the restructuring, including the Candies Instruction, reassured Candies that OSA would be true to its promises and obligations.

1275. Citigroup and OSA had a duty to speak and disclose these omitted facts because (1) their failure to speak would render their prior representations to Candies about the Restructuring Agreement and Candies Instruction false and misleading; (2) they were providing assurances to Candies to induce it to continue leasing its vessels to OSA, from which Citigroup would also receive a financial benefit (e.g., increased interest from cash advance requests by OSA relating to Pemex contracts assigned to Candies vessels); (3) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit OSA's continued relationship with Candies; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Candies would rely on the omitted facts when determining whether to maintain its leases with OSA; and (5) the fraudulent scheme was well underway at this time. Citigroup's and OSA's special knowledge of their fraudulent scheme also denied Candies the ability to sufficiently investigate OSA's finances prior to agreeing to restructure OSA's debt and continuing its leases.

1276. When deciding whether to continue doing business with OSA in September 2012, including agreeing to continue negotiations regarding the debt restructuring, Candies relied on the Candies Instruction, which included material omissions by OSA, which Citigroup aided and abetted on account of its knowledge and substantial assistance (*see infra* at ¶ 1299).

### 5. Citigroup's Fraudulent Misrepresentations and Material Omissions Relating to Candies' February 2014 Demand Letter

#### *a. Background*

1277. OSA missed its payment due for the month of February, 2013.

1278. On February 18, 2013, Candies sent OSA and Banamex a demand letter for the February 2013 payment. The notice procedure, which required Candies to give notice not just to OSA, but also to Banamex, was OSA's own creation. OSA responded by paying the amount owed.

1279. OSA missed its payment due for the month of August, 2013. On August 23, 2013, Candies drafted a letter following the procedures set out in the Candies Restructuring Agreement and again, OSA responded with payment.

1280. OSA failed to make its required payment for the month of January, 2014. Accordingly, on February 17, 2014, Candies' U.S. counsel, located in New Orleans, informed Citigroup and Banamex via a written demand letter that OSA had made partial payments in 2013 and 2014 (the "Demand Letter"). Specifically, Candies' U.S. counsel informed Citigroup and Banamex that (1) OSA had paid $40,166,000; and (2) owed Candies USD $18,572,502.08 pursuant to the Candies Restructuring Agreement and Candies Instructions.

1281. The next day, February 18, 2014, Mr. Yáñez's personal lawyer, Omar Olvera, called Candies to discuss the Demand Letter.

1282. Mr. Olvera informed Candies that Banamex had frozen OSA's line of credit; thus Banamex could not pay Candies pursuant to the Demand Letter. Mr. Olvera also denied any wrongdoing by OSA.

*b. Citigroup's Fraudulent Misrepresentations and Material Omissions Relating to Withdrawal Letter*

1283. On February 19, 2014, Citigroup and Banamex employees, including Mr. Granja, Roberto Glenn Cardenas, Emmanuel Amor Cagigas, Ricardo Garduño López (a U.S.-trained and former U.S. lawyer) and Rodrigo Rivera Santamarina (a prominent Mexican lawyer), called Candies' U.S. counsel. Messrs. Granja, Cardenas, Cagigas, Garduño López, and Santamarina

asked Candies to "withdraw its letter" demanding that Citigroup pay the remaining $18,572,502.08 owed by OSA to Candies.

1284. In order to convince Candies to withdraw the Demand Letter, they highlighted OSA's financial attractiveness, i.e. that the company was so large and had such extensive remaining contracts it would be able to weather its current financial storm, and that "financial guys" were going to cover "the company."

1285. The Citigroup and Banamex representatives on the call further represented that the company would be "covered" once Pemex reopened the contracts, and encouraged Candies to take a different position that would avoid "killing the company." Citigroup and Banamex informed Candies that they were working with OSA to pay its creditors and had hired a consultant to navigate this period.

1286. Based on this call, Candies believed that OSA's financial troubles and the freezing of the cash advance facility were temporary and that OSA's continued support from Citigroup and Banamex, trusted third parties, provided additional security that Candies would get paid. While Candies did not withdraw the Demand Letter, it declined to take other action against OSA to recover the debt owed in reliance on the representations by Citigroup and Banamex.

1287. When Messrs. Granja, Cardenas, Cagigas, Lopez-Arevalo, and Santamarina contacted Candies' U.S. counsel to ask him to withdraw the Demand Letter on February 19, 2014, (1) Citigroup was already conducting an investigation into the fraudulent scheme; and (2) intended to permanently cancel the cash advance facility (*see supra* at Section VIII).[56] But, the Citigroup and Banamex representatives did not inform Candies of this information. Omission of this

[56] At least one of the Citigroup officials present on the call, Mr. Granja, was aware of Citigroup's investigation because of his dual role as a senior Citigroup ICG executive and Pemex-Citi Relationship Manager.

information during the February 19, 2014 call rendered Citigroup's and Banamex's representations therein false and misleading.

1288. Mr. Granja and the Citigroup and Banamex representatives on the call had a duty to speak and disclose this information to Candies because (1) their failure to speak would render their previous and ongoing representations about its support of OSA and OSA's ability to repay its debt to Candies false and misleading; (2) they had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit it gained from OSA's use of the Candies vessels and to avoid responsibility for its role in the fraud; (3) they knew Candies would rely on the information they, as representatives of Citigroup, disclosed (or did not disclose) when determining whether to take action against OSA for the default; and (4) Citigroup was actively investigating the fraudulent scheme at this time. Citigroup's special knowledge of its fraudulent scheme with OSA and the ongoing investigation also denied Candies the ability to sufficiently investigate OSA's finances at this moment.

1289. Based on Citigroup and Banamex's fraudulent misrepresentations and material omissions relating to the Demand Letter, Candies did not take immediate action to collect on its $120 million restructured lease debt, including by extracting its vessels from Mexico. Days later OSA collapsed. Candies has been unable to recover the unpaid debt of approximately $120 million, and the loss of the use of 21 vessels, worth hundreds of millions of dollars.

1290. If Citigroup or Banamex had indicated that there was a problem with the facility or that they had discovered the fraudulent scheme, Candies would have taken efforts at that very moment to call their debt and get the vessels out of Mexico.

**6. Candies Lawsuit Against Citigroup and Banamex**

1291. Candies sued Citigroup and Banamex in Mexico in 2015 ("Mexico Candies Litigation").

1292. Candies alleges that Citigroup and Banamex breached their contractual obligation to disburse funds to Candies upon Candies' request as required by the Candies Restructuring Agreement.

1293. In the Mexico Candies Litigation, Candies seeks $18,572,502.08, which are the funds that Citigroup should have disbursed to Candies upon Candies' request in the Demand Letter. Candies' claim is a contractual claim against Citigroup and Banamex concerning the Candies Restructuring Agreement, and is not duplicative of the claims asserted—or the damages sought—in this complaint.

1294. To date, there is no final decision in the Mexico Candies Litigation.

#### 7. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Candies

1295. Citigroup committed fraud against Candies through the fraudulent misrepresentations and material omissions in the (1) April 2011 discussions with OSA's external financial consultant; (2) May 10, 2011 Meeting; (3) August 2012 Meeting; (4) September 14, 2012 Emails; (5) September 21, 2012 Email; (6) September 26, 2012 Teleconference; (7) February 19, 2014 Teleconference; and (8) materials shared with, and communications made to, Candies between 2010 and 2014 by OSA (including those made by its external financial consultant), which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors, and bondholders, including Candies.

1296. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant) in communications and materials shared with Candies relating to OSA's debt

restructuring, including those made in (1) the May 2011 Stock Agreement; (2) the Candies Restructuring Agreement; and (3) the Candies Instructions (*see supra* at Section XV B 3).

1297. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to shipping companies like Candies on account of its (1) participation in the fraud; (2) its role in approving OSA's false documentation; (3) its role in the restructuring of OSA's debt, including as to Candies; and (4) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section VI).

1298. With knowledge of OSA's fraudulent misrepresentations and material omissions to Candies (including those made by OSA's external financial consultant) between 2011 and 2014 described *supra* at Section XV. B., Citigroup participated in and substantially assisted and aided abetted OSA in making fraudulent misrepresentations and material omissions and committing fraud against Candies, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the Regulatory Contract which purported to release Citigroup from any responsibility in validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in its financial statements and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA in these communications and materials.

1299. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 8. Candies Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions

1300. When Candies agreed to restructure OSA's debt and continue leasing its vessels to OSA, Candies relied on the fraudulent misrepresentations and material omissions by Citigroup, and by OSA (including those made by OSA's external financial consultant), which Citigroup aided and abetted on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup, through OSA's external financial consultant, (1) made fraudulent misrepresentations and material omissions to Candies; and (2) aided and abetted OSA in making material omissions (described *supra* at ¶¶ 1200-1209) to Candies in discussions in or around April 2011;

(b) Citigroup, and OSA's external financial consultant, (1) made fraudulent misrepresentations and material omissions to Candies; and (2) Citigroup aided and abetted OSA in making material omissions (described *supra* at ¶¶ 1210-1217) to Candies in discussions in or around May 2011;

(c) Citigroup aided and abetted OSA in making material omissions (described *supra* at ¶¶ 1218-1225) to Candies in the May 2011 Stock Agreement;

(d) Citigroup, through OSA's external financial consultant, made fraudulent misrepresentations and material omissions (described *supra* at ¶¶ 1234-1239) to Candies during the August 2012 Meeting;

(e) Citigroup made material omissions (described *supra* at ¶¶ 1240-1250) to Candies in the September 14, 2012 email;

(f) Citigroup made material omissions (described *supra* at ¶¶ 1251-1257) to Candies in the September 21, 2012 email;

(g) Citigroup made material omissions (described *supra* at ¶¶ 1258-1267) to Candies in the September 26, 2012 Teleconference;

(h) Citigroup aided and abetted OSA in making material omissions (described *supra* at ¶¶ 1268-1276) to Candies in the Candies Instructions;

(i) Citigroup made fraudulent misrepresentations and material omissions (described *supra* at ¶¶ 1283-1290) to Candies during the February 19, 2014 Teleconference.

1301. In other words, Candies would not have agreed to restructure OSA's debt, nor would Candies have continued leasing its vessels to OSA, had it known about (1) OSA's false financial projections; (2) false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1302. Due to the fraud and corresponding collapse of OSA, Candies has been unable to recover the unpaid debt of approximately $120 million, and the loss of the use of the 21 vessels Candies leased to OSA, worth hundreds of millions of dollars.

## C. <u>Coastline</u>

### 1. Background

#### *a. Caballo Maya*

1303. In or around 2008, OSA approached Coastline about the possibility of Coastline providing a vessel to be employed by OSA in its activities for Pemex in the Gulf of Mexico. Thereafter, OSA and Coastline, through Marfield, entered into a bareboat charter agreement to charter the vessel, Caballo Maya, after its construction, for $65,000 per day (the "Maya Charter").

1304. The Caballo Maya is an offshore construction ship that Coastline owned and constructed for OSA through Coastline's wholly owned subsidiary, Marfield.

1305. On or around March 18, 2011, OSA and Coastline executed a memorandum of agreement pursuant to which OSA agreed to purchase the Caballo Maya (the "Maya Sale Agreement"). This followed months of negotiations including by email and telephone and during in-person meetings between OSA and Coastline in Singapore on approximately March 17, 2011.

1306. The Maya Sale Agreement called for OSA to (1) make 4 payments for a total of $45,000,000 to Coastline; and (2) assume responsibility for $89,000,000 of debt that Coastline and Marfield owed to Caterpillar Financial Services Asia Pte Ltd. ("Caterpillar") and Eksportfinans ASA ("Eksportfinans")[57] for the expense of constructing the ship. In addition, as required by the terms of Coastline's loan agreement with Caterpillar and Eksportfinans, OSA was required to obtain approval from those lenders in order to purchase Marfield.

1307. Beginning in approximately April 2011 and continuing for nearly three years, OSA sought Caterpillar's and Eksportfinans's approval for its purchase of Marfield but consistently failed to deliver the documents requested by the lenders.

1308. Caterpillar and Eksportfinans never approved OSA's purchase of Marfield or the Caballo Maya, so Coastline, through Marfield, continued to own the vessel and the right to collect payment under the Maya Charter.

1309. In approximately May 2011, Coastline delivered the Caballo Maya to OSA, which immediately began using it as part of its business operations on behalf of Pemex in the Gulf of Mexico.

1310. In fall 2013, OSA ceased payment on the Maya Charter.

---

[57] Caterpillar is an industrial equipment company that, in addition to manufacturing and selling equipment, provides financing for industrial businesses. Eksportfinans is a Norwegian financing company whose aim is to enhance the Norwegian export sector; it is jointly owned by a conglomerate of Norwegian banks and the Norwegian government.

1311. On or about January 29, 2014, Coastline notified OSA that it would terminate the Maya Charter should OSA fail to pay the money owed under the Maya Charter.

1312. On or about February 28, 2014, Coastline served OSA with notice that it was terminating the Maya Charter due to nonpayment. Before Coastline could take possession of the vessel, however, the Mexican government issued an order barring Coastline from taking the ship due to the criminal investigations into OSA.

1313. Thereafter, the Mexican government retained possession of the Caballo Maya until approximately February 2017.

*b. Caballo Marango*

1314. In or around 2008, OSA approached Coastline about the possibility of Coastline providing another vessel for OSA. Thereafter, OSA and Coastline, through Shanara, entered into a bareboat charter agreement to charter the vessel, Caballo Marango, after its construction, for $65,000 per day (the "Marango Charter").

1315. The Caballo Marango is a offshore construction ship that Coastline owned and constructed through its wholly owned subsidiary, Shanara.

1316. On or about May 3, 2011, at a meeting in Houston, Texas, OSA and Coastline executed a memorandum of agreement by which OSA agreed to purchase the Caballo Marango for $150,000,000 (the "Marango Sale Agreement"). This followed months of negotiations including by email and telephone and during in-person meetings between OSA and Coastline in Singapore and the United States.

1317. The Marango Sale Agreement called for OSA to make 4 payments for a total of $45,000,000 to Coastline and to assume responsibility for $105,000,000 of debt Coastline and

Shanara owed to Caterpillar, KfW IPEX-Bank,[58] and Eksportfinans for construction of Caballo Marango.

1318. OSA failed to make the payments required under the Marango Sale Agreement so Coastline, through Shanara, continued to own the vessel and the right to collect payment under the Marango Charter.

1319. In approximately November 2012, Coastline delivered the Caballo Marango to OSA, which immediately began using it as part of its business operations in the Gulf of Mexico pursuant to its contracts with Pemex.

1320. In approximately May 2013, OSA proposed to Coastline that it would issue a bond to raise capital to purchase the Caballo Marango.

1321. In approximately September 2013, OSA provided the 2013 Preliminary Offering Memorandum for the 2013 Bond Issuance to Coastline.

1322. OSA ultimately did not use any of the proceeds of the 2013 Bond Issuance to purchase the Caballo Marango.

1323. In fall 2013, OSA ceased payment on the Marango Charter.

1324. On or about January 29, 2014, Coastline notified OSA that it would terminate the Marango Charter should OSA fail to pay the money owed under Charter.

1325. On or about February 28, 2014, Coastline served OSA with notice that it was terminating the Marango Charter due to nonpayment. Before Coastline could take possession of the vessel, however, the Mexican government issued an order barring Coastline from taking the ship due to the criminal investigations into OSA.

---

[58] KfW IPEX-Bank is a subsidiary of Kreditanstalt für Wiederaufbau, a German bank that focuses on international development and export financing.

1326. Thereafter, the Mexican government retained possession of the Caballo Marango until approximately July 2018.

*c. Summary of Fraudulent Misrepresentations and Material Omissions to Coastline*

1327. As described further below, Coastline, in its own right and through Marfield and Shanara, agreed to (1) construct provide the Caballo Maya and Caballo Marango for to be used by OSA for the purpose of its work for Pemex in the Gulf of Mexico; and (2) charter and continue chartering those ships to OSA, despite OSA's failure to perform its obligations under the Maya and Marango Sale Agreements, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup in the 2013 Preliminary Offering Memorandum which (a) necessarily incorporated information provided by Citigroup as OSA's banker; and (b) was distributed to OSA's current and potential vendors, such as Coastline, with Citigroup's knowledge; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA was providing to vendors like Coastline.

1328. Specifically, Citigroup represented—or substantially assisted OSA in making representations that—OSA (1) was financially secure, including because of the stability and reliability of the cash advance facility; (2) was supported by Citigroup including because it served as the fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance (*see supra* at Section XIV.C.1.b); and (3) had positive profit projections.

1329. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure, including because (i) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; and (ii) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the

financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments, lease agreements and restructure OSA's debt to the financial benefit of Citigroup and OSA; (2) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (3) there was a revolving door of former Citigroup employees taking key positions in OSA; and (4) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012.

1330. Coastline also agreed to (1) provide the Caballo Maya and Caballo Marango to be used by OSA; and (2) charter and continue chartering those ships to OSA, despite OSA's failure to perform its obligations under the Maya and Marango Sale Agreements, in reliance on ***material omissions*** by (1) Citigroup, including in communications made to and materials shared with Coastline by OSA and Pareto based on information provided by Citigroup and with Citigroup's knowledge; and (2) OSA, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false information circulated by OSA and Pareto to current and potential investors as well as creditors, including Coastline.

1331. Specifically, Citigroup omitted—or substantially assisted OSA in omitting—the following information from communications made to and materials shared with Coastline: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing

payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections that were premised on a cash advance facility that was, in actuality, unstable, unreliable, and propped up by false documentation. Such omissions in the communications made to and materials shared with Coastline by Citigroup, OSA and Pareto rendered them false, misleading and deceptive.

1332. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Pareto and Coastline given (1) their previous and ongoing representations to Coastline, including in emails, agreements, the July 2013 Preliminary Offering Memorandum, and meetings; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties; (ii) the parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from the relationship with Coastline; (iv) Citigroup's and OSA's awareness of Coastline's reliance on the false and misleading information; and (v) Citigroup's and OSA's participation in the fraud.

1333. Citigroup also had a duty to speak fully and disclose this information to Pareto (and likewise to those with whom Pareto shared the Pareto Materials) on account of its role as fiduciary of the Mexican Trust through the ICG and Banamex, but it failed to do so.

1334. Citigroup and OSA directly benefited from fraudulently inducing and luring Coastline to charter their ships to OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1335. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to Coastline and substantially assisted OSA

as well as participated in making those misrepresentations and material omissions and committing fraud against Coastline, as described *infra* at ¶¶ 1369-71.

1336. Had Coastline known about (1) OSA's true financial condition; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, it would not have agreed to charter and continue chartering the Caballo Maya or Caballo Marango to OSA.

1337. Due to the fraud and corresponding collapse of OSA, Coastline was deprived of the revenue it could have derived from chartering the Caballo Maya and Caballo Marango beginning in fall 2013.

**2. Material Omissions in 2008 Relating to Pemex Service Contract**

1338. In or around 2008, OSA, including Mr. Yáñez, approached Coastline to propose that Coastline adapt the Caballo Maya and Caballo Marango, then in the preliminary stages of construction, for its use in performing a service contract that Pemex had awarded to it for oil exploration in the Gulf of Mexico. During this time period, OSA and Coastline held several meetings regarding OSA's proposal. Because Coastline would have to finance the construction of the ships, the purpose of the 2008 meetings and communications was for OSA to assure Coastline that it was financially secure such that Coastline could rely on OSA to make its future charter payments.

1339. On information and belief, during the negotiations relating to the financing of the construction of the ships, OSA and Mr. Yáñez provided documents and information to Coastline regarding (1) OSA's present financial condition; and (2) its future financial projections, including the stability and security of its expected revenue from its contract with Pemex.

1340. At this time, on information and belief, (1) OSA's finances were deteriorating; (2) Citigroup and OSA were engaged in a fraud relating to the cash advance facility; and (3) the cash advance facility was failing, including because (i) the facility had false and weak controls, (ii) Pemex was refusing to pay Banamex on invoices for which it had advanced OSA funds under the cash advance facility; and (iii) Citigroup was incurring significant liabilities in connection with the cash advance facility. Accordingly, OSA's representations to Coastline that it was financially healthy and stable and had positive liquidity and cash flow were false and misleading.

1341. In addition, during the 2008 negotiations regarding the adaptation of the ships, on information and belief, OSA and Mr. Yáñez omitted the following information from its communications to and materials shared with Coastline in 2008: (1) its deteriorating financial condition; (2) its false financial projections; (3) the false and weak controls of the cash advance facility; (4) Pemex's refusal to pay Banamex on OSA invoices; (5) Citigroup's increasing liability under the cash advance facility; and (5) the ongoing fraud with Citigroup.

1342. OSA had a duty to speak and disclose this information to Coastline because (1) its failure to speak would render its previous and ongoing representations to Coastline about its financial condition false and misleading; (2) OSA knew this information and intentionally withheld it to receive the financial benefit from an agreement with Coastline; (3) OSA knew the omitted material facts and that Coastline would rely on the omitted facts when determining whether to construct vessels for and execute agreements with OSA; and (4) the fraudulent scheme between Citigroup and OSA was, on information and belief, underway during this time. OSA's special knowledge of the fraudulent scheme with Citigroup also denied Coastline the ability to sufficiently investigate OSA's finances.

1343. On information and belief, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); and (2) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with shipping companies, including Coastline, was making (1) fraudulent misrepresentations regarding its financial health, positive liquidity and cash flow, and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶¶ 1369-71, Citigroup aided and abetted and substantially assisted OSA in making these material omissions to Coastline in 2008.

1344. Coastline relied on OSA's material omissions in 2008, which were made with Citigroup's knowledge and substantial assistance, in agreeing to adapt the Caballo Maya and Caballo Marango for OSA's use and to charter those two vessels to OSA. In reliance on these material omissions, Coastline procured credit for more than $200,000,00 to construct the ships and engaged shipyards at substantial expense to adapt both vessels.

### 3. Material Omissions in 2011 and 2012 Relating to the Caballo Maya and Caballo Marango Charters

#### *a. Overview*

1345. Between approximately September 2011 and August 2012, OSA—through both email communications and in-person meetings in the United States—provided Coastline with false and misleading information regarding its financial condition. The purpose of these communications and meetings was for OSA to convince Coastline to continue chartering both Caballo Maya and Caballo Marango to it, despite OSA's failure to perform under either the Maya Sale Agreement or the Marango Sale Agreement.

1346. Specifically, (1) on or about September 11, 2011, OSA sent Coastline, via email, its financial statements as of the end of July 2011; (2) on or about April 30, 2012, OSA's principals met with Coastline in Houston Texas; and (3) on or about August 22, 2012, OSA sent Coastline, via email from Fabiola Jimenez Juarez, an attorney employed by GGM Gasolineras S.A. de. C.V. ("GGM")[59] who managed both GGM's and OSA's relationship with Coastline, financial statements relating to its performance from 2008 until May 2012. In each of these communications, on information and belief, OSA falsely represented, either directly or unwittingly through Mr. Jimenez, to Coastline that it was financially stable, had access to a reliable stream of revenue from its contract from Pemex and the cash advance facility, and was able to meet its financial obligations under the Sale Agreements and Charters.

*b. 2011 and 2012 Financial Statements*

1347. As described *supra* at Section XIV.E, OSA's financial statements for 2008 through 2012 included positive financial projections, including as to liquidity and cash flow stemming from Pemex contracts and the cash advance facility.

1348. During this time, (1) OSA was submitting false documents to ICG employees in support of its cash advance requests; (2) the cash advance facility was failing, including due to false and weak controls; and (3) Citigroup and OSA were engaged in a fraudulent scheme which threatened the reliability and stability of the cash advance facility, which served as the primary source of liquidity and cash flow for OSA. Accordingly, the information contained in OSA's financial statements between 2008 and 2012 was false and misleading.

[59] GGM was a company in the Mexican petroleum industry that primarily operated gas stations. OSA partnered with GGM for the purchase and charter of the Caballo Maya and Caballo Marango.

1349. In addition, these financial statements omitted any information regarding (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1350. OSA had a duty to speak and disclose this information in its financial statements or when distributing such statements to creditors, vendors and bondholders, such as Coastline, because (1) OSA's failure to speak would render its prior and ongoing representations in its financial statements false and misleading; (2) OSA was attempting to reassure Coastline about its financial condition and requesting that Coastline continue leasing vessels to it despite its failure to make payments under the Sales Agreements; (3) OSA knew this information and intentionally withheld it to receive the financial benefit from its charter with Coastline; (4) OSA was aware of the omitted material facts and also knew that Coastline would rely on the omitted facts when determining whether to continue leasing its vessels to OSA; and (5) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Coastline the ability to sufficiently investigate OSA's finances before agreeing to continue its relationship with OSA.

1351. In 2011 and 2012, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with creditors and vendors such as Coastline, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described

*infra* at ¶¶ 1369-71, Citigroup aided and abetted and substantially assisted OSA in making these material omissions to Coastline in 2011 and 2012.

1352. When Coastline decided not to terminate the Maya and Marango Charters in 2011 and 2012 despite OSA's failure to perform on either the Maya or Marango Sale Agreement, it did so in reliance on the material omissions in OSA's financial statements provided to Coastline, which were made with Citigroup's knowledge and substantial assistance.

*c. April 2012 Meeting Between OSA and Coastline in Houston, Texas*

1353. On information and belief, during the April 30, 2012 meeting between OSA's principals, including Mr. Yáñez and Coastline's principals, including its owner, Terry Highlands, (the "April 2012 Houston Meeting"), OSA presented positive financial projections and cash flow and a reliable stream of income from Pemex contracts and the cash advance facility in order to assure Coastline to continuing leasing its vessels to OSA.

1354. During this time, (1) OSA was submitting false documents to ICG employees in support of its cash advance requests; (2) the cash advance facility was failing, including due to false and weak controls; and (3) Citigroup and OSA were engaged in a fraudulent scheme which threatened the reliability and stability of the cash advance facility, which served as the primary source of liquidity and cash flow for OSA. Accordingly, on information and belief, the representations made by OSA during the April 2012 Houston Meeting were false and misleading.

1355. In addition, during the Meeting, OSA failed to inform Coastline of: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1356. OSA had a duty to speak and disclose this information because (1) OSA's failure to speak would render its prior and ongoing representations to Coastline about its financial health false and misleading; (2) OSA was attempting to reassure Coastline about its financial condition

and requesting that Coastline continue leasing vessels to it despite its failure to make payments under the Sales Agreement; (3) OSA knew this information and intentionally withheld it to receive the financial benefit from its charter with Coastline; (4) OSA was aware of the omitted material facts and also knew that Coastline would rely on the omitted facts when determining whether to maintain its investment; and (5) the fraudulent scheme with Citigroup was well underway at this time. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Coastline the ability to sufficiently investigate OSA's finances before agreeing to continue its relationship with OSA.

1357. In April 2012, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with creditors and vendors such as Coastline, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 1369-71, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Coastline in 2012.

1358. When Coastline decided not to terminate the Maya and Marango Charters in 2012 despite OSA's failure to perform on either the Maya or Marango Sale Agreements, it did so in reliance on the material omissions by OSA to Coastline during the April 2012 Houston Meeting, which were made with Citigroup's knowledge and substantial assistance.

#### 4. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to the Bond Issuance

1359. In the summer of 2013, OSA informed Coastline that it intended to issue a bond to raise $300,000,000 to complete its purchase of the Caballo Marango (i.e., the 2013 Bond Issuance). In approximately September 2013, Mr. Yáñez provided Coastline the 2013 Preliminary Offering Memorandum, described *supra* at Section XIV.C.2.b. OSA informed Coastline of the 2013 Bond Issuance and provided it with the 2013 Preliminary Offering Memorandum to (1) assuage Coastline's frustrations and concerns with OSA's failure to perform under the Marango Sale Agreement; and (2) provide Coastline comfort that OSA could still complete the transaction.

1360. As described in detail *supra* at Section XIV.C.2, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials, including the 2013 Preliminary Offering Memorandum. Citigroup (and OSA) were aware, that OSA and Pareto intended to provide 2013 Preliminary Offering Memorandum to creditors, vendors and bondholders of OSA, including shipping companies like Coastline, in order to (1) demonstrate OSA's continued financial viability; (2) instill confidence in OSA's ability to repay its debts; and/or (3) solicit further investment in OSA.

1361. As detailed above, the 2013 Preliminary Offering Memorandum, like the other Pareto Materials, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure (*see supra* at ¶¶ 321-23).

1362. Such representations were false because in 2013 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the

stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1363. In addition, the 2013 Preliminary Offering Memorandum omitted the following information rendering it false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1364. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those to whom OSA and Pareto provided the 2013 Preliminary Offering Memorandum) because (1) their failure to speak would render their representations in the Memorandum false and misleading; (2) Citigroup and OSA were soliciting investments and attempting to instill creditor and investor confidence in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased contracts with Pemex for OSA and increased cash advances and interest flowing therefrom for Citigroup); (3) Citigroup and OSA had full access to this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise Coastline), or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from OSA's charter of the Caballo Maya and Caballo Marango; and (4) at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup's and OSA's special knowledge of the fraudulent scheme also denied Pareto (and Coastline) the ability to sufficiently investigate OSA's finances.

1365. Citigroup also had a duty to speak fully and disclose this information to Pareto on account of its role as fiduciary of the Mexican Trust through the ICG and Banamex.

1366. In continuing the Charters, Coastline relied on the 2013 Preliminary Offering Memorandum including its fraudulent misrepresentations and Material omissions by (1) Citigroup; and (2) OSA, with Citigroup's knowledge and substantial assistance.

**5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Coastline**

1367. Citigroup committed fraud against Coastline through the fraudulent misrepresentations and material omissions contained in the 2013 Preliminary Offering Memorandum.

1368. Citigroup knowingly conspired to make, and was aware that OSA was making fraudulent misrepresentations and material omissions between 2008 and 2014 to vendors like Coastline in communications and materials shared with such vendors, like in the 2008 financial information, the 2011 and 2012 financial statements, the 2012 financial information provided in Houston, and the 2013 Preliminary Offering Memorandum.

1369. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to shipping companies like Coastline on account of its (1) participation in the fraud (*see supra at* Section VII); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

1370. With knowledge of OSA's fraudulent misrepresentations and material omissions to Coastline, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against Coastline, including by (1) approving the false documentation OSA

submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility in validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial statements and projections, including by not correcting or revising the false and inaccurate information provided by OSA in its financial statements and other documents.

1371. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 6. Coastline Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions

1372. When (1) agreeing to adapt the Caballo Maya and Caballo Marango for OSA's use; (2) charter those ships to OSA; and (3) continuing to charter both ships to OSA despite OSA's failure to perform under either Sale Agreement, Coastline relied on the fraudulent misrepresentations and material omissions (1) by Citigroup in the 2013 Preliminary Offering Memorandum; and (2) by OSA —with Citigroup's knowledge and substantial assistance—in the 2013 Preliminary Offering Memorandum and in communications and meetings between OSA and Coastline between 2008 and 2013, which Citigroup knowingly conspired with OSA to make, and aided and abetted, on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup (1) made material omissions to Coastline, and (2) aided and abetted OSA in making material omissions to Coastline during the 2008 negotiations for OSA to lease the Caballo Maya and Caballo Marango;

(b) Citigroup (1) made material omissions to Coastline, and (2) aided and abetted OSA in making material omissions to Coastline in OSA's 2011 and 2012 financial statements;

(c) Citigroup (1) made material omissions to Coastline, and (2) aided and abetted OSA in making material omissions to Coastline made during the April 2012 Houston Meeting;

(d) Citigroup (1) made fraudulent misrepresentations and material omissions to Coastline, and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to Coastline in the 2013 Preliminary Offering Memorandum;

1373. In other words, Coastline would not have adapted and provided either ship to OSA, entered into either Sale Agreement, or agreed to either Charter had it known about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1374. When OSA collapsed in February 2014, it possessed the Caballo Marango and the Caballo Maya, which had a combined estimated value of $328 million.

1375. OSA owed approximately $65,000 per vessel per day for its leases of Caballo Marango and Caballo Maya to Plaintiffs Shanara and Marfield, respectively. OSA ceased paying these charter fees in fall 2013, depriving Coastline, Shanara, and Marfield of a total of $130,000 per day beginning in fall 2013.

1376. In response to the Mexican government's actions in preventing Coastline from recovering the two ships, Marfield and Shanara initiated international arbitration proceedings

against the Mexican government pursuant to a bilateral investment treaty between Panama and Mexico.

1377. Marfield and Shanara seek damages in connection with the Mexican government's seizure of the Caballo Marango and Caballo Maya.

1378. The international arbitration treaty pursuant to which Coastline initiated its arbitration against the Mexican government permits only claims against countries, so Coastline, Marfield, and Shanara could not file such claims against Citigroup.

**D. De Hoop**

**1. Overview**

1379. In approximately 2006, OSA purchased one vessel from De Hoop. De Hoop designed and built this vessel tailor-made for OSA, per Pemex's contract requirements.

1380. In approximately 2006, OSA lured De Hoop into entering additional vessel-building contracts. Specifically, OSA represented to De Hoop that it was growing and that it had more contracts lined up with Pemex.

1381. As a result, in 2007 and 2008, OSA purchased nine vessels from De Hoop, using a loan obtained from Rabobank (the "Rabobank-financed vessels"). Specifically, Rabobank financed two vessels in 2007 and seven vessels in 2008. For the 2008 financing, De Hoop was required to keep, with its own funds, a security deposit as collateral for Rabobank, in case OSA defaulted on the loans. At the time of OSA's collapse, this deposit comprised approximately $10 million (the "De Hoop Security Deposit").

1382. In connection with these nine vessels, De Hoop provided to OSA goods and services not covered by Rabobank's financing—primarily design advice, fuel supply and equipment worth approximately $16 million (the "De Hoop Goods and Services"). In other words,

OSA was to pay De Hoop for the De Hoop Goods and Services from its own funds, not the loan provided by Rabobank.

1383. In 2009, OSA stopped making installment payments on the Rabobank loans and had not yet paid for the De Hoop Goods and Services.

1384. As a result of OSA's increasing debt to Rabobank and De Hoop, in 2010, OSA, Rabobank and De Hoop renegotiated the terms of the Rabobank Loans. As further described *infra* at Section XVI, in connection with this renegotiation, OSA and Rabobank established the Rabobank Trust at Banamex's trust division on March 10, 2010, which was to receive payments for services provided by OSA to Pemex with the Rabobank-financed vessels. De Hoop was a beneficiary of the Rabobank Trust.

1385. Citigroup ICG employees, notably Jorge Salazar, Leticia Vergara Pino and Fabiola Alejandra Cinta Narvaez, managed the Rabobank Trust, including by (1) requesting cash advances from Banamex on the Trust's behalf; and (2) disbursing funds from the Trust to its beneficiaries such as De Hoop.

1386. On June 30, 2010, following the Second Amendment to the Rabobank Trust Agreement (dated May 27, 2010), De Hoop, OSA, Rabobank and CFA entered into a Memorandum of Agreement rescheduling OSA's debt. De Hoop agreed (1) that 5 million EUR of its outstanding claim against OSA for the De Hoop Goods and Services would be included in the parties' restructuring agreement, provided that this amount would be paid after OSA became current on the existing repayment schedule to Rabobank and (2) the remainder of the claim for the De Hoop Goods and Services (approximately 11 million EUR) would be paid only after OSA fully repaid the Rabobank loans. In other words, De Hoop agreed to subordinate the payment of the

De Hoop Goods and Services to Rabobank's $240 million loan to OSA. In exchange for these concessions, De Hoop received a second mortgage on the Rabobank financed vessels.

1387. In approximately 2011, Citigroup, through the ICG, and OSA sought to amend the Rabobank Trust in a manner that would allow the Rabobank Trust to automatically obtain cash advances upon Banamex's receipt of an OSA invoice to Pemex for services relating to the Rabobank-financed vessels, rather than the Trust having to request funds from Banamex.

1388. In connection with the amendment and other issues, Citigroup, through the ICG, OSA, and De Hoop held a series of meetings and calls throughout 2011, in which Citigroup and OSA made fraudulent misrepresentations and material omissions to De Hoop, including by providing audited financial statements based on false information and company presentations showing misleading financial projections, as further described below.

1389. At the conclusion of these negotiations, De Hoop agreed to a third ranking mortgage over the Rabobank-financed vessels to secure the payment of the De Hoop Goods and Services. De Hoop also agreed to (1) build four new vessels for OSA for EUR 138,200,000; and (2) continue maintaining the De Hoop Security Deposit as collateral for Rabobank in case OSA defaulted.

1390. Finally, in 2012, OSA requested that De Hoop sell it seven new fast supply intervention vessels. OSA convinced De Hoop to be paid through the Rabobank Trust with cash advances from Citigroup. De Hoop relied on Citigroup's and OSA's fraudulent misrepresentations and material omissions when deciding to sell OSA the seven new vessels and accept payment through the Rabobank Trust.

1391. The total value of the contracts for the seven new fast supply intervention vessels was approximately EUR 55,970,000, with a down payment of approximately 20% of the total price.

1392. In August 2013, OSA agreed that it would pay De Hoop approximately EUR 5,000,000 per month for the new vessels from September 2013 to August 2014, through payments by the Rabobank Trust.

1393. As described below, De Hoop agreed (1) to renegotiate OSA's payment for the De Hoop Goods and Services; (2) to become a beneficiary of the Rabobank Trust; (3) to receive payment for the De Hoop Goods and Services after OSA finished repaying the Rabobank loans; and (4) to sell new vessels to OSA and receive payment for them through the Rabobank Trust, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup, in communications made to and materials shared with De Hoop by OSA's external financial consultant and Pareto, to whom Citigroup had provided false and misleading information about OSA's finances and the cash advance facility and with the knowledge that the external financial consultant and Pareto would disseminate such information to De Hoop (*see supra* at Section XIV G); and (2) OSA (including those made by its external financial consultant), with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false information circulated by OSA, its external financial consultant and Pareto to current and potential creditors, vendors and bondholders, including De Hoop.

1394. Specifically, Citigroup, through OSA, OSA's external financial consultant, and Pareto, represented to De Hoop—or substantially assisted OSA (and its external financial consultant) in making representations to De Hoop—that OSA (1) was financially strong (including because of the stability and reliability of the cash advance facility); (2) was supported by Citigroup,

including through the ICG's role as trustee of the Rabobank Trust; (3) had positive profitability projections; and (4) had sufficient cash flow to pay De Hoop for the vessels under construction and the De Hoop Goods and Services.

1395. Such representations were false because, as Citigroup (and OSA) knew: (1) Citigroup and OSA were engaged in a fraud involving the cash advance facility between 2008 (on information and belief) and 2014; (2) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA; (3) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (4) there was a revolving door of former Citigroup employees taking key positions in OSA; and (5) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012.

1396. De Hoop also agreed (1) to renegotiate OSA's payment for the De Hoop Goods and Services; (2) to become a beneficiary of the Rabobank Trust; (3) to receive payment for the De Hoop Goods and Services after OSA finished repaying the Rabobank loans; and (4) to sell new vessels to OSA and receive payment for them through the Rabobank Trust, in reliance on ***material omissions*** by (1) Citigroup, in communications made to and materials shared with De Hoop by OSA, OSA's external financial consultant, Pareto and Rabobank, to whom Citigroup had provided false and misleading information about OSA's finances and the cash advance facility and with the knowledge that they would disseminate such information to De Hoop; and (2) OSA (including those made by its external financial consultant), with Citigroup's knowledge and substantial

assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false information circulated by OSA, its external financial consultant, Pareto and Rabobank to current and potential creditors, vendors and bondholders, including De Hoop.

1397. Specifically, Citigroup, through OSA, OSA's external financial consultant, Pareto, and Rabobank omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with De Hoop: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable, and propped up by false documentation. Omission of such information from communications to and materials shared with De Hoop rendered them false and misleading.

1398. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to De Hoop (1) because their failure to speak would render their previous and ongoing representations to De Hoop, including in emails, agreements, and meetings, false and misleading; and (2) the following factors created a duty to speak: (i) the nature of the relationship between Citigroup, OSA and De Hoop; (ii) parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from the relationship with De Hoop;

(iv) Citigroup's and OSA's awareness of De Hoop's reliance on the false and misleading information; and (v) Citigroup's and OSA's participation in the fraud (*see supra* at Sections I and VI).

1399. Citigroup also had a duty to speak and disclose information on account of its role as trustee of the Rabobank Trust, through the ICG, but it failed to do so.

1400. Citigroup, through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with De Hoop by OSA, OSA's external financial consultant, Pareto and Rabobank, based on information provided by Citigroup and with Citigroup's knowledge, committed fraud against De Hoop.

1401. Citigroup was also aware of OSA's fraudulent misrepresentations and material omissions to De Hoop (including those made by OSA's external financial consultant) and substantially assisted and aided and abetted OSA in making such misrepresentations and material omissions and committing fraud against De Hoop, as described *infra* at ¶ 1470.

1402. Citigroup and OSA directly benefited from fraudulently inducing and luring De Hoop to agree (1) to renegotiate OSA's payment for the De Hoop Goods and Services; (2) to become a beneficiary of the Rabobank Trust; (3) to receive payment for the De Hoop Goods and Services after OSA finished repaying the Rabobank loans; and (4) to sell new vessels to OSA and receive payment for them through the Rabobank Trust, in order to increase cash flows to OSA and interest payments and fees to Citigroup.

1403. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's, fraudulent misrepresentations and material omissions to De Hoop (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in committing fraud against De Hoop, as described *infra* at ¶ 1470.

1404. Had De Hoop known about (1) OSA's true financial condition; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, it would not have agreed (1) to renegotiate OSA's payment for the De Hoop Goods and Services; (2) to become a beneficiary of the Rabobank Trust; (3) to receive payment for the De Hoop Goods and Services after OSA finished repaying the Rabobank loans; and (4) to sell new vessels to OSA and receive payment for them through the Rabobank Trust.

1405. Due to the fraud and corresponding collapse of OSA, De Hoop has not recovered the De Hoop Security Deposit, has not been paid for the De Hoop Goods and Services and did not receive complete payment from OSA for the seven new fast-supply intervention vessels.

### 2. Material Omissions In 2011 Relating To The Amendment To The Rabobank Trust

#### *a. May 2010 Meetings In Houston, Texas Between De Hoop and OSA*

1406. Upon information and belief, Mr. Yáñez met with Patrick Janssens from De Hoop twice in Houston, Texas in May 2010 (the "May 2010 Meetings").

1407. The purpose of the May 2010 Meetings was to discuss the renegotiation of the terms of the Rabobank loans and payment of the De Hoop Goods and Services.

1408. On information and belief, during the May 2010 Meetings, OSA assured De Hoop that OSA would pay the past due amounts and timely make the future payments under the shipbuilding contracts for the nine Rabobank-financed vessels.

1409. At this time, (1) OSA was submitting false documents to ICG employees in support of its cash advance requests; (2) the cash advance facility was failing due to false and weak controls; and (3) Citigroup and OSA were engaged in an ongoing fraud which threatened the

reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1410. At no point during the May 2010 Meetings did OSA advise Mr. Janssens and De Hoop of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive OSA's assurances about its financial stability, including its ability to make future payments and repay its debt to De Hoop.

1411. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its prior representations false and misleading; (2) OSA was trying to restructure its debt to and convince De Hoop to enter into additional ship building contracts, from which OSA would receive a financial benefit (e.g., increased contracts with Pemex using vessels built by De Hoop); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of restructuring its debt to De Hoop and from the new vessels built by De Hoop; (4) OSA had full access to and was aware of the omitted material facts, and also knew that De Hoop would rely on the omitted facts when determining whether to renegotiate OSA's debt and/or build new vessels for OSA; and (5) the fraudulent scheme between Citigroup and OSA was underway by May 2010. OSA's special knowledge of the fraud also denied De Hoop the ability to sufficiently investigate OSA's finances when considering whether to restructure OSA's debt and/or enter into new contracts with OSA.

1412. Furthermore, given Citigroup's (1) close relationship with OSA; (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including De Hoop, was making (1) fraudulent misrepresentations regarding its financial health and the

stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶ 1470, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to De Hoop in 2010.

1413. When deciding whether to renegotiate the terms of the Rabobank loans and the payment of the De Hoop Goods and Services, De Hoop relied on the discussions during the May 2010 Meetings, which included material omissions by OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶ 1470).

*b. May 18, 2011 Presentation Regarding OSA*

1414. On or around September 6, 2011, Patrick Janssens from De Hoop received a presentation from Galaz, Yamazaki, Ruiz Urquiza, S.C. ("GYRU") which was prepared at the request of Rabobank (the "GYRU Report"). GYRU prepared the report after meeting with Rabobank and OSA in Mexico City between February 15 and 17, 2011. As part of its analysis, GYRU evaluated an "update of [OSA's] financial projections and financial information, as requested by [Rabobank]". Upon completion of its evaluation, GYRU provided OSA "with copies of selected analyses in order to obtain [its] input", which GYRU then incorporated into the GYRU Report. In sum, the GYRU report incorporated and relied upon information and documents provided by OSA.

1415. The GYRU Report noted that "[a]ccording to the financial projections provided by [OSA], there is positive cash flow for the following [i.e., from 2011 to 2015] periods".

1416. The GYRU Report also stated that OSA's external financial consultant "has been carrying out the corporate and financial restructuring inside OSA"; and that he considered the Banamex factoring facility as one of the eight key restructuring points.

1417. The GYRU Report featured, *inter alia*, slides titled "Trust overview" in which it presented positive financial projections for the Trust (including both Pemex deposits and outstanding invoices for services performed by Rabobank-financed vessels built by De Hoop). GYRU prepared these slides based on (i) "the invoices provided by OSA related to the contracts of the [Rabobank financed] vessels" and (ii) "a relation of invoices deposited by PEMEX into the trust and a (sic) internal statement of the balance of the trust".

1418. In 2011, however, (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in an fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1419. The GYRU Report omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive OSA's financial projections and the implicit representation contained therein that OSA had sufficient cash flow to pay De Hoop.

1420. OSA had a duty to speak and disclose this information to GYRU (and likewise De Hoop) because (1) its failure to speak would render its representations in the GYRU Report false and misleading; (2) it was seeking to amend the Rabobank Trust and to purchase additional vessels from De Hoop, from which OSA would receive a financial benefit (e.g., increased contracts with Pemex); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of the amendment to the Rabobank Trust and purchase of additional vessels from De Hoop; (4) OSA had full access to and was aware of the omitted material facts, and also knew that De Hoop would rely on the omitted facts when determining whether to

amend the Rabobank Trust and enter into additional purchase agreements for new vessels with OSA; and (5) the fraudulent scheme with Citigroup was well underway in 2011. OSA's special knowledge of its fraudulent scheme with Citigroup also denied De Hoop the ability to sufficiently investigate OSA's finances prior to amending the Rabobank Trust and entering into new contracts with OSA.

1421. Citigroup also had a duty to speak and disclose this information on account of its role as trustee of the Rabobank Trust, of which De Hoop was a beneficiary, but it failed to do so.

1422. Furthermore, given Citigroup's (1) close relationship with OSA; (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including De Hoop, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶ 1470, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to De Hoop in 2011.

1423. When deciding to amend the Rabobank Trust and to build additional vessels for OSA, De Hoop relied on the fraudulent misrepresentations and material omissions included in the GYRU Report, including as to the strength of OSA's finances and the reliability of the Banamex factoring facility, which GYRU unwittingly made based on the misleading information provided by OSA, which Citigroup aided and abetted on account of its knowledge and substantial assistance (*see infra* at ¶ 1470).

### 3. Fraudulent Misrepresentations and Material Omissions in 2012 and 2013 Relating to OSA's Financials

#### *a. Material Omissions Relating to OSA's 2010 and 2011 Audited Financial Statements*

1424. In or around March 2, 2012, De Hoop received OSA's 2010 and 2011 Financial Statements.

1425. As described above (*see supra* at Section XIV E), OSA's 2010 and 2011 Financial Statements discussed OSA's cash flow from the Citigroup cash advance facility and implicitly represented that OSA had sufficient cash flow to pay De Hoop.

1426. OSA's 2010 and 2011 Financial Statements omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive the financial projections contained in OSA's 2010 and 2011 Financial Statements and the implicit representations contained therein that OSA had sufficient cash flow to pay De Hoop.

1427. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its prior representations in the financial statements false and misleading; (2) it was seeking to enter into new contracts with De Hoop to purchase additional vessels, from which OSA would receive a financial benefit; (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of purchasing new vessels and using them to provide services to Pemex; (4) OSA had full access to and was aware of the omitted material facts, and also knew that De Hoop would rely on the omitted facts when determining whether to enter into agreements or continue doing business with OSA, notably with regards to the shipbuilding contracts for seven additional fast-supply intervention vessels ultimately signed in October 2012; and (5) the fraudulent scheme with Citigroup was well

underway in 2012. OSA's special knowledge of its fraudulent scheme with Citigroup also denied De Hoop the ability to sufficiently investigate OSA's finances prior to agreeing to sell new vessels to OSA.

1428. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including De Hoop, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶ 1470, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to De Hoop in 2011.

1429. When deciding to build new vessels for OSA in 2012, De Hoop relied on OSA's material omissions regarding OSA's financial stability and cash flow in OSA's 2010 and 2011 Financial Statements, which Citigroup aided and abetted on account of its knowledge and substantial assistance (*see infra* at ¶ 1470).

*b. Discussions with Jose Ortega-Rivera in October 2012 Regarding The Financing Of Four Additional Vessels*

1430. As discussed *supra* at ¶ 129, Citigroup fired Mr. Ortega-Rivera, the former Citigroup head of cash advances, in August 2012 for having received bribes and kickbacks from OSA.

1431. On information and belief, after Citigroup fired Mr. Ortega-Rivera, Mr. Yáñez hired him to provide services on behalf of OSA.

1432. On information and belief, Citigroup knew that OSA hired Mr. Ortega-Rivera after having been fired from Citigroup for bribery and kickbacks to OSA; but did not disclose this information to OSA's vendors, creditors and bondholders, such as De Hoop.

1433. On information and belief, at all relevant times for this Third Amended Complaint, De Hoop was not aware that Citigroup had fired Mr. Ortega-Rivera for bribery relating to OSA.

1434. In or around October 2012, Mr. Janssens from De Hoop and Mr. Ortega-Rivera (ex-Citigroup), with Omar Olvera Monroy (OSA's counsel) copied, exchanged emails regarding the financing of additional vessels to be built by De Hoop for OSA (the "October 2012 Emails").

1435. In the October 2012 Emails, Mr. Janssens and Mr. Ortega-Rivera discussed the signed contracts between OSA and De Hoop for the construction of four additional vessels in July 2011 and September 2012 and the options for financing these vessels. Mr. Ortega-Rivera suggested that Mr. Janssens schedule meetings with prospective financiers, "in order to present them the company and all the improvement it have been make (sic) and sow (sic) all the numbers and the actuals grate (sic) situation of OSA". Mr. Ortega-Rivera also indicated that he was "at a meeting with Pemex", indirectly suggesting potential new business between OSA and Pemex.

1436. In the October 2012 Emails with De Hoop, Mr. Ortega-Rivera, on behalf of OSA, represented that OSA's situation had improved and was now "great," notwithstanding the false documents submitted by OSA to ICG employees, the weak controls of the cash advance facility, and the ongoing fraud (*see* supra at Section VI), of which Mr. Ortega-Rivera—as the ex-Citigroup head of cash advances for Mexico from 2010 to August 2012—was well aware.

1437. Mr. Ortega-Rivera omitted the following information from the October 2012 Emails: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided;

(2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable, and propped up by false documentation. Omission of such information from the October 2012 Emails rendered them false, misleading and deceptive.

1438. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its prior representations false and misleading; (2) it was seeking new vessels from De Hoop, from which OSA would receive a financial benefit (e.g., increased contracts with Pemex); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of receiving additional vessels from De Hoop; (4) OSA had full access to and was aware of the omitted material facts, and also knew that De Hoop would rely on the omitted facts when determining whether to enter into agreements or continue doing business with OSA, notably entering into shipbuilding contracts for seven additional fast-supply intervention vessels, for which contracts were ultimately signed in October 2012; and (5) the fraudulent scheme with Citigroup was well underway in 2012. OSA's special knowledge of its fraudulent scheme with Citigroup also denied De Hoop the ability to sufficiently investigate OSA's finances prior to entering into new contracts with OSA.

1439. Citigroup also had a duty to speak and disclose the omitted information on account of its role as trustee of the Rabobank Trust through the ICG, but failed to do so.

1440. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); (3) knowledge of Mr. Ortega-Rivera's receipt of bribes and kickbacks from OSA in 2012 and subsequent firing of Mr. Ortega-Rivera; (4) knowledge of services provided by Mr. Ortega-Rivera on behalf of OSA; and (5) participation in the fraud, Citigroup knew that OSA (including through Mr. Ortega-Rivera), in communications and materials shared with its creditors, vendors and bondholders, including De Hoop, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶ 1470., Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to De Hoop in 2012.

1441. When agreeing to enter into new shipbuilding contracts for OSA in 2012, De Hoop relied on (1) the October 2012 Emails, which included fraudulent misrepresentations and material omissions by OSA, which Citigroup aided and abetted on account of its knowledge and substantial assistance (as described *infra* at ¶ 1470.); and (2) Citigroup's omissions as trustee of the Rabobank Trust.

*c. Meeting Between De Hoop and OSA's External Financial Consultant In Late 2012 – Early 2013 Regarding OSA's Purchase of Seven New Vessels From De Hoop*

1442. In or around late 2012 – early 2013, Patrick Janssens from De Hoop had a meeting in Ciudad del Carmen (Mexico) with OSA's external financial consultant about OSA's purchase of the seven new fast supply intervention vessels from De Hoop.

1443. During the meeting, OSA's external financial consultant repeatedly assured De Hoop that the cash advance facility was a reliable source of liquidity for the company,

notwithstanding the (1) false documents submitted by OSA to ICG employees; (2) the false and weak controls of the cash advance facility, and (3) the ongoing fraud (*see* supra at Section VI), of which Citigroup and OSA (but not its external financial consultant) were aware.

1444. OSA's external financial consultant made these representations based on information obtained from Citigroup and OSA. As noted above (*see supra* at ¶ 458), OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including De Hoop.

1445. However, Citigroup and OSA failed to advise De Hoop of (1) the false documents submitted by OSA to ICG employees; (2) the false and weak controls of the cash advance facility; and (3) the ongoing fraud (*see supra* at Section VI). These omissions rendered the representations made by OSA's external financial consultant to De Hoop in late 2012 – early 2013 misleading and deceptive.

1446. Citigroup and OSA had a duty to disclose this information to OSA's external financial consultant (and likewise De Hoop) because (1) they were all working together to restructure OSA's debt; (2) Citigroup and OSA had full access to this information and intentionally withheld it from OSA's external financial consultant and De Hoop to receive a benefit; and (3) at this time, Citigroup and OSA were involved in a fraudulent scheme.

1447. Citigroup, as trustee of the Rabobank Trust of which De Hoop was a beneficiary, had a duty to speak and disclose this information to OSA's external financial consultant and De Hoop, but it failed to do so.

1448. De Hoop relied on (1) the material omissions made by Citigroup, through OSA's external financial consultant in late 2012 – early 2013, which were based on information provided by Citigroup and with Citigroup's knowledge that OSA's external financial consultant would disseminate this information to OSA's creditors, vendors and bondholders, including De Hoop , and (2) Citigroup's omissions as trustee of the Rabobank Trust when deciding to sell seven additional fast supply intervention vessels to OSA.

*d. Receipt of Pareto Materials in September 2013*

1449. On or around September 2013, Patrick Janssens from De Hoop was approached by Citigroup and OSA regarding the 2013 Bond Issuance. Citigroup and OSA explained to Mr. Janssens that the 2013 bonds offered a new means of financing to OSA, who could in turn purchase additional vessels.

1450. On information and belief, on or around September 4, 2013, De Hoop received one or more of the Pareto Materials described *supra* in Section XIV. C.

1451. OSA provided Mr. Janssens and De Hoop with the Pareto Materials as evidence of OSA's financial stability, including its ability to make future payments for the construction of additional vessels by De Hoop.

1452. As described in detail *supra* at Section XIV C, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials. Accordingly, the Pareto Materials, including those materials received by De Hoop, included fraudulent misrepresentations and material omissions by both Citigroup and OSA.

1453. Citigroup (and OSA) were aware, as described *supra* at Section XIV.C, that OSA and Pareto intended to provide the Pareto Materials to creditors, vendors and bondholders of OSA

in order to demonstrate OSA's continued financial viability, instill confidence in OSA's ability to repay its debts, and/or to solicit further investment in OSA.

1454. As detailed *supra* in Section XIV C, the Pareto Materials, including those documents received by De Hoop, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure. Such representations were false because in 2013 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section VI.).

1455. In addition, the Pareto Materials, including those received by De Hoop, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1456. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those to whom OSA and Pareto provided the Pareto Materials) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments and attempting to instill creditor and investor confidence in OSA, through Pareto, from which they would receive a financial benefit (e.g., increased contracts with Pemex for OSA and increased cash advances and interest flowing therefrom for Citigroup); (3) Citigroup and OSA had full access to this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise shipyard companies such as De Hoop), or (ii) persuaded Pareto to participate in the scheme, to

receive a financial benefit from OSA's use of additional vessels built by De Hoop to provide services to Pemex; and (4) at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup's and OSA's special knowledge of the fraudulent scheme also denied Pareto (and De Hoop) the ability to sufficiently investigate OSA's finances.

1457. Citigroup also had a duty to speak fully and disclose this information to Pareto and De Hoop on account of its roles as trustee of the Rabobank Trust and fiduciary of the Mexican Trust through the ICG and Banamex.

1458. When agreeing to continue building additional vessels for OSA and to be paid through the Rabobank Trust in 2013, De Hoop relied on the Pareto Materials, which included fraudulent misrepresentations and material omissions by (1) Citigroup, through Pareto; and (2) OSA, which Citigroup aided and abetted on account of its knowledge and substantial assistance (as described *infra* at ¶ 1470).

### 4. Material Omissions Between 2012 and 2014 Relating To Periodic Reports Sent By Rabobank

1459. Between 2012 and 2014, De Hoop received reports from Rabobank on a bi-annual basis providing a summary of the main developments of the Rabobank Trust (the "Rabobank Reports"), including (1) a financial overview of OSA, including its financial performance; (2) an overview of the Rabobank financial facilities with regards to OSA; (3) updates on recent transactions; and (4) a description of any changes to the Trust structure.

1460. The Rabobank Reports were based on information and documents obtained from Citigroup and OSA, notably (i) OSA's audited financial reports; (ii) OSA's financial presentations; and (iii) information provided to Rabobank by OSA's external financial consultant.

1461. The Rabobank Reports presented OSA as being financially secure, and noted that "OSA updates its financial presentations (which are and have been used to reassure creditors of

OSA's performance) on a regular basis to reflect the positive developments." The Reports also indicated that the Banamex factoring/discounting program was central to OSA's cash flow and liquidity positions, stating that "OSA's liquidity position [is] adequate: the company is highly cash generative, but this is partly offset by OSA's cash need for its capex program and its reliance on the discounting facility."

1462. The Rabobank Reports omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.[60] These omissions rendered misleading and deceptive the financial projections contained the Rabobank Reports and the implicit representations contained therein that OSA had sufficient cash flow to pay De Hoop.

1463. Citigroup and OSA had a duty to speak and disclose this information because (1) their failure to speak would render its prior representations to Rabobank for purposes of preparing the Reports false and misleading; (2) OSA was seeking new vessels from De Hoop, from which Citigroup and OSA would receive a financial benefit (e.g., increased contracts with Pemex and increased interest from cash advance requests and increased fees for serving as trustee of the Rabobank Trust for Citigroup); (3) OSA and Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of receiving new vessels from De Hoop; (4) OSA and Citigroup had full access to and were aware of the omitted material facts, and also knew that De Hoop would rely on the omitted facts when determining whether to enter into agreements or continue doing business with OSA, notably to enter into additional shipbuilding contracts for the seven new fast-supply intervention vessels which were ultimately

[60] Rabobank had no knowledge of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; or the (3) the false and weak controls of the cash advance facility, nor did Rabobank participate in the fraud.

signed in October 2012; and (5) the fraudulent scheme between Citigroup and OSA was well underway in 2012-2014. OSA's and Citigroup's special knowledge of its fraudulent scheme with Citigroup also denied De Hoop the ability to sufficiently investigate OSA's finances prior to building new vessels for OSA.

1464. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including De Hoop, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶ 1470, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to De Hoop in 2012-2014.

1465. Citigroup also had a duty to speak and disclose the omitted information on account of its role as trustee of the Rabobank Trust, but it failed to do so.

1466. When deciding whether to build new ships for OSA in 2012 and continuing to do business with OSA between 2012 and 2014, De Hoop relied on the fraudulent misrepresentations and material omissions regarding OSA's financial stability and cash flow in the Rabobank Reports by (1) Citigroup, through Rabobank; and (2) OSA, which Citigroup aided and abetted on account of its knowledge and substantial assistance (*see infra* at ¶ 1470).

### 5. Citigroup (1) Directly Committed Fraud; and (2) Conspired with and Aided Abetted OSA in Committing Fraud, Against De Hoop

1467. Citigroup committed fraud against De Hoop through the fraudulent misrepresentations and material omissions in the (1) October 2012 Emails; and (2) materials shared

with, and communications made to, De Hoop between 2010 and 2014 by OSA, including those made by its external financial consultant and Pareto, and unwittingly made by Rabobank, which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors, and bondholders, including De Hoop.

1468. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant) in communications and materials shared with De Hoop relating to the renegotiation of the terms of the Rabobank Loans and OSA's financial health, including those made in the (1) May 2010 Meetings; (2) GYRU Report; (3) OSA's 2010 and 2011 Financial Statements; and (4) October 2012 Emails (*see supra* at Section XV D 2-4).

1469. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to creditors like De Hoop on account of its (1) participation in the fraud (*see supra* SectionVI); (2) its role in approving OSA's false documentation; (3) role as trustee of the Rabobank Trust; and (4) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

1470. With knowledge of OSA's fraudulent misrepresentations and material omissions to De Hoop (including those made by OSA's external financial consultant) between 2010 and 2014 described *supra* at Section XV D 2-4), Citigroup substantially assisted and aided abetted OSA in making fraudulent misrepresentations and material omissions and committing fraud against De Hoop, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering

into the secret Regulatory Contract which purported to release Citigroup from any responsibility in validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; (5) concealing Mr. Ortega-Rivera's misconduct at and firing from Citigroup; and (6) sanctioning OSA's false financial projections in its financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA and Pareto in these communications and materials.

1471. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

**6. De Hoop Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions**

1472. When De Hoop agreed (1) to renegotiate OSA's payment for the De Hoop Goods and Services; (2) to become a beneficiary of the Rabobank Trust; (3) to receive payment for the De Hoop Goods and Services after OSA finished repaying the Rabobank loans; and (4) to sell new vessels to OSA and receive payment for them through the Rabobank Trust, De Hoop relied on the fraudulent misrepresentations and material omissions by Citigroup, through OSA's external financial consultant, Pareto, and Rabobank; and by OSA (including those made by OSA's external financial consultant), which Citigroup aided and abetted on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup aided and abetted OSA in making material omissions to De Hoop in the May 2010 Meetings (described *supra* at ¶¶ 1406-1413);

(b) Citigroup aided and abetted OSA in making material omissions to De Hoop in the GYRU Report (described *supra* at ¶¶ 1414-1423);

(c) Citigroup aided and abetted OSA in making material omissions to De Hoop in OSA's 2010 and 2011 Financial Statements (described *supra* at ¶¶ 1424-1429);

(d) Citigroup, in the October 2012 Emails, (1) made material omissions as trustee of the Rabobank Trust and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to De Hoop (described *supra* at ¶¶ 1430-1441);

(e) Citigroup, during a meeting in or around late 2012 – early 2013, (1) made material omissions as trustee of the Rabobank Trust and (2) through OSA's external financial consultant, made material omissions to De Hoop (described *supra* at ¶¶ 1442-1448);

(f) Citigroup, through Pareto's communications made to and materials transmitted to De Hoop in September 2013, (1) made fraudulent misrepresentations and material omissions to De Hoop; and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to De Hoop (described *supra* at ¶¶ 1449-1458);

(g) Citigroup, through the Rabobank Reports transmitted to De Hoop between 2012 and 2014, made (1) fraudulent misrepresentations and material omissions to De Hoop, and (2) aided and abetted OSA to made fraudulent misrepresentations and material omissions to De Hoop ((described *supra* at ¶¶ 1459-1466);

(h) Citigroup committed fraud against De Hoop between 2010 and 2014 by making material omissions and failing to disclose information as trustee of the Rabobank Trust (described *supra* at (described *supra* at Section XV D).

1473. In other words, De Hoop would not have agreed to accommodate OSA's requests with regards to the restructuring of its loans with Rabobank, nor would De Hoop have entered into additional shipbuilding contracts with OSA, had it known about the (1) OSA's false financial projections; (2) false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1474. Due to the fraud and corresponding collapse of OSA, De Hoop has not recovered the De Hoop Security Deposit, has not been paid for the De Hoop Goods and Services and did not receive complete payment from OSA for the seven new vessels.

## E. Gulf

### 1. Overview

1475. Mr. Yáñez and other OSA principals contacted Gulf in 2011, seeking to lease the vessel Titan 2. At this time, Gulf held the rights to lease Titan 2 through Baltic Offshore Marine Contractors AB ("Baltic"), a Swedish company. Titan 2 is a large vessel equipped with a crane used for heavy lifting at offshore oil facilities, which OSA sought to utilize to provide services to Pemex.

1476. On April 13, 2011, Baltic and OSA entered into a five-year charter agreement, in which Baltic leased the Titan 2 to OSA (the "Titan Charter Agreement"). In October 2013, Gulf replaced Baltic as the lessor in the Titan Charter Agreement. At the time of OSA's collapse, OSA was still leasing the Titan 2 from Gulf.

1477. As described further below, between 2011 and 2014, including through the period of the fraud, Gulf leased the Titan 2 to OSA in reliance on ***fraudulent misrepresentations*** by OSA

including in meetings between Citigroup, OSA and Gulf, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud.

1478. Specifically, OSA represented—with Citigroup's knowledge and substantial assistance—that OSA was financially secure, including because of the stability and reliability of the cash advance facility.

1479. Such representations were false because, as Citigroup and OSA knew: (1) OSA was not financially secure, including because (i) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; and (ii) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments, lease agreements and restructure OSA's debt to the financial benefit of Citigroup and OSA; (2) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (3) there was a revolving door of former Citigroup employees taking key positions in OSA; and (4) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012.

1480. Gulf also leased Titan 2 to OSA from 2011 to 2014, including through the period of the fraud, in reliance on ***material omissions*** by (1) Citigroup, including in a meeting between Citigroup, OSA and Gulf; and (2) OSA, with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud.

1481. Specifically, between 2011 and 2014, Citigroup omitted—or substantially assisted OSA in omitting—the following information from communications made to Gulf: (1) the

documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's statements regarding its financial stability were false including because they were based on false revenue and profitability projections premised on false documents.

1482. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Gulf given (1) their previous and ongoing representations to Gulf, including in meetings; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties (*see infra* at Section XIII); (ii) parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from the relationship with Gulf; (iv) Citigroup's and OSA's awareness of Gulf's reliance on the false and misleading information; and (v) Citigroup's and OSA's participation in the fraud (*see infra* at *see supra* at Sections IV, VI, XIII, XV(E)(2)–(3)).

1483. Citigroup and OSA directly benefited from fraudulently inducing and luring Gulf to lease its vessel, and continue leasing its vessel, to OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1484. Citigroup, through its fraudulent misrepresentations and material omissions in communications with Gulf, committed fraud against Gulf.

1485. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to Gulf and aided and abetted and

substantially assisted OSA as well as participated in committing fraud against Gulf, as described *infra* at Section VI.

1486. Had Gulf known about (1) OSA's true financial condition; (2) the false and weak controls of Citigroup's cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, it would not have entered into lease agreements with OSA or continued doing business with OSA between 2011 and 2014.

1487. Due to the fraud and corresponding collapse of OSA, Gulf has not received the payments under its lease of Titan 2 to OSA and Gulf cannot recover the vessel from OSA.

#### 2. Material Omissions in April 2011 Relating to Gulf's Decision to Enter into the Titan Charter Agreement

1488. On April 5, 2011, Arne Hall of Baltic (as predecessor to Gulf) participated in an in-person meeting at OSA's headquarters in Ciudad del Carmen, Mexico (the "April 2011 Meeting") with (1) OSA principals, including Mr. Yáñez and OSA's Commercial Director Hermilo Escobedo; and (2) OSA's external financial consultant. The purpose of the April 2011 Meeting was to discuss a potential lease agreement relating to the Titan 2. OSA, including Mr. Yáñez, provided assurances to Mr. Hall about OSA's ability to make the lease payments.

1489. During the April 2011 Meeting, OSA's external financial consultant summoned a Citigroup ICG representative from an adjoining room to join the meeting: Mr. Granja. To Mr. Hall, it appeared that Mr. Granja had an office within OSA and was working there full-time.

1490. Upon joining the meeting, Mr. Granja gave Mr. Hall his business card, which included the Citigroup logo.

1491. During the April 2011 Meeting, Mr. Granja vouched for OSA, including by informing Mr. Hall that Banamex "support[ed] Oceanografía's finances" and "all Oceanografía payments were coming through them."

1492. Implicit in these comments was a representation by Citigroup that OSA's cash advance facility with Banamex, the primary source of liquidity and cash flow for OSA and from which OSA would pay Gulf and others, was stable, reliable and controlled by Citigroup.

1493. At this time, however, OSA was (1) submitting false documents to ICG employees; (2) the facility controls were false and weak; and (3) Citigroup and OSA were engaged in an fraudulent scheme involving the facility (*see supra* at Section VI), all of which Citigroup obviously was aware.

1494. At no point during the April 2011 Meeting did Citigroup's representatives or OSA's principals advise Mr. Hall and Gulf of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered false and misleading Citigroup's representations regarding its support of OSA and the reliability of the cash advance facility and OSA's assurances about its ability to make the lease payments.

1495. Citigroup and OSA had a duty to speak and disclose this information because (1) their failure to speak would render their prior representations false and misleading; (2) OSA was seeking a lease to the Titan 2, from which both Citigroup and OSA would receive a financial benefit (e.g., increased contracts with Pemex for OSA and increased cash advance requests and interest earned therefrom for Citigroup); (3) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of the lease to the Titan 2; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Gulf would rely on the omitted facts when determining whether to enter into a lease agreement with OSA; and (5) the fraudulent scheme between Citigroup and OSA was well

underway by April 2011. Citigroup's and OSA's special knowledge of the fraud also denied Gulf the ability to sufficiently investigate OSA's finances prior to leasing the Titan 2 to OSA.

1496. When deciding whether to lease the Titan 2 to OSA in April 2011 and continuing to lease the vessel to OSA between April 2011 and February 2014, Gulf relied on (1) Citigroup's material omissions in the April 2011 Meeting relating to its support of OSA and the reliability of the cash advance facility; and (2) OSA's material omissions during the same meeting, including as to OSA's ability to make the lease payments, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1503–07).

### 3. Fraudulent Misrepresentations and Material Omissions in May 2011 Relating to Gulf Continuing to Lease the Titan 2 to OSA

1497. On May 2, 2011, Mr. Hall met with Mr. Yáñez at a hotel in Houston, Texas to discuss OSA's first lease payment to Gulf (the "May 2011 Meeting"). During the May 2011 Meeting, Mr. Yáñez assured Mr. Hall that OSA would timely make the initial lease payments, including by saying that "everything was good" at OSA.

1498. At this time, however, OSA and Citigroup were involved in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow. Thus, OSA's representation that "everything was good" at OSA was false.

1499. At no time during the May 2011 Meeting did Mr. Yáñez advise Mr. Hall and Gulf about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered false and misleading OSA's representations about its ability to pay Gulf.

1500. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its prior and ongoing representations to Gulf false and misleading; (2) it had entered into a lease agreement with Gulf, from which it would receive a financial benefit; (3) OSA

had full access to and knowledge of this information and intentionally withheld it in order to continue leasing the Titan 2 from Gulf; (4) OSA had full access to and was aware of the omitted material facts, and also knew that Gulf would rely on the omitted facts when determining whether to continue leasing the Titan 2 to Gulf; and (5) the fraudulent scheme between Citigroup and OSA was underway by May 2011. OSA's special knowledge of the fraud also denied Gulf the ability to sufficiently investigate OSA's finances before continuing to lease its vessel to OSA.

1501. In May 2011, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); (3) participation the April 2011 meeting with Gulf; and (4) participation in the fraud, Citigroup was aware that OSA, in communications to and materials shared with creditors, vendors and investors, including Gulf, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶¶ 1503–07, Citigroup aided and abetted and substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Gulf in May 2011.

1502. When deciding to continue leasing the Titan 2 to OSA between May 2011 and February 2014, Gulf relied on OSA's fraudulent misrepresentations and material omissions in the May 2011 Meeting, including as to the strength of OSA's finances and its ability to make the lease payments to Gulf, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1503–07).

### 4. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Gulf

1503. Citigroup directly committed fraud against Gulf through its material omissions to Gulf in the April 2011 Meeting (*see supra* at ¶¶ 1491–94).

1504. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions to Gulf in April and May 2011 (*see supra* at ¶ 1495).

1505. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to vessel lessors like Gulf on account of its (1) participation in the fraud (*see supra* Section VI); (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

1506. With knowledge of OSA's fraudulent misrepresentations and material omissions to Gulf in 2011, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against Gulf, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false communications about its ability to make lease payments

to Gulf in the April and May 2011 Meetings, including by not correcting the false and inaccurate information provided by OSA during these meetings.

1507. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 5. Gulf Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions

1508. When leasing the Titan 2 to OSA in April 2011 and continuing to lease the vessel to OSA between April 2011 and February 2014, Gulf relied on the matrial omissions by Citigroup; and fraudulent representations and material omissions by OSA, which Citigroup aided and abetted on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup (1) made material omissions to Gulf in the April 2011 Meeting and (2) aided and abetted OSA in making material omissions to Gulf in the April 2011 Meeting (described *supra* at ¶¶ 1488–96);

(b) Citigroup aided and abetted OSA in making fraudulent misrepresentations and material omissions to Gulf in the May 2011 Meeting (described *supra* at ¶¶ 1497–1502). (1) Citigroup's material omissions in the April 2011 Meeting; and (2) OSA's fraudulent misrepresentations and material omissions in the April and May 2011 Meetings, made with Citigroup's knowledge and substantial assistance.

1509. In other words, Gulf would not have leased its vessel or continued to lease its vessel to OSA had it known of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1510. From April 2011, when the Titan lease began, to February 2014, when OSA collapsed, OSA was late on its monthly lease payments on approximately two-dozen occasions, and failed to make any monthly rent payments at all since April 2013. Any delay in payment entitled Gulf to cancel the lease.

1511. OSA owed approximately $32,500 per day for its lease of Titan 2. Gulf has received no lease payments for Titan 2 since April 2013.

1512. In March 2014, the Mexican government seized OSA and its assets, including Titan 2 (*see supra* at ¶ 201). Thus, Gulf cannot recover the Titan 2 from OSA.

1513. As a result, Gulf cannot lease the Titan 2 to any other company and has not received lease payments for the Titan 2 since April 2013.

1514. Under the Titan Charter Agreement, OSA also agreed to maintain the Titan 2 during the lease term, including by maintaining the Titan 2's regulatory certifications. However, the Titan 2 has not been maintained since its seizure, thereby diminishing the Titan 2's value and causing the loss of regulatory certifications required for its commercial operation.

## F. <u>Halani</u>

### 1. Overview

1515. In or around late 2011 and early 2012, a ship-broker acting on behalf of OSA contacted Halani about the possibility of OSA leasing a vessel from Halani called "Halani 1."

1516. As part of the lease negotiations, an OSA principal, Enrique Castillo, traveled to Oman to meet with Halani and inspect the vessel. During the inspection, the OSA principal represented that OSA (1) was a strong, reputable company with a steady cash flow; (2) leased vessels from large companies across the globe; and (3) held loans with large financial institutions including Citigroup.

1517. Ultimately OSA convinced Halani to lease it Halani 1, which OSA utilized to provide services to Pemex.

1518. Shortly after executing the lease agreement in early 2012, Halani deployed two full-time employees to OSA's headquarters to service and maintain the Halani 1.

1519. Every month between 2012 and 2013, Halani's owner and managing director, Ashok Bhambhani, visited OSA's headquarters in Ciudad del Carmen, Mexico. On each occasion, he observed that OSA's employees wore coveralls emblazoned with Banamex's logo.

1520. Under the lease agreement, Halani was entitled to cancel the lease if OSA was late on its monthly rent. In approximately January 2013, OSA missed the December 2012 lease payment. OSA subsequently failed to make any rent payments in 2013.

1521. As described further below, Halani delayed canceling the lease with OSA in reliance on ***fraudulent misrepresentations*** by (1) Citigroup in (i) communications between Halani and Citigroup, as trustee and collateral agent for the 2008 Bonds Issuance, and (ii) materials provided by OSA and Pareto to Halani, which (a) necessarily incorporated information provided by Citigroup as fiduciary of the Mexican Trust and OSA's banker; and (b) were distributed to current and potential creditors, vendors and bondholders, such as Halani, with Citigroup's knowledge; and (2) OSA—with Citigroup's knowledge and substantial assistance—including through Citigroup's participation in the fraud and its failure to correct or revise the false information Citigroup knew OSA and Pareto were providing to current and potential creditors like Halani.

1522. Specifically, Citigroup represented to Halani—and substantially assisted OSA (and its external financial consultant) in representing—that OSA (1) was financially secure, including because of its Pemex contracts and the stability and reliability of the cash advance facility; (2) was

supported by Citigroup, including in its roles as trustee and collateral agent of the 2008 Bond Issuance and fiduciary of the Mexican Trust through the ICG and Banamex in connection with the 2013 Bond Issuance; and (3) had positive profit projections. Such representations were false because, as Citigroup (and OSA) knew: (1) OSA was not financially secure; (2) Citigroup and OSA were engaged in a fraud between 2008 (on information and belief) and 2014 involving the cash advance facility; (3) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA's principals; (4) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (5) there was a revolving door of former Citigroup employees taking key positions in OSA; and (6) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012 (*see supra* at Sections I, VI, and XIII).

1523. Halani also entered into the lease agreement with OSA, and delayed canceling the lease, in reliance on ***material omissions*** by (1) Citigroup in (i) communications with Halani, (ii) materials prepared by Pareto and others that incorporated information provided by Citigroup and with Citigroup's knowledge that they would be distributed to potential creditors, vendors and bondholders, like Halani, and (iii) through its roles as trustee and collateral agent for the 2008 Bond Issuance and fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance; and (2) OSA—with Citigroup's knowledge and substantial assistance—including Citigroup's participation in the fraud and its failure to correct the false and misleading information Citigroup knew OSA and Pareto were providing to Halani.

1524. Specifically, between late 2011 or early 2012 and 2013, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with Halani: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections because they were premised on a cash advance facility that was, in actuality, unstable, unreliable, and propped up by false documentation. Such omissions in the communications made to and materials shared with Halani by Citigroup, OSA, OSA's external financial consultant and Pareto rendered them false, misleading and deceptive.

1525. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to Halani given (1) their previous and ongoing representations to Halani, including in emails, agreements, and meetings; and (2) the following factors created a duty to speak: (i) the nature of the relationship between the parties (*see infra* at Section XIII); (ii) the parties' relative access (or lack thereof) to the omitted information; (iii) benefits derived by Citigroup and OSA from the relationship with Halani; (iv) Citigroup's and OSA's awareness of Halani's reliance on the false and misleading information; and (v) Citigroup's and OSA's participation in the fraud (*see supra* at Sections IV, VI, XIII, XV(F)(2)–(3)).

1526. Citigroup and OSA directly benefitted from fradulently inducing and luring Halani to invest, and maintain its investment in OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1527. Citigroup directly committed fraud against Halani through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with Halani, including those in the Pareto Materials, which were based on information provided by Citigroup and with Citigroup's knowledge that OSA and Pareto would distribute the Materials to potential potential creditors, vendors and bondholders including Halani.

1528. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to Halani (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in committing fraud against Halani, as described *infra* at ¶¶ 1565–69.

1529. Had Halani known about (1) OSA's true financial condition; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, it would not have entered into lease agreements with OSA or continued doing business with OSA between 2012 and 2014.

1530. Due to the fraud and corresponding collapse of OSA, Halani has not received approximately $14 million in past due lease payments owed under its agreement with OSA.

### 2. Material Omissions in 2012 Relating to the Lease Negotiations

#### *a. January 2, 2012 OSA Communication Forwarding a Standby Letter of Credit*

1531. On January 2, 2012, and before Halani executed the lease with OSA, a shipping broker that, on information and belief was acting on OSA's behalf, emailed Halani (the "January

2, 2012 Email"), stating that: "Finally OCEANOGRAPHIA received comments from *their City Bank (México – Banamex)* and they are proposing the attached Stand By Letter of Credit". In other words, as part of the lease negotiations with Halani, OSA had procured a standby letter of credit (the "Standby Letter of Credit") from "City Bank (México – Banamex)" to provide assurances to Halani about OSA's ability to make the lease payments.

1532. Specifically, the Stand By Letter of Credit permitted Halani to seek payment for any debts owed by OSA to Halani directly from OSA's bank. Specifically, the Stand By Letter of Credit states that "[OSA] authorize[s] [Halani] to debit [OSA's] USD Account No. Number that we hold with Citibank N.A., New York." The Stand By Letter Credit, which Citigroup knew was being provided to an OSA supplier given, among other things, its role in preparing and revising the Letter, provided Halani with comfort that, in the event OSA defaulted on a lease payment, Halani could seek payment directly from OSA's bank.

1533. In 2012, however, (1) OSA was submitting false documents to the ICG; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in an fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section V).

1534. The (1) January 2012 Email, which was based on information provided by OSA to the shipping broker and with OSA's knowledge that the broker would provide that information to Halani; and (2) Standby Letter of Credit omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive OSA's implicit representations through the Email and Standby Letter of Credit that Halani would receive payment from either OSA or its bank.

1535. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its representations in the January 2012 Email and the Standby Letter of Credit false and misleading; (2) it was seeking a lease to the Halani 1, from which OSA would receive a financial benefit (e.g., increased contracts with Pemex); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of the lease to the Halani 1; (4) OSA had full access to and was aware of the omitted material facts, and also knew that Halani would rely on the omitted facts when determining whether to enter into a lease agreement with OSA; and (5) the fraudulent scheme with Citigroup was well underway in 2012. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Halani the ability to sufficiently investigate OSA's finances prior to leasing the Halani 1 to OSA.

1536. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at XIII); (2) role in restructuring OSA's debt (*id*.); (3) role in preparing the Standby Letter of Credit; and (4) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including Halani, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶¶ 1565–69, Citigroup aided and abetted OSA, on account of its knowledge and substantial assistance, in making these fraudulent misrepresentations and material omissions to Halani in 2012, including by providing the Standby Letter of Credit.

1537. When deciding whether to lease the Halani 1 to OSA in early 2012 and continuing to lease the vessel to OSA between 2012 and 2014, Halani relied on the January 2012 Email and the Standby Letter of Credit regarding OSA's financial stability and relationship with Citigroup,

which included material omissions by OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1565–69).

*b. 2012 OSA Presentation*

1538. In or around 2012, and before Halani executed the lease with OSA, OSA provided Halani with a presentation about the company (the "2012 OSA Presentation"), which included a list of OSA's Pemex contracts, indicating the cash flow from each contract and reassuring Halani that OSA had sufficient cash flow to pay the lease on the Halani 1.

1539. In 2012, however, (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in an fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section V).

1540. The 2012 OSA Presentation omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (2) the false and weak controls of the cash advance facility; and (3) the ongoing fraud. These omissions rendered misleading and deceptive OSA's list of Pemex contracts and the implicit representation contained therein that OSA had sufficient cash flow to pay Halani.

1541. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its representations in the 2012 OSA Presentation false and misleading; (2) it was seeking a lease to the Halani 1, from which OSA would receive a financial benefit (e.g., increased contracts with Pemex); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of the lease to the Halani 1; (4) OSA had full access to and was aware of the omitted material facts, and also knew that Halani would rely on the omitted facts when determining whether to enter into a lease agreement with OSA; and (5) the fraudulent scheme with Citigroup was well underway in 2012. OSA's special knowledge

of its fraudulent scheme with Citigroup also denied Halani the ability to sufficiently investigate OSA's finances prior to leasing the Halani 1 to OSA.

1542. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at XIII); (2) role in restructuring OSA's debt (*id*.); and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including Halani, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at ¶¶ 1565–69, Citigroup aided and abetted OSA, on account of its knowledge and substantial assistance, in making these fraudulent misrepresentations and material omissions to Halani in 2012.

1543. When deciding whether to lease the Halani 1 to OSA in early 2012 and continuing to lease the vessel to OSA between 2012 and 2014, Halani relied on the January 2012 Email, Standby Letter of Credit, and 2012 OSA Presentation regarding OSA's financial stability and Pemex contracts, which included material omissions by OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1565–69).

### 3. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to Late Lease Payments

#### *a. Meeting with OSA in Houston, Texas in May 2013*

1544. On May 9, 2013, during the annual Offshore Technology Conference in Houston, Texas, Mr. Bhambhani met with Mr. Yáñez, OSA's external financial consultant, and Citigroup employees at Mr. Yáñez's hotel (the "May 2013 Meeting"). The purpose of the May 2013 Meeting was to discuss OSA's outstanding debt to Halani.

1545. During the Meeting, Mr. Yáñez introduced OSA's external financial consultant as the "cash manager" and the "cash man," implying that OSA's external financial consultant was responsible for managing OSA's cash flow and paying its creditors and vendors. OSA's external financial consultant then introduced the Citigroup employees as "these are the guys from Citibank."

1546. During the May 2013 Meeting, OSA and OSA's external financial advisor assured Halani that OSA would pay the past due amounts and timely make the future lease payments.

1547. At no point during the May 2013 Meeting did OSA, OSA's external financial consultant, or Citigroup advise Mr. Bhambhani and Halani of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive OSA's assurances about its financial stability, including its ability to make future lease payments and repay its debt to Halani.

1548. Citigroup and OSA had a duty to speak and disclose this information because (1) their failure to speak would render their prior representations false and misleading; (2) OSA was trying to assuage Halani's concerns and prevent Halani from terminating the lease or taking other adverse action, from which both Citigroup and OSA would receive a financial benefit (e.g., increased contracts with Pemex using Halani 1 for OSA and increased cash advance requests and interest earned therefrom for Citigroup); (3) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of the Halani 1; (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Halani would rely on the omitted facts when determining whether to terminate the lease agreement with OSA; and (5) the fraudulent scheme between Citigroup and OSA was well

underway by May 2013. Citigroup's and OSA's special knowledge of the fraud also denied Halani the ability to sufficiently investigate OSA's finances when considering whether to terminate its lease with OSA.

1549. When deciding whether to terminate its lease with OSA in 2013, Halani relied on the discussions during the May 2013 Meeting, which included material omissions by (1) Citigroup and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1565–69).

*b. Meetings with OSA's External Financial Consultant in 2013*

1550. On one occasion in 2013, Mr. Bhambhani met with OSA's external financial consultant in Ciudad del Carmen, Mexico to discuss OSA's outstanding debt to Halani. During this meeting, OSA's external financial consultant reassured Mr. Bhambhani and Halani about OSA's financial health, including its ability to repay its debt and make future lease payments to Halani.

1551. OSA's external financial consultant made these representations based on information obtained from Citigroup and OSA (*see supra* at ¶¶ 448–50). As noted above (*supra* at ¶¶ 448–50), OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including Halani.

1552. Citigroup and OSA purposefully concealed the following information from Halani: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

These omissions rendered misleading and deceptive the representations made by OSA's external financial consultant to Halani about the financial health of OSA and its ability to make payments.

1553. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise Halani) because (1) their failure to speak would render their prior representations false and misleading; (2) Citigroup, OSA. and OSA's external financial consultant were all working together to (i) restructure OSA's debt; and (ii) obtain support from OSA's creditors and bondholders for the proposed restructuring plans; (3) Citigroup and OSA had full access to this information and intentionally withheld it to receive the financial benefit from the continued lease of the Halani 1 (e.g., increased contracts with Pemex using the Halani 1 for OSA and increased interest from increased cash advances relating thereto for Citigroup ); (4) Citigroup and OSA had full access to and were aware of the omitted material facts, and also knew that Halani would rely on the omitted facts when determining whether to terminate its lease with OSA; and (5) Citigroup's and OSA's fraudulent scheme was well underway at this time. Citigroup's and OSA's special knowledge of the fraud also denied Halani the ability to sufficiently investigate OSA's finances prior to deciding whether to terminate its lease with OSA.

1554. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt (*id.*); and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including Halani, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described *infra* at

¶¶ 1565–69, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to Halani in 2013.

1555. When deciding whether to terminate its lease with OSA in 2013, Halani relied on the material omissions during the May 2013 Meeting regarding OSA's true financial condition, the false documents submitted by OSA to ICG employees, the false and weak controls of the cash advance facility, and the ongoing fraud by (1) Citigroup, including those made by OSA and OSA's external financial consultant based on information provided by Citigroup and with Citigroup's knowledge; and (2) OSA, including through OSA's external financial consultant, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1565–69).

*c. Receipt of Pareto Materials in Fall 2013*

1556. In or around the summer and fall of 2013, Mr. Bhambhani informed OSA of Halani's intent to terminate the lease agreement due to OSA's repeated failure to make the lease payments and its increasing debt to Halani. In response, OSA repeatedly assured Halani that it would make the payments and pay off its debt. Specifically, in or around the fall of 2013, Hermilo Escobedo, OSA's Commercial Director, provided Mr. Bhambhani and Halani with information about the 2013 Bond Issuance, including materials provided by Pareto. On information and belief, Halani received one or more of the Pareto Materials described *supra* in Section XIV(C)(2).

1557. OSA provided Mr. Bhambhani and Halani with the Pareto Materials as evidence of OSA's financial stability, including its ability to make future lease payments and pay off its debt to Halani.

1558. As described in detail *supra* at ¶¶ 311–15, in the months leading up to September 2013, Citigroup and OSA—with Citigroup's knowledge and substantial assistance—provided false and misleading information to Pareto in order to prepare the Pareto Materials. Accordingly,

the Pareto Materials, including those materials received by Halani, included fraudulent misrepresentations and material omissions by both Citigroup and OSA.

1559. Citigroup (and OSA) were aware, as described *supra* at ¶¶ 311–15, that OSA and Pareto intended to provide the Pareto Materials to creditors, vendors and bondholders of OSA in order to demonstrate OSA's continued financial viability, instill confidence in OSA's ability to repay its debts, and/or to solicit further investment in OSA.

1560. As detailed *supra* in ¶¶ 311–15, the Pareto Materials, including those documents received by Halani, (1) included positive financial forecasts and cash flow for OSA; and (2) represented that bondholders would be protected by the Mexican Trust, Banamex's role as fiduciary of such Trust, and the Waterfall Structure (*see supra* at ¶¶ 313). Such representations were false, however, because in 2013 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section V).

1561. In addition, the Pareto Materials, including those received by Halani, omitted the following information rendering them false, misleading and deceptive: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud.

1562. Citigroup (and OSA) had a duty to speak and disclose this information to Pareto (and likewise to those to whom OSA and Pareto provided the Pareto Materials) because (1) their failure to speak would render their representations in the Pareto Materials false and misleading; (2) Citigroup and OSA were soliciting investments and attempting to instill creditor and investor confidence in OSA, through Pareto, from which they would receive a financial benefit (e.g.,

increased contracts with Pemex for OSA and increased cash advances and interest flowing therefrom for Citigroup); (3) Citigroup and OSA had full access to this information and, on information and belief, (i) intentionally withheld such information from Pareto (and likewise shipping companies such as Halani), or (ii) persuaded Pareto to participate in the scheme, to receive a financial benefit from OSA's lease of the Halani 1; and (4) at this time, the fraudulent scheme between Citigroup and OSA was well underway. Citigroup's and OSA's special knowledge of the fraudulent scheme also denied Pareto (and Halani) the ability to sufficiently investigate OSA's finances.

1563. Citigroup also had a duty to speak fully and disclose this information to Pareto on account of its role as fiduciary of the Mexican Trust through the ICG and Banamex.

1564. When delaying cancelation of the lease in 2013, Halani relied on the Pareto Materials, which included fraudulent misrepresentations and material omissions by (1) Citigroup; and (2) OSA, which Citigroup aided and abetted, on account of its knowledge and substantial assistance (*see infra* at ¶¶ 1565–69).

#### 4. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Halani

1565. Citigroup committed fraud against Halani through its fraudulent misrepresentations and material omissions in (1) the meetings between Citigroup, OSA, OSA's external financial consultant and Halani in 2013; and (2) the Pareto Materials, which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors, and bondholders, such as Halani (*see supra* at ¶¶ 1531–64).

1566. Citigroup knowingly conspired to make and was aware that OSA was making fraudulent misrepresentations and material omissions (including those made by OSA's external

financial consultant) in communications and materials shared with Halani, including the 2012 OSA Presentation and meetings between OSA and Halani in 2013 (*see supra* at ¶¶ 1538–55).

1567. Specifically, Citigroup had actual knowledge that OSA was making fradulent misrepresentations and material omissions to shipping companies like Halani on account of its (1) participation in the fraud (*see supra* Section Section VI); (2) its role in approving OSA's false documentation; (2) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (3) trustee of the Rabobank Trust; and (4) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

1568. With knowledge of OSA's fraudulent misrepresentations and material omissions to Halani, Citigroup directly participated in and substantially assisted and aided and abetted OSA in committing fraud against Halani, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility in validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in the 2012 OSA Presentation and Pareto Materials, including by not correcting or revising the false and inaccurate information provided by OSA in these documents.

1569. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

**5. Halani Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions**

1570. When (1) entering into the lease agreement with OSA; and (2) delaying cancellation of the lease on account of OSA's failure to make the lease payments, Halani relied on the fraudulent misrepresentations and material omissions by (1) Citigroup, in meetings with Halani and the Pareto Materials; and (2) OSA (including those made by OSA's external financial consultant), which Citigroup knowingly conspired with OSA to make, and aided and abetted, on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup (1) made material omissions to Halani; and (2) aided and abetted OSA in making material omissions to Halani in the January 2012 Email and the Standby Letter of Credit (described *supra* at ¶¶ 1531–37);

(a) Citigroup aided and abetted OSA in making fraudulent misrepresentations and material omissions to Halani in the 2012 OSA Presentation (described *supra* at ¶¶ 1538–43);

(b) Citigroup, in the May 2013 Meeting, (1) made material omissions and (2) aided and abetted OSA in making material omissions to Halani (described *supra* at ¶¶ 1544–49);

(c) Citigroup, in the meetings with OSA's external financial consultant in 2013, (1) made material omissions and (2) aided and abetted OSA in making material omissions to Halani (described *supra* at ¶¶ 1550–55);

(d) Citigroup, through Pareto's communications made to and materials transmitted to Halani in Fall 2013, (1) made fraudulent misrepresentations and material omissions to Halani; and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to Halani (described *supra* at ¶¶ 1556–64).

1571. In other words, Halani would not have entered into the lease agreement and/or canceled the lease earlier, had it known about OSA's false financial projections, the false documents submitted by OSA to ICG employees, the false and weak controls of the cash advance facility, or the ongoing fraud.

1572. When OSA collapsed, it owed Halani approximately $14 million in past-due lease payments.

1573. Halani has not recovered the amounts due to it from OSA.

## G. <u>MADISA</u>

### 1. Overview

1574. Beginning in approximately 2006, MADISA provided OSA with (1) Caterpillar and other marine and industrial equipment, such as engines, generators, air compressors, and cranes; and (2) vessel maintenance services, such as original equipment manufacturer spare parts and specialized labor for this equipment.

1575. As MADISA was the local distributor of certain essential products used by OSA on its vessels and for the services it provided, OSA, including its external financial consultant, held calls and meetings with MADISA regarding OSA's operations as frequently as on a daily basis, in some instances.

1576. As described further below, MADISA provided equipment and vessel maintenance services to and entered into related agreements with OSA, and delayed canceling those agreements, in reliance on ***fraudulent misrepresentations*** by (1) Citigroup, including in communications made

to and materials shared with MADISA by OSA and OSA's external financial consultant; and (2) OSA (including those made by its external financial consultant), with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false information circulated by OSA and its external financial consultant to MADISA.

1577. Specifically, Citigroup represented to MADISA—or substantially assisted OSA (and its external financial consultant) in making representations to MADISA—that OSA (1) was financially strong (including because of the stability and reliability of the cash advance facility); (2) was supported by Citigroup; (3) had positive profitability projections; and (4) had sufficient cash flow to pay MADISA for the vessel equipment and maintenance supplied to OSA.

1578. Such representations were false because, as Citigroup (and OSA) knew, (1) Citigroup and OSA were engaged in a fraud involving the cash advance facility between 2008 (on information and belief) and 2014; (2) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA; (3) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests; (4) there was a revolving door of former Citigroup employees taking key positions in OSA; and (5) in August 2012, Citigroup fired Mr. Ortega-Rivera for receiving bribes and kickbacks from OSA in 2012.

1579. MADISA also provided equipment and maintenance service agreements to and entered into related agreements with OSA, and delayed canceling those agreements, in reliance on ***material omissions*** by (1) Citigroup, including in communications made to and materials shared

with MADISA by OSA and OSA's external financial consultant; and (2) OSA (including those made by its external financial consultant), with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false information circulated by OSA and its external financial consultant to current and potential creditors, vendors and bondholders, including MADISA.

1580. Specifically, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with MADISA: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the documentation, but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable, and propped up by false documentation. Omission of such information from Citigroup's and OSA's communications and materials shared with MADISA rendered them false, misleading and deceptive.

1581. As described further below, Citigroup and OSA had a duty to speak and disclose the omitted information to MADISA because (1) of their previous and ongoing representations to MADISA, including in emails, agreements, and meetings; and (2) the following factors created a duty to speak: (i) the nature of the relationship between Citigroup, OSA and MADISA (*see infra* at ¶ 1582); OSA and MADISA; (ii) parties' relative access (or lack thereof) to the omitted

information; (iii) benefits derived by Citigroup and OSA from the relationship with MADISA; (iv) Citigroup's and OSA's awareness of MADISA's reliance on the false and misleading information; and (v) Citigroup's and OSA's participation in the fraud (*see infra* at ¶¶ 1607-11).

1582. Citigroup and OSA directly benefited from fraudulently inducing and luring MADISA to lease equipment, and continue leasing equipment, to OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1583. Citigroup, through the fraudulent misrepresentations and material omissions contained in the communications made to and materials shared with MADISA, including those by OSA and OSA's external financial consultant based on information provided by Citigroup and with Citigroup's knowledge, directly committed fraud against MADISA.

1584. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's fraudulent misrepresentations and material omissions to MADISA (including those made by OSA's external financial consultant) and substantially assisted and aided and abetted OSA as well as participated in committing fraud against MADISA, as described *infra* ¶¶1607-11.

1585. Had MADISA known about (1) OSA's true financial condition; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, it would not have provided vessel equipment and maintenance services to OSA, entered into or delayed canceling agreements relating thereto, or continued doing business with OSA between 2008 and 2014.

1586. Due to the fraud and corresponding collapse of OSA, MADISA has not received past due payments owed under its agreement to provide vessel equipment and maintenance services to OSA.

### 2. Fraudulent Misrepresentations and Material Omissions in 2011 Relating to MADISA's Past Due Invoices

1587. On February 4, 2011, in Mexico City, OSA's external financial consultant met with Mario Trevino of MADISA and employees of Caterpillar Financial, a Caterpillar Inc. subsidiary that provides financing to Caterpillar distributors' customers, and which MADISA, as a Caterpillar distributor, used to provide financing to clients, to discuss renewing OSA's credit line with Caterpillar Financial (the "February 2011 Meeting").

1588. During the February 2011 Meeting, OSA's external financial consultant discussed OSA's cash flow from the Citigroup cash advance facility and reassured MADISA that OSA had sufficient cash flow to make timely payments to MADISA, emphasizing that "everything is ok" and "don't worry" based on OSA's "big line of credit with Banamex" to assuage MADISA's and Caterpillar Financial's doubts given OSA's untimely payments for a prior line of credit.

1589. The parties also discussed the possibility of MADISA (1) becoming a beneficiary of a Banamex trust, whereby Pemex's payments for OSA's work would go directly to MADISA; and (2) working with Jose Ortega of Citigroup to complete that process.[61]

1590. OSA's external financial advisor made these representations based on information and documents obtained from Citigroup and OSA. As previously discussed, OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility),

[61] Subsequent to the meeting, MADISA and Caterpillar Financial employees exchanged emails noting that although OSA's financial situation was "high risk," the arrangement was acceptable because such a trust from a "first class bank, e.g. Banamex" was a "secure source of payment."

and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including MADISA.

1591. The representations made by OSA's external financial consultant during the February 2011 Meeting, including that "everything is ok", were false because in 2011 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in an fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1592. Citigroup and OSA purposefully concealed the following information from MADISA during the February 2011 Meeting: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive the representations made by OSA's external financial consultant in the February 2011 Meeting.

1593. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise MADISA) because (1) their failure to speak would render their prior representations false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to restructure OSA's debts, including to MADISA; (3) OSA was seeking additional equipment and maintenance services from MADISA, from which Citigroup and OSA would receive a financial benefit (e.g., increased contracts with Pemex for OSA and increased interest for Citigroup from increased cash advances stemming therefrom); (4) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of receiving equipment and maintenance services from MADISA; (5) Citigroup and OSA had full access to and were aware of the omitted material facts, and also

knew that MADISA would rely on the omitted facts when determining whether to enter into agreements and continue doing business with OSA; and (6) Citigroup and OSA were involved in a fraudulent scheme at this time. Citigroup's and OSA's special knowledge of its fraudulent scheme also denied OSA's external financial advisor (and likewise MADISA) the ability to sufficiently investigate OSA's finances prior to and after the February 2011 Meeting.

1594. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and bondholders, including MADISA, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described below, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to MADISA in 2011.

1595. When deciding whether to renew OSA's line of credit in 2011 and continuing to do business with OSA between 2011 and 2014, MADISA relied on the fraudulent misrepresentations and material omissions during the February 2011 Meeting regarding OSA's financial stability, cash flow and Pemex contracts by (1) Citigroup, including those made by OSA and OSA's external financial consultant based on information provided by Citigroup and with Citigroup's knowledge; and (2) OSA, including through OSA's external financial consultant, which Citigroup aided and abetted, on account of its knowledge and substantial assistance.

**3. Material Omissions in 2012 Relating to MADISA's Past Due Invoices**

1596. On March 20, 2012, OSA's external financial consultant emailed Mario Trevino of MADISA, attaching OSA's 2010 audited financial statements and interim financial statements

through November 2011 ("OSA's 2010 and 2011 Financial Statements"). The 2010 and 2011 Financial Statements discussed OSA's cash flow from the Citigroup cash advance facility and implicitly represented that OSA had sufficient cash flow to pay MADISA.

1597. OSA's 2010 and 2011 Financial Statements omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive the financial projections contained in OSA's 2010 and 2011 Financial Statements and the implicit representations contained therein that OSA had sufficient cash flow to pay MADISA.

1598. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its prior representations false and misleading; (2) it was seeking equipment and maintenance services from MADISA, from which OSA would receive a financial benefit (e.g., increased contracts with Pemex); (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of receiving equipment and maintenance from MADISA; (4) OSA had full access to and was aware of the omitted material facts, and also knew that MADISA would rely on the omitted facts when determining whether to enter into agreements or continue doing business with OSA; and (5) the fraudulent scheme with Citigroup was well underway in 2012. OSA's special knowledge of its fraudulent scheme with Citigroup also denied MADISA the ability to sufficiently investigate OSA's finances prior to providing equipment and maintenance services to OSA.

1599. Furthermore, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role in restructuring OSA's debt; and (3) participation in the fraud, Citigroup knew that OSA, in communications and materials shared with its creditors, vendors and

bondholders, including MADISA, was making (1) fraudulent misrepresentations regarding its financial health and the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) the false documentation submitted by OSA to ICG employees; (ii) the false and weak controls of the cash advance facility; and (iii) the ongoing fraud. As described below, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to MADISA in 2012.

1600. When deciding whether to renew OSA's line of credit in 2012 and continuing to do business with OSA between 2012 and 2014, MADISA relied on OSA's fraudulent misrepresentations and material omissions regarding OSA's financial stability and cash flow in OSA's 2010 and 2011 Financial Statements, which Citigroup aided and abetted, on account of its knowledge and substantial assistance.

#### 4. Fraudulent Misrepresentations and Material Omissions in 2013 Relating to MADISA's Past Due Invoices

1601. On March 1, 2013, Banamex entered into a "CitiConnect" agreement with MADISA to ensure timely payment of $2.5 million that OSA then-owed MADISA (the "March 2013 CitiConnect Agreement"). Per the March 2013 CitiConnect Agreement, and the parties' discussions relating thereto, MADISA was to receive payment directly from Pemex, for work OSA performed under its Pemex contracts, in satisfaction of OSA's debt to MADISA.

1602. Subsequently, on March 22, 2013, Carlos Marroquin of MADISA emailed Banamex employees Guadalupe Valdes and Daniel Perez inquiring about the status of Banamex's payment to MADISA of the $2.5 million (the "March 2013 Email"). Mr. Perez replied that once OSA sent the invoices to Banamex, OSA's account "will immediately receive resources" and MADISA would have "no problem receiving payments from Oceanografía."

1603. Such representations were false, however, because in 2013 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in an fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1604. The March 2013 CitiConnect Agreement and March 2013 Email also omitted any information about the: (1) false documents submitted by OSA to ICG employees; (2) the false and weak controls of the cash advance facility; and (3) the ongoing fraud. These omissions rendered misleading and deceptive the March 2013 CitiConnect Agreement and March 2013 Email and the implicit representations contained therein that OSA had sufficient cash flow to pay MADISA.

1605. Citigroup had a duty to speak and disclose this information because (1) its failure to speak would render its prior representations false and misleading; (2) it was assisting OSA to restructure its debts and to obtain additional equipment and maintenance services from MADISA, from which Citigroup and OSA would receive a financial benefit (e.g., increased contracts with Pemex for OSA and increased interest on cash advances for Citigroup flowing therefrom); (3) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit of restructuring OSA's debts and receiving additional equipment and maintenance services from MADISA; (4) Citigroup had full access to and was aware of the omitted material facts, and also knew that MADISA would rely on the omitted facts when determining whether to enter into agreements or continue doing business with OSA; and (5) the fraudulent scheme with OSA was well underway in 2012. Citigroup's special knowledge of its fraudulent scheme with OSA also denied MADISA the ability to sufficiently investigate OSA's finances prior

to providing additional equipment and maintenance services to OSA, entering into agreements with OSA, and continuing to do business with OSA.

1606. When deciding whether to enter into the March 2013 CitiConnect Agreement and continuing to do business with OSA between 2013 and 2014, MADISA relied on Citigroup's fraudulent misrepresentations and material omissions in and related to the March 2013 CitiConnect Agreement and March 2013 Email regarding OSA's ability to pay MADISA.

### 5. Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against MADISA

1607. Citigroup directly committed fraud against MADISA through the fraudulent misrepresentations and material omissions in the (1) March 2013 CitiConnect Agreement; (2) March 2013 Email, and (3) materials shared with, and communications made to, MADISA between 2011 and 2014 by OSA (including those made by its external financial consultant), which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors, and bondholders, including MADISA.

1608. Citigroup knowingly conspired to make, and was aware that OSA (including its external financial consultant) was making fraudulent misrepresentations and material omissions in communications and materials shared with MADISA, including in the meetings between OSA, its external financial consultant, and MADISA in 2011 to 2013 (*see supra* ¶¶ 1587-1606).

1609. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to service providers like MADISA on account of its (1) participation in the fraud; (2) its role in approving OSA's false documentation; (3) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuances; (4) trustee of the Rabobank Trust; and (5) the close

relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility.

1610. With knowledge of OSA's fraudulent misrepresentations and material omissions to MADISA (including those made by OSA's external financial consultant), Citigroup substantially assisted OSA in committing fraud against MADISA, including by (1) approving the false documentation OSA submitted to ICG employees; (2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility in validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; and (5) sanctioning OSA's false financial projections in its financial statements, including by not correcting or revising the false and inaccurate information provided by OSA in these documents.

1611. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

### 6. MADISA Suffered Injury Due to Citigroup's and OSA's Fraudulent Misrepresentations and Material Omissions

1612. When MADISA (1) entereding into the equipment and maintenance service purchase orders with OSA: and (2) delayeding cancellation of the agreements on account of OSA's failure to timely make payments, MADISA relied on the fraudulent misrepresentations and material omissions by Citigroup, through OSA's external financial consultant; and by OSA (including those made by OSA's external financial consultant), which Citigroup aided and abetted on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup (1) made fraudulent misrepresentations and material omissions to MADISA and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to MADISA in the February 2011 Meeting (described *supra* ¶¶ 1587-95);

(b) Citigroup aided and abetted OSA in making fraudulent misrepresentations and material omissions to MADISA in OSA's 2010 and 2011 Financial Statements received by MADISA on March 20, 2012 (described *supra* ¶¶ 1596-1600);

(c) Citigroup made fraudulent misrepresentations and material omissions to MADISA in the March 2013 CitiConnect Agreement and March 2013 Email (described *supra* ¶¶ 1601-06).

1613. In other words, MADISA would not have entered the equipment and maintenance service agreements and/or canceled the agreements earlier, had it known about the (1) false documents submitted by OSA to ICG employees; (2) the false and weak controls of the cash advance facility; and (3) the ongoing fraud.

1614. When OSA collapsed, it owed MADISA for several past-due invoices.

1615. MADISA has not recovered the amounts due to it from OSA.

## XVI. CITIGROUP'S AND OSA'S FRAUDULENT MISREPRESENTATIONS AND MATERIAL OMISSIONS CAUSED RABOBANK INJURY

### A. Overview

#### 1. Rabobank Loans to OSA

1616. In 2007, Rabobank loaned EUR 102,528,636 to OSA, and in 2008 it loaned EUR 115,062,450 to OSA (the "Rabobank Loans"). The Loans were made in order for OSA to purchase nine oil service vessels from De Hoop, which it then used to provide services to Pemex.

The nine vessels served as collateral for Rabobank's loans to OSA (the "Rabobank-financed vessels").

1617. In 2009, OSA stopped making installment payments on the Rabobank Loans.

1618. As described further below, between 2010 and 2011, OSA and Rabobank renegotiated the terms of the Loans. During these negotiations, the parties agreed to (1) establish a special purpose vehicle ("SPV") to hold the Rabobank-financed vessels;[62] and (2) Rabobank insisted that OSA establish a trust, with a reputable, trustworthy financial institution and for the ultimate benefit of Rabobank, to receive payments for services provided by OSA to Pemex utilizing the Rabobank-financed vessels (the "Rabobank Trust").

**2. Rabobank Agrees to Banamex as Trustee of Rabobank Trust**

1619. OSA proposed Banamex as the trustee of the Rabobank Trust. Relying on Citigroup's strong international reputation, Rabobank agreed and OSA established the Rabobank Trust at Banamex's trust division on March 24, 2010 (the "March 2010 Trust Agreement").

1620. For Rabobank, the fact that one of the largest financial institutions in the world (i.e., Citigroup through the ICG) had agreed to serve as trustee of the Rabobank Trust provided comfort to Rabobank that OSA would comply with its promises and obligations.

[62] Caballo Frion Arrendadora ("CFA"). CFA was the new title holder of the Rabobank-financed vessels and held all of OSA's rights and obligations under the loan agreements after the restructuring of the Rabobank Loans. CFA rented out the Rabobank-financed vessels on bareboat charters to OSA, which in turn used the Rabobank-financed vessels to provide services to Pemex. At the same time, OSA assigned its receivables from Pemex to the Rabobank Trust through which the Rabobank Loans would be repaid to Rabobank as first beneficiary of the Rabobank Trust. Receivables from OSA to CFA under the bareboat charters were also assigned to the Rabobank Trust to be distributed to Rabobank.

### 3. Amendment to Trust Agreement

1621. In approximately 2011, Banamex and OSA persuaded Rabobank to modify the March 2010 Trust Agreement. Specifically, they persuaded Rabobank to allow the Rabobank Trust to have direct access to the cash advance facility (i.e., the Trust no longer needed to wait for Pemex to pay for services relating to the Rabobank-financed vessels, but rather would receive the money directly from the cash advance facility upon Banamex's receipt of OSA invoice to Pemex for services relating to the Rabobank-financed vessels) from which the Trust would disburse funds to more quickly service Rabobank's debt.

1622. Rabobank first agreed to amend the March 2010 Trust Agreement on July 29, 2011 (the "July 2011 Trust Agreement"). Four other amendments ultimately followed.

1623. Citigroup ICG employees, notably Jorge Salazar, Leticia Vergara Pino and Fabiola Alejandra Cinta Narvaez, managed the Rabobank Trust and had responsibility for, among other things, requesting funds from OSA's cash advance facility with Banamex, on the Trust's behalf, and disbursing cash to the Trust's beneficiaries.[63]

### 4. Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA Between 2010 and 2014

1624. Rabobank agreed to the March 2010 Trust Agreement, the July 2011 Trust Agreement, and the subsequent amendments thereto in reliance on ***fraudulent misrepresentations*** by (1) Citigroup, including in communications made to and materials shared with Rabobank by Citigroup and OSA's external financial consultant, to whom Citigroup had provided false and misleading information about OSA's finances and the cash advance facility and with the

---

[63] Each Trust Manager's email address included "[ICG-SFS]", "[ICG-LATAM]", "[ICG-GTS]" or "[ICG-CTS]" electronic stamps. In addition, Mr. Salazar used an @citi.com email address and signed his emails as "VP Client Services ICG."

knowledge that the external financial consultant would disseminate such information to Rabobank (*see supra* at Section XIV G); and (2) OSA (including those made by its external financial consultant), with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false information circulated by OSA and its external financial consultant to current and potential creditors, vendors and bondholders, including Rabobank.

1625. Specifically, Citigroup represented—or substantially assisted OSA (and its external financial consultant) in making representations—that OSA (1) was financially strong (including because the cash advance facility provided by Citigroup, which was integral to OSA's liquidity and cash flow, was stable and reliable); (2) was supported by Citigroup, including its role as trustee of the Rabobank Trust; (3) had positive profitability projections; and (4) had sufficient cash flow to repay the Rabobank Loans.

1626. Such representations were false because, as Citigroup (and OSA) knew: (1) Citigroup and OSA were engaged in a fraud involving the cash advance facility between 2008 (on information and belief) and 2014; (2) Citigroup and OSA used the cash advance facility as a mechanism to fraudulently bolster the financial statements of OSA and to conceal OSA's true, precarious financial condition in order to obtain investments and restructure OSA's debt to the financial benefit of Citigroup and OSA; and (3) the cash advance facility lacked sufficient controls, particularly because Citigroup intentionally violated its own policies and procedures and OSA, not Citigroup, was in charge of validating and authenticating the documentation OSA submitted in support of its cash advance requests.

1627. Rabobank also agreed to the March 2010 Trust Agreement, the July 2011 Trust Agreement, and the subsequent amendments thereto in reliance on ***material omissions*** by

(1) Citigroup, including in communications made to and materials shared with Rabobank by Citigroup and OSA's external financial consultant, to whom Citigroup had provided false and misleading information about OSA's finances and the cash advance facility and with the knowledge that the external financial consultant would disseminate such information to Rabobank (*see supra* at Section XIV G); and (2) OSA (including those made by its external financial consultant), with Citigroup's knowledge and substantial assistance, including through Citigroup's participation in the fraud and failure to correct or revise the false information circulated by OSA and its external financial consultant to current and potential creditors, vendors and bondholders, including Rabobank.

1628. Specifically, Citigroup omitted—or substantially assisted OSA (and its external financial consultant) in omitting—the following information from communications made to and materials shared with Rabobank, which rendered them false, misleading and deceptive: (1) the documentation submitted by OSA to Citigroup in connection with the cash advance facility was false, including because it contained false signatures and was for services not provided; (2) the facility controls were false because (i) Citigroup was not, in fact, in control of ensuring the validity of the invoices; but rather OSA was in control of such process; (ii) Citigroup was advancing payments based on false documents; and (iii) Citigroup was advancing more than it should under the contracts because the face amount of the invoices exceeded the contracts' values; and (3) OSA's financial statements and projections were false including because they contained false revenue and profitability projections premised on a cash advance facility that was, in actuality, unstable, unreliable, and propped up by false documentation.

1629. Citigroup, through its fraudulent misrepresentations and material omissions in communications made to and materials shared with Rabobank by Citigroup and OSA's external

financial consultant, based on false information provided by Citigroup and with Citigroup's knowledge that the financial consultant would provide the information to Rabobank, committed fraud against Rabobank.

1630. Citigroup was also aware of OSA's fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant) to Rabobank and aided and abetted and substantially assisted OSA in making those misrepresentations and omissions and committing fraud against Rabobank, as described *infra* at ¶ 1704.

1631. Citigroup and OSA directly benefited from fraudulently inducing and luring Rabobank to agree to enter into loan agreements with OSA, agree to restructure the loans, or continue doing business with OSA in order to increase (1) cash flows to OSA; and (2) interest payments and fees to Citigroup.

1632. Citigroup also knowingly conspired with OSA to make, and was aware of OSA's, fraudulent misrepresentations and material omissions to Rabobank (including those made by OSA's external financial consultant) and substantially assisted OSA as well as participated in committing fraud against Rabobank, as described *infra* at ¶ 1704.

1633. Had Rabobank known about (1) OSA's true financial condition; (2) the false and weak controls of Citigroup's cash advance facility, including Citigroup's abdication of its responsibility to be a gatekeeper for the cash advance facility; and (3) the ongoing fraud between Citigroup and OSA, it would have not entered into loan agreements with OSA, agreed to restructure the loans, or continued doing business with OSA.

1634. Due to the fraud and corresponding collapse of OSA, Rabobank suffered damages as described *infra* at Section XVI F.

## B. 2010 and 2011: Fraudulent Misrepresentations and Material Omissions by Citigroup and OSA Relating to the Restructuring of the Rabobank Loans

### 1. February 2, 2010 Meeting Between OSA and Rabobank

1635. On or about February 2, 2010, OSA (represented by Mr. Yáñez and Barry Barnes), Rabobank (represented by Hans Bartelds, Alessandra Jahnel, and Remco Voogt) and Baker & McKenzie, counsel to Rabobank (represented by Edwin Sieswerda), held a meeting in Ciudad Del Carmen, Mexico to discuss OSA's outstanding debt to Rabobank (the "February 2, 2010 Meeting").

1636. During the February 2, 2010 Meeting, OSA informed Rabobank that it had "a strong back log of US 1.7 to 2 billion for vessels to be chartered by [OSA] to Pemex" and that "the cash flow prognosis shows positive results". In other words, OSA represented that it expected to receive significant cash flow from Pemex in the future. Such representations were false, however, because on information and belief, in or around February 2010, as Citigroup and OSA knew: (1) OSA was on the brink of bankruptcy; (2) Citigroup was contemplating temporarily freezing (or had already frozen) the cash advance facility because Pemex had stopped paying Citigroup on OSA's invoices; and (3) Citigroup and OSA were involved in a fraudulent scheme relating to the cash advance facility (*see supra*, at Sections VI and VIII).

1637. In addition, OSA sought approval from Rabobank to (1) create an SPV to own the Rabobank-Financed Vessels and assume the obligations under the Rabobank loans; and (2) assign OSA's rights to collect payments under the Pemex contracts to a trust.

1638. At no point during the February 2, 2010 Meeting, however, did Mr. Yáñez and OSA advise Rabobank about (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud, including but not limited to (i) Pemex's refusal to pay certain OSA invoices; and

(ii) the liabilities incurred by Citigroup as a result (*see supra* at Section VI). These omissions rendered false and misleading OSA's representations in the February 2, 2010 Meeting about its positive financial projections and significant cash flow from Pemex.

1639. OSA had a duty to speak and disclose this information because (1) its failure to speak would render its prior and ongoing representations to Rabobank about its positive financial projections and reliability of the proposed Rabobank Trust Structure false and misleading; (2) it was soliciting a restructuring of the Rabobank Loans, from which it would receive a financial benefit; (3) OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from the restructuring of the Rabobank Loans; (4) OSA had full access to and was aware of the omitted material facts, and also knew that Rabobank would rely on the omitted facts when determining whether to restructure the Loans; and (5) on information and belief, the fraudulent scheme with Citigroup was underway at the time of the February 2010 negotiations surrounding the establishment of the Rabobank Trust. OSA's special knowledge of its fraudulent scheme with Citigroup also denied Rabobank the ability to sufficiently investigate OSA's finances before agreeing to restructure the Loans.

1640. In February 2010, on information and belief, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) role as trustee of the 2008 Bond Issuance and potential trustee of the Rabobank Trust; (3) role in restructuring OSA's debt (*id.*); and (4) participation in the fraud, Citigroup was aware that OSA, in communications and materials shared with Rabobank, was making (1) fraudulent misrepresentations regarding its financial health, including the stability and reliability of the cash advance facility; and (2) material omissions regarding (i) its false financial projections; (ii) the false documentation submitted by OSA to ICG employees; (iii) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud.

As described *infra* at ¶ 1704, Citigroup substantially assisted and aided and abetted OSA in making these fraudulent misrepresentations and material omissions to and committing fraud against Rabobank in February 2010.

1641. When agreeing to restructure the Rabobank Loans in 2010, Rabobank relied on the discussions in the February 2, 2010 Meeting, which included fraudulent misrepresentations and material omissions by OSA, which Citigroup aided and abetted, on account of its knowledge and assistance (*see infra* at ¶ 1704).

**2. February 3, 2010 Meeting Between Banamex and Rabobank**

1642. On or around February 3, 2010, during a meeting in Mexico City arranged by OSA between Banamex (Gabriel Arroyo Chávez, Susana Heredia Barajas, and Eunice Barrera Montañez); Rabobank (Hans Bartelds, Alessandra Jahnel, and Remco Voogt); and Baker & McKenzie (Edwin Sieswerda), Banamex provided Rabobank with an overview of its fees and represented that it was willing to cooperate with Rabobank in order to set up the trust agreement (the "February 3, 2010 Meeting").

1643. On information and belief, in or around February 2010, as Citigroup and OSA knew: (1) OSA was on the brink of bankruptcy; (2) Citigroup was contemplating temporarily freezing (or had already frozen) the cash advance facility because Pemex had stopped paying Citigroup on OSA's invoices; and (3) Citigroup and OSA were involved in a fraudulent scheme relating to the cash advance facility (*see supra*., at Sections VI and VIII).

1644. At no time during the February 3, 2010 Meeting did Citigroup, through the ICG, inform Rabobank of the following information: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility, and (4) the ongoing fraud, including (i) Pemex's refusal to pay certain invoices; and (ii) Citigroup's increasing liabilities in connection with the cash advance facility (*see* supra at

Section VI). These omissions rendered false and misleading Banamex's representations about working with Rabobank and its implicit endorsement of the Rabobank Trust structure.

1645. Citigroup, through its ICG, had a duty to speak and disclose this information because (1) its failure to speak would render its prior and ongoing representations to Rabobank about the Rabobank Trust false and misleading; (2) it was assisting OSA in soliciting a restructuring of its loans, from which both Citigroup and OSA would receive a financial benefit (e.g., increased liquidity and cash flow for OSA and increased fees as trustee of the Rabobank Trust and increased interest from the cash advance facility for Citigroup); (3) Citigroup had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from the restructuring of the Rabobank Loans; (4) Citigroup had full access to and was aware of the omitted material facts, and also knew that Rabobank would rely on the omitted facts when determining whether to restructure the Loans; and (5) on information and belief, Citigroup and OSA were engaged in a fraudulent scheme relating to the cash advance facility in February 2010. Citigroup's special knowledge of its fraudulent scheme with OSA also denied Rabobank the ability to sufficiently investigate OSA's finances and the reliability and stability of the cash advance facility before restructuring the Loans.

1646. In addition, given that Citigroup, through the ICG, was promoting itself as trustee of the Rabobank Trust, which it would operate for Rabobank's benefit, Citigroup, through the ICG, had a duty to speak and should have disclosed the omitted information, but it failed to do so.

1647. When deciding whether to restructure the Rabobank Loans in 2010, Rabobank relied on Citigroup's material omissions in the February 3, 2010 Meeting.

### 3. Discussions Between Rabobank and OSA's External Financial Consultant in 2011 Regarding the July 2011 Trust Agreement

1648. In or around 2011, Mr. Sieswerda, who by then was a full-time employee of Rabobank, had several telephone conversations with OSA's external financial consultant about the financial stability of OSA, including the reliability of the cash advance facility.

1649. During these conversations with Mr. Sieswerda in 2011, OSA's external financial consultant assured Mr. Sieswerda that Citigroup and OSA had fixed the prior problems with the cash advance facility and the new facility was a reliable source of liquidity for the company, notwithstanding the ongoing fraud which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1650. OSA's external financial consultant made these misrepresentations based on information obtained from Citigroup and OSA. As noted above (*see supra* at ¶ 458), OSA's external financial consultant was in regular contact with Citigroup and OSA between 2010 and early 2014 regarding the restructuring of OSA's debt to Plaintiffs Candies and Rabobank (which necessarily included discussions about OSA's financial health, debt and the cash advance facility), and both Citigroup and OSA were aware that he was relaying information and documents received from them to Plaintiffs who inquired about OSA's finances, including Rabobank.

1651. Citigroup and OSA purposefully concealed the following from Rabobank: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). OSA's external financial consultant did not inform Mr. Sieswerda and Rabobank of this information during his communications with them in 2011. These omissions rendered the representations made by OSA's external financial consultant to Mr. Sieswerda and Rabobank in 2011 false and misleading.

1652. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant (and likewise Rabobank) because (1) their failure to speak would render their prior and ongoing representations to OSA's external financial consultant and Rabobank about the reliability and stability of the cash advance facility false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to restructure OSA's debt, including as to Rabobank; (3) Citigroup and OSA had full access to this information and intentionally withheld it from Rabobank to receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA and increased fees and interest for Citigroup as trustee and in connection with the cash advance facility); (4) Citigroup and OSA had full access and were aware of the omitted material facts, and also knew that Rabobank would rely on the omitted facts when determining whether to renegotiate the Loans and continue doing business with OSA; and (5) Citigroup and OSA were involved in a fraudulent scheme in 2011. Citigroup and OSA's special knowledge of the fraudulent scheme also denied OSA's external financial consultant and Rabobank the ability to sufficiently investigate OSA's finances.

1653. Citigroup also had a duty to speak and disclose this information to OSA's external financial consultant and Rabobank on account of its role as trustee of the Rabobank Trust through the ICG, but it failed to do so.

1654. In 2011, when agreeing to (1) to amend Rabobank Trust; (2) renegotiate the Loans; and (3) maintain its business with OSA; Rabobank relied on (1) the fraudulent misrepresentations and material omissions made by OSA's external financial consultant based on false and misleading information provided by OSA and Citigroup and with their knowledge that he would disseminate such information to Rabobank; and (2) material omissions made by Citigroup, as trustee of the Rabobank Trust.

**4. May 18, 2011 Report Regarding OSA**

1655. On or around May 18, 2011, Rabobank received a report from Galaz, Yamazaki, Ruiz Urquiza, S.C. ("GYRU"), which was prepared at the request of Rabobank (the "GYRU Report"). GYRU prepared the Report after meeting with Rabobank and OSA in Mexico City between February 15 and 17, 2011. As part of its analysis, GYRU evaluated an "update of [OSA's] financial projections and financial information, as requested by [Rabobank]". Upon completion of its evaluation, GYRU provided OSA "with copies of selected analyses in order to obtain [its] input", which GYRU then incorporated into the GYRU Report. In sum, the GYRU report incorporated and relied upon information and documents provided by OSA.

1656. The GYRU Report noted that "[a]ccording to the financial projections provided by [OSA], there is positive cash flow for the following [i.e., from 2011 to 2015] periods".

1657. The GYRU Report also stated that OSA's external financial consultant "has been carrying out the corporate and financial restructuring inside OSA"; and that he considered the Banamex factoring facility as one of the eight key restructuring points.

1658. The GYRU Report featured, *inter alia*, slides titled "Trust overview" in which it presented positive financial projections for the Trust (including both Pemex deposits and outstanding invoices for services performed by Rabobank-financed vessels built by De Hoop). GYRU prepared these slides based on (i) "the invoices provided by OSA related to the contracts of the [Rabobank financed] vessels" and (ii) "a relation of invoices deposited by PEMEX into the trust and a (sic) internal statement of the balance of the trust".

1659. In sum, the GYRU report portrayed OSA as a financially healthy company; therefore reassuring Rabobank as to OSA's ability to repay the Rabobank Loans.

1660. These representations were false because in 2011, (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false

and weak; and (3) Citigroup and OSA were engaged in an fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section VI).

1661. In addition, the GYRU Report omitted any information about: (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud. These omissions rendered misleading and deceptive the representations in the GYRU Report that OSA was financially secure.

1662. OSA (including through representations by OSA's external financial consultant) provided false and misleading information to GYRU, which GYRU relied upon when preparing the Report. Accordingly, the GYRU Report contained fraudulent misrepresentations and material omissions by OSA.

1663. OSA had a duty to speak and disclose the omitted information to OSA's external financial consultant (and likewise GYRU and Rabobank) because (1) its failure to speak would render its prior and ongoing representations to OSA's external financial consultant, GYRU, and Rabobank about OSA's financial projections and cash flow false and misleading; (2) Citigroup, OSA and OSA's external financial consultant were all working together to restructure OSA's debt, including as to Rabobank; (3) Rabobank had commissioned the GYRU Report and expected OSA to provide accurate and transparent information to GYRU; (4) OSA had full access to the omitted information and intentionally withheld it from OSA's external financial consultant, GYRU and Rabobank to receive a financial benefit (e.g., increased liquidity and Pemex contracts for OSA); (5) OSA had full access to and was aware of the omitted material facts, and also knew that GYRU and Rabobank would rely on the omitted facts when preparing the Report and determining whether

to renegotiate the Loans and continue doing business with OSA, respectively; and (6) OSA was involved in a fraudulent scheme in 2011. OSA's special knowledge of the fraudulent scheme with Citigroup also denied GYRU and Rabobank the ability to sufficiently investigate OSA's finances.

1664. In May 2011, given Citigroup's (1) close relationship with OSA (*see supra* at Section XIII); (2) roles as trustee and collateral agent of the 2008 Bond Issuance and trustee of the Rabobank Trust through its banking arm Citibank and Banamex; and (3) participation in the fraud, Citigroup was aware that OSA was making material omissions, in communications to and materials shared with OSA's external financial consultant, GYRU, and Rabobank, about (1) its false financial projections; (2) the false documentation submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (iv) the ongoing fraud. As described *infra* at ¶ 1704, Citigroup substantially aided and abetted and assisted OSA in making these material omissions to OSA's external financial consultant, GYRU and Rabobank in 2011.

1665. Citigroup also had a duty to speak and disclose this information to OSA's external financial consultant, GYRU and Rabobank on account of its role as trustee of the Rabobank Trust through the ICG, but it failed to do so.

1666. When agreeing to modify the March 2010 Trust Agreement in 2011, Rabobank relied on the (1) GYRU Report, which included fraudulent misrepresentations and material omissions by OSA (and those made by OSA's external financial consultant), which were made with Citigroup's knowledge and substantial assistance; and (2) Citigroup's omissions as trustee of the Rabobank Trust.

### 5. July-August 2011 Meetings and Emails Between Banamex, OSA and Rabobank Regarding the Second Amendment to the March 2010 Trust Agreement

1667. On or around July 27, 2011, OSA's external financial consultant emailed Messrs. Sieswerda and van der Velde from Rabobank to introduce them to Mr. Ortega-Rivera,

"Head of [B]anamex factoring", touting OSA's close relationship and contacts with Citigroup. That same day, Mr. Ortega-Rivera proposed and conducted a telephone conference with M. Sieswerda, to "clarify" the proposed amendment to the agreement between Rabobank and Banamex.

1668. On or around August 3, 2011, Mr. Ortega explained "the terms of the factoring" to Rabobank, as part of the finalization of the July 2011 Trust Agreement.

1669. On information and belief, between on or around July 2011 and on or around August 2011, and in connection with discussions regarding the second amendment to the March 2010 Trust Agreement, Banamex representatives informed Mr. Sieswerda during a telephone conference that Banamex, not OSA, was responsible for validating and verifying OSA's receivables.

1670. Such representations were false, however, because at this time, Citigroup and OSA were engaged in a fraud, which threatened the reliability and stability of the cash advance facility, OSA's primary source of liquidity and cash flow.

1671. In addition, in the July and August 2011 email exchanges and telephone conferences with Mr. Sieswerda, neither Mr. Ortega nor OSA's external financial consultant advised Mr. Sieswerda and Rabobank of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). These omissions rendered false and misleading Mr. Ortega's implicit representation during the July and August 2011 communications with Rabobank that the cash advance facility was stable and reliable.

1672. Citigroup and OSA had a duty to speak and disclose this information to OSA's external financial consultant and Rabobank because (1) their failure to speak would render false

and misleading their prior and ongoing representations to OSA's external financial consultant and Rabobank about OSA's positive financial forecasts and the strength and reliability of the cash advance facility; (2) Citigroup and OSA had full access to this information and intentionally withheld it to receive a financial benefit (increased liquidity and Pemex contracts for OSA and increased fees and interest to Citigroup from its role as trustee and increased cash advance requests); (3) Citigroup and OSA had full access to and knowledge of this information and intentionally withheld it to receive the financial benefit from Rabobank's agreement to amend the March 2010 Trust Agreement; (4) Citigroup had full access to and was aware of the omitted material facts, and also knew that OSA's external financial consultant and Rabobank would rely on the omitted facts when investigating OSA's finances; and (5) the fraudulent scheme between Citigroup and OSA was well underway at this time. Citigroup's and OSA's special knowledge of its fraudulent scheme also denied OSA's external financial consultant and Rabobank the ability to sufficiently investigate OSA's finances during the July and August 2011 negotiations.

1673. Citigroup also had a duty to speak and disclose the omitted information to OSA's external financial consultant and Rabobank on account of its role as trustee of the Rabobank Trust through the ICG, but it failed to do so.

1674. In July and August 2011, when agreeing to (1) amend the Rabobank Trust; (2) renegotiate the Rabobank Loans; and (3) continue its business with OSA, Rabobank relied on the fraudulent misrepresentations and material omissions in the July and August 2011 email exchanges and telephone conferences by (1) Citigroup, including its failure to disclose the omitted information as trustee of the Rabobank Trust; and (2) OSA (through its external financial consultant), with Citigroup's knowledge and substantial assistance (*see infra* at ¶ 1704).

### C. Fraudulent Misrepresentations and Material Omissions Between 2012 and 2014 Relating to Daily Reports Sent by Citigroup to Rabobank

1675. Between at least September 2012 and December 2014, Citigroup was directly involved in managing the Rabobank Trust, including by sending daily reports to OSA and Rabobank describing the balance of the Rabobank Trust. The Daily Reports, sent by Leticia Vergara Pino with an email stamp "[ICG-GTS]" to Messrs. Van Berkel, Bartelds, and Sieswerda from Rabobank, Messrs. Yáñez, Dinorin, and Varela from OSA, OSA's external financial consultant, and Ms. Cinta Narvaez and Mr. Salazar from the ICG (Citigroup) "reflected the movements in Discounted and Non Discounted accounts" including revenues from different vessels.

1676. Such representations were false because between September 2012 and December 2014, (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section VI).

1677. In addition, at no point during these daily transmission of reports did Citigroup inform Rabobank of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). These omissions rendered false and misleading Citigroup's representations of OSA's revenue as reported in the Daily Reports.

1678. Citigroup had a duty to speak and disclose these facts because (1) its failure to speak would render its prior and ongoing representations to Rabobank about OSA's finances and the stability and reliability of the cash advance facility false and misleading; (2) it served as Trustee of the Rabobank Trust; (3) it provided information about the Trust on a daily basis to Rabobank;

(4) Citigroup had full access to the omitted information and intentionally withheld it from Rabobank to allow Citigroup to continue earning revenue on the cash advance facility; and (5) at this time, Citigroup and OSA were involved in a fraudulent scheme relating to the cash advance facility. Citigroup's special knowledge of its fraudulent scheme with OSA also denied Rabobank the ability to sufficiently investigate OSA's finances prior to agreeing to restructure the Rabobank Trust, amend the March 2010 Trust Agreement, and continue to do business with OSA.

1679. When deciding to maintain its business with OSA between 2012 and 2014, Rabobank relied on Citigroup's fraudulent misrepresentations and material omissions in the Daily Reports between 2012 and 2014.

## D. Fraudulent Misrepresentations and Material Omissions Between 2011 and 2013 to Convince Rabobank That OSA Was a Financially Attractive Investment

### 1. Discussions Between Rabobank, Citigroup's ICG, Banamex and OSA in or Around August 2011 Regarding the Implementation of the Waterfall

1680. On or around August 19 and 23, 2011, Banamex, OSA, Rabobank and, on information and belief, members of Citigroup's ICG, had at least two meetings to discuss the waterfall mechanism relating to the Rabobank Trust (the "August 2011 Meetings").[64] Following these meetings, Mr. Sieswerda provided Citigroup and Banamex (including Mr. Ortega-Rivera, an ICG employee) and OSA (including Mr. Yáñez ) with a Rabobank presentation showing the implementation of the waterfall, specifying that "[i]n this overview the account structure with

[64] The waterfall mechanism is described as follows in the August 2011 Waterfall Presentation : payments by Pemex are made in the "General Trust Account at Banamex, which in turn makes payments to the Rabobank Trust. The Rabobank Trust also receives payment from the Banamex cash advance facility and from OSA. The Rabobank Trust then redistributes money in order of priority : (1) VAT to OSA ; (2) Trustee Fees to Banamex ; (3) Distribution to 2007 and 2008 Loans accounts (which then have their own waterfall mechanisms, serving first Rabobank ; then De Hoop ; and finally the SPV, CFA).

Banamex is finalized and Chanel Finance has provided its input based on which the cash flow process of the Discounted PEP Invoices becomes more efficient" (the "August 2011 Waterfall Presentation").

1681. The August 2011 Waterfall Presentation incorporated comments made by Banamex, sent by Manuel de Jesus Paullada Nevarez from Banamex and, on information and belief, under the supervision and diretion of Citigroup's ICG, on or around August 22, 2011.

1682. The August 2011 Waterfall Presentation specifically indicated that the "[c]ashflow from Pemex to Trust Accounts" had "[t]o be done by Banamex".

1683. As discussed above, OSA's financial strength and security was inherently tied to its ability to obtain cash through the cash advance facility (*see supra* at Section VI). Accordingly, Citigroup's and Banamex's representations about OSA's ability to obtain cash through the cash advance facility as presented in the "overview of account structure with Banamex" indirectly included representations that the cash advance facility was stable and reliable and therefore supporting the waterfall.

1684. Such representations were false, however, because in 2011 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section VI). Accordingly, Citigroup's and Banamex's representations to Rabobank in the August 2011 communications were false and misleading.

1685. In the August 2011 Meetings, Citigroup also did not advise Rabobank of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section

VI). These material omissions similarly rendered Citigroup's representations about the cash advance facility and waterfall structure false and misleading.

1686. Citigroup had a duty to speak and disclose this information because (1) its failure to speak would render its prior and ongoing representations to Rabobank false and misleading; (2) it was acting as trustee of the Rabobank Trust, from which it would receive a financial benefit (e.g., increased fees for its role as trustee and interest from the cash advance facility); (3) it had full access to this information and intentionally withheld it from Rabobank to receive a financial benefit; and (4) at this time, Citigroup was involved in a fraudulent scheme with OSA. Citigroup's special knowledge of the fraudulent scheme with OSA also denied Rabobank the ability to sufficiently investigate OSA's finances prior to agreeing to continue doing business with OSA.

1687. In agreeing to continue doing business with OSA in August 2011, Rabobank relied on Citigroup's fraudulent misrepresentations and material omissions in the August 2011 communications relating to the cash advance facility and waterfall structure.

**2. Discussion Between Rabobank and Citigroup in or Around May 2012 Regarding the Payment Mechanism**

1688. On or around May 10, 2012, Jorge Salazar from Citigroup (with email address jorge1.salazar@citi.com) emailed Messrs. Sieswerda and Bartelds from Rabobank, copying OSA (czertuche@oceanografia.com.mx) and OSA's external financial consultant, a flow chart related to payments made to the Rabobank Trust (the "Rabobank Trust Flow Chart" and the "May 10, 2012 Email"). The Rabobank Trust Flow Chart pictured Banamex as the Trustee ("Fiduciario") of the Rabobank Trust.

1689. As discussed above, OSA's financial strength and security was inherently tied to its ability to obtain cash through the cash advance facility (*see supra* at Section VI). Accordingly, Citigroup's representations about OSA's ability to obtain cash through the cash advance facility

in the Rabobank Trust Flow Chart indirectly included representations that the cash advance facility was stable and reliable and therefore supporting the Rabobank Trust payment mechanism.

1690. Such representations were false, however, because in 2012 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section VI). Accordingly, Mr. Salazar's representations to Messrs. Sieswerda and Bartelds and Rabobank were false and misleading.

1691. Neither in the May 10, 2012 Email nor the Rabobank Trust Flow Chart did Mr. Salazar advise Messrs. Sieswerda and Bartelds and Rabobank of (1) OSA's false financial projections; (2) false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). These material omissions similarly rendered Citigroup's representations about the cash advance facility false and misleading.

1692. Citigroup had a duty to speak and disclose this information because (1) its failure to speak would render its prior and ongoing representations to Rabobank false and misleading; (2) Citigroup was acting as trustee of the Rabobank Trust, from which it would receive a financial benefit (i.e., trustee fees); (3) Citigroup had full access to this information and intentionally withheld it to receive a benefit; and (4) at this time, Citigroup was involved in a fraudulent scheme with OSA. Citigroup's special knowledge of its fraudulent scheme with OSA also denied Rabobank the ability to sufficiently investigate OSA's finances before restructuring the Loans and continuing to do business with OSA.

1693. Rabobank relied on (1) Citigroup's fraudulent misrepresentations and material omissions in the Rabobank Trust Flow Chart and the May 10, 2012 Email, which implicitly included representations that the cash advance facility was reliable and stable and omitted information regarding the fraud; and (2) Citigroup's material omissions regarding the fraud, as trustee of the Rabobank Trust.

**3. July 9, 2013 Correspondence Regarding Payment Instructions to the Rabobank Trust**

1694. On or around July 9, 2013, Mr. Salazar, using his @citi.com email address, sent to Han Rizelli, Jasper van Berkel, Han Bartelds, Edwin Sieswerda, Monique Albers and Harry Weinands from Rabobank, after a telephone conference that was held earlier that day, a spreadsheet dated July 8, 2013 detailing "operations" between Rabobank and Banamex (the "July 9, 2013 Email" and the "July 8, 2013 Spreadsheet"). The July 8, 2013 Spreadsheet listed twelve invoices linked to three different vessels pertaining to the Rabobank Trust. For each invoice, the July 8, 2013 spreadsheet listed a "factored amount".

1695. The July 8, 2013 Spreadsheet showed that for specific Rabobank financed vessels, cash was disbursed as per the factoring agreement, therefore illustrating OSA's capacity to obtain cash through the cash advance facility, to then be allocated to the Rabobank Trust.

1696. As discussed above, OSA's financial strength and security was inherently tied to its ability to obtain cash through the cash advance facility (*see supra* at Section VI). Accordingly, Citigroup's representations about OSA's ability to obtain cash through the cash advance facility in the July 9, 2013 Email and the July 8, 2013 Spreadsheet implicitly included representations that the cash advance facility was stable and reliable.

1697. Such representations were false, however, because in 2013 (1) OSA was submitting false documents to ICG employees; (2) Citigroup's controls over the cash advance facility were

false and weak; and (3) Citigroup and OSA were engaged in a fraudulent scheme that threatened the stability and reliability of the cash advance facility, OSA's primary source of liquidity and cash flow (*see supra* at Section VI). Accordingly, Mr. Salazar's representations to Rabobank were false and misleading.

1698. In the July 9, 2013 Email and Spreadsheet and related telephone conference, Mr. Salazar did not advise Rabobank of (1) OSA's false financial projections; (2) the false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility; and (4) the ongoing fraud (*see supra* at Section VI). These material omissions similarly rendered Mr. Salazar's representations about the factoring facility false and misleading.

1699. Citigroup had a duty to speak and disclose this information because (1) its failure to speak would render its representations in the Email, Spreadsheet and corresponding telephone conference false and misleading; (2) Citigroup was the trustee of the Rabobank Trust, from which it would receive a financial benefit (i.e., trustee fees); (3) Citigroup had full access to this information and intentionally withheld it to receive a benefit; and (4) at this time, Citigroup was involved in a fraudulent scheme with OSA. Citigroup's special knowledge of its fraudulent scheme with OSA also denied Rabobank the ability to sufficiently investigate OSA's finances before restructuring the loans and continuing to do business with OSA.

1700. Rabobank relied on (1) Citigroup's fraudulent misrepresentations and material omissions in the July 9, 2013 Email and Spreadsheet and related telephone conference, which implicitly included representations that the cash advance facility was reliable and stable and omitted information regarding the fraud; and (2) Citigroup's material omissions regarding the fraud, as trustee of the Rabobank Trust.

**E. <u>Citigroup (1) Directly Committed Fraud, and (2) Conspired with and Aided and Abetted OSA in Committing Fraud, Against Rabobank</u>**

1701. Citigroup committed fraud against Rabobank through the fraudulent misrepresentations and material omissions in the (1) February 3, 2010 Meeting; (2) discussions between Rabobank and OSA's external financial consultant in 2011 regarding the July 2011 Trust Agreement; (3) July-August 2011 Meetings and Emails; (4) Daily Reports; (5) May 10, 2012 Email; (6) July 9, 2013 Email and (7) materials shared with, and communications made to, Rabobank between 2010 and 2014 by OSA, including those made by its external financial consultant and Pareto, which were (i) based on information provided by Citigroup; and (ii) made with Citigroup's knowledge that such information would be disseminated to OSA's creditors, vendors, and bondholders, including Rabobank (*see supra* at Section XIV).

1702. Citigroup knowingly conspired to make, and was aware that OSA was making, fraudulent misrepresentations and material omissions (including those made by OSA's external financial consultant) in communications and materials shared with Rabobank, including the February 2, 2010 Meeting and the May 18, 2011 GYRU Report (*see supra* at Section XVI B.).

1703. Specifically, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to creditors like Rabobank on account of its (1) participation in the fraud (*see supra* Section VI); (2) its role in approving OSA's false documentation; (3) role as trustee of the Rabobank Trust; and (4) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* at Section XIII).

1704. With knowledge of OSA's fraudulent misrepresentations and material omissions to Rabobank, Citigroup aided and abetted and substantially assisted OSA in committing fraud against Rabobank, including by (1) approving the false documentation OSA submitted to ICG employees;

(2) violating its own internal controls relating to the cash advance facility, including by entering into the secret Regulatory Contract which purported to release Citigroup from any responsibility in validating OSA's documentation in support of cash advance requests; (3) allowing OSA to control the cash advance facility; (4) providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests; (5) not disclosing accurate financial information on the Daily Reports; and (6) failing to speak and disclose accurate information, as the trustee of the Rabobank Trust.

1705. Citigroup received a direct financial incentive to participate in the conspiracy, including by collecting interest payments on illicit cash advances issued to OSA and fees for services to OSA.

**F. Rabobank Suffered Injury Due to OSA's and Citigroup's Fraudulent Misrepresentations and Material Omissions**

1706. When Rabobank decided to (1) renegotiate the terms of its Loans to OSA; (2) enter into the various Trust Agreements and amendments; and (3) decline to take adverse actions against OSA due to its failure to repay the Loans, Rabobank relied on the fraudulent misrepresentations and material omissions by Citigroup, through OSA's external financial consultant and Pareto; and by OSA (including those made by OSA's external financial consultant), which Citigroup aided and abetted on account of its knowledge and substantial assistance. Specifically:

(a) Citigroup aided and abetted OSA in making fraudulent misrepresentations and material omissions to Rabobank in the February 2, 2010 Meeting (described *supra* at ¶¶ 1635-1641);

(b) Citigroup made fraudulent misprepresentations and material omissions to Rabobank in the February 3, 2010 Meeting (described *supra* at ¶¶ 1642-1647);

(c) Citigroup, (1) through OSA's external financial consultant, made fraudulent misrepresentations and material omissions to Rabobank in discussions between Rabobank and OSA's external financial consultant in 2011 regarding the July 2011 Trust Agreement and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to Rabobank in the discussions between Rabobank and OSA's external financial consultant in 2011 regarding the July 2011 Trust Agreement (described *supra* at ¶¶ 1648-1654);

(d) Citigroup aided and abetted OSA in making fraudulent misrepresentations and material omissions to Rabobank in the GYRU Report (described *supra* at ¶¶ 1655-1666);

(e) Citigroup (1) made fraudulent misrepresentations and material omissions to Rabobank and (2) aided and abetted OSA in making fraudulent misrepresentations and material omissions to Rabobank in the July-August 2011 Meeting and Emails (described *supra* at ¶¶ 1667-1674);

(f) Citigroup made fraudulent misrepresentations and material omissions to Rabobank in the Daily Reports (described *supra* at ¶¶ 1675-1679);

(g) Citigroup made fraudulent misrepresentations and material omissions to Rabobank in the August 2011 Communications (described *supra* at ¶¶ 1680-1687);

(h) Citigroup made fraudulent misrepresentations and material omissions to Rabobank in the May 10, 2012 Email and the Rabobank Trust Flowchart (described *supra* at ¶¶ 1688-1693);

(i) Citigroup made fraudulent misrepresentations and material omissions to Rabobank in the July 9, 2013 Correspondence (described *supra* at ¶¶ 1694-1700).

1707. In other words, Rabobank would not have (1) renegotiated the terms of its Loans to OSA; (2) entered into the various Trust Agreements and amendments; or (3) declined to take adverse actions against OSA due to its failure to repay the Loans, had Rabobank known of (1) OSA's false financial projections; (2) false documents submitted by OSA to ICG employees; (3) the false and weak controls of the cash advance facility, or the (4) ongoing fraud.

1708. To date, Rabobank has only received partial payment of the principal and interest it originally loaned to OSA. In addition, Rabobank was unable to recover the Rabobank-Financed Vessels until July of 2015.

## XVII. CAUSES OF ACTION

### COUNT ONE
### Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(c)

(All Plaintiffs)

1709. Plaintiffs repeat and re-allege paragraphs 1-1708 above as if fully set forth herein.

1710. Pursuant to 18 U.S.C. § 1964(c), Count One seeks relief from Defendant for violation of 18 U.S.C. § 1962(c).

1711. At all relevant times, Citigroup, including its agents, employees or representatives, was and is a "person" within the meaning of 18 U.S.C. §§ 1962(c) and 1961(3).

1712. Citigroup violated 18 U.S.C. § 1962(c) by the acts described below.

### *The RICO Enterprise*

1713. At all relevant times, Citigroup, individually and through its agents, employees or representatives, together with OSA, individually and through its agents, employees or representatives, associated in fact with each other so as to constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "RICO Enterprise").

1714. At all times relevant to this Third Amended Complaint, the RICO Enterprise was engaged in, and its activities affected, interstate and foreign commerce, including because Citigroup and OSA (1) communicated with each other about the fraudulent scheme; and (2) made fraudulent misrepresentations and material omissions to Plaintiffs using interstate and international wires through (i) telephone calls to and from the United States; and (ii) emails to and from the United States that traveled through email servers in the United States.

1715. The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the members of the RICO Enterprise engaged. Specifically, the members of the RICO Enterprise associated with the RICO Enterprise through their personal involvement in the underlying racketeering offenses as well as by (1) establishing, administering and participating in the cash advance facility, thus developing a co-dependent, mutually-beneficial financial relationship; (2) making fraudulent misrepresentations and material omissions to Plaintiffs through in-person meetings, telephone conferences and emails and in written materials including presentations and financial statements; (3) providing loans and other financial and investment support to OSA apart from the cash advance facility; and (4) continuously promoting the RICO Enterprise's activities and concealing them from Pemex, government regulators and others.

1716. The members of the RICO Enterprise associated with each other for the common purpose of fraudulently inducing and luring Plaintiffs to invest, and maintain their investment in, OSA in order to increase (1) cash flows to OSA; and (2) interest payments to Citigroup. Given OSA's use of Citigroup's cash advance facility to inflate its revenue numbers and projections, Citigroup and OSA knew that OSA was inducing continued and increased infusions of outside capital and resources by Plaintiffs through their shared fraudulent enterprise.

1717. The RICO Enterprise began as early as 2008 but no later than September 2013, and continued until February 2014.

1718. During this time period, in furtherance of the RICO Enterprise, the members of the RICO Enterprise committed numerous predicate acts of racketeering activity, including wire fraud in violation of 18 U.S.C. § 1343.

1719. The members of the RICO Enterprise directly or indirectly benefited from the fraudulent scheme due to, among other things, receipt by: (1) OSA of capital and resources from Plaintiffs; (2) OSA of hundreds of millions of dollars in fraudulent cash advances; (3) Citigroup of tens of millions of dollars in interest for issuing fraudulent cash advances; (4) Citigroup of millions of dollars in fees for serving as trustee for the 2008 Bond Issuance and the Mexican Trust.

1720. The RICO Enterprise existed independent of the routine contractual relationships between OSA and Citigroup. In addition to the numerous acts of fraud described herein, which necessarily fell outside the scope of any legitimate contractual relationship, as described supra in paragraphs XX, key employees including Mr. Barnes, Mr. Valera, and Mr. Ortega-Rivera moved freely between OSA and Citigroup.

***The Purpose and Object of the Racketeering Activity***

1721. The members of the RICO Enterprise associated with each other for the common purpose of defrauding Pemex through the submission of fraudulent and forged receipts and fraudulently inducing and luring Plaintiffs to invest, and maintain their investment in, OSA in order to increase (1) cash flows to OSA; and (2) interest payments to Citigroup.

1722. The members of the RICO Enterprise agreed to engage in a pattern of racketeering activity to further the objectives of the RICO Enterprise.

***Direction of the RICO Enterprise's Affairs***

1723. Citigroup knowingly conducted and participated in, directly and indirectly, the RICO Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

1724. Additionally, Citigroup was "employed by or associated with" the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c).

1725. Citigroup, individually and through its agents, employees or representatives, including the ICG, Citibank, and Banamex as described *supra* in Sections V-VII, participated in the operation or management of the RICO Enterprise, including by knowingly (1) inducing and luring Plaintiffs into investing and maintaining their investments in OSA by making fraudulent misrepresentations and material omissions through in-person meetings, telephone conferences and emails and in written materials such as presentations and financial statements; (2) approving and providing cash advances to OSA based on documentation Citigroup knew to be fraudulent; (3) submitting receipts Citigroup knew to be forged to Pemex for payment; (4) charging OSA tens of millions of dollars in interest for the cash advances and thus obtaining a significant benefit; and (5) increasing OSA's cash advance limits to (a) increase the interest Citigroup received; and (b) maximize the RICO Enterprise's ability to capitalize on Plaintiffs investments in OSA (obtained through fraudulent misrepresentations and material omissions).

1726. The fraudulent scheme carried out by members of the RICO Enterprise could not have succeeded without Citigroup's direction, management, authorization, approval and cover-up of the fraudulent cash advances submitted by OSA—as evidenced by, among other things, Citigroup's approval of cash advances that were (1) blatantly inconsistent with the value of the

underlying Pemex contracts allegedly supporting the cash advances; and (2) based on fraudulent documentation.

1727. In fact, Citigroup admitted that it was responsible for the fraudulent scheme. Specifically, as alleged above:

(a) In April 2014, Citigroup's CEO admitted that at least one of Citigroup's employees was "criminally involved" in the fraudulent scheme;

(b) Within the next month, Citigroup terminated approximately a dozen employees, both "inside and outside" of Mexico, that perpetrated the fraud; and

(c) Subsequently, in its annual reports, Citigroup disclosed that the DOJ and the SEC are investigating Citigroup's role in the fraud.

1728. Citigroup's agents, employees or representatives who committed acts in furtherance of the RICO Enterprise committed those acts within the course of their employment by Citigroup or on the authority and approval of Citigroup, which included responsibility for the cash advance facility with OSA and coordination with OSA, another member of the RICO Enterprise.

1729. As alleged *supra* in Section IV, Citigroup relationship managers who (1) had Citigroup email addresses; (2) had email addresses containing ICG email stamps; (3) signed emails as employees of "Banamex-Citi" divisions; and (4) were deemed by Mexican authorities to be responsible for the fraudulent scheme, handled Citigroup's relationship with OSA and Pemex, in connection with the cash advance facility.[65]

---

[65] As described above, on May 12, 2014, a Mexican criminal court issued arrest warrants against Citigroup ICG employees based on their roles in the fraudulent cash advances issued to OSA. In addition, on June 20, 2014, Mr. Murillo, the head of the PGR, testified before the Mexican Senate that Citigroup employees, including at least one senior Citigroup executive,

1730. As alleged *supra* in Section VII, Citigroup Cash Advance Product employees who (1) had U.S.-hosted Citigroup email addresses; (2) had email addresses containing ICG email stamps; (3) signed emails as employees of "Banamex-Citi" divisions; and (4) were deemed by Mexican authorities to be responsible for the fraudulent scheme, reviewed OSA's cash advance requests and, on information and belief, approved those case advance requests multiple times per week.

1731. As alleged *supra* in Section X, Citigroup managers who (1) had U.S.-hosted Citigroup email addresses; (2) had email addresses containing ICG email stamps; (3) signed emails as employees of "Banamex-Citi" divisions; and (4) were deemed by the Mexican authorities to be responsible for the fraudulent scheme, managed the cash advance facility—including by managing trusts established to pay OSA's vendors, creditors and bondholders and approving increases to OSA's cash advance limit.

1732. Citigroup's agents, employees or representatives who committed acts in furtherance of the RICO Enterprise committed those acts for the benefit of Citigroup, who profited significantly from the interest collected on the fraudulent cash advances issued to OSA.

1733. Citigroup authorized or acquiesced in acts committed by its agents, employees or representatives in furtherance of the RICO Enterprise, including by failing to (1) stop the fraudulent acts; (2) make an effort to timely investigate the acts; or (3) discipline the responsible agents, employees or representatives until *after* the SFP's probe into OSA's insurance policies with Pemex forced Citigroup to launch an investigation.

---

and OSA employees conspired to commit fraud. Moreover, on April 29, 2014, the CNBV rendered an opinion to the Mexican federal government on the cash-advance scheme concluding that ten bank employees were criminally responsible for the fraud.

### ***The Pattern of Racketeering Activity***

1734. In the course of conducting and participating in the RICO Enterprise, Citigroup committed numerous predicate acts of racketeering activity, which are indictable under provisions of the U.S. criminal code enumerated in 18 U.S.C. § 1961(1)(B).

1735. Specifically, Citigroup executed a pattern of predicate acts of racketeering as defined in 18 U.S.C. §§ 1961(1) and 1961(5), and in violation of 18 U.S.C. § 1962(c), including but not limited to wire fraud in violation of 18 U.S.C. § 1343.

#### *Wire Fraud*

1736. In furtherance of the RICO Enterprise, and as described herein, Citigroup and OSA, individually and through agents, employees or representatives, used wire communications in interstate or foreign commerce via telephone and email in violation of 18 U.S.C. § 1343.

1737. As described *supra* in Sections VI-VII, Citigroup, in conjunction with OSA, devised a scheme and artifice to defraud Pemex and OSA's current and prospective investors, creditors, and vendors including by using the payment of cash advances based on fraudulent and forged documents to intentionally mislead investors, creditors and vendors into believing that OSA was financially healthy and had access to reliable liquid capital when, in reality, neither of those facts were true.

1738. For the purpose of executing this scheme and artifice to defraud, Citigroup transmitted or caused to be transmitted information by means of wire in interstate or foreign commerce on at least the following instances, each constituting a violation of 18 U.S.C. § 1343.

1739. Between 2008 and February 2014, as described *supra* in Sections VI-VII, Citigroup, through its ICG executives and employees and through Banamex, transmitted to OSA, in Mexico, approval messages for fraudulent cash advances based on false documents bearing

forged Pemex signatures. On information and belief, Citigroup transmitted (1) certain of these fraudulent approvals by wire, including electronic mail, from the offices of its ICG executives and employees in New York; and (2) certain of these fraudulent approvals by wire, including electronic mail, from ICG employees in Mexico and such electronic mail messages (i) were sent from ICG employees' email addresses which are hosted on Citigroup's servers in the United States; and (ii) included recipients among the ICG executives and employees in New York such that the messages were transmitted by wire in the United States. Citigroup transmitted the fraudulent cash advance approvals at least quarterly between 2008 and February 2014 and, on information and belief, sent such approvals multiple times per week during that period. Each such transmittal constituted wire fraud in violation of 18 U.S.C. § 1343.

1740. Between 2008 and February 2014, as described *supra* in Sections VI-VII, Citigroup, through its ICG executives and employees and through Banamex, transmitted to Pemex, in Mexico, for reimbursement fraudulent receipts that Citigroup received from OSA and that Citigroup knew bore forged Pemex signatures. On information and belief, Citigroup transmitted (1) certain of these fraudulent receipts by wire, including electronic mail, from the offices of its ICG executives and employees in New York and Miami; and (2) certain of these fraudulent approvals by wire, including electronic mail, from Citigroup employees in Mexico and such electronic mail messages (i) were sent from ICG employees' email addresses which are hosted on Citigroup's servers in the United States; and (ii) included recipients among the ICG executives and employees in New York such that the messages were transmitted by wire in the United States. Citigroup transmitted the fraudulent receipts to Pemex at least quarterly between 2008 and February 2014 and, on information and belief, sent such approvals multiple times per month during that period. Each such transmittal constituted wire fraud in violation of 18 U.S.C. § 1343.

1741. In the spring of 2008, as described *supra* in Section XIV.B.1.d, Citigroup provided Morgan Stanley with information for use in marketing the 2008 Bond Issuance to potential investors. On information and belief, Citigroup provided this information to Morgan Stanley, which was located in New York, by electronic mail sent via wire from both the United States and Mexico. This information was provided to Morgan Stanley to execute the scheme to defraud by causing Morgan Stanley to provide unwittingly misleading information to investors regarding the value and stability of the bonds and inducing investors to purchase the bonds. Transmitting the information by means of wire including through U.S. wires in furtherance of the scheme to defraud potential bond purchasers constituted wire fraud in violation of 18 U.S.C. § 1343.

1742. On or about August 2008, as described *supra* in Section XIV.I.3.a, Mr. Yáñez sent Mr. Corrigan and Mr. Gilmore of TCW emails arranging for Mr. Corrigan and Mr. Gilmore to come to Mexico to meet with OSA executives for the purposes of providing information about OSA's financial condition. Mr. Yáñez transmitted these emails from his OSA email account, hosted in Mexico, to Mr. Corrigan and Mr. Gilmore's email accounts, hosted in the United States. Mr. Yáñez's emails passed through U.S. wires. The emails were intended to execute the scheme to defraud by arranging for a meeting at which OSA intended to provide TCW/GPF II and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon. Sending these messages by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for these violations as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Yáñez sent the emails in furtherance of that conspiracy.

1743. On or about July 16, 2009, as described *supra* in Section XIV.G.2.a, Mr. Yáñez sent Mr. Edmondson of Ashmore an email providing Mr. Edmondson with assurances regarding

OSA's payment of the coupon on the 2008 bonds. Mr. Yáñez transmitted this email from his OSA email account, hosted in Mexico, to Mr. Edmondson's email account, on information and belief hosted in the United States. Mr. Yáñez's email passed through U.S. wires. The email was intended to execute the scheme to defraud by providing Ashmore and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Yáñez sent the email in furtherance of that conspiracy.

1744. On or about September 8 and 11, 2009, as described *supra* in Section XIV.I.3.a, Mr. Gaona of OSA spoke to Mr. Corrigan of TCW via telephone regarding OSA's untimely payment of the coupon for the 2008 bonds. Mr. Gaona was in Mexico during both of these telephone calls and Mr. Corrigan was in the United States. Both telephone calls used U.S. wires. The calls were intended to execute the scheme to defraud by providing TCW/GPF II and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Transmitting the contents of the phone calls by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for these violations as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Gaona conducted the telephone call in furtherance of that conspiracy.

1745. On or about September and October 2009, as described *supra* in Section XIV.I.3.a, Mr. Yáñez sent Mr. Corrigan and Mr. Ravindran of TCW emails arranging for Mr. Corrigan and Mr. Ravindran to come to Mexico to meet with OSA executives for the purposes of providing information about OSA's financial condition. Mr. Yáñez transmitted these email from his OSA email account, hosted in Mexico, to Mr. Corrigan and Mr. Ravindran's email accounts, hosted in the United States. Mr. Yáñez's emails passed through U.S. wires. The emails were intended to execute the scheme to defraud by arranging for a meeting at which OSA intended to provide TCW/GPF II and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon. Sending these messages by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for these violations as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Yáñez sent the emails in furtherance of that conspiracy.

1746. On or about January 7, 2011, as described supra in Section XIV.G.2.c, Mr. Betancourt of OSA sent Ashmore an email providing Ashmore with OSA's 2009 and 2010 financial statements. Mr. Betancourt transmitted this email from his OSA email account, hosted in Mexico, to Ashmore's email accounts, hosted in the United States. Mr. Betancourt's email passed through U.S. wires. The email was intended to execute the scheme to defraud by providing Ashmore and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is

liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Betancourt sent the email in furtherance of that conspiracy.

1747. On or about February 23, 2011, as described *supra* in Section XIV.K.3.a, Mr. Piscitelli of Citibank N.A., the banking arm of Citigroup, sent an email to Mr. Partap of ICE including OSA's 2009 and 2010 financial statements. Mr. Piscitelli transmitted this email from his citigroup.com email address, hosted in the United States, to Mr. Partap's email address, hosted in the United States. Mr. Piscitelli's email passed through U.S. wires. The email was intended to execute the scheme to defraud by providing ICE with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1748. On or about March 10, 2011; March 24, 2011; April 6, 2011; July 12, 2012; September 25, 2012; and January 17, 2013, as described *supra* in Section XIV.I.3.b, OSA's external financial consultant spoke to Mr. Corrigan and Mr. Gilmore of TCW via telephone regarding TCW's concerns about OSA's payment of the principal and interest on the 2008 bonds and OSA's financial health. Mr. Corrigan and Gilmore were, on information and belief, in the United States during these phone calls. Each of the telephone calls used U.S. wires. Citigroup and OSA, its co-conspirator, caused OSA's external financial consultant to transmit this information by wire in interstate and foreign commerce by providing him with false information regarding OSA's financial condition with the intent that he pass that false information to OSA's investors and bondholders. Citigroup intended the calls to execute the scheme to defraud by providing TCW and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding

the 2008 bonds. Causing the transmission of the contents of the phone calls by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1749. On or about April 29, 2011, as described *supra* in Section XV.B.3.b, OSA's external financial consultant spoke to Candies via telephone regarding OSA's restructuring of its debt to Candies. The representatives of Candies were in Louisiana during this telephone call. The telephone call used U.S. wires. Citigroup and OSA, its co-conspirator, caused OSA's external financial consultant to transmit this information by wire in interstate and foreign commerce by providing him with false and misleading information regarding OSA's financial condition with the intent that he pass that false information to OSA's vendors, including Candies. Citigroup intended the call to execute the scheme to defraud by falsely assuring Candies that OSA would be able to restructure and pay its debt to Candies due, in part, to the cash flow from the cash advance facility. Causing the transmission of the contents of the phone call by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1750. On or about May 23, 2011, as described *supra* in Section XV.B.3.d OSA sent to Candies, via email, the May 2011 Stock Agreement for execution. OSA sent the Agreement from its email accounts, hosted in Mexico, to Candies' email account, hosted in the United States. The email used U.S. wires. The email was intended to execute the scheme to defraud OSA's vendors by falsely assuring Candies that OSA would pay the money it owed Candies and dissuading Candies from taking steps to repossess its ships. Sending the Agreement by wire, including U.S. wires, constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation

as it was engaged in a conspiracy with OSA to defraud investors and vendors and OSA sent the agreement in furtherance of that conspiracy.

1751. On or about July 27, 2011, as described *supra* in Section XVI..B.5, OSA's external financial consultant emailed Mr. Sieswerda and Mr. van der Velde of Rabobank to introduce them to Mr. Ortega-Rivera of Citigroup and Banamex, touting OSA's close relationship with Banamex. OSA's external financial consultant sent the email from his mac.com email address, hosted in the United States, to Mr. Sieswerda and Mr. van der Velde's Rabobank email addresses, hosted in the Netherlands. The email used U.S. wires. Citigroup and OSA, its co-conspirator, caused OSA's external financial consultant to transmit this information by wire in interstate and foreign commerce by providing him with false and misleading information regarding OSA's financial condition. Citigroup intended the email to execute the scheme to defraud by falsely assuring Rabobank of OSA's financial stability thereby inducing it to continue to offer credit to OSA. Causing the transmission of the contents of the email by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1752. Between on or about July 27, 2011 and on or about August 3, 2011, as described *supra* in Section XVI.B.5, Mr. Ortega-Rivera of Citigroup sent emails to emailed Mr. Sieswerda and Mr. van der Velde of Rabobank regarding the terms of the March 2010 Trust Agreement and the mechanisms of the cash advance facility that supposedly provided reliability and security for OSA's payments on the debt it owed Rabobank. Mr. Ortega sent these emails from his Citigroup email account, hosted in the United States, to Mr. Sieswerda and Mr. van der Velde's Rabobank email addresses, hosted in the Netherlands. The emails used U.S. wires. The emails were intended to execute the scheme to defraud by providing Rabobank with false comfort regarding OSA's

financial condition and ability to consistently pay its debt, thereby inducing Rabobank to continue providing credit to OSA. Sending these messages by wire including through U.S. wires in furtherance of the scheme to defraud OSA's creditors constituted wire fraud in violation of 18 U.S.C. § 1343.

1753. On or about August 5, 2011, as described *supra* in Section XIV.K.3.c, Mr. Betancourt and Mr. Yáñez of OSA and Ms. Orfy, Ms. Encarnacion, and Mr. Piscitelli of Citigroup exchanged emails regarding the payment of the 2008 bond coupon; Mr. Betancourt forwarded one of these emails to Mr. Saffari of ICE. Mr. Betancourt and Mr. Yáñez sent and received these emails from their OSA email accounts, hosted in Mexico; Ms. Orfy, Ms. Encarnacion, and Mr. Piscitelli sent and received these emails from their Citigroup email accounts, hosted in the United States; and Mr. Saffari received the forwarded email at his ICE email account, hosted in the United States. Each of these emails passed through U.S. wires. The emails were intended to execute the scheme to defraud by providing ICE and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Sending these messages by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is directly liable for the messages its employees and agents sent and is liable for the messages OSA sent as Citigroup was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Yáñez and Mr. Betancourt sent the emails in furtherance of that conspiracy.

1754. On or about August 22, 2011, as described *supra* in Section XVI.D.1, Mr. Paullada of Banamex and Citigroup sent representatives of Rabobank, including Mr. Sieswerda, via email, comments on the August 2011 Waterfall Presentation regarding the financial security provided by

OSA's access to the cash advance facility. Mr. Paullada transmitted these emails from his Citigroup email account, hosted in the United States, to Mr. Sieswerda's email account, hosted in the Netherlands. Mr. Paullada's email used U.S. wires. The email was intended to execute the scheme to defraud by providing Rabobank with false assurances that OSA had reliable access to the cash advance facility to provide the cashflow to pay its debt to Rabobank, thereby inducing Rabobank to continue providing credit to OSA. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's creditors constituted wire fraud in violation of 18 U.S.C. § 1343.

1755. On or about January 20, 2012 and February 10, 2012, as described *supra* in Section XIV.k.4.a, Mr. Piscitelli of Citigroup sent Mr. Saffari of ICE two emails relating to the late payment of the coupon on the 2008 bonds. Mr. Piscitelli transmitted these emails from his Citigroup email account, hosted in the United States, to Mr. Saffari's email account, hosted in the United States. Mr. Piscitelli's emails passed through U.S. wires. The emails were intended to execute the scheme to defraud by providing ICE with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Sending these messages by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1756. On or about February 28, 2012, as described *supra* in Section XIV.G.2.c, Mr. Betancourt of OSA sent Ashmore, TCW and other 2008 Bondholders an email providing them with OSA's 2009 and 2010 financial statements. Mr. Betancourt transmitted this email from his OSA email account, hosted in Mexico, to Ashmore's, TCW's and the 2008 Bondholders' email accounts, hosted in numerous countries including the United States. Mr. Betancourt's email passed through U.S. wires. The email was intended to execute the scheme to defraud by providing

Ashmore, TCW and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Betancourt sent the email in furtherance of that conspiracy.

1757. On or about March 20, 2012, as described *supra* in Section XV.G.3, OSA's external financial consultant sent an email to Mr. Trevino of MADISA attaching OSA's 2010 and 2011 Financial Statements. OSA's external financial consultant sent the email from his mac.com email address, hosted in the United States, to Mr. Trevino's MADISA email account, hosted in Mexico. The email used U.S. wires. Citigroup and OSA, its co-conspirator, caused OSA's external financial consultant to transmit this information by wire in interstate and foreign commerce by providing him with false information regarding OSA's financial condition with the intent that he pass that false information to OSA's vendors. Citigroup intended the email to execute the scheme to defraud by providing MADISA and the other vendors with false comfort regarding OSA's financial condition and ability to consistently pay its debts to vendors. Causing the transmission of the contents of the phone call by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1758. On or about May 10, 2012, as described *supra* in Section XVI.D.2, Mr. Salazar of Citigroup sent Mr. Sieswerda and Mr. Bartelds of Rabobank the Rabobank Trust Flow Chart. Mr. Salazar transmitted this email from his Citigroup email account, hosted in the United States, to Mr. Sieswerda's and Mr. Bartelds' email accounts, hosted in the Netherlands. Mr. Salazar's email used U.S. wires. The email was intended to execute the scheme to defraud by providing Rabobank

with false assurances that OSA had reliable access to the cash advance facility to provide the cashflow to pay its debt to Rabobank, thereby inducing Rabobank to continue providing credit to OSA. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1759. Between approximately September 2012 and December 2014, as described *supra* in Section XVI.C, Ms. Vergara of Citigroup sent the Daily Reports via email to Mr. Van Berkel, Mr. Bartelds, and Mr. Sieswerda of Rabobank, Mr. Yáñez, Mr. Dinorin, and Mr. Varela of OSA, OSA's external financial consultant, and Ms. Narvaez and Mr. Salazar of Citigroup. Ms. Vergara transmitted these emails from her Citigroup email account, hosted in the United States, to email accounts hosted in the United States, Mexico, and the Netherlands. Ms. Vergara's emails used U.S. wires. The emails were intended to execute the scheme to defraud by providing Rabobank with false comfort regarding OSA's financial condition and ability to consistently pay its debt and inducing Rabobank to continue providing credit to OSA. Sending these messages by wire including through U.S. wires in furtherance of the scheme to defraud OSA's creditors constituted wire fraud in violation of 18 U.S.C. § 1343.

1760. On or about September 14, 2012, as described *supra* in Section XV.B.4.d, Mr. Granja of Citigroup sent an email to Candies, copying other Citigroup employees, with a proposal for a trust structure relying on the cash advance facility to ensure payment to Candies. Mr. Granja sent this email from his Citigroup email account, hosted in the United States, to Candies' email account, hosted in the United States. The email used U.S. wires. The email was sent in furtherance of the scheme to defraud OSA's investors by providing false assurances to Candies about the reliability of the cash advance facility and security of the cashflow intended to pay OSA's debt to

Candies. Transmitting this email and proposal by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1761. On or about September 21, 2012, as described *supra* in Section XV.B.4.e, Mr. Lopez of Citigroup's Banamex arm sent an email to Candies, copying other Citigroup employees, explaining the mechanics of the cash advance facility and how it would be used to ensure payments to Candies. Mr. Lopez sent this email from his Citigroup email account, hosted in the United States, to Candies' email account, hosted in the United States. The email used U.S. wires. The email was sent in furtherance of the scheme to defraud OSA's investors by providing false assurances to Candies about the reliability of the cash advance facility and security of the cashflow intended to pay OSA's debt to Candies. Transmitting this email and proposal by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1762. On or about September 26, 2012, as described *supra* in Section XV.B.4.f, Mr. Granja and other representatives of Banamex, Citigroup, and OSA held a teleconference with Candies regarding changes to the debt restructuring agreement. On information and belief, Mr. Granja and the representatives of Banamex, Citigroup and OSA were in both the United States and Mexico during the call and the representatives of Candies were in the United States. The teleconference used U.S. wires. The teleconference was held in furtherance of the scheme to defraud OSA's investors by providing false assurances to Candies about the reliability of the cash advance facility and security of the cashflow intended to pay OSA's debt to Candies. Holding this teleconference by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1763. On or about February 13, 2013, as described *supra* in Section XIV.K.5.a, OSA's external financial consultant sent an email to ICE regarding OSA's untimely payment of the coupon on the 2008 bonds. OSA's external financial consultant sent this message from his mac.com email account, hosted in the United States, to ICE's email account, hosted in the United States. The message was transmitted by U.S. wires. Citigroup and OSA, its co-conspirator, caused OSA's external financial consultant to transmit this information by wire in interstate and foreign commerce by providing him with false and misleading information regarding OSA's financial condition with the intent that he pass that false information to OSA's investors and bondholders. Citigroup intended the email to execute the scheme to defraud by providing ICE and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Causing the transmission of the contents of the email call by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1764. On or about March 1 and 22, 2013, as described *supra* in Section XV.G.4, Mr. Perez and other representatives of Citigroup and Banamex sent, via email, the March 2013 CitiConnect Agreement and the March 2013 email to representatives of MADISA, including Mr. Marroquin. These emails and the attached documents provided assurances to MADISA about how it would receive payments directly from Pemex as payment on the debts OSA owed to MADISA. Mr. Perez and the other representatives of Citigroup and Banamex sent these emails from their Citigroup email accounts, hosted in the United States, to MADISA's email accounts, hosted in Mexico. The emails used U.S. wires. The emails were sent in furtherance of the scheme to defraud OSA's investors by providing false assurances to MADISA about the security of the cashflow

intended to pay OSA's debt to MADISA. Transmitting these emails and proposal by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1765. In approximately May to August 2013, as described *supra* in Section XIV.C.2, Citigroup and OSA provided Pareto with information for use in marketing the 2013 Bond Issuance to potential investors. On information and belief, Citigroup and OSA provided this information to Pareto, including to Pareto's U.S. affiliate, Pareto Securities, Inc., by electronic mail sent via wire from both the United States and Mexico. This information was provided to Pareto to execute the scheme to defraud by causing Pareto to provide unwittingly misleading information to investors regarding the value and stability of the bonds and inducing investors to purchase the bonds. Transmitting the information by means of wire including through U.S. wires in furtherance of the scheme to defraud potential bond purchasers constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for violating 18 U.S.C. § 1343 both for the wire transmissions it itself sent to Pareto and for the wire transmissions OSA sent to Pareto as Citigroup was engaged in a conspiracy with OSA to defraud investors and vendors and OSA sent the presentation in furtherance of that conspiracy.

1766. In approximately June 2013 to early 2014, as described *supra* in Section XIV.L.3.a, OSA's external financial consultant spoke to Mr. Atuan of Moneda via telephone numerous times regarding OSA's financial health and the reliability of the case advance facility. Mr. Atuan was, on information and belief, in the United States during these telephone calls. The telephone calls used U.S. wires. Citigroup and OSA, its co-conspirator, caused OSA's external financial consultant to transmit this information by wire in interstate and foreign commerce by providing him with false information regarding OSA's financial condition with the intent that he pass that

false information to OSA's investors and bondholders. Citigroup intended the calls to execute the scheme to defraud by providing Moneda with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to purchase the 2013 bonds and to purchase and continue holding the 2008 bonds. Causing the transmission of the contents of the phone calls by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1767. On or about July 9, 2013, as described *supra* in Section XVI.D.3, Mr. Salazar of Citigroup sent numerous representatives of Rabobank the July 8, 2013 Spreadsheet listing factored amounts for different vessels pertaining to the Rabobank Trust. Mr. Salazar transmitted this email from his Citigroup email account, hosted in the United States, to Rabobank email accounts, hosted in the Netherlands. Mr. Salazar's email used U.S. wires. The email was intended to execute the scheme to defraud by providing Rabobank with false assurances that OSA had reliable access to the cash advance facility to provide the cashflow to pay its debt to Rabobank including funds to allocated to the Rabobank Trust, thereby inducing Rabobank to continue providing credit to OSA and dissuading it from taking action as trustee of the Rabobank Trust. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1768. On or about July 11, 2013, as described *supra* in Section XIV.L.3.b, Mr. Betancourt of OSA sent to Mr. Atuan of Moneda, via email, the June 2013 Presentation regarding OSA's purportedly strong financial projections. Mr. Betancourt sent this email to Mr. Atuan, whose email account was hosted in the United States and who was working in New York. The email used U.S. wires. This email was intended to execute the scheme to defraud by providing false and misleading information regarding OSA's financial condition to Moneda in order to induce Moneda to purchase

and retain both the 2008 and 2013 bonds. Transmitting the email by means of wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Betancourt sent the email in furtherance of that conspiracy.

1769. On or about July 15, 2013, as described *supra* in Section XIV.L.4.c, Mr. Piscitelli of Citigroup sent to Mr. Atuan of Moneda, via email, OSA's preliminary financial results for 2012 and the first quarter of 2013, and sent a separate email stating that OSA's financial statements were "fine." Mr. Piscitelli sent these emails from his Citigroup email account, hosted in the United States, to Mr. Atuan's email account, hosted in the United States. The emails used U.S. wires. These emails were intended to execute the scheme to defraud by providing false and misleading information regarding OSA's financial condition to Moneda in order to induce Moneda to purchase and retain both the 2008 and 2013 bonds. Transmitting the emails by means of wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1770. During the July Negotiations in July 2013 and subsequent negotiations in August 2013, described *supra* in Section XIV.M.4, representatives of OSA sent numerous emails and held at least one teleconference with Nordic Trustee, Pareto and other parties to provide information to persuade Nordic Trustee to serve as trustee of the 2013 Bond Issuance. OSA sent these emails from its email accounts, hosted in Mexico, to representatives of Pareto and Nordic Trustee whose email accounts were hosted in multiple countries, including the United States. During the teleconference, on information and belief, OSA's representatives were located in Mexico and the representatives of Pareto, Nordic Trustee, and the other participants were located in multiple

countries, including the United States. Both the emails and teleconference used U.S. wires. The emails and teleconference were intended to execute the scheme to defraud by providing false and misleading information to Nordic Trustee to cause it to agree to serve as trustee for the 2013 Bond Issuance, there by inducing investors to purchase the 2013 bonds in reliance on Nordic Trustee's credibility. Transmitting the emails and holding the teleconference by means of wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for these violations as it was engaged in a conspiracy with OSA to defraud investors and vendors and OSA sent the emails and held the teleconference in furtherance of that conspiracy.

1771. On September 10, 2013, as described *supra* in paragraph XIII.H.1, Mark Clark of Citigroup sent a copy of the fraudulent Advent Presentation, relabeled as a Management Presentation, from his mark.clark@citi.com email address to eight other individuals with email addresses at the domains citi.com, banamex.com, and mac.com. On information and belief, the email accounts of both Mr. Clark and all individuals who received the presentation were hosted in the United States. Certain of the recipients of Mr. Clark's email were in Mexico at the time of receipt. This presentation was intended to execute the scheme to defraud by preparing materials to mislead vendors, investors and creditors regarding OSA's financial condition. Transmitting the presentation by means of wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1772. On or about July-August 2013, as described *supra* in Section XIV.C.3.a, OSA sent Nordic Trustee and the 2013 Bondholders the 2013 Bond Agreement. On information and belief, OSA transmitted the 2013 Bond Agreement via electronic mail from Mexico to Nordic Trustee in Norway and to the prospective purchasers of the 2013 bonds in multiple countries including the

United States. OSA's transmissions passed through U.S. wires. The 2013 Bond Agreement was intended to execute the scheme to defraud by providing Nordic Trustee and the bondholders it represented with the false impression that investment in the 2013 bonds would be legally protected and inducing investors to purchase the 2013 bonds. Transmitting the Agreement by means of wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and OSA sent the 2013 Bond Agreement in furtherance of that conspiracy.

1773. In approximately October 2013, as described *supra* in Section XIV.C.2.g, Citigroup and OSA provided Pareto with information for use in preparing its Quarterly Credit Review of OSA's credit worthiness and the 2013 Bond Issuance. On information and belief, Citigroup and OSA provided this information to Pareto, including to Pareto's U.S. affiliate, Pareto Securities, Inc., by electronic mail sent via wire from Mexico. This information was provided to Pareto to execute the scheme to defraud by causing Pareto to provide unwittingly misleading information to investors regarding the value and stability of the bonds and inducing investors to purchase and retain the bonds. Transmitting the information by means of wire including through U.S. wires in furtherance of the scheme to defraud potential bond purchasers constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for violating 18 U.S.C. § 1343 both for the wire transmissions it itself sent to Pareto and for the wire transmissions OSA sent to Pareto as Citigroup was engaged in a conspiracy with OSA to defraud investors and vendors and OSA sent the presentation in furtherance of that conspiracy.

1774. On October 10, 2013, as described *supra* in Section XIII.H.1, Rodrigo Riveroll of Citigroup, sent the October 2013 Presentation from his Citigroup email address, hosted in the

United States, to potential investors both in the United States and in foreign countries, and other representatives of the Enterprise with email addresses at the domains citi.com and banamex.com, which are hosted in the United States. This presentation was intended to execute the scheme to defraud by preparing materials to mislead vendors, investors and creditors regarding OSA's financial condition. Transmitting the presentation by means of wire including through U.S. wire in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1775. On or about October 17, 2013, as described *supra* in Section XIV.C.3.b, OSA sent Nordic Trustee and the 2013 Bondholders the Mexican Trust Agreement. On information and belief, OSA transmitted the Mexican Trust Agreement via electronic mail from Mexico to Nordic Trustee in Norway and to the prospective purchasers of the 2013 bonds in multiple countries including the United States. OSA's transmissions passed through U.S. wires. The Mexican Trust Agreement was intended to execute the scheme to defraud by providing Nordic Trustee and the bondholders it represented with the false impression that the payments on the 2013 bonds would be reliable and secure and inducing investors to purchase the 2013 bonds. Transmitting the Agreement by means of wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and OSA sent the Mexican Trust Agreement in furtherance of that conspiracy.

1776. On or about November 13, 2013, as described *supra* in Section XIV.I.5.a, Mr. Betancourt of OSA sent Mr. Gilmore, Mr. Corrigan, and Mr. Songsanand of EIG an email providing them with information on how to access the Investor's Site, including OSA's financial reports and statements uploaded to that site. Mr. Betancourt transmitted this email from his OSA

email account, hosted in Mexico, to Mr. Gilmore, Mr. Corrigan, and Mr. Songsanand's email accounts, hosted in the United States. Mr. Betancourt's email passed through U.S. wires. The email was intended to execute the scheme to defraud by providing EIG with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing EIG/GPF II to continue to hold the 2008 bonds. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Betancourt sent the email in furtherance of that conspiracy.

1777. On November 29, 2013, as described *supra* in Section XIII.H.1, Mr. Betancourt of OSA, in Mexico, transmitted a revised version of the October 2013 Presentation to OSA's external financial consultant's mac.com email address. OSA's external financial consultant's mac.com email account was hosted in the United States. This presentation was intended to execute the scheme to defraud by preparing materials to mislead vendors, investors and creditors regarding OSA's financial condition. Transmitting the presentation by means of wire including through U.S. wire in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Betancourt sent the presentation in furtherance of that conspiracy.

1778. On or about December 2013, as described *supra* in Section XIII.H.2, Citigroup sent information to OSA for use in preparing the December 2013 Presentation. On information and belief, Citigroup sent this information from citigroup.com and banamex.com email addresses hosted in the United States to OSA's email addresses hosted in Mexico; the information was

transmitted by U.S. wires. Citigroup provided this information to OSA in order to further its fraudulent scheme by intending that OSA use the information to create the Presentation in order to induce investors to purchase or retain the 2008 and 2013 bonds. Transmitting the information by means of wire including through U.S. wire in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1779. On or about January 4, 2014, as described *supra* in Section XIV.L.4.a, OSA's external financial consultant sent an email to and spoke via telephone to Mr. Atuan of Moneda regarding OSA's intent to restructure the 2008 bonds and extend the Goliath contract. OSA's external financial consultant sent the email from his mac.com email account, hosted in the United States to Mr. Atuan's email account, hosted in the United States; Mr. Atuan was, on information and belief, in the United States during this telephone call. The email and telephone call used U.S. wires. Citigroup and OSA, its co-conspirator, caused OSA's external financial consultant to transmit this information by wire in interstate and foreign commerce by providing him with false and misleading information regarding OSA's financial condition and plans for restructuring its debts. Citigroup intended the email and call to execute the scheme to defraud by falsely assuaging ICE's concerns arising from the media reports, providing Moneda and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the bonds. Causing the transmission of the contents of the email and phone call by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1780. On or about January 21, 2014, as described *supra* in Section XIV.K.6.a, OSA's external financial consultant spoke to (1) Mr. Rocha and Mr. Free of ICE; and (2) Mr. Atuan of Moneda via telephone regarding media reports of irregularities in OSA's contracts with Pemex,

attributing those reports to errors by Pemex and encouraging ICE not to sell its bonds. Mr. Rocha, Mr. Free, and Mr. Atuan were, on information and belief, in the United States during this telephone call. The telephone calls used U.S. wires. Citigroup and OSA, its co-conspirator, caused OSA's external financial consultant to transmit this information by wire in interstate and foreign commerce by providing him with false and misleading information regarding OSA's financial condition and the media reports of irregularities with the intent that he pass that false information to OSA's investors and bondholders. Citigroup intended the call to execute the scheme to defraud by falsely assuaging ICE's and Moneda's concerns arising from the media reports, providing ICE, Moneda and the other 2008 Bondholders with false comfort regarding OSA's financial condition and ability to consistently pay the bond coupon and inducing them to continue holding the 2008 bonds. Causing the transmission of the contents of the phone calls by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

1781. On or about January 22, 2014, as described *supra* in Section XIV.I.5.b, Mr. Betancourt sent Mr. Gilmore, Mr. Corrigan and Mr. Songsanand of EIG two emails stating that OSA would pay the overdue coupon on the 2008 bonds by early February 2014. Mr. Betancourt transmitted these emails from his OSA email account, hosted in Mexico, to Mr. Gilmore, Mr. Corrigan and Mr. Songsanand's email accounts, hosted in the United States. Mr. Betancourt's emails passed through U.S. wires. The emails were intended to execute the scheme to defraud by providing EIG with false comfort regarding OSA's ability to pay the bond coupon. Sending these messages by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for these

violations as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Yáñez sent the email in furtherance of that conspiracy.

1782. On or about January 24, 2014, as described *supra* in Section XIV.K.6.b, OSA issued a press release in response to media reports that Mexican authorities were investigating OSA's contracts with Pemex, falsely stating that OSA had acted legally. On information and belief, OSA sent this press release via electronic mail from its email account, hosted in Mexico, to numerous media and public relations companies in the United States and other countries. OSA transmitted the press release through U.S. wires. The press release was executed in furtherance of the scheme to defraud as it was intended to assuage bondholders' concerns arising from the media reports of irregularities in OSA's contracts with Pemex and induce the bondholders to retain their bonds. Issuing this press release by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and OSA issued the press release in furtherance of that conspiracy.

1783. On or about January 28, 2014, as described *supra* in Section XIV.K.6.c, OSA held a conference call with the 2008 Bondholders. During that call, representatives of OSA, including Mr. Yáñez, stated that the allegations against OSA were false, that Pemex was mistaken in its claims against OSA, and that OSA was in the process of paying the 2008 bond coupon. The representatives of OSA, including Mr. Yáñez were in the United States and Mexico during this telephone call and the bondholders were in several countries including the United States. The telephone call used U.S. wires. The call was intended to execute the scheme to defraud by falsely assuaging the bondholders' concerns about the reported allegations, providing the bondholders with false comfort regarding OSA's financial condition and inducing them to continue holding the

2008 bonds. Transmitting the contents of the phone call by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Yáñez participated in the telephone conference in furtherance of that conspiracy.

1784. On or about January 29, 2014, as described *supra* in Section XIV.I.5.b, Mr. Betancourt sent Mr. Gilmore and Mr. Corrigan of EIG an email containing a link to listen to a recording of the teleconference that took place on January 28, 2014, described above. Mr. Betancourt transmitted this email from his OSA email account, hosted in Mexico, to Mr. Gilmore and Mr. Corrigan's email accounts, hosted in the United States. Mr. Betancourt's email passed through U.S. wires. The email was intended to execute the scheme to defraud by falsely assuaging EIG's concerns about the reported allegations, providing EIG with false comfort regarding OSA's financial condition and inducing EIG to maintain GPF II's investment in the 2008 bonds. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Betancourt sent the email in furtherance of that conspiracy.

1785. On or about February 7, 2014, as described *supra* in Section XIV.I.5.c, Mr. Betancourt sent Mr. Gilmore, Mr. Corrigan and Mr. Songsanand of EIG an email stating that OSA was committed to pay the overdue coupon on the 2008 bonds and blaming the non-payment on Pemex's failure to timely pay OSA. Mr. Betancourt transmitted this email from his OSA email account, hosted in Mexico, to Mr. Gilmore, Mr. Corrigan and Mr. Songsanand's email accounts, hosted in the United States. Mr. Betancourt's email passed through U.S. wires. The email was

intended to execute the scheme to defraud by providing EIG with false comfort regarding OSA's ability to pay the bond coupon and misleading EIG as to the allegations against OSA related to Citigroup and OSA's fraudulent scheme. Sending this message by wire including through U.S. wires in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Betancourt sent the email in furtherance of that conspiracy.

1786. On or about February 18, 2014, as described *supra* in Section XV.B.5.a, Mr. Olvera, Mr Yáñez's personal lawyer who, on information and belief, was acting on behalf of Mr. Yáñez and OSA, contacted Candies by telephone regarding Candies' Demand Letter for payment on the debts OSA owed to it. In that phone call, Mr. Olvera stated to Candies that Citigroup, through Banamex, had frozen OSA's line of credit and denied any wrongdoing on the part of OSA. On information and belief, Mr. Olvera was in Mexico during this call and the representatives of Candies were in the United States. The telephone call used U.S. wires. The telephone call was held to execute the scheme to defraud by falsely denying OSA's culpability and seeking to dissuade Candies from taking action against OSA. Transmitting the contents of the phone call by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors and vendors constituted wire fraud in violation of 18 U.S.C. § 1343. Citigroup is liable for this violation as it was engaged in a conspiracy with OSA to defraud investors and vendors and Mr. Olvera held the teleconference in furtherance of that conspiracy.

1787. On February 19, 2014, as described *supra* in Section XV.B.5.b, numerous Citigroup employees, including Mr. Granja, Mr. Cardenas, Mr. Cagigas, Mr. López, and Mr. Santamarina contacted Candies' U.S. counsel via telephone requesting that Candies withdraw its

demand that Citigroup pay the outstanding balance OSA owed to Candies, falsely describing OSA's financial attractiveness, and falsely stating that Pemex would reopen its contracts with OSA. On information and belief, the Citigroup representatives were in Mexico and the United States during this call and Candies' U.S. counsel were in the United States. The telephone call used U.S. wires. The telephone call was held to execute the scheme to defraud by seeking to dissuade Candies from taking action against OSA. Transmitting the contents of the phone call by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors and vendors constituted wire fraud in violation of 18 U.S.C. § 1343.

1788. During the February 21, 2014 Telephone Conference Between Citigroup and Counsel, described *supra* in Section XIV.G.4.a, in response to media reports relating to Citigroup and OSA's fraudulent scheme, Citigroup stated to counsel for the bondholders that OSA was above-board with its financials, that Citigroup was working with OSA to avoid a default, and that Citigroup and OSA were taking a "constructive and proactive approach." The representatives of Citigroup were in the United States and Mexico during this telephone call. The telephone call used U.S. wires. The call was intended to execute the scheme to defraud by providing the bondholders with false comfort regarding OSA's financial condition and inducing them to continue holding the 2008 bonds. Transmitting the contents of the phone call by wire, including through U.S. wires, in furtherance of the scheme to defraud OSA's investors constituted wire fraud in violation of 18 U.S.C. § 1343.

*Relationship*

1789. Citigroup conducted these predicate acts of wire fraud to further the common purpose of the RICO Enterprise: to defraud Pemex and to fraudulently induce and lure Plaintiffs to invest, and maintain their investment in, OSA in order to increase (1) cash flows to OSA; and

(2) interest payments to Citigroup. These predicate acts of racketeering had the same or similar participants, victims, methods of commission and results and were related and not isolated events.

*Continuity*

1790. The pattern of racketeering activity set forth herein extended over a substantial period of time, beginning, on information and belief, as early as 2008 and continuing through February 2014.

1791. Citigroup and OSA intended to continue the fraudulent scheme indefinitely. Indeed, the pattern of racketeering activity was designed to extract from and capitalize on Plaintiffs' investments—which were based on Citigroup's and OSA's fraudulent misrepresentations and material omissions—for as long as possible.

1792. By necessity, Citigroup's fraudulent scheme required a continuous pattern of racketeering activity to fraudulently conceal the truth of OSA's poor financial condition and the fraudulent nature of the cash advance facility from OSA's investors, creditors, and vendors in order to induce those parties to continue doing business with OSA.

1793. Citigroup's participation in the fraudulent scheme became a regular way of conducting business and would have continued absent intervention.

1794. If not for the SFP's probe into OSA's insurance policies and subsequent ban on OSA from entering into new contracts with Pemex, which forced Citigroup to launch an inquiry into its cash advance facility, the pattern of racketeering activity would have continued.

*The RICO Enterprise Directly Caused Injury to Plaintiffs*

1795. Plaintiffs, who include OSA's largest vendors, creditors and bondholders, have been injured in their business or property as a direct and proximate result of the RICO Enterprise's

violations, described above, of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

1796. As a direct result of Citigroup's pattern of racketeering activity, including dozens of instances of wire fraud, each Plaintiff agreed to (1) start doing business with OSA; (2) continue doing business with OSA; or (3) both, in reliance on the false and misleading financial picture of OSA created by Citigroup and the RICO Enterprise.

1797. Citigroup's pattern of racketeering activity has been targeted at, and conducted from, the United States.

(a) Citigroup's ICG based in the United States, was directly responsible for Citigroup's cash advance business with OSA

(b) Citigroup's Latin American headquarters has been based in the United States since 2013;

(c) Mr. Corbat, Citigroup's CEO who was ultimately responsible for ICG's global operations, is based in the United States;

(d) Mr. Forese, the global head of the ICG, was based in the United States;

(e) Mr. Garcia-Tames, the Citigroup Public Sector Head who was responsible for Citigroup's relationship with Pemex, is or has been based in the United States;

(f) Mr. Aristeguieta, the Citigroup CEO for Latin America, was based in the United States at the relevant time; and

(g) Mr. Libnic, Citigroup's head of legal matters for Latin America who ordered and led the audit into the cash advance facility with OSA, was based in the United States at the relevant time.

1798. Each individual Plaintiff has suffered U.S. domestic injury as a result of Citigroup's pattern of racketeering activity.

1799. Adar suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the near absolute reduction in the value of those 2008 bonds. As described *supra* in Section XIV.F, Adar relied on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and in retaining those bonds through OSA's collapse in February 2014. Adar was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Adar into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008 bonds were an attractive investment. The 2008 Bond Issuance required OSA to pay all interest and, at maturity or default, principal to Citibank N.A., a subsidiary of Citigroup and U.S. financial institution. OSA has not paid the interest due since 2014, and has not paid the principal. Adar has suffered domestic injury by being deprived of this money in the United States.

1800. Moreover, Citigroup's pattern of racketeering activity against Adar reached into the United States to inflict domestic injury on Adar. Specifically, as alleged above, OSA issued the 2008 Bond Issuance in the United States pursuant to Rule 144A and marketed those bonds to U.S. investors.

1801. Ashmore suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the near absolute reduction in the value of those 2008 bonds. As described *supra* in Section XIV.G, Ashmore relied on Citigroup's fraudulent statements and

communications in purchasing bonds from the 2008 Bond Issuance and in retaining those bonds through OSA's collapse in February 2014. Ashmore was further directly harmed by the instances of wire fraud describe above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Ashmore into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008 bonds were an attractive investment. The 2008 Bond Issuance required OSA to pay all interest and, at maturity or default, principal to Citibank N.A., a subsidiary of Citigroup and U.S. financial institution. OSA has not paid the interest due since 2014, and has not paid the principal. Ashmore has suffered domestic injury by being deprived of this money in the United States.

1802. Moreover, Citigroup's pattern of racketeering activity against Ashmore reached into the United States to inflict domestic injury on Ashmore. Specifically, as alleged above, OSA issued the 2008 Bond Issuance in the United States pursuant to Rule 144A and marketed those bonds to U.S. investors.

1803. The Copernico Funds suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the near absolute reduction in the value of those 2008 bonds. As described *supra* in Section XIV.H, Copernico, as manager of the Copernico Funds, relied on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and in retaining those bonds through OSA's collapse in February 2014. The Copernico Funds were further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Copernico into

believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008 bonds were an attractive investment. The 2008 Bond Issuance required OSA to pay all interest and, at maturity or default, principal to Citibank N.A., a subsidiary of Citigroup and U.S. financial institution. OSA has not paid the interest due since 2014, and has not paid the principal. The Copernico Funds have suffered domestic injury by being deprived of this money in the United States. In addition the Copernico Fund includes U.S. investors, who have suffered domestic injury through the non-payment of interest and principal and the near absolute reduction in the value of the 2008 bonds as a direct result of the pattern of racketeering activity.

1804. Moreover, Citigroup's pattern of racketeering activity against Copernico reached into the United States to inflict domestic injury on Copernico. Specifically, as alleged above, OSA issued the 2008 Bond Issuance in the United States pursuant to Rule 144A and marketed those bonds to U.S. investors including the Copernico Fund's U.S. investors, including Mr. Carlos Federico Carballo, a U.S. partner of Copernico and and a principal of CCP Advisors LLC, the U.S. entity providing sub-advisory services to one of the Copernico Funds, which despite not being organized in the U.S., have U.S. investors as a part of their investment base. OSA, with the substantial assistance of Citigroup, met with and marketed the bonds to Copernico in New York in March 2013, just two months before Copernico purchased its 2008 bonds in May 2013. Subsequently, Pareto, using the false information provided by Citigroup, met with Copernico in New York in September 2013. The Copernico Funds used their investors funds—including those of the U.S. investors—to purchase the 2008 bonds through a U.S. brokerage account held at J.P. Morgan Clearing Corp., a U.S. company.

1805. GPF II suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the near absolute reduction in the value of those 2008 bonds. As described *supra* in Section XIV.I, TCW/EIG, the U.S.-based managers of GPF II, relied on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and in retaining those bonds through OSA's collapse in February 2014. GPF II was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled TCW/EIG into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008 bonds were an attractive investment. The 2008 Bond Issuance required OSA to pay all interest and, at maturity or default, principal to Citibank N.A., a subsidiary of Citigroup and U.S. financial institution. OSA has not paid the interest due since 2014, and has not paid the principal. GPF II has suffered domestic injury by being deprived of this money in the United States. In addition, 82.1% of GPF II's investors were U.S. investors, who have suffered domestic injury through the non-payment of interest and principal and the near absolute reduction in the value of the 2008 bonds as a direct result of the pattern of racketeering activity.

1806. Moreover, Citigroup's pattern of racketeering activity against GPF II reached into the United States to inflict domestic injury on GPF II. Specifically, as alleged above, OSA issued the 2008 Bond Issuance in the United States pursuant to Rule 144A and marketed those bonds to U.S. investors and investment managers including TCW/EIG and GPF II's U.S. investors. As discussed *supra* in paragraph XIV.B, OSA, along with Morgan Stanley (unknowingly using false information provided by Citigroup and OSA) marketed the 2008 bonds to TCW in Los Angeles,

California. Additionally, as described *supra* in Section XIV.I, between 2008 and 2014, Citigroup and OSA, including through OSA's external financial consultant, contacted TCW/OIG at its headquarters in Washington, D.C. on several occasions to perpetrate the pattern of racketeering activity.

1807. The HBK Fund suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 and 2013 bonds and the near absolute reduction in the value of those 2008 and 2013 bonds. As described *supra* in Section XIV.J, HBK, the U.S.-based managers of the HBK Fund, relied on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance, purchasing bonds from the 2013 Bond Issuance, and retaining both the 2008 and 2013 bonds. The HBK Fund was further directly harmed by the of wire fraud describe above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled HBK into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008 bonds were an attractive investment. The 2008 Bond Issuance required OSA to pay all interest and, at maturity, principal to Citibank N.A., a subsidiary of Citigroup and U.S. financial institution. OSA has not paid the interest due since 2014, and has not paid the principal. The HBK Fund has suffered domestic injury by being deprived of this money in the United States. In addition, more than half of the HBK Fund's investors were U.S. investors, who have suffered domestic injury through the non-payment of interest and principal and the near absolute reduction in the value of the 2008 bonds as a direct result of the pattern of racketeering activity.

1808. Moreover, Citigroup's pattern of racketeering activity against HBK reached into the United States to inflict domestic injury on HBK. Specifically, as alleged above, OSA issued the 2008 Bond Issuance in the United States pursuant to Rule 144A and marketed those bonds to U.S. investors and investment managers, including HBK, which had multiple offices in the United States including in New York, Texas ,and Virginia, and the HBK Fund's U.S. investors.

1809. The ICE Fund suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the near absolute reduction in the value of those 2008 bonds. As described *supra* in Section XIV.K, ICE Canyon, as collateral manager of the ICE Fund, relied on Citigroup's fraudulent statements and communications in respect of its funds' purchasing bonds from the 2008 Bond Issuance and retaining those bonds. The ICE Fund was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled ICE into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008 bonds were an attractive investment. The 2008 Bond Issuance required OSA to pay all interest and, at maturity, principal to Citibank N.A., a subsidiary of Citigroup and U.S. financial institution. OSA has not paid the interest due since 2014, and has not paid the principal. The ICE Fund has suffered domestic injury by being deprived of this money in the United States. In addition, the ICE Fund includes U.S. investors, who have suffered domestic injury through the non-payment of interest and principal and the near absolute reduction in the value of the 2008 bonds as a direct result of the pattern of racketeering activity.

1810. Moreover, Citigroup's pattern of racketeering activity against the ICE Fund reached into the United States to inflict domestic injury on the ICE Fund. Specifically, as alleged above, OSA issued the 2008 Bond Issuance in the United States pursuant to Rule 144A and marketed those bonds to investment firms in the United States, including ICE Canyon, which was based in Los Angeles, and to U.S. investors including the ICE Fund's U.S. investors.

1811. The Moneda Funds suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the near absolute reduction in the value of those 2008 bonds. As described *supra* in Section XIV.L, Moneda, as manager of the Moneda Funds, relied on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and retaining those bonds. The Moneda Funds was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Moneda into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008 bonds were an attractive investment. The 2008 Bond Issuance required OSA to pay all interest and, at maturity, principal to Citibank N.A., a subsidiary of Citigroup and U.S. financial institution. OSA has not paid the interest due since 2014, and has not paid the principal. The Moneda Funds have suffered domestic injury by being deprived of this money in the United States. In addition, the Moneda Funds include U.S. investors, who purchased the 2008 bonds through a brokerage account with J.P. Morgan Securities Inc. in New York and have suffered domestic injury through the non-payment of interest and principal and the near absolute reduction in the value of the 2008 bonds as a direct result of the pattern of racketeering activity.

1812. Moreover, Citigroup's pattern of racketeering activity against the Moneda Funds reached into the United States to inflict domestic injury on the Moneda Funds. Specifically, as alleged above, OSA issued the 2008 Bond Issuance in the United States pursuant to Rule 144A and marketed those bonds to U.S. investors including the Moneda Funds' U.S. investors. As alleged above, in 2013, both Citigroup and OSA, with the substantial assistance of Citigroup, communicated fraudulent representations and material omissions to Mr. Atuan of Moneda in New York, culminating in Moneda's decisions to purchase and then retain its 2008 bonds. Citigroup also communicated fraudulent representations to Pareto, including Pareto's U.S. entity in New York, which subsequently passed on that false information to Moneda in meetings in New York between June and September 2013.

1813. Nordic Trustee represents the interests of the 2013 Bondholders, who have suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2013 bonds and the near absolute reduction in the value of the 2013 bonds. As described *supra* in Section XIV.M, the 2013 Bondholders represented by Nordic Trustee, relied on Citigroup's fraudulent statements and communications in purchasing bonds from the 2013 Bond Issuance and retaining those bonds. The 2013 Bondholders were further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled the 2013 Bondholders into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2013 bonds, and that the 2013 bonds were an attractive investment. The 2013 Bondholders further relied on Nordic Trustee's agreement to serve as Trustee of the 2013 Bond Issuance, which was the product of Nordic Trustee's reliance on Citigroup's pattern of

racketeering activity. Nordic Trustee also relied on Citigroup's pattern of racketeering activity in deciding not to declare an event of default between October 2013 and February 2014, further compounding the 2013 Bondholders' injury and reducing the value of the 2013 bonds. In addition, many of the largest 2013 Bondholders are (1) U.S.-managed investment funds including the HBK Fund; and (2) funds that have substantial numbers of U.S. investors—including the Moneda Funds—which have suffered domestic injury through the non-payment of interest and principal and the near absolute reduction in the value of the 2013 bonds as a direct result of the pattern of racketeering activity. As alleged above, OSA was to pay certain of this interest and principal through U.S. Dollar payments from the Mexican Trust's Citibank account in New York; the pattern of racketeering activity deprived the 2013 Bondholders of these funds in the United States.

1814. Moreover, Citigroup's pattern of racketeering activity against the 2013 Bondholders reached into the United States to inflict domestic injury on the 2013 Bondholders. Specifically, OSA and Citigroup directly targeted U.S. investors, including many of the 2013 Bondholders, when issuing the 2013 bonds.

1815. Waypoint suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the near absolute reduction in the value of those 2008 bonds. As described *supra* in Section XIV.N, Waypoint relied on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and retaining those bonds. Waypoint was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Waypoint into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008

bonds were an attractive investment. The 2008 Bond Issuance required OSA to pay all interest and, at maturity, principal to Citibank N.A., a subsidiary of Citigroup and U.S. financial institution. OSA has not paid the interest due since 2014, and has not paid the principal. Waypoint has suffered domestic injury by being deprived of this money in the United States.

1816. Moreover, Citigroup's pattern of racketeering activity against Waypoint reached into the United States to inflict domestic injury on Waypoint. Specifically, as alleged above, OSA issued the 2008 Bond Issuance in the United States pursuant to Rule 144A and marketed those bonds to U.S. investors including Waypoint, a Florida-based investment firm. As alleged above, OSA, with the substantial assistance of Citigroup, marketed the bonds to Waypoint at the J.P. Morgan Global High Yield & Leveraged Finance Conference in Miami, Florida in January 2008 and at the BBVA Bancomer investor conference in New York in May 2013. OSA's fraudulent communications with Waypoint consistently reached into the United States as Waypoint and its agents and employees who made the decisions to invest in OSA and then to maintain that investment were based in Florida.

1817. Candies, a Louisiana-based shipbuilding and leasing company, suffered domestic injury through the loss of approximately $120 million in unpaid debt owed by OSA and the loss of the use of 21 of Candies' vessels as a result of OSA's collapse. As described *supra* in Section XV.B, Candies relied on Citigroup's fraudulent statements and communications in agreeing to restructure OSA's debt and continue leasing Candies' vessels to OSA. Candies was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Candies into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of

liquidity with which it could pay its debt to Candies. As a U.S. company, Candies suffered all of this injury in the United States.

1818. Moreover, Citigroup's pattern of racketeering activity against Candies reached into the United States to inflict domestic injury on Candies. Specifically, Candies is a Louisiana-based company with its headquarters in Louisiana and its U.S. counsel, Karl Zimmerman, is also Louisiana-based. All communications, by phone, mail or email, reached Candies and its counsel in the United States.

1819. Coastline suffered domestic injury through the loss of charter fees for the Caballo Marango and the Caballo Maya as a result of Citigroup's fraudulent scheme and pattern of racketeering activity. As described *supra* in Section XV.C, Coastline relied on Citigroup's fraudulent statements and communications in agreeing to begin and continue leasing the Caballo Marango and the Caballo Maya vessels to OSA. Coastline was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Coastline into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its charters to Coastline.

1820. Moreover, Citigroup's pattern of racketeering activity against Coastline reached into the United States to inflict domestic injury on Coastline. Specifically, as described *supra* in Section XV.C.3.c, OSA, using false information prepared with the substantial assistance of Citigroup, met with Coastline in Houston, Texas on or about April 30, 2012 to persuade Coastline to continue chartering the Caballo Mayo and Caballo Marango to it and to negotiate the proposed sale of the Caballo Marango to OSA.

1821. De Hoop suffered domestic injury through its inability to recover the De Hoop Security Deposit, OSA's failure to pay for the De Hoop Goods and Services, and OSA's failure to complete payment for the seven new vessels De Hoop agreed to build for it. As described *supra* in Section XV.D, De Hoop relied on Citigroup's fraudulent statements and communications in agreeing to OSA's requests to restructure its loans with Rabobank and in agreeing to construct additional ships for OSA. De Hoop was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled De Hoop into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its loans to Rabobank and pay De Hoop for the construction of new vessels.

1822. Moreover, Citigroup's pattern of racketeering activity against De Hoop reached into the United States to inflict domestic injury on De Hoop. Specifically, Mr. Yáñez from OSA met with Patrick Janssens from De Hoop twice in Houston, Texas in May 2010. During these meetings, Mr. Yáñez made material omissions to De Hoop which Citigroup substantially assisted. De Hoop was also a beneficiary of the Rabobank Trust, in which certain payments were made and were to be made (but were never received) in U.S. dollars to a U.S. financial institution.

1823. Gulf suffered domestic injury through the loss of lease payments for the Titan 2 from April 2013 to the present, the loss of the use of Titan 2 as a result of OSA's collapse and the inability to lease that vessel for a period of years, and the material degradation of Titan 2. As described *supra* in Section XV.E, Gulf relied on Citigroup's fraudulent statements and communications in agreeing to begin and continue leasing the Titan 2 to OSA. Gulf was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all

investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Gulf into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its lease to Gulf. In addition, the owner and CEO of Gulf is Erik Arne Hall, a U.S. resident who lives in Houston, Texas, who has suffered domestic injury through the loss of Gulf's continued business with OSA.

1824. Moreover, Citigroup's pattern of racketeering activity against Gulf reached into the United States to inflict domestic injury on Gulf. Specifically, in May 2011, OSA, with the substantial assistance of Citigroup, communicated fraudulent information to Mr. Hall of Gulf at a meeting in Houston, Texas.

1825. Halani suffered domestic injury through the loss of overdue lease payments for the Halani 1. As described *supra* in Section XV.F, Halani relied on Citigroup's fraudulent statements and communications in agreeing to begin and continue leasing the Halani 1 to OSA. Halani was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Halani into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its lease to Halani.

1826. Moreover, Citigroup's pattern of racketeering activity against Halani reached into the United States to inflict domestic injury on Halani. Specifically, in May 2013, OSA, with the substantial assistance of Citigroup, communicated fraudulent information to Halani during the annual Offshore Technology Conference in Houston, Texas.

1827. MADISA suffered domestic injury through the loss of past-due invoices that have not been paid by OSA. As described *supra* in Section XV.F, MADISA relied on Citigroup's fraudulent statements and communications in entering into equipment and maintenance service agreements with OSA and delaying cancelation of those agreements when OSA failed to make payments on time. MADISA was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled MADISA into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its lease to MADISA.

1828. Rabobank suffered domestic injury through the loss of the interest and principal due on the loans it made to OSA. As described *supra* in Section XVI, Rabobank relied on Citigroup's fraudulent statements and communications in renegotiating the terms of its loans the OSA, entering into the various trust agreements and amendments, and declining to take action against OSA when it failed to make timely payments on the loans. Rabobank was further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Rabobank into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its lease to Rabobank.

1829. Moreover, Citigroup's pattern of racketeering activity against Rabobank reached into the United States to inflict domestic injury on Rabobank. Specifically, certain payments were made and were to be made (but were never received) in the Rabobank Trust in U.S. dollars to a U.S. financial institution.

1830. Plaintiffs became aware of their RICO-related injuries caused by members of the RICO Enterprise on or around March 1, 2014, after Citigroup cancelled its cash advance credit facility with OSA and the PGR seized OSA and all its assets.

***Plaintiffs' Entitlement to Treble Damages***

1831. As a result of the violations of 18 U.S.C. § 1962(c) by the RICO Enterprise, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

1832. Citigroup and its subsidiaries are jointly and severally liable for the acts of one another and for the acts of other members of the RICO Enterprise, including OSA.

1833. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble their damages, plus interest, costs, and attorney's fees incurred by reason of Citigroup's violations of 18 U.S.C. § 1962(c).

1834. In addition, by reason of their injuries, Plaintiffs are entitled to any other relief the Court deems just and proper.

**COUNT TWO**
**Conspiracy to Violate Federal RICO, 18 U.S.C. § 1962(d)**

(All Plaintiffs)

1835. Plaintiffs repeat and re-allege paragraphs 1 to 1708 above as if fully set forth herein.

1836. Count Two seeks relief against Citigroup for violation of 18 U.S.C. § 1962(d).

1837. In violation of 18 U.S.C. § 1962(d), the members of the RICO Enterprise knowingly conspired with each other to violate 18 U.S.C. § 1962(c).

1838. The object of the conspiracy included, but was not limited to, fraudulently inducing and luring Plaintiffs to invest, and maintain their investment in, OSA in order to increase (1) cash flows to OSA; and (2) interest payments to Citigroup.

1839. Citigroup, individually and through its agents, employees or representatives, agreed and combined with OSA, individually and through its agents, employees or representatives, to perform a criminal or unlawful act, or a lawful act by criminal or unlawful means.

1840. Citigroup, individually and through its agents, employees or representatives, objectively manifested agreement to the commission of substantive RICO violations and to the commission of two or more predicate acts of racketeering through participation in the conduct of the affairs of the RICO Enterprise.

1841. Citigroup's agreement with OSA to engage in a pattern of racketeering activity can be reasonably inferred from (1) their business relationship; (2) their mutual financial gain resulting from the pattern of racketeering activity; (3) Citigroup's and OSA's fraudulent misrepresentations and material omissions to Plaintiffs regarding OSA's financial attractiveness as an investment; (4) the dependency of the fraudulent acts of each on the fraudulent acts of the others for the success of the fraudulent scheme; (5) Citigroup's CEO's admission that at least one of Citigroup's employees was "criminally involved" in the fraudulent scheme, and that Citigroup had terminated approximately a dozen employees, both "inside and outside" of Mexico, who participated in the fraud; and (6) the findings of the Mexican authorities, including the CNBV, that Citigroup's agents, employees or representatives knowingly engaged in a fraudulent scheme with OSA.

1842. Citigroup's agreement with OSA to engage in a pattern of racketeering activity was further manifested by the number and similarity of the racketeering offenses committed by them as alleged above.

1843. The conspirators committed overt acts to achieve the purpose of the conspiracy, including by submitting and accepting at least 166 fraudulent cash advances and making fraudulent misrepresentations and material omissions to Plaintiffs.

1844. As described *supra* in paragraphs 1739-88, by committing numerous acts of wire fraud in furtherance of the RICO Enterprise, the conspirators engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).

1845. Citigroup knew that its acts in furtherance of the conspiracy, including submitting and accepting at least 166 fraudulent cash advances and making fraudulent misrepresentations and material omissions to Plaintiffs, were part of a pattern of fraudulent activity.

1846. As a direct and proximate result of Citigroup's participation, individually and through its agents, employees or representatives, in a conspiracy to violate 18 U.S.C. § 1962(c), Plaintiffs have suffered substantial damages in an amount to be proven at trial.

1847. As alleged above, Plaintiffs suffered domestic U.S. injuries.

1848. Citigroup is jointly and severally liable for the acts of other members of the RICO Enterprise.

1849. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble their damages, plus interest, costs, and attorney's fees incurred by reason of Citigroup's violations of 18 U.S.C. § 1962(c).

1850. In addition, by reason of their injuries, Plaintiffs are entitled to any other relief the Court deems just and proper.

## COUNT THREE
## Fraud

(All Plaintiffs)

1851. Plaintiffs repeat and re-allege paragraphs 109 to 147, 172-182, 256-1708 above as if fully set forth herein.

1852. Count Three seeks relief from Citigroup for fraud.

1853. At all relevant times, Citigroup, individually and through its agents, employees, and representatives who engaged in fraudulent misrepresentations and material omissions, were acting within the scope of their employment and in Citigroup's interest.

1854. Citigroup engaged in a fraudulent scheme with OSA to illicitly increase its interest income and fees on the backs of Plaintiffs, OSA's vendors, creditors and bondholders. Specifically, Citigroup, through its ICG, operated, managed and supervised a cash advance facility for OSA utilizing Banamex, through which Citigroup (1) prepaid OSA what Pemex, its sole customer, allegedly owed to OSA; (2) collected the full receivable from Pemex; and (3) charged OSA interest on those receivables. Thus, the more cash advances OSA sought, the more money Citigroup made.

1855. Taking advantage of the framework presented by the cash advance facility, Citigroup and OSA engaged in a fraudulent scheme between 2008 (on information and belief) and 2014, whereby Citigroup (1) knowingly advanced funds to OSA based on fraudulent documentation; and (2) repeatedly increased OSA's credit limit, allowing it to request more cash advances.

1856. The fraud not only provided Citigroup with illicit funds, but it resulted in fraudulent misrepresentations by Citigroup and OSA relating to OSA's financial condition, including that (1) OSA was a financially attractive company with sufficient and guaranteed liquidity and cash flow; and (2) OSA was entitled to Citigroup's cash advances as presented in its financial statements.

1857. Specifically, and as alleged in more detail *supra* in Sections XIV and XV, Citigroup, acting directly and through others such as OSA's external financial consultant and Pareto to whom Citigroup had knowingly provided false and misleading information for dissemination to OSA's creditors, vendors and bondholders, made fraudulent misrepresentations

and material omissions regarding OSA and the cash advance facility to Plaintiffs through in-person meetings, telephone conferences, emails, and written materials such as presentations and financial statements.

1858. For example, Citigroup, either directly or through others to whom it provided false and misleading information that it knew would be disseminated to OSA's creditors, vendors and bondholders such as Plaintiffs, knowingly (1) made fraudulent misrepresentations to Plaintiffs that (i) the cash advance facility operated, managed and supervised by Citigroup's ICG provided OSA with a consistent and reliable source of cash flow sufficient for OSA's liquidity needs; and (ii) Citigroup, not OSA, had primary responsibility for the control system governing the facility, thereby mitigating the risk that Pemex would not pay Banamex on the invoices submitted by OSA; and (2) omitted the following material information: (i) the cash advance facility actually lacked any controls; (ii) Citigroup was not following its own internal policies and procedures; (iii) in September 2012, Citigroup executed the Regulatory Contract with OSA purporting to absolve Citigroup and Banamex of any responsibility for validating and authenticating the documentation OSA submitted to the ICG in support of its cash advance requests; (iv) Citigroup was approving false documentation submitted by OSA in support of its cash advances; (v) OSA's financial projections were false; (vi) Citigroup and OSA were involved in an ongoing fraud relating to the cash advance facility; and (vii) former Citigroup employees, including one that Citigroup terminated for bribery and corruption relating to OSA, worked at OSA and participated in the fraudulent scheme with Citigroup.

1859. Citigroup's fraudulent misrepresentations and material omissions led Plaintiffs to (1) invest and maintain their investments in OSA; (2) do business with and continue doing business with OSA; (3) restructure their debts with OSA; and (4) enter into financial agreements with OSA.

1860. Citigroup intended for Plaintiffs to rely and act (or not act) on these fraudulent misrepresentations and material omissions.

1861. Plaintiffs reasonably and justifiably relied on Citigroup's fraudulent misrepresentations and material omissions in deciding to do business with or invest in OSA or continue doing business with and investing in OSA.

1862. Had Plaintiffs known that the cash advance facility was predicated on a fraud, they would have (1) declined to do business with or invest in OSA; (2) ceased doing business with OSA or sold their investments in OSA; or (3) otherwise protected themselves against further damage.

1863. Specifically, Plaintiff Adar relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 378-411.

1864. Specifically, Plaintiff Ashmore relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 412-517.

1865. Specifically, Plaintiff Copernico relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 518-692.

1866. Specifically, Plaintiffs HBK and the HBK Fund[66] relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 693-772.

1867. Specifically, Plaintiffs ICE Canyon and the ICE Fund relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 773-899.

---

[66] The HBK Fund represents the interests and pursues the claims of EIG Global Project Fund II, Ltd. ("GPF II"), a Cayman Islands-based fund that was managed or advised by EIG Management Company, LLC ("EIG"), an investment management company based in the United States, relating to the 2008 bonds.

1868. Specifically, Plaintiff Moneda Funds relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 900-1035.

1869. Specifically, Plaintiff Nordic Trustee relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1036-1111.

1870. Specifically, Plaintiff Waypoint relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1112-1171.

1871. Specifically, Plaintiff Candies relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1177-1302.

1872. Specifically, Plaintiff Coastline relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1303-1378

1873. Specifically, Plaintiff De Hoop relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1379-1474.

1874. Specifically, Plaintiff Gulf relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1475-1514.

1875. Specifically, Plaintiff Halani relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1515-1573.

1876. Specifically, Plaintiff MADISA relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1574-1615.

1877. Specifically, Plaintiff Rabobank relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1616-1708.

1878. As a direct and proximate result of Citigroup's fraudulent misrepresentations and material omissions, all Plaintiffs suffered substantial damages in an amount to be proven at trial.

**COUNT FOUR**
**Aiding and Abetting Fraud**

(All Plaintiffs)

1879. Plaintiffs repeat and re-allege paragraphs paragraphs 109 to 147, 172-182, 256-1708 above as if fully set forth herein.

1880. Count Four seeks relief from Citigroup for aiding and abetting OSA's fraud.

1881. At all relevant times, Citigroup, individually and through its agents, employees or representatives who knowingly substantially assisted OSA's fraud, were acting within the scope of their employment and in Citigroup's interest.

***Underlying Fraud***

1882. OSA conducted a fraudulent scheme to illicitly increase its income on the backs of Plaintiffs, OSA's vendors, creditors and bondholders.

1883. Specifically, OSA, through Citigroup's ICG, had a cash advance facility utilizing Banamex. Through the facility, Citigroup prepaid OSA on Pemex invoices, charged OSA interest, and received full reimbursement from Pemex, resulting in increased liquidity and cash flow for OSA.

1884. Taking advantage of the framework presented by the cash advance facility, OSA engaged in a fraudulent scheme between 2008 (on information and belief) and 2014, whereby (1) OSA submitted fraudulent documentation to Citigroup's ICG in support of its cash advance requests; (2) Citigroup knowingly advanced OSA funds based on the fraudulent documentation; and (3) Citigroup repeatedly increased OSA's credit limit, allowing it to request more cash advances.

1885. The fraud not only provided OSA with illicit funds, but it resulted in fraudulent misrepresentations by OSA relating to its financial condition, including that OSA (1) was a

financially attractive company with sufficient and guaranteed liquidity and cash flow; and (2) entitled to Citigroup's cash advances as presented in its financial statements.

1886. Specifically, and as alleged in more detail *supra* in Sections XIV and XV, OSA, acting directly and through others such as OSA's external financial consultant and Pareto to whom OSA had knowingly provided false and misleading information for dissemination to OSA's creditors, vendors and bondholders, made fraudulent misrepresentations and material omissions regarding its finances and the cash advance facility to Plaintiffs through in-person meetings, telephone conferences, emails, and written materials such as presentations and financial statements.

1887. For example, OSA, either directly or through others to whom it provided false and misleading information that it knew would be disseminated to its creditors, vendors and bondholders like Plaintiffs, knowingly (1) made fraudulent misrepresentations to Plaintiffs that (i) the cash advance facility operated, managed and supervised by Citigroup's ICG provided OSA with a consistent and reliable source of cash flow sufficient for OSA's liquidity needs; and (ii) Citigroup, not OSA, had primary responsibility for the control system governing the facility, thereby mitigating the risk that Pemex would not pay Banamex on the invoices submitted by OSA; and (2) omitted the following material information: (i) the cash advance facility actually lacked any controls; (ii) Citigroup was not following its own internal policies and procedures; (iii) in September 2012, Citigroup executed the Regulatory Contract with OSA purporting to absolve Citigroup and Banamex of any responsibility for validating and authenticating the documentation OSA submitted to the ICG in support of its cash advance requests; (iv) Citigroup was approving false documentation submitted by OSA in support of its cash advances; (v) OSA's financial projections were false; (vi) Citigroup and OSA were involved in an ongoing fraud relating to the

cash advance facility; and (vii) former Citigroup employees, including one that was terminated by Citigroup for bribery and corruption relating to OSA, worked at OSA and participated in the fraudulent scheme with Citigroup. OSA intended for Plaintiffs to rely and act (or not act) on these fraudulent misrepresentations and material omissions.

1888. By knowingly making fraudulent misrepresentations and material omissions to all Plaintiffs to induce them to (1) invest or continue investing in OSA; (2) enter into agreements with OSA; (3) restructure their debts with OSA; or (4) agree to other concessions with OSA, both OSA and Citigroup benefited, including from an increase in OSA's income and Citigroup's interest payments and fees, all on the backs of Plaintiffs, OSA's largest vendors, creditors and bondholders.

1889. Plaintiffs reasonably and justifiably relied on OSA's fraudulent misrepresentations and material omissions in deciding to invest in or do business with, or maintain their investments in or continue doing business, with OSA.

1890. Had Plaintiffs known that the cash advance facility was predicated on a fraud, they would have (1) declined to do business with or invest in OSA; (2) ceased doing business with OSA or sold their investments in OSA; or (3) otherwise protected themselves against further damage.

1891. As a direct and proximate result of OSA's fraudulent misrepresentations and material omissions, Plaintiffs have sustained damages.

1892. Specifically, Plaintiff Adar relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 378-411.

1893. Specifically, Plaintiff Ashmore relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 412-517.

1894. Specifically, Plaintiff Copernico relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 518-692.

1895. Specifically, Plaintiffs HBK and the HBK Fund[67] relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 693-772.

1896. Specifically, Plaintiffs ICE Canyon and the ICE Fund relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 773-899.

1897. Specifically, Plaintiff Moneda Funds relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 900-1035.

1898. Specifically, Plaintiff Nordic Trustee relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1036-1111.

1899. Specifically, Plaintiff Waypoint relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1112-1171.

1900. Specifically, Plaintiff Candies relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1177-1302.

1901. Specifically, Plaintiff Coastline relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1303-1378

1902. Specifically, Plaintiff De Hoop relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1379-1474.

---

[67] The HBK Fund represents the interests and pursues the claims of EIG Global Project Fund II, Ltd. ("GPF II"), a Cayman Islands-based fund that was managed or advised by EIG Management Company, LLC ("EIG"), an investment management company based in the United States, relating to the 2008 bonds.

1903. Specifically, Plaintiff Gulf relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1475-1514.

1904. Specifically, Plaintiff Halani relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1515-1573.

1905. Specifically, Plaintiff MADISA relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1574-1615.

1906. Specifically, Plaintiff Rabobank relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1616-1708.

***Aiding and Abetting***

1907. Citigroup is responsible for the harm committed by OSA because it aided and abetted OSA's fraudulent misrepresentations and material omissions to Plaintiffs.

*Actual Knowledge*

1908. At all times relevant to this Third Amended Complaint, Citigroup had actual knowledge of OSA's fraud, including because it knowingly approved false documentation submitted by OSA to Citigroup's ICG.

1909. In addition, Citigroup had actual knowledge that OSA was making fraudulent misrepresentations and material omissions to its creditors, bondholders and vendors on account of (1) its knowledge of OSA's fraud and its role in approving OSA's false documentation; (2) its role as OSA's banker, trustee and collateral agent of the 2008 Bond Issuance, fiduciary of the Mexican Trust in connection with the 2013 Bond Issuance and trustee of the Rabobank Trust; and (3) the close relationship between Citigroup and OSA, including the services provided by Citigroup to OSA beyond that of the cash advance facility (*see supra* Sections I, IV, VI and XIII).

1910. Specifically, Citigroup had actual knowledge that OSA was making the following fraudulent misrepresentations and material omissions, among others (*see supra* Sections I, VI, VII and IX):

(a) OSA was (1) informing its creditors, bondholders and vendors, like Plaintiffs that: (i) the prior problems with the cash advance facility had been fixed; (ii) the cash advance facility was functioning properly; (iii) Citigroup was in charge of the internal controls; and (iv) they had nothing to worry about regarding the stability and reliability of the cash advance facility; and

(b) OSA was purposefully concealing that: (1) OSA was submitting false documents containing forged Pemex signatures to the ICG in support of its cash advance requests; (2) the cash advance facility lacked sufficient internal controls because (i) Citigroup intentionally violated its own internal policies; and (ii) in 2012, through the Regulatory Contract, Citigroup absolved itself of any responsibility for validating and authenticating documents submitted by OSA; (3) OSA was involved in a fraudulent scheme involving the cash advance facility between 2008 (on information and belief) and 2014; and (4) former Citigroup employees worked at OSA and were involved the fraud, including one that Citigroup had fired for bribery and corruption before he joined OSA.

1911. Furthermore, as alleged *supra* in Sections V and VI, Citibank participated in OSA's fraud and thus had knowledge of the fraud, including but not limited to:

(a) Knowingly approving the false documentation OSA submitted to the ICG;

(b) Violating its own internal controls relating to the cash advance facility, including by entering into the Regulatory Contract which purported to release Citigroup from

any responsibility for validating OSA's documentation in support of cash advance requests;

(c) Allowing OSA to control the cash advance facility in violation of its own internal policies and procedures;

(d) Providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests;

(e) Increasing OSA's cash advance limits in violation of its internal policies and procedures; and

(f) Sanctioning OSA's false financial projections (among other false and misleading information) in financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA, Pareto and others in these communications and materials.

1912. Even still, and as described above, Citigroup admitted that it was responsible for the fraudulent scheme, showing that Citigroup agreed with OSA to commit fraud and, in furtherance of the fraud, make fraudulent misrepresentations and material omissions to its vendors, creditors and bondholders (*see supra* Section XI). Specifically:

(a) In April 2014, Citigroup's CEO admitted that at least one of Citigroup's employees was "criminally involved" in the fraudulent scheme;

(b) Within the next month, Citigroup terminated approximately a dozen employees, both "inside and outside" of Mexico, that perpetrated the fraud; and

(c) The SEC fined Citigroup $4.75 million based on the fraud.

1913. In addition, in April 2014, the CNBV found that (1) ten Citigroup employees had violated Mexican criminal law, which provides that a bank officer may not extend a loan the officer knows the recipient cannot repay; and (2) Mr. Yáñez, the CEO and majority shareholder of OSA, and four other OSA employees had violated Mexican criminal law by submitting forged documents to obtain cash advances from Citigroup (*see supra* Section X).

1914. Furthermore, as alleged above, in May 2014, on the request of the PGR, a Mexican criminal court issued arrest warrants against three Citigroup employees for the violations detailed in the CNBV report. Additionally, in October 2014, the PGR obtained another arrest warrant against Mr. Yáñez on the basis that he submitted false information to Citigroup to obtain cash advances (*see supra* Section X).

*Substantial Assistance*

1915. Citigroup intentionally provided substantial assistance to OSA enabling OSA's fraud and its fraudulent misrepresentations and material omissions to Plaintiffs.

1916. As alleged above, Citigroup's substantial assistance included, but was not limited to:

(a) Knowingly approving the false documentation OSA submitted to the ICG;

(b) Violating its own internal controls relating to the cash advance facility, including by entering into the Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests;

(c) Allowing OSA to control the cash advance facility in violation of its own internal policies and procedures;

(d) Providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests;

(e) Increasing OSA's cash advance limits in violation of its internal policies and procedures; and

(f) Sanctioning OSA's false financial projections (among other false and misleading information) in financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA, Pareto and others in these communications and materials.

1917. These actions by Citigroup enabled OSA to make fraudulent misrepresentations and material omissions regarding its financial condition—in particular, regarding its cash flow from Pemex contracts and Citigroup cash advances—in order to extract additional investments and concessions from its vendors, creditors and bondholders, including Plaintiffs, which allowed the fraud and increases in OSA's fraudulent income to continue.

1918. Citigroup knew and intended that its actions would substantially assist OSA in making fraudulent misrepresentations and material omissions to Plaintiffs, which Citigroup knew would provide false assurance and incentive for Plaintiffs to invest in or do business with and continue doing business with or investing in OSA. Citigroup also knew that such fraudulent misrepresentations and material omissions to Plaintiffs would allow the fraud and increases in OSA's fraudulent income to continue.

1919. Citigroup benefitted from substantially assisting OSA in making fraudulent misrepresentations and material omissions to Plaintiffs, including from (1) increased illicit interest; and (2) increased fees from additional services to OSA stemming from investments, restructurings

and financial agreements with Plaintiffs, e.g., as trustee of the 2008 Bond Issuance, fiduciary of the Mexican Trust, and trustee of the Rabobank Trust.

1920. Absent this fraudulent partnership with Citigroup, Plaintiffs would not have been misled into investing in or doing business with OSA, maintaining their investments or continuing to do business with OSA, thereby sustaining the damages they did.

*Damages*

1921. As a direct and proximate result of Citigroup aiding and abetting OSA's fraud, Plaintiffs have suffered damages in an amount to be proven at trial.

1922. Citigroup is jointly and severally liable for aiding and abetting OSA's fraudulent misrepresentations and material omissions.

**COUNT FIVE**
**Conspiracy to Commit Fraud**

(All Plaintiffs)

1923. Plaintiffs repeat and re-allege paragraphs paragraphs 109 to 147, 172-182, 256-1708 above as if fully set forth herein.

1924. Count Five seeks relief from Citigroup for conspiracy to commit fraud.

1925. At all relevant times, Citigroup, individually and through its agents, employees or representatives who conspired with OSA in committing fraud against Plaintiffs, were acting within the scope of their employment and in Citigroup's interest.

*The Conspiracy*

1926. OSA conspired with Citigroup to conduct a fraudulent scheme to illicitly increase its income on the backs of the Plaintiffs, OSA's vendors, creditors and bondholders.

1927. Specifically, OSA, through Citigroup's ICG, had a cash advance facility utilizing Banamex. Through the facility, Citigroup prepaid OSA on Pemex invoices, charged OSA interest, and received full reimbursement from Pemex.

1928. Taking advantage of the framework presented by the cash advance facility, OSA conspired with Citigroup to engage in a fraudulent scheme between 2008 (on information and belief) and 2014, whereby (1) OSA submitted fraudulent documentation to Citigroup's ICG in support of its cash advance requests; (2) Citigroup knowingly advanced OSA funds based on the fraudulent documentation; and (3) Citigroup repeatedly increased OSA's credit limit, allowing it to request more cash advances.

1929. The fraud not only provided OSA with illicit funds, but it resulted in misrepresentations by OSA relating to its financial condition, including that OSA (1) was a financially attractive company with sufficient and guaranteed liquidity and cash flow; and (2) entitled to Citigroup's cash advances as presented in its financial statements.

1930. Specifically, and as alleged in more detail *supra* in Sections XIV and XV, Citigroup and OSA, acting directly and through others such as OSA's external financial consultant and Pareto to whom OSA had knowingly provided false and misleading information for dissemination to OSA's creditors, vendors and bondholders, conspired to make fraudulent misrepresentations and material omissions regarding OSA's finances and the cash advance facility to Plaintiffs through in-person meetings, telephone conferences, emails, and written materials such as presentations and financial statements.

1931. For example, Citigroup and OSA, either directly or through others to whom they provided false and misleading information that they knew would be disseminated to OSA's creditors, vendors and bondholders like Plaintiffs, knowingly conspired to: (1) make fraudulent

misrepresentations to Plaintiffs that (i) the cash advance facility operated, managed and supervised by Citigroup's ICG provided OSA with a consistent and reliable source of cash flow sufficient for OSA's liquidity needs; and (ii) Citigroup, not OSA, had primary responsibility for the control system governing the facility, thereby mitigating the risk that Pemex would not pay Banamex on the invoices submitted by OSA; and (2) omit the following material information: (i) the cash advance facility actually lacked any controls; (ii) Citigroup was not following its own internal policies and procedures; (iii) in September 2012, Citigroup executed the Regulatory Contract with OSA purporting to absolve Citigroup and Banamex of any responsibility for validating and authenticating the documentation OSA submitted to the ICG in support of its cash advance requests; (iv) Citigroup was approving false documentation submitted by OSA in support of its cash advances; (v) OSA's financial projections were false; (vi) Citigroup and OSA were involved in an ongoing fraud relating to the cash advance facility; and (vii) former Citigroup employees, including one that was terminated by Citigroup for bribery and corruption relating to OSA, worked at OSA and participated in the fraudulent scheme with Citigroup.

1932. The objective of the conspiracy was to increase OSA's liquidity and cash flow and increase Citigroup's interest payments and fees, including by knowingly making fraudulent misrepresentations and material omissions to all Plaintiffs to induce them to (1) invest or continue investing in OSA; (2) enter into agreements with OSA; (3) restructure their debts with OSA; or (4) agree to other concessions with OSA, which resulted in an increase in OSA's income and Citigroup's interest payments and fees, all on the backs of Plaintiffs, OSA's largest vendors, creditors and bondholders.

1933. Plaintiffs reasonably and justifiably relied on Citigroup's fraudulent misrepresentations and material omissions in deciding to do business with or invest in or continue doing business or maintain their investments with OSA.

1934. Had Plaintiffs known that the cash advance facility was predicated on a fraud, they would have (1) declined to do business with or invest in OSA; (2) ceased doing business with or investing in OSA; or (3) otherwise protected themselves against further damage.

1935. Specifically, Plaintiff Adar relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 378-411.

1936. Specifically, Plaintiff Ashmore relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 412-517.

1937. Specifically, Plaintiff Copernico relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 518-692.

1938. Specifically, Plaintiffs HBK and the HBK Fund[68] relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 693-772.

1939. Specifically, Plaintiffs ICE Canyon and the ICE Fund relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 773-899.

1940. Specifically, Plaintiff Moneda Funds relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 900-1035.

[68] The HBK Fund represents the interests and pursues the claims of EIG Global Project Fund II, Ltd. ("GPF II"), a Cayman Islands-based fund that was managed or advised by EIG Management Company, LLC ("EIG"), an investment management company based in the United States, relating to the 2008 bonds.

1941. Specifically, Plaintiff Nordic Trustee relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1036-1111.

1942. Specifically, Plaintiff Waypoint relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1112-1171.

1943. Specifically, Plaintiff Candies relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1177-1302.

1944. Specifically, Plaintiff Coastline relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1303-1378

1945. Specifically, Plaintiff De Hoop relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1379-1474.

1946. Specifically, Plaintiff Gulf relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1475-1514.

1947. Specifically, Plaintiff Halani relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1515-1573.

1948. Specifically, Plaintiff MADISA relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1574-1615.

1949. Specifically, Plaintiff Rabobank relied on, and suffered harm from, Citigroup's fraudulent misrepresentations and material omissions as detailed in paragraphs ¶¶ 1616-1708.

### *Conspiratorial Agreement*

1950. Citigroup and OSA agreed to engage in a conspiracy to commit fraud using the cash advance facility and to make fraudulent misrepresentations and material omissions to Plaintiffs in furtherance of the fraud.

1951. Citigroup's agreement with OSA to engage in a conspiracy to commit fraud involving the cash advance facility and make fraudulent misrepresentations and material omissions in furtherance of the fraud is evident from its (1) degree of knowledge of the conspiracy's objective; (2) acts committed in furtherance of the conspiracy; (3) close association with OSA; and (4) direct financial incentives. Specifically:

(a) Citigroup had actual knowledge that OSA was making the following fraudulent misrepresentations and material omissions (*see supra* Sections I, VI, VII and IX), including, among others:

i) OSA was informing its creditors, bondholders and vendors, like Plaintiffs that (1) the prior problems with the cash advance facility had been fixed; (2) the cash advance facility was functioning properly; (3) Citigroup was in charge of the internal controls; and (4) they had nothing to worry about regarding the stability and reliability of the cash advance facility;

ii) OSA was purposefully concealing that (1) OSA was submitting false documents containing forged Pemex signatures to the ICG in support of its cash advance requests; (2) the cash advance facility lacked sufficient internal controls because (i) Citigroup intentionally violated its own internal policies; and (ii) in 2012, through the Regulatory Contract, Citigroup absolved itself of any responsibility for validating and authenticating documents submitted by OSA; (3) OSA was involved in a fraudulent scheme involving the cash advance facility between 2008 (on information and belief) and 2014; and (4) former Citigroup employees worked at OSA

and were involved the fraud, including one employee that Citigroup fired for bribery and corruption before he joined OSA.

(b) Citigroup committed acts in furtherance of the conspiracy (*see supra* Sections V and VI), including:

(i) Knowingly approving the false documentation OSA submitted to the ICG;

(ii) Violating its own internal controls relating to the cash advance facility, including by entering into the Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests;

(iii) Allowing OSA to control the cash advance facility in violation of its own internal policies and procedures;

(iv) Providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests;

(v) Increasing OSA's cash advance limits in violation of its internal policies and procedures; and

(vi) Sanctioning OSA's false financial projections (among other false and misleading information) in financial statements, the Pareto Materials and other communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA, Pareto and others in these communications and materials.

(c) Citigroup regularly associated with OSA and Mr. Yáñez specifically in connection with (1) the cash advance facility and in Citigroup's role as OSA's banker, through Banamex, for general banking services and daily operations beyond that of the cash

advance facility; (2) role as trustee and collateral agent for the 2008 Bond Issuance through its banking arm Citibank and Banamex, respectively; (3) role as OSA's advisor on the acquisition of the Goliath and Cal Dive; (4) lender of millions to OSA; and (5) role as OSA's advisor on identifying equity investors, including by preparing presentations to such investors; and contributor in preparing "Management Presentations" (*see supra* Sections IV, VI and XIII).

(d) Citigroup had a direct financial incentive to participate in the conspiracy, including from (1) increased illicit interest; and (2) increased fees from additional services to OSA stemming from investments, restructurings and financial agreements with Plaintiffs, e.g., as trustee of the 2008 Bond Issuance, fiduciary of the Mexican Trust, and trustee of the Rabobank Trust (*see supra* Section VI).

1952. Furthermore, and as described in *supra* Section XI, Citigroup admitted that it was responsible for the fraudulent scheme, showing that Citigroup entered into an agreement with OSA to commit fraud and, in furtherance of the fraud, make fraudulent misrepresentations and material omissions to its vendors, creditors and bondholders. Specifically, as alleged above:

(a) In April 2014, Citigroup's CEO admitted that at least one of Citigroup's employees was "criminally involved" in the fraudulent scheme;

(b) Within the next month, Citigroup terminated approximately a dozen employees, both "inside and outside" of Mexico, that perpetrated the fraud; and

(c) The SEC fined Citigroup $4.75 million based on the fraud.

1953. In addition, as alleged *supra* in Section X, in April 2014, the CNBV found that (1) ten Citigroup employees had violated Mexican criminal law, which provides that a bank officer may not extend a loan the officer knows the recipient cannot repay; and (2) Mr. Yáñez, the CEO

and majority shareholder of OSA, and four other OSA employees had violated Mexican criminal law by submitting forged documents to obtain cash advances from Citigroup.

1954. Furthermore, as alleged *supra* in Section X, in May 2014, on the request of the PGR, a Mexican criminal court issued arrest warrants against three Citigroup employees for the violations detailed in the CNBV report. Additionally, in October 2014, the PGR obtained another arrest warrant against Mr. Yáñez on the basis that he submitted false information to Citigroup to obtain cash advances.

***Overt Acts in Furtherance of the Conspiracy***

1955. As alleged above, OSA and Citigroup committed numerous overt acts in furtherance of the conspiracy, most notably Citigroup engaged in the following:

(a) Knowingly approving the false documentation OSA submitted to the ICG;

(b) Violating its own internal controls relating to the cash advance facility, including by entering into the Regulatory Contract which purported to release Citigroup from any responsibility for validating OSA's documentation in support of cash advance requests;

(c) Allowing OSA to control the cash advance facility in violation of its own internal policies and procedures;

(d) Providing cash advances that exceeded the amounts of the underlying Pemex contracts purporting to justify OSA's cash advance requests;

(e) Increasing OSA's cash advance limits in violation of its internal policies and procedures; and

(f) Sanctioning OSA's false financial projections (among other false and misleading information) in financial statements, the Pareto Materials and other

communications and materials, including by not correcting or revising the false and inaccurate information provided by OSA, Pareto and others in these communications and materials.

1956. Citigroup and OSA knowingly took these actions in furtherance of the conspiracy in order to illicitly increase its interest payments and fees, including by luring Plaintiffs to (1) invest or continue investing in OSA; (2) enter agreements with OSA; (3) restructure their debts with OSA; (4) conduct business or continuing conducting business with OSA; or (5) agree to other concessions with OSA, thus perpetuating the fraudulent scheme.

***Damages***

1957. As a direct and proximate result of Citigroup's and OSA's conspiracy to commit fraudulent misrepresentations and material omissions, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

1958. Citigroup is jointly and severally liable for (1) its own acts in furtherance of the conspiracy; and (2) the acts of its co-conspirator, OSA, or other co-conspirators, in furtherance of the conspiracy to commit fraud.

**COUNT SIX**
**Vicarious Liability for Banamex's and Citibank's Fraudulent Conduct Based on Actual Agency**

(All Plaintiffs)

1959. Plaintiffs repeat and re-allege paragraphs 60-1708 above as if fully set forth herein.

1960. As stated above, Citigroup is directly liable for fraud, aiding and abetting fraud, and conspiracy to commit fraud based on (1) the participation of ICG employees in the fraud; (2) the fraudulent misrepresentations and material omissions by ICG employees to Plaintiffs in furtherance of the fraud; and (3) the ICG employees' knowing conspiracy with and aiding and

abetting of OSA in making fraudulent misrepresentations and material omissions to Plaintiffs in furtherance of the fraud.

1961. Alternatively, Citigroup, as a principal, is jointly and severally liable or otherwise vicariously liable for any and all damages resulting from the fraudulent misrepresentations and material omissions of its agents—Banamex and Citibank and their employees and agents—in furtherance of the fraud based on actual agency.

***Acknowledgement of Actual Agency by Citigroup as Principal***

1962. Citigroup as principal acknowledged and intended that Banamex as its actual agent would act for it in matters relating to Pemex and OSA, including the cash advance facility, under the direction and supervision of Citigroup's ICG, including based on Banamex's banking activities on behalf of Citigroup in Mexico, Citigroup's support of Banamex with company resources, and the shared use of the Citigroup brand and logo.

1963. Citigroup as principal acknowledged and intended that Citibank as its actual agent would act for it in matters relating to Pemex and OSA, including based on Citibank's serving as trustee of the 2008 Bond Issuance and Banamex's and OSA's use of Citibank bank accounts in the United States in connection with cash advance activities, Citigroup's support of Citibank with company resources, and the shared use of the Citigroup brand and logo.

1964. At all times material thereto, Banamex's and Citibank's employees, agents, officers, and representatives who engaged in fraudulent misrepresentations and material omissions were acting within the scope of their employment, in Citigroup's interest, and under the supervision, management and control of Citigroup's ICG.

### *Acceptance of Actual Agency by Banamex and Citibank as Agents*

1965. Banamex as agent manifested an acceptance of the undertaking and authority to represent Citigroup as its principal in Mexico in matters relating to Pemex and OSA, including the cash advance facility, under the direction, supervision and control of Citigroup's ICG, including by fostering the OSA and Pemex relationships and entering into agreements for the ultimate benefit of Citigroup, such as the Regulatory Contract that provided loan interest to Citigroup (which was executed by ICG employees on behalf of Banamex).

1966. Citibank as agent manifested an acceptance of the undertaking and authority to represent Citigroup as its principal in matters relating to Pemex and OSA, including through its service as trustee for the 2008 Bond Issuance for the ultimate benefit of Citigroup and as banker for OSA and Banamex in the United States.

### *Control of Actual Agents Banamex and Citibank by Citigroup as Principal*

1967. Citigroup as principal had the right to and did in fact control the OSA cash advance facility, through the ICG, with Banamex serving as its agent, including by (1) supervising and managing the cash advance facility; (2) preparing investor presentations to encourage Plaintiffs' investment in OSA such that the facility grew in size; and (3) having its legal department review the facility, the related trust agreements, and other related agreements.

1968. Citigroup as principal further controlled Citibank's role as (1) trustee for the 2008 Bond Issuance for the ultimate benefit of Citigroup; and (2) banker for OSA and Banamex in the United States, which ultimately supported the Pemex and OSA relationship managed by the ICG.

### *Reliance*

1969. Plaintiffs reasonably and justifiably relied on the fraudulent misrepresentations and material omissions of Banamex and Citibank and their employees and agents, which Plaintiffs

perceived as Citigroup, a major international financial institution, in deciding to do business or continue doing business with OSA.

***Damages***

1970. As a direct and proximate result of Citigroup's vicarious liability for the fraudulent misrepresentations and material omissions of its agents—Banamex and Citibank and their employees and agents—based on actual agency, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

**COUNT SEVEN**
**Vicarious Liability for Banamex's and Citibank's Fraudulent Conduct Based on Apparent Agency**

(All Plaintiffs)

1971. Plaintiffs repeat and re-allege paragraphs 60-1708 above as if fully set forth herein.

1972. As stated above, Citigroup is directly liable for fraud, aiding and abetting fraud, and conspiracy to commit fraud based on (1) the participation of ICG employees in the fraud; (2) the fraudulent misrepresentations and material omissions by ICG employees to Plaintiffs in furtherance of the fraud; and (3) the ICG employees' knowing conspiracy with and aiding and abetting of OSA in making fraudulent misrepresentations and material omissions to Plaintiffs in furtherance of the fraud.

1973. Alternatively, Citigroup, as a principal, is jointly and severally liable or otherwise vicariously liable for any and all damages resulting from the fraudulent misrepresentations and material omissions of its agents—Banamex and Citibank and their employees and agents—in furtherance of the fraud based on apparent agency.

***Representations by Citigroup as Principal Causing Plaintiffs' Belief in Apparent Agency***

1974. Citigroup, particularly Citigroup employees such as Emilio Granja and Alfonso Ortega-Brehm, two senior ICG executives, and Louis Pisctelli, trustee of the 2008 Bond Issuance, made representations to Plaintiffs which caused Plaintiffs to reasonably believe that Citigroup's agents—employees of Banamex and Citibank—were authorized to act for Citigroup's benefit, including by introducing those employees as working for both Citigroup and Banamex or Citibank (*e.g.*, *supra* ¶ 1491) and using joint Banamex/Citigroup letterhead and email signatures (*supra* ¶¶ 63-64). On information and belief, Citigroup intended for Plaintiffs to hold such reasonable belief.

1975. At all times material thereto, Banamex's and Citibank's employees, agents, officers, and representatives who engaged in fraudulent misrepresentations and material omissions were acting within the scope of their employment, in Citigroup's interest, and under the supervision, management and control of Citigroup's ICG.

***Reliance***

1976. These representations by Citigroup induced Plaintiffs' reasonable and justifiable reliance upon the appearance of agency between (1) Citigroup as principal, which Plaintiffs recognized as a major international financial institution; and (2) Banamex and Citibank as agents. Plaintiffs further reasonably and justifiably relied on Banamex's and Citibank's fraudulent misrepresentations and material omissions through their employees and agents by deciding to do business or continue doing business with OSA.

***Damages***

1977. As a direct and proximate result of Citigroup's vicarious liability for the fraudulent misrepresentations and material omissions of its agents—Banamex and Citibank and their

employees and agents—based on apparent agency, Plaintiffs have suffered substantial damages in an amount to be proven at trial.

## ***DEMAND FOR RELIEF***

WHEREFORE, Plaintiffs demand judgment against Citigroup as follows:

(a) Damages for all injuries suffered as a result of Citigroup's unlawful and improper conduct, including but not limited to compensatory and punitive damages where appropriate in an amount to be determined at trial, and pre-judgment and post-judgment interest;

(b) Treble damages pursuant to 18 U.S.C. § 1964(c);

(c) Costs of this action, including Plaintiffs' attorney's fees; and

(d) Such other and further relief is just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand trial by jury on issues so triable.

Respectfully submitted,

Dated: February 25, 2022

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Juan P. Morillo*

JUAN P. MORILLO
Florida Bar No. 135933
juanmorillo@quinnemanuel.com

GABRIEL F. SOLEDAD (admitted *pro hac vice*)
gabrielsoledad@quinnemanuel.com

DEREK L. SHAFFER (admitted *pro hac vice*)
derekshaffer@quinnemanuel.com

LAUREN H. DICKIE (admitted *pro hac vice*)
laurendickie@quinnemanuel.com

DAVID H. NEEDHAM (admitted *pro hac vice*)
davidneedham@quinnemanuel.com

1300 I Street NW, 9th Floor
Washington, D.C. 20005
Telephone: (202) 538-8000

TERRY L. WIT (admitted *pro hac vice*)
terrywit@quinnemanuel.com

50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600

JOHN F. O'SULLIVAN
Florida Bar No. 143154
johnosullivan@quinnemanuel.com

LAURA N. FERGUSON (admitted *pro hac vice*)
lauraferguson@quinnemanuel.com

2601 S. Bayshore Dr., Ste. 1500
Miami, FL 33123
Telephone: (202) 538-8000

HOMER BONNER JACOBS, P.A.

PETER W. HOMER
Florida Bar No. 291250
Email: phomer@homerbonner.com

GREGORY J. TRASK
Florida Bar No. 0055883
Email: gtrask@homerbonner.com

KEVIN P. JACOBS
Florida Bar No. 169821
Email: kjacobs@homerbonner.com

1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5100

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 25th day of February, 2022, the foregoing was filed electronically and notification of this filing is to be provided to counsel of record by the Court's ECF filing system.

*/s/ Juan P. Morillo*