# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 10, 2025

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

FILED BY _____ JG _____ D.C.

Jul 10, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Appeal Number:  23-13152-HH
Case Style: Otto Candies, LLC, et al v. Citigroup Inc.
District Court Docket No: 1:16-cv-20725-DPG

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13152

_____

OTTO CANDIES, LLC,
ADAR MACRO FUND LTD.,
ASHMORE EMERGING MARKETS DEBT AND CURRENCY
FUND LIMITED,
ASHMORE EMERGING MARKETS HIGH YIELD PLUS FUND
LIMITED, et al.,

Plaintiffs-Appellants,

*versus*

CITIGROUP INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cv-20725-DPG

_____

2                                                                 23-13152

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: May 8, 2025

For the Court: DAVID J. SMITH, Clerk of Court

ISSUED AS MANDATE: July 10, 2025

[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-13152

_____

OTTO CANDIES, LLC,

ADAR MACRO FUND LTD.,

ASHMORE EMERGING MARKETS DEBT AND CURRENCY
FUND LIMITED,

ASHMORE EMERGING MARKETS HIGH YIELD PLUS FUND
LIMITED, et al.,

Plaintiffs-Appellants,

*versus*

CITIGROUP INC.,

Defendant-Appellee.

2                    Opinion of the Court                    23-13152

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cv-20725-DPG

_____

Before JILL PRYOR, BRANCH, and GRANT, Circuit Judges.

GRANT, Circuit Judge:

For the second time, we consider this long-running dispute alleging a transnational fraudulent scheme resulting in over $1 billion of losses to thirty plaintiffs.  The case has cycled through four complaints, and it has languished at the pleading stage for nine years.  The district court dismissed all seven counts in the 541-page third amended complaint for failure to state a claim.  We see things differently.  Because each of the plaintiffs has sufficiently pleaded the elements of each count alleged in the complaint, we reverse and remand.

## I. FACTS

### A. BACKGROUND

Given the breadth of the allegations, we describe the factual background in detail.  We set out the facts as pleaded in the third amended complaint and, as we must at the motion-to-dismiss stage, accept them as true.  *See Wood v. Moss*, 572 U.S. 744, 755 n.5 (2014).

23-13152                    Opinion of the Court                    3

We start with the major players. Citigroup, Inc. is a banking and financial institution incorporated in Delaware and headquartered in New York. Citibank is Citigroup's "primary U.S. lending and banking entity." Oceanografía S.A. de C.V. (OSA) is a now-defunct Mexican oil and gas services company. At one time, OSA provided offshore drilling services to Petróleos Mexicanos S.A. de C.V. (Pemex), Mexico's state-owned oil and gas company. Banco Nacional de México (Banamex) is a wholly owned Mexican subsidiary of Citigroup that furnished on-the-ground banking services for Citigroup.

Next, the scheme. In 2008, Citigroup, through Banamex, established credit facilities—a type of loan allowing borrowers to take out loans over extended periods of time—to provide cash advances to Pemex contractors, including OSA.[1] These facilities were "operated, managed, supervised, and controlled" by a New York-based division within Citigroup called the Institutional Client's Group (ICG). The ICG collaborated with Banamex to run the cash-advance facilities, including the one used by OSA. Citigroup ICG employees were responsible for approving all increases in OSA's cash-advance limit. And Citigroup managed and supervised those Banamex and Citigroup ICG employees operating the cash-advance facility at issue here.

---

[1] This system is also called "accounts receivable factoring" in the banking industry. Citigroup Inc., Exchange Act Release No. 83,858, 2018 WL 3913653, at *1 (Aug. 16, 2018).

Because Pemex often did not pay its contractors immediately, the cash advances provided OSA with liquidity to perform its underlying contracts.   Under their arrangement, Citigroup advanced OSA funds—subject to steep interest rates—in exchange for the right to collect repayment directly from Pemex. Given Pemex's low likelihood of default as a state-owned entity, Citigroup upped the amount of its advances nine times to sums that far exceeded the value of the underlying contracts.  *See Otto Candies, LLC v. Citigroup, Inc. (Otto Candies I)*, 963 F.3d 1331, 1336 (11th Cir. 2020).  This, in turn, bloated OSA with debt up to nearly half of its revenue and enabled Citigroup to earn millions in "risk-free" profits.  All told, Citigroup advanced over $3.3 billion to OSA from 2008 to 2014.  *See* Citigroup Inc., Exchange Act Release No. 83,858, 2018 WL 3913653, at *1, *3 (Aug. 16, 2018).

Citigroup knew about OSA's financial condition.  Indeed, OSA sent the bank audited financial statements and other information detailing its outstanding debts and general financial condition.  Despite its knowledge that OSA was overleveraged, Citigroup boosted its advances to OSA by almost 600% between 2009 and 2012.  Yet OSA's revenue increased by less than half that rate during that period.

As early as 2011, Citigroup's internal-control procedures mandated that for each cash-advance request, OSA had to submit copies of a Pemex work estimate and a "work estimate authorization" form.   These documents were signed by both

23-13152          Opinion of the Court          5

Pemex and the relevant contractor (here, OSA) reflecting the amount owed to the contractor by Pemex for services provided.

Citigroup did not hew to these procedures for OSA. Instead, the bank granted OSA's requests even though (1) their value dwarfed the value of the Pemex contracts, and (2) Citigroup knew that OSA had forged Pemex signatures on the authorization forms it submitted to Citigroup. The plaintiffs allege that none of that mattered to the bank. Citigroup had "deepen[ed] its ties with one of the largest state-owned enterprises in the world"—Pemex—and continued to amass greater interest payments on the illicit funds.

Worse yet, in 2012, Citigroup orchestrated a secret contract with OSA that became known as the Regulatory Contract. Under that arrangement, Citigroup outsourced to OSA—the player that stood to gain the most from inflating the value of the Pemex contracts—the job of authenticating the documents it submitted in support of its own cash-advance requests. The fox, in other words, was guarding the henhouse. And in constructing this arrangement, Citigroup further violated its internal-control procedures and sought to insulate itself from scrutiny.

Citigroup also profited from its relationship with OSA in other ways. The ties between the two entities nurtured "a relationship that extended far beyond the cash advance facility." For example, Citigroup (or its agents and subsidiaries) served as trustee of OSA's 2008 bond issuance and as fiduciaries of the trust that facilitated OSA's 2013 bond issuance. These bond issuances helped OSA raise capital for general corporate purposes, repay

6                    Opinion of the Court                    23-13152

loans, and finance acquisitions of shipping vessels.  The trusts, in turn, were designed to "guarantee payment to OSA's creditors" should OSA default.  Beyond the trusts, Citigroup also helped restructure OSA's debt; drafted investor presentations; advised OSA on acquisitions; and served as OSA's banker.  *See Otto Candies I*, 963 F.3d at 1337.

These deeper ties spawned deeper fraud.  During the bond issuances, Citigroup duped investors—including the bondholding plaintiffs—by misrepresenting and omitting key information about OSA's financial condition and "the stability and reliability of the cash advance facility."  In reality, OSA was in "financial crisis."  So much so, the plaintiffs allege, that Citigroup froze the cash-advance facility because "Pemex had refused to pay Banamex" on certain invoices "for funds [Citigroup] had already advanced to OSA."  More broadly, Citigroup played an integral role in drafting the fraudulent materials distributed to investors between 2008 and 2014, and in vouching for OSA's fraudulent financial statements.  The links between Citigroup and OSA were so "extensive" that the very existence of the fraud depended on Citigroup's knowledge, consent, and funding.

Things came to a head in 2014, when during an investigation of OSA's insurance policies, Mexican authorities determined that the company had violated Mexican law.  As a result, the government prohibited OSA from executing new contracts with Pemex.  During the investigation, Mexican regulators uncovered the cash-advance scheme and determined that ten Citigroup

23-13152                Opinion of the Court                    7

employees were criminally liable under Mexican law.  Prosecutors fined Banamex $2.3 million, and a Mexican court issued arrest warrants for three Citigroup employees for banking violations. Finally, the Mexican government seized OSA and placed it into restructuring proceedings, triggering its collapse.

Citigroup fared little better in the United States.  After an internal investigation, the bank discovered that it had issued nearly $430 million in fraudulent cash advances.  Citigroup also disclosed in its 2014 SEC annual report that the Department of Justice and the SEC were investigating the cash-advance scheme, and in 2018, the latter fined Citigroup $4.75 million for failing to maintain a system of internal controls related to Banamex.  *See* Citigroup Inc., Exchange Act Release No. 83,858, 2018 WL 3913653, at *9 (Aug. 16, 2018).  The SEC called Banamex's internal-control mechanisms "critically flawed" because they permitted "a single Banamex employee to verify invoices that led to disbursement of funds" to OSA.  *Id.* at *6.  And it found that "[s]everal individuals within Banamex" had "rais[ed] questions about the propriety" of how the cash-advance facility operated.  *Id.*

Finally, Citigroup's then-CEO, Michael Corbat, explained one result of the company's "rigorous internal investigation": Citigroup "terminated one employee, who we believe was directly involved in the fraud."  Corbat also divulged that Citigroup's investigation had led to the dismissal of eleven other employees, including "four Managing Directors, two of whom are business heads in Mexico," because their "actions or inactions failed to

protect our company from this fraud." He promised that Citigroup was "reviewing our controls and processes in Mexico," with the goal of ensuring that the bank and its subsidiaries acted "with the highest ethical standards."

*       *       *

To summarize, the plaintiffs thoroughly allege that Citigroup and its agents (Citibank and Banamex) conspired with OSA to orchestrate and execute a vast and fraudulent scheme designed to boost the appearance of OSA's profits and increase Citigroup's earnings from interest payments. OSA, they say, submitted inflated cash-advance requests containing forged Pemex signatures to Citigroup, which—with full knowledge of the fraud—approved them. The result? A cycle in which OSA requested larger and larger cash advances from Citigroup, allowing the fraud to flourish. In the process, OSA collected millions in "increased illicit income," while Citigroup amassed millions in "increased illicit interest."

All the while, Citigroup masked the true nature of OSA's precarious financial condition from bondholders and other investors. Citigroup failed to disclose that (1) the cash-advance facility lacked adequate safeguards; (2) it had entered into a secret agreement granting OSA the power to vet its own financials; and (3) its banking arm was neglecting internal-control procedures. Together, these misrepresentations and omissions caused the plaintiffs to (1) "invest and maintain their investments in OSA"; (2) "restructure their debts with OSA"; and (3) continue to enter

into financial agreements with OSA.  When OSA collapsed, the plaintiffs collectively lost over $1 billion on their investments.  The plaintiffs allege that had they known the truth, they would "have never done business" with OSA.

## B. PROCEDURAL HISTORY

Based on these allegations, over thirty plaintiffs filed suit against Citigroup in 2016.  The plaintiffs are shipping and leasing companies, investment funds, and a bank.  Each was a vendor, creditor, or bondholder of OSA.  The plaintiffs can be grouped into three categories:

(1) shipping companies and a service provider that sold or leased vessels to OSA or that provided it with services;[2]

(2) those who bought or held bonds issued by OSA or its affiliates;[3] and

---

[2] The shipping company and service provider plaintiffs include Otto Candies, LLC; Coastline Maritime Pte. Ltd. (together with Marfield Ltd. Inc. and Shanara Maritime International, S.A., Coastline); Shipyard De Hoop B.V.; Hoop Lobith International B.V. (together with Shipyard De Hoop B.V., De Hoop); Gulf Investments and Services Ltd.; Halani International Ltd.; and Máquinas Diesel S.A. de C.V. (MADISA).  As relevant here, Marfield and Shanara are wholly owned subsidiaries of Coastline.

[3] The bondholding plaintiffs include Adar Macro Fund Ltd.; Ashmore Emerging Markets Debt and Currency Fund Limited; Ashmore Emerging Markets High Yield Plus Fund Limited; Ashmore Emerging Markets Tri Asset Fund Limited; Ashmore SICAV in respect of Ashmore SICAV Emerging Markets Corporate Debt Fund; Ashmore SICAV in respect of Ashmore SICAV Emerging Markets Debt Fund; Ashmore SICAV in respect of Ashmore SICAV

10                    Opinion of the Court                    23-13152

(3) a bank that loaned money to OSA.[4]

The plaintiffs are based in the United States and abroad.

In 2018, the district court granted Citigroup's motion to dismiss for *forum non conveniens*. *Otto Candies, LLC v. Citigroup, Inc.*, No. 16-CV-20725, 2018 WL 3008740, at *7 (S.D. Fla. June 15, 2018) (unpublished). This Court reversed and remanded, holding that the district court had failed to give proper deference to the domestic plaintiffs' choice of forum. *See Otto Candies I*, 963 F.3d at 1335. We also explained that Citigroup had failed to carry its burden to show that most of the relevant documents and witnesses were in Mexico and criticized the bank for "misconstruing the

---

Emerging Markets High Yield Corporate Debt Fund (collectively with other Ashmore funds, Ashmore); Copernico Capital Partners (Bermuda) Ltd.; HBK Investments L.P.; HBK Master Fund L.P.; ICE Canyon LLC; ICE 1 EM CLO Limited; Padstow Financial Corp.; Moneda Deuda Latinoamericana Fondo de Inversión; Moneda International Inc.; Moneda Latin American Corporate Debt; Moneda Renta CLP Fondo de Inversión; Moneda S.A. Administradora General de Fondos (collectively with other Moneda funds and Padstow Financial Corporation, Moneda); Nordic Trustee; and Waypoint Asset Management LLC.

As relevant here, HBK controls GPF II's bondholding interest. Moneda "is an agent for and acts on behalf of" Padstow.

Plaintiffs Adar, Ashmore, Copernico, HBK (on behalf of itself and GPF II), ICE, Moneda, and Waypoint purchased bonds in the 2008 issuance. Only Plaintiffs HBK and Moneda purchased bonds in the 2013 bond issuance. Plaintiff Nordic Trustee represents HBK and Moneda's interests in the 2013 bonds.

[4] The plaintiff bank is Coöperatieve Rabobank U.A. (Rabobank).

23-13152              Opinion of the Court                    11

complaint" and "contradicting the plaintiffs' allegations." *Id.* at 1345–46, 1348.

Plaintiffs filed a second amended complaint, and Citigroup again moved to dismiss. The district court yet again granted the motion, holding that the complaint was "an impermissible shotgun pleading" and did not "meet the heightened pleading standard for fraud." At the hearing, the court said it would allow the plaintiffs leave to amend, but warned them to allege the "who, what, when and where" of the fraudulent misrepresentations and omissions.

A slimmed-down group of thirty plaintiffs filed a 541-page third amended complaint in 2022. That complaint is the operative one here, and it raises seven claims:

(1) substantive violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) under 18 U.S.C. § 1962(c);

(2) conspiracy to violate RICO under 18 U.S.C. § 1962(d);

(3) common-law fraud;

(4) common law aiding and abetting fraud;

(5) common-law conspiracy to commit fraud;

(6) vicarious liability based on actual agency; and

(7) vicarious liability based on apparent agency.

Attempting to satisfy the district court's request for more specificity, the plaintiffs attached four appendices to the complaint:

(1) a list of contracts;

12 Opinion of the Court 23-13152

(2) a table describing the major Citigroup employees involved in the scheme;

(3) a table describing additional Citigroup employees involved; and

(4) a table describing the allegedly fraudulent misrepresentations and omissions and how the plaintiffs relied on them to their detriment.

Citigroup again moved to dismiss, and the district court again obliged, dismissing all seven counts. *Otto Candies, LLC v. Citigroup, Inc.*, No. 1:16-CV-20725, 2023 WL 6418135, at \*12 (S.D. Fla. Aug. 25, 2023) (unpublished). The court disposed of the plaintiffs' substantive RICO and common-law fraud claims first, concluding that the allegations came up short on two fronts: failure to provide details about which specific misrepresentations the plaintiffs relied on, and failure to claim that their reliance was "justifiable." *Id.* at \*3–4. According to the court, these failures meant the counts fell short of Federal Rule of Civil Procedure 9(b)'s heightened requirements for pleading fraud. *See* Fed. R. Civ. P. 9(b).

The plaintiffs' RICO and common law conspiracy-to-commit-fraud claims fared no better. The court dismissed the RICO conspiracy claims for failure to plead "an agreement to the overall objective of the alleged conspiracy or an agreement to commit two predicate acts." *Otto Candies*, 2023 WL 6418135, at \*5. As for the common-law conspiracy claim, the district court found that the plaintiffs had once more failed to satisfy Rule 9(b).

Next was the plaintiffs' common-law aiding-and-abetting-fraud claim.  The district court concluded that the plaintiffs had failed to allege facts giving rise to "a strong inference of actual knowledge" on Citigroup's part about the fraud.  *Id.* at *7 (quotation omitted).  Plus, the court said, the plaintiffs failed to plead with particularity that Citigroup had substantially assisted the fraud.  That left the second and third elements of the claim unsatisfied.

Finally, the court rejected the plaintiffs' vicarious liability claims.  Though Citigroup did not dispute the existence of an agency relationship between itself, Citibank, and Banamex, the court dismissed the vicarious liability counts for the same reason it threw out the substantive RICO and fraud counts: a lack of specificity in the pleading.

This appeal followed.

## II. STANDARD OF REVIEW

We review a dismissal for failure to state a claim de novo, accepting the complaint's factual allegations as true and construing them in the light most favorable to the plaintiffs.  *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345 (11th Cir. 2022).

## III. DISCUSSION

We proceed in three parts, tracing the lower court's reasoning.  *First*, we address the plaintiffs' aiding-and-abetting claim (count four).  *Second*, we analyze the court's dismissal of the substantive RICO, common-law fraud, and vicarious liability

14                   Opinion of the Court                 23-13152

counts (counts one, three, six, and seven).  *Finally*, we turn to the plaintiffs' RICO and common-law conspiracy claims (counts two and five).

## A. AIDING AND ABETTING COMMON-LAW FRAUD

The complaint alleges that Citigroup aided and abetted OSA's fraudulent scheme so that it could financially benefit from interest and fee payments.  The district court disagreed.  Florida law governs the plaintiffs' aiding-and-abetting claim.  Though "no Florida court has explicitly recognized a cause of action for aiding and abetting fraud, Florida courts have assumed that the cause of action exists."  *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017).  The aiding-and-abetting-fraud tort has three elements: "(1) the existence of an underlying fraud; (2) that the defendant had knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the commission of the fraud."  *Id.* at 1097–98 (alterations adopted and quotations omitted).

Because the parties "do not dispute the existence of the underlying fraud," only the second and third elements—actual knowledge and substantial assistance—are relevant here.  *Otto Candies*, 2023 WL 6418135, at *6.  The district court dismissed this claim, concluding that the plaintiffs had not properly alleged either element.  We disagree.  We treat each in turn, and in the process clarify the standard for pleading knowledge for an aiding-and-abetting-fraud claim under Florida law.

### 1. KNOWLEDGE ELEMENT

The district court concluded that the plaintiffs had failed to satisfy the knowledge element.  The court acknowledged that "the element of actual knowledge may be alleged generally," but said such allegations must include "specific facts that give rise to a *strong inference of actual knowledge* regarding the underlying fraud."  *Id.* at *7 (emphasis added) (quoting *Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012) (quotation omitted)).  While the plaintiffs' allegations contained "*some* particularity," the district court explained, they did not plead facts "that would give rise to a strong inference" of actual knowledge.  *Id.*

That standard was improper.  Because confusion has crept into district courts' standards for pleading knowledge, we "take the opportunity to get our house in order."  *McDonough v. Garcia*, 116 F.4th 1319, 1321 (11th Cir. 2024) (en banc).

### a. PLEADING STANDARD FOR KNOWLEDGE

First, the basics.  The plaintiffs allege fraud, so they must satisfy the heightened pleading standards of Rule 9(b).  To meet this standard, plaintiffs must allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud."  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quotation omitted).  Though Rule 9(b) requires more particularity than the normal Rule 8(a) standard, its application "must not abrogate the concept of

16                    Opinion of the Court                    23-13152

notice pleading." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quotation omitted). Courts should "hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1318 (11th Cir. 2024) (quotation omitted). "A defendant has knowledge of an underlying fraud if it has a general awareness that its role was part of an overall improper activity." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003 (Fla. Dist. Ct. App. 2020).

Because the plaintiffs filed this lawsuit in federal court, Rule 9(b)'s specificity requirements apply. But even under that rule, the "conditions of a person's mind," including knowledge, "may be alleged generally." Fed. R. Civ. P. 9(b). That's why, in an adjacent context, we have held that a plaintiff "need not have pled [the defendant's] knowledge of the relevant contracts with specificity, even assuming Rule 9(b) applies." *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018).

It is also necessary to differentiate between the standards for pleading common-law fraud under Rule 9(b) and securities fraud under the Private Securities Litigation Reform Act (PSLRA). *See* 15 U.S.C. § 78u-4(b). Passed in 1995, the PSLRA mandates that private plaintiffs "allege facts supporting a strong inference of scienter for each defendant with respect to each violation" when pleading securities fraud, heightening the pleading standard. *Mizzaro v.*

23-13152               Opinion of the Court                    17

*Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quotation omitted); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313–14 (2007).  So in securities-fraud cases, "a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." *Mizzaro*, 544 F.3d at 1238.

Because the plaintiffs here do not bring securities-fraud claims, these requirements are inapplicable.  But some district courts have also extended the PSLRA's pleading standard, requiring plaintiffs to plead a "strong inference of actual knowledge regarding the underlying fraud" under Florida aiding-and-abetting law.[5]  *Otto Candies*, 2023 WL 6418135, at *7 (quotation omitted).

---

[5] *See, e.g.*, *Lawrence v. Bank of Am., N.A.*, No. 8:09-CV-2162-T-33TGW, 2010 WL 3467501, at *3 (M.D. Fla. Aug. 30, 2010) (unpublished); *Lamm*, 889 F. Supp. 2d at 1332; *Meridian Tr. Co. v. Batista*, No. 17-23051, 2018 WL 4693533, at *3 (S.D. Fla. Sept. 26, 2018) (unpublished); *Todd Benjamin Int'l, Ltd. v. Grant Thornton Int'l, Ltd.*, 682 F. Supp. 3d 1112, 1136–37 (S.D. Fla. 2023); *Rusty115 Corp. v. Bank of Am., N.A.*, No. 22-CV-22541, 2023 WL 6064518, at *6 (S.D. Fla. Sept. 18, 2023) (unpublished); *Metrocity Holdings, LLC v. Bank of Am., N.A.*, No. 22-CV-80980, 2023 WL 6064516, at *9 (S.D. Fla. Sept. 18, 2023) (unpublished); *Wang v. Revere Cap. Mgmt., LLC*, No. 22-CV-80884, 2023 WL 2198570, at *5 (S.D. Fla. Feb. 15, 2023) (unpublished).

18                     Opinion of the Court                  23-13152

Some have not.[6]  And still other district courts have flagged the inconsistency.[7]

Those courts requiring a heightened standard for pleading knowledge have gotten it wrong—there is no reason to import the PSLRA's standard onto Florida common-law fraud claims.  In *Mizzaro*, for example, we expressly stated that "Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made."  544 F.3d at 1237.  Rather, "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent."  *Id.*

Other decisions interpreting Rule 9(b) tell the same story. We held in *Sun Life*, for example, that "even assuming Rule 9(b) applies," the plaintiff "need not have pled" the defendant's "knowledge of the relevant contracts with specificity" because "[i]n alleging fraud knowledge may be alleged generally."  904 F.3d at

---

[6] *See, e.g.*, *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1296 (M.D. Fla. 2018) (explaining that "[t]he second element [of an aiding-and-abetting-fraud claim], whether the [defendants] had knowledge of the fraud, is not subject to the particularly [sic] requirement"); *Cabot E. Broward 2 LLC v. Cabot*, No. 16-61218-CIV, 2016 WL 8739579, at *4 (S.D. Fla. Oct. 25, 2016) (unpublished); *Platinum Ests., Inc. v. TD Bank, N.A.*, No. 11-60670-CIV, 2012 WL 760791, at *3–4 (S.D. Fla. Mar. 8, 2012) (unpublished); *Bruhl v. Price WaterhouseCoopers Int'l*, No. 03-23044-CIV, 2007 WL 983263, at *10 (S.D. Fla. Mar. 27, 2007) (unpublished).

[7] *See, e.g.*, *Angell v. Allergan Sales, LLC*, No. 3:18-cv-282-J-34JBT, 2019 WL 3958262, at *10 n.16 (M.D. Fla. Aug. 22, 2019) (unpublished).

23-13152               Opinion of the Court                    19

1215–16 (ellipses omitted) (quoting Fed. R. Civ. P. 9(b)).  So too in *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, where we concluded that "[u]nder Rule 9(b)'s standards" for pleading knowledge, "general allegations are sufficient."  671 F.3d 1217, 1224 (11th Cir. 2012).[8]

This approach makes sense.  It also comports with the text of Rule 9(b) and recognizes that a plaintiff rarely will be able to plead a defendant's actual state of mind—particularly before it has access to discovery.  In assessing a defendant's knowledge, we therefore ask whether "the plaintiff pleads factual content that allows the court to draw the reasonable inference" that a defendant knew about the alleged fraud.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[9]

---

[8] Citigroup's reliance on *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993–94 (11th Cir. 2014) (unpublished), is unpersuasive.  For starters, other unpublished cases go the other direction.  *See, e.g., W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 88 (11th Cir. 2008) (unpublished) (explaining that "Rule 9(b) permits states of mind, including knowledge, to be pled generally").  But more fundamentally, unpublished cases "are not precedential and they bind no one."  *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016).

[9] This standard matches those of most of our sister circuits, which also recognize the different pleading requirements for securities fraud and fraud under Rule 9(b).  *See, e.g., Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009); *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 471 (6th Cir. 2011); *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 & n.7 (7th Cir. 2007); *Migliaccio*

20                    Opinion of the Court                    23-13152

### b. APPLICATION OF THE PLEADING STANDARD

Applying that standard here, we conclude that the plaintiffs effectively pleaded the knowledge element of their aiding-and-abetting claim. *First*, the complaint plausibly alleges that Citigroup employees and agents themselves knew about the fraud. "Under Florida law, knowledge an agent or employee acquires within the scope of her authority generally may be imputed to her principal or employer." *Chang*, 845 F.3d at 1095. True, an exception to this general rule applies "where an individual is acting adversely to the corporation." *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (quotation omitted). But this carveout is narrow in scope: "an agent's knowledge will be imputed to the principal unless the agent's interest is entirely adverse to the principal's interest, meaning the actions must neither be intended to benefit the

---

*v. K-tel Int'l, Inc.* (*In re K-tel Int'l, Inc. Sec. Litig.*), 300 F.3d 881, 889 (8th Cir. 2002); *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1036 (9th Cir. 2016); *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002).

We recognize that the Second Circuit sees things differently. But in that circuit—even before the PSLRA's passage—plaintiffs have always had "to allege facts that give rise to a strong inference of fraudulent intent" in order "to serve the purposes of Rule 9(b)." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). That has never been the standard in this Circuit.

In the Third Circuit, the standard is less clear. *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418, 1420–21 (3d Cir. 1997); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004).

23-13152                    Opinion of the Court                    21

corporation nor actually cause short- or long-term benefit to the corporation." *Chang*, 845 F.3d at 1096 (quotations omitted).

Citigroup does not dispute that Banamex and Citibank employees acted as its agents—and for good reason. To begin, Citibank is Citigroup's "primary U.S. lending and banking entity," which acted as trustee for the 2008 bond issuance. And Banamex was a wholly owned subsidiary of Citigroup that ran the cash-advance facility on which the "fraud centers." A division within Citigroup called the Institutional Client's Group (ICG) "operated, managed, supervised, and controlled" the cash-advance facility and collaborated closely with Banamex.

We also recognize the ways in which Citigroup represented its relationship with Banamex to the plaintiffs. Take Banamex's letterhead logo, which was sent to Plaintiff Otto Candies:



Or the email signature and business card of a Banamex employee from September 2010 and April 2011, respectively:

 

22                    Opinion of the Court                    23-13152

These representations, and others like them, led the plaintiffs to "perceive[] Citigroup and Banamex as one and the same" because "ICG and Banamex employees identif[ied] themselves as employees of 'Banamex-Citi' or 'Banamex-Citigroup,'" and ICG employees "sign[ed] documents on behalf of Banamex."

One employee was responsible "for Citigroup's relationship with OSA" and helped to oversee the processing of cash-advance requests.  Another, "ICG's Pemex-Citigroup Relationship Manager and a Citigroup Managing Director," oversaw "Citigroup's relationship with Pemex," signed the Regulatory Contract on Citigroup's behalf, and "approved increases in the cash advance limit for OSA."  Citigroup terminated the managing director for his role in the fraud, and Mexican regulators declared them both criminally responsible.

Nor were the actions of Banamex and Citibank employees "entirely adverse" to Citigroup's interests.  After all, Citigroup "collected tens of millions of dollars in interest every year" from the cash-advance scheme alone.  And in an appendix to the complaint, the plaintiffs detailed how certain Citigroup employees—including "ICG's Pemex-Citigroup Relationship Manager and a Citigroup Managing Director" and the "CEO of Citigroup's ICG-GTS for Mexico"—were aware of (and actively participated in) the fraud.[10]

---

[10] Citigroup's ICG is divided into five groups, of which Global Transaction Services (GTS) is one.

23-13152                    Opinion of the Court                    23

Citigroup's own acts and statements also support the plaintiffs' contentions that Citigroup employees knew of the fraud. The bank's then-CEO, Michael Corbat, announced that Citigroup had fired an employee who the company "believe[d] was directly involved in the fraud." And Citigroup's subsequent investigation led to it terminating eleven other employees, including "four Managing Directors, two of whom are business heads in Mexico," because their "actions or inactions failed to protect our company from this fraud." Conceding criminal involvement in fraud requires knowledge of that fraud. Corbat's statements, together with Citigroup's subsequent remedial actions, are enough to plausibly show that Citigroup employees and agents knew about the fraud.

The district court resisted these conclusions. Addressing Corbat's admission, the court labeled "misleading" the plaintiffs' assertion that Citigroup had fired an employee "because he was 'criminally involved' in the fraudulent scheme." *Otto Candies*, 2023 WL 6418135, at *6 (quoting operative complaint). Citigroup, the court said, had only admitted to terminating an employee "who it believed was directly involved in the fraud," but had not said that it fired the employee for being "criminally involved" in the fraud. *Id.* (alterations adopted and emphasis deleted). That is a rather fine distinction. And in any event, that purported interpretation of the statement is quite flimsy considering that Mexican authorities eventually brought criminal charges against multiple Citigroup employees. More on that below.

24                    Opinion of the Court                    23-13152

Citigroup, for its part, contends that the complaint "provides no support" for the plaintiffs' characterization that "*Citigroup* employees were involved in the fraud." To start, it makes the odd assertion that Corbat's statement could mean that Citigroup fired a non-Citigroup employee. It would be peculiar for Citigroup's then-chief executive to issue a "Dear Colleagues" memorandum—on formal Citigroup letterhead, no less—to disclose the termination of an employee from a *different* company.

On top of that, the plaintiffs have pointed to several employees—including three employees who used ICG or "Citi" email addresses and identified themselves as either Citigroup or Banamex employees—involved in the scheme. Even if these persons were theoretically Banamex employees, Citigroup conceded that they functioned as Citigroup's agents. It is immaterial whether the terminated employee was a Citigroup or Banamex employee because that person's actions are imputed to Citigroup. *See Chang*, 845 F.3d at 1095. In short, Citigroup fights the factual allegations of the complaint. But its efforts to litigate the nuances of the agency relationship between itself and Banamex are better suited for summary judgment than a motion to dismiss.

Aside from the statements of its own employees and agents, the actions of Mexican authorities bolster the plaintiffs' allegations that Citigroup knew about the fraud. The Mexican government found that Citigroup employees were criminally responsible for "extending loans they know recipients cannot repay" and

"knowing participation in the fraudulent scheme." Arrest warrants were issued for three Citigroup ICG employees.

The district court rejected reliance on this allegation because "Mexican law does not necessarily mirror the standard" applicable in American courts. *Otto Candies*, 2023 WL 6418135, at *8. True enough. But also beside the point—of course neither foreign law nor foreign regulators bind this Court. Even so, the Mexican authorities' conclusions make it less plausible that Citigroup employees or agents were in fact unaware of the alleged scheme.

What's more, the discrepancies between the cash-advance values and the underlying Pemex contracts render it plausible that Citigroup knew of the fraud. Consider the sheer volume of the disparities. OSA once requested a cash advance of $126 million on a contract paying $39 million annually. Another request asked for "approximately $110 million on a contract that only paid $23 million annually." Ultimately, OSA's requests exceeded the amount of the Pemex contracts by over $200 million.[11]

"Simply put, the numbers did not add up." *Gilison*, 303 So. 3d at 1003. Citigroup is one of the world's most sophisticated financial institutions, and it strains credulity to conclude that,

---

[11] The plaintiffs contend that this number lowballs the true figure. That's because "Citigroup limited its internal investigation to 166 cash advance requests (totaling approximately $430 million), even though, according to the documents it provided to the PGR [Mexican Attorney General's Office] in or around March 2014, Oceanografía submitted approximately 223 cash advance requests (totaling approximately $750 million) over that period."

26                    Opinion of the Court                    23-13152

assuming the plaintiffs' allegations are true, Citigroup lacked awareness of OSA's activities.

In sum, the plaintiffs' complaint meets the knowledge pleading standard allowed under Rule 9(b). The complaint sufficiently pleads that Citigroup employees and agents knew about and participated in the alleged fraud.

### 2. SUBSTANTIAL-ASSISTANCE ELEMENT

To plead an aiding-and-abetting-fraud claim, a plaintiff must also show that the defendant substantially assisted the fraud. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Chang*, 845 F.3d at 1098 (quotation omitted). Pleading substantial assistance "requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Gilison*, 303 So. 3d at 1004 (quotation omitted). Providing funds to enable fraud qualifies as supplying substantial assistance under Florida law. *Id.* And because pleading substantial assistance involves "the circumstances constituting fraud," it must be alleged with particularity. Fed. R. Civ. P. 9(b).

Parsing the complaint reveals allegations that Citigroup provided "substantial assistance" to OSA by any measure of that phrase. Take its approval of hundreds of millions of dollars of cash advances to OSA, which far exceeded the value of the Pemex contracts. These cash injections were critical to OSA's performance of its basic functions—and also to perpetuating the

fraud. The advances, and the imprimatur that they provided for the stability of the cash-advance facility, convinced the plaintiffs to invest, and maintain their investments, in what looked like a lucrative investment opportunity. Plaintiff MADISA, for instance, received OSA's 2010 and 2011 financial statements in a March 20, 2012, email. The documents "discussed OSA's cash flow from the Citigroup cash advance facility," suggesting that "OSA had sufficient cash flow to pay MADISA." And that, in turn, convinced MADISA "to renew OSA's line of credit in 2012" and "continu[e] to do business with OSA between 2012 and 2014." Without representations like these, OSA's liquidity would have dried up.

The plaintiffs point to other examples of Citigroup's assistance, too. For one, Citigroup helped prepare a December 2013 presentation given to Plaintiffs HBK, Moneda, Nordic, and Waypoint that was designed to "maintain investor confidence in OSA and solicit new investors." A slide from the presentation prominently features Citigroup's logo:



This detail conveyed Citigroup's endorsement of the presentation's content and communicated to the presentation's audience that OSA was a "financially strong" investment. Because a "highly regarded international bank"—indeed, "one of the largest financial institutions in the world"—backed the cash-advance facility, the plaintiffs assumed that the facility was "stable, reliable and sufficiently controlled." Hindsight, of course, revealed the opposite. The SEC concluded that "throughout the life of the Banamex-OSA accounts receivable factoring facility, Banamex's internal accounting controls were insufficient to appropriately evaluate numerous red flags." Citigroup Inc., Exchange Act Release No. 83,858, 2018 WL 3913653, at *6 (Aug. 16, 2018).

The complaint is replete with alleged examples of Citigroup's substantial assistance to OSA's fraud, and we include a few below:

- At an April 5, 2011, meeting between Plaintiff Gulf, Citigroup, and OSA, a Citigroup senior executive vouched for OSA's stability. The Citigroup executive told Gulf that Banamex "support[ed] Oceanografía's finances" and that "all Oceanografía payments were coming through them [Banamex]." These statements convinced Gulf to lease a vessel called the Titan 2 to OSA from April 2011 to February 2014.

- During a September 26, 2012, telephone conference between Plaintiff Otto Candies, Citigroup, and OSA, a Citigroup senior executive told Otto Candies that OSA's debt was "quite over collateralized." OSA would therefore be able to settle its debt. OSA could not pay its debt,

however, leaving Otto Candies unable to recover "the unpaid debt of approximately $120 million, and the loss of the use of the 21 vessels Candies leased to OSA" that were "worth hundreds of millions of dollars."

- In a February 23, 2011, email exchange, Citigroup—acting as trustee of the 2008 bond issuance through a Citibank vice president—provided Plaintiff ICE with "OSA's audited financial statements for 2009 and quarterly financial statements for 2010."  Based on the financial metrics it received from Citibank, ICE retained the bonds.

The plaintiffs allege that each of these communications, among others, either misrepresented or omitted mention of the fraudulent cash-advance scheme and OSA's true financial condition.  And in response to the district court's request that they plead their allegations in a manner that was "clear to understand," the plaintiffs appended a chart chronicling "Plaintiff by Plaintiff Examples of Aiding and Abetting Claims."

Citigroup fights these allegations, arguing that the plaintiffs "fail to identify facts" showing "substantial assistance on the part of *Citigroup*" rather than "Banamex or other Citigroup subsidiaries." That's a nonstarter.  As we have explained, the complaint thoroughly alleges that Citigroup ICG employees both knew of and substantially assisted the commission of the fraud.  And even if *Citigroup* employees lacked knowledge or did not abet the fraud, actions of the company's agents are imputed to the company.  *See Chang*, 845 F.3d at 1095.  Finally, based on the allegations in the complaint, we question Citigroup's characterization of its role as

simply providing "basic banking services" to OSA.  But even if true, that would not win the day for Citigroup.  The simple "performance of ordinary business transactions" can "satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort."  *Id.* at 1098 (quotation omitted).

After reviewing the allegations in the complaint and appendices, we are satisfied that each plaintiff pleaded the substantial-assistance element with requisite particularity.  *See, e.g.*, Doc. 187 ¶¶ 408 (Adar), 512 (Ashmore), 563–66 (Copernico), 682, 687 (GPF II), 767 (HBK), 894 (ICE), 1031 (Moneda), 1100–05 (Nordic Trustee), 1167 (Waypoint), 1300 (Otto Candies), 1372 (Coastline), 1472 (De Hoop), 1508 (Gulf), 1570 (Halani), 1612 (MADISA), 1706 (Rabobank); *see also id.* ¶¶ 87–88, 130–32, 1241–45. We therefore agree with the plaintiffs that the "fraud could not have existed without Citigroup's assistance."

The plaintiffs, in short, have adequately pleaded that Citigroup knew about the fraud and substantially assisted its commission.  Because the district court concluded otherwise, we reverse its dismissal of this count.

## B. COMMON-LAW FRAUD, RICO, AND VICARIOUS LIABILITY

We now move to the common-law fraud claim (count 3), the substantive RICO claim (count 1), and vicarious liability claims (counts 6 and 7).  The district court dismissed these claims as a

group for the same reasons. But because different standards apply to them, we will break them apart.

### 1. COMMON-LAW FRAUD

We start with common-law fraud because the plaintiffs' fraud allegations form the heart of their complaint. Florida law requires a plaintiff to allege four things to plead a fraud claim: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (emphasis deleted and quotation omitted). "Fraud also includes the intentional omission of a material fact." *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. Dist. Ct. App. 2001). Where "failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous." *Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985). Should a "party in an arm's length transaction undertake[] to disclose information, all material facts must be disclosed." *Gutter v. Wunker*, 631 So. 2d 1117, 1118–19 (Fla. Dist. Ct. App. 1994). And even if "a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, if he undertakes to do so he must disclose the whole truth." *Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. Dist. Ct. App. 1985).

Finally, because the plaintiffs sued in federal court, the requirements of Rule 9(b) apply. So they must "plead the who,

32                  Opinion of the Court                  23-13152

what, when, where, and how of the allegedly false statements." *Mizzaro*, 544 F.3d at 1237.  But the plaintiffs may still "allege generally that those statements were made with the requisite intent." *Id.*

The district court dismissed the plaintiffs' fraud claims for not satisfying Rule 9(b).  The court criticized the plaintiffs for "mostly offer[ing] vague and conclusory statements that they suffered damages/injuries because they relied on Citigroup's alleged misrepresentations." *Otto Candies*, 2023 WL 6418135, at *3. It further concluded that they had neither provided the "details about the specific misrepresentations that they relied on" nor showed "how any misrepresentations informed their decision to invest in OSA." *Id.* at *3–4.  We think that the plaintiffs properly pleaded both specific misrepresentations and reliance on those misrepresentations.  The same goes for omissions.

### a. MISREPRESENTATIONS AND OMISSIONS

The complaint details Citigroup's responsibility for both its own misrepresentations and omissions and those of third parties like OSA.

### Direct Misrepresentations

We start with the plaintiffs' allegations of direct misrepresentations.  The plaintiffs say that Citigroup was directly involved in the fraud in five ways:

(1) executing the 2012 Regulatory Contract with OSA;

(2) approving increases in OSA's cash-advance limit;

23-13152              Opinion of the Court              33

(3) greenlighting OSA's submission of false documentation to support its cash-advance requests;

(4) misrepresenting and omitting the details of the scheme—and OSA's true financial condition—to the plaintiffs; and

(5) "directing and supervising Banamex employees" who helped perpetrate the fraud.

Citigroup, in contrast with the district court, implicitly acknowledges that Plaintiffs Ashmore, GPF II, ICE, Moneda, Otto Candies, Gulf, and Rabobank allege misrepresentations made by Citigroup itself.

We highlight several examples. Plaintiff Otto Candies alleges that on May 13, 2011, it met with senior Citigroup executives, among others, to discuss OSA's outstanding debt. During the meeting, Citigroup said it was helping OSA restructure its debt to Otto Candies, even though the executives recognized that OSA's liquidity crisis made such a restructuring impossible. A telephone conference on September 26, 2012, followed. There, another Citigroup ICG senior executive described OSA's debt to Otto Candies as "quite over collateralized," meaning that investors could recoup their investment should OSA default. This was not true—OSA's cash flow hung by a thread, largely dependent on the fraudulent advance system propped up by Citigroup.

When Otto Candies finally had enough, it sent Citigroup a demand letter for millions in unpaid fees from OSA. Citigroup employees requested that Otto Candies withdraw the letter. On a February 19, 2014, phone call, Citigroup assured Otto Candies that

34                    Opinion of the Court                    23-13152

its "financial guys" would solve OSA's debt problem; indeed, the bank was collaborating with OSA to "cover[]" the debt owed to creditors. In other words, Citigroup suggested that it would make sure OSA survived its financial difficulties. But by this point Citigroup had begun to investigate the scheme and intended to shutter the cash-advance facility. In fact, a Citigroup representative on the call knew of the bank's investigation because of his "dual role as a senior Citigroup ICG executive and Pemex-Citi Relationship Manager." Yet none of this information was communicated to Otto Candies. Unaware but reassured, Otto Candies "declined to take other action against OSA to recover the debt owed."

Otto Candies was not the only plaintiff misled. In conversations "on or around" February 21, 2014, Citigroup reassured a group of bondholders, including Plaintiffs Ashmore, GPF II, ICE, and Moneda, that OSA's financial outlook was stable. Citigroup told the plaintiffs that it wanted to have "a constructive and proactive approach" to prevent an OSA default. Citigroup's approach—potentially terminating the cash-advance facility, "OSA's primary and most important source of liquidity"—was not what the plaintiffs expected, however.

The complaint also alleges multiple direct misrepresentations or omissions by Citigroup's agents. Plaintiffs ICE and MADISA, for example, assert that they were misled by direct communications from either Citibank or Banamex. ICE points to a February 23, 2011, email exchange, where a Citibank

vice president provided OSA's audited financial statements from 2009 and quarterly statements from 2010. MADISA highlights the March 2013 "CitiConnect" Agreement between itself and Banamex, in which a Banamex employee promised that MADISA would encounter "no problem receiving payments from Oceanografía." And Plaintiffs ICE and Moneda pleaded that Citibank affected their investment decisions when it circulated OSA's fraudulent financial statements to the plaintiffs on February 23, 2011, and July 15, 2013, respectively. These are only a few examples—the plaintiffs allege a wide range of other misstatements and omissions by Citigroup or its agents.[12]

The district court labeled these "general allegations" and said they were insufficient to satisfy Rule 9(b). *Otto Candies*, 2023 WL 6418135, at *6. That gives the complaint too little credit. At its hearing on Citigroup's motion to dismiss the second amended complaint, the district court instructed the plaintiffs to "be pretty clear about what the fraudulent misrepresentations and omissions were; provide the who, what, when and where in a succinct way so that it's clear to understand." As we have explained, the

---

[12] *See, e.g.*, **Ashmore**: Doc. 187 ¶¶ 413, 416, 429, 488–92; Doc. 187-4 at 2; **GPF II**: Doc. 187 ¶¶ 573–77, 590, 631–32, 663–64; Doc. 187-4 at 6; **Halani**: Doc. 187 ¶¶ 1544–48; **ICE**: *id.* ¶¶ 775, 779, 815–16, 1747; Doc. 187-4 at 12–13, 15; **Moneda**: Doc. 187 ¶¶ 233–44, 903, 937–42, 1007–11; Doc. 187-4 at 16; **Otto Candies**: Doc. 187 ¶¶ 130–32, 1241–45, 1251, 1258–67, 1283–90, 1295; Doc. 187-4 at 21–22; **Gulf**: Doc. 187 ¶¶ 1488–95; Doc. 187-4 at 27; **MADISA**: Doc. 187 ¶¶ 1577–78, 1601–06; Doc. 187-4 at 29; **Rabobank**: Doc. 187 ¶¶ 130–32, 1621–23, 1669–70, 1675–76, 1688–90, 1694–96; Doc. 187-4 at 30–31.

plaintiffs followed through on that request. The complaint contains detailed allegations of the "who, what, when, where, and how" for each plaintiff. *Mizzaro*, 544 F.3d at 1237. And the complaint's appendices summarize the misrepresentations and omissions in a "succinct way" that is "clear to understand"—in other words, just what the district court directed.

To be sure, Rule 9(b) applies here. But even in cases where a plaintiff does not plead the precise date and time of every allegedly false statement, the higher pleading threshold does not nullify the complaint's allegations if a "plaintiff has substantial prediscovery evidence of those facts." *Gose*, 109 F.4th at 1318 (quotation omitted). And we have suggested that Rule 9(b)'s pleading standards "should be relaxed" in "appropriate circumstances to aid those alleging prolonged multi-act schemes"—like the one alleged here—if the plaintiff alleges "at least some examples" to "lay a complete foundation for the rest of his allegations." *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002). A contrary "application of the rule" would "abrogate the concept of notice pleading," which it cannot do. *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988).

We ask instead whether the plaintiffs accompanied their complaint with sufficient detail of the underlying acts that allegedly constitute fraud to provide defendants with notice of the "precise misconduct with which they are charged." *Id.* (quotation omitted). Given the breadth and depth of the allegations in the complaint and

accompanying appendices, we do not see how the plaintiffs could have pleaded their fraud claims with greater specificity.

Resisting these conclusions, Citigroup wrangles over the factual allegations. But its counterarguments are not persuasive. Plaintiff Gulf alleges that a Citigroup employee vouched for OSA's finances at an April 2011 meeting. Citigroup counters that this speaker was a Banamex employee, not a Citigroup ICG representative. This dispute is one best resolved at summary judgment. Citigroup also contends that it did not make any disclosures to the plaintiffs that could have made it liable for fraudulent omissions, but that contradicts dozens of allegations in the complaint. And at this stage, we must construe all facts and inferences in the light most favorable to the nonmoving party—here, the plaintiffs.

### Third Party Misrepresentations and Omissions

The bondholding plaintiffs also seek to hold Citigroup accountable for the misrepresentations and omissions of third parties, including OSA. That's because, they say, Citigroup recognized that certain investment materials it had a hand in assembling or circulating would be transmitted to the plaintiffs "on Citigroup's behalf and with Citigroup's imprimatur." And though Citigroup knew that these materials contained misrepresentations or material omissions, it did nothing.

The district court disagreed. It found that because many of the misrepresentations or omissions alleged in the complaint were made by OSA, they could not be attributed to Citigroup.

38                    Opinion of the Court                 23-13152

Citigroup, for its part, agrees that OSA's statements are not enough, and contends that Plaintiffs Adar, Copernico, HBK, Nordic, Waypoint, Coastline, De Hoop, Halani, and MADISA did not share "any substantive communications whatsoever" with Citigroup or its agents.[13]

We agree with the plaintiffs that OSA's misrepresentations and omissions can lead to liability for Citigroup.  Florida law imposes civil liability for third-party misrepresentations in certain cases.  *See Forbes v. Auerbach*, 56 So. 2d 895, 900 (Fla. 1952); *Reimsnyder v. Southtrust Bank, N.A.*, 846 So. 2d 1264, 1270 (Fla. Dist. Ct. App. 2003).  Indeed, the Florida Supreme Court permits recovery for "misrepresentation as to a third party's financial condition" when, "for the purpose of inducing another to lend money or sell goods," a party "misrepresent[s] the solvency or financial responsibility" of the third party.  *Forbes*, 56 So. 2d at 900.

The Second Restatement of Torts, which has been cited approvingly by the Florida Supreme Court, is also instructive.  *See First Fla. Bank, N.A. v. Max Mitchell & Co.*, 558 So. 2d 9, 14–15 (Fla. 1990).  It explains that in certain cases, those who make fraudulent misrepresentations can be held liable for statements conveyed to third parties:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the

---

[13] We note, however, that contrary to Citigroup's claim, MADISA allegedly communicated with its agent, Banamex, about the "CitiConnect" agreement.

> misrepresentation, although not made directly to the
> other, is made to a third person and the maker intends
> or has reason to expect that its terms will be repeated
> or its substance communicated to the other, and that
> it will influence his conduct in the transaction or type
> of transaction involved.

Restatement (Second) of Torts § 533 (Am. L. Inst. 1977). Indeed, for fraudulent misrepresentations, liability extends to "those whom [the speaker] has reason to expect it to reach and influence." *Id.* cmt. d. This "class" may include "potential sellers, buyers, creditors, lenders or investors, or others who may be expected to enter into dealings in reliance upon the misrepresentation." *Id.* § 531 cmt. e. And "if [the speaker] is aware of the intention of the third person to make use of the misrepresentation by communicating it to others, he has a special reason to expect that it will be so communicated and will be relied on." *Id.* § 533 cmt. d. Overall, the message is clear: "Florida law does not require that the defendant directly communicate any fraudulent misrepresentation to the plaintiff." *Globe Commc'ns Corp. v. R.C.S. Rizzoli Periodici, S.p.A.*, 729 F. Supp. 973, 977 (S.D.N.Y. 1990); *see also Albertson v. Richardson-Merrell, Inc.*, 441 So. 2d 1146, 1150 (Fla. Dist. Ct. App. 1983).

Applied here, the plaintiffs pin liability on Citigroup for two categories of misrepresentations or omissions made by third parties. First are those related to Citigroup's communications with OSA's external financial consultant. Second are misrepresentations and omissions regarding the bank role's in producing and helping

40                    Opinion of the Court                    23-13152

to distribute investor materials.  These materials include: (1) the December 2013 and January 2014 investor presentations and (2) the so-called "Pareto Materials," which were given to investors like the plaintiffs.[14]  After careful review, we agree that all plaintiffs have adequately pleaded Citigroup's liability for these misrepresentations and omissions.

*First*, the plaintiffs argue that Citigroup is liable for the misrepresentations of OSA's external financial consultant.  OSA retained the consultant between 2010 and 2013 to "assist OSA in restructuring its debt to Plaintiffs Candies and Rabobank."  In this capacity, the consultant "communicated and worked directly with Citigroup," "received information from Citigroup" about OSA's financial condition, debt, and the cash-advance facility, and then "disseminated it to at least Plaintiffs Candies and Rabobank."  The consultant also communicated or met with several plaintiffs, including Ashmore, De Hoop, GPF II, ICE, MADISA, Moneda, Gulf, and Halani.

All the while, Citigroup was "aware" that the consultant "was relaying information and documents" it received "to Plaintiffs who inquired about OSA's finances" when determining whether to invest in OSA.  That's because (1) the consultant maintained a consistent line of communication with Citigroup; (2) Citigroup and Banamex (as well as OSA) "participated in meetings and telephone

---

[14] OSA hired Pareto to manage the 2013 bond issuance.  Pareto consists of Pareto Securities AS, Pareto Securities Pte. Ltd., and Pareto Securities, Inc. For ease of reference, we refer to them collectively as "Pareto."

23-13152                Opinion of the Court                41

conferences" between the consultant and the plaintiffs; and (3) the purpose of retaining the consultant was to restructure OSA's debt, which necessitated "providing assurances about OSA's finances and the strength and reliability of the cash advance facility." But the consultant remained ignorant of the scheme, instead functioning as an unaware middleman between OSA, Citigroup, and investors.

A few examples add color. They also underscore why it makes sense to hold Citigroup responsible for the misrepresentations of the OSA consultant. Consider:

- A January 21, 2014, phone conversation where the consultant told Plaintiff ICE that media reports highlighting "irregularities" in OSA/Pemex contracts were false. Instead, "any discrepancy is a Pemex bookkeeping error" because "Oceanografía has never defaulted on a Pemex contract." The consultant promised that "everything will be fine." Everything, it turned out, was not fine—ICE has not recovered principal or interest on its purchase of the 2008 bonds.

- On May 9, 2013, representatives from Plaintiff Halani, OSA, OSA's consultant, and Citigroup met to discuss OSA's debt to Halani. The consultant introduced the Citigroup representatives as "the guys from Citibank" before "assur[ing] Halani that OSA would pay the past due amounts and timely make the future lease payments." Halani is owed roughly $14 million in overdue lease payments.

- On January 27, 2012, the consultant and Fatma Kamara from Plaintiff Ashmore met.  During the meeting, the consultant explained that he had "a plan for the company [OSA] and the liquidity/connections to be successful" and that OSA had "settled a number of disputes/extensions with the banks." Given Citigroup and OSA's "constructive manner" of attack to improve OSA's financial condition, the consultant recommended that Ashmore "be a buyer of more paper at these levels."  But Citigroup's submission of false financial information to the consultant—and knowledge that the consultant used it to pitch investors—falsely forecasted "improvements in OSA's financial situation" and misrepresented "OSA's plan for increased liquidity." Indeed, "Ms. Kamara at Ashmore would routinely call Citigroup for confirmation of the information."

- On February 4, 2011, the consultant met Mario Trevino from Plaintiff MADISA to discuss "renewing OSA's credit line" with a MADISA distributor.  The consultant reassured Trevino that OSA had sufficient liquidity to make timely payments, telling him that "everything is ok" because OSA's "big line of credit with Banamex" would ensure payment. This convinced MADISA to renew OSA's line of credit despite its "doubts given OSA's untimely payments for a prior line of credit."

These allegations, and others like them, are "classic illustration[s] of fraud" where one party has "superior knowledge" and yet fails to disclose information "which is not discoverable by ordinary observation." *Nessim v. DeLoache*, 384 So. 2d 1341, 1344 (Fla. Dist. Ct. App. 1980).  ICE, Gulf, and Halani had no way to

23-13152                Opinion of the Court                43

discern OSA's true financial condition.  Apart from performing their own due diligence, the plaintiffs relied on OSA's financial consultant and on Citigroup—a "highly regarded international bank"—for its "purported neutrality as a third-party, expertise and professionalism."

Citigroup, on the other hand, was in a unique position given its intimate knowledge of OSA's financial condition.  After all, the bank served as trustee and collateral agent of OSA's 2008 bond issuance (through Citibank and Banamex) and as trustee of a trust established for 2013 bondholders.  And when "the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group"—as Citigroup recognized that the consultant would distribute the information that it received from Citigroup to the plaintiffs—that party can be held accountable.  *First Fla. Bank*, 558 So. 2d at 15 (quotation omitted).

*Second*, the plaintiffs allege that Citigroup is responsible for misrepresentations and omissions related to (1) the December 2013 and January 2014 investor presentations, and (2) the preparation and distribution of the Pareto Materials.  Citigroup, the complaint alleges, contributed to the misrepresentations within these investor materials by "knowingly providing misleading information and omitting key facts."  And as before, Citigroup recognized that these misrepresentations would be distributed to OSA's investors.  The district court did not credit these allegations.  It instead found that the plaintiffs "mostly offer vague and

conclusory statements that they suffered damages/injuries." *Otto Candies*, 2023 WL 6418135, at *3. We see things differently.

Start with the December 2013 and January 2014 investor presentations. Conceived by Citigroup to "re-acquaint debt investors" with OSA's "story," these presentations were adapted by OSA to "maintain investor confidence" and "solicit new investors." But Citigroup still played a role. At one December meeting, two Citigroup employees presided while OSA's consultant delivered a presentation aboard the Goliath shipping vessel—a vessel OSA had acquired with funds raised in the 2013 bond issuance.

Citigroup also played a key role in arranging another December investor presentation given to Plaintiff Moneda, among other investors. Not only that, but Citigroup's logo was affixed to "each page" of the presentation, suggesting to investors that a "highly regarded international bank" vouched for its contents. Nodding to the cash-advance facility, the presentation promised that "OSA engages in recourse factoring with Mexican banks to minimize days receivable and ensure sufficient liquidity." But this statement omitted important details, including the lack of internal controls.

Next, the plaintiffs allege that they may sue Citigroup for its role in helping to prepare and distribute the Pareto Materials. The gist: Citigroup provided misleading information and omitted key facts about OSA's financial condition, recognizing that this information would be incorporated into investor materials and "distributed to and relied upon" by the plaintiffs.

Here is one example.  To acquire the Goliath vessel, OSA issued $160 million in bonds as part of its 2013 bond issuance.  OSA hired Pareto to manage the bond issuance and Plaintiff Nordic Trustee to serve as trustee.  Pareto needed "information and documents" from OSA and Citigroup to raise capital and solicit investors—and Citigroup was in a prime position to supply such information.   It worked as OSA's banker, had functioned previously as "trustee and collateral agent of the 2008 Bond Issuance through Citibank and Banamex," and served as trustee of the "Mexican Trust."  The latter position was significant because it "ensure[d] the security and service of the 2013 bonds," reassuring the 2013 bondholders that if OSA defaulted, they would be compensated.

After receiving OSA's financial data from OSA and Citigroup, Pareto synthesized and distributed it to investors between May 2013 and early 2014.  The Pareto Materials were circulated to the plaintiffs at several junctures and through several avenues.[15]  They were also distributed via in-person solicitations. Ultimately the Pareto Materials were circulated to Plaintiffs Adar,

---

[15] These avenues included (1) a September 3, 2013, Preliminary Offering Memorandum; (2) a September 2013 Pareto Investor Presentation; (3) a September 2013 Pareto Credit Analysis Presentation, which called the cash flow "solid and sufficient" to service the bond and explained that "Pemex expects to invest more than 110bn over the coming years"; (4) weekly periodic reports to investors between starting in October 2013; and (5) an investor site for the bond issuance, which included "financial reports" and "company presentations," all of which were accessed by the 2008 and 2013 bondholders between "October 2013 and February 2014."

Ashmore, Copernico, GPF II, HBK, ICE, Moneda, Nordic, Waypoint, and Halani.

The problem?  The information Citigroup funneled to Pareto boasted of "positive financial forecasts and cash flow for OSA" and pledged "that bondholders would be protected by the Mexican Trust" through "Banamex's role as fiduciary of such Trust."  Yet Citigroup omitted any mention of the mounting problems with the cash-advance facility or the shakiness of OSA's finances.  And that was not because Citigroup did not know; from "at least" 2010 to 2013, "OSA sent to Citigroup its annual audited financial statements" as well as "other financial and operational information detailing its financial condition."  Citigroup, in other words, had "full access" to the relevant information.

The 2013 Pareto Materials also incorporated information from OSA's 2008 bond offering.  These materials, including the "2008 Offering Memorandum" and the "2008 Bond Indenture," were distributed "to all 2008 Bondholders, including the 2008 Bond Plaintiffs."   But they too contained false and misleading information about OSA's financial condition, especially the cash-advance facility.  Citigroup likewise never updated the 2008 bond documents before their incorporation into the Pareto Materials even though circumstances had materially changed during that five-year period.  The plaintiffs assert that the deterioration of OSA's financial condition, Pemex's refusal to pay certain Banamex invoices, and Citigroup's freezing of the cash-advance facility in 2010 all necessitated the revision of the 2008 bond documents.  Yet

23-13152               Opinion of the Court                    47

"with Citigroup's knowledge," those unedited materials were circulated to investors between 2009 and early 2014 "to solicit investments in both the 2008 and 2013 bonds."

Citigroup understood, moreover, that the Pareto Materials would be distributed to investors like the plaintiffs. And documents encompassing "future profitability projections" and describing "protections for bondholders" would naturally be among the most important for investors. Although only Plaintiffs Moneda and HBK purchased bonds from the 2013 issuance, each bondholding plaintiff received materials from Pareto.[16] Those that

---

[16] As a reminder, the bondholding plaintiffs purchased and retained bonds—from either the 2008 bond issuance, the 2013 bond issuance, or both—at different junctures:

- **Adar**: Only purchased 2008 bonds. Retained those bonds through 2014. Received Pareto Materials in September 2013 and partially relied on them in maintaining investment in 2008 bonds.

- **Ashmore**: Only purchased 2008 bonds. Retained those bonds through 2014. Received Pareto Materials at a September 6, 2013, meeting with OSA and Pareto. Partially relied on these materials in maintaining investment in 2008 bonds.

- **Copernico:** Only purchased 2008 bonds. Retained those bonds through 2014. Received Pareto Materials shortly after a September 9, 2013, meeting with Pareto representatives. Partially relied on these materials in maintaining investment in 2008 bonds.

- **GPF II:** Only purchased 2008 bonds. Those bonds are now held by Plaintiff HBK. Received Pareto Materials on or around September 9,

48                    Opinion of the Court                    23-13152

did not buy bonds through the 2013 issuance allege that they *retained* their prior investments in OSA (*i.e.*, from 2008 bond issuance) or *invested* in OSA as late as 2013 in reliance on the Pareto Materials.

Relatedly, the complaint alleges that Citigroup knew about the false, misleading, and omitted information in OSA's financial statements. But Citigroup helped to distribute them anyway.[17]

_____

2013, via email. Partially relied on these materials in maintaining investment in 2008 bonds.

- **HBK:** Purchased both 2008 and 2013 bonds. Met with Pareto representatives multiple times in September 2013 and received Pareto Materials in or around this time. Partially relied on these materials in maintaining investment in 2008 bonds.

- **ICE:** Only purchased 2008 bonds. Retained those bonds through 2014. Received Pareto Materials on September 3, 2013. Partially relied on these materials in maintaining investment in 2008 bonds.

- **Moneda:** Purchased both 2008 and 2013 bonds. Retained those bonds through 2014. Received Pareto Materials in September 2013. Partially relied on these materials in maintaining investment in 2008 bonds.

- **Nordic Trustee:** Does not hold bonds from the 2008 Bond issuance; represents the interests of all 2013 bondholders, including Moneda and HBK.

- **Waypoint:** Only purchased 2008 bonds. Retained those bonds through 2014. Listened to a presentation by a Pareto representative about the Pareto Materials in September 2013. Partially relied on these materials in maintaining investment in 2008 bonds.

[17] This allegation excludes situations in which Citigroup distributed OSA's financial information directly to investors.

23-13152          Opinion of the Court          49

Between 2008 and 2014, OSA issued—"at a minimum"—annual financial statements from 2018 to 2012 and quarterly statements from 2010 to 2013.  These were distributed to 2008 and 2013 bondholders like the plaintiffs.

Even so, none of OSA's "annual or quarterly financial statements" suggested problems with the cash-advance facility, "OSA's primary source of liquidity and cash flow."  Nor did the data divulge that between 2008 and 2010, Pemex had rebuffed requests to pay Banamex for certain invoices where Banamex had advanced OSA payment.  *See* Citigroup Inc., Exchange Act Release No. 83,858, 2018 WL 3913653, at *5 (Aug. 16, 2018).  Still, Citigroup either distributed these materials through Citibank or sat idly by while they were given to the plaintiffs.  Because "[f]raud also includes the intentional omission of a material fact," the plaintiffs satisfy that threshold.  *Ward*, 777 So. 2d at 1146.

⋆          ⋆          ⋆

The district court did not address these allegations.  Its oversight ignored how the plaintiffs pleaded the "who, when, how, and to whom" about misrepresentations and omissions.  We have recounted only a sampling of the plaintiffs' allegations, and are confident that they have pleaded more than enough.  Indeed, we see little more that the plaintiffs could have pleaded in alleging the misrepresentations and omissions.

"Fraud may be proven by showing a series of distinct acts, each of which may be a badge of fraud and when taken together as a whole, constitute fraud."  *Allen v. Tatham*, 56 So. 2d 337, 339 (Fla.

50                    Opinion of the Court                 23-13152

1952).   The complaint pleads that Citigroup both directly and indirectly misrepresented and omitted information relevant to the plaintiffs' investments in OSA.   The mosaic of fraud that the plaintiffs have put forth, alleged with appropriate specificity, satisfies Rule 9(b).   The district court erred in finding otherwise.

### b. RELIANCE

Pleading a misrepresentation alone is not enough to show fraud.   Reliance is required, too.   To establish reliance under Florida law, the plaintiffs must show that "but for the alleged misrepresentation or nondisclosure, the party would not have entered the transaction."  *Humana, Inc. v. Castillo*, 728 So. 2d 261, 265 (Fla. Dist. Ct. App. 1999).   Under Rule 9(b), a "bare allegation of reliance on alleged misrepresentations, bereft of any additional detail, will not suffice."  *Wilding v. DNC Servs. Corp*, 941 F.3d 1116, 1128 (11th Cir. 2019).   So, alleging "the technical elements of fraud" without supporting details "will not satisfy the rule's pleading-with-particularity requirement."   5A Charles Alan Wright, Arthur R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure* § 1297 (4th ed. 2018) (Wright & Miller).

The district court found that the plaintiffs failed to specify "the exact misrepresentations they relied on to induce them to either invest in OSA, renegotiate the terms of their loans to OSA, or enter into an agreement with OSA."  *Otto Candies*, 2023 WL 6418135, at *3.   Again, we disagree.   The complaint explains how each plaintiff relied on a misrepresentation or omission when deciding whether to invest in, maintain an investment in, or

23-13152                   Opinion of the Court                    51

conduct business with OSA.  And the misrepresentations were not contained in generic advertisements; they were specific, targeted communications composed of financial and audit statements, materials related to bond offerings, and investor presentations from Citigroup, its agents, and OSA.  The complaint also explains how the plaintiffs' investment decisions would have been different without those misrepresentations and omissions.

Plaintiff MADISA, for example, alleges that it relied on fraudulent misrepresentations and omissions in a March 22, 2013, email from a Banamex employee when deciding whether to enter a "CitiConnect" contract and whether to continue doing business with OSA.  The Banamex employee told MADISA that under the contract, MADISA would have "no problem receiving payments" from OSA.  Of course, plenty of problems followed, and MADISA has still not recovered its overdue invoices.  MADISA alleges that had it known about the scheme (and OSA's financial condition), it would not have entered the CitiConnect Agreement and would have pulled its business in 2013–2014.[18]

Plaintiff Rabobank presents another good example.  It loaned OSA funds to purchase nine vessels from Plaintiff De Hoop.  When OSA stopped making payments on the loan, Rabobank

---

[18] Citigroup argues that these communications "merely concerned" the "mechanics" of the CitiConnect contract.  That reads the situation too narrowly.  MADISA did in fact have a problem receiving payments; it has not received "several past-due invoices."  Indeed, MADISA may have avoided investing altogether had it known the truth.

52                    Opinion of the Court                 23-13152

agreed to restructure the terms, with Banamex as trustee to ensure repayment.  Rabobank points to a February 3, 2010, meeting between Banamex and Rabobank's counsel, where Rabobank agreed to restructure the loan.  But Banamex did not share that by that point "OSA was on the brink of bankruptcy."  Additional meetings on August 19 and 23, 2011, as well as an email and telephone call on July 9, 2013, brought more of the same— Citigroup misrepresenting the stability of the cash-advance facility.  But to date, Rabobank has only received partial repayment of the principal and interest.  Had Rabobank known the truth, it claims that it would have (1) declined to renegotiate the terms of the loan; (2) not entered into the various trust agreements; and (3) promptly "take[n] adverse actions against OSA due to its failure to repay."

Or take Plaintiff Moneda.  On July 15, 2013, a Moneda representative, George Atuan, exchanged emails with a Citibank vice president, Louis Piscitelli.  After sending copies of OSA's 2012 preliminary financial statements and those from the first quarter of 2013, Piscitelli assured Atuan that OSA's financials "are going through the audit process[;] I believe they are fine."  Crediting the vice president's guarantee, Moneda retained bonds from the 2008 bond issuance and purchased bonds in 2013.

The other plaintiffs tell similar stories.  They too pleaded specific reliance on various misrepresentations and omissions. *See, e.g.*, Doc. 187 ¶¶ 408–11 (Adar), 512–17 (Ashmore), 563–71 (Copernico), 687–92 (GPF II), 767–72 (HBK), 894–99 (ICE), 1031–35 (Moneda), 1100–11 (Nordic Trustee), 1167–71 (Waypoint),

1300–02 (Otto Candies), 1372–78 (Coastline), 1472–74 (De Hoop), 1496, 1508–14 (Gulf), 1570–73 (Halani), 1612–15 (MADISA), 1706–08 (Rabobank). And the plaintiffs offered the clarity the lower court requested, distilling their misrepresentation and reliance claims into two easy-to-digest charts. Examples abound, but the point remains: the district court erred by not recognizing the plaintiffs' allegations of reliance.

Instead, the court relied on *Fernau v. Enchante Beauty Products* to dismiss this count. 847 F. App'x 612 (11th Cir. 2021) (unpublished). To start, that unpublished case is not precedential. But it's also very different: the plaintiffs there "alleged only that if [the defendants] had made 'full and accurate disclosure at the time of sale,' the plaintiffs 'would not have invested into the company.'" *Id*. at 621–22. That sort of "bare allegation of reliance" fails to satisfy Rule 9(b), but here, the plaintiffs bolstered their claims with far more. *Wilding*, 941 F.3d at 1128; *see also* Oral Arg. at 19:01.

The district court also suggested—again relying on *Fernau*—that the plaintiffs' allegations fail because they did not allege that they read the materials in question. But that is not the benchmark. To begin, the cases cited to support that conclusion allege *securities* fraud, which as we have said compels more robust pleading. In any event, there are no magic words to plead reliance—the complaint, for example, states that at least three plaintiffs "reviewed" the

54                    Opinion of the Court                    23-13152

relevant investment documents.[19]   It follows that sophisticated investors who "reviewed" financial documents "read" those documents.

Citigroup, for its part, argues that certain plaintiffs failed to meet a heightened standard to plead reliance for claims based on "holding" an investment (rather than making a new one).   That argument also misses its mark.   Even if Florida law imposes a heightened pleading requirement for these claims, the "rules of procedure that apply in federal cases—even those in which the controlling substantive law is that of a state—are the Federal Rules of Civil Procedure." *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir. 2015) (quotation omitted).   The federal pleading requirements control here.

This is not a case where the plaintiffs have provided no details about which alleged misstatements and omissions they relied on.   Nor do the plaintiffs levy "bare allegation[s] of reliance

---

[19] Citigroup contends that Copernico and ICE's allegations are insufficient because they did "not specify by whom" the relevant bond documents were "reviewed."   And while Waypoint identified the reviewer, it "fail[ed] to explain what the claimed review entailed."

We reject these verbal gymnastics.   Citigroup cites *Ambrosia Coal & Construction Co. v. Pages*, but that case differs from this one in meaningful ways. 482 F.3d 1309 (11th Cir. 2007).   In *Ambrosia Coal*, the plaintiff's reliance claim foundered because he failed to "specify[] the content or manner in which the statements misled" him.   *Id.* at 1317 n.12.   But that's not the situation we confront here.   Plaintiff Waypoint, for example, pleads a direct link between its decision to maintain its investment in OSA and the misleading financial projections and material omissions contained in the Pareto Materials.

on alleged misrepresentations" that are "bereft of any additional detail." *Wilding*, 941 F.3d at 1128. The complaint outlines— consistent with Rule 9(b)—that "but for the alleged misrepresentation or nondisclosure, the party would not have entered the transaction." *Humana*, 728 So. 2d at 265.[20]

⋆    ⋆    ⋆

In sum, the complaint pleads that Citigroup and its agents made misrepresentations or omissions on which the plaintiffs relied to their detriment. Citigroup's awareness of the fraud and assistance in the distribution of certain investment materials renders it liable for third-party misrepresentations, too. We reverse the district court's dismissal of this count.

---

[20] In dismissing this count, the district court singled out Plaintiff HBK as the closest to alleging reliance, but said its pleading failed because it "d[id] not allege that its reliance was *justifiable*." *Otto Candies*, 2023 WL 6418135, at ⋆4 (emphasis added). To start, it is unclear whether "justifiable" reliance is required under Florida law. *Compare Butler*, 44 So. 3d at 105 ("Justifiable reliance is not a necessary element of fraudulent misrepresentation."), *with Royal Typewriter Co., a Div. of Litton Bus. Sys. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1103 (11th Cir. 1983) (plaintiff must show "consequent injury to the party acting in justifiable reliance on the representation"), *and First Union Disc. Brokerage Servs., Inc. v. Milos*, 997 F.2d 835, 845 (11th Cir. 1993) (plaintiffs must demonstrate "that they justifiably relied on a false statement of material fact knowingly made" by the defendant). But even if so, HBK and the other plaintiffs have made that showing here. After all, the alleged fraud evaded the detection of Citigroup—not to mention American and Mexican financial regulators—"for years due to the falsification of documentation."

56                    Opinion of the Court                    23-13152

### 2. RICO

Next, the plaintiffs claim that Citigroup violated the Racketeer Influenced and Corrupt Organizations Act. *See* 18 U.S.C. § 1964(c). A plaintiff suing under the "civil provisions of RICO must plausibly allege six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020). The RICO statute is to "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985) (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947).

Section 1962(c)—the subsection under which the plaintiffs bring their claim—makes it unlawful "for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce" to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The term "racketeering activity," in turn, covers multiple predicate acts, including "any act which is indictable under . . . section 1343." 18 U.S.C. § 1961(1)(B). And Section 1343 prohibits so-called wire fraud, which "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property" and (2) uses the wires to further that scheme. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quotation omitted).

23-13152                Opinion of the Court                57

The plaintiffs here contend that Citigroup and OSA formed a RICO enterprise for two common purposes, mirroring their general fraud allegations: (1) to defraud Pemex, and (2) to fraudulently induce the plaintiffs to invest, or maintain their investments, in OSA. The scheme was intended to increase both cash flow to OSA and interest payments to Citigroup. To that end, Citigroup and OSA duped investors into "believing that OSA was financially healthy and had access to reliable liquid capital when, in reality, neither of those facts were true." And members of the enterprise "communicated with each other about the fraudulent scheme" through telephone calls and emails sent to and from the United States, establishing a pattern of predicate acts of wire fraud in violation of 18 U.S.C. § 1343.

Because their substantive RICO claim is predicated on allegations of wire fraud, the plaintiffs must "comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard" as to the "alleged predicate acts." *Id.* at 1291; *Cisneros*, 972 F.3d at 1216. Still, a plaintiff "need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008).[21]

---

[21] For RICO purposes, mail and wire fraud are treated interchangeably. *See Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1151 (11th Cir. 2011) (explaining that in *Bridge*, the Supreme Court "held that plaintiffs who had not

The district court assessed the plaintiffs' substantive RICO claim alongside the common-law fraud count.  The court found that because the plaintiffs provided "no details about the specific misrepresentations that they relied on or—as in *Fernau*—how their reliance was justifiable," the RICO count failed to satisfy Rule 9(b). *Otto Candies*, 2023 WL 6418135, at *4.

That was error.  As discussed, the plaintiffs adequately alleged the misrepresentations and omissions on which they relied. They have thus satisfied their burden under Rule 9(b).[22]  Because the district court dismissed this count on pleading grounds, it did not address whether the plaintiffs sufficiently pleaded the elements of a civil RICO claim.  The court instead explained that it would not address "whether Plaintiffs adequately allege a domestic injury and whether the Plaintiffs' RICO claim is barred by Section 107 of the PSLRA."  *Id.* at *4 n.5.  We therefore remand to the district court to determine in the first instance whether the plaintiffs have otherwise pleaded the elements of a civil violation under the RICO statute.  For now, we address Citigroup's two alternative arguments for affirmance.  Neither is persuasive.

*First*, Citigroup contends that the alleged predicate acts cannot establish a RICO claim because if true they would also constitute securities fraud.  True, "no person may rely upon any

themselves relied on the misrepresentations could bring a civil RICO claim based on mail *or* wire fraud" (emphasis added)).

[22] We note too that a plaintiff need not show reliance under the RICO statute when the alleged predicate acts are wire fraud.  *See Bridge*, 553 U.S. at 661.

conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). Plaintiffs' RICO claims, Citigroup argues, are barred because they are actionable as securities fraud.[23]

Not so. The shipping and leasing plaintiffs allege that Citigroup's misrepresentations and omissions induced them to lease, sell, and maintain vessels for OSA's benefit. That conduct is not itself securities fraud. Plaintiff Rabobank alleges that Citigroup duped it into continuing to supply credit to OSA despite its precarious "financial condition" and inability to "consistently pay its debt." Again, not securities fraud.

Citigroup also hits a snag with the plaintiff bondholders. Citigroup acknowledges the Supreme Court's conclusion that "holding" an investment—maintaining one's stake in company X—does not offer grounds to sue under the federal securities laws. *See* 17 C.F.R. § 240.10b-5; *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735–36 (1975). So the plaintiff bondholders who merely held their investments in OSA because of the fraud cannot sue under the securities laws. It's unclear, then, why the PSLRA would foreclose these claims. We decline Citigroup's invitation to

---

[23] We understand why Citigroup makes this attempt. After all, if the alleged misconduct were actionable under the federal securities laws, Citigroup would secure two victories for the price of one: plaintiffs' RICO allegations would fail, and the even higher pleading standards of the PSLRA would apply to the plaintiffs' other claims.

60                    Opinion of the Court                  23-13152

weaponize the PSLRA bar at the pleading stage in a case where the allegations have little to do with securities fraud in the first place.

*Second*, Citigroup contends that the plaintiffs have insufficiently pleaded the continuity element of RICO.  As relevant here, to prove a "pattern" of racketeering activity, a plaintiff must show "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5); *see Am. Dental*, 605 F.3d at 1290–91.  These predicate acts must, in turn, "amount to or pose a threat of continued criminal activity."   *Am. Dental*, 605 F.3d at 1291. Continuity comes in two flavors: open-ended and closed-ended. Open-ended continuity involves "past conduct that by its nature projects into the future with a threat of repetition," and closed-ended continuity refers to a "closed period of repeated conduct." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989).

Citigroup argues that the plaintiffs have only pleaded a 150-day period of fraudulent activity from September 2013 through February 2014.  That would not satisfy the continuity requirement because "closed-ended continuity cannot be met with allegations of schemes lasting less than a year." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1266 (11th Cir. 2004). And because the plaintiffs' closed-ended continuity claims were alleged on "information and belief," Citigroup asserts that they are "not adequately pleaded."

Once again, we disagree.  Citigroup ignores allegations in the complaint dating back as far as 2008—which, if taken as true, establish that Citigroup knew about the fraud for years.  These allegations include (1) Banamex's failure to validate invoices in

23-13152 Opinion of the Court 61

2009; (2) Pemex's refusal to pay invoices in 2010; (3) Citigroup's secret Regulatory Contract with OSA in 2012; and (4) Citigroup firing an employee for receiving bribes from OSA in 2012. In December 2009, for instance, the SEC determined that "Banamex had already lost $1 million" via the cash-advance facility. Citigroup Inc., Exchange Act Release No. 83,858, 2018 WL 3913653, at *6 (Aug. 16, 2018). When it attempted to process an invoice "without properly validating the documents with Pemex," Pemex then "refused to pay the invoices." *Id.*

The SEC's 2018 release went on to note that "[o]ver the period *between 2008 and February of 2014*, Banamex loaned billions of dollars on the basis of invoices and work estimates" based on "documents received from OSA, amounting to about $400 million, [that] were fraudulent and included forged signatures." *Id.* at *1 (emphasis added). The complaint also points to "OSA's consolidated 2011 and 2012 financial statements," which reveal "that Banamex and OSA entered into a factoring agreement establishing the cash advance facility on February 27, 2008." These allegations render Citigroup's continuity rebuttal unconvincing. They also make the plaintiffs' "theoretically viable claim[s] plausible," and—even if pleaded on information and belief— sufficient to survive Rule 9(b). *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (emphasis deleted and quotation omitted).

### 3. VICARIOUS LIABILITY

We turn next to the plaintiffs' vicarious liability claims.  As alternatives to their direct fraud claims, the plaintiffs pleaded that Citigroup is liable for the acts of its agents, Banamex and Citibank.[24]  They rely on theories of actual and apparent agency.  Because Citigroup "does not dispute the existence of an actual or apparent agency relationship between Citigroup, as principal, and Banamex and Citibank, as its agents," we consider any contrary argument forfeited.  *Otto Candies*, 2023 WL 6418135, at *10; *see also Am. Builders Ins. Co. v. S.-Owners Ins. Co.*, 71 F.4th 847, 856–57 n.1 (11th Cir. 2023).

The plaintiffs' vicarious liability claims therefore turn on whether they sufficiently pleaded Citigroup's liability for fraudulent misrepresentations and omissions by Banamex and Citibank.[25]  In other words, the complaint must adequately allege that Citibank or Banamex (1) made "a false statement concerning a material fact"; (2) knew that the representation was false; (3) intended the misrepresentation to induce reliance; and (4) caused injury from the other party's reliance.  *Lance v. Wade*, 457

---

[24] As a reminder, Banamex is a wholly owned Mexican subsidiary of Citigroup that provided banking services for Citigroup.  Citibank functions as Citigroup's "primary U.S. lending and banking entity."

[25] As the district court pointed out, the plaintiffs were not required to show "that Citigroup's agents' wrongdoing was done in furtherance of Citigroup's interests."  *Otto Candies*, 2023 WL 6418135, at *11 n.15.

23-13152               Opinion of the Court                    63

So. 2d 1008, 1011 (Fla. 1984).  Once again, the allegations must satisfy Rule 9(b).

The district court dismissed the vicarious liability counts, saying the plaintiffs failed to satisfy Rule 9(b).  The court explained that the plaintiffs offered "no allegations in support of their vicarious liability claim for fraudulent misrepresentation based on actual agency."  *Otto Candies*, 2023 WL 6418135, at *12. Referencing two summary paragraphs at the end of the complaint, the district court stated that the plaintiffs failed to "identify the purported fraudulent misrepresentations, the individuals who made them, or the time, location, or manner of the fraudulent misrepresentations."  *Id.*  In essence, then, the court disposed of the actual and apparent agency counts for the same reason it dismissed the common-law fraud and RICO counts—a lack of specificity in alleging misrepresentations and reliance.   We have already explained why this conclusion was incorrect there, and we reach the same result here.

We agree with the plaintiffs that the district court erred by ignoring the complaint's express incorporation of the preceding factual allegations in alleging their vicarious liability claims. Though this Court has dismissed complaints where "each count adopts the allegations of all preceding counts," we have permitted adoptions—like the plaintiffs'—containing "extensive details and factual allegations."  *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792

64                      Opinion of the Court                    23-13152

F.3d 1313, 1321 & n.11 (11th Cir. 2015); *Williamson v. Travelport, LP*, 953 F.3d 1278, 1299 (11th Cir. 2020).[26]

That flexibility is important in cases like this one.  Rather than contain the "irrelevant factual allegations and legal conclusions" characteristic of a shotgun pleading, the complaint pleads a transnational scheme with multiple players.  *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002).  The factual allegations naturally relate to multiple counts and "lengthy descriptions" are required to flesh out the plaintiffs' claims.  *Williamson*, 953 F.3d at 1299.  Put differently, though "the facts are voluminous, overall they are not conclusory, vague, and immaterial."  *Id.* (quotation omitted).

To accommodate the volume of the allegations, the plaintiffs organized the complaint in a manageable way.  *First*, the complaint describes the relationships between the relevant parties, the structure of the scheme, and the fallout from its discovery.  *Second*, the complaint specifies how the fraud injured the plaintiff bondholders through the bond issuances, among other ways.  *Third*, the complaint chronicles how Citigroup's misrepresentations and omissions injured the shipping and leasing

---

[26] At the hearing on Citigroup's motion to dismiss the second amended complaint, the district court labeled it a "shotgun pleading" because "each count improperly incorporates all the paragraphs preceding."  Nowhere did the court label the third amended complaint—the operative complaint—a shotgun pleading.  That is because the plaintiffs amended the complaint to reincorporate only the factual allegations rather than each individual count.

plaintiffs.  *Fourth*, the complaint addresses Rabobank's injuries. And *finally*, the complaint pleads the seven causes of action.

By circumscribing its review of the plaintiffs' vicarious liability counts to several summary paragraphs while neglecting literally hundreds of others, the district court adopted too narrow a lens.  In the process, the court again overlooked allegations of misrepresentations satisfying the pleading standard.  As we've already explained, Plaintiffs Moneda, Otto Candies, and MADISA sufficiently alleged misrepresentations or omissions by Banamex or Citibank.  *See supra*, at *33–35, 51–53*.  And we underscore several more here:

- *ICE.*  Communications between Citibank Vice President Louis Piscitelli (yes, him again) and Aneesh Partap from Plaintiff ICE on February 23, 2011.  In email correspondence, Piscitelli provided Partnap with OSA's audited financial statements.  This information contained embedded misrepresentations and omissions about OSA's true financial condition, of which Citigroup and its agents "were aware."  ICE pleaded that it relied on such misrepresentations in deciding to "retain[] bonds from the 2008 Bond Issuance," of which Citigroup was a "trustee and collateral agent."  ICE therefore alleged (1) a false statement; (2) the agent's knowledge that the statement was false; (3) the agent's intention for the plaintiff's reliance; and (4) the plaintiff's actual reliance.

- *Rabobank.*  On or around July 27, 2011, OSA's external financial consultant introduced Rabobank representatives to the "Head of Banamex factoring," Jose Antonio Ortega-

Rivera.  Ortega-Rivera and a Rabobank employee, Edwin Sieswerda, discussed the 2011 trust agreement.  In the process, Banamex representatives told Sieswerda that Banamex—not OSA—"was responsible for validating and verifying OSA's" cash-advance requests.  But this was untrue given the secret Regulatory Contract between Citigroup and OSA.   In amending the Rabobank Trust and renegotiating the terms of OSA's loans, Rabobank relied on Banamex's statements.

These are two examples among many pleaded in the complaint.

As should be clear by now, Rule 9(b) is demanding.  But it is not a straitjacket.  To "carry any water," pleading under a heightened standard "must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged" in a "conclusory fashion."  *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1313 (11th Cir. 2002).  And yet "[w]hen Rule 9(b) applies to a complaint, a plaintiff is not expected to actually *prove* his allegations."  *Id.*

The district court's order hews to the wrong side of that line.  The court failed to engage with the totality of the plaintiffs' allegations, ignored certain claims altogether, and flipped the presumption at the pleading stage on its head by reading inferences and uncertainties against the plaintiffs.  The result was that rather than evaluating whether the plaintiffs had sufficiently pleaded their claims, the court effectively asked whether the plaintiffs had proven them.  That's not the standard at the motion-to-dismiss stage.  The plaintiffs have sufficiently pleaded their vicarious

23-13152               Opinion of the Court               67

liability claims, so we reverse the district court's dismissal of these counts.

### C. CONSPIRACY

We turn last to the plaintiffs' claims for conspiracy to violate the RICO statute and conspiracy to commit fraud. Because the district court dismissed both claims for similar and overlapping reasons—a lack of particularized allegations regarding an agreement to join the conspiracy—we treat them together, beginning with the conspiracy to violate RICO count.

### 1. CONSPIRACY TO VIOLATE RICO

Though "a bare assertion of conspiracy will not suffice" to prove a RICO conspiracy, plaintiffs "need not offer direct evidence of a RICO agreement; the existence of conspiracy may be inferred from the conduct of the participants." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Am. Dental*, 605 F.3d at 1293 (quotation omitted). Circumstantial evidence of a RICO scheme can also be enough. *See Cisneros*, 972 F.3d at 1220.

While Rule 9(b) governs the predicate acts of the plaintiffs' substantive RICO claim, the general plausibility standards of Rule 8(a) control the agreement element of their RICO conspiracy claim.[27] *See* 5 Wright & Miller, § 1233. Because "federal courts have recognized that the nature of conspiracies often makes it

---

[27] We note that even if the more rigorous Rule 9(b) standard governed the agreement element of the plaintiffs' RICO conspiracy claim, the plaintiffs have satisfied that standard here.

68                    Opinion of the Court                    23-13152

impossible for the plaintiff to provide details at the pleading stage," courts have concluded that "the pleader should be allowed to resort to the discovery process and not be subjected to a dismissal of his complaint." *Id.*; *see also Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994).

There are two paths to establishing a RICO conspiracy claim: (1) "showing that the defendant agreed to the overall objective of the conspiracy"; or (2) "showing that the defendant agreed to commit two predicate acts." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997). Here, the district court concluded that the plaintiffs satisfied neither. *First*, it found that because Citigroup lacked knowledge of the fraud, it could not have conspired with OSA to defraud the plaintiffs. *Second*, it determined that the plaintiffs had insufficiently pleaded that Citigroup agreed to commit two predicate acts in furtherance of the conspiracy. We disagree with the district court's first conclusion, so we need not address the second.

The plaintiffs pleaded six factors to allege that Citigroup agreed to conspire with OSA to engage in a pattern of racketeering activity: (1) Citigroup and OSA's "business relationship"; (2) their mutual financial gain from the racketeering activity; (3) their joint fraudulent misrepresentations and omissions; (4) their dependency on each other's fraudulent conduct to prolong the scheme; (5) Citigroup's then-CEO's "admission" that certain employees were "criminally involved" in the scheme; and (6) Mexican

23-13152                Opinion of the Court                69

regulators' conclusion that Citigroup employees or agents "knowingly engaged in a fraudulent scheme with OSA."

As already explained, the district court reached the wrong conclusion because it imposed the incorrect "strong inference" standard for pleading Citigroup's knowledge. *See supra*, at 18–26. That analysis controls here. What's more, a RICO conspiracy may be inferred from the "conduct of the alleged participants *or* from circumstantial evidence of a scheme." *Cisneros*, 972 F.3d at 1220 (emphasis added and quotation omitted). The six factors listed above demonstrate that the plaintiffs pleaded ample circumstantial evidence to support their allegations. Indeed, each plaintiff alleges several ways in which Citigroup plausibly agreed to the conspiracy.

To take one example, bondholding plaintiff GPF II alleges that Citigroup conspired to make—and knew that OSA was making—fraudulent misrepresentations and omissions to OSA's investors. In GPF II's case, these misrepresentations and omissions came via two sources: (1) a February 21, 2014, telephone conference call between Citigroup and Plaintiffs Ashmore, GPF II, ICE, and Moneda, and (2) a plethora of financial material circulated to investors, such as marketing documents related to the 2008 bond issuance, the Pareto Materials, and the OSA investor site, "www.oceanografia.com.mx." The materials were, in turn, "based on information provided by Citigroup," which the bank recognized "would be disseminated to OSA's creditors, vendors, and bondholders." GPF II contends that the close ties between

70                    Opinion of the Court                    23-13152

Citigroup and OSA—not to mention the similar experiences of the other plaintiffs—permit a reasonable inference of agreement.

The other plaintiffs levy similar allegations of agreement between Citigroup and OSA throughout the complaint.  Plaintiff Rabobank, for example, points to a July 27, 2011, meeting where OSA introduced a Banamex employee and "tout[ed] OSA's close relationship and contacts with Citigroup."  Or consider Plaintiff Gulf.  On April 5, 2011, Gulf's predecessor-in-interest met with OSA principals and their consultant to discuss a lease agreement. During the meeting—at OSA's headquarters—the consultant "summoned" a Citigroup ICG executive, Emilio Granja, from an adjoining room.  It "appeared" that Granja "had an office within OSA and was working there full-time."   Granja told Gulf's predecessor that Banamex "supported Oceanografía's finances" and not to worry: "all Oceanografía payments were coming through them."  To the predecessor, this remark meant that the cash-advance facility was "stable, reliable and controlled by Citigroup."  It also creates the reasonable inference that Citigroup, OSA, and the financial consultant had agreed to conspire to commit the alleged fraud.

If the allegations in the complaint were not clear enough, the plaintiffs summarized their RICO and common-law conspiracy allegations in a chart.  One section outlines specifically how Citigroup agreed with OSA to further the RICO enterprise.  The conspiracy chart lists (1) the date and location of the alleged misstatement or omission; (2) the source of the misstatement or

23-13152                Opinion of the Court                71

omission; (3) the relevant misrepresentation or omission by OSA or its agents; (4) each plaintiff's reliance; (5) Citigroup's alleged agreement with OSA; (6) the acts in furtherance of the conspiracy; and (7) each plaintiff's injury.

We thus find it hard to conclude, as the district court did, that the plaintiffs' claims are "unsupported by any factual allegations." *O'Malley v. O'Neill*, 887 F.2d 1557, 1560 (11th Cir. 1989). The complaint does not "allege at most" that Citigroup "knew about" the fraud. *Id*. And it does not—as the district court found—allege that Citigroup merely "should have known" about the fraud. *Otto Candies*, 2023 WL 6418135, at *6. To take a step back, we confront a scheme where Citigroup—with knowledge of OSA's fraud—allegedly participated in the RICO conspiracy by:

- approving false documentation submitted to ICG employees by OSA;

- violating its own internal controls relating to the cash-advance facility;

- permitting OSA to control that facility;

- providing cash advances that far exceeded the value of the underlying contracts that justified those advances; and

- failing to correct OSA's false financial projections.

All the while, the bank possessed a "direct financial incentive to participate in the conspiracy" by stockpiling higher interest payments. And on the back end, American and foreign regulators found Citigroup either criminally or civilly liable for events stemming from the fraud.

72                    Opinion of the Court                    23-13152

Unlike in *Republic of Panama v. BCCI Holdings*, a case on which the district court relied, there are "facts in the complaint" that "allow us to infer" an "agreement to engage in the scheme." 119 F.3d at 950.  Because when alleging a RICO conspiracy "it is sufficient to show that [a defendant] had knowledge of the essential nature of the plan," the plaintiffs have met their pleading burden here.  *United States v. Kopituk*, 690 F.2d 1289, 1323 (11th Cir. 1982) (quotation omitted).

We therefore disagree with the district court's conclusion that the plaintiff's allegations are so "vague" and "conclusory" that they "do not support an inference that Citigroup knowingly agreed to participate in the RICO conspiracy."  *Otto Candies*, 2023 WL 6418135, at *5 (quotation omitted).

We add that the district court made an additional mistake when it dismissed the RICO conspiracy count.  The court appeared to assume that because, in its view, the plaintiffs' substantive RICO allegation did "not comply with Rule 9(b)," its RICO conspiracy claim necessarily failed.  *Id.*  The court noted that "[i]f the underlying cause of action is not viable, the conspiracy claim must also fail."  *Id.* (quoting *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1199 (11th Cir. 2004)).  But that language was drawn from an Alabama state-court decision construing state-law conspiracy claims—not the federal RICO statute.  *See Brown &*

*Williamson Tobacco Corp.*, 363 F.3d at 1199 (quoting *Allied Supply Co. v. Brown*, 585 So. 2d 33, 36 (Ala. 1991)).

This Circuit has not "expressly stated" that "if a plaintiff fails to state a claim of a primary RICO violation, then the plaintiff's civil RICO conspiracy claim necessarily fails." *Am. Dental*, 605 F.3d at 1296 n.6; *see also Beck v. Prupis*, 529 U.S. 494, 506 n.10 (2000). While "parties must have agreed to commit an act that is itself illegal" in order "[t]o be guilty of conspiracy," the plaintiffs' wire-fraud allegations suffice. *United States v. Vaghela*, 169 F.3d 729, 732 (11th Cir. 1999). Thus, even if the plaintiffs had not pleaded a viable substantive RICO claim, their conspiracy allegation could independently survive. Only where a RICO conspiracy claim "adds nothing" to a substantive RICO allegation should the conspiracy claim be dismissed outright. *See Jackson*, 372 F.3d at 1269.

In any event, the plaintiffs' RICO conspiracy claim "adds something" here—that Citigroup and OSA worked together for several years to "fraudulently induc[e] and lur[e]" the plaintiffs into investing in OSA. To successfully plead this count, the plaintiffs need only "plausibly allege facts showing that a [RICO] conspiracy created the alleged scheme." *Am. Dental*, 605 F.3d at 1291. They have done so.

### 2. CONSPIRACY TO COMMIT COMMON-LAW FRAUD

We turn next to the plaintiffs' allegation that Citigroup conspired with OSA to commit common-law fraud. To plead a civil conspiracy under Florida law, a plaintiff must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act

74                   Opinion of the Court                 23-13152

or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff[s] as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997).   "Each coconspirator need not act to further a conspiracy; each need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. Dist. Ct. App. 2008) (quotation omitted).   Rule 9(b) governs the plaintiffs' fraud claims.

It is undisputed that the alleged scheme is unlawful.  *See Raimi*, 702 So. 2d at 1284.  And the plaintiffs suffered injuries— "damages totaling over $1 billion" in losses from 2008 to 2014.  But the district court dismissed this count because as "with Plaintiffs' RICO and RICO conspiracy claims," the complaint failed to allege "with particularity who made the agreement, when the agreement was made, or how Citigroup made the purported agreement with OSA."  *Otto Candies*, 2023 WL 6418135, at *10.  The court also found that the plaintiffs failed "to show that Citigroup had actual knowledge of OSA's misrepresentations and omissions" and did not adequately allege an "overt act taken by Citigroup showing its intent to defraud Plaintiffs."  *Id.* at *9.  We have already rejected the district court's first two conclusions earlier in this opinion, and we now reject its third.

The plaintiffs have pleaded that Citigroup and OSA committed overt acts in furtherance of the conspiracy. These include:

- Knowingly "advanc[ing] funds to OSA that were (1) inconsistent with OSA's contracts with Pemex; and (2) based on fraudulent documentation containing forged Pemex signatures." The plaintiffs allege that Citigroup submitted or accepted "at least 166 fraudulent cash advances." Consider that between 2011 and 2014, "OSA requested cash advances of (1) approximately $126 million on a contract that only paid $39 million annually; (2) approximately $110 million on a contract that only paid $23 million annually; (3) approximately $88 million on a contract that only paid $32 million annually; (4) approximately $44 million on a contract that only paid $16 million; and (5) approximately $75 million on a contract that only paid $51 million."

- Falsely representing to multiple plaintiffs, including Otto Candies and Rabobank, that "Citigroup and OSA had implemented a new control system for the cash advance facility, with the acknowledgement and approval of Pemex," when that was not in fact the case.

- Jointly signing the secret 2012 Regulatory Contract in which "Citigroup attempted to absolve itself of any responsibility for validating and authenticating documents submitted by OSA." The contract, signed by OSA and Banamex, "effectively gutted" Citigroup's established policies and procedures so that "OSA, not Citigroup" possessed "sole

> responsibility for implementing the control system for its own cash advance facility."

- Knowingly contributing to and distributing OSA's false financial statements and projections to investors. In the process, Citigroup failed to correct or revise the information contained in disclosures, even though it realized that they were incorrect and even though it recognized that the plaintiffs would rely on those disclosures.

These allegations touched each of the plaintiffs, from the shipping and leasing entities who relied on the stability of the cash-advance facility, to the bondholding plaintiffs who invested based on the Pareto Materials. We reject the district court's findings that the plaintiffs did not sufficiently plead the "overt acts" requirement of this count.

We also disagree with the district court on the agreement element of the conspiracy tort. Just as with the RICO conspiracy count, the plaintiffs adequately pleaded that Citigroup and OSA agreed to conspire to commit common-law fraud. The plaintiffs allege that the agreement between Citigroup and OSA was evident from Citigroup's "(1) degree of knowledge of the conspiracy's objective; (2) acts committed in furtherance of the conspiracy; (3) close association with OSA; and (4) direct financial incentives." Taken together, the plaintiffs say these factors show Citigroup's agreement "to participate in the fraud." We agree.

We do not recount in detail each allegation of agreement here because of the overlap with those discussed under the plaintiffs' RICO conspiracy claim. For now, it is sufficient to cite to

the relevant portions of the complaint. *See, e.g.*, Doc. 187 ¶¶ 396–97, 404–07 (Adar); 508–10 (Ashmore); 536, 559–62 (Copernico); 683–86 (GPF II); 712, 763–66 (HBK); 890–93 (ICE); 971–72, 1027–30, 1031(g) (Moneda); 1096–99 (Nordic Trustee); 1163–66 (Waypoint); 1296–99 (Otto Candies); 1357, 1368–72 (Coastline); 1467–71 (De Hoop); 1488–1507 (Gulf); 1536, 1566–69 (Halani); 1608–11 (MADISA); 1702–05 (Rabobank); Doc. 194-3 ("Plaintiff by Plaintiff Examples of Conspiracy Claims").

The district court thought otherwise. But the caselaw it relied on does not support its conclusion. In one case the district court cited, "there [was] no evidence of any kind to support Plaintiffs' allegations." *Jaffe v. Bank of Am., N.A.*, 667 F. Supp. 2d 1299, 1323 (S.D. Fla. 2009). The word "evidence" is the first clue that the case does not apply here. And for good reason—the court's determination came after a full bench trial, not at the pleading stage. *See id.* By contrast, no evidence is required here, only allegations.

In another case cited by the district court, the plaintiffs' "conclusory and unsupported assertions of an agreement" did not "provide any factual predicate" for their claims. *Meridian Tr. Co. v. Batista*, No. 17-23051, 2018 WL 4693533, at *6 (S.D. Fla. Sept. 26, 2018) (unpublished). To find that the plaintiffs failed to "provide any factual predicate" for their allegations, or that there was "no evidence of any kind to support" their claims, strains credulity. To quote the pleading standard, plaintiffs have not leveled "conclusory allegation[s] of agreement at some unidentified point" that

78                  Opinion of the Court                  23-13152

Citigroup conspired to commit fraud.  *Twombly*, 550 U.S. at 557.
Rather, we confront allegations of a multipronged, transnational
scheme in which:

- a major financial institution has conceded that it terminated
  an employee it "believe[d] was directly involved in the
  fraud," in addition to "four Managing Directors";

- foreign regulators have determined that Citigroup
  employees were criminally liable;

- the SEC fined Citigroup nearly $5 million for violating the
  bank's own internal controls related to the fraud;

- the sheer volume of the discrepancies between the cash
  advances and the underlying contracts suggests a degree of
  acquiescence; and

- a "revolving door" of senior executives shifted between
  Citigroup and OSA, including OSA hiring an employee
  terminated by Citigroup for accepting bribes and kickbacks.

To be sure, the plaintiffs' conspiracy allegations require
some degree of inference.  But rather than reading plausible
inferences in the plaintiffs' favor—as it was obligated to do at this
stage of the case—the district court disregarded them altogether.
In a scheme as complex as this one, there is often no smoking gun,
particularly before discovery.  And that's especially true when
information remains peculiarly within a defendant's knowledge or
control—as is the case here.  So even when Rule 9(b) applies,
plaintiffs with "substantial prediscovery evidence"—as shown by
these plaintiffs' "detailed complaint and accompanying exhibits"—

can proceed past the motion-to-dismiss stage. *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1319 (11th Cir. 2024). Nine years and four complaints later, we conclude that Citigroup "has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial," a traditional justification for mandating particularity in pleading fraud. *Id.* at 1318 (quotation omitted).

Finally, the complaint does not impermissibly "rely on the actions of OSA" to plead a conspiracy. *Otto Candies*, 2023 WL 6418135, at *10. There are myriad examples of Citigroup's active participation in the fraud, both directly and through its agents. Plus, under Florida law, "[e]ach coconspirator need not act to further a conspiracy" but "need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Charles,* 988 So. 2d at 1160 (quotation omitted). So even if we agreed with the district court's cramped characterization of the allegations for this count, Citigroup could still be held responsible for OSA's actions because Citigroup both knew of the scheme and "assist[ed] in it in some way." *Id.* (quotation omitted).

⋆     ⋆     ⋆

Because we conclude that the district court erred in dismissing the plaintiffs' RICO and common-law conspiracy claims, we reverse its dismissal of those counts.

### D. REQUEST FOR REASSIGNMENT

Finally, the plaintiffs ask us to reassign this case to a new judge on remand. Though we appreciate their frustration, we decline the invitation.

It is true—"reassigning a case to a different district judge falls within our authority." *Stargel v. SunTrust Banks, Inc.*, 791 F.3d 1309, 1311 (11th Cir. 2015); *see* 28 U.S.C. § 2106. But though we can take that action, it is a "severe remedy." *Stargel*, 791 F.3d at 1311 (quotation omitted). And reassignment is "only appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public." *Comparelli v. Republica Bolivariana de Venezuela*, 891 F.3d 1311, 1328 (11th Cir. 2018) (quotation omitted). To determine whether reassignment is appropriate, this Court examines three factors: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; (3) whether reassignment would entail waste and duplication out of proportion to the gains realized from reassignment." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 (11th Cir. 1997) (quotation omitted).

Here, we do not think the balance points toward reassignment. Though the district court erred in dismissing the plaintiffs' complaint, first for *forum non conveniens* and now for failure to state a claim, that's not enough. In *Chudasama*, for example, we reassigned the case following revelations that the

judge delegated "the task of drafting sensitive, dispositive orders to plaintiffs' counsel, and then uncritically adopt[ed] his proposed orders nearly verbatim." *Id.* The judge also permitted "excessive and dilatory discovery tactics" and imposed "draconian sanctions," but only after "over a year and a half" in what was "really a simple products liability case." *Id.* at 1356, 1374. But the district court's missteps here were more "garden-variety errors of law than the kind of direct defiance" or "willful or malicious" conduct that would warrant reassignment. *AcryliCon USA, LLC v. Silikal GMBH*, 46 F.4th 1317, 1331 (11th Cir. 2022) (quotation omitted).

We have full confidence that on remand the district court will evaluate this case impartially and in a timely fashion, so we decline to reassign the case.

⋆    ⋆    ⋆

Pared to its core, this case is factually complicated but legally straightforward. The plaintiffs allege that Citigroup conspired and participated in a vast fraudulent scheme. Citigroup contests those allegations. There are quarrels over which employee worked for which company, what Citigroup's then-CEO *really* admitted to, and whether Citigroup knew about the fraud at all. But those factual disputes are best left for another day.

At this stage, the plaintiffs have met their burden—even under the heightened requirements of Rule 9(b). The district court erred in concluding otherwise. We therefore **REVERSE** its decision regarding each plaintiff as to each count alleged in the

82                    Opinion of the Court                    23-13152

complaint and **REMAND** for proceedings consistent with this opinion.

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith                                                            For rules and forms visit
Clerk of Court                                                           www.ca11.uscourts.gov

May 08, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-13152-HH
Case Style:  Otto Candies, LLC, et al v. Citigroup Inc.
District Court Docket No:  1:16-cv-20725-DPG

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing must include a Certificate of Interested Persons**. See 11th Cir. R. 40-3.

Costs
Costs are taxed against Appellee(s) / Respondent(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

<u>Clerk's Office Phone Numbers</u>

General Information:    404-335-6100       Attorney Admissions:          404-335-6122
Case Administration:    404-335-6135       Capital Cases:                404-335-6200
CM/ECF Help Desk:    404-335-6125       Cases Set for Oral Argument:  404-335-6141

OPIN-1 Ntc of Issuance of Opinion