**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Miami Division**

**CASE NO. 1:16-cv-20725-GAYLES/TORRES**

**OTTO CANDIES, LLC, et al.,**

Plaintiffs,

v.

**CITIGROUP INC.,**

Defendant.

# LETTER ROGATORY PURSUANT TO THE HAGUE EVIDENCE CONVENTION TO OBTAIN DOCUMENTARY EVIDENCE AND TESTIMONY FROM:

## OCEANOGRAFÍA S.A. DE C.V.

The United States District Court for the Southern District of Florida, in Miami-Dade County, United States of America, presents its compliments to the appropriate judicial authority of Mexico and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter.

This Court requests that the appropriate judicial authority of Mexico compel the production of documents and testimony from Oceanografía S.A. de C.V. ("OSA") and certain former or current OSA employees or officers, including Amado Yáñez Jr., Barry Joseph Barnes, Alejandro Gaona, Jorge Betancourt, Hermilo Escobedo, Israel Varela Morales, José A. Ortega-Rivera, and Thomas Heather. The assistance described below is necessary in the interests of justice.

**1. Sender**

Hon. Darrin P. Gayles
Wilkie D. Ferguson, Jr. U.S. Courthouse
400 North Miami Avenue
Miami, Florida 33128
United States of America

**2. Central Authority of the Requested State**

Directorate-General of Legal Affairs, Ministry of Foreign Affairs
Plaza Juarez No. 20
Planta Baja Edificio Tlatelolco
Colonia Centro
Delegación Cuauhtémoc
C.P. 06010, Mexico, Distrito Federal

**3. Persons to Whom Executed Request Is to Be Returned**

Juan P. Morillo
Gabriel F. Soledad
David H. Needham
Quinn Emanuel Urquhart & Sullivan, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
Telephone: (202) 538-8142
juanmorillo@quinnemanuel.com
gabrielsoledad@quinnemanuel.com
davidneedham@quinnemanuel.com

**4. Date by Which Requesting Authority Requires Response to the Letter of Request**

This Court requests receipt of a response to this request as soon as reasonably practicable, consistent with your calendar and the laws of Mexico.

**In conformity with Article 3 of the Convention, the undersigned applicant has the honor to submit the following request:**

**5. Background Information**

**A. Requesting Judicial Authority**

United States District Court, Southern District of Florida
Wilkie D. Ferguson, Jr. U.S. Courthouse
400 North Miami Avenue
Miami, Florida 33128

United States of America

**B. To the Competent Authority of**

Ciudad de Mexico, Mexico

**C. Case Name and Number**

*Otto Candies, LLC, et al. v. Citigroup Inc.*, Case No. 16-cv-20725-GAYLES-TORRES (S.D. Fla. 2016).

**6. Identities of the Parties and Their Representatives**

A lawsuit is currently pending in the United States District Court for the Southern District of Florida, in Miami-Dade County, between the Plaintiffs listed below and Defendant Citigroup Inc. The addresses of these parties and their counsel are as follows:

**A. Plaintiffs**

Plaintiffs

Otto Candies, LLC

Adar Macro Fund Ltd.

Ashmore Emerging Markets Debt and Currency Fund Limited,
Ashmore Emerging Markets High Yield Plus Fund Limited,
Ashmore Emerging Markets Tri Asset Fund Limited,
Ashmore SICAV in Respect of Ashmore SICAV Emerging Markets Corporate Debt Fund,
Ashmore SICAV in Respect of Ashmore SICAV Emerging Markets Debt Fund,
Ashmore SICAV in Respect of Ashmore SICAV Emerging Markets High Yield Corporate Debt Fund,

Coastline Maritime Pte. Ltd.
Marfield Ltd. Inc.,
Shanara Maritime International S.A.,

Coöperatieve Rabobank U.A.

Copernico Capital Partners (Bermuda) Ltd.

Gulf Investments and Services Ltd.

Halani International Ltd.

HBK Investments L.P.,
HBK Master Fund L.P.,

Hoop Lobith International B.V.,
Shipyard De Hoop B.V.

Máquinas Diesel S.A. de C.V.

Moneda Deuda Latinoamericana Fondo de Inversion,
Moneda International Inc.,
Moneda Latin American Corporate Debt,
Moneda Renta CLP Fondo de Inversion,
Moneda S.A. Administradora General de Fondos,
Padstow Financial Corp.,

Nordic Trustee AS

Waypoint Asset Management LLC

Counsel for Plaintiffs

Juan P. Morillo
Gabriel F. Soledad
Derek L. Shaffer
Lauren H. Dickie
David H. Needham
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th St. NW, Suite 600
Washington, DC 20004
Telephone: (202) 538-8142
juanmorillo@quinnemanuel.com
gabrielsoledad@quinnemanuel.com
derekshaffer@quinnemanuel.com
laurendickie@quinnemanuel.com
davidneedham@quinnemanuel.com

Laura N. Ferguson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2601 S. Bayshore Dr., Ste. 1550
Miami, FL 33133
Telephone: (305) 402-4880

lauraferguson@quinnemanuel.com

Samantha I. Gillespie
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
Telephone: (212) 849-7000
samanthagillespie@quinnemanuel.com

Vasundhara Ziemba-Prasad
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
vasundharaprasad@quinnemanuel.com

HOMER BONNER JACOBS ORTIZ, P.A.
Peter W. Homer
Gregory J. Trask
Kevin P. Jacobs
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5100
phomer@homerbonner.com
gtrask@homerbonner.com
kjacobs@homerbonner.com

**B. Defendant Citigroup Inc.**

Defendant Citigroup Inc.

Citigroup, Inc.
388 Greenwich Street
New York, NY 10013
USA

Counsel for Defendant

Adam S. Hakki
John Nathanson
ALLEN OVERY SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
adam.hakki@aoshearman.com
john.nathanson@aoshearman.com

Michael P. Mitchell
ALLEN OVERY SHEARMAN STERLING US LLP
1101 New York Avenue, NW
Washington, D.C. 20005
Tel: (202) 508-8000
michael.mitchell@aoshearman.com

Manuel A. Garcia-Linares
DAY PITNEY LLP
396 Alhambra Circle, 14th Floor
Miami, Florida 33134
(305) 373-4000
mgarcialinares@daypitney.com
gthompson@daypitney.com

**C. Other Parties**

None.

**7. Description of the Case**

**A. Nature of the Proceedings**

This is a civil lawsuit involving allegations of violations of the Racketeer Influenced and Corrupt Organizations Act (the "RICO statute") at 18 U.S.C. § 1961, fraud, conspiracy, aiding and abetting fraud, and vicarious liability for fraud.

**B. Summary of Complaint and Defenses Thereto**

The case involves a dispute between Otto Candies, LLC, et al. ("Plaintiffs") and Citigroup Inc. ("Defendant"). Plaintiffs allege that Defendant, through its U.S.-based Institutional Clients Group ("ICG") and Mexican subsidiary Banco Nacional de México S.A. ("Banamex"), conspired with Oceanografía, S.A. de C.V. ("OSA") to orchestrate a fraudulent scheme utilizing a cash advance facility that Banamex established for OSA and that Plaintiffs allege was operated, managed, and supervised by the ICG, wherein OSA submitted false documents containing forged Pemex signatures to the ICG in support of cash advance requests relating to work purportedly performed by OSA for Pemex, Mexico's state-owned oil and gas company and OSA's only

customer, and Citigroup, through the ICG, knowingly approved the false documentation and earned interest on the cash advances. Plaintiffs are creditors of OSA, holders of bonds issued by OSA in 2008 and 2013, shipping and supplier companies that contracted with OSA, and a bank (Coöperatieve Rabobank U.A.) that provided a loan to OSA.

Plaintiffs allege, among others, that Defendant made fraudulent misrepresentations and material omissions to Plaintiffs regarding OSA's financial condition, resulting in damages exceeding $1 billion upon OSA's collapse in 2014.

Defendant denies all allegations of misconduct and asserts that it was a victim of OSA's fraud. Defendant denies that it knew of OSA's fraud, denies that it orchestrated a fraudulent scheme, denies that it knowingly approved false documentation, denies that it made any fraudulent misrepresentations or material omissions, denies that it aided and abetted in making any fraudulent misrepresentations or material omissions, and denies that Plaintiffs reasonably relied on any statements made by Defendant, including because Plaintiffs had independent access to information about OSA's financial condition.

Copies of the operative Third Amended Complaint, which sets forth Plaintiffs' allegations in full, are submitted together with this request. Citigroup has not yet filed an Answer.

**8. Evidence to be Obtained**

It is requested in the interests of justice, and to enable this Court to determine the issues pending before it, that the appropriate judicial authority of Mexico compel, by its proper and usual process, the production of documents and testimony from OSA and certain former or current OSA employees or officers, including Amado Yáñez Jr., Barry Joseph Barnes, Alejandro Gaona, Jorge Betancourt, Hermilo Escobedo, Israel Varela Morales, José A. Ortega-Rivera, and Thomas Heather. This evidence is material and necessary to the matter pending before this Court. OSA was a client of Citigroup's subsidiary, Banamex, for the factoring facility, and it submitted

documentations, including Pemex work estimates and authorizations, to support the cash-advance requests. Plaintiffs reasonably expect OSA to possess critical information concerning, among other things, the cash advance program, its financial condition during the relevant period, and any material misrepresentations or omissions made to induce Plaintiffs' investments and partnerships.

The specific document requests and examination topics are set forth in Schedules A through R, attached hereto.

Furthermore, pursuant to article 10 of the Hague Convention, this Court requests and gives the appropriate judicial authority the necessary capacity to impose any enforcement measures applicable under the procedural laws of Mexico, which suffice to ensure that OSA complies with the request for production of documents and testimony referred to herein.

**9. Identity and Addresses of Person to Be Examined or Person From Whom Documents Are Requested**

Manzana D, Lote 3, Avenida 4 Oriente
Col. Puerto Pesquero
24129 Ciudad del Carmen, Campeche
Mexico

**10. Documents or Other Property to Be Inspected**

Please see Schedules A through R, attached.

**11. Any Requirement that the Evidence be Given on Oath or Affirmation and Any Special Form to Be Used**

This Court requests that the testimony of OSA and the individual witnesses identified herein be taken under oath or affirmation, or under such procedures as are customary under the laws of Mexico for the examination of witnesses. This Court further requests that counsel for the parties be permitted to examine and cross-examine the witnesses, and that a verbatim transcript or recording of the testimony be prepared and transmitted to this Court together with the documentary evidence produced pursuant to Schedules A through R attached hereto.

**12. Special Methods or Procedures to Be Followed**

**A. Confidentiality**

This Court orders that the evidence produced pursuant to your enforcement of this request shall not be used by anyone in any manner or proceeding other than in this matter, *Otto Candies, LLC, et al. v. Citigroup Inc.*, Case No. 16-cv-20725-GAYLES-TORRES, pending in the United States District Court for the Southern District of Florida.

This Court further requests that the testimony be taken under oath or affirmation, or under such procedures as are customary under the laws of Mexico for the examination of witnesses. This Court requests that counsel for the parties be permitted to examine and cross-examine the witness(es), and that a verbatim transcript or recording of the testimony be prepared and transmitted to this Court together with the documentary evidence produced pursuant to Schedules A through R attached hereto.

**B. Participation by Local Counsel**

Not applicable. The Parties do not have local counsel in Mexico.

**13. Request for Notification of the Time and Place for the Execution of the Request**

Please send notice of the time and place of the production of documents to this Court and the parties' counsel as follows:

Hon. Darrin P. Gayles
U.S. District Court, Southern District of Florida
Wilkie D. Ferguson, Jr. U.S. Courthouse
400 North Miami Avenue
Miami, Florida 33128
United States of America

Juan P. Morillo
Gabriel F. Soledad
David H. Needham
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th St. NW, Suite 600
Washington, DC 20004

Telephone: (202) 538-8000
juanmorillo@quinnemanuel.com
gabrielsoledad@quinnemanuel.com
davidneedham@quinnemanuel.com

Adam S. Hakki
John Gueli
John Nathanson
ALLEN OVERY SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
adam.hakki@aoshearman.com
jgueli@aoshearman.com
john.nathanson@aoshearman.com

Michael P. Mitchell
ALLEN OVERY SHEARMAN STERLING US LLP
1101 New York Avenue, NW
Washington, D.C. 20005
Tel: (202) 508-8000
michael.mitchell@aoshearman.com

Manuel A. Garcia-Linares
DAY PITNEY LLP
396 Alhambra Circle, 14th Floor
Miami, Florida 33134
(305) 373-4000
mgarcialinares@daypitney.com
gthompson@daypitney.com

**14. Request for Attendance or Participation of Judicial Personnel**

No attendance or participation of judicial personnel is requested.

**15. Specification of Privilege or Duty to Refuse to Give Evidence Under the Law of the State of Origin**

OSA may assert any privilege or duty to refuse to produce documents that is recognized under the laws of the United States or the laws of Mexico.

**16. Reimbursements of Fees and Costs**

Plaintiffs are willing to reimburse the appropriate judicial authority of Mexico for costs incurred in executing the special procedures requested.

**17. Reciprocity**

This Court appreciates the judicial authority's assistance in obtaining evidence in this matter. This Court is willing to provide similar assistance to judicial authorities in Mexico should a judicial authority in Mexico so require.

WITNESS, the Honorable Darrin P. Gayles: District Judge in the United States District Court for the Southern District of Florida, County of Miami-Dade, and the seal thereof:

Dated: 08/17/26

**DARRIN P. GAYLES**
**UNITED STATES DISTRICT JUDGE**

# SCHEDULE A

## DOCUMENT REQUESTS TO OCEANOGRAFÍA S.A. DE C.V.

## DEFINITIONS AND INSTRUCTIONS

As used herein, the words and phrases set out below shall have the following meanings:

**I. DEFINITIONS**

1. "2008 Bond Issuance" means the bond issuance by OSA (as defined below) in 2008.

2. "2008 Bonds" means the bonds issued pursuant to the 2008 Bond Issuance.

3. "2013 Bond Agreement" means the bond agreement entered into in connection with the 2013 Bond Issuance between, among others, OSA's affiliate Goliath Ltd. as issuer, OSA as guarantor, and Nordic Trustee AS as trustee.

4. "2013 Bond Issuance" means the bond issuance by OSA (as defined below) in 2013.

5. "2013 Bonds" means the bonds issued pursuant to the 2013 Bond Issuance.

6. "Advent Presentation" means the presentation prepared in or around September 2013, originally titled the "Advent Presentation," which was subsequently revised, relabeled, and circulated to investors as a "Management Presentation."

7. "Banamex" means Defendant Citigroup's Mexican subsidiary Banco Nacional de Mexico S.A., Grupo Financiero Banamex S.A. de C.V., their affiliates, and any person or entity acting, or purporting to act, on their behalf.

8. "Blackstone Presentation" means the presentation prepared in or around July 2013 for the Blackstone Group, L.P. in connection with Citigroup's engagement to assist OSA in identifying equity investors, which included Citigroup's logo.

9. "Cash Advance Facility" means any cash advance facility pursuant to which OSA obtained cash advances from Banamex or Citigroup based on receivables from contracts between OSA and Pemex.

10. "Citibank" means Citibank, N.A. and any person or entity acting, or purporting to act, on its behalf.

11. "Citigroup" means Citigroup Inc., its affiliates, including but not limited to Banamex and Citibank, and any person or entity acting, or purporting to act, on its behalf.

12. "CNBV" means Comisión Nacional Bancaria y de Valores (the National Banking and Securities Commission of Mexico), or any successor entity, and includes all of its departments, divisions, offices, agents, representatives, and employees acting within the scope of their authority.

13. "December 2013 Presentation" means the presentation entitled "Management Presentation" delivered by OSA at the energy and oil industry conference hosted by BCP Securities in Mexico City on or about December 3, 2013.

14. "Document" is used in its broadest sense and means, without limitation, written, typed, printed, electronic, graphic or otherwise recorded material of any kind, however produced or reproduced, whether different because of notes made thereon or otherwise, including but not limited to, and by way of example only, any advertisement, agreement, analysis, book, brochure, calendar, chart, check (front and back) or check stub, checklist, contract, cost sheet, database information, diary, electronic file, email, facsimile, filing, financial report, graph, guideline, handbook, index, instant message, invoice, ledger, letter or other correspondence, license, log, memorandum, microfilm, minutes, motion picture film, notebook, notes (handwritten, typed or otherwise), opinion, pamphlet, paper, picture, photograph, plan, policy, procedure, press release, purchase order, receipt, recording, report, statement, study, submission, summary, tabulation, talking points, tape recording,

task list, telegram, telephone call record, text message, thing, timesheet, transcript of a telephone conversation, transcript of testimony, travel record, video, voice message or recording, work paper, data compilation, including but not limited to computer data stored on a USB drive, external hard drive, compact disc, computer disk or other memory unit containing such data from which information can be obtained or translated into usable form, translations or summaries of foreign language documents and all similar recorded material.

15. "Entity" means all corporations, associations, partnerships, joint ventures, companies, funds, trusts, limited liability companies, limited liability partnerships, any government or regulatory authority, and all other forms of incorporated and unincorporated organizations that are not natural persons.

16. "Goliath Ltd." means OSA Goliath Pte. Ltd., an affiliate of OSA that issued bonds in connection with the 2013 Bond Issuance, and any person or entity acting, or purporting to act, on its behalf.

17. "GPF II" means EIG Global Project Fund II, Ltd., a Cayman Islands-based fund whose interests and claims relating to bonds issued by Oceanografía, S.A. de C.V. in 2008 are represented and pursued by Plaintiff HBK Master Fund L.P.

18. "GYRU" means Galaz, Yamazaki, Ruiz Urquiza, S.C. an affiliate of Deloitte Mexico, including any representative or agent thereof.

19. "ICG" means the Institutional Clients Group, a division within Banamex that operated, managed, supervised, and controlled the Cash Advance Facility.

20. "January 2014 Presentation" means the presentation delivered by OSA to current and potential investors in or around January 2014, which was substantially similar to the December 2013 Presentation.

21. "KPMG" means KPMG Cárdenas Dosal, S.C., or any representative or agent thereof.

22. "March 2010 Trust Agreement" means the trust agreement entered into in or around March 2010 between OSA, Banamex (as trustee), and Rabobank (as beneficiary), pursuant to which Pemex payments on OSA contracts were directed to Rabobank in satisfaction of OSA's debt, including any amendments thereto.

23. "Mexican Trust" means the Mexican trust established in connection with the 2013 Bond Issuance, for which Banamex served as fiduciary and Nordic Trustee AS was the beneficiary, to receive funds as collateral for the 2013 Bondholders.

24. "Mexican Trust Agreement" means the agreement executed on October 17, 2013 by OSA, Goliath Ltd., and Nordic Trustee, establishing the Mexican Trust in Banamex to receive the proceeds of Goliath Ltd.'s services to Pemex.

25. "Morgan Stanley" means Morgan Stanley & Co. LLC and any person or entity acting, or purporting to act, on its behalf.

26. "Nordic Trustee" means Plaintiff Nordic Trustee AS (formerly Norsk Tillitsmann ASA) and any person or entity acting, or purporting to act, on its behalf.

27. "Oceanografía" or "OSA" or "You" or "Your" means Oceanografía, S.A. de C.V. and any person or entity acting, or purporting to act, on its behalf and each and all of its current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, representatives, attorneys, accountants, consultants, independent contractors or any other person or entity acting, or purporting to act, with or on behalf of any of the foregoing, including Amado Yáñez.

28. "October 2013 Presentation" means the revised version of the Advent Presentation circulated by Rodrigo Riveroll of the ICG division of Citigroup on or about October 10, 2013 to investors, Mr. Yáñez, and OSA's External Financial Consultant.

29. "OSA's External Financial Consultant" means Martin Diaz, whom Plaintiffs allege was a third-party financial consultant engaged by OSA to assist in restructuring OSA's debt to Plaintiffs Candies and Rabobank, referred to in the Third Amended Complaint at, among other paragraphs, Paragraphs 230 and 458.

30. "Pareto" means Pareto Securities AS, Pareto Securities Pte. Ltd., and Pareto Securities, Inc., or any representative or agent thereof.

31. "Pareto Materials" means any materials distributed by Pareto to potential investors in the 2013 Bonds, including presentations, credit models, financial projections, term sheets, offering memoranda, road show materials, marketing materials, pitch books, investor solicitation documents, due diligence reports, compliance analyses, and risk assessments.

32. "Pemex" means Petróleos Mexicanos S.A. and any person or entity acting, or purporting to act, on its behalf.

33. "Plaintiffs" means Otto Candies, LLC, Adar Macro Fund Ltd., Coastline Maritime Pte. Ltd., Marfield Ltd. Inc., Shanara Maritime International S.A., Gulf Investments and Services Ltd., Halani International Ltd., Shipyard de Hoop B.V., Hoop Lobith International B.V., Máquinas Diesel S.A. de C.V., Waypoint Asset Management LLC, Ashmore Emerging Markets Debt and Currency Fund Limited, Ashmore Emerging Markets High Yield Plus Fund Limited, Ashmore Emerging Markets Tri Asset Fund Limited, Ashmore SICAV in respect of Ashmore SICAV Emerging Markets Corporate Debt Fund, Ashmore SICAV in respect of Ashmore SICAV Emerging Markets Debt Fund, Ashmore SICAV in respect of Ashmore SICAV Emerging Markets High Yield

Corporate Debt Fund, Copernico Capital Partners (Bermuda) Ltd., HBK Investments L.P., HBK Master Fund L.P., Moneda International Inc., Moneda Latin American Corporate Debt, Padstow Financial Corp., Moneda S.A. Administradora General de Fondos, Moneda Deuda Latinoamericana Fondo de Inversion, Moneda Renta CLP Fondo de Inversion, Nordic Trustee AS, Coöperatieve Rabobank U.A. and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, representatives, attorneys, accountants, consultants, independent contractors or any other person or entity acting, or purporting to act, with or on behalf of any of the foregoing.

34. "Person" means any natural person or any business, legal or governmental entity or association.

35. "PGR" means the Procuraduría General de la República (the Attorney General's Office of Mexico), or any successor entity, and includes all of its departments, divisions, offices, agents, representatives, and employees acting within the scope of their authority.

36. "Rabobank" means Plaintiff Coöperatieve Rabobank U.A. (formerly Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.) and any person or entity acting, or purporting to act, on its behalf.

37. "Rabobank Trust" means the trust established pursuant to the March 2010 Trust Agreement between OSA, Banamex (as trustee), and Rabobank (as beneficiary), including any amendments thereto, pursuant to which Pemex payments on OSA contracts were directed to Rabobank in satisfaction of OSA's debt.

38. "Regulatory Contract" means the agreement dated September 21, 2012 between OSA and Banamex, signed by Amado Yáñez on behalf of OSA and by Emilio Granja and Alfonso Ortega-Brehm on behalf of Banamex, regarding the Cash Advance Facility.

39. "Relating to" or "Related to" mean to any extent addressing, assessing, comprising, concerning, constituting, construing, containing, discussing, embodying, evidencing, identifying, implying, including, indicating, interpreting, being involved in, prepared in connection with, used in preparation for, referring to, reflecting, regarding, being relevant to, setting forth, showing, stating, suggesting or being in any way legally, logically or factually concerned with or pertinent to, directly or indirectly, in whole or in part, the matter described, referred to or discussed.

40. "SAE" means the Servicio de Administración y Enajenación de Bienes, the Mexican government agency responsible for managing and disposing of seized companies and assets.

41. "Waterfall Structure" means the distribution procedure described in the 2013 Bond Agreement and the Mexican Trust Agreement, designed to ensure that the 2013 Bondholders received their principal and interest from the Mexican Trust before any funds were disbursed to OSA.

42. The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary so as to bring within the scope of a Request all responses that might otherwise be construed to be outside of its scope.

43. The use of the singular of any word includes the plural and vice versa as necessary so as to bring within the scope of a Request all responses that might otherwise be construed to be outside of its scope.

44. The use of the past tense includes the present tense unless otherwise explicitly delimited.

## II. INSTRUCTIONS

45. Terms that are defined above shall have the meanings provided above whether or not they are capitalized.

46. The documents shall be produced as they are kept in the ordinary course of business and shall be organized so that the parties can ascertain the files in which the documents were located, their relative order in such files, and how such files were maintained.

47. If any portion of any document is responsive to any request, the entire document shall be produced. If any requested document cannot be produced in full, produce the document to the extent possible, specifying each reason for your inability to produce the remainder, and stating whatever information, knowledge, or belief you have concerning the portion not produced.

48. If any document requested herein is withheld based upon a claim of privilege, state as to each such document: (i) the privilege asserted and its basis; (ii) the nature of the document withheld; (iii) the date of the document; (iv) the identity of the author; (v) the identity of each recipient of the document or a copy thereof; and (vi) the general subject matter of the document.

49. When only a portion of a document is believed to be privileged, the non-privileged portion shall be produced with the allegedly privileged portion redacted and indicated as such.

50. The timeframe for these Requests shall be between January 1, 2008, through present.

## REQUESTS FOR PRODUCTION

It is requested that OSA produce the following:

**Request No. 1:** All contracts (and any amendments or extensions thereto) between You and Pemex related to the Cash Advance Facility and the associated contract guidelines, during the relevant time period.

**Request No. 2:** All Documents related to OSA's financial statements, financial projections, and annual reports prepared, circulated, or made available to OSA's creditors, vendors, or bondholders between 2008 and February 2014, including but not limited to audited and unaudited financial statements for 2008 through 2013.

**Request No. 3:** All Documents related to the Cash Advance Facility between You and Banamex, including but not limited to cash advance requests, supporting documentation submitted in connection with cash advance requests, Pemex work estimates, credit notes, invoices, and records of amounts advanced and repaid.

**Request No. 4:** All Documents related to the 2008 Bond Issuance, including but not limited to the offering memorandum, investor presentations, marketing materials, and communications with Morgan Stanley, Citigroup, and potential investors.

**Request No. 5:** All Documents related to the 2013 Bond Issuance, including but not limited to the offering memorandum, the 2013 Bond Agreement, investor presentations, and communications with Pareto, Nordic Trustee, Citigroup, and potential investors.

**Request No. 6:** All Documents related to any internal or external audit, investigation, or review of OSA's finances, the Cash Advance Facility, or OSA's relationship with Citigroup, including but not limited to any investigation by KPMG, GYRU, or any other accounting firm.

**Request No. 7:** All Documents related to the Rabobank Trust, the Mexican Trust, or any other trust or collateral arrangement between You, Citigroup, and any Plaintiff, including but not limited to trust agreements, amendments, correspondence, and reports.

**Request No. 8:** All Documents related to the Advent Presentation, the October 2013 Presentation, the December 2013 Presentation, the January 2014 Presentation, and any prior or subsequent versions, drafts, or modifications thereof.

**Request No. 9:** All Documents related to the September 21, 2012 Regulatory Contract between You and Banamex, including but not limited to drafts, negotiations, internal communications regarding the purpose or effect of the Regulatory Contract, any actions taken pursuant to it, and any Documents reflecting changes to the operation or control of the Cash Advance Facility following its execution.

**Request No. 10:** All Documents relating to the February 10, 2014 ban by the Secretaría de la Función Pública ("SFP") against You entering into new contracts with Pemex for one year, nine months, and 12 days, and the subsequent cancellations of OSA-Pemex contracts.

**Request No. 11:** All Documents between You and CNBV concerning its probe into the Cash Advance Facility, including but not limited to any written statements, submissions, or responses made by You to the CNBV regarding OSA's cash advance requests and the documentation submitted in support thereof.

**Request No. 12:** All Documents between You and PGR concerning PGR's criminal investigation into the Cash Advance Facility, including but not limited to any written statements, submissions, or document productions made by You to the PGR in connection with that investigation.

**Request No. 13:** All Documents related to the appointment of Thomas Heather to oversee, manage, or administer OSA following the March 2014 seizure of OSA's assets, including but not limited to the instrument, order, or agreement effecting his appointment, and any Documents reflecting the scope of his authority to act on OSA's behalf.

**Request No. 14:** All Documents related to Thomas Heather's participation in, direction of, or knowledge of OSA's restructuring of its debts to its creditors, vendors, and bondholders during his tenure overseeing OSA, including but not limited to any proposed or executed restructuring agreements he reviewed, approved, or negotiated, and any communications to, from, or copying Mr. Heather with the SAE, PGR, or CNBV concerning the restructuring.

**Request No. 15:** All Documents related to any communications to, from, or copying Thomas Heather and any actual, prospective, or potential holder of OSA's 2008 Bonds, 2013 Bonds, or any other OSA debt instrument, concerning OSA's legal status, the priority or security of any creditor's claims, the anticipated timing or outcome of any restructuring or bankruptcy proceeding, or OSA's ability to satisfy its obligations to creditors.

**Request No. 16:** All Documents reflecting any investigation, review, or analysis conducted by, requested by, or provided to Thomas Heather concerning the Cash Advance Facility, the Regulatory Contract, or the fraudulent cash advance scheme at OSA, in connection with his oversight of OSA.

**Request No. 17:** All Documents related to OSA's financial condition, financial statements, or financial projections that Thomas Heather prepared, reviewed, approved, or transmitted, or that were prepared, reviewed, approved, or transmitted at his direction, during his tenure overseeing OSA, including any such materials provided to any of OSA's creditors, vendors, or bondholders.

**Request No. 18:** All Documents related to the circumstances of Thomas Heather's resignation from his oversight role in or around August 2014, including but not limited to any resignation letter, internal communications regarding the reasons for his departure, and any communications to, from, or copying Mr. Heather and the SAE, Citigroup, or OSA personnel concerning his departure.

**Request No. 19:** All Documents related to any communications to, from, or copying Thomas Heather and any owner, lessor, or charterer of a vessel leased or chartered to OSA, including but not limited to Coastline, Gulf, Halani, and De Hoop, concerning the release, custody, arrest, or continued operation of that vessel following the March 2014 seizure of OSA's assets, including any requests made to Mr. Heather to facilitate such release or continued operation and any response he gave.

# SCHEDULE B

## EXAMINATION TOPICS FOR OCEANOGRAFÍA S.A. DE C.V.

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that OSA designate one or more representatives prepared to answer questions related to the following topics:

**Topic No. 1:** OSA's contracts with Pemex related to the Cash Advance Facility, including the terms of those contracts, the associated contract guidelines, the services OSA performed under those contracts, the amounts invoiced and paid, and any related documents or communications.

**Topic No. 2:** OSA's financial statements, financial projections, and annual reports prepared, circulated, or made available to OSA's creditors, vendors, or bondholders between 2008 and February 2014, including the preparation and review of audited and unaudited financial statements for 2008 through 2013, the accuracy of the information contained therein, any decisions regarding what information to include or omit, and the identity of all persons and entities to whom such materials were provided.

**Topic No. 3:** The Cash Advance Facility between OSA and Banamex, including the process by which OSA submitted cash advance requests and supporting documentation, the preparation of Pemex work estimates, credit notes, and invoices submitted in connection with such requests, the amounts advanced and repaid, OSA's knowledge of any discrepancies between cash advance requests and the underlying Pemex contracts, and any related documents or communications.

**Topic No. 4:** The 2008 Bond Issuance, including OSA's role in preparing the offering memorandum, investor presentations, and marketing materials, OSA's communications with

Morgan Stanley, Citigroup, and potential investors in connection with that issuance, the accuracy of the information provided to investors, and any related documents or communications.

**<u>Topic No. 5</u>:** The 2013 Bond Issuance, including OSA's role in preparing the offering memorandum and the 2013 Bond Agreement, OSA's communications with Pareto, Nordic Trustee, Citigroup, and potential investors in connection with that issuance, the accuracy of the information provided to investors, and any related documents or communications.

**<u>Topic No. 6</u>:** Any internal or external audit, investigation, or review of OSA's finances, the Cash Advance Facility, or OSA's relationship with Citigroup, including any investigation conducted by KPMG, GYRU, or any other accounting firm, the scope and findings of any such audit, investigation, or review, OSA's cooperation with or participation in any such audit, investigation, or review, and any related documents or communications.

**<u>Topic No. 7</u>:** The Rabobank Trust, the Mexican Trust, and any other trust or collateral arrangement between OSA, Citigroup, and any Plaintiff, including the establishment, purpose, and operation of each such trust, the terms of any trust agreements and amendments thereto, the flow of funds through each such trust, and any related documents, correspondence, or reports.

**<u>Topic No. 8</u>:** The Advent Presentation, the October 2013 Presentation, the December 2013 Presentation, the January 2014 Presentation, and any prior or subsequent versions, drafts, or modifications thereof, including OSA's role in preparing, revising, approving, and distributing each such presentation, Citigroup's role in preparing or providing information for each such presentation, the accuracy of the information contained therein, and any related documents or communications.

**<u>Topic No. 9</u>:** The September 21, 2012 Regulatory Contract between OSA and Banamex, including the negotiations leading to that contract, OSA's understanding of its purpose and effect,

any changes to the operation or control of the Cash Advance Facility following its execution, whether and how the Regulatory Contract was disclosed to any of OSA's creditors, vendors, or bondholders, and any related documents or communications.

**Topic No. 10:** The February 10, 2014 ban by the Secretaría de la Función Pública against OSA entering into new contracts with Pemex, including the circumstances leading to that ban, the subsequent cancellations of OSA-Pemex contracts, the effect of the ban on OSA's financial condition and its ability to service its debts to Plaintiffs, and any related documents or communications.

**Topic No. 11:** OSA's communications with the CNBV concerning its probe into the Cash Advance Facility, including any written statements, submissions, or responses made by OSA to the CNBV, the substance of any findings communicated by the CNBV to OSA, any actions taken by OSA in response to the CNBV's investigation, and any related documents or communications.

**Topic No. 12:** OSA's communications with the PGR concerning PGR's criminal investigation into the Cash Advance Facility, including any written statements, submissions, or document productions made by OSA to the PGR, the substance of any findings or charges communicated by the PGR to OSA, any actions taken by OSA in response to the PGR's investigation, and any related documents or communications.

**Topic No. 13:** The appointment of Thomas Heather to oversee, manage, or administer OSA following the March 2014 seizure of OSA's assets, including the instrument, order, or agreement effecting his appointment, and the scope of his authority to act on OSA's behalf, and any related documents or communications.

**Topic No. 14:** Thomas Heather's participation in, direction of, or knowledge of OSA's restructuring of its debts to its creditors, vendors, and bondholders during his tenure overseeing

OSA, including any proposed or executed restructuring agreements he reviewed, approved, or negotiated, and any communications to, from, or copying Mr. Heather with the SAE, PGR, or CNBV concerning the restructuring, and any related documents or communications.

**Topic No. 15:** Communications with Thomas Heather and any actual, prospective, or potential holder of OSA's 2008 Bonds, 2013 Bonds, or any other OSA debt instrument, concerning OSA's legal status, the priority or security of any creditor's claims, the anticipated timing or outcome of any restructuring or bankruptcy proceeding, or OSA's ability to satisfy its obligations to creditors, and any related documents or communications.

**Topic No. 16:** Any investigation, review, or analysis conducted by, requested by, or provided to Thomas Heather concerning the Cash Advance Facility, the Regulatory Contract, or the fraudulent cash advance scheme at OSA, in connection with his oversight of OSA.

**Topic No. 17:** OSA's financial condition, financial statements, or financial projections that Thomas Heather prepared, reviewed, approved, or transmitted, or that were prepared, reviewed, approved, or transmitted at his direction, during his tenure overseeing OSA, including any such materials provided to any of OSA's creditors, vendors, or bondholders.

**Topic No. 18:** The circumstances of Thomas Heather's resignation from his oversight role in or around August 2014, including any resignation letter, internal communications regarding the reasons for his departure, and any communications to, from, or copying Mr. Heather and the SAE, Citigroup, or OSA personnel concerning his departure, and any related documents or communications.

**Topic No. 19:** Communications with Thomas Heather and any owner, lessor, or charterer of a vessel leased or chartered to OSA, including but not limited to Coastline, Gulf, Halani, and De Hoop, concerning the release, custody, arrest, or continued operation of that vessel following

the March 2014 seizure of OSA's assets, including any requests made to Mr. Heather to facilitate such release or continued operation and any response he gave, and any related documents or communications.

## SCHEDULE C

## DOCUMENT REQUESTS TO AMADO YANEZ JR.

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness produce the following:

**Request No. 1**: All Documents related to the September 21, 2012 Regulatory Contract between OSA and Banamex, including but not limited to negotiations leading to that contract, Mr. Yáñez's knowledge of its terms and purpose, any instructions Mr. Yáñez gave regarding its execution, and any communications between Mr. Yáñez and Citigroup or Banamex employees regarding the Regulatory Contract.

**Request No. 2**: All Documents related to Mr. Yáñez's knowledge of or involvement in the submission of cash advance requests by OSA to Banamex through the Cash Advance Facility, including but not limited to Mr. Yáñez's knowledge of the documentation submitted in support of such requests, any discrepancies between cash advance amounts and underlying Pemex contract values, and any communications between Mr. Yáñez and Israel Varela Morales, Erik Cervantes-Murillo, or other Citigroup or Banamex employees regarding the operation of the Cash Advance Facility.

**Request No. 3**: All Documents related to allegations that Mr. Yáñez misused funds obtained through the Cash Advance Facility between 2008 and 2012, including but not limited to the use of cash advance proceeds for purposes other than OSA's business operations, and any communications between Mr. Yáñez, Banamex, or Citigroup regarding such allegations.

**Request No. 4**: All Documents related to OSA's "Management Presentations" prepared for then-current and potential new investors, including but not limited to the Advent Presentation, the October 2013 Presentation, the December 2013 Presentation, the January 2014 Presentation,

and any presentations given at conferences in New York City in March and May 2013, including Mr. Yáñez's role in preparing, reviewing, approving, or distributing any such presentation and any modifications made to presentations.

**Request No. 5:** All Documents related to communications between Mr. Yáñez and Morgan Stanley and potential investors in connection with the 2008 Bond Issuance during the spring and summer of 2008, including but not limited to any representations Mr. Yáñez made regarding OSA's financial condition, Pemex contracts, or the Cash Advance Facility.

**Request No. 6:** All Documents related to the 2013 Bond Issuance, including but not limited to the 2013 Preliminary Offering Memorandum, information provided to Pareto, Nordic Trustee, and potential investors in or around summer and early fall 2013, and any representations Mr. Yáñez made regarding OSA's financial condition in connection with that issuance.

**Request No. 7:** All Documents related to Mr. Yáñez's communications with Ashmore, including but not limited to: (a) an email on or about July 16, 2009 to Andrew Edmondson regarding the 2008 Bond Issuance; (b) a telephone conference on or about September 30, 2010 with Fatma Kamara regarding OSA's financial condition; and (c) the meeting on or about September 6, 2013 in London with Ashmore regarding the 2013 Bond Issuance.

**Request No. 8:** All Documents related to Mr. Yáñez's communications with GPF II (or its predecessor TCW), including but not limited to: (a) meetings with Kevin Corrigan, Brian Gilmore, and other TCW representatives on or about August 17, 2008 and in approximately October 2009 at OSA's headquarters in Mexico regarding OSA's financial information; and (b) a meeting in or around December 2009 in Mexico City with GPF II regarding OSA's financial information.

**Request No. 9:** All Documents related to Mr. Yáñez's communications with ICE Canyon, including but not limited to: (a) the August 5, 2011 email exchange with Citibank regarding OSA's coupon payment, which was forwarded to Said Saffari of ICE; (b) the January 28, 2014 telephone conference with ICE regarding media allegations against OSA; and (c) the February 21, 2014 telephone conference with counsel for Ashmore, GPF II, ICE, and Moneda.

**Request No. 10:** All Documents related to Mr. Yáñez's communications with Copernico, including but not limited to a meeting in or around March 2013 with Federico Carballo of Copernico.

**Request No. 11:** All Documents related to Mr. Yáñez's communications with Waypoint, including but not limited to: (a) a meeting during or around the week of January 21, 2008 concerning OSA; (b) the May 9, 2013 meeting in Houston, Texas with Jose Pedreira; and (c) the May 10, 2013 meeting with Jose Pedreira regarding Banamex's expediting of cash advances.

**Request No. 12:** All Documents related to Mr. Yáñez's communications with Otto Candies, including but not limited to: (a) the May 13, 2011 meeting at OSA's office in Mexico City with Candies, OSA's External Financial Consultant, and Citigroup representatives including Jose Ortega-Rivera and Emilio Granja; (b) the August 14, 2012 meeting in Ciudad del Carmen, Mexico to discuss restructuring OSA's debt to Candies; and (c) any other meetings or communications between Mr. Yáñez and Candies between 2008 and February 2014 regarding OSA's financial condition or debt restructuring.

**Request No. 13:** All Documents related to Mr. Yáñez's communications with Coastline Maritime, including but not limited to: (a) meetings in 2008 regarding the Pemex service contract; (b) the April 30, 2012 meeting in Houston, Texas between OSA's principals and Terry Highlands and other Coastline principals regarding OSA's financial projections; and (c) any other meetings

or communications between Mr. Yáñez and Coastline between 2008 and February 2014 regarding OSA's financial condition or the Cash Advance Facility.

**Request No. 14:** All Documents related to Mr. Yáñez's communications with De Hoop, including but not limited to: (a) information provided to De Hoop in or around summer and early fall 2013, including the 2013 Preliminary Offering Memorandum; (b) any meetings or communications regarding the construction of vessels by De Hoop for OSA; and (c) Mr. Yáñez's decision to hire Jose Ortega-Rivera after his termination from Banamex and any communications with De Hoop involving Mr. Ortega-Rivera.

**Request No. 15:** All Documents related to Mr. Yáñez's communications with Gulf and Halani, including but not limited to: (a) the five-year charter agreement made in 2011 with Gulf; (b) the May 2010 meetings with Gulf; and (c) any meetings or communications between Mr. Yáñez and Gulf or Halani between 2008 and February 2014 regarding OSA's financial condition, vessel leases, or the Cash Advance Facility.

**Request No. 16:** All Documents related to Mr. Yáñez's communications with Rabobank, including but not limited to: (a) the meeting on or about February 2, 2010 in Ciudad del Carmen, Mexico with Hans Bartelds, Alessandra Jahnel, Remco Voogt, and Edwin Sieswerda to discuss OSA's outstanding debt to Rabobank; and (b) any other meetings or communications between Mr. Yáñez and Rabobank between 2008 and February 2014 regarding OSA's financial condition, debt restructuring, or the Rabobank Trust.

**Request No. 17:** All Documents related to Mr. Yáñez's communications with any Plaintiff between January 1, 2014 and February 28, 2014, including but not limited to: (a) the January 28, 2014 conference call between OSA and Plaintiffs, including any recording of that call; (b) the February 26, 2014 conference with counsel for Ashmore; and (c) any communications regarding

the SFP ban, media reports of irregularities in OSA's Pemex contracts, and Citigroup's internal investigation.

**Request No. 18:** All Documents related to Mr. Yáñez's communications with Mr. Diaz, including but not limited to the engagement or retention of Mr. Diaz in or around 2010, instructions or information Mr. Yáñez provided to Mr. Diaz regarding OSA's financial condition, the Cash Advance Facility, or OSA's debts to Plaintiffs, and Mr. Yáñez's knowledge of communications between Mr. Diaz and any Plaintiff.

**Request No. 19:** All Documents related to any investigation of Mr. Yáñez by the PGR, CNBV, or any other governmental or law enforcement authority, including but not limited to the October 2014 arrest warrant issued against Mr. Yáñez, any written statements, submissions, or responses made by or on behalf of Mr. Yáñez in connection with any such investigation, and any communications between Mr. Yáñez and OSA or Citigroup employees regarding any such investigation.

**Request No. 20:** All Documents related to Mr. Yáñez's decision to engage or hire Jose Ortega-Rivera following Mr. Ortega-Rivera's termination from Banamex in August 2012, including but not limited to any engagement letter, consulting agreement, or other agreement governing the terms of Mr. Ortega-Rivera's services to OSA, the scope of work Mr. Ortega-Rivera was hired to perform, and any communications between Mr. Yáñez and Mr. Ortega-Rivera regarding OSA, the Cash Advance Facility, or any Plaintiff.

# SCHEDULE D

## EXAMINATION TOPICS FOR AMADO YANEZ JR.

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness be prepared to answer questions related to the following topics:

**Topic No. 1**: Mr. Yáñez's knowledge of and involvement in the September 21, 2012 Regulatory Contract entered into between OSA and Banamex, including the negotiations leading to that contract, Mr. Yáñez's understanding of its terms and purpose, any instructions Mr. Yáñez gave regarding its execution, any communications between Mr. Yáñez and Citigroup or Banamex employees regarding the Regulatory Contract, and whether and how the Regulatory Contract was disclosed to any of OSA's creditors, vendors, or bondholders.

**Topic No. 2**: Mr. Yáñez's knowledge of and involvement in the submission of cash advance requests by OSA to Banamex through the Cash Advance Facility, including the process by which OSA prepared and submitted documentation in support of such requests, Mr. Yáñez's knowledge of any discrepancies between cash advance amounts and underlying Pemex contract values, any communications between Mr. Yáñez and Israel Varela Morales, Erik Cervantes-Murillo, or other Citigroup or Banamex employees regarding the operation of the Cash Advance Facility, and Mr. Yáñez's knowledge of any forged Pemex signatures or other false documentation submitted in support of cash advance requests.

**Topic No. 3**: Allegations that Mr. Yáñez misused funds obtained through the Cash Advance Facility between 2008 and 2012, including the purposes for which cash advance proceeds were used, whether any such proceeds were used for purposes other than OSA's business operations, any communications between Mr. Yáñez and Banamex or Citigroup regarding such

allegations, and the effect of any such misuse on OSA's financial condition and its ability to pay its creditors, vendors, and bondholders.

**Topic No. 4:** Mr. Yáñez's knowledge of and involvement in the preparation and distribution of OSA's Management Presentations, including the Advent Presentation, the October 2013 Presentation, the December 2013 Presentation, the January 2014 Presentation, and any presentations given at conferences in New York City in March and May 2013, including any modifications Mr. Yáñez or others at OSA made to presentations, the accuracy of the financial information and projections contained in those presentations, and Mr. Yáñez's knowledge of Citigroup's role in preparing or providing information for those presentations.

**Topic No. 5:** Mr. Yáñez's communications with Morgan Stanley and potential investors in connection with the 2008 Bond Issuance during the spring and summer of 2008, including any representations Mr. Yáñez made regarding OSA's financial condition, Pemex contracts, or the Cash Advance Facility, the accuracy of those representations, and any related documents or communications.

**Topic No. 6:** Mr. Yáñez's knowledge of and involvement in the 2013 Bond Issuance, including the preparation of the 2013 Preliminary Offering Memorandum, information provided to Pareto, Nordic Trustee, and potential investors in or around summer and early fall 2013, any representations Mr. Yáñez made regarding OSA's financial condition in connection with that issuance, and the accuracy of those representations.

**Topic No. 7:** Mr. Yáñez's communications with Ashmore, including: (a) the email on or about July 16, 2009 to Andrew Edmondson regarding the 2008 Bond Issuance, including the substance and accuracy of any representations made therein; (b) the telephone conference on or about September 30, 2010 with Fatma Kamara regarding OSA's financial condition, including any

assurances Mr. Yáñez provided and his knowledge of OSA's financial condition at that time; and (c) the meeting on or about September 6, 2013 in London with Ashmore regarding the 2013 Bond Issuance, including the matters discussed, any representations made, and any related documents.

**Topic No. 8:** Mr. Yáñez's communications with GPF II (or its predecessor TCW), including: (a) the meetings with Kevin Corrigan, Brian Gilmore, and other TCW representatives on or about August 17, 2008 and in approximately October 2009 at OSA's headquarters in Mexico regarding OSA's financial information, including the matters discussed, any representations made regarding OSA's financial condition, and the accuracy of those representations; and (b) the meeting in or around December 2009 in Mexico City with GPF II regarding OSA's financial information, including any representations made and any related documents.

**Topic No. 9:** Mr. Yáñez's communications with ICE Canyon, including: (a) the August 5, 2011 email exchange with Citibank regarding OSA's coupon payment, which was forwarded to Said Saffari of ICE, including Mr. Yáñez's instructions to forward that email and his knowledge of OSA's financial condition at that time; (b) the January 28, 2014 telephone conference with ICE regarding media allegations against OSA, including the matters discussed, any representations made, and Mr. Yáñez's knowledge of the accuracy of those representations; and (c) the February 21, 2014 telephone conference with counsel for Ashmore, GPF II, ICE, and Moneda, including the matters discussed, any representations or omissions, and Mr. Yáñez's knowledge of Citigroup's internal investigation at that time.

**Topic No. 10:** Mr. Yáñez's communications with Copernico, including the meeting in or around March 2013 with Federico Carballo of Copernico, the matters discussed, any representations made regarding OSA's financial condition, and any related documents.

**<u>Topic No. 11</u>:** Mr. Yáñez's communications with Waypoint, including: (a) the meeting during or around the week of January 21, 2008, the matters discussed, and any representations made; (b) the May 9, 2013 meeting in Houston, Texas with Jose Pedreira, including the substance of the presentation and any representations that amounts advanced by Banamex should not be considered OSA debt; and (c) the May 10, 2013 meeting with Jose Pedreira regarding Banamex's expediting of cash advances, including any representations made and Mr. Yáñez's knowledge of the accuracy of those representations.

**<u>Topic No. 12</u>:** Mr. Yáñez's communications with Otto Candies, including: (a) the May 13, 2011 meeting at OSA's office in Mexico City with Candies, OSA's External Financial Consultant, and Citigroup representatives including Jose Ortega-Rivera and Emilio Granja, including the matters discussed and any representations made regarding OSA's financial condition and ability to pay its debts; (b) the August 14, 2012 meeting in Ciudad del Carmen, Mexico to discuss restructuring OSA's debt to Candies, including any representations made regarding OSA's financial projections and repayment; and (c) any other meetings or communications between Mr. Yáñez and Candies between 2008 and February 2014 regarding OSA's financial condition or debt restructuring.

**<u>Topic No. 13</u>:** Mr. Yáñez's communications with Coastline Maritime, including: (a) meetings in 2008 regarding the Pemex service contract and any representations made; (b) the April 30, 2012 meeting in Houston, Texas between OSA's principals and Terry Highlands and other Coastline principals regarding OSA's financial projections, including the basis for any projections presented and Mr. Yáñez's knowledge of their accuracy; and (c) any other meetings or communications between Mr. Yáñez and Coastline between 2008 and February 2014 regarding OSA's financial condition or the Cash Advance Facility.

**<u>Topic No. 14</u>:** Mr. Yáñez's communications with De Hoop, including: (a) information provided to De Hoop in or around summer and early fall 2013, including the 2013 Preliminary Offering Memorandum and any representations regarding OSA's financial condition; (b) any meetings or communications regarding the construction of vessels by De Hoop for OSA; and (c) Mr. Yáñez's decision to hire Jose Ortega-Rivera after his termination from Banamex, including Mr. Yáñez's knowledge of the circumstances of Mr. Ortega-Rivera's termination and any communications with De Hoop involving Mr. Ortega-Rivera.

**<u>Topic No. 15</u>:** Mr. Yáñez's communications with Gulf and Halani, including: (a) the five-year charter agreement made in 2011 with Gulf, including the negotiations and any representations made regarding OSA's financial condition; (b) the May 2010 meetings with Gulf, including the matters discussed and any representations made; and (c) any other meetings or communications between Mr. Yáñez and Gulf or Halani between 2008 and February 2014 regarding OSA's financial condition, vessel leases, or the Cash Advance Facility.

**<u>Topic No. 16</u>:** Mr. Yáñez's communications with Rabobank, including: (a) the meeting on or about February 2, 2010 in Ciudad del Carmen, Mexico with Hans Bartelds, Alessandra Jahnel, Remco Voogt, and Edwin Sieswerda to discuss OSA's outstanding debt to Rabobank, including the matters discussed, any representations made regarding OSA's financial condition, and the accuracy of those representations; and (b) any other meetings or communications between Mr. Yáñez and Rabobank between 2008 and February 2014 regarding OSA's financial condition, debt restructuring, or the Rabobank Trust.

**<u>Topic No. 17</u>:** Mr. Yáñez's communications with any Plaintiff between January 1, 2014 and February 28, 2014, including: (a) the January 28, 2014 conference call between OSA and Plaintiffs, including any recording of that call, the matters discussed, any representations made,

and Mr. Yáñez's knowledge of OSA's financial condition and the status of the Cash Advance Facility at that time; (b) the February 26, 2014 conference with counsel for Ashmore, including the matters discussed and any representations or omissions; and (c) Mr. Yáñez's knowledge of the SFP ban, media reports of irregularities in OSA's Pemex contracts, and Citigroup's internal investigation, and what, if anything, Mr. Yáñez communicated to Plaintiffs regarding those matters.

**Topic No. 18:** Mr. Yáñez's relationship with OSA's External Financial Consultant, including: (a) the engagement or retention of Mr. Diaz in or around 2010 and the scope of that engagement; (b) the instructions, information, and documents Mr. Yáñez provided to Mr. Diaz regarding OSA's financial condition, the Cash Advance Facility, and OSA's debts to Plaintiffs; (c) Mr. Yáñez's knowledge of Mr. Diaz's communications with Plaintiffs, including Candies, Rabobank, Ashmore, MADISA, ICE, Moneda, Gulf, Halani, and De Hoop; and (d) whether Mr. Yáñez knew or had reason to know that Mr. Diaz was providing false or misleading information to Plaintiffs.

**Topic No. 19:** Any investigation of Mr. Yáñez by the PGR, CNBV, or any other governmental or law enforcement authority, including: (a) the October 2014 arrest warrant issued against Mr. Yáñez and the basis therefor; (b) any written statements, submissions, or responses made by or on behalf of Mr. Yáñez in connection with any such investigation; (c) any communications between Mr. Yáñez and OSA or Citigroup employees regarding any such investigation; and (d) Mr. Yáñez's knowledge of the CNBV's findings regarding Banamex and/or Citigroup employee participation in the fraudulent scheme.

**Topic No. 20:** Mr. Yáñez's decision to engage or hire Jose Ortega-Rivera following Mr. Ortega-Rivera's termination from Citigroup in August 2012, including: (a) Mr. Yáñez's

knowledge of the circumstances of Mr. Ortega-Rivera's termination; (b) the terms and scope of Mr. Ortega-Rivera's engagement by OSA; (c) the services Mr. Ortega-Rivera performed on behalf of OSA, including any communications with Plaintiffs; and (d) any communications between Mr. Yáñez and Mr. Ortega-Rivera regarding OSA, the Cash Advance Facility, or any Plaintiff.

## SCHEDULE E

## DOCUMENT REQUESTS TO BE PRODUCED BY BARRY JOSEPH BARNES

All definitions and instructions from Schedule A are incorporated by reference here. As used in this Schedule, references to "Mr. Barnes" refer to Barry Joseph Barnes. It is requested that the witness produce the following:

**Request No. 1**: All Documents related to Mr. Barnes's participation in the meeting held on or about August 17, 2008 with GPF II (or its predecessor TCW), including Kevin Corrigan and Brian Gilmore, concerning OSA's financial information, including any representations made regarding OSA's financial condition, any materials prepared for or distributed at that meeting, and any related communications.

**Request No. 2**: All Documents related to Mr. Barnes's participation in the meeting held in approximately October 2009 with GPF II concerning OSA's financial information, including any representations made regarding OSA's financial condition, any materials prepared for or distributed at that meeting, and any related communications.

**Request No. 3**: All Documents related to Mr. Barnes's participation in the meeting on or about February 2, 2010 in Ciudad del Carmen, Mexico between OSA and Rabobank, including Hans Bartelds, Alessandra Jahnel, Remco Voogt, and Edwin Sieswerda, to discuss OSA's outstanding debt to Rabobank, including any representations made regarding OSA's financial condition or repayment, and any related communications.

**Request No. 4**: All Documents related to Mr. Barnes's role at OSA, including his title, responsibilities, dates of service, and involvement in OSA's communications with any of OSA's creditors, vendors, or bondholders regarding OSA's financial condition between 2008 and February 2014.

**SCHEDULE F**

**EXAMINATION TOPICS FOR BARRY JOSEPH BARNES**

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness be prepared to answer questions related to the following topics:

**Topic No. 1:** Mr. Barnes's participation in the meeting held on or about August 17, 2008 with GPF II (or its predecessor TCW), including Kevin Corrigan and Brian Gilmore, concerning OSA's financial information, including the matters discussed, any representations made regarding OSA's financial condition, Mr. Barnes's knowledge of the accuracy of those representations, any follow-up actions taken thereafter, and any related documents or communications.

**Topic No. 2:** Mr. Barnes's participation in the meeting held in approximately October 2009 with GPF II concerning OSA's financial information, including the matters discussed, any representations made regarding OSA's financial condition, Mr. Barnes's knowledge of the accuracy of those representations, any follow-up actions taken thereafter, and any related documents or communications.

**Topic No. 3:** Mr. Barnes's participation in the meeting on or about February 2, 2010 in Ciudad del Carmen, Mexico between OSA and Rabobank, including Hans Bartelds, Alessandra Jahnel, Remco Voogt, and Edwin Sieswerda, to discuss OSA's outstanding debt to Rabobank, including the matters discussed, any representations or assurances made regarding repayment, Mr. Barnes's knowledge of OSA's financial condition at that time, any follow-up actions taken thereafter, and any related documents or communications.

**Topic 4:** Mr. Barnes's role at OSA, including his title, responsibilities, and dates of service, his involvement in OSA's communications with creditors, vendors, or bondholders

regarding OSA's financial condition between 2008 and February 2014, and his knowledge of the Cash Advance Facility and the accuracy of OSA's financial representations to Plaintiffs.

## SCHEDULE G

## DOCUMENT REQUESTS TO BE PRODUCED BY ALEJANDRO GAONA

All definitions and instructions from Schedule A are incorporated by reference here. As used in this Schedule, references to "Mr. Gaona" refer to Alejandro Gaona. It is requested that the witness produce the following:

**Request No. 1:** All Documents related to Mr. Gaona's communications with Ashmore, including but not limited to: (a) communications regarding Ashmore's July 16, 2009 email to OSA concerning the 2008 Bond Issuance; and (b) any representations Mr. Gaona made to Ashmore regarding OSA's financial condition or the 2008 Bonds.

**Request No. 2:** All Documents related to Mr. Gaona's communications with GPF II (or its predecessor TCW), including but not limited to: (a) telephone calls with Kevin Corrigan on or about September 8, 2009 and September 11, 2009 concerning OSA's financial information; (b) any email from Mr. Gaona on or about October 22, 2009 to Kevin Corrigan in preparation for the October 2009 meeting with OSA; and (c) any other communications between Mr. Gaona and GPF II regarding OSA's financial condition.

**Request No. 3:** All Documents related to Mr. Gaona's role at OSA, including his title, responsibilities, and involvement in communications with any of OSA's creditors, vendors, or bondholders regarding OSA's financial condition, and any information Mr. Gaona provided to or received from Citigroup or Banamex regarding the Cash Advance Facility or OSA's Pemex contracts.

# SCHEDULE H

## EXAMINATION TOPICS FOR ALEJANDRO GAONA

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness be prepared to answer questions related to the following topics:

**Topic No. 1:** Mr. Gaona's communications with Ashmore, including communications regarding Ashmore's July 16, 2009 email concerning the 2008 Bond Issuance, the substance of those communications, any representations Mr. Gaona made regarding OSA's financial condition or the 2008 Bonds, Mr. Gaona's knowledge of the accuracy of those representations, and any related documents or communications.

**Topic No. 2:** Mr. Gaona's communications with GPF II (or its predecessor TCW), including: (a) the telephone calls with Kevin Corrigan on or about September 8, 2009 and September 11, 2009 concerning OSA's financial information, including the substance of those calls and any representations made; (b) any email on or about October 22, 2009 to Kevin Corrigan in preparation for the October 2009 meeting at OSA's headquarters; and (c) any other communications between Mr. Gaona and GPF II regarding OSA's financial condition, including Mr. Gaona's knowledge of the accuracy of the financial information provided.

**Topic No. 3:** Mr. Gaona's role at OSA, including his title and responsibilities, his involvement in communications with any of OSA's creditors, vendors, or bondholders regarding OSA's financial condition, any information Mr. Gaona provided to or received from Citigroup or Banamex regarding the Cash Advance Facility or OSA's Pemex contracts, and his knowledge of the accuracy of OSA's financial representations to Plaintiffs.

## SCHEDULE I

## DOCUMENT REQUESTS TO BE PRODUCED BY JORGE BETANCOURT

All definitions and instructions from Schedule A are incorporated by reference here. As used in this Schedule, references to "Mr. Betancourt" refer to Jorge Betancourt. It is requested that the witness produce the following:

**Request No. 1:** Documents related to OSA's "Management Presentations" prepared for then-current and potential new investors, including but not limited to the Advent Presentation, the October 2013 Presentation, the December 2013 Presentation, the January 2014 Presentation, and the May 2013 Presentation given at an investor conference in New York, including Mr. Betancourt's role in preparing, reviewing, modifying, approving, or distributing any such presentation, any modifications Mr. Betancourt made to presentations, and the accuracy of the financial information contained therein.

**Request No. 2:** All Documents related to OSA's 2009 and 2010 financial statements that were provided to Plaintiffs, including Mr. Betancourt's role in preparing, reviewing, or transmitting those financial statements, and Mr. Betancourt's knowledge of the accuracy of the information contained therein.

**Request No. 3:** All Documents related to Mr. Betancourt's communications with Ashmore, including but not limited to a conference with Fatma Kamara in or around February 2011 discussing OSA's 2009 and 2010 financial statements and media reports regarding OSA, and any representations Mr. Betancourt made regarding OSA's financial condition.

**Request No. 4:** All Documents related to the investor website maintained by OSA containing OSA's financial information and projections, including but not limited to an email sent

by Mr. Betancourt on or about November 13, 2013 to Plaintiff ICE Canyon regarding that website, the accuracy of the information posted thereto, and any decisions made regarding its content.

**Request No. 5:** All Documents related to Mr. Betancourt's communications with ICE Canyon, including but not limited to: (a) assurances given on or about January 22, 2014 and on or about February 7, 2014 regarding OSA's payment obligations to ICE; and (b) any other communications between Mr. Betancourt and ICE regarding OSA's financial condition or ability to make interest payments.

**Request No. 6:** All Documents related to Mr. Betancourt's communications with Moneda, including but not limited to: (a) emails exchanged in July 2013, including any representations made regarding OSA's financial condition; (b) the June 2013 Presentation entitled "Clientes" that Mr. Betancourt sent to Moneda's Mr. Atuan; and (c) any other communications between Mr. Betancourt and Moneda regarding OSA's financial condition or the 2013 Bond Issuance.

**Request No. 7:** All Documents related to Mr. Betancourt's communications with Waypoint, including but not limited to the May 2013 meeting with Jose Pedreira of Waypoint, including the presentation entitled "Corporate Presentation," and any representations made regarding OSA's financial condition.

**Request No. 8:** All Documents related to Mr. Betancourt's participation in the September 2013 telephone conference with ICE Canyon regarding OSA's untimely interest payments, including the matters discussed, any representations made regarding future payments, and Mr. Betancourt's knowledge of the reasons for those payment delays.

**Request No. 9:** All Documents related to Mr. Betancourt's participation in or knowledge of the January 28, 2014 conference call between OSA and Plaintiffs, including any recording of that call, the matters discussed, and any follow-up actions taken.

**Request No. 10**: All Documents related to Mr. Betancourt's participation in the February 14, 2014 conference call between OSA and counsel for Plaintiffs, including the matters discussed, any representations made, and any related documents.

## SCHEDULE J

## EXAMINATION TOPICS FOR JORGE BETANCOURT

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness be prepared to answer questions related to the following topics:

**Topic No. 1**: Mr. Betancourt's knowledge of and involvement in preparing OSA's "Management Presentations" for then-current and potential new investors, including the Advent Presentation, the October 2013 Presentation, the December 2013 Presentation, the January 2014 Presentation, and the May 2013 Presentation given at an investor conference in New York, including any modifications Mr. Betancourt made to presentations, Mr. Betancourt's knowledge of the accuracy of the financial information and projections contained therein, and any communications with Citigroup regarding the preparation or content of those presentations.

**Topic No. 2**: Mr. Betancourt's knowledge of OSA's 2009 and 2010 financial statements that were provided to Plaintiffs, including their preparation, content, accuracy, Mr. Betancourt's role in reviewing or distributing those statements, and any communications related to their distribution.

**Topic No. 3**: Mr. Betancourt's communications with Ashmore, including the conference with Fatma Kamara in or around February 2011 discussing OSA's 2009 and 2010 financial statements and media reports regarding OSA, the matters discussed, any representations made regarding OSA's financial condition, Mr. Betancourt's knowledge of the accuracy of those representations, and any related documents or communications.

**Topic No. 4**: The investor website maintained by OSA containing OSA's financial information and projections, including Mr. Betancourt's email on or about November 13, 2013 to

Plaintiff ICE Canyon regarding that website, the accuracy of the information posted thereto, any decisions made regarding its content, and any related documents or communications.

**Topic No. 5:** Mr. Betancourt's communications with ICE Canyon, including: (a) the assurances given on or about January 22, 2014 and on or about February 7, 2014 regarding OSA's payment obligations, including the basis for those assurances and Mr. Betancourt's knowledge of OSA's financial condition at that time; and (b) any other communications between Mr. Betancourt and ICE regarding OSA's financial condition or ability to make interest payments.

**Topic No. 6:** Mr. Betancourt's communications with Moneda, including: (a) emails exchanged in July 2013 and any representations made regarding OSA's financial condition; (b) the June 2013 Presentation entitled "Clientes" that Mr. Betancourt sent to Moneda's Mr. Atuan, including the accuracy of the information contained therein; and (c) any other communications between Mr. Betancourt and Moneda regarding OSA's financial condition or the 2013 Bond Issuance.

**Topic No. 7:** Mr. Betancourt's communications with Waypoint, including the May 2013 meeting with Jose Pedreira, the presentation entitled "Corporate Presentation," the matters discussed, any representations made regarding OSA's financial condition, and any related documents or communications.

**Topic No. 8:** Mr. Betancourt's participation in the September 2013 telephone conference with ICE Canyon regarding OSA's untimely interest payments, including the reasons for those payment delays, any representations made regarding future payments, Mr. Betancourt's knowledge of OSA's financial condition at that time, and any related documents or communications.

**Topic No. 9**: Mr. Betancourt's participation in or knowledge of the January 28, 2014 conference call between OSA and Plaintiffs, including any recording of that call, the matters discussed, any representations made, any follow-up actions taken thereafter, and any related documents or communications.

**Topic No. 10**: Mr. Betancourt's participation in the February 14, 2014 conference between OSA and counsel for Plaintiffs, including the matters discussed, any representations made, Mr. Betancourt's knowledge of OSA's financial condition at that time, any follow-up actions taken thereafter, and any related documents or communications.

## SCHEDULE K

## DOCUMENT REQUESTS TO BE PRODUCED BY HERMILO ESCOBEDO

All definitions and instructions from Schedule A are incorporated by reference here. As used in this Schedule, references to "Mr. Escobedo" refer to Hermilo Escobedo. It is requested that the witness produce the following:

**Request No. 1:** All Documents related to Mr. Escobedo's participation in the meeting with De Hoop on April 5, 2011, including any materials prepared for or distributed at that meeting, any representations made to De Hoop regarding OSA's financial condition or the status of the vessel construction contracts, and any related communications.

**Request No. 2:** All Documents related to Mr. Escobedo's communications with Gulf and Halani in the summer and fall of 2013, including but not limited to any assurances Mr. Escobedo made regarding OSA's financial condition, the 2013 Bond Issuance, or the Pareto Materials, and any related documents or communications.

**Request No. 3:** All Documents related to Mr. Escobedo's role at OSA, including his title and responsibilities, and his involvement in communications with any of OSA's creditors, vendors, or bondholders regarding OSA's financial condition, vessel leases, or the Cash Advance Facility between 2008 and February 2014.

# SCHEDULE L

## EXAMINATION TOPICS FOR HERMILO ESCOBEDO

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness be prepared to answer questions related to the following topics:

**Topic No. 1:** Mr. Escobedo's participation in the meeting with De Hoop on April 5, 2011, including the matters discussed, any representations made to De Hoop regarding OSA's financial condition or the status of the vessel construction contracts, any materials prepared for or distributed at that meeting, any follow-up actions taken thereafter, and any related documents or communications.

**Topic No. 2:** Mr. Escobedo's communications with Gulf and Halani in the summer and fall of 2013, including any assurances Mr. Escobedo made regarding OSA's financial condition, the 2013 Bond Issuance, or the Pareto Materials, the basis for those assurances, Mr. Escobedo's knowledge of OSA's financial condition at that time, and any related documents or communications.

**Topic No. 3:** Mr. Escobedo's role at OSA, including his title and responsibilities, his involvement in communications with any of OSA's creditors, vendors, or bondholders regarding OSA's financial condition, vessel leases, or the Cash Advance Facility between 2008 and February 2014, and his knowledge of the accuracy of OSA's financial representations to Plaintiffs.

## SCHEDULE M

## DOCUMENT REQUESTS TO BE PRODUCED BY ISRAEL VARELA MORALES

All definitions and instructions from Schedule A are incorporated by reference here. As used in this Schedule, references to "Mr. Varela" refer to Israel Varela Morales. It is requested that the witness produce the following:

**Request No. 1:** All Documents related to Mr. Varela's role as OSA's senior financial manager responsible for obtaining cash advances from the Cash Advance Facility, including but not limited to the nature and scope of Mr. Varela's responsibilities, communications with Citigroup or Banamex employees regarding the submission, processing, review, or approval of cash advance requests submitted by OSA, and any related documents or communications.

**Request No. 2:** All Documents Mr. Varela prepared, reviewed, submitted, or caused to be submitted to Citigroup or Banamex or their employees in support of OSA's cash advance requests, including but not limited to Pemex work estimates, credit notes, invoices, and any documentation containing forged Pemex signatures.

**Request No. 3:** All Documents related to Mr. Varela's role as primary liaison between OSA and Pemex, including but not limited to communications with Pemex personnel regarding OSA's contracts, invoices, credit notes, or the Cash Advance Facility.

**Request No. 4:** All Documents related to Mr. Varela's prior employment at Citigroup or Banamex, including but not limited to his role(s), responsibilities, dates of employment, the circumstances of his departure from Citigroup or Banamex and subsequent hiring by OSA, and any communications Mr. Varela maintained with former Citigroup or Banamex employees after joining OSA.

**<u>Request No. 5</u>:** All documents related to Mr. Varela's communications with Erik Cervantes-Murillo, including but not limited to any coordination regarding the submission of documentation to Citigroup or Banamex in support of OSA's cash advance requests or regarding the operation and management of the Cash Advance Facility.

**<u>Request No. 6</u>:** All Documents related to any Rabobank Trust reports that Mr. Varela received from Citigroup between September 2012 and December 2014, including but not limited to Mr. Varela's responses to, analysis of, or use of those reports.

**<u>Request No. 7</u>:** All documents related to representations Mr. Varela made between 2008 and February 2014 to any of OSA's creditors, vendors, or bondholders regarding the Cash Advance Facility, OSA's financial condition, or OSA's ability to service its debts, including but not limited to communications with Otto Candies, Rabobank, or any bondholder.

**<u>Request No. 8</u>:** All documents related to Mr. Varela's knowledge of or involvement in OSA's "Management Presentations" prepared for then-current and potential new investors, including but not limited to the October 2013 Presentation, the December 2013 Presentation delivered at the BCP Securities energy and oil industry conference in Mexico City, the March 2013 presentation given at a conference in New York City, and the May 2013 presentation given at an investor conference in New York City, including but not limited to Mr. Varela's role in preparing, reviewing, approving, or distributing any such presentation.

**<u>Request No. 9</u>:** All Documents related to Mr. Varela's knowledge of the September 21, 2012 Regulatory Contract between OSA and Banamex, including but not limited to when and how Mr. Varela became aware of that contract, his understanding of its purpose and effect, any role Mr. Varela played in its negotiation, execution, or implementation, and any changes to the operation of the Cash Advance Facility following its execution.

**Request No. 10**: All documents related to any investigation by Citigroup or Banamex, any Mexican regulatory authority, or any other governmental or law enforcement body into the Cash Advance Facility or the fraudulent cash advance scheme at OSA, including but not limited to any communications Mr. Varela received or sent regarding such investigation, any requests to Mr. Varela for information or documents, or any decisions not to investigate or not to interview Mr. Varela.

**Request No. 11**: All documents related to former Citigroup employees taking senior positions at OSA, including but not limited to documents reflecting how Mr. Varela's prior employment at Citigroup facilitated or was leveraged in connection with OSA's Cash Advance Facility or its relationship with Citigroup.

**Request No. 12**: All documents related to Mr. Varela's communications with any OSA principal, officer, or employee, including Amado Yáñez, regarding the Cash Advance Facility, the Rabobank Trust, or any representations made to Plaintiffs about OSA's financial condition.

**Request No. 13**: All documents related to OSA's financial statements, projections, or reports that were distributed or made available to OSA's investors, creditors, or vendors between 2008 and 2014, including but not limited to Mr. Varela's role in preparing, reviewing, approving, or transmitting such materials.

**Request No. 14**: All documents related to Mr. Varela's communications with any Plaintiff, including Otto Candies, Rabobank, or any bondholder, regarding OSA's financial condition, the Cash Advance Facility, or OSA's ability to service its debts.

**Request No. 15**: All documents related to any compensation, benefits, bonuses, or other remuneration Mr. Varela received from OSA in connection with his role managing the Cash

Advance Facility or his role as liaison to Pemex, including but not limited to any invoices, wire transfers, or other records of payment.

# SCHEDULE N

## EXAMINATION TOPICS FOR ISRAEL VARELA MORALES

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness be prepared to answer questions related to the following topics:

**Topic No. 1:** Mr. Varela's role as OSA's senior financial manager responsible for obtaining cash advances from the Cash Advance Facility, including the nature and scope of his responsibilities, the process by which he submitted cash advance requests to Citigroup or Banamex, and any related documents or communications.

**Topic No. 2:** The documentation Mr. Varela prepared, reviewed, submitted, or caused to be submitted to Citigroup or Banamex in support of OSA's cash advance requests, including the manner in which such documentation was generated, whether any such documentation contained forged Pemex signatures, his knowledge of any such forgeries, and any related documents or communications.

**Topic No. 3:** Mr. Varela's role as primary liaison between OSA and Pemex, including the nature and scope of his responsibilities in that role, his communications with Pemex personnel regarding OSA's contracts, invoices, credit notes, or the Cash Advance Facility, and any related documents or communications.

**Topic No. 4:** Mr. Varela's prior employment at Citigroup or Banamex, including his role, responsibilities, and dates of employment, the circumstances of his departure from Citigroup or Banamex and subsequent hiring by OSA, and any communications Mr. Varela maintained with former Citigroup or Banamex colleagues after joining OSA.

**Topic No. 5:** Mr. Varela's communications and coordination with Erik Cervantes-Murillo regarding the submission of documentation to Citigroup or Banamex in support of OSA's cash

advance requests, the operation and management of the Cash Advance Facility, and any related documents or communications.

**Topic No. 6**: Mr. Varela's receipt and use of daily Rabobank Trust reports from Citigroup between September 2012 and December 2014, including the information contained in those reports, any analysis he performed or caused to be performed in connection with those reports, any actions he took in response to those reports, and any related documents or communications.

**Topic No. 7**: Any representations Mr. Varela made between 2008 and February 2014 to OSA's creditors, vendors, or bondholders regarding the Cash Advance Facility, including the substance of those representations, the persons to whom they were made, the circumstances under which they were made, and any related documents or communications.

**Topic No. 8**: Mr. Varela's knowledge of and involvement in OSA's "Management Presentations" prepared for then-current and potential new investors, including the October 2013 Presentation, the December 2013 Presentation delivered at the BCP Securities conference in Mexico City, and the January 2014 Presentation, including any information Mr. Varela provided for inclusion in those presentations, his knowledge of the accuracy of the representations contained therein, and any related documents or communications.

**Topic No. 9**: Mr. Varela's knowledge of the September 21, 2012 Regulatory Contract between OSA and Banamex, including when and how he became aware of that contract, his understanding of its purpose and effect, any role he played in its negotiation, execution, or implementation, and any related documents or communications.

**Topic No. 10**: Any investigation by Citigroup, any Mexican regulatory authority, or any other governmental or law enforcement body into the fraudulent cash advance scheme at OSA, including Mr. Varela's knowledge of any such investigation, any communications he received or

sent in connection with any such investigation, whether he was contacted or interviewed in connection with any such investigation, and any related documents or communications.

**Topic No. 11**: Mr. Varela's knowledge of the movement of former Citigroup or Banamex employees into senior positions at OSA, including his own transition from Citigroup or Banamex to OSA, how his prior Citigroup or Banamex employment informed or facilitated his responsibilities at OSA in connection with the Cash Advance Facility, and any related documents or communications.

**Topic No. 12**: Mr. Varela's communications with OSA principals, officers, or employees, including Amado Yanez, regarding the Cash Advance Facility, the Rabobank Trust, or any representations made to Plaintiffs about OSA's financial condition, and any related documents or communications.

**Topic No. 13**: Mr. Varela's role in connection with OSA's financial statements, projections, or reports that were distributed or made available to investors, creditors, or vendors between 2008 and 2014, including any statements or reports he prepared, reviewed, approved, or transmitted, his knowledge of the accuracy of the information contained therein, and any related documents or communications.

**Topic No. 14**: Mr. Varela's communications with any Plaintiff regarding OSA's financial condition, the Cash Advance Facility, or OSA;s ability to service its debts, including the substance of those communications, the circumstances under which they occurred, and any related documents or communications.

**Topic No. 15**: Any compensation, benefits, bonuses, or other remuneration Mr. Varela received from OSA in connection with his role managing the Cash Advance Facility or his service

as liaison to Pemex, including the basis on which such compensation was calculated or awarded, and any related documents or communications.

## SCHEDULE O

## DOCUMENT REQUESTS TO BE PRODUCED BY JOSE A. ORTEGA-RIVERA

All definitions and instructions from Schedule A are incorporated by reference here. As used in this Schedule, references to "Mr. Ortega-Rivera" refer to Jose Antonio Ortega-Rivera. It is requested that the witness produce the following:

**Request No. 1:** All Documents related to Mr. Ortega-Rivera's engagement by OSA following his termination from Citigroup in August 2012, including but not limited to any engagement letter, consulting agreement, retainer, or other agreement governing the terms of his services, the scope of work he agreed to perform, the identity of OSA personnel who hired or supervised Mr. Ortega-Rivera, and any communications with Amado Yáñez or Genaro Yáñez regarding the engagement.

**Request No. 2:** All Documents related to any compensation, fees, or other remuneration Mr. Ortega-Rivera received from OSA in connection with services he provided on OSA's behalf following his termination from Citigroup in August 2012, including but not limited to any invoices, wire transfers, or other records of payment.

**Request No. 3:** All Documents related to Mr. Ortega-Rivera's communications with Genaro Yáñez or other OSA personnel regarding the scope, nature, or purpose of the services he provided to OSA following his termination from Citigroup in August 2012.

**Request No. 4:** All Documents related to Mr. Ortega-Rivera's communications with Otto Candies, including but not limited to his participation in the May 13, 2011 meeting at OSA's office in Mexico City with Candies, OSA's External Financial Consultant, Amado Yáñez, Omar Olvera, and Emilio Granja, and any representations Mr. Ortega-Rivera made regarding OSA's financial condition, the Cash Advance Facility, or Citigroup's role in the facility.

**Request No. 5**: All Documents related to the October 2012 communications Mr. Ortega-Rivera exchanged with De Hoop, including Patrick Janssens, regarding the financing of vessels to be built by De Hoop for OSA, including but not limited to any representations Mr. Ortega-Rivera made regarding OSA's financial condition or its relationship with Pemex, any suggestions he made regarding meetings with prospective financiers, and any follow-up communications or actions taken in connection with those communications.

**Request No. 6**: All Documents related to any meeting or communication Mr. Ortega-Rivera attended with Pemex on behalf of OSA following his termination from Citigroup in August 2012, including but not limited to the meeting with Pemex referenced in his October 2012 emails with De Hoop.

**Request No. 7**: All Documents related to Mr. Ortega-Rivera's communications with Rabobank on behalf of OSA, including but not limited to: (a) the July 27, 2011 email introduction to Edwin Sieswerda and Mr. van der Velde from Rabobank; (b) the telephone conference with Mr. Sieswerda to discuss the proposed amendment to the March 2010 Trust Agreement; (c) Mr. Ortega-Rivera's August 3, 2011 explanation of "the terms of the factoring" in connection with finalization of the July 2011 Trust Agreement; and (d) any other communications with Rabobank regarding the Cash Advance Facility, OSA's financial condition, or the Rabobank Trust.

**Request No. 8**: All Documents related to any representations Mr. Ortega-Rivera made on behalf of OSA to any of OSA's vendors, creditors, or bondholders regarding OSA's financial condition, its relationship with Pemex, or the Cash Advance Facility, between August 2012 and February 2014.

**Request No. 9**: All Documents related to Mr. Ortega-Rivera's communications with any current or former Citigroup employee after August 2012 regarding OSA, the Cash Advance Facility, or any investigation into the fraudulent scheme involving OSA and Citigroup.

**Request No. 10**: All Documents related to any investigation by Citigroup, any Mexican regulatory authority, or any other governmental or law enforcement body into the bribes and kickbacks Mr. Ortega-Rivera received from OSA and/or the fraudulent cash advance scheme, including but not limited to any communications regarding such investigation and any requests made to Mr. Ortega-Rivera for information or documents.

**Request No. 11**: All Documents related to OSA's financial statements, projections, or investor materials that Mr. Ortega-Rivera reviewed, contributed to, transmitted, or used in connection with his services to OSA between August 2012 and February 2014, including but not limited to any materials provided to OSA's creditors, vendors, or bondholders.

## SCHEDULE P

## EXAMINATION TOPICS FOR JOSE A. ORTEGA-RIVERA

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness be prepared to answer questions related to the following topics:

**Topic No. 1:** Mr. Ortega-Rivera's engagement by OSA following his termination from Citigroup in August 2012, including the terms and scope of his engagement, the identity of OSA personnel who hired or supervised him, the nature of the services he agreed to perform, any communications with Amado Yáñez or Genaro Yáñez regarding the engagement, and any related documents or communications.

**Topic No. 2:** Mr. Ortega-Rivera's communications with Genaro Yáñez or other OSA personnel regarding the scope, nature, or purpose of the services he provided to OSA following his termination from Citigroup in August 2012, including any instructions or direction he received, and any related documents or communications.

**Topic No. 3:** Any compensation, fees, or other remuneration Mr. Ortega-Rivera received from OSA in connection with services he provided on OSA's behalf following his termination from Citigroup in August 2012, including the basis on which such compensation was calculated or awarded, and any related documents or communications.

**Topic No. 4:** Mr. Ortega-Rivera's communications with Otto Candies on behalf of OSA, including his participation in the May 13, 2011 meeting at OSA's office in Mexico City with Candies, OSA's External Financial Consultant, Amado Yáñez, Omar Olvera, and Emilio Granja, the matters discussed, any representations Mr. Ortega-Rivera made regarding OSA's financial condition, the Cash Advance Facility, or Citigroup's role in the facility, and any related documents or communications.

**<u>Topic No. 5</u>:** Mr. Ortega-Rivera's October 2012 communications with Plaintiff De Hoop, including Patrick Janssens, regarding the financing of vessels to be built by De Hoop for OSA, including the representations he made regarding OSA's financial condition, any suggestions he made regarding meetings with prospective financiers, any follow-up actions he took in connection with those communications, and any related documents or communications.

**<u>Topic No. 6</u>:** Any meetings or communications Mr. Ortega-Rivera attended with Pemex on behalf of OSA following his termination from Citigroup in August 2012, including the meeting with Pemex referenced in his October 2012 communications with De Hoop, the matters discussed, any representations made, and any related documents or communications.

**<u>Topic No. 7</u>:** Mr. Ortega-Rivera's communications with Rabobank on behalf of OSA, including: (a) the July 27, 2011 email introduction to Edwin Sieswerda and Mr. van der Velde; (b) the telephone conference with Mr. Sieswerda to discuss the proposed amendment to the March 2010 Trust Agreement; (c) Mr. Ortega-Rivera's August 3, 2011 explanation of the terms of the factoring in connection with finalization of the July 2011 Trust Agreement; (d) any representations made regarding the Cash Advance Facility, including whether Banamex or OSA was responsible for validating and verifying OSA's receivables; and (e) any related documents or communications.

**<u>Topic No. 8</u>:** Any other representations Mr. Ortega-Rivera made on behalf of OSA between August 2012 and February 2014 to any of OSA's vendors, creditors, or bondholders regarding OSA's financial condition, its relationship with Pemex, or the Cash Advance Facility, including the substance of those representations, the persons to whom they were made, the circumstances under which they were made, and any related documents or communications.

**<u>Topic No. 9</u>:** Mr. Ortega-Rivera's communications after August 2012 with any current or former Citigroup employee regarding OSA, the Cash Advance Facility, or any investigation into

the fraudulent scheme involving OSA and Citigroup, including the substance of those communications, the persons involved, and any related documents or communications.

**Topic No. 10**: Any investigation by Citigroup, any Mexican regulatory authority, or any other governmental or law enforcement body into the bribes and kickbacks Mr. Ortega-Rivera received from OSA and/or the fraudulent cash advance scheme, including his knowledge of any such investigation, any communications he received or sent in connection therewith, whether he was contacted or interviewed, and any related documents or communications.

**Topic No. 11**: OSA's financial statements, projections, or investor materials that Mr. Ortega-Rivera reviewed, contributed to, transmitted, or used in connection with his services to OSA between August 2012 and February 2014, including his knowledge of the accuracy of those materials, any role he played in their preparation or distribution to OSA's creditors, vendors, or bondholders, and any related documents or communications.

## SCHEDULE Q

## DOCUMENT REQUESTS TO BE PRODUCED BY THOMAS HEATHER

All definitions and instructions from Schedule A are incorporated by reference here. As used in this Schedule, references to "Mr. Heather" refer to Thomas Heather. It is requested that the witness produce the following:

**Request No. 1:** All Documents related to Mr. Heather's appointment by the Mexican government (whether as administrator, general manager, or in any other capacity) to oversee, manage, or administer OSA following the March 2014 seizure of OSA's assets, including but not limited to the instrument, order, or agreement effecting his appointment, the scope of his authority and responsibilities, and the identity of any Person who appointed, supervised, or directed him.

**Request No. 2:** All Documents related to Mr. Heather's participation in or knowledge of OSA's restructuring of its debts to its creditors, vendors, and bondholders during the SAE administration, including but not limited to any proposed or executed restructuring agreements, negotiations with Plaintiffs or any Plaintiff, and communications with the SAE, PGR, or CNBV concerning the restructuring.

**Request No. 3:** All Documents related to any communications between Mr. Heather and any actual, prospective, or potential holder of OSA's 2008 Bonds, 2013 Bonds, or any other OSA debt instrument, concerning OSA's legal status, the priority or security of any creditor's claims, the anticipated timing or outcome of any restructuring or bankruptcy proceeding, or OSA's ability to satisfy its obligations to creditors.

**Request No. 4:** All Documents reflecting any investigation, review, or analysis conducted or received by Mr. Heather concerning the Cash Advance Facility, the Regulatory Contract, or the fraudulent cash advance scheme at OSA, in connection with his oversight of OSA.

**Request No. 5:** All Documents related to OSA's financial condition, financial statements, or financial projections prepared, reviewed, or circulated during Mr. Heather's tenure, including any Documents reflecting his role in preparing, reviewing, approving, or transmitting such materials to any of OSA's creditors, vendors, or bondholders.

**Request No. 6:** All Documents related to the circumstances of Mr. Heather's resignation from his oversight role in or around August 2014, including but not limited to any resignation letter, internal communications regarding the reasons for his departure, and any communications between Mr. Heather and the SAE, Citigroup, or OSA personnel concerning his departure.

**Request No. 7:** All Documents related to any communications between Mr. Heather and any owner, lessor, or charterer of a vessel leased or chartered to OSA, including but not limited to Coastline, Gulf, Halani, and De Hoop, concerning the release, custody, arrest, or continued operation of that vessel following the March 2014 seizure of OSA's assets, including any requests made to Mr. Heather to facilitate such release or continued operation and any response he gave.

## SCHEDULE R

## EXAMINATION TOPICS FOR THOMAS HEATHER

All definitions and instructions from Schedule A are incorporated by reference here. It is requested that the witness be prepared to answer questions related to the following topics:

**Topic No. 1:** Mr. Heather's appointment by the Mexican government (whether as administrator, general manager, or in any other capacity) to oversee, manage, or administer OSA following the March 2014 seizure of OSA's assets, including but not limited to the instrument, order, or agreement effecting his appointment, the scope of his authority and responsibilities, and the identity of any Person who appointed, supervised, or directed him, and any related documents or communications.

**Topic No. 2:** Mr. Heather's participation in or knowledge of OSA's restructuring of its debts to its creditors, vendors, and bondholders during the SAE administration, including but not limited to any proposed or executed restructuring agreements, negotiations with Plaintiffs or any Plaintiff, and communications with the SAE, PGR, or CNBV concerning the restructuring, and any related documents or communications.

**Topic No. 3:** Any communications between Mr. Heather and any actual, prospective, or potential holder of OSA's 2008 Bonds, 2013 Bonds, or any other OSA debt instrument, concerning OSA's legal status, the priority or security of any creditor's claims, the anticipated timing or outcome of any restructuring or bankruptcy proceeding, or OSA's ability to satisfy its obligations to creditors, and any related documents or communications.

**Topic No. 4:** Any investigation, review, or analysis conducted or received by Mr. Heather concerning the Cash Advance Facility, the Regulatory Contract, or the fraudulent cash advance

scheme at OSA, in connection with his oversight of OSA, and any related documents or communications.

**Topic No. 5:** OSA's financial condition, financial statements, or financial projections prepared, reviewed, or circulated during Mr. Heather's tenure, including any Documents reflecting his role in preparing, reviewing, approving, or transmitting such materials to any of OSA's creditors, vendors, or bondholders, and any related documents or communications.

**Topic No. 6:** The circumstances of Mr. Heather's resignation from his oversight role in or around August 2014, including but not limited to any resignation letter, internal communications regarding the reasons for his departure, and any communications between Mr. Heather and the SAE, Citigroup, or OSA personnel concerning his departure, and any related documents or communications.

**Topic No. 7:** Any communications between Mr. Heather and any owner, lessor, or charterer of a vessel leased or chartered to OSA, including but not limited to Coastline, Gulf, Halani, and De Hoop, concerning the release, custody, arrest, or continued operation of that vessel following the March 2014 seizure of OSA's assets, including any requests made to Mr. Heather to facilitate such release or continued operation and any response he gave, and any related documents or communications.