**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-20725-CIV-GAYLES/TORRES**

OTTO CANDIES, LLC, *et al,*

*Plaintiffs*,

v.

CITIGROUP INC.,

*Defendant*.
______________________________________/

***REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS ON REMAND***

This case now presents the question whether Plaintiffs allege a domestic injury under 18 U.S.C. § 1964(c) for a fraudulent scheme hatched in Mexico but when the property they lost largely consisted of U.S.-law instruments and the enterprise that impaired them was managed from New York. Following remand of the action, Defendants argue that Plaintiffs have no standing to raise any RICO claims because they seek relief for purely extraterritorial injuries. But this amended complaint alleges racketeering activity that was orchestrated in great part through a major United States financial institution operating from domestic soil, the underlying instruments were issued, governed, and held within the United States financial system, and the injurious aims of the enterprise targeted property rights grounded

in United States law.[1] Plaintiffs thus have standing to raise RICO claims in the case; the motion to dismiss should be Denied.

## *I. BACKGROUND*

### *A. <u>The Alleged Fraudulent Enterprise</u>*

This case returns to this Court following remand from the Court of Appeals in an opinion that detailed the facts supporting the operative complaint, *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1173-75 (11th Cir. 2025), *cert. denied,* 223 L. Ed. 2d 508 (2026) [D.E. 215]. We incorporate the Court of Appeals' recitation of those allegations here. In summary, the Third Amended complaint [D.E. 187] alleges the following.

Beginning in February 2008, Citigroup Inc., the New York-based global financial institution, established a cash advance facility for Oceanografía S.A. de C.V. ("OSA"), then the largest oil-services company in Latin America. The facility operated through Citigroup's Institutional Clients Group ("ICG"), headquartered in New York, using Citigroup's Mexican subsidiary, Banamex. The mechanics were straightforward: OSA submitted work estimates reflecting services purportedly performed for México's state-owned oil company, Petróleos Mexicanos ("Pemex"); Citigroup, through ICG, prepaid OSA those amounts; Citigroup then sought reimbursement directly from Pemex; and Citigroup charged OSA interest on each advance for the period between disbursement and repayment—typically ninety to one hundred eighty days. Citigroup bore essentially no credit risk. It insisted on the right

---

1 All pretrial matters have been referred for appropriate disposition by presiding District Judge Darrin P. Gayles.

to collect repayment directly from Pemex, a sovereign entity, and its employees deliberately reclassified the advances as Pemex credit risk to keep internal controls from flagging the facility. [D.E. 187 ¶¶ 48, 73, 76, 115-17].

What made this product so lucrative was also what made it so susceptible to abuse: the larger the advance, the more interest Citigroup earned, with Pemex absorbing the repayment obligation regardless. According to the complaint, the incentive structure pointed in one direction only. [D.E. 187 ¶ 118 ("The greater the amount of the cash advances, the more interest Citigroup earned. Entirely insulated from risk, Citigroup had every incentive to permit, and indeed encourage, OSA to increasingly seek payment via cash advances. And that is precisely what happened.")].

Beginning as early as 2008, OSA began submitting fraudulent documentation—including forged Pemex signatures—to inflate the volume of cash advances. Citigroup's own ICG employees approved the false documentation. With each approval, the cycle accelerated. Between 2009 and 2012 alone, Citigroup raised OSA's cash advance limit on nine separate occasions, growing the facility more than sixfold. [D.E. 187 ¶¶ 104, 109, 118 122].

By 2012, Citigroup was advancing OSA $450 million, an amount that was purportedly nearly half of OSA's entire annual revenue of $920 million. In the final six months of the fraud, September 2013 through February 2014, Citigroup approved approximately $750 million in advances against contracts whose aggregate total value was only $542 million. More specifically, Cash advances of approximately $126 million flowed on a $39 million contract; $110 million on a $23 million contract; $88

million on a $32 million contract. As the complaint concludes, the arithmetic was, by that point, irreconcilable according with any legitimate business purpose. [D.E. 187 ¶¶ 119, 137, 140].

When Pemex refused reimbursement following a 2010 crisis, because the documentation was deemed to be fraudulent, Citigroup purported to implement corrective controls. In actuality, those controls were never followed according to the complaint. And in doing so, Citigroup knowingly allowed the fraud to continue from 2011 through early 2014. [D.E. 187 ¶¶ 125, 128, 134].

Indeed, in September 2012, Citigroup executed a secret "Regulatory Contract" with OSA that absolved Citigroup of responsibility for validating and authenticating the very documentation it was receiving. That contract was allegedly concealed from all plaintiffs. This furthers the claim that Citigroup chose to erect a paper wall to insulate Citigroup from liability while the fraud continued. [D.E. 187 ¶¶ 6, 90-92, 105-108].

Only years later, on February 28, 2014, Citigroup publicly disclosed the fraud. Citigroup's CEO acknowledged that employees "inside and outside" Mexico were involved. Approximately twelve employees were terminated, notably including several ICG employees based in the United States. Nevertheless, the complaint alleges that Citigroup's bottom line emerged unscathed as Pemex made Citigroup whole on all advances. Yet, Plaintiffs, who had extended credit, entered into charter agreements, and purchased bonds in reliance on OSA's represented financial health, received nothing. Their aggregate losses are alleged to exceed one billion dollars. [D.E. 187 ¶¶ 7, 15, 145-46].

The thirty plaintiffs fall into three categories, each with distinct United States ties. The shipping and service-provider plaintiffs include Otto Candies, LLC, a Louisiana limited liability company that operated vessels for OSA. Gulf Investments and Services Ltd. is a foreign entity whose principal is a United States citizen and resident. These plaintiffs say they extended services on the strength of Citigroup's representations about OSA's liquidity and the integrity of the cash advance facility.[2] [D.E. 187 ¶¶ 20, 23].

Another group of plaintiffs bought or held bonds issued by OSA or its affiliates. These bondholder plaintiffs include thirteen investment funds and Nordic Trustee AS, a Norwegian company serving as trustee for holders of OSA's 2013 bonds. In particular, OSA issued $335 million in bonds in the United States in 2008 under Securities Act Rule 144A. Significantly, Citibank N.A., Citigroup's United States banking arm, served as trustee and paying agent. The bonds were governed by New York law and traded in United States capital markets.[3] [D.E. 187 ¶¶ 26-27, 43-45].

---

[2] The shipping company and service provider plaintiffs also include Coastline Maritime Pte. Ltd. (together with Marfield Ltd. Inc. and Shanara Maritime International, S.A., Coastline); Shipyard De Hoop B.V.; Hoop Lobith International B.V. (together with Shipyard De Hoop B.V., De Hoop); Halani International Ltd.; and Máquinas Diesel S.A. de C.V. (MADISA).

[3] The bondholding plaintiffs include Adar Macro Fund Ltd.; Ashmore Emerging Markets Debt and Currency Fund Limited; Ashmore Emerging Markets High Yield Plus Fund Limited; Ashmore Emerging Markets Tri Asset Fund Limited; Ashmore SICAV in respect of Ashmore SICAV Emerging Markets Corporate Debt Fund; Ashmore SICAV in respect of Ashmore SICAV Emerging Markets Debt Fund; Ashmore SICAV in respect of Ashmore SICAV Emerging Markets High Yield Corporate Debt Fund (collectively with other Ashmore funds, Ashmore); Copernico Capital Partners (Bermuda) Ltd.; HBK Investments L.P.; HBK Master Fund L.P.; ICE Canyon LLC; ICE 1 EM CLO Limited; Padstow Financial Corp.; Moneda Deuda Latinoamericana Fondo de Inversión; Moneda International Inc.; Moneda Latin American Corporate Debt; Moneda Renta CLP Fondo de Inversión; Moneda S.A.

The investment manager plaintiffs (HBK Investments L.P., ICE Canyon LLC, and Waypoint Asset Management LLC) are United States entities. They sue as assignees of the civil RICO injury claims directly assigned by the bondholder funds they managed. [D.E. 187 ¶¶ 31-36, 46].

Coöperatieve Rabobank U.A., a Dutch bank, extended restructuring loans to OSA denominated in Euros. Its domestic connections are the most attenuated of any plaintiff in this proceeding: the bank maintains several branches in the United States but it is the bank's Mexican operations that had the greatest connection to OSA. [D.E. 187 ¶ 47].

### *B. Relevant Procedural History*

This case has traveled a long road. After Plaintiffs' initial complaint was dismissed on *forum non conveniens* grounds, the Eleventh Circuit reversed and remanded. *Otto Candies,* 963 F.3d 1331 (11th Cir. 2020).

On remand, the Court dismissed the Plaintiffs' second amended complaint. Plaintiffs then "pared down" their complaint into seven claims (in a third amended complaint spanning 538 pages and 1,977 paragraphs). This complaint, operative at this stage of the case, asserted these claims:

(1) substantive violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) under 18 U.S.C. § 1962(c);

---

Administradora General de Fondos (collectively with other Moneda funds and Padstow Financial Corporation, Moneda); Nordic Trustee; and Waypoint Asset Management LLC. Plaintiffs Adar, Ashmore, Copernico, HBK (on behalf of itself and GPF II), ICE, Moneda, and Waypoint purchased bonds in the 2008 issuance. Only Plaintiffs HBK and Moneda purchased bonds in the 2013 bond issuance. Plaintiff Nordic Trustee represents HBK and Moneda's interests in the 2013 bonds.

(2) conspiracy to violate RICO under 18 U.S.C. § 1962(d);

(3) common-law fraud;

(4) common law aiding and abetting fraud;

(5) common-law conspiracy to commit fraud;

(6) vicarious liability based on actual agency; and

(7) vicarious liability based on apparent agency.

[D.E. 187].

The District Court granted Citigroup's motion to dismiss, this time on Rule 12(b)(6) grounds, but that Order was reversed by the Eleventh Circuit, which in its last opinion held that the Third Amended Complaint plausibly alleges RICO and common law claims against Citigroup. *Otto Candies,* 137 F.4th at 1158-1207. The Court found that dismissal was improper as Citigroup's United States-based ICG operated, managed, supervised, and controlled the cash advance facility, and that this dispute is focused on Citigroup's conduct in the United States. *Id.* at 1180-82.

In particular, the Court's opinion held:

(1) the aiding and abetting claims were plausibly alleged because the complaint pleads that Citigroup employees and agents knew about and participated in, and indeed "substantially assisted," in the alleged fraud (*Id.* at 1183-84);

(2) the common law fraud claim was plausibly alleged as the complaint sufficiently pleads that specific fraudulent misrepresentations, both by Citigroup directly and indirectly based on OSA's mispresentations, damaged the plaintiffs that relied on the truthfulness of those representations (*Id.* at 1185-1196);

(3) the RICO claim should not have been dismissed on fraud predicate acts or continuity that were sufficiently pleaded (except as to the question the court reserved on whether other RICO elements, principally the domestic injury requirement, had been pleaded) (*Id.* at 1196-98);

(4) the vicarious liability claims for actual or apparent agency were also plausibly alleged (*Id.* at 1199-201);

(5) the RICO conspiracy claim was plausibly alleged in part because the complaint alleged that Citigroup and OSA worked together for several years to fraudulently induce and lure the plaintiffs into investing in OSA (*Id.* at 1201-03); and

(6) the common law conspiracy claim was also plausibly alleged as a myriad of allegations supported Citigroup's active participation in the fraud, both directly and through its agents, and in any event Citigroup could still be held responsible for OSA's actions because Citigroup both knew of the OSA scheme and substantially assisted in its success (*Id.* at 1204-06).

The Circuit remanded for this Court to determine, in the first instance, whether Plaintiffs have adequately alleged a domestic injury to assert a RICO claim. Having done so, we should proceed to the next stage of the case and leave the pleadings behind by denying the motion to dismiss as recommended below.

## *II. APPLICABLE PRINCIPLES*

Civil RICO allows a private right of action for "[a]ny person injured in his business or property by reason of a violation of" the RICO substantive provisions. 18 U.S.C. § 1964(c). In *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016), the Supreme Court held that this private cause of action does not apply extraterritorially

and requires a domestic injury to its business or property in order to establish standing to bring suit under RICO. In determining whether an injury is domestic or foreign, "[t]he application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.' " *Id.* at 354. (alteration added). To determine "whether the case involves a domestic application of the statute, . . [look] to the statute's 'focus.' If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* at 337.

In this manner, the domestic injury requirement could be satisfied if the racketeering activities alleged touch on predicate offenses committed abroad that Congress expressly acknowledged (like section 2332(a) for a pattern of killing Americans abroad). *Id.* at 339-40. Or, a RICO enterprise itself need not be a purely domestic enterprise so long as it "engage[s] in or affect[s] in some significant way commerce directly involving the United States – *e.g.,* commerce between the United States and a foreign country. Enterprises whose activities lack that anchor to U.S. commerce cannot sustain a RICO violation." *Id.* at 344.

Additionally, however, beyond satisfying the territorial reach of the RICO statute's substantive provisions, under section 1964(c) a private cause of action is unavailable for "injuries suffered outside of the United States." *Id.* at 349. The Court concluded that this statute "requires a civil RICO plaintiff to allege and prove a

domestic injury to business or property and does not allow recovery for foreign injuries." *Id.* at 354.

As to this latter requirement of the statute, the Court left open for another day the precise contours of that domestic injury requirement. It then focused on that narrower question in *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), which established how courts determine whether an injury is domestic: through "a case-specific analysis that looks to the circumstances surrounding the injury." *Id.* at 543. Three factors bear particular relevance: (1) the nature of the alleged injury; (2) the racketeering activity that directly caused it; and (3) the injurious aims and effects of that activity. *Id.* at 543–46.

Under this test, no single factor is dispositive; the inquiry is holistic. *Id.* at 544. The Supreme Court expressly rejected any rigid rule tying domestic injury to plaintiff domicile. So, as the Court found there, a Russian plaintiff whose economic loss was felt in Russia satisfied the domestic injury requirement because the racketeering activity and its injurious effects were centered in California. *Id.* at 545-46. Courts are thus bound not to treat a foreign plaintiff's residency as dispositive on whether its injury is domestic or foreign. *E.g., Catano v. Capuano*, No. 18-20223-CIV, 2019 WL 3890343, at *5 (S.D. Fla. May 28, 2019). They should instead consider "factors such as where the injury to a property interest took place, . . . and whether Plaintiffs were working, traveling or doing business in the United States at the time. . . ." *GolTV, Inc. v. Fox Sports Latin Am., Ltd.,* No. 16-24431-Civ-CMA, 2018 WL 1393790, at *20 (S.D. Fla. Jan. 26, 2018) (citations omitted). And in determining where the injury to property interests took place "courts must examine more closely the specific type of

injuries alleged. It is not enough simply to label the business or property injuries, tautologically, as 'economic' injuries." *Bascuñán v. Elsaca*, 874 F.3d 806, 817 (2d Cir. 2017)

Several key features of this framework matter here. The first is that the analysis is disaggregated. Where a complaint alleges separate schemes that harmed materially distinct interests in business or property, "each harm—that is to say, each 'injury'—should be analyzed separately for purposes of this inquiry." *Id.* at 814. And if one alleged injury is domestic, "then the plaintiff may recover for that particular injury even if all of the other injuries are foreign." *Id.* at 818. That principle governs a case like this one, in which thirty plaintiffs falling into three categories allege losses arising from a single course of conduct but through materially different property interests. The Court therefore does not ask whether "the" injury in this case is domestic; it should instead ask, plaintiff group by plaintiff group, which injuries fall within those criteria.

The second is that a plaintiff's residence is a fact, not a rule. *Yegiazaryan* rejected a bright-line test locating a plaintiff's injury at the plaintiff's residence. 599 U.S. at 544-45. The Second Circuit found as much six years earlier: "the location of the property and not the residency of the plaintiff is the dispositive factor." *Bascuñán*, 874 F.3d at 824. So had courts in this District. *See, e.g., GolTV,* 2018 WL 1393790, at *20 ("Evidence of foreign nationality or primary place of business alone is insufficient to categorize an injury as foreign under RICO."). The converse, of course, is equally true: an American domicile does not by itself make an injury domestic any more than

a foreign domicile makes it foreign. Residence is one circumstance among several others.

Third, property located in the United States when it is harmed will ordinarily yield a domestic injury. "[A]bsent some extraordinary circumstance, the injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad." *Bascuñán*, 874 F.3d at 820-21. Before *Yegiazaryan*, courts applied that rule to tangible property and applied a separate multi-factor test to intangible interests. *See, e.g., Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 707 (3d Cir. 2018) (looking to where the injury arose, the plaintiff's residence or principal place of business, where services were provided, where the benefits of those services were to be received, where the governing agreements were made and what law bound them, and where the activities giving rise to the dispute occurred). *Yegiazaryan* collapsed that division. As the Ninth Circuit put it, the Supreme Court's opinion "does not make such a distinction," and its "holding and definition of 'domestic injury'" therefore "apply uniformly." *Global Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1274 (9th Cir. 2023). The factors identified in *Humphrey* survive as circumstances relevant to the contextual inquiry. They no longer operate as a separate test for a separate class of property.

Fourth, the domestic injury requirement is not satisfied by the mere passage of money through American banks. "[T]he use of bank accounts located within the United States to facilitate or conceal the theft of property located outside of the United States does not, on its own, establish a domestic injury." *Bascuñán*, 874 F.3d at 819. The reason is practical. "Because of the primacy of American banking and

financial institutions, particularly those in New York, a transnational RICO case is often likely to involve in some way, however insignificant, financial transactions with American institutions." *Ibid.* A rule that treated any such transaction as domesticating the injury "might well effectively eliminate the effect of the domestic injury requirement in a large number of cases." *Ibid.*

The Fourth Circuit has also applied that limit to reject what it called a "conduct-plus-property rule" that simply looks to where the the plaintiff's property happened to sit at the moment of the racketeering conduct, as "racketeering conduct and the property it involves will so often be in the same place that a conduct-plus-property rule will mostly turn out to be just a conduct rule," which *RJR Nabisco* forbids. *Percival Partners Ltd. v. Nduom*, 99 F.4th 696, 702-03 (4th Cir. 2024).

Fifth, in applying these principles cases have converged on a rationale of justified expectations. The Second Circuit grounded its rule in the observation that "[f]oreign persons and entities that own private property located within the United States expect that our laws will protect them in the event of damage to that property." *Bascuñán*, 874 F.3d at 821. The Fourth Circuit relied on the same idea to the opposite effect, finding no domestic injury where the stolen funds "made their way to the United States only by virtue of the defendants' unilateral and unlawful conduct," so that the investors "had no reason to expect that United States law would protect their funds." *Percival*, 99 F.4th at 703-04. The focus of this expectation-based analysis is whether the plaintiff's relationship to the United States preceded the fraud or was manufactured by it.

Finally, the domestic injury requirement is an element of statutory standing; it is not a limit on this Court's subject matter jurisdiction. *Humphrey*, 905 F.3d at 701; *Catano,* 2019 WL 3890343, at *4. And the fact-bound character of the inquiry is no reason to defer it. "[T]here is no bar to review of a fact-specific claim at the pleading stage; that posture means only that we must . . . take as true all well-pleaded allegations in the complaint and draw all reasonable factual inferences from them in the plaintiff's favor." *Percival*, 99 F.4th at 704 n.4. Notably, *Yegiazaryan* itself was resolved on the pleadings. 599 U.S. at 543.

As we are addressing the issue on the pleadings, the traditional Rule 12(b)(6) standards still govern. On a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must plead facts sufficient to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And the Eleventh Circuit has endorsed "a 'two-pronged approach' in applying these principles: (1) eliminate any allegations in the complaint that are merely legal conclusions; and (2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal,* 556 U.S. at 679).

## *III. ANALYSIS*

### *A. <u>Plaintiffs Have Sufficiently Alleged a Domestic RICO Injury</u>*

Applying *Yegiazaryan*'s three-factor framework to the allegations in the TAC, the Court finds that the United States-domiciled plaintiffs, as well as the investment

manager plaintiffs suing as assignees of direct injury claims, have adequately alleged a domestic injury. We will address each factor separately.

### *1. The Nature of the Alleged Injury*

The first factor to consider is a very broad concept: the nature of the alleged injury. The Court in *Yegiazaryan* described this factor as a practical based inquiry focusing on the injury alleged to be the product of the racketeering activity alleged in the case: "in assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury. If those circumstances sufficiently ground the injury in the United States, such that it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury." 599 U.S. at 545.

We can get a fairly helpful idea of what the Court was talking about by taking a closer look at the facts in *Yegiazaryan*. There the dispute involved a Russian plaintiff who held a multimillion dollar California judgment against a Russian defendant who relocated to California to avoid criminal charges in Russia. The foreign plaintiff obtained an arbitration award against the defendant, which award was domesticated in California after he relocated there. The judgment went unpaid, allegedly due in part to shenanigans the defendant engaged in to hide his assets. The foreign plaintiff then sued in the Central District of California alleging that the judgment debtor, with the assistance of a Monaco bank, engaged in a pattern of criminal activity, including procuring of fraudulent documents and forged

documents, all designed to prevent the plaintiff from collecting on his California judgment. *Id.* at 537-39.

The legal issue that generated the Supreme Court proceeding was the defense that a domestic RICO injury was not satisfied in the case, as required by *RJR Nabisco,* given that the plaintiff was Russian, the defendant was Russian, the underlying fraud originated in Russia, and the judgment at issue arose from a London-based arbitration. But the Supreme Court focused on allegations in the complaint that laid out a racketeering scheme involving a California resident who was engaging others to help frustrate the collection on a California judgment through a pattern of wire fraud and other RICO predicate racketeering acts, including witness tampering and obstruction of justice. *Id.* at 539.

In particular, the Court found the "nature" of the injury to be sufficiently domestic in that case because "much of the alleged racketeering activity that caused the injury occurred in the United States. Yegiazaryan took domestic actions to avoid collection, including allegedly creating U.S. shell companies to hide his U.S. assets, submitting a forged doctor's note to a California District Court, and intimidating a U.S.-based witness." *Id.* at 545. And that was true even though "other components of the scheme occurred abroad." *Ibid.*

With that guidance, what was the "nature" of the injury alleged in this case? OSA's 2008 bonds were issued in the United States, under Rule 144A, through Citibank N.A. as trustee and paying agent. The property interest at stake—the right to collect on those instruments—is a United States-law right, governed by New York law, held by entities domiciled in the United States financial system. This is very

much unlike a non-domestic injury suffered by Ghanaian depositors in a Ghanaian bank. *See Percival,* 99 F.4th at 701-04. Nor is it the type of injury suffered by individuals whose property interest was limited to a foreign business dispute by foreign citizens who simply used American bank accounts to further the foreign scheme. *See Yerkyn v. Yakovlevich*, 164 F.4th 224, 229-32 (2d Cir. 2026). The property rights here, including bond instruments issued under federal securities law, governed by New York law, and held in the United States capital markets, are inherently domestic in character.

To begin with, the shipping plaintiffs present the analysis in starker fashion. Otto Candies, LLC is a Louisiana limited liability company. Its claimed injury is the loss of charter income flowing from a fraud-induced business relationship. That is an injury to the business of a United States entity. The nature of its injury clearly arose in the United States. *See, e.g., Global Master,* 76 F.4th at 1276 (injury arising where plaintiff took delivery of and assumed legal title in California was domestic despite ultimate foreign destination). And the same is true for other substantial U.S. investors and U.S.-based operations, such as the Investment Manager Plaintiffs HBK Investments and Waypoint Asset Management.

But even as to non-U.S plaintiffs, the operative complaint [D.E. 187 ¶¶ 1799-1829] lays out in great detail (synthesized below) the nature of the domestic injury alleged suffered by each entity due to Citigroup's alleged racketeering activity that was allegedly conducted in the United States and harmed the plaintiffs' U.S.-based interests:

- Adar suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the reduction in the value of those 2008 bonds, following its reliance on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and in retaining those bonds through OSA's collapse in February 2014. Citigroup's pattern of racketeering activity misled Adar into believing that OSA was financially stable, that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay the interest and principal of the 2008 bonds, and that the 2008 bonds were an attractive investment.
- Ashmore similarly suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the reduction in the value of those 2008 bonds, in reliance on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and in retaining those bonds through OSA's collapse in February 2014.
- The Copernico Funds also suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the reduction in the value of those 2008 bonds, in reliance on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and in retaining those bonds through OSA's collapse in February 2014. And OSA, with the substantial assistance of Citigroup, met with and marketed the bonds to Copernico in New York

in March 2013, just two months before Copernico purchased its 2008 bonds in May 2013.

- GPF II suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the reduction in the value of those 2008 bonds, in reliance on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and in retaining those bonds through OSA's collapse in February 2014. In addition, 82.1% of GPF II's investors were U.S. investors, who have suffered domestic injury through the non-payment of interest and principal and the near absolute reduction in the value of the 2008 bonds as a direct result of the pattern of racketeering activity.
- The ICE Fund also suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the reduction in the value of those 2008 bonds, in reliance on Citigroup's fraudulent statements and communications as to its funds' purchasing bonds from the 2008 Bond Issuance and retaining those bonds.
- The Moneda Funds similarly suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the reduction in the value of those 2008 bonds, in reliance on Citigroup's fraudulent statements and communications as to purchasing bonds from the 2008 Bond Issuance and retaining those bonds. And the Moneda Funds include U.S. investors, who purchased the 2008 bonds through a brokerage account with J.P. Morgan Securities Inc. in New York and

have suffered domestic injury through the non-payment of interest and principal and the reduction in the value of the 2008 bonds as a direct result of the pattern of racketeering activity.

- Nordic Trustee is on a different footing. It represents the interests of the 2013 Bondholders, and they purport to have suffered domestic injury through OSA's failure to pay the principal and interest owed on the 2013 bonds and the reduction in the value of the 2013 bonds, in reliance on Citigroup's fraudulent statements and communications in purchasing bonds from the 2013 Bond Issuance and retaining those bonds. The 2013 Bondholders allege that they relied on Nordic Trustee's agreement to serve as Trustee of the 2013 Bond Issuance, which itself was the product of Nordic Trustee's reliance on Citigroup's pattern of racketeering activity.
- Waypoint instead suffered a direct domestic injury through OSA's failure to pay the principal and interest owed on the 2008 bonds and the reduction in the value of those 2008 bonds, in reliance on Citigroup's fraudulent statements and communications in purchasing bonds from the 2008 Bond Issuance and retaining those bonds.
- Coastline is in a very different position. It allegedly suffered domestic injury through the loss of charter fees for the Caballo Marango and the Caballo Maya as a result of Citigroup's fraudulent scheme and pattern of racketeering activity. OSA, using false information prepared with the substantial assistance of Citigroup, met with Coastline in Houston,

Texas on or about April 30, 2012 to persuade Coastline to continue chartering the Caballo Mayo and Caballo Marango to it and to negotiate the proposed sale of the Caballo Marango to OSA.

- De Hoop similarly suffered domestic injury through its inability to recover the De Hoop Security Deposit, OSA's failure to pay for the De Hoop Goods and Services, and OSA's failure to complete payment for the seven new vessels De Hoop agreed to build for it. De Hoop claims to have relied on Citigroup's fraudulent statements and communications in agreeing to OSA's requests to restructure its loans with Rabobank and in agreeing to construct additional ships for OSA. De Hoop was further harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity also allegedly misled De Hoop into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its loans to Rabobank and pay De Hoop for the construction of new vessels.
- Gulf suffered domestic injury through the loss of lease payments for the Titan 2 from April 2013 to the present, the loss of the use of Titan 2 as a result of OSA's collapse and the inability to lease that vessel for a period of years, and the material degradation of Titan 2. Gulf purports to have relied on Citigroup's fraudulent statements and communications in agreeing to begin and continue leasing the Titan 2 to OSA. Gulf was

further directly harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. And like the other plaintiffs, Citigroup's pattern of racketeering activity misled Gulf into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its lease to Gulf. 1824. Moreover, Citigroup's pattern of racketeering activity against Gulf reached into the United States to inflict domestic injury on Gulf. Specifically, in May 2011, OSA, with the substantial assistance of Citigroup, communicated fraudulent information to Gulf's CEO and owner, Erik Arne Hall, at a meeting in Houston, Texas.

- Like Gulf, Halani also suffered domestic injury through the loss of overdue lease payments. Halani relied on Citigroup's fraudulent statements and communications in agreeing to begin and continue leasing the Halani 1 to OSA. Halani was further harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's alleged pattern of racketeering activity misled Halani into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its lease to Halani. And notably in May 2013, OSA, with the substantial assistance of

Citigroup, communicated fraudulent information to Halani during the annual Offshore Technology Conference in Houston, Texas.

- MADISA stands on very different footing. MADISA purports to suffered domestic injury through the loss of past-due invoices that have not been paid by OSA. But MADISA claims it relied on Citigroup's fraudulent statements and communications in entering into equipment and maintenance service agreements with OSA and delaying cancelation of those agreements when OSA failed to make payments on time. MADISA was further harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled MADISA into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its lease to MADISA.

- Finally, Rabobank suffered domestic injury through the loss of the interest and principal due on the loans it made to OSA. Rabobank relied on Citigroup's fraudulent statements and communications in renegotiating the terms of its loans the OSA, entering into the various trust agreements and amendments, and declining to take action against OSA when it failed to make timely payments on the loans. Rabobank was further harmed by the instances of wire fraud described above, by which Citigroup denied all investors, creditors and vendors access to

> truthful information about OSA and its financial situation. Citigroup's pattern of racketeering activity misled Rabobank into believing that OSA was financially stable and that the cash advance facility provided OSA with a reliable source of liquidity with which it could pay its lease to Rabobank. And certain payments were made, and were to be made (but were never received) in the Rabobank Trust in U.S. dollars to a U.S. financial institution.

Citigroup's response to all these varying allegations is that these losses were nonetheless ultimately felt where each plaintiff sits – *i.e.* in Oslo, in Santiago, in Utrecht – despite the complaint's allegations that the injured property interests were created, held, and enforceable in the United States. But that is a claim about where a loss was ultimately booked. It is not a claim about where the *injury* arose. These are different inquiries. The relevant inquiry is where the injury arose, not simply where a plaintiff is located. As the Supreme Court put it in *Yegiazaryan*, if the circumstances "ground the injury in the United States," and "it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury." 599 U.S. at 545.

Citigroup's position makes the now-rejected mistake of treating the tangible completion of a tort-like measure of damages as the "injury" that section 1964(c) speaks to. The Supreme Court, no less, has already rejected that view expressly in the section 1964(c) context. In *Medical Marijuana, Inc. v. Horn,* 604 U.S. 593 (2025), the Court held that "injured" under this provision does not have a specialized, tort-like definition. Instead, one is "injured" under the ordinary meaning of that term: by suffering any wrong, loss, harm or hurt to one's property. *Id.* at 603-04. That is true

in part because the same provision also allows the recovery of "damages" to a plaintiff who suffers any of those types of injuries:

> By allowing a plaintiff to recover "threefold the damages he sustains," the statute [§ 1964(c)] allows a plaintiff to recover triple the amount that makes him whole. . . . And if "damages" refers to "monetary redress," it obviously means something different from "hurt or harmed." Giving "injured" its ordinary meaning, therefore, is perfectly consistent with the meaningful-variation canon. Besides, Medical Marijuana's preferred definition of "damages" is untenable. Under it, the statute would allow a plaintiff to recover "threefold the loss, hurt, or harm he sustains." That makes little sense.

*Id.* at 604 (holding that one can suffer an injury to one's business or property under section 1964(c) even if economic harms derive from unrecoverable personal injuries).

Most relevant to our case, the Court's opinion also looked to its decision in *Yegiazaryan* as further reason why the two terms must connote different events:

> [*Yegiazaryan*] . . . adopted a contextual, fact-intensive inquiry that accounts for "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." . . . Medical Marijuana's argument stands in significant tension with *Yegiazaryan*. Carried to its logical conclusion, a tort-centric reading of § 1964(c) would require that courts refer to choice-of-law principles governing the "place of wrong" when locating the situs of a RICO injury. . . . Those principles dictate looking to where "the last event necessary to make an actor liable for an alleged tort takes place." . . . So there would be no reason for a court to use a contextual approach, surveying the "injurious effects" of the defendant's conduct and pinpointing where they "largely manifested." . . . But this is the precise approach we outlined in *Yegiazaryan*. And we rejected the petitioner's appeal to the common law, deeming it inconsistent with "the thrust of § 1964(c)."

*Id.* at 606 (citations omitted).

Thus the foreign Plaintiffs may have suffered "damages" only at the point that the extent of the reduction in value of the OSA bonds could be measured, which one could say occurred where they are each domiciled. But they were "injured" under

section 1964(c) when the RICO conspirators' acts first caused them "harm" by purchasing OSA bonds, by retaining those bonds even after Citigroup knew of the scheme, or by lost fees, leases and monies resulting from representations and omissions from Citigroup from the United States. In each Plaintiff's case, the injuries all arose in and from the United States because the key co-conspirator, Citigroup's ICG, engaged in its activities in and from the United States. *See also Sedima, S. P. R. L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) ("the compensable *injury* necessarily is the *harm* caused by predicate acts sufficiently related to constitute a pattern.") (emphasis added); *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639, 644, n.3 (2008) ("For present purposes, it suffices that respondents allege they 'suffered the loss of property related to the liens they would have been able to acquire' "); *Klehr v. A. O. Smith Corp.*, 521 U.S. 179, 191 (1997) ("[T]heir injuries—the harm to their farm—have always been specific and calculable"); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 271 (1992) (equating "injuries" with "losses suffered").

Next we will focus on the circumstances grounding these alleged injuries in the United States in the context of the broader discussion of the second factor: the nature and circumstances of the racketeering activity that caused them.

### *2. The Racketeering Activity that Directly Caused the Injuries*

The TAC alleges that Citigroup's ICG, a group headquartered in New York, operated, managed, supervised, and controlled the cash advance facility. The Eleventh Circuit recognized the significance of this claim in reversing the dismissal of the complaint, both on forum non conveniens as well as Rule 12(b)(6) grounds. Wire transfers moved through United States correspondent banking channels. The joint

Citigroup-OSA Management Presentation bearing the Citi logo, disseminated to investors in December 2013, was prepared in significant part by Citigroup's own ICG executives. Citibank N.A., as United States trustee for the 2008 bonds, occupied a position of trust in the United States capital market throughout the period of the fraud. And the bulk of the alleged injuries in the TAC revolve around the reduction in value of those bonds once the fraud was discovered. These are all tangible elements of Citigroup's complicit activity that furthered that fraud, and the "focus" of them all revolve around its United States operations.

Citigroup argues that because the cash advance facility's day-to-day execution occurred within Banamex and in Mexico City, the operative locus of the fraud was Mexico. The argument has limited facial appeal but fails on closer examination. The question we must focus on under *Yegiazaryan* is not where the scheme's operational employees were stationed; it is whether the defendant's role in the racketeering activity that caused the injury was domestic. Based on the Eleventh Circuit's own detailed analysis of the TAC, it certainly was with respect to Citigroup. The alleged injury to the 2008 bondholders was caused, directly, by misrepresentations about the cash advance facility's integrity and reliability, which are misrepresentations originating with ICG and communicated through Citigroup's United States operations. It is simply not persuasive to make believe this aspect of the alleged conspiracy has little to do with the case. With respect to Citigroup's potential liability, it has almost *everything* to do with the case. This materially contributes to a domestic injury for RICO purposes. *See, e.g., Ferguson v. Republic of Trinidad & Tobago*, 422 So. 3d 717, 719–20 (Fla. 3d DCA 2025) (domestic injury for purposes of federal and

Florida RICO claims were established where a scheme aimed at a foreign sovereign's foreign construction project was devised, initiated, and carried out through acts and communications initiated in and directed toward Florida).

Citigroup's reliance on *Percival Partners* in its motion and reply memorandum only illustrates the distinction that we are bound to draw based on the pleaded allegations, rather than supporting dismissal. There, the defendants' use of United States wire transfers was peripheral to the overall fraudulent enterprise: mere routing in the course of a scheme whose aim, execution, and effects were all centered in Ghana. 99 F.4th at 700-01. Here, the financial institution that materially furthered the alleged fraud, Citigroup, is itself *the* defendant. So unlike *Percival*, the United States institution was not a conduit; it was the enterprise. (We return to *Percival* at greater length below).

So what we have gleaned so far from the TAC's allegations, which are assumed to be true for purposes of a motion to dismiss, is that the financial institution furthered the fraud, through misrepresentations, actions, and omissions that were hatched in and carried out from New York at ICG. The Plaintiffs are alleging that, without this aspect of the RICO conspiracy, they would not have been injured to the extent they were but for ICG's central role in the conspiracy. The nature of the injuries and the context in which the racketeering activity drove those injuries all "focus" on Citigroup in the United States, not just Mexico where the operational-level actors engaged in their roles in the conspiracy.

Of course, as we know from *RJR Nabisco*, the place of the racketeering activity is not dispositive in the domestic injury calculus. 579 U.S. at 335. But after

*Yegiazayran*, there is also no doubt that the location of the racketeering activity itself is a very relevant factor. *See, e.g., Percival,* 99 F.4th at 702 ("It is true that the RICO case law, *Yegiazaryan* prominently included, instructs that the place of racketeering conduct may be relevant to whether an injury is domestic or foreign. Civil RICO's 'focus is on the injury, not in isolation, but as the product of racketeering activity.'") (quoting *Yegiazaryan,* 599 U.S. at 545).

Like *Yegiazaryan*, we find here that "much of the alleged racketeering activity that caused the injury occurred in the United States." 599 U.S. at 545. Though not dispositive, this conclusion further bolsters the case for finding domestic injury under section 1964(c). And as we explain below, the third prong of the "context-specific inquiry" settles the matter.

***3. The Injurious Aims and Effects of the Racketeering Activity***

As part and parcel of these earlier findings, it is evident that the scheme's aims were not confined to Mexico. They were directed, in material part, at entities operating in the United States capital markets. OSA's $335 million 2008 bond issuance was made in the United States, to United States market participants (who are party-plaintiffs in the case). The December 2013 Management Presentation was disseminated to investors (who are party-plaintiffs in the case), including United States-based investors, one month before OSA's collapse. When the fraud was discovered, it was Citigroup's internal investigation team in Miami, Florida that led the response. The injurious aims of the "scheme" at the heart of the TAC were transnational, but they encompassed United States capital markets and United

States investors as deliberate targets. Those connections were not incidental; they were central to the overall alleged purpose of the scheme.

A good illustration is found in the Second Circuit's pre-*Yegiazaryan* decision that falls squarely in line with the Supreme Court's analysis. In *Bascuñán*, a citizen and resident of Chile inherited a substantial estate from his parents in the 1990s, including a stake in Banco de Crédito e Inversiones (BCI), Chile's third-largest bank. Unable to manage his own finances, he retained a financial manager, his Chilean cousin, to whom he granted a broad power of attorney that permitted self-dealing without prior authorization. Before he fired him, the plaintiff alleged that over roughly a decade his cousin and co-defendants diverted about $64 million from the estate through four schemes. 874 F.3d at 810-11. The plaintiff sued for damages from the conspirators through fraud and RICO claims filed in New York. The defendants convinced the district court, however, to dismiss the RICO claims for lack of standing under the domestic injury requirement. The district court did not analyze the schemes separately. It characterized the RICO injury globally as "]"an economic loss of approximately $64 million," then located that loss by analogy to New York's borrowing statute, CPLR § 202, asking who became poorer and where. Because economic loss is normally felt at the plaintiff's residence, and Bascuñán resided in Chile, the court held all injuries foreign and dismissed. *Id.* at 810, 813-14.

On appeal, the Court of Appeals agreed that two of the schemes failed for lack of standing. The "Dividend Scheme" involved funds owned by a foreign corporation and held in a Chilean bank account; the only domestic element was that the defendant moved the money to his own New York accounts after taking it. The

Anacapri scheme involved the laundering of a Chilean fund's proceeds through accounts in New York and elsewhere. As to both, "the only domestic connections alleged here were acts of the defendant," and the plaintiff "and his relevant property always remained abroad." *Id.* at 818-19.

But the Court of Appeals took a closer look at two other alleged schemes and concluded that they *did* satisfy the domestic injury requirement. The misappropriation of roughly $3 million from a J.P. Morgan account in New York, and the physical removal of bearer shares from a New York safety deposit box, were racketeering activities that focused on New York and generated New York injuries. *Id.* at 820-23. These latter investments were created by the plaintiff in financial institutions based in New York for his financial benefit, which investments were negatively harmed by the fraudulent scheme. The Court reversed dismissal as to these elements of the RICO claim because:

> Foreign persons and entities that own private property located within the United States expect that our laws will protect them in the event of damage to that property. That modest expectation is entirely justified, especially when we consider that a foreign resident's property located in the United States is otherwise subject to all of the regulations imposed on private property by American state and federal law.

*Id*. at 821.

This case thus illustrates that a critical aspect of the analysis is the distinction between ancillary connections with U.S. financial systems that a wrongdoer may have used, versus the direct investment and use of the benefits of U.S. financial systems or investments by a foreign investor who was injured by the theft or devaluation of those very same interests. The bond allegations in the TAC belong to the latter in multiple ways: (1) OSA's 2008 bonds were issued in the United States

under Securities Act Rule 144A; (2) Citibank N.A., Citigroup's United States banking arm, served as trustee and paying agent; and (3) the instruments were governed by New York law and traded in United States capital markets. [D.E. 187 ¶¶ 26-27, 43-45]. These property interests were not isolated connections utilized by the alleged wrongdoers; they were substantial interests procured by the Plaintiffs in reliance on Citibank, its agents, and its affiliates' alleged misrepresentations. The "focus" of these procured interests are thus squarely in the United States – specifically the United States's financial center in New York City.

Moreover, like the trust funds in *Bascuñán*, this property "could be located within the jurisdiction of the United States at all times relevant to the complaint." 874 F.3d at 823. And unlike the "dividend scheme" in that case, these Plaintiffs' connection to the United States did not begin when the defendant's wires began to move; they began when they acquired instruments issued here, governed by our law, through a United States trustee.

In this case, these Plaintiffs have thus alleged more than enough to confer standing to raise RICO allegations for the fraud that caused them injury to their U.S.-backed and generated interests. In fact, further support for this conclusion can be found in some of the very authorities that Citigroup points to. *Percival Partners* is Citigroup's lead authority, where Ghanaian investors placed Ghanaian funds with a Ghanaian investment firm on the promise that the money would be lent to small businesses in Africa. The Nduom family, Ghanaians domiciled in Virginia, wired the money out through a Virginia company and a web of shell entities on both continents.

When U.S. litigation ensued that included RICO allegations, the Fourth Circuit held the Ghanaian investors' injuries were foreign. 99 F.4th at 701-04.

But three key features of this holding matter, and each runs the other way here. First, the defendant. In *Percival* the American entity was a recipient and a laundering vehicle; the enterprise's aim, execution, and injured property were all Ghanaian. Here, by contrast, the American entity – Citigroup – is the defendant/co-conspirator, and the TAC alleges that Citigroup's New York-based Institutional Clients Group operated, managed, supervised, and controlled the cash advance facility. As we know by now, these allegations have been found to be legally sufficient to connect the Mexican fraud scheme with Citibank. *Otto Candies*, 137 F.4th at 1180-82. So the contrast in these two cases is palpable: the United States institution in *Percival* was a conduit; in this case the United States institution is a key component in the enterprise.

Second, the property. The *Percival* plaintiffs, the court observed, "can point only to conduct." 99 F.4th at 704. That is precisely how the court distinguished *Yegiazaryan*, where "that domestic conduct was accompanied by inherently domestic property – the rights under a California judgment – and resulting domestic effects." *Id.* at 703-04. But here the 2008 bonds are this case's California judgment. A right to payment on a Rule 144A instrument governed by New York law and enforced through a United States indenture trustee is a right that exists *here* and, in any meaningful sense, nowhere else.

Third, expectation. The *Percival* investors "had no reason to believe the money they invested in Ghana would migrate to the United States," and so "no reason to

expect that United States law would protect their funds." *Id.* at 703-04. Again, the contrast here is undeniable. The bondholders made the opposite choice at the outset. They bought paper issued into the United States market, under United States securities law, governed by New York law, with a United States trustee standing behind it. Neither they, nor the alleged wrongdoers, stumbled into the protection of American law. On the TAC's allegations, they bargained for it. That makes their claim for a domestic injury far more concrete, as *Percival* itself put it: "if property is located in the United States when it is stolen or harmed . . . then its owners will reasonably expect that our laws will protect them." *Id.* at 704. And further "under those circumstances, allowing a cause of action under RICO will simply 'protect[ ] the interest each sovereign has in regulating the private property situated in its own territory,' reducing the possibility of 'international discord.'" *Ibid.* (quoting *Bascuñán*, 874 F.3d at 821-22).

Our research has not revealed any case closely similar to this one where RICO domestic injury standing was found to be wanting. The Florida case of *Ferguson v. Republic of Trinidad & Tobago*, 422 So. 3d at 717, decided last November, is the closest factual analogue the Court has found, which only further supports Plaintiffs' position. A foreign sovereign sued over a bid-rigging and kickback scheme surrounding construction of an airport in Port of Spain. Trinidad and Tobago paid every dollar of the overcharge, and the airport is in Trinidad. The Third District nonetheless held the injury domestic under Florida's Civil RICO Act (which is largely construed in accordance with federal RICO decisions) because the conspiracy was "hatched" in Miami, co-conspirators "lived in and orchestrated the scheme from

Florida," fake invoices and backdated contracts were created there and incriminating evidence destroyed there, and because "funds to advance the conspiracy flowed into and out of Florida." *Id.* at 719-20, 726. One detail is directly on point: "To pay for part of the project, Trinidad and Tobago obtained a loan in the form of a letter of credit from a bank in Miami. The letter of credit was an asset of Trinidad and Tobago located in Miami and depleted in part by the conspiracy." *Id.* at 726 (Logue, J., concurring).

The parallel is close, and it runs in the Plaintiffs' favor at each step. The 2008 bonds are this case's Miami letter of credit: a United States financial instrument, held within the United States system, alleged to have been depleted by the scheme. The Houston meetings are this case's Miami meetings. [D.E. 187 ¶¶ 1799-1829] (alleging that OSA, with Citigroup's substantial assistance, conveyed fraudulent information to De Hoop in Houston in May 2010, to Gulf's principal in Houston in May 2011, to Coastline in Houston on or about April 30, 2012, and to Halani at the Offshore Technology Conference in Houston in May 2013). The March 2013 New York marketing meeting that preceded Copernico's May 2013 bond purchase is another. *Id.* And the posture cuts the same way. *Ferguson* sustained a domestic injury finding after a month-long jury trial, on a fully developed record, viewing the evidence in the light most favorable to the verdict. 422 So. 3d at 719. This Court at this stage is tasked with finding only whether well-pleaded allegations, taken as true, plausibly ground the injury here. If the *Ferguson* record sufficed after trial, this complaint amply suffices at the pleading stage. We can certainly revisit the matter at summary judgment or at trial, but for now where all inferences must be drawn in Plaintiffs' favor Defendants' standing objections ring quite hollow.

*Catano* is this Court's own prior decision that touched on this question, and Citigroup's position would require departing from it. A Guatemalan plaintiff who had never lived in the United States sued over the embezzlement of the proceeds of a Miami property. The defendant argued that residence controlled, that the plaintiff's interest was contingent on a Guatemalan probate proceeding, and that any injury was therefore foreign. The Court rejected both arguments. Residence "is not dispositive on whether her injury is foreign or domestic." 2019 WL 3890343, at *5. And the contingency argument failed because "it is only the entitlement to the Florida real estate that is contingent on a foreign proceeding whereas the interest itself is undeniably domestic." *Ibid.* Holding otherwise "would undermine civil RICO claims for domestic property interests merely because there is a question presented in a foreign proceeding as to the ownership of that property." *Ibid.*

That reasoning answers a version of the argument Citigroup presses here. OSA's collapse and the proceedings that followed it unfolded in Mexico, and the recovery any bondholder ultimately obtains from OSA's estate will be determined there. But the property interest the racketeering activity is alleged to have destroyed – the right to payment on New York-law instruments issued in the United States through a United States trustee – is domestic regardless of the forum in which OSA's remains are administered.

Another case from our district supplies the same principle in a commercial setting, *GolTV*, where Global Sports, a Uruguayan company with no United States base, lost its bids to purchase United States and Americas broadcasting rights to certain soccer tournaments. Judge Altonaga held the injury domestic because "[e]ach

of the bids was also an attempt by Global Sports to do business in the United States," and because "[e]vidence of foreign nationality or primary place of business alone is insufficient to categorize an injury as foreign under RICO." 2018 WL 1393790, at *20. At minimum the bondholder funds here stand in the same or better position. They did not merely attempt to do business in the United States; they completed it, purchasing instruments issued into the United States market (and in the case of the Moneda Funds' United States investors, through a brokerage account with J.P. Morgan Securities in New York). [D.E. 187 ¶¶ 43-45, 1799-1829].

Other cases outside our District lend further support to Plaintiffs' position. The Ninth Circuit's *Global Master* decision addresses the objection that the bond losses were ultimately felt abroad. A Chinese company bought nutritional supplements from a California supplier; the supplier substituted inferior product; and the loss was realized in the Chinese market where the company resold. The Ninth Circuit held the injury domestic anyway. The purchase orders were F.O.B. Los Angeles, so "legal title and risk of loss passed to [the buyer] in Los Angeles," and it therefore "owned the injured property in the United States." 76 F.4th at 1276. "Even though the supplements were ultimately shipped to China, this is not dispositive." *Id.*

Now, substitute U.S.-issued bonds for those nutrition supplements. The 2008 Bond Plaintiffs acquired their property interest in the United States, in an offering made in the United States under Rule 144A, through a United States trustee. That the funds used to purchase them were domiciled abroad, or that the investors' books ultimately recorded the loss abroad, is this case's shipment to China. It is a circumstance in the analysis. It is not *the* analysis. But, like *Global Master,* the

Plaintiffs' expectations in procuring bonds that were administered by an uber-established U.S. financial giant, Citigroup, provide strong support for a showing of domestic injury as *Yegiazaryan* envisioned it.

We could stop there but, while we are at it we should take note of a Southern District of New York case that is also a close post-*Yegiazaryan* analogue on the pleadings, *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20-CV-4650 (ER), 2024 WL 4008120 (S.D.N.Y. Aug. 30, 2024). The plaintiffs there were a company based in the United Arab Emirates and its South African principal. Neither was located in the United States, and, like Citigroup, the defendants argued that this fact alone defeated the domestic injury requirement. The court disagreed, because "most of [the defendants'] racketeering activities occurred in the United States": the individual defendant resided in New York, the enterprise was headquartered in New York, the fraudulent white paper and token purchase agreement were transmitted from New York, and the plaintiff met the defendant in person in New York, "where [he] continued his fraudulent misrepresentations." 2024 WL 4008120, at *16. Those circumstances "indicate the injury arose in the United States." *Ibid.*

The structural parallel is close. The enterprise's management here is alleged to have sat in New York. [D.E. 187 ¶¶ 48, 73, 115-17]. The document the investors are alleged to have relied upon (including the December 2013 Management Presentation bearing the Citi logo) is alleged to have been prepared in significant part by ICG executives in the United States. And the TAC alleges an in-person New York marketing meeting two months before that investor bought its bonds. [D.E. 187 ¶¶ 1799-1829].

Citigroup would say that the alleged misrepresentations in *Digilytic* ran directly from New York to the plaintiff, whereas here the operative communications ran through Banamex and OSA in Mexico. As to some plaintiffs and some communications, the distinction may have some force. But at the pleading stage we have seen enough to allow the factual distinctions to get fleshed out in discovery before trial. For now, we simply hold that the Plaintiffs' allegations collectively support a finding at this stage that a domestic injury has been firmly established for both the U.S. and non-U.S. entities and that they have standing to proceed to the next stages of the case. *See also Aquino v. Mobis Alabama, LLC*, 739 F. Supp. 3d 1152, 1184-87 (N.D. Ga. 2024) (domestic injury for RICO claim found where the scheme was devised and directed from the United States even though only one causal link between that conduct and plaintiffs' losses and some of plaintiffs' injuries were suffered in Mexico; "Accepting Plaintiffs' factual averments as true, there is no doubt that the Plaintiffs were 'injured by racketeering activity either taken in [Georgia] or directed from [Georgia], with the aim and effect' of getting Plaintiffs to Georgia using a TN visa to secure cheap labor.") (quoting *Yegiazaryan*, 599 U.S. at 546); *Khan Funds Mgmt. Am., Inc. v. Nations Technologies Inc.*, No. 23 Civ. 5000, 2025 WL 1003964 (S.D.N.Y. Mar. 31, 2025) (financial and investment losses caused by racketeering in the United States satisfied *Yegiazaryan*'s contextual standard).

### ***B. Citigroup's Arguments Fail to Persuade***

Citigroup advances three overarching arguments in support of its motion, and a fourth is implicit in the first three. None carries the day, as we discussed above in detail and summarize below.

First, Citigroup argues that the Bond Plaintiffs' investment losses were necessarily felt in the foreign countries where they are located. That argument was the basis of the prior dismissal. *Yegiazaryan* rejected it. The Supreme Court held that a foreign plaintiff can satisfy the domestic injury requirement when the circumstances surrounding the alleged injury "sufficiently ground the injury in the United States." 599 U.S. at 545. Plaintiff residence is a factor in the contextual inquiry; it is not dispositive in either direction.

Second, Citigroup argues that the fraud was targeted at and centered on Mexico. As an account of how the scheme was executed at the operational level, this has some basis in the pleading. But Citigroup is not a Mexican company. The enterprise's management and control, the ICG, is based in New York and carried out a great deal of its alleged racketeering activities from New York. The Eleventh Circuit has twice rejected Citigroup's characterization of the TAC as a primarily Mexican fraud carried out by Mexican actors. This Court is bound by that characterization of the pleading.

Third, Citigroup relies principally on *Percival Partners* and *Yerkyn* for the proposition that the use of United States financial infrastructure does not transform a foreign injury into a domestic one. But as discussed earlier, *Percival* and *Yerkyn* involved schemes that were foreign in their aims, their actors, and their injured property, with incidental routing through United States accounts. This case involves a United States defendant, a United States-chartered trustee, United States-law bond instruments, and a scheme whose controlling enterprise operated from United States soil. Accepting Citigroup's argument would require treating Citigroup's New

York headquarters as legally irrelevant. *Yegiazaryan's* context-specific standard does not permit that, especially at the pleading stage. *See Yegiazaryan,* 599 U.S. at 545 ("RICO covers a wide range of predicate acts and is notoriously 'expansive' in scope. . . . Thus, depending on the allegations, what is relevant in one case to assessing where the injury arose may not be pertinent in another. While a bright-line rule would no doubt be easier to apply, fealty to the statute's focus requires a more nuanced approach.") (quoting *Sedima*, 473 U.S. at 498-99).

Citigroup's argument ultimately asks the Court to doubt the complaint's central allegation: that the fraud was directed from New York rather than merely executed in Mexico. Though Citigroup may not fathom how anyone could believe that, at this stage that allegation is taken as true. Because both the racketeering activity and the harm that flowed from it are alleged to have occurred in substantial part in New York, the domestic injury requirement is satisfied on the pleadings. *See Otto Candies,* 137 F.4th at 1182 ("In short, Citigroup fights the factual allegations of the complaint. But its efforts to litigate the nuances of the agency relationship between itself and Banamex are better suited for summary judgment than a motion to dismiss. Aside from the statements of its own employees and agents, the actions of Mexican authorities bolster the plaintiffs' allegations that Citigroup knew about the fraud. The Mexican government found that Citigroup employees were criminally responsible for 'extending loans they know recipients cannot repay' and 'knowing participation in the fraudulent scheme.' Arrest warrants were issued for three Citigroup ICG employees. . . . [T]he Mexican authorities' conclusions make it less plausible that Citigroup employees or agents were in fact unaware of the alleged

scheme. What's more, the discrepancies between the cash-advance values and the underlying Pemex contracts render it plausible that Citigroup knew of the fraud. . . . Citigroup is one of the world's most sophisticated financial institutions, and it strains credulity to conclude that, assuming the plaintiffs' allegations are true, Citigroup lacked awareness of OSA's activities.").

Fourth, Citigroup impliedly makes the straw man argument that the Plaintiffs' position may be said to have no stopping point. If a New York headquarters, a New York-law instrument, and wires through American correspondent banks suffice, then every transnational fraud that touches a global American bank becomes a domestic RICO case. *Bascuñán* warned against that result. 874 F.3d at 819. *Percival* warned against it again. 99 F.4th at 702-03. Fair point.

But Citigroup's view of the case is unduly narrow and inconsistent with the standard of review that governs on a motion to dismiss. The *Bascuñán–Percival* limit is aimed at a *defendant's* unilateral routing of foreign property through domestic accounts, where, as the Second Circuit put it, "the only domestic connections alleged here were acts of the defendant." *Bascuñán*, 874 F.3d at 819. *That is not this complaint*. Here the *Plaintiffs'* relationship to the United States existed before any racketeering act occurred or was discovered: the 2008 bonds were issued into the United States market, under United States securities law, with a United States trustee, before a single fraudulent work estimate was approved. The domestic connection is not something Citigroup's wires created; it is something Citigroup's alleged fraud impaired.

If Citigroup was simply an after-the-fact player facilitating a wire transfer for an international transaction, then a RICO injury would not follow. But what ultimately carries this TAC past the pleadings at least for the non-U.S. based plaintiffs is the conjunction of three things: a United States-law property interest that existed independent of the fraud, a domestic enterprise alleged to have managed the scheme that impaired it, and injurious aims that reached United States capital markets and United States market participants. The Supreme Court's nuanced test for the "context-specific inquiry" required to find a domestic RICO injury has been squarely satisfied.

### ***C. Each Set of Plaintiffs Have Plausible RICO Injuries***

The domestic injury inquiry is individual, not collective. The Court addresses each plaintiff group in turn.

Otto Candies, LLC is a Louisiana company whose injury is to the business of a United States entity arising from representations made, in part, by Citigroup's own ICG executives. The domestic injury requirement is easily satisfied. It is alleging that the racketeering acts, the injuries, *and* their ultimate damages all touch U.S. soil. It is not persuasive to argue in this instance how a domestic injury could not be satisfied simply because the fraudulent scheme was hatched in Mexico and revolved around a defunct Mexican entity. Otto is not suing that entity; it is suing Citigroup. Its domestic injury as against Citigroup is crystal clear.

The investment manager plaintiffs (HBK Investments L.P., ICE Canyon LLC, and Waypoint Asset Management LLC) are United States domiciliaries who sue as assignees of the direct civil RICO injury claims of the bondholder funds they

managed. A valid assignee steps into the shoes of the assignor and asserts the assignor's direct injury as its own. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 290 (2008); *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008). A pre-suit assignment of RICO claims does not divest the assignee of Article III standing; any real-party-in-interest concern is curable under Rule 17(a)(3). *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386-88 (2d Cir. 2021); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) (valid assignment confers Article III standing on the assignee). And Citigroup's reliance to the contrary based on *Medical Marijuana, Inc. v. Horn* itself mischaracterizes the theory of recovery. The investment manager plaintiffs do not allege only derivative losses, like just lost management fees or reputational harm, flowing from clients' injuries. They also allege the assigned direct injury. *Medical Marijuana*'s proximate cause analysis does not apply at least at this stage.

Citigroup's supporting authority is not to the contrary. *Alix v. McKinsey & Co.*, 739 F. Supp. 3d 172 (S.D.N.Y. 2024), and *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411 (2d Cir. 2015), hold that an assignee must plead a proprietary interest in the assigned claim, not a bare authorization to sue, and that where the assignment instrument does not in fact transfer the RICO claim, the assignee never acquires standing. But those cases were resolved on a developed record showing the assignment did not reach the claim asserted. Here, at the Rule 12(b)(6) stage, the Court accepts as true the TAC's allegation that the bondholder funds *directly* assigned their civil RICO injury claims to the investment manager plaintiffs. The Court holds only that this well-pleaded direct-assignment allegation

is sufficient at the pleading stage. Whether the operative assignment instruments in fact transferred the RICO claims, a question on which *Alix* and *Cortlandt* turned, is reserved for resolution on a developed record. For now the assignment allegations in the TAC are legally sufficient at the pleading stage.

The 2008 Bond Plaintiffs, whose property interests were in instruments issued in the United States under Rule 144A, governed by New York law, with Citibank N.A. as trustee, have also adequately alleged a domestic injury. The nature of the injured property right is inherently domestic for the reasons set forth in detail above. The Court reserves any further individualized determination regarding certain foreign bondholder funds for proceedings following discovery.

Rabobank presents the weakest case in this lineup. Its loans were extended by a Dutch bank, denominated in Euros, to a Mexican borrower, for operations conducted exclusively in Mexico, and its principal relationship with OSA ran through its Mexican operations. [D.E. 187 ¶ 47]. Strip away the bond instruments and the United States-law property interest that comes with them, and what remains as to Rabobank resembles *Percival*: a foreign lender, foreign-currency credit, a foreign borrower, and American financial infrastructure appearing in the case because the defendant used it. The TAC's domestic allegations as to Rabobank are correspondingly thinner: direct misrepresentations communicated through Citigroup's United States operations, and payments that were to be made "in the Rabobank Trust in U.S. dollars to a U.S. financial institution" but never were. [D.E. 187 ¶ 1829]. Standing alone, those dollar-denominated payment channels may not suffice. *See Bascuñán*. 874 F.3d at 819.

Yet, what should keep Rabobank in the case at this stage is the allegation that a United States-based enterprise made direct misrepresentations on which Rabobank relied in restructuring its loans, entering the trust agreements, and forbearing from enforcement when OSA missed payments. That allegation must be credited for now. It will have to be proved later and, if so, may be enough. The Court's recommendation as to Rabobank should not be read as anything more than a pleading-stage judgment, and Citigroup is free to renew the question on a developed record.[4]

### *C. __Nordic Trustee AS's Standing To Sue__*

Citigroup separately argues that Nordic Trustee AS lacks standing to sue on behalf of the 2013 bondholders, not just on domestic injury grounds, but also on the broader claim that, as a matter of law, the bond trustee of the $160 million bond issued by an OSA affiliate cannot sue on their behalf for these types of damages. The Court will defer ruling on that issue through this Report and Recommendation and, instead, address that issue separately in connection with Citigroup's stand-alone motion to dismiss Nordic Trustee's claims. [D.E. 350].

## *IV. CONCLUSION*

Congress enacted RICO and its private enforcement mechanism because ordinary civil remedies were inadequate against enterprises willing to commit sustained, patterned racketeering. The private civil action exists precisely for cases

---

4 On this score, we can envision that after a full analysis of the record evidence in the case one or more subset of plaintiffs may ultimately fail to support their burden of showing domestic injury. We are viewing the TAC in the light most favorable to each group of Plaintiffs and erring on their side for now. When all the evidence is in, perhaps the Court's findings on the pleadings will need to be revisited. But for the bulk of the Plaintiffs, the domestic injury analysis is amply supported.

where a sophisticated institution with deep resources allegedly facilitates a massive fraud, profits from it, emerges financially whole, and leaves counterparties that relied on that institution's representations with multi-million dollar losses. Whether plaintiffs will ultimately prove what they allege is for another day. But they have adequately alleged that their injuries arose here, grounded in the United States through in its capital markets, its financial institutions, and its law. That is enough to proceed.

Accordingly we recommend that, at the Rule 12(b)(6) stage, these categories of plaintiff have adequately alleged a domestic injury under *Yegiazaryan's* context-specific standard: those domiciled in the United States; those holding rights in United States-law bond instruments issued into this market through a United States trustee; those suing as assignees of directly assigned RICO injury claims other than Nordic Trustee AS that will be addressed separately; and those alleging reliance on misrepresentations made from Citigroup's United States operations in transactions that reached into this country. Defendant's motion to dismiss on domestic injury grounds should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1; *see, e.g.,*

*Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers, Miami, Florida, this 31st day of August, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge